UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20772-GAYLES/LOUIS

DENNIS ANEIROS

       Plaintiff,

vs.

VIORMAR TRADING CORPORATION, N.V.,
AND ORLANDO A. FERNANDEZ,

       Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, VIORMAR TRADING CORPORATION, N.V., ("VIORMAR TRADING") and ORLANDO A. FERNANDEZ (collectively "Defendants"), by and through its undersigned counsel, hereby files its Motion for Summary Judgment against Plaintiff, Dennis Aneiros ("Mr. Aneiros" or "Plaintiff"), and as grounds states:

### UNDISPUTED FACTS

1.      On or about 2010, Orlando Fernandez's father discovered Mr. Aneiros on VIORMAR TRADING's property (the "Property"). Mr. Aneiros was living out of his car at the time. *See* **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 11:1-5, and **Exhibit "B"** Orlando Fernandez's Affidavit.

2.      As an act of charity, Orlando Fernandez's father allowed Mr. Aneiros to sleep in one of the vacant offices on the Property. *See* **Exhibit "B"** Orlando Fernandez's Affidavit.

3.     Mr. Aneiros alleges that he was working for Defendants since approximately 2010. *See* Paragraph 18 of Mr. Aneiros' Second Amended Complaint.

4.     Mr. Aneiros alleges that he had never been paid for the alleged work he performed on behalf of Defendants. Mr. Aneiros alleges that Defendants allowed him to reside in an office of one of their commercial properties in lieu of payment. *See* Mr. Aneiros' Second Amended Complaint, Paragraph 20.

5.     Mr. Aneiros alleges that after the passing of Orlando Fernandez's father, Orlando Fernandez continued with the scheme his father created, to allow Mr. Aneiros to reside in the property in lieu of payment. *See* Mr. Aneiros' Second Amended Complaint, Paragraph 48.

6.     Mr. Aneiros alleges that he performed various job duties including but not limited to: cleaning, repairing, renovating, collecting, renting for its commercial property rentals, and demolition. *See* Paragraphs 17 and 50 of Mr. Aneiros' Second Amended Complaint.

7.     Mr. Aneiros' Second Amended Complaint alleges that "To the extent that records exist regarding the exact dates of Plaintiff's employment, such records are believed to be in the exclusive custody of Defendants." *See* Paragraph 19 of Mr. Aneiros' Second Amended Complaint.

8.     Defendants do not have any employment file on Mr. Aneiros because he was never an employee.

9.     The record clearly establishes that at best Mr. Aneiros was an independent contractor and at worst, a disgruntled tenant.

10.     Mr. Aneiros' Amended Complaint does not state what VIORMAR TRADING's business purpose was or how his work was integral to the interest of Defendants business.

11.     Mr. Aneiros' Amended Complaint does not allege that Defendants provided him with the tools or materials necessary to carry out Defendants business interests.

12.     The record does not show that Defendants provided Mr. Aneiro's with the tools or materials necessary to carry out Defendants business interests. In fact, Mr. Aneiro's deposition testimony shows the exact opposite. *See* **Exhibit "A"** Depo. Transcript of Mr. Aneiros, 94:24-25; 95:1-15**.** (Mr. Aneiros was required to obtain his own postage for his alleged mailing duties).

13.     Mr. Aneiros' Amended Complint does not allege that Mr. Aneiros was precluded from performing services for others. In fact, Mr. Aneiros' deposition testimony shows that he often performed work for others and for himself. *See* **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 28:14-25; 29:1-11; 31:15-22.

14.     Mr. Aneiros' Amended Complaint does not allege that Mr. Aneiros was provided a fixed work schedule. Instead, Mr. Aneiros' deposition testimony shows that he was never provided a work schedule by the Defendants. *See* **Exhibit "A"** Mr. Aneiros' Deposition Transcript 25:20-25.

15.     Additionally, the record clearly refutes that the Defendants are liable under either individual or enterprise coverage pursuant to the FLSA. See Paragraph 13 of Mr. Aneiros' Second Amended Complaint alleging that Defendants earn more than the $500,000.00 threshold necessary to bring an FLSA claim, and See Defendants Response to Plaintiff's First Request for Production, VIORMAR TRADING's Tax Returns attached hereto as **Exhibit "C"**.

16.     Plaintiff's Amended Complaint alleges that Defendants regularly employed more than two employes that handled goods that traveled through interstate commerce (an FLSA requirement), but Mr. Aneiros testified in his deposition that Defendants did not have any

employees during the relevant period. *See* **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 12:4-6.

17.     Mr. Aneiros claims to have collected rent on behalf of Viormar, but testified that he was collecting rent for Cristina Fernandez's company, who is not a party to this suit. See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 20:18-25, and 22:4-13.

18.     Mr. Aneiros claims to have performed intricate construction work, including work required for a building to be in compliance with Florida's mandated 40-year recertification, while not having the appropriate licenses to do said work. **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 26:15-25; 27:1; 42:18-25; 43:1.

19.     Mr. Aneiros testified that he was free to to work with any other company/person during his alleged employment with VIORMAR TRADING. See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 28:14-25; 29:1-11; 31:15-22.

20.     Mr. Aneiros claims to have been enslaved by Defendants, but simultaneously testifies that he viewed the Defendants as family and that he would care for them. See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 11:22-25, 51:23-25, 52:1.

21.     Mr. Aneiros testified that he was aware that Defendants are trying to sell the property, but refuses to leave unless the Defendants pay him for his alleged work. When asked "So you wouldn't say that's extortion?" Mr. Aneiros responded by saying "And they exploited my whole life.". See **Exhibit "A"** Mr. Aneiros Deposition Transcript 59:1-7.

<div align="center">

**SUMMARY JUDGMENT STANDARD**

</div>

On December 31, 2020, the Florida Supreme Court, on its own motion, issued an amendment to the summary judgment standard, effective May 1, 2021. The Court adopted the

summary judgment standard utilized by federal courts, which has been adopted by a majority of the state courts.

The "old standard", set forth in Florida Rule of Civil Procedure 1.510, required that the trial court grant summary judgment where the record showed "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The federal rule is similarly worded, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The "new standard" is identical to the standard for granting a directed verdict at trial such that "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, the greatest distinction between the old Florida standard and the recently adopted federal standard is that while Florida used to hold that the moving party must effectively disprove the non-moving party's case, the federal standard only requires the moving party to show that the nonmoving party lacks the evidence to support its claims. *See Cleotex Corp. v. Cartrett*, 477 U.S. 317, 325 (1986). Therefore, when the opposing party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," summary judgment is appropriate. Scott v. Harris, 550 U.S. 372, 380 (2007).

In the present case, the Plaintiff has made incendiary claims of violations of the Fair Labor Standards Act of 1938 (Count I), Florida Minimum Wage Action Violations (Count II), and slave trafficking in violation of the Trafficking Victims Protection Act (Coun III); three claims that are rarely brought in the same action. Following the deposition of Plaintiff and the discovery responses of Defendants, the record clearly establishes that the claims raised in Plaintiff's complaint cannot

be supported by evidence. As such, pursuant to *Cleotex Corp. v. Cartrett*, Defendants are entitled to summary judgment as a matter of law.

## SUMMARY OF ARGUMENT

With respect to the first two Counts in Plaintiff's Second Amended Complaint, FLSA Minimum Wage Violation and Florida Minimum Wage Action Violations, Defendants are entitled to summary judgment in their favor for two reasons: (i) Plaintiff cannot establish that he is an employee as defined by the FLSA, and (ii) Defendants are not liable under individual or enterprise coverage. When determining whether a laborer is an employee or independent contractor, the court uses the economic reality test. The economic reality test has six factors, and Plaintiff can only establish two. As the evidence will show, Plaintiff was not economically dependent upon the Defendants, he was not provided a work schedule, he had to use his own materials to complete aspects of his alleged job duties, and he had no prospect of profit or loss depending on his managerial skills.

However, even if this Court were to find that the Plaintiff was an employee according to the FLSA, Plaintiff still has to establish that the defendants are liable under individual coverage or enterprise coverage. The evidence shows that Defendants are not liable under individual coverage because they do not have employees who are working on goods or materials that travel through interstate commerce and they are not liable under enterprise coverage because they are not an entity that engages in interstate commerce, has two or more employees, or makes more than $500,000.00 annually.

With respect to the third Count in Plaintiff's Second Amended Complaint, Violation of the Trafficking Victims Protection Act, the evidence shows that Plaintiff was not lured into forced

labor. Nor was the Plaintiff restricted from leaving the property. In fact, the evidence shows the opposite. Plaintiff was free to work with whomever he desired, Plaintiff often stated that he had a familial relationship with Defendants and was grateful for them. Additionally, the evidence shows that the Defendants did not abuse the legal process by threatening eviction. In reality, Plaintiff was fully aware that Defendants intended to sell the property. Plaintiff even knew how much the property was worth and stated that he would leave if the Plaintiff's agreed to pay him some of the sale proceeds. For these reasons, Defendants are entitled to summary judgment on all counts.

<div align="center">**ARGUMENT**</div>

**I.      Defendants Cannot Be Held Liable Under the Fair Labor Standards Act Because Mr. Aneiros is Not an Employee ("FLSA").**

      **a.  The purpose and intent of the FLSA.**

The purposes of the FLSA are undeniably noble and just. It was designed to prevent the unseemly conditions that employees often found themselves in during the Great Depression. Congress, recognizing the unequal bargaining power between workers and employers, enacted the FLSA to prevent contracts that would endanger the flow of goods traversing through interstate commerce and ensure that the basic rights of workers were protected.

**The Fair Labor Standards Act (FLSA) was enacted in 1938 for the prime purpose of aiding the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage. Congress enacted the FLSA in recognition of the fact that, due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum**

**hours were provided, and the policy considerations underlying those standards forbid waiver of those basic standards.**

*Walthour v. Chipio Windshield Repair*, LLC, 745 F.3d 1326, 1327 (11th Cir. 2014).

### b. The scope of liability under the FLSA.

Nevertheless, the scope of the FLSA is a limited. In order to bring a claim under the FLSA, the laborer must establish that he is an employee rather than an independent contractor. *See Nieman v. Nat'l Claims Adjusters, Inc.*, 775 F. App'x 622, 623 (11th Cir. 2019). There are several factors to consider when determining whether a laborer is an independent contractor, but the most integral consideration is the degree of control an employer has over the laborer, "[T]he court found that there was sufficient evidence for the jury to find an employer-employee relationship, as defined under the Fair Labor Standards Act, based on the testimony about employer's control over employee's work schedule, tasks, tools, and review of timesheets." *Cornelius v. Rollins Ranches, Ltd. Liab. Co*., No. 22-12862, 2024 U.S. App. LEXIS 6268, at *1 (11th Cir. Mar. 15, 2024). Seeing that this action was brought by Mr. Aneiro's, examining his testimony about Defendants' control is a natural starting point.

### c. How an independent contractor can be distinguished from an employee.

To determine if an individual is an employee, courts look at the "economic reality" of all the circumstances surrounding the activity. This has been referred to as the "economic reality" test. The touchstone of the economic reality test is the alleged employee's economic dependence on the employer. The final and determinative question must be whether the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit. *Freeman v. Key Largo Volunteer Fire & Rescue Dep't., Inc*., 494 F. App'x 940, 941 (11th Cir. 2012).

### d.  The six factors of the economic reality test

The 11th Circuit identifies several factors that guide the economic reality inquiry in determining if an individual is a contractor, namely: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. While those factors are important, the overarching focus of the inquiry is economic dependence, or in other words, whether the individual is in business for himself or is dependent upon finding employment in the business of others. *Nieman v. Nat'l Claims Adjusters, Inc*., 775 F. App'x 622, 623 (11th Cir. 2019).

## II.    Mr. Aneiros Is An Independent Contractor Under The Economic Reality Test.

### a.  Test #1 - Degree of Control

The Nieman Court found that the Plaintiff in its case was indeed an independent contractor rather than an employer, and the analysis supporting this ruling should be used by this Court. Now, for the ease of the Court's review and comparison, Defendant will intertwine the facts of the present case with the bolded, block quote below just so the Court can quickly identify the similarities between the two cases. Before delving into the findings, it is important to note that the economics realities test only requires a simple majority for a finding on whether or not a laborer is an independent contractor.

**Construing the allegations in the complaint in the light most favorable to Nieman, the district court did not err in dismissing Nieman's complaint on the ground that Nieman was an independent contractor, rather than an employee. Using the six factors to guide the economic reality inquiry, the first, third, fourth, and fifth factors favor independent contractor status while the second and sixth factors do not weigh in favor of either. The first factor—control—weighs in favor of independent contractor status because Nieman controlled when he started work for National and for how long, how many assignments he took from National, and when he received those assignments. In other words, he controlled his schedule. He admitted in his complaint that after he began receiving assignments from Brown, he set up his own appointments and inspections. He also controlled the geographic location within which he took assignments. Although he alleged that National controlled the software that he used, the methods by which he completed his reports, and in some ways, how he performed the job, he ultimately controlled how and when he completed the assignments and whether he would take on more or less of them, showing that he was essentially "in business for himself." *See Scantland*, 721 F.3d at 1312.**

With respect to the first consideration under the economics realities test, control, much like Nieman, Mr. Aneiros also did not have a set schedule. Or, at the very least, he controlled his own schedule as indicated by his deposition testimony.

**Q: Okay. How many hours would you say that you work a week for Viormar on average?**

A: It would be a night. Imagine how many hours.

**Q: Were you ever provided a schedule from Viormar?**

A: No.

See **Exhibit "A"** Mr. Aneiros Deposition Transcript 25:20-25

**Q: As part of the job duties that you were performing for Viormar or for Orlando Fernandez, were you regularly sending or receiving mail for the company?**

A: Correct.

**Q: How often would you send mail for Viormar or for Orlando?**

A: Every 15 days, something like that. The letters would accumulate. They would accumulate. He would send everything with the stickers, Denny and Orlando, and then he would buy the postage and send it to me. And then he told me he'd' have – I'd have to pay for my own electricity, that I'd have to buy my own postage. And then – postage and envelopes. And I didn't have the funds to buy the postage and the envelope, so they would delay it a little bit.

See **Exhibit "A"** Depo. Transcript of Mr. Aneiros, **94:24-25; 95:1-15.**

Another instance showing Defendants lack of control over Mr. Aneiros is his ability to work for others and himself whenever he desired. This shows that Mr. Aneiros had no economic dependency on Defendant VIORMAR.

**Q: Okay. When you were discussing working with Orlando, did you ever negotiate payment?**

A: Yes.

**Q: Okay. What did those negotiations look like?**

A: I said that I needed money because I had to pay for electricity. I need to eat. And he said that I was free to go and work outside, and that I could go repair a car or do whatever it was that I needed to survive, that I only had the logding or the roof to live under.

**Q: So look -- just for my own clarification purposes: Orlando allowed you to work any odd jobs that you needed to get paid otherwise?**

A: Yes.

**Q: Okay.**

A: I would go -- I -- I would do it, but then I would get home and -- and I was tired at night. Well, I had a lot of work. By the time I got back from doing whatever job I was doing, like washing dishes or whatever, I was exhausted.

**Q: But you didn't -- but did you have a set time schedule while working at Viormar?**

A: No.

See **Exhibit "A"** Mr. Aneiros Deposition Transcript, **28:14-25; 29:1-11**

It is abundantly clear that the first factor, control, under the economic reality test favors that Mr. Aneiros is an independent contractor rather than an employee because he had no economic dependency upon Defendants and he had no set schedule. In fact, his degree of independence far exceeded that of the Plaintiff in Neiman because Defendants didn't even provide him with the postage to send mail. Therefore, the first test of control shows that Mr. Aneiros is an independent contractor.

**b.  Test #2 - Profit or loss depending upon managerial skill.**

The second factor of profit or loss depending upon managerial skill also seems to indicate that Mr. Aneiros is an independent contractor. Much like the case before the Neiman Court, Defendant's Amended Complaint is rather light on allegations of managerial skill.

> **As to the second factor—the employee's opportunity for profit or loss depending on his managerial skill—and the sixth factor—the extent to which the service rendered is an integral part of the alleged employer's business—Neiman did not state many facts in his complaint that would support his claim for employee status.**

Plaintiff's Amended Complaint alleges that Mr. Aneiros performed various job duties, such as: cleaning, repairing, renovating, collecting, and renting for its commercial property rentals. See Paragraph 17 of Plaintiff's Amended Complaint. As such, there is simply not enough information to determine whether Mr. Aneiros had an opportunity for profit or loss based on his managerial skills. However, in Mr. Aneiros deposition, he does make the claim that he has a letter establishing him as property manager. The March 1, 2017 letter which labels Mr. Aneiro's as "assistant property manager" is attached hereto as **Exhibit "D"**. It should be noted that this letter is on behalf of a company named Corina, which is not a party to this suit. Furthermore, if the Plaintiff wishes to argue that he was an assistant property manager, which his testimony seems to suggest, he would

be exempt under the FLSA. "The administrative and executive exemptions provide that the FLSA's requirements shall not apply with respect to any employee employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C.S. § 213(a)(1)." *Gonzalez v. Batmasian*, 734 F. App'x 677, 678 (11th Cir. 2018). Therefore, Mr. Aneiros cannot satisfy the second prong of the economic reality test.

### c.  Test #3 - Employee's investment in equipment and materials for the work.

The third test is whether the laborer had invested in the equipment and materials that were necessary for the work. As this Court knows, contractors (generally construction related contractors) use their own tools to complete the job. Here, we have already seen that one of Mr. Aneiro's claimed duties (mailing) required him to use his own postage. The Neiman Court notes that most if not all of the work performed by the Plaintiff, was done with his own materials.

> **The third factor—alleged employee's investment in equipment and materials for the work—weighs in favor  of independent contractor status. Nieman had his own home office, a laptop, and iPad for field work and was equipped with a vehicle, ladder, measuring tools, digital voice and photographic equipment, and "other similar tools of the trade." It appears that the only "tool" that National provided was the Xactimate software, and even then, it is not clear whether Nieman had this software before he began work for National, or whether National paid for and provided it to him.**

However, mailing isn't the only job duty that Mr. Aneiros has claimed to perform. Mr. Aneiros also claims to have done extensive construction work, even making renovations to comply with Florida's 40 year recertification requirements.

> **Q: Okay. And what exactly did they order you to do?**
> A: Paint, repair walls, debris removal, the paint of the structure. There was termites, and so the restructuring of the wood. There was a lot of wood in that building. And I've done that throughout the years, many years.

**Q: Okay. Do you have any professional licenses?**
A: Me? A professional license?

**Q: Yeah. Like, do you have any contractor's license that allows you to do construction work?**
A: No. I'm a genius.

See **Exhibit "A"** Mr. Aneiro's Deposition Transcript, 26:15-25; 27:1
**Q: How -- how big is that second property that he's now in the process of remodeling?**
A: 4,400 feet.

**Q: Okay.**
A: But aside from that, theres a problem. That property needs structural repair.

**Q: Okay.**
A: And that man made me remove the cracks that were on the walls to pass the 40 year inspection.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 42:18-25; 43:1

Now, Mr. Aneiros claims that he was provided the tools to perform this work, but there hasn't been any documentation produced in discovery to suggest that this has occurred. But even if it did in the state of Florida, a construction contractor must either have a license issued by the relevant state department, or, conduct the work under the license of another contractor. In fact, it is a felony to perform work without the proper certification and any work that is performed without the required license cannot be compensated. *See* Fla. Stat. § 489.117.

Therefore, even if Mr. Aneiros did perform this work and even if Defendant VIORMAR provided him with the tools to perform this work (which they did not), Mr. Aneiros cannot seek recovery based upon this construction work by circumventing the statute via an FLSA claim. It should be noted that test number 6 asks whether the work performed was integral to the employer's business and Defendants are not in the business of construction. Therefore, Mr. Aneiros has not

met the third test of being provided the tools necessary to complete his work. For this reason, test three also establishes Mr. Aneiros as an independent contractor.

### d. Test #4 - Special Skill

Similar to the preceding test, the question of whether or not a job requires a special skill helps the finder of fact to determine whether or not an individual is acting in the capacity of an independent contractor. Most construction companies that are hired to do 40-year recertification work on buildings are independent contractors. Construction firms that are hired to ensure commercial facilities are ADA Compliant, or firms that handle the plumbing or electric linings of buildings are also typically independent contractors. They are individuals who are hired to perform a specialized job. Here, as shown above, all of the construction work or "demolition" work as alleged in Paragraph 40 of the Plaintiff's Amended Complaint, require licensure.

Therefore, at least with respect to construction work Plaintiff alleges to have performed, he is an independent contractor. This also highlights the conspicuously convenient nature of Plaintiff's pleading. Plaintiff alleges that he provided cleaning, repairing, renovating, collecting, and renting services for Defendants. In his deposition, he also claims to have provided security and bodyguard services. There is absolute no semblance of continuity with respect to Plaintiff's job role. If Defendants show that he is an independent contractor for jobs "A" through "C", Plaintiff will simply argue that he was an employee for "D" through "E". Under the law, that is a completely viable position. However, Plaintiff has produced zero evidence to support the contention that he was an employee for any of the claimed work he alleges to have performed.

### e. Test #5 - Degree of permanency and duration

The 5th test is arguably Plaintiff's strongest position. However, it's strength is still mired by the facts of the case. Mr. Aneiros claims to have worked at Viormar since 2010 or 2011. The reality is that Mr. Aneiros has simply been squatting on the property since 2010 or 2011.

**The fifth factor—the degree of permanency and duration of the working relationship— weighs in favor of independent contractor status because Nieman alleged that National engaged him to handle claims arising from Hurricane Irma and acknowledged that he was hired for a "special project."**

Mr. Aneiros himself does not refute that he has been residing on the property. The only dispute is whether Mr. Aneiros has been employed since 2010 or 2011. Now, it is important to note that the fifth factor questions not only the duration, but the degree of permanency. Mr. Aneiros testimony clearly shows that he has performed various jobs for himself and others during this time period.

> **Q: Can you tell me, what are some of the side jobs you would do while you were at Viormar?**
>
> A: Dishwashing, fixing of a door. I have a – I have a friend who's like – it – it would break down, something in his house, and I'd go fix it. So Ricky, the guy from across the street, he had a factory that made fishing rods. But he was older, so he would call me in to help him.
>
> **Q: Can – can you tell me Ricky's full name?**
>
> A: His name is Riano.
>
> See **Exhibit "A"** Mr. Aneiros Deposition Transcript, 29:14-23.

The record shows that Mr. Aneiros has conducted himself as an independent contractor. Nevertheless, as shown by the Neiman Court, even if the degree of permanency requirement is in Mr. Aneiros favor, he must have a majority of such requirements to be found as an employee.

 **f.   Test #6 - Was the work an integral part of the business**

The Neiman Court combines the 6th test with an all encompassing economic overview. The Court noted that Neiman did not state many facts in his complaint that showed the work he performed was an integral part of the Defendant's business. Mr. Aneiro's Complaint suffers the same fatal flaw.

> **Further, looking to the overall economic reality of the parties' working relationship, it is also significant that Nieman completed work for another company after he responded to National's initial advertisement and looked for and interviewed for other jobs while he was still engaged with National, which shows that he was not economically dependent on National. As to the second factor—the employee's opportunity for profit or loss depending on his managerial skill—and the sixth factor—the extent to which the service rendered is an integral part of the alleged employer's business—Neiman did not state many facts in his complaint that would support his claim for employee status. Therefore, when all the factors are viewed in the light most favorable to Nieman, four of the six factors weigh strongly in favor of independent contractor status. Thus, Nieman was an independent contractor, not an employee, under the FLSA, and to the extent that he argues that National committed tax fraud for falsely representing to the IRS that he was an independent contractor, that argument fails for the same reason. Accordingly, the district court correctly dismissed his federal claims.**

**Nieman v. Nat'l Claims Adjusters, Inc., 775 F. App'x 622, 624-25 (11th Cir. 2019)**

The Complaint completely fails to state the business in which the Defendants are engaged in. As such, there is almost no way to determine whether or not cleaning, repairing, renovating, collecting, is an integral part of the Defendants business. With that being said, Defendant hasn't been an active business for over a decade now and has only leased part of its property to a single tenant. Defendant concedes that the job duties listed above can certainly be interpreted as integral to it's business. However, the documents produced in discovery and the testimony provided in Plaintiff's deposition do not show that those job duties were done in an employment capacity rather than in the capacity as an independent contractor.

Now, the Court may be tempted to identify that as a genuine dispute of material fact. However, Defendant wishes to remind the Court that the economic reality test is simply a tool used to determine whether a laborer is closer to an employee or an independent contractor. If the factors are evenly split (3-3), then a genuine dispute of material fact exists. Thus far, Mr. Aneiros has only met two out of the six factors to establish employment. Neiman also only met two out of the six factors and the Court found that he was an independent contractor. Therefore, the Court should do the same here.

### g. Brief Summary of Mr. Aneiros' Status as an Independent Contractor

It is abundantly clear that Defendants did not maintain sufficient control over Mr. Aneiros for the Court to find that they were his employer. Mr. Aneiros did not have a set schedule and by his own admission he worked for others while allegedly being employed by Defendant VIORMAR. Mr. Aneiros claims to have provided construction work that requires special licenses that he does not have. Mr. Aneiros claims to have collected rent on behalf of Defendants, but the only evidence he has substantiating this claim is a letter that is for a company that is not a party to this suit. Therefore, Mr. Aneiros cannot establish the economic dependency which is typically shown by employees. For these reasons, this Court should find that Mr. Aneiros is an independent contractor.

### III.   Mr. Aneiros Cannot Establish Individual or Enterprise Coverage Under the FLSA

Although it is sufficient for Defendants to win on summary judgment by showing that Mr. Aneiros is an independent contractor rather than an employee, Mr. Aneiros must also show that Defendants are liable under the theories of individual coverage or enterprise coverage. In other

words, even if the Court finds that Mr. Aneiros is an employee, if individual or enterprise coverage does not apply, Defendants are entitled to summary judgment in their favor as a matter of law.

Employees are covered under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., in one of two instances: individual coverage or enterprise coverage. Individual coverage lies where the employee is engaged in commerce or the production of goods for commerce. 29 U.S.C.S. § 207(a)(1). Enterprise coverage lies where the employee works for an enterprise engaged in commerce or in the production of goods for commerce. § 207(a)(1). *Josendis v. Wall to Wall Residence Repairs, Inc*., 606 F. Supp. 2d 1376, 1378 (S.D. Fla. 2009).

In the context of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., an "enterprise engaged in commerce or in the production of goods for commerce" is defined, in part, as an enterprise that: (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $ 500,000 (exclusive of excise taxes at the retail level that are separately stated); or (B) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution. 29 U.S.C.S. § 203(s)(1). *Id*.

Mr. Aneiros has testified that he has not worked on any goods or materials that have traveled through interstate commerce. Therefore, individual coverage is not applicable here.

**Q: Okay. And is there anything that you worked on, on behalf of Viormar, whether goods or materials, that traveled through interstate commerce?**

Mr. Alvarez: I can rephrase if it's –

The interpreter: Yeah.

Mr. Alvarez: – hard to translate.

The interpreter: Yeah.

**Q: Okay. Let me see. Is there anything in your job duties that required to work on things that traveled out of the state of Florida?**

Mr. Larou: Form.

The Witness: No.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 12:9-21.

With respect to enterprise coverage, Defendants also are not a company that engages in goods or materials that travel through interstate commerce, nor do they have employees that work on goods or materials that travel through interstate commerce, and they do not have an annual gross volume of sales that exceed $500,000.00. See **Exhibit "C"** Defendants Tax Returns and **Exhibit "B"** Affidavit of Orlando A. Fernandez. Moreover, enterprise coverage also requires the employment of two or more employees that are engaged in interstate commerce and Mr. Aneiros has testified in his deposition that the Defendants did not have two or more employees during the relevant period.

**Q: Okay. And did Viormar have any other employees from 2010 to 2024?**

A: No.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 12:4-6.

It is Defendants' understanding that Plaintiff is arguing that the leasing of property and the sending or receiving of mail is engagement in interstate commerce. However, the FLSA only considers "the actual movement of persons or things in interstate commerce."

Under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., to be engaged in interstate commerce, an employee must be directly participating in the actual movement of persons or things in interstate commerce. This includes employees of the transportation or communications industries or any employee who regularly uses "interstate telephone, telegraph, mails, or travel.

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 606 F. Supp. 2d 1376, 1378 (S.D. Fla. 2009)

Now, Mr. Aneiros claims to have sent and received mail on behalf of Viormar. However, there is no evidence that any of this mail was sent to different states. Mr. Aneiros does claim that he sent mail to Curacao, a dutch Carribean island. However, this does not constitute interstate commerce as it is typically understood. "Interstate Commerce defined: The term "interstate commerce" means commerce between one state and another state. This includes all means of transportation and communication between one state and another state." *United States v. Klopf*, 423 F.3d 1228, 1238 n.6 (11th Cir. 2005). Therefore, Defendants cannot be found liable under the FLSA because Mr. Aneiros cannot be found as an employee and Defendant VIORMAR cannot be found as an employer.

**IV. Defendants Cannot Be Found Liable for Violating the Florida Minimum Wage Act Because Defendants Are not Plaintiff's Employer.**

The analysis in this section is the same analysis detailed in the FLSA section of this Motion. This is because Fla. Const. Art. X § 24 adopts the definitions of employer, employee, and wage from the federal Fair Labor Standards Act. *See* Fla. Const. Art. X § 24(b). Paragraph 27 of Plaintiff's Amended Complaint alleges that "Florida law provides a cause of action against each "employer" who violates the FMWA by failing to pay the minimum wages required by Florida law." If we look at the Florida Constitution itself it states, "It is intended that case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall

guide the construction of this amendment and any implementing statutes or regulations." Fla. Const. Art. X, § 24(f).

As such, the economics realities test and all the supporting case law cited in the FLSA portion of this Motion applies. It has already been conclusively established that Defendants cannot be held to be employers under the FLSA and Mr. Aneiros cannot be an employee as defined by the Act. For these reasons, Defendants' are entitled to summary judgment as to Count II of Plaintiff's Amended Complaint.

### V. Defendants Did Not Violate the Trafficking Victims Protection Act

#### a. The applicability of the TVPA

The third and final Count in Plaintiff's Amended Complaint is the most egregious and incendiary, the Violation of the Trafficking Victims Protection Act (the "TVPA"). The TVPA is typically used, and was intended to be used, to protect victims of sex trafficking, an allegation that is not present here. "The Trafficking Victims Protection Act permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture." 18 U.S.C.S. § 1595(a). However, Defendants acknowledge that the wording of the Act is broad and has been used in cases involving forced labor. The Act states:

> **(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—**
>
> **(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;**
>
> **(2) by means of serious harm or threats of serious harm to that person or another person;**

**(3) by means of the abuse or threatened abuse of law or legal process; or**

**(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).**

**(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).**

**(c) In this section:**

**(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.**

**(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.**

**(d) Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.**

18 USCS § 1589

The key allegation of violation of the TVPA is found in Paragraph 42 of Plaintiff's Amended Complaint, "In essence, Defendants subjected Plaintiff to involuntary servitude by threatening to remove him from the property where he resided if he did not continue to perform

free labor for them, despite Defendants' knowledge of Plaintiff's financial hardship." See Paragraph 42 of Plaintiff's Amended Complaint. It appears that Plaintiff's allegation is traveling under subsection (c)(1) of the TVPA, the "abuse or threatened abuse of legal process".

### b. Defendants have not abused the legal process

Aside from there being no evidence that Defendants threatened Mr. Aneiros' with eviction if he refused to perform free labor, the alleged misuse of legal process is not enough to find a violation of the TVPA. "Alleged misuse of the legal process is not enough to allege a violation of 18 USCS § 1589(3); to adequately allege a violation of this statute, the government must allege that a defendant misused the legal process to coerce another into providing labor." *United States v. Peterson*, 627 F. Supp. 2d 1359, 2008 U.S. Dist. LEXIS 78780 (M.D. Ga. 2008). Nevertheless, Mr. Aneiros concession that he is aware that Defendants are trying to sell the property presents a key question that this Court must consider. If the Plaintiff is acknowledging that Defendants have been trying to sell the property, do the facts not seem to indicate that Mr. Aneiros' is taking advantage of this development? After all, Mr. Aneiros did not file his claim until 14 years after he allegedly began working for Defendants, which is around the time that he learned of the Defendants desire to sell the property.

**Q: Okay. Did you know that Viormar is trying to sell the property?**

A: Me? I know that they're trying to sell the property, of course. I have brought people who want to buy it.

**Q: So you would find it beneficial for the property to be sold then?**

A: Of course. And that way, they could pay me my money and I could leave.

**Q: Okay.**

A: It's $6 million that that property is worth.

**Q: Okay.**

A: And he's going to spend it, just like he spent all of his father's money.

**Q: But you are aware that the property cannot be sold while you're residing in it?**

A: So give me a deposit and I'll leave.

**Q: So –**

A: Or an advance. I'll leave.

**Q: So you wouldn't say that's extortion?**

A: And they exploited me my whole life.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 58:12-25; 59:1-7

The Plaintiff has failed to produce a single shred of evidence that Defendants have threatened him with eviction in order to obtain free labor. If Defendants did threaten Mr. Aneiros with eviction (which they didn't) it is awfully convenient that he waits until the Defendants are attempting to sell the property to file his claim.

The reason why Defendants are trying to get Mr. Aneiros removed from the property is so that they can sell it. This is not a misuse of the legal process, it is why the process was created. However, it is a misuse of the legal process to file a frivolous claim for unpaid wages in an effort to extort an employer. Mr. Aneiro's seems to know the exact value of the property and now that he knows the Defendants intend to sell it, he decides to file a claim for unpaid wages 14 years late.

### c.   Mr. Aneiros was free to leave at any time.

Another key component of the TVPA is the inability to escape and Plaintiffs allege this in Paragraph 34 of their Amended Complaint, "Once Defendants lured Plaintiff into working for

them in exchange for living in an office, he could not escape; he had no other meaningful choice but to continue performing free labor for Defendants' benefit since 2010 out of fear that he would lose his home if he ceased working for them." See Paragraph 34 of Plaintiff's Amended Complaint.

The allegations raised in the Complaint do not coincide with the testimony of Plaintiff at his deposition. Plaintiff was free to work any where he wanted and did in fact do so.

**Q: Can you tell me, what are some of the side jobs you would do while you were at Viormar?**

A: Dishwashing, fixing of a door. I have a – I have a friend who's like – it – it would break down, something in his house, and I'd go fix it. So Ricky, the guy from across the street, he had a factory that made fishing rods. But he was older, so he would call me in to help him.

**Q: Can – can you tell me Ricky's full name?**

A: His name is Riano.

See **Exhibit "A"** Mr. Aneiros Deposition Transcript, 29:14-23.

### d. Mr. Aneiros was not lured into working for Defendants.

Additionally, there is no evidence that Plaintiff was "lured" into working for Defendants. The fact of the matter is that Defendants found Mr. Aneiros living out of his car and this is supported by Mr. Aneiros' own testimony.

**Q: Or so – or so my question is: Tell me how you met Orlando's father, if you could expand on that.**

A: I worked at Jessy Limo. That was next to the building. Sometimes I would repair a car. And since that building, Viormar was abandoned. Sometimes we would park a car underneath a tree. And so that's how, on one occasion, the father arrived and I met him.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 10:24-25; 11:1-5.

This is also corroborated by Orlando Fernandez's testimony as seen in his affidavit. See **Exhibit "B"** Orlando Fernandez's Affidavit. Orlando Fernandez's father as an act of charity allowed Mr. Aneiro's to sleep in one of the properties units so he wouldn't have to sleep in a car underneath a tree. In fact, Mr. Fernandez testifies that he had immense gratitude for this act of charity. Mr. Aneiros recalls an incident where he found a painting of Orlando's father in the trash and he states:

**Mr. Aneiros:** And I said no, that I would keep that, that I was not going to throw out the painting of the man who helped me out.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 51:2-4.

Mr. Aneiros was never lured into working for the Defendants. Mr. Aneiros was never an employee of the Defendants. The only predatory action before the Court today, is Mr. Aneiros' bold attempt at extortion.

**e.  Mr. Aneiros' testimony does not reflect his alleged enslavement.**

Aside from the fact that Mr. Aneiros was free to work for others and often did work for others, he appears to have conflicting reasons on why he could not vacate the property. None of his testimony suggest that he was forced to stay. He often states that he cannot leave because he has animals, or because the business would fail without him.

**Q: So your tie to this property is for the love of Orlando's father?**

A: I don't have anywhere to go. I don't have anywhere to go.

**Q: Okay.**

A: And it's not just me, it's me and my dogs.

**Q: Okay. So –**

A: I appreciate Orlando the father, but it's not only that I did it for love and family. I worked. And – and he said to me, I inherited you along with this building –

**Q: So –**

A: – Which means i'm an object.

**Q: Okay. So let me – let me get this straight. You first stated that you couldn't leave the property because the business would fail. Hold on. And now, you're saying that you can't leave the property because you don't have anywhere to go and you have dogs. So – so which is it?**

A: They're both related.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 66:19-25; 67:1-13

It should also be noted that Mr. Aneiros  stated that when he met Orlando's father, he considered him to be family. There is nothing in Mr. Aneiro's testimony that suggest that he was being held by Defendants against his own will.

**Q: Okay. Is that a similar relationship that you have with the defendants?**

A: Yes. So since I met his father, it became like family.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 11:22-25

Even if the Court chooses not to consider Mr. Aneiros' conflicting testimony, the only consideration needed to dispel the claims of slave trafficking is determining whether or not Mr. Aneiros was free to leave. The below cited case shows how important that distinction is with respect to the TVPA:

**Former church ministers' claims against church and corporate entity under Trafficking Victims Protection Act failed because record contained little evidence that church obtained their labor by means of serious harm, threats, or other improper**

**methods since, inter alia, they joined and voluntarily worked for church, they had innumerable opportunities to leave, and potential consequence of being declared "suppressive persons" and thus potentially losing contact with family, friends, or each other was not "serious harm" and warning of such consequence was not "threat."**

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 2012 U.S. App. LEXIS 15224 (9th Cir. 2012).

In the present case, there is no evidence that Mr. Aneiros began working due to a threat of serious harm or through improper threats. Rather, Mr. Aneiros testimony seems to indicate that he had a familial type of relationship with Defendants. It was not until the Defendants asked Mr. Aneiros to vacate the property in order to sell it, that Mr. Aneiros alleged that he would be evicted if he refused to work for free.

The second phrase to focus on in the *Headley* case is "innumerable opportunities to leave". As the Court has seen, Mr. Aneiros was free to work for anyone he pleased. Mr. Aneiros had the opportunity to seek gainful employment and did in fact work for others. If Mr. Aneiros does not have the means to acquire property through his own labor, that isn't a harm that was imposed by the Defendants. Mr. Aneiros could have worked various jobs and saved that money until he had enough to make a downpayment on a property, especially since he wasn't paying any rent for residing at Viormar.

**Q: Okay. And what was the true market value of the property?**

A: So at the current rate for a 4,400 square feet, that runs about $10 per square feet. And they should be paying around $5,000.

**Q: And that's monthly?**

A: Yes.

**Q: Okay. So would you agree that if they're paying – if they were to be paying $5,000 monthly, that would be $60,000 a year?**

A: Something like that.

**Q: Okay. And you're currently not paying any rent for where you're residing: is that right?**

A: No.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 45:3-16

Finally, it should be noted that Defendant Orlando Fernandez has been living in the city of Orlando for almost a decade now. See **Exhibit "A"** Mr. Aneiros Deposition Transcript, 54:3-6. It would be a rather difficult task to ensure that the person you are enslaving remains on the property, especially if one doesn't have any other employees or staff to ensure the slaves compliance. It is readily apparent that Mr. Aneiros had various opportunities to leave Viormar, he simply chose not to.

**VI. The Statute of Limitations Has Run On Count I and Count II of Plaintiff's Second Amended Complaint.**

An immediate issue on the face of Plaintiff's allegations is the time-frame in which these allegations are made. Plaintiff claims to have begun working for the Defendants on or about 2010. Defendant's Motion concerns the Plaintiff's Second Amended Complaint, but it will be useful to note that Plaintiff's initial Complaint was filed on February 28, 2024. In the original Complaint, Plaintiff brought a claim for the TVPA and violation of the minimum wage provisions of the FLSA. Plaintiff's Second Amended Complaint added a count for violation of the Florida minimum wage requirements of Fla. Const. Art. X, Section 24(a).

As noted previously, the Florida Constitution wholly adopts the interpretations and case law surrounding claims made under the FLSA. Pursuant to the Portal-To-Portal Pay Act, a claim for violation of the FLSA must be brought within two (2) years but if a willful violation is found,

the claim must be brought within three (3) years. However, it is important to note that the Portal-to-Portal Pay Act is only concerning unpaid overtime wages under the FLSA. For the recovery of regular unpaid wages, which is being alleged here, Fla. Stat. Section 95.11(5)(d) governs and states that an action for unpaid wages must be brought within two (2) years. Therefore, Mr. Aneiros was required to file suit by 2012 or the latest 2013.

## CONCLUSION

The first two counts of Plaintiff's Amended Complaint, Violation of the FLSA and the Florida Minimum Wage Act, fail as a matter of law because Plaintiff has failed to show that Defendant VIORMAR TRADING is an employer as defined by the Act or that Plaintiff is an employee as defined by the Act. Similarly, the final count, Violation of the Trafficking Victims Protection Act, also fails as a matter of law because Plaintiff's testimony clearly establishes that he did not begin working for Defendants under the threat of force and he was not restrained from leaving. It is readily apparent that Plaintiff's action is nothing more than an act of retaliation due to Defendants' intent to sell the property. For these reasons, Defendants are entitled to summary judgment in their favor as to all counts.

Respectfully Submitted,

**WHITE & TWOMBLY, P.A.**
*Counsel for Defendants*
9999 NE 2nd Avenue, Suite 306
Miami Shores, Florida 33138
Telephone: (786) 502-2038
robert@whitetwombly.com
David@whitetwombly.com
paralegalryt@whitetwombly.com

*/s/ Robert Twombly*
Robert Twombly, Esquire
FBN: 0060127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the following was electronically filed with the Clerk of the Court via CM/ECF on December 20, 2024. I also certify that the foregoing was served to opposing counsel: Brian H. Pollock, brian@fairlawattorney.com

*/s/ Robert Twombly*
Robert Twombly, Esquire
FBN: 0060127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

# EXHIBIT "A"

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3  DENNIS ANEIROS,

4            Plaintiff,

5       vs.              CASE NO. 1:24-CV-20772-GAYLES/LOUIS

6  VIORMAR TRADING CORPORATION, N.V.,
   AND ORLANDO A. FERNANDEZ,
7
             Defendants.
8

9

10                     DEPOSITION OF

11                     DENNIS ANEIROS

12                 Monday, October 7, 2024

13                      10:00 a.m.

14

15             Offices of White & Twombly
           9999 Northeast 2nd Avenue, Suite 306
16                 Miami, Florida 33138

17

18

19

20

21

22

23              Dillon Poberezhsky
                Digital Reporter
24           Commission No. HH 324684

25



1               APPEARANCES OF COUNSEL

2    On behalf of DENNIS ANEIROS, Plaintiff:

3         PATRICK B. LAROU, ESQ.
          FAIRLAW FIRM
4         135 San Lorenzo Avenue
          Suite 770
5         Miami, Florida 33146
          305-686-2460
6         larou@fairlawattorney.com
          APPEARED IN PERSON

7

8    On behalf of VIORMAR TRADING CORPORATION
     AND ORLANDO A FERNANDEZ, Defendants:
9
          DAVID ALVAREZ, ESQ.
10        WHITE & TWOMBLY, P.A.
          9999 Northeast 2nd Avenue
11        Suite 306
          Miami, Florida 33138
12        786-502-2038
          david@whitetwombly.com
13        APPEARED IN PERSON

14

15   Also present:

16        Yenisbel Rodriguez, Spanish Interpreter

17

18

19

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATION

 2   EXAMINATION OF DENNIS ANEIROS                    PAGE

 3   Direct Examination by MR. ALVAREZ                   5

 4   Cross-Examination by MR. LAROU                     93

 5   Redirect Examination by MR. ALVAREZ              115

 6   CERTIFICATE OF REPORTER                          126

 7   CERTIFICATE OF TRANSCRIPTIONIST                  127

 8

 9

10                     INDEX TO EXHIBITS

11        DEFENDANT EXHIBITS FOR IDENTIFICATION:

12   NUMBER          DESCRIPTION                     PAGE

13   Exhibit 1       Sunbiz Listing for Ocean Mack's   35

14   Exhibit 2       Sunbiz Listing for Doc Motors     38

15   Exhibit 3       Plaintiff's Second Amended        74
                     Complaint
16

17
     (Original exhibits retained by counsel for Defendant.)
18

19

20

21

22

23

24

25
```



1          THE REPORTER:  We are now on the record; the

2     date is October 7th, 2024; the time is 10:00 a.m.,

3     Eastern Standard Time; to take the deposition of Dennis

4     Aneiros in the case of Dennis Aneiros v. Viormar

5     Trading Corporation, N.V., and Orlando A.  Fernandez.

6          My name is Dillon Poberezhsky, notary public

7     and digital reporter for Esquire Deposition Solutions

8     in the state of Florida.  I'll be capturing the

9     verbatim record of today's proceeding using electronic

10    audio equipment, a computer, and specialized recording

11    software, which is not a form of stenography.  I'll

12    begin by swearing in the interpreter, Yenisbel

13    Rodriguez, who has produced her Florida driver's

14    license as identification.

15                    YENISBEL RODRIGUEZ,

16    being called as an interpreter, was first sworn to

17    translate English to Spanish and Spanish to English the

18    testimony of the following witness:

19          THE REPORTER:  Thank you, Madam.

20          The witness, Dennis Aneiros, is located in

21    Miami, Florida and does not have a valid State-issued

22    ID, preventing me from administering the oath to them.

23    In lieu of my administering the oath to this witness, I

24    would ask all parties to stipulate that the witness has

25    identified themselves as David Aneiros, and the



1  witness' testimony will be treated as if given under

2  oath.

3          Counsel, can you please state your appearance,

4  and then verbalize your agreement to this stipulation.

5          MR. LAROU:  Yes.  Good morning.  This is

6  Patrick Brooks Larou on behalf of the plaintiff.  My

7  only correction is I -- I believe the plaintiff's name

8  is Dennis Aneiros.

9          THE REPORTER:  Oh, I --

10         THE INTERPRETER:  That is --

11         THE REPORTER:  I'm so sorry.  The witness has

12  identified themselves as Dennis Aneiros, and the

13  witness' testimony will be treated as if given under

14  oath.

15         Counsel, can you verbalize you're in agreement

16  for this stipulation?

17         MR. LAROU:  Counsel for plaintiff agrees.

18         THE REPORTER:  Thank you --

19         MR. ALVAREZ:  Same for defendant.

20         THE REPORTER:  Thanks.  Thank you.  Counsel,

21  you may begin.

22                   DIRECT EXAMINATION

23  BY MR. ALVAREZ:

24      Q.  Good morning, Dennis.  Thank you for coming in

25  today.



1       A.  Good morning.  Good morning.

2       Q.  Dennis, have you ever had your deposition

3  taken before?

4       A.  No.

5       Q.  Okay.  So before we get into the --

6       A.  When I went to the attorney's office?  No.

7           MR. ALVAREZ:  Well, no, I think it's -- he's

8  referencing the deposition of -- of my client.

9           THE WITNESS:  No.  This is the first time this

10 happens to me.

11 BY MR. ALVAREZ:

12      Q.  Okay.  So I'm going to go through a few ground

13 rules to explain how depositions essentially work.  And

14 after we get through that, we could start asking about

15 questions about the case.  All right.  So the way a

16 deposition works is, I'm going to ask you a series of

17 questions to get a better idea of your position on the

18 case.  It's not an interrogation.  There's no need to

19 feel anxious about what's happening.

20      A.  No.

21      Q.  If you ever feel that you need a break or you

22 need to use the bathroom, please let me know and I'd be

23 happy to let you do so.

24      A.  Okay.  Yes.  Thank you.

25      Q.  The only thing that I ask is that if there's a



1  question pending at that time, you answer that

2  question, and then we'll go take the break.

3       A.  Okay.

4       Q.  Now, is there any reason why you wouldn't be

5  able to testify truthfully today?

6       A.  No.

7       Q.  Okay.

8       A.  I always tell the truth.

9       Q.  Okay.  Are you under any prescription

10  medication that would prevent you from testifying

11  truthfully?

12       A.  No.

13       Q.  Are you on any illicit substances that would

14  keep you from testifying truthfully?

15       A.  No.  No, I don't do that.  I don't do any of

16  that.

17       Q.  All right.  Do you have any medical -- medical

18  conditions that would prevent you from testifying

19  truthfully?

20       A.  No.

21       Q.  Okay.  Perfect.  All right.  So Dennis, in

22  Paragraph 8 of your Complaint, you allege that the

23  defendants are your direct employers, joint employers,

24  and co-employers for the purposes of the -- for the

25  purposes of the FLSA.



1            THE INTERPRETER:  For the purpose of?

2            MR. ALVAREZ:  The FLSA, Fair Labor Standards

3   Act.

4            THE INTERPRETER:  Employer, co-employer, or --

5            MR. ALVAREZ:  Joint -- joint employer.

6   BY MR. ALVAREZ:

7       Q.  Can you tell me how that relationship came

8   about?

9            MR. LAROU:  Objection to form.

10           MR. ALVAREZ:  I'm sorry.  Before we move

11  forward, what was the basis for the form objection?

12           MR. LAROU:  For the form; I think if someone

13  calls for a legal conclusion for my client by -- by

14  asking him for the grounds on which, you know, an

15  employment relationship under the FLSA would be formed.

16           MR. ALVAREZ:  Okay.  All right.  I'll move

17  forward.

18           THE WITNESS:  It's many years I would have to

19  explain to you.

20           MR. ALVAREZ:  Okay.

21           THE WITNESS:  Many years.

22  BY MR. ALVAREZ:

23      Q.  Okay.  So what year do you claim to have

24  started working for Viormar?

25      A.  2010, '11.



1      Q.  Okay.  And what type of work were you doing at

2   Viormar?

3      A.  I met a father, who then died.  And then he

4   gave me the opportunity to start repairing that whole

5   building, which was abandoned.  I started by painting

6   the building, making divisions to the vessels.

7          Then I brought in Jessy Limo.  I rented a

8   property out to him.  And then I brought in another

9   tenant and it was called 911.  And it was some sort of

10  tire place.  I continued to do the maintenance outside,

11  dealing with everything.  And then the years went by.

12  And then in 2016, I had to remove Jessy Limo.

13         Orlando Fernandez made the contracts for 911.

14  A lot of people knew me, so I would bring him the

15  people and he would make the contracts.  They didn't

16  pay for two months.  They were evicted, taken to court.

17         Then that part of the building remained empty.

18  We were also trying to deal with Jessy because he

19  wasn't complying with the payments due to a rent

20  increase.  So during that time, Orlando Fernandez

21  created this company called Vita Home Care Solutions.

22         And then I started working with them,

23  assembling and having everything to do with that

24  company.  They bought saws, and tools, and equipment

25  for me to work, working on the display, getting ready



 1  for the exhibition.

 2          MR. ALVAREZ:  Okay.  But hold on.  That's for

 3  Vita Home Care Solutions, is what he's talking about

 4  now?

 5          THE WITNESS:  Yes.

 6          MR. ALVAREZ:  Okay.  So I don't -- I don't

 7  mean to interrupt, but I want to focus on -- on what --

 8  Viormar and what he's done for Viormar.

 9          THE INTERPRETER:  Okay.

10  BY MR. ALVAREZ:

11      Q.  So -- and -- and let's -- let's walk it back a

12  little bit.  Before you began working for Viormar, what

13  job did you have prior to that?

14      A.  I was self-employed, and I was working on some

15  patents.  As a matter of fact, I have two patents.

16  That's how I met Orlando Father.

17      Q.  Okay.  So how -- you met Orlando's father

18  through those two patents?  Does --

19          THE INTERPRETER:  Orlando, the father.  It's

20  Orlando, Sr.

21          MR. ALVAREZ:  Right.

22          THE INTERPRETER:  Okay.  What's your question?

23  BY MR. ALVAREZ:

24      Q.  Or so -- or so my question is: Tell me how you

25  met Orlando's father, if you could expand on that.



1      A.  I worked at Jessy Limo.  That was next to the
2  building.  Sometimes I would repair a car.  And since
3  that building, Viormar was abandoned.  Sometimes we
4  would park a car underneath a tree.  And so that's how,
5  on one occasion, the father arrived and I met him.
6      Q.  Okay.  So was Jessy Limo a tenant on the
7  Viormar property?
8      A.  After I met the father.
9      Q.  Okay.
10      A.  So Viormar is here, Jessy Limo is here.  And
11  so they sold the building where Jessy Limo was, and I
12  brought him over to Viormar.
13      Q.  Okay.  And when you were working at Jessy
14  Limo, what -- what years did that span?
15      A.  2005 to 2010, '11.
16      Q.  And was -- were you a W2 employee?
17      A.  No.
18      Q.  Okay.  Were you an independent contractor for
19  Jessy Limos?
20      A.  I would just come in as a friend, do the work,
21  and he'd pay me.
22      Q.  Okay.  Is that a similar relationship that you
23  have with the defendants?
24      A.  Yes.  So since I met his father, it became
25  like family.



1      Q.  Okay.  And can you remind me what year you

2  roughly began working at Viormar?

3      A.  2011, 2012, something like that.

4      Q.  Okay.  And did Viormar have any other

5  employees from 2010 to 2024?

6      A.  No.

7      Q.  Okay.

8      A.  I'd get everything for them.

9      Q.  Okay.  And is there anything that you worked

10  on, on behalf of Viormar, whether goods or materials,

11  that traveled through interstate commerce?

12          MR. ALVAREZ:  I can rephrase it if it's --

13          THE INTERPRETER:  Yeah.

14          MR. ALVAREZ:  -- hard to translate.

15          THE INTERPRETER:  Yeah.

16  BY MR. ALVAREZ:

17      Q.  Okay.  Let me see.  Is there anything in your

18  job duties that required you to work on things that

19  traveled out of the state of Florida?

20          MR. LAROU:  Form.

21          THE WITNESS:  No.

22  BY MR. ALVAREZ:

23      Q.  Okay.

24      A.  Just want to move them to Orlando.

25      Q.  Okay.  Explain that.  How did you move them to



1   Orlando?

2        A.   Orlando rented a truck and we went back and

3   forth.  It was like he was moving his house when his

4   father dies.  I do restoration of the home, including

5   broken floors, broken tiles on the roof, the fence.  So

6   when it was ready, they sold it.  I removed the

7   furniture.  And I moved them up there to Orlando.

8        Q.   Okay.  Did you perform that as one of your job

9   duties?

10       A.   Well, they didn't employ anybody else, just

11  me.  Remember Orlando is an elderly person.

12       Q.   But did you do it as a favor because he is an

13  elderly person, or did they order you to do that?

14       A.   They would tell me to do it, the job.

15       Q.   Were they asking you to do it as a favor?

16       A.   I don't think so.

17       Q.   Okay.  Did they --

18       A.   Since I already lived there -- well, we had a

19  meeting about it before moving.  They took me out to a

20  lunch or they asked me to meet.  So it was like, let's

21  talk business, they said.  And initially, I would paid

22  them $500 for the office space.  And they said, don't

23  pay us, we're going to pay everything, just handle all

24  the maintenance, all the things that have to be done.

25            And then that's where everything came in, in



1  terms of the move and the repair of the cars.  And they

2  would pay me through -- through lodging.  And so, you

3  know, Orlando said, you've lived for free in this

4  country.  And I said, no, I've lived through the work

5  that I do for you.

6     Q.  Okay.  So when you were paying for -- you

7  know, when you were paying $500 for the office space,

8  can you tell me the -- the time frame of when those

9  payments were being made?

10    A.  Those were the first times that they told me

11 to come and stay.  Okay.  So in terms of the Viormar

12 property, I did all the removal of everything there,

13 including the safety -- the safes.  I also did

14 shredding of all the documentation that they had there.

15 I did everything.  I emptied it out or vacated it.  I

16 vanished everything.  I shredded all the paper.

17    Q.  Okay.  So the documents that you were -- were

18 shredding, what were they in relation to?

19    A.  I don't know.  I think it was the history of

20 the company.  He said those papers were very

21 confidential, Orlando said, and that it was very costly

22 to have them shredded.  I am -- I am an inventor.  I

23 invent things.  So I just said, well, I'll make a

24 machine with an engine that shreds.  So I shredded,

25 like, 80, 100 boxes.



1      Q.  Okay.  So -- and I don't want to get into the

2  information that's related to your patents, but can you

3  describe some of the things that you've invented?

4      A.  So I created a system for this -- you know how

5  the cars overheat and the children die in them?  So

6  this system will save the children's lives.

7      Q.  That's beautiful.

8      A.  And the other is a system in which you can't

9  steal license plates of cars.

10      Q.  Okay.  Do you have any investors in those

11  inventions?

12      A.  No.

13      Q.  Okay.

14      A.  I've spoken to Orlando about it.  A company

15  that he didn't want to mention.  So there was a lot of

16  money spent in the company, but then the father died,

17  and then they decided to move to Orlando.

18          So that's why they wanted to me to shred

19  everything regarding that company.  They would spend a

20  lot of money.  And I was like, I need so much of that,

21  even if it's just to create 50, 100 systems.  It's --

22  it's, like, criminal.

23      Q.  Okay.  Have -- have you ever sold any of your

24  inventions?

25      A.  I want to or finance it, or when they give you



1  a license for the person who's making it -- I don't

2  know what you call that.  I've tried to do all those

3  things, but I never have been able to.

4      Q.  Okay.

5      A.  I've written to the President, I've written to

6  Congress, I've met with a lot of people.  But I don't

7  know why, but the children are not going to be able to

8  be saved.  I don't have money.

9      Q.  Okay.  So during the year of 2020 -- '12, you

10 were paying $500 for that office space.  Would you say

11 that you were a tenant at that time?

12         MR. LAROU:  Form.

13         THE WITNESS:  I was a tenant, but I worked for

14 them.

15 BY MR. ALVAREZ:

16     Q.  Okay.

17     A.  I would do the maintenance and everything.

18     Q.  Can you tell me what type of business Viormar

19 was engaged in, in 2020 -- '12?

20         MR. LAROU:  Form.

21         THE WITNESS:  It created those companies,

22 Viormar, Vita Home Care Solution.  They would do

23 mortgage, so they would receive checks from houses and

24 stuff.  Well, they had a foreign company and it was

25 kind of, like, lost, and I was able to get it back for



1   them.

2   BY MR. ALVAREZ:

3       Q.  Hold on.  I want to get into that.  So how

4   were you able to get it back from them?

5       A.  So when the father dies, Orlando Fernandez'

6   son, he didn't have control of all those things.  I

7   would get the correspondence because it would -- it

8   would arrive to where I was.  And the correspondence or

9   letter said that the title to the company had been

10  lost.  I immediately sent them the paperwork.  Well,

11  don't tell anybody that this is happening because the

12  building doesn't have papers.

13          I would have to go to Curacao because that's

14  where the company is.  And I think you have to be there

15  six months in order to do the paperwork and gain the

16  papers back.  Years went by, and I did not relay this

17  concern to anybody.  He had already sent the papers,

18  the due diligence papers.  In another occasion, the

19  company was put up at auction due to lack of tax

20  payment.

21      Q.  And which company are we talking about right

22  now?

23      A.  Viormar.

24      Q.  Okay.

25      A.  And I said -- and -- and then -- the paper --



1   the papers for auction said that the company would go

2   to the greatest bidder.

3       Q.  Okay.

4       A.  He does all the paperwork, and then he sends a

5   letter, thank you for my work, my attorney has it, he

6   thanks me for my good job, and to put that sticker

7   behind the door, like, saying the taxes were paid.

8       Q.  Okay.  So since we've kind of ventured into

9   various roles that you performed on behalf of Viormar,

10  how would you label your job title?

11      A.  Well, I would guard the property at night,

12  too.  It's in the records.  It's in the police records

13  when I was chasing the bandits.  They were very

14  grateful for that.  I don't know why he's saying I

15  didn't work for him.

16      Q.  Well --

17      A.  I don't know why he would say that.

18      Q.  So were --

19      A.  There's so much evidence to that.

20      Q.  So were you requested to provide security

21  services for Viormar?

22      A.  It wasn't requested of me, but he said, at

23  night -- well, I was living there.  And then he would

24  put me in charge of the whole property and building.

25  They were (audio interruption) at another building at



1    another time in Sunrise.

2         Q.  Okay.

3         A.  It was a big shopping center.  There were

4    problems there.  And Cristina, his daughter, she -- she

5    was having difficulties, like, getting the rent money.

6         Q.  Well, hold on.  Is the property in Sunrise, is

7    that owned by Viormar?

8         A.  No.

9         Q.  Okay.  So -- so let -- let's focus on --

10        A.  You're asking me to qualify my job

11   description --

12        Q.  Yes.

13        A.  -- and I'm telling you that all of my work has

14   been for them.  And everything arose or arised [sic]

15   from Viormar or came from there.  Because Corrina

16   [phonetic] resided at Viormar.  The -- First Son

17   Mortgage, that resided at Viormar.

18        MR. LAROU:  And pardon my interruption.  Just

19   for the record, I believe the spelling on the mortgage

20   company he was referring to is Fersom -- Fersom,

21   F-E-R-S-O-M.

22        MR. ALVAREZ:  I believe he's correct.

23        THE WITNESS:  Well, Viormar had a lot of

24   companies there and they all resided there.  All the

25   deposits were made via Fersom, Corrina, Viormar.



```
 1   BY MR. ALVAREZ:
 2        Q.  Okay.  And I don't mean to interrupt.  I -- I
 3   do appreciate your explanation.  But the reason why I
 4   want to limit it to Viormar is because right now,
 5   Fersom and Corrine [sic], and all those other names,
 6   they're not named in this suit.
 7        A.  But I would do all the work for them --
 8        Q.  I understand.
 9        A.  -- through those companies.
10        Q.  I understand your position.
11        A.  Aside from maintenance --
12        Q.  But --
13        A.  -- and restoration of the whole building.  You
14   understand?
15        Q.  I do understand.  But --
16        A.  And they would have me, you know, collect rent
17   from people and do other things.  That's work.
18        Q.  Okay.  Who did you collect rent from?
19        A.  Okay.  So the black people from Sunrise.  So
20   Cristina had difficulties getting the rent money.  So
21   they wrote a letter saying that from that moment on, I
22   was going to be the assistant manager and they
23   introduced me as such.  And so I started getting
24   involved with getting the rent because she was a woman
25   and she was having difficulty doing that.
```



 1        Q.  Okay.

 2        A.  And then there's copies of that paper.  But it

 3   all stemmed or started from Viormar.

 4        Q.  Okay.  But that property in Sunrise that

 5   you're collecting rents for, who is the landlord of

 6   that property?

 7        A.  In -- in Sunrise?

 8             THE INTERPRETER:  In Sunrise.

 9             THE WITNESS:  Corrina is a real estate

10   company.  I don't know what relation Corrina had with

11   Viormar with that property.  I would -- I would do

12   maintenance, I would --

13             THE INTERPRETER:  Sorry.

14             THE REPORTER:  I'm sorry to interrupt.  Would

15   you -- I just wanted to advise, if we could please let

16   the interpreter fully finish translating before

17   answering the question, just so I can make sure I get a

18   clear transcript.  I apologize.

19             MR. ALVAREZ:  No, no, I probably should

20   have --

21             THE WITNESS:  It's just that I get excited and

22   stuff.  It's just that there's a lot of things.  Sorry.

23   BY MR. ALVAREZ:

24        Q.  No, it's fine.  But that property where

25   Corrina is residing at -- let me rephrase.  To -- as to



 1   the best of your knowledge, you're not aware of who the

 2   landlord is at the Corrina property?

 3       A.  Yes.  Cristina Fernandez.

 4       Q.  Okay.  So you're -- would you say that you

 5   were collecting rents for Cristina Fernandez?

 6       A.  Yes.

 7       Q.  Okay.

 8       A.  Well, she couldn't do it.  So her father

 9   motivated me to do it, so that I could help out his

10   daughter.  But that's work.

11       Q.  But that was for the benefit of the daughter's

12   company, right?

13       A.  I know that, but it would come from Viormar.

14       Q.  Earlier, you mentioned that you had gotten

15   some tenants for Viormar.  Can you identify who those

16   tenants were?

17       A.  Joelle Sardina -- Jorge Sardina [phonetic] --

18           THE INTERPRETER:  I'm going to put the

19   spellings right here.

20           THE WITNESS:  I only -- 911, I only know the

21   name of the company.  I didn't have much dealings with

22   them.  There's Carlos de la Flor [phonetic], and that's

23   a tenant that I brought in.  The only thing that

24   Orlando did was the paperwork.  It's a mechanic shop,

25   and he has a brother whose name is Miguel de la Flor.



 1   There -- there's no one else there right now.  There's
 2   only two vessels.
 3   BY MR. ALVAREZ:
 4       Q.  Okay.  What year did you bring those two
 5   vessels in?
 6       A.  What did I bring Carlos de la Flor?  Carlos de
 7   la Flor has been at the property for seven years.
 8       Q.  Okay.  And why did you bring them in?
 9       A.  A lot of people know me.  So, you know, I
10   would bring him people to rent out the property.  And
11   sometimes issues wouldn't go through because of the
12   money or whatever.  But Carlos de la Flor was a person
13   that they were getting out of another unit or vessel.
14       Q.  Okay.  Hold on.
15       A.  And he didn't have a place to go, so I told
16   him --
17           MR. ALVAREZ:  So hold on.  And -- and I should
18   have done this instruction in the beginning, and I
19   failed to do that, and I apologize.  But, you know,
20   he's saying a lot.  And I know you can only translate
21   as much as you can --
22           THE INTERPRETER:  Sure.
23           MR. ALVAREZ:  -- remember.  If we could get
24   him to, you know, pieces.  Because he mentioned
25   earlier -- and I speak Spanish, and that's why I'm



 1  picking up on it -- that he knows a lot of people --

 2          THE INTERPRETER:  Uh-huh.

 3          MR. ALVAREZ:  -- right?  So if you could

 4  instruct him to, you know, give you a minute to --

 5          THE INTERPRETER:  Sure.

 6          MR. ALVAREZ:  -- translate back to me.

 7          THE INTERPRETER:  Thank you.

 8          THE WITNESS:  Okay.  Sorry.

 9  BY MR. ALVAREZ:

10      Q.  No, it's fine.  I understand.  You know,

11  it's -- it's your first deposition and they're

12  stressful.

13      A.  I wish I did -- I wish I did speak English and

14  tell you the whole story.

15      Q.  So let's go back.  So you said that you were

16  able to get these tenants because you know a lot of

17  people; is -- is that right?

18      A.  That is correct.

19      Q.  Okay.  Did you go out and get these tenants

20  before Orlando spoke to you about this?

21      A.  No.

22      Q.  Okay.  So if Orlando had never spoken to you

23  about it, you would have never gone looking for

24  tenants?

25      A.  No, because he's the owner of the property.



1        Q.   Okay.   Do you have any document that could

2   support your assertion that Orlando asked you to find

3   tenants?

4            THE INTERPRETER:   That Orlando did what?

5            MR. ALVAREZ:   Asked him to go find tenants.

6            THE WITNESS:   No.   That's verbal.

7   BY MR. ALVAREZ:

8        Q.   Okay.   Are there any --

9        A.   That is what his father, who died, told me

10  from the beginning.

11       Q.   All right.   So tell me, to the best of your

12  recollection, exactly what Orlando's father told you.

13       A.   He wanted to fix the building because there

14  was a lot of disorder inside, and that he wanted to

15  rent out the two vessels.   That's why I enclosed the

16  door that connected both buildings.

17       Q.   Okay.   Did he mention that he wanted that done

18  in passing, or did he ask you directly to do that?

19       A.   He asked me to do that.

20       Q.   Okay.   How many hours would you say that you

21  work a week for Viormar on average?

22       A.   It would be a night.   Imagine how many hours.

23       Q.   Were you ever provided a schedule from

24  Viormar?

25       A.   No.



1        Q.  Okay.  Did you ever have a written employment

2   contract?

3        A.  No.  Just a paper authorizing me to be his

4   representative.

5        Q.  Okay.  So let's talk about the remodeling that

6   you claim to have done on Orlando's father's behalf.

7   Did he supervise those renovations in any way?

8        A.  Yes.  He bought all the material.  It was a

9   computer factory.  So I started the renovation process,

10  the taking out the trash from it.

11       Q.  Did he -- all right.  Did you have the ability

12  to complete that job in the way that you wanted to do

13  it?

14       A.  No.  Whatever they said.

15       Q.  Okay.  And what exactly did they order you to

16  do?

17       A.  Paint, repair walls, debris removal, the paint

18  of the structure.  There was termites, and so the

19  restructuring of the wood.  There was a lot of wood in

20  that building.  And I've done that throughout the

21  years, many years.

22       Q.  Okay.  Do you have any professional licenses?

23       A.  Me?  A professional license?

24       Q.  Yeah.  Like, do you have any contractor's

25  license that allow you to do construction work?



1        A.   No.  I'm a genius.

2        Q.   Understood.

3        A.   That's why they used me.

4        Q.   Got it.

5        A.   To restore cars, to do all kinds of things.

6   And telling me that I inherited the building or I was

7   inherited with the building.

8        Q.   When did they tell you that?

9        A.   Orlando Fernandez did.  When his father died.

10        Q.   What did he mean by "inherited"?

11        A.   He was now that -- that I am his property.

12        Q.   Were you ever interviewed by Orlando's father

13   before you began working for him?

14        A.   When he saw me working on Jessy's car under --

15   under the tree, he approaches me and we start talking.

16   I show him my projects.

17        Q.   Hold on.  The -- that's a good amount.  What

18   type of projects were you showing him?

19        A.   My patents.

20        Q.   Okay.

21        A.   He admired it.  And then he said, come in my

22   office.  And then we started to talk about things like,

23   how did he get to Venezuela, how he got to have

24   everything he had.  We started to build a friendship.

25   So then, since he saw that I was a reliable person, he



1    said, come, do the repair work, take out the trash.

2    All the keys to the building.  Gave the keys to the

3    building, and I've had them ever since.

4         Q.  So --

5         A.  He wanted repairs and restorations.  He wanted

6    to rent out the building.

7         Q.  Okay.  So hold on.  The trash and -- and

8    garbage stuff that you were doing, was that just for

9    the unit you were residing in?

10        A.  The one that I occupied to live?  I had to

11   throw out a bunch of stuff from there, too, but that

12   came after.  We're talking about the building, 8,500

13   square feet.

14        Q.  Okay.  When you were discussing working with

15   Orlando, did you ever negotiate payment?

16        A.  Yes.

17        Q.  Okay.  What did those negotiations look like?

18        A.  I said that I needed money because I had to

19   pay for electricity.  I need to eat.  And he said that

20   I was free to go and work outside, and that I could go

21   repair a car or do whatever it was that I needed to

22   survive, that I only had the lodging or the roof to

23   live under.

24        Q.  So look -- just for my own clarification

25   purposes: Orlando allowed you to work any odd jobs that



1    you needed to get paid otherwise?

2         A.   Yes.

3         Q.   Okay.

4         A.   I would go -- I -- I would do it, but then I

5    would get home and -- and I was tired at night.  Well,

6    I had a lot of work.  By the time I got back from doing

7    whatever job I was doing, like washing dishes or

8    whatever, I was exhausted.

9         Q.   But you didn't -- but did you have a set time

10   schedule while working at Viormar?

11        A.   No.

12        Q.   Okay.

13        A.   He would write to me at whatever hour.

14        Q.   Can you tell me, what are some of the side

15   jobs you would do while you were at Viormar?

16        A.   Dishwashing, fixing of a door.  I have a -- I

17   have a friend who's, like -- it -- it would break down,

18   something in his house, and I'd go fix it.  So Ricky,

19   the guy from across the street, he had a factory that

20   made fishing rods.  But he was older, so he would call

21   me in to help him.

22        Q.   Can -- can you tell me Ricky's full name?

23        A.   His name is Riano [phonetic].

24        Q.   Okay.  Do you --

25        A.   I don't remember his last name.  It's in the



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      30

 1  Internet.

 2      Q.  Do you -- do you have Ricky's phone number?

 3      A.  It's here.  He would see me all the time

 4  working.  He's, like, I've never seen a person work so

 5  hard day and night.

 6      Q.  Can you -- can you read us Ricky's phone

 7  number?

 8      A.  I had turned it off.  I'm turning it back on.

 9          MR. ALVAREZ:  Okay.  I think we could take a

10  five-minute break, if that's okay with you, Brooks.

11          THE REPORTER:  Counsel, may I call us off the

12  record?

13          MR. ALVAREZ:  Yeah.

14          THE REPORTER:  We are going off the record.

15  The time is now 11:07 a.m., Eastern Standard Time.

16          (A recess was taken.)

17          THE REPORTER:  We are going back on the

18  record.  The time is now 11:32 a.m., Eastern Standard

19  Time.

20  BY MR. ALVAREZ:

21      Q.  All right.  I'd like to talk about Ricky for a

22  moment, and the jobs that you did for him.  How much

23  would Ricky pay you to do those jobs?

24      A.  I would just help him, like, unload a

25  merchandise.



1     Q.   Is -- do you make a habit of -- of helping

2     people with odd jobs?

3     A.   I help them because you have to help.  You

4     have to keep up a store.  You have to buy merchandise.

5     You have to do everything everybody else does.  You

6     have to get an incentive to do it.

7     Q.   Okay.  But --

8     A.   So Orlando Fernandez's son told me, for

9     example, when I got the food stamps, that nobody could

10     know that I worked for him nor that I lived there.

11     Q.   Okay.  Do you have that communication in

12     writing?

13     A.   No.  It's very subtle.  That's something very

14     subtle.

15     Q.   Okay.  And earlier, you were mentioning that

16     Orlando's father permitted you to do odd jobs on the

17     side.  Can you give me an example of some of the

18     clients that you did odd jobs for?

19     A.   Cars.

20     Q.   Cars?

21     A.   Cars, walls, doors, repair doors at homes,

22     electricity, plumbing.

23     Q.   Okay.

24     A.   Everything that needs to be done.

25     Q.   Okay.  Can you tell me some of the people --



1   can you identify -- hold on.  Let -- let me retract and

2   rephrase that.  Whose cars did you work on?

3       A.  Acquaintances or their own cars.  I did a lot

4   of their own cars.  Tune-ups, change the oil, paint,

5   repairs to their cars as well.

6       Q.  Okay.  How much would you charge, say, for an

7   oil change?

8       A.  For him or the other people?

9       Q.  The other people.

10      A.  I would tell people to buy their own oil.  And

11  I would charge, like, $20 to change it, something like

12  that.

13      Q.  Okay.  And what about the -- the tune-ups?

14  How much would you charge for the tune-ups?

15      A.  I would do everything regarding the tune-up.

16  The air filters, spark plugs.

17          THE INTERPRETER:  Thank you.

18  BY MR. ALVAREZ:

19      Q.  And how much would you charge for paint jobs?

20      A.  I would -- I would do it on the cheap because

21  there was a lot of body shops.  100, 150, the person

22  buys their own materials.  But that's not money.  You

23  turn the corner, you go to the store, and you spend it.

24  Electricity, telephone.

25      Q.  Is that a mystery to figure it out?



 1          MR. ALVAREZ:  Can we go off the record for a
 2   little --
 3          THE REPORTER:  We are going off the record.
 4   The time is now 11:37 a.m., Eastern Standard Time.
 5          (A recess was taken.)
 6          THE REPORTER:  All right.  We are back on the
 7   record.  The time is now 11:41 a.m., Eastern Standard
 8   Time.
 9   BY MR. ALVAREZ:
10      Q.  So, Dennis, you were mentioning that you
11   charge rather reasonable prices for the mechanic work
12   you do.  Did you find that that allowed you to get a
13   larger clientele?
14          THE INTERPRETER:  Did you say mechanic or
15   painting?
16          MR. ALVAREZ:  Mechanic.
17          THE WITNESS:  It wasn't always.  It was
18   sporadic.  I didn't have a lot of clientele.  When you
19   have clientele, that's when you have a business.  I
20   don't have a -- that type of business.  I did -- I did
21   it to survive.
22          My real job was Viormar and taking care of the
23   property.  But he would say he couldn't pay me.  I had
24   to survive.
25   BY MR. ALVAREZ:



1      Q.   Okay.   So did Viormar ever pay you for your

2  time working there?

3      A.   No.   Only with the roof over my head.

4      Q.   And is that why you weren't able to afford to

5  move out?

6      A.   I haven't because of that.   I've even told

7  Orlando, Orlando, you do real estate, get me a lot or

8  land.   He did find me one years ago.   And so my brother

9  lived outside, and so I seized rights to the property

10  to my brother.

11          Orlando would say, what do you need that lot

12  for, you're fine here.   He never wanted me to leave.

13  And I would say to him, I do need a place to go, I'm

14  going to have to leave one day from here.   And last

15  time we spoke, I explained that to him again.   And

16  that's why I ended up doing this.

17      Q.   Okay.

18      A.   He said that wasn't his problem.   He said,

19  that's your problem.   And I said, Orlando, I've given

20  my life here, I've worked here.

21      Q.   Okay.

22      A.   I -- he didn't care.

23      Q.   All right.

24      A.   He said no.

25      Q.   All right.   So you mentioned earlier that your



 1  true job is at Viormar.  Do you own any other
 2  businesses?
 3       A.  No.
 4       Q.  Okay.
 5       A.  I have a company with Renee.  And it's --
 6  it -- it has a website, and it's an order for me once I
 7  get my patent to do the car thing, then I could use
 8  that.
 9       Q.  Okay.  What's the name of that company?
10       A.  Ocean Mark.  I -- it's something like that.
11  Renee is the one that knows the name.
12       Q.  All right.  So I'm going to introduce my first
13  exhibit.  It's going to be marked as Exhibit 1.  And I
14  pulled this from Sunbiz.
15          (Defendant's Exhibit 1 was marked for
16  identification.)
17  BY MR. ALVAREZ:
18       Q.  Can you please let me know if that's the
19  company you're referring to?
20       A.  I can't really see things.  I didn't bring --
21          MR. ALVAREZ:  Well, maybe -- Mr. Larou, would
22  you be able to assist him?
23          MR. LAROU:  Of course.
24          Yeah.  And, Mr. Aneiros, the spelling on this
25  exhibit, which appears to be a printout from Sun --



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      36

 1   Sunbiz.org --

 2          THE INTERPRETER:  Are you doing this for the

 3   client off the record or on the record?

 4          MR. LAROU:  On the record.

 5          THE INTERPRETER:  Uh-huh.

 6          MR. LAROU:  So Exhibit 1, it -- it appears to

 7   be a printout from Sunbiz.org.  And the name of the

 8   business entity listed for this profile is Ocean

 9   Mack's.  And the spelling of that is M-A-C-K apostrophe

10   S.

11          THE WITNESS:  That's where Renee did it.  So

12   we could do -- if we could do some kind of business as

13   it involves the patents for the seat or the license

14   plates, that's where we would put in the percentages

15   and amounts and stuff.

16   BY MR. ALVAREZ:

17      Q.  Okay.  Can you state Renee's full name for the

18   record?  Okay.

19      A.  Renee Sevreco [phonetic].  Okay.

20          MR. ALVAREZ:  And, I'm sorry; I'm going to

21   have to ask for your assistance again, Mr. Larou.

22   BY MR. ALVAREZ:

23      Q.  Who is the director listed under Ocean Mack's,

24   according to Sunbiz?

25          MR. LAROU:  Who?



1              MR. ALVAREZ:  The director.

2              THE WITNESS:  I think Renee named me that.

3              MR. ALVAREZ:  Okay.  I can take the exhibit

4    back.

5              MR. LAROU:  Sure.

6    BY MR. ALVAREZ:

7        Q.  So does Ocean Mack's only exist for the

8    purposes of your patent?

9        A.  Yes.

10       Q.  Does Ocean Mack's currently have any revenue?

11       A.  No.

12       Q.  Okay.

13       A.  It -- it doesn't show us that.

14       Q.  Okay.  And for which patent is this for?

15       A.  The child seat.

16       Q.  Got it.  How did you meet Renee?

17       A.  Renee was a client of Carlos de la Flor.

18       Q.  Okay.

19       A.  Or still is a client.

20       Q.  Okay.  Is -- is Renee an investor in Ocean

21   Mack's?

22       A.  No.  No, he doesn't have anything.

23       Q.  Are there any shareholders in Ocean Mack's?

24       A.  No.

25       Q.  What is -- sorry, go ahead.



1        A.   We're -- we're looking for some.

2        Q.   What is Doc Motors, Inc.?

3        A.   I don't know.  I don't know what that is.

4             MR. ALVAREZ:  Okay.  So I'm going to introduce

5    Exhibit Number 2.

6             (Defendant's Exhibit 2 was marked for

7    identification.)

8             MR. ALVAREZ:  Mr. Larou, I'm going to need

9    your help with this one as well.  If you could describe

10   the document to your client.

11            MR. LAROU:  Sure.  And so Exhibit 2 appears to

12   be another printout from Sunbiz.org.  The business

13   entity listed on this profile is Doc Motors, Inc.  And

14   the spelling of Doc is D-O-C.

15   BY MR. ALVAREZ:

16       Q.   Do you have any affiliation with that company?

17       A.   I don't know what that company is.

18            MR. ALVAREZ:  Can you read the second page for

19   your client, Mr. Larou?

20            MR. LAROU:  Of course.  And --

21            THE WITNESS:  What does the company say?  I

22   don't know.

23            MR. LAROU:  So listed as the vice president on

24   this printout from Sunbiz.org, Dennis Aneiros is listed

25   as the vice president of the company.



1         THE WITNESS:  I don't know what that is.

2    BY MR. ALVAREZ:

3         Q.  Considering that you claim to have entered the

4    property since 2010, why did you wait nearly 14 years

5    to file a suit for unpaid wages?

6         THE INTERPRETER:  Why did you wait how many

7    years?

8         MR. ALVAREZ:  14.

9         THE WITNESS:  I was expecting that question.

10   I -- I appreciate them -- I appreciated them so much

11   that I gave my life to them there.  But he showed up --

12   on a Friday, he showed up and he was very rude or --

13   and he was very unpleasant.  And as it states in the

14   other lawsuit, he called me a homeless.  He -- he

15   really treated me poorly.

16        He said he didn't care about my life.  And he

17   said, you've been living in this country for free for

18   many years.  And that's -- and that's when I said, I'm

19   going to find out how to go about this because I've

20   been working for this man, and there's a lot of

21   witnesses to this.

22   BY MR. ALVAREZ:

23        Q.  Can you name some of the witnesses?

24        A.  Yes.  Roberto Perez.

25        Q.  Okay.  Can you tell me Roberto Perez's title



```
 1   and what he essentially knows?

 2        A.  He's -- he's an owner from the building across

 3   the street.

 4        Q.  Okay.  And what is it that he knows?

 5        A.  He had a mechanic shop as well.  Everything,

 6   that I even restored their home and they even pay me --

 7   they didn't even pay me a penny.  Everything.  He was

 8   his dad's mechanic.

 9        Q.  Now, Paragraph 43 of your Complaint, you state

10   that the plaintiffs offered for you to reside in the

11   office if you performed work for them back in 2010, and

12   you accepted that offer.

13            THE INTERPRETER:  If you did what?

14   BY MR. ALVAREZ:

15        Q.  If you worked for them.  Yes.  Okay.  And you

16   stated previously in your testimony today that you

17   collected rents on behalf of the defendants.  Do you

18   know how much the defendants typically charged for

19   renting out the property at Viormar?

20        A.  The big warehouses, the current ones?

21            MR. ALVAREZ:  Oh, the one that he's residing

22   in.

23            THE WITNESS:  That was his dad's office.

24   BY MR. ALVAREZ:

25        Q.  Okay.  But did the father ever rent out other
```



1   properties on that lot to different tenants?

2       A.  No.  Not at the office space.  It's small.

3       Q.  Okay.  But I'm not referring to -- I'm not

4   limiting it to just the office space.  I'm talking

5   about the entire lot that Viormar owns.  Do you know if

6   they've rented any piece of that lot to another tenant?

7       A.  It is rented out to Jessy Limo and 911 Tire.

8   They were rented there.

9       Q.  Okay.  And do you know how much rent is

10  charged to that company?

11      A.  3,800 to Carlos de la Flor.

12      Q.  Okay.

13      A.  Presently.

14      Q.  How big is -- is the property that he's

15  renting out?

16      A.  600 square feet.

17          MR. ALVAREZ:  Okay.  He's talking about his

18  office?

19          THE INTERPRETER:  Sorry, first person would

20  help.

21  BY MR. ALVAREZ:

22      Q.  So -- all right.  So I'm asking how -- roughly

23  the size of Jessy's Limousine company.

24      A.  4,400.

25      Q.  Okay.  And what's, roughly, the size of the



 1   office that you're residing in?

 2        A.  600 square feet.

 3        Q.  Okay.  And are you using any other property at

 4   Viormar?

 5        A.  Well, he told me to tear down all the office

 6   space that Jessy -- Jessy Limousine had.

 7        Q.  Okay.

 8        A.  And that's undergoing a process.

 9        Q.  Okay.  Is that the only piece of property that

10   you are using?

11        A.  I am using it because he assigned me to undo

12   all of it, all of the offices.

13        Q.  Okay.  Does he have that assignment in

14   writing?

15        A.  No.

16        Q.  Okay.

17        A.  He's very smart.

18        Q.  How -- how big is that second property that

19   he's now in the process of remodeling?

20        A.  4,400 feet.

21        Q.  Okay.

22        A.  But aside from that, there's a problem.  That

23   property needs structural repair.

24        Q.  Okay.

25        A.  And that man had me remove the cracks that



1   were on the walls to pass the 40 year inspection.

2       Q.  Okay.

3       A.  I said no, that that was a -- that was

4   dangerous, to rent out to a person, and then have the

5   building fall upon them or on them.

6       Q.  Okay.  Has -- since you've been on the Viormar

7   property, have you ever seen it rented out for

8   residential purposes?

9       A.  No, never.

10      Q.  Okay.  Now, I want to talk about Jessy Limos

11  again.  You're saying that the monthly rent was $3,800.

12  So would you agree that, a year, that would bring a

13  rental proceeds of $45,600?

14      A.  When I say 3,800, that was the initial

15  contract.  But it -- that was Carlos de la Flor.

16      Q.  Okay.

17      A.  And there was another problem because I said

18  if the contract was only for the first three years, why

19  does Carlos de la Flor not have the original price,

20  which would be for 5,000 square feet?  And so that's

21  where the problems begin.  Jessy is another price.

22      Q.  Okay.  So -- all right.  Let's stay with

23  Jessy, and then I'll go to Carlos in a second.  What is

24  Jessy currently paying for rent?

25      A.  Jessy is no longer there.  I got Jessy out of



 1   there.

 2        Q.  Okay.  How did you get Jessy out of there?

 3        A.  With the letter that Orlando made and said

 4   that I was the manager of the building and required

 5   Jessy to move out.

 6        Q.  And just to confirm: Jessy's Limousine was on

 7   Viormar property?  There were a tenant of Viormar

 8   property?

 9        A.  Yes.

10        Q.  Okay.  So before Jessy was evicted by you, how

11   much was Jessy Limousine paying in rent monthly?

12        A.  At the beginning, because the -- it was the

13   starting of the building, they made a contract in which

14   he would pay $1,800.

15        Q.  And that's monthly?

16        A.  Yes.  And then, as time went on, Orlando

17   needed more money.  And then, he puts it in writing,

18   and that he's going to revert it to the original price

19   of the location.

20        Q.  Okay.

21        A.  Jessy did not want to do that.  And that's

22   when he did that in writing, so that he could be

23   evicted.

24        Q.  Okay.  And so for my clarification purposes,

25   based on your answer, Orlando wanted to begin charging



1   Jessy the true market value of the property in rent?

2       A.  Yes.

3       Q.  Okay.  And what was the true market value of

4   the property?

5       A.  So at the current rate for a 4,400 square

6   feet, that runs about $10 per square feet.  And they

7   should be paying around $5,000.

8       Q.  And that's monthly?

9       A.  Yes.

10      Q.  Okay.  So would you agree that if they're

11  paying -- if they were to be paying $5,000 monthly,

12  that would be $60,000 a year?

13      A.  Something like that.

14      Q.  Okay.  And you're currently not paying any

15  rent for where you're residing; is that right?

16      A.  No.

17      Q.  Okay.

18      A.  That would be -- that -- mine's 600.

19      Q.  Were you ever told that if you stopped working

20  at Viormar that you would be evicted?

21      A.  Certainly.

22          MR. ALVAREZ:  All right.  If you could tell

23  him that he can't be on his phone during a depo.

24          THE WITNESS:  I'm going to turn it off.

25  BY MR. ALVAREZ:



1        Q.  Okay.

2        A.  Didn't you need Riano's number?

3        Q.  Oh, I did.  I did.

4        A.  Do you want the number?

5        Q.  Well, I would like the number.  So if you

6    could just --

7        A.  It's (305) 362-7556.

8        Q.  And whose phone number is this, again, just

9    for the record?

10       A.  Riano Ricardo.

11       Q.  And what was your relation to Riano Ricardo?

12       A.  He was my neighbor, so I would help him out,

13   do certain jobs.  I don't know if you want Roberto

14   Perez's.

15       Q.  Yeah.  If I could get Roberto Perez's number,

16   too, that would be great.

17       A.  (305) 282-4539.

18       Q.  And what's your relation to Roberto Perez?

19       A.  He was the owner from the property across the

20   street.  He had a mechanic shop.  And he knew that

21   Orlando Fernandez would not pay me for my job.  And

22   then, he would ask me to go work for him or with him on

23   his cars.  That man did pay me.  Just to help him at

24   his shop with the cars, he would pay me weekly 250,

25   350.



1      Q.  Okay.

2      A.  Something like that.

3      Q.  And if I'm recalling correctly, you stated

4  earlier that Orlando encouraged you to do other jobs to

5  supplement your pay; is that right?

6          THE INTERPRETER:  To supplement?

7          MR. ALVAREZ:  His pay.

8          THE WITNESS:  Yes.  He knew I did that.

9  BY MR. ALVAREZ:

10     Q.  Okay.  So why is it that you claim that you

11 can't afford to move out of the property?

12     A.  Because in order to move out, I have to make a

13 decent amount of money, which I can't do all the time.

14 They ask for security, they ask for one deposit, one

15 rent's worth, and then one rent month.

16     Q.  So if you were evicted from the property, what

17 would your damages be?

18     A.  I was -- I was doing a job in a building, and

19 there was a piece of wood in the structure, and there

20 was an inspection coming up.  And I'm -- the structure

21 had termites.  I -- I sent a letter to Orlando saying

22 we had to do that.

23         And then he said, cover all that up, cover,

24 cover, cover.  And so all of that debris or termite

25 fell onto my eye.  And so I've been having this problem



1  for three years now.  And all he did was get me some

2  glasses through Amazon.

3      Q.  Okay.  Those are --

4      A.  How am I going to go out into the street and

5  I'm blind?

6      Q.  Okay.  But, so those are more so damages

7  related to work that you claim to have performed.  What

8  I'm asking is: What are the damages that you would

9  suffer if you were removed from the property?

10     A.  Imagine a person with nothing out on the

11 street after I've spent my whole life there.

12     Q.  But you just said, not so long ago, that you

13 perform jobs in various capacities for various other

14 people.  So why wouldn't you be able to continue doing

15 that elsewhere?

16     A.  Because I've lost my eyesight.  I've asked for

17 help.  The government gives me food stamps.  Something

18 fell in my eye and it affected my head, it affected my

19 eyesight, because of the terrible living conditions in

20 which I live, mold, cockroaches, spiders.

21     Q.  So if it's so terrible to live there because

22 of the mold, cockroaches, and spiders, why wouldn't you

23 want to move out?

24     A.  I don't have -- I don't have where to live.  I

25 don't have a place to go.  Where am I going to go?



1    Q.  Okay.

2    A.  Pay me my money, and I'll leave.

3    Q.  Okay.

4    A.  I worked very hard for them.  It's not a lie.

5  It is true.  He's the liar here.  So he even said that

6  I was a homeless person and I was invading that

7  property without permission.  He made me even a notary

8  public, so that I would notarize all his dirty

9  paperwork.

10    Q.  Are you currently a notary public that's

11  licensed?

12    A.  I'm not right now because I don't have -- I

13  don't have a way to pay.  They paid for that, the 2,500

14  that they asked for.

15    Q.  Why did they make you pay notary public?

16    A.  They -- they wanted me to be a notary, so they

17  wouldn't have to go do that out on the street.

18    Q.  Okay.  Can you identify the people, dates, and

19  times in which you acted in the capacity as a notary?

20    A.  It was only the paperworks that they would

21  say -- or tell me.  When they had the company, Vita

22  Solutions, they would notarize things that were in

23  regards to the company.

24    Q.  Are you currently collecting disability from

25  the State?



1        A.  No.  She wanted -- he wanted me to.

2        Q.  Okay.  Have you ever filed a workers'

3   compensation claim due to your eye injury?

4        A.  I did not want to do that.  I didn't want to

5   do that.  I just think it's unfair.

6        Q.  Okay.

7        A.  I've even been his bodyguard.  I'm just

8   saying, no, that I don't exist.

9        Q.  Can -- can you expand on that?  How -- how --

10  what do you mean that you were his bodyguard?

11       A.  Well, to go charge rent to the black people,

12  watching his back on the warehouse when people had to

13  be removed from there.  It's in the police record.

14       Q.  Have you ever been charged with a crime of

15  dishonesty at any point?

16       A.  No.

17       Q.  Okay.

18       A.  God doesn't want you to tell lies.  My roots

19  are of honesty.  I never thought this person would do

20  this to me.  He would say, I want you to go up there

21  with me, I have a farm, I want to do a house in the

22  back for you, so we could grow things over there.  He

23  wanted me to continue that way.  I appreciate you as a

24  son.  No such thing.  When he sold the house and had me

25  throw out the trash, you know what I found in the



1    trash?  His photos of his mother and father.

2           And I said no, that I would keep that, that I

3    was not going to throw out the painting of the man who

4    helped me out.  So what are we talking about?  We're

5    talking about a person who took advantage of his own

6    father his whole life.  You can never throw out a

7    picture of your parents.

8         Q.  So how -- how is it that Orlando took

9    advantage of his father?

10        A.  Well, his dad would give him everything, so he

11   got off with that his whole life.  Had him go study in

12   Canada.  He became a doctor, sports medicine.  And he

13   never actually practiced it.  How -- how else would I

14   know all of this history [inaudible 01:46:20]?

15        Q.  So it's your position that Orlando took

16   advantage of his father because he was able to go get

17   his doctorate degree in Canada?

18        A.  That's not the only thing.  It's his

19   lifestyle.  His whole lifestyle.

20        Q.  What is your --

21        A.  How is he going to throw out his dad's

22   photograph?

23        Q.  Is that the only issue of his lifestyle that

24   bothers you?

25        A.  No.  His life doesn't bother me.  I



1    appreciated him.  I would take care of him.

2         Q.  Okay.  What's your highest level of education,

3    Dennis?

4         A.  I never went to school.

5         Q.  Okay.

6         A.  I did go to school, but that has nothing to do

7    with this.  Bad people.

8              MR. ALVAREZ:  Is it all right if we take a

9    five-minute break to go off the record?

10             THE REPORTER:  We are going off the record.

11   The time is now 12:23 p.m., Eastern Standard Time.

12             (A recess was taken.)

13             THE REPORTER:  We're back on the record.  The

14   time is now 12:31 p.m., Eastern Standard Time.

15   BY MR. ALVAREZ:

16        Q.  Dennis, so I wanted to speak a bit about that

17   period of time where you were paying $300 a month in

18   rent.  Why did you stop paying that?

19        A.  It wasn't 300.  It was 500.

20        Q.  500.  Okay.  So why did you stop paying $500 a

21   month in rent?

22        A.  Well, they -- they sat me down at Villa de

23   Sabores to talk business.  It's a restaurant or a

24   cafeteria.  They said, we're leaving to Orlando, can

25   you -- that I had to stay in charge of the property.



1       Q.  Okay.  So during that period when you were
2  paying $500 a month in rent, what jobs were you
3  performing out at the Viormar property?
4       A.  It's a lot of trees, so the care and
5  maintenance of it, parking spaces, if a pipe breaks.
6  There was a man who was stealing water from the
7  property in the back of the property.  I caught him.
8  And -- and I told Orlando, then Orlando was afraid to
9  take him to court.  That was my job, to take care of
10  it, fix a pipe, the bathrooms.
11           When I brought Carlos in, fix a lot of the
12  office space.  And when the guy from the limousine,
13  Barry [phonetic], then a lot of things that were broken
14  inside, repair everything.  It was -- that was my job.
15      Q.  Okay.  Are you aware that commercial tenants
16  are required to maintain their own properties?
17      A.  That is correct.
18      Q.  Okay.  So what's the difference?
19      A.  Yeah, but he wouldn't say that to them.  He
20  wouldn't tell them that, they had to do it themselves.
21  So the tenants would call me all the -- oh, fix that
22  light, oh, the fake ceiling.
23      Q.  Why would the tenants call you to do that?
24      A.  They knew I was in charge.
25      Q.  How did they know that you were in charge?



1      A.  That I was in charge?  They knew because
2   Orlando had said it.
3      Q.  Okay.  How long has Orlando been -- how long
4   has Mr. Fernandez been in the city of Orlando?
5      A.  When his father died.  I think it's been
6   eight, nine years.
7      Q.  Okay.  And you testified earlier that Orlando
8   knew that you were doing jobs on the side; is that
9   right?  And -- and he didn't prevent you --
10      A.  Yes, he knew.  He would send me messages, even
11   at 1:00, and then send the correspondence to him.  He
12   would prepare, like, a package, stickers with the
13   stamps to prepare packages to go to this P.O Box that
14   he had.  He said, I would pick up the packages and get
15   the mail.
16          He would start asking me about the cars.  This
17   car, that car.  I would say, this is Carlos, that other
18   one says Carlos.  I would say, this car, I'm -- I'm
19   holding it for a friend, he's traveling, and he's
20   giving me a little money because I have it there.
21      Q.  Who's --
22      A.  Because I have to pay for the electricity.
23      Q.  Who's giving you a little money?
24      A.  The person that I told to leave the car there.
25      Q.  Okay.



1        A.  He said, no, take everything out, take them

2    all out.  But -- and I found mold.  That's how I paid

3    my electricity on my own thing.

4        Q.  Okay.  So --

5        A.  Because he doesn't pay me.  And then he would

6    say, no, remove everything, get everything out.  And he

7    knew it, that I would -- that that's what I would make

8    money doing.

9        Q.  So if you're paying for the electricity and

10   you're maintaining the property, what's the difference

11   between you and every other commercial tenant?

12            THE INTERPRETER:  Can you repeat that?

13            MR. ALVAREZ:  Yes.

14   BY MR. ALVAREZ:

15       Q.  So if you're paying for the electricity and

16   maintaining the property, what is -- what is the

17   difference between you and every other commercial

18   tenant?

19       A.  Because the tenant pays him rent and they work

20   their business.  I don't have a business.  I work for

21   Orlando Fernandez.

22       Q.  But it was -- you stated earlier that you came

23   into an agreement with Viormar that you would be

24   allowed to live on the property for free in exchange

25   for whatever labor you provided.  Was that your



1    testimony?

2         A.  Yes.

3         Q.  Okay.

4         A.  And that they would pay for everything.  And

5    then they came back a month later and said, no, you pay

6    your own electricity.

7         Q.  Okay.  Is that a damage that you've suffered?

8         A.  What?

9         Q.  Having to pay for the light?

10        A.  No.  I have to have electricity.

11        Q.  Okay.

12        A.  I don't have A/C. And I don't really have

13   water to bathe with.  And -- and I withstood it

14   because -- because of the need I had.

15        Q.  Okay.  So let's talk about the need you had

16   for a minute.  You stated previously that you were

17   allowed to work outside of your role in Viormar, right?

18        A.  Yes.

19        Q.  Have you tried finding gainful employment

20   outside of doing odd jobs?

21        A.  I have tried.

22        Q.  Where have you applied to?

23        A.  I looked for employment in several places,

24   body shops, including this man, Roberto -- Roberto

25   Perez.  I've done work for him in cars, I've been a



```
 1   dishwasher.
 2        Q.  Okay.  Hold on.  Because I want to be able to
 3   get all this information.  What is the name of
 4   Roberto's company?
 5        A.  He got out and he rented that place.  And I
 6   said, give them my number because I know how this
 7   works.  I do know the history.
 8        Q.  So Roberto used to own a property at the
 9   Viormar location?
10        A.  No.  He's a neighbor across the street.  He
11   owns a building across the street, Roberto.  And he --
12   and at some point, he wanted to buy Viormar.
13        Q.  Okay.  So then I'll make my question broader.
14   Have you ever looked for work outside of a 20-mile
15   radius of Viormar?
16        A.  Well, I can't leave Viormar because I have to
17   take care of everything there.  I can't leave there.  I
18   have to be on top of it, like they say.  When an
19   inspector comes, when everything.
20        Q.  Who's -- what would happen if you weren't on
21   top of it?
22        A.  Everything.  Their life would just go down or
23   get derailed.
24        Q.  But why do you care about if their life or
25   business goes down?
```



1      A.  Because that's the occupation that they gave

2  me.

3      Q.  Okay.  But you seem to have -- do you believe

4  that Viormar has enslaved you?

5      A.  I think so.

6      Q.  Okay.  So then why do you care if their

7  business gets derailed?

8      A.  Because I -- I thought they were trustworthy

9  people or people with principles, so I guarded and

10  protected them.  But see that they didn't care about my

11  life.

12      Q.  Okay.  Did you know that Viormar is trying to

13  sell the property?

14      A.  Me?  I know that they're trying to sell the

15  property, of course.  I have brought people who want to

16  buy it.

17      Q.  So you would find it beneficial for the

18  property to be sold then?

19      A.  Of course.  And that way, they could pay me my

20  money and I could leave.

21      Q.  Okay.

22      A.  It's $6 million that that property is worth.

23      Q.  Okay.

24      A.  And he's going to spend it, just like he spent

25  all of his father's money.



1      Q.  But are you aware that that property cannot be

2   sold while you're residing in it?

3      A.  So give me a deposit and I'll leave.

4      Q.  So --

5      A.  Or an advance.  I'll leave.

6      Q.  So you wouldn't say that's extortion?

7      A.  And they exploited me my whole life.

8      Q.  Okay.  So you testified earlier that the

9   living conditions are unfavorable; is that fair to say?

10     A.  No.

11     Q.  And you claim to have worked long hours as

12  well?

13     A.  Yes.

14     Q.  Which portion of the job requires you to work

15  these long hours?

16     A.  Which?  I have to be there the whole time.

17     Q.  Okay.  But you don't have -- do you have a

18  schedule that says from 9:00 a.m. to 1:00 p.m., you

19  have to do this specific job, and then from 2:00 p.m.

20  to 10:00, you have to do this other one?

21         THE INTERPRETER:  What -- what time?  5:00?

22         MR. ALVAREZ:  10:00.

23         MR. LAROU:  Objection.  Asked and answered.

24         THE WITNESS:  How is it possible that you

25  don't understand?  Well, now with the pandemic,



1  everybody threw their dogs out into the street.  I
2  picked up some dogs.  They accompany me.  They protect
3  me.  And they protect their property.
4         Those dogs bark because outside, there's a lot
5  of people, there's a lot of cars because then, they'll
6  steal their parts.  And there's police reports.  So
7  while the cars are being disassembled, people will come
8  and steal the parts.
9  BY MR. ALVAREZ:
10     Q.  Okay.  The cars that are being disassembled,
11 are those cars that Viormar is working on?
12     A.  They are from Carlos, a tenant from Viormar.
13     Q.  Okay.  So wouldn't you agree that the security
14 responsibility lies on Carlos and not Viormar?
15     A.  Could be.
16     Q.  Okay.
17     A.  But that's my job.  I also put the cameras to
18 see.  That's what Orlando would tell me.
19     Q.  Okay.
20     A.  Because if they steal things from Carlos, then
21 Carlos is not going to want to live there or -- or be
22 there, and then he's going to go find somewhere else to
23 be.  Just a few days ago, let's say last week, I felt,
24 I heard an explosion, dogs barking.  I go outside, lots
25 of smoke.  Turns out my neighbor's building exploded



1    and fire started.

2           I can't wait for the firemen to come, so I

3    went and I grabbed the extinguisher and jumped over.

4    And I saved all of those other -- all those buildings

5    and cars from not catching fire.  I did it because I

6    wanted to.  No, I did it --

7           THE INTERPRETER:  Sorry.

8           MR. ALVAREZ:  Oh, no, you're good.

9           THE WITNESS:  I did it because I have a

10   conscience and I have appreciation.

11   BY MR. ALVAREZ:

12      Q.  Okay.

13      A.  And because I have to take care of it.

14      Q.  When did this happen?

15      A.  A few days ago.  Last week.

16      Q.  Did --

17      A.  And if I wouldn't have been there at that

18   place, everything would have burned down.  It was 11:00

19   at night.  There was no one there.  It -- I'm not doing

20   anything bad by that.  I'm doing my job.

21      Q.  That sounds like a pretty large fire if it

22   could have burned everything down.  Did the fire

23   department show up?

24      A.  Yes, and the police, too.

25      Q.  Okay.



1      A.  And then they said, you did a good job.  So I

2  was doing a good job.  As one of those letters say,

3  like the people from the building thanking me for my

4  good job.

5      Q.  So --

6      A.  I did a good job.  I need him to compensate

7  me.

8      Q.  Okay.

9      A.  That's it.

10      Q.  So can you remember what day of last week that

11  fire happened?

12      A.  I think it was a Monday or a Tuesday of last

13  week, something like that.

14      Q.  Do you know if there was any news article

15  reporting that a local man stopped fire?

16      A.  No.

17      Q.  Okay.

18      A.  It was none of that.  But I can get the

19  report.  I called.

20      Q.  Okay.  Would you agree --

21      A.  I do it because -- to show that, like, it's my

22  job.

23      Q.  All right.  So we've established that -- well,

24  you've established that part of your job duties were

25  security; would that be fair to say?



1        A.  Correct.

2        Q.  Now, would you agree that if most companies

3    hire security personnel, part of their job duties is in

4    fighting fires?

5        A.  Yes.

6        Q.  Okay.

7        A.  But I can't let it burn down.  Nobody says in

8    the Constitution or any law says, you have to let it be

9    and let the fire happen.

10       Q.  Okay.

11       A.  Or I see somebody getting killed, that I'm not

12   going to intervene to stop them from getting killed.

13       Q.  Fair enough.  Let's talk about the dogs for a

14   minute.  How good are they at providing security?

15       A.  My dogs are good.  They -- I trained them

16   myself.  I trained their dog, too.  I have the videos.

17   They destroyed the big house.

18       Q.  And he also mentioned that you installed

19   security cameras on the property.  Is that encompassing

20   the whole property?

21       A.  No.

22       Q.  Where are the security cameras?

23       A.  There's only one, but it doesn't -- to see,

24   but it doesn't record.  I -- it's just for me to look.

25       Q.  So those security cameras don't really benefit



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     64

1   Viormar, they benefit where you're residing?

2        A.  It sees everything, the front.

3        Q.  Okay.  So if --

4        A.  And it has the audio.

5        Q.  So if there are security dogs on the property

6   and security cameras, why is your position as a

7   security guard required?

8        A.  I installed those cameras for self-protection.

9        Q.  Okay.  I thought a moment ago, you said you

10  installed the cameras as a part of your job duties?

11       A.  No.  I bought them.

12       Q.  Okay.

13       A.  And I brought the dogs myself, too.  And he

14  agreed to it.  And there was a moment that they were

15  going to break in, and then he said, don't go out there

16  without the dog.

17           When there's an incident, I call the police,

18  and they don't come, and then I call them again.  And

19  then I -- I say to them, if you don't come soon, I'm

20  going to let the dogs out.  They're like, no, we're --

21  we're almost there.  So they're not aggressive or

22  clandestine, those dogs.  If you have a weapon or

23  you're aggressive, they'll turn aggressive.

24       Q.  Okay.  So can you give me a rough

25  approximation of how many years you're providing



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                         65

1  security services for Viormar for?

2      A.  Since I started.

3      Q.  So that's about --

4      A.  Since I started.  2010.

5      Q.  Okay.

6      A.  When I started, the piles of trash were all

7  over the parking lot, everywhere.  And I eliminated all

8  of that.

9      Q.  So would you say that you're good at providing

10 security?

11     A.  Yes.

12     Q.  Okay.

13     A.  When I was a boy in Cuba, like, 16 or 17, I

14 was trained to guard.

15     Q.  Okay.  Well, if you have training in security

16 from your time in Cuba, and you've been providing

17 training services for 14 years at Viormar, why haven't

18 you ever tried applying to be a security guard at

19 another company?

20     A.  I would like to, but I can't leave there.  As

21 we're speaking about the pile of trash, that's when

22 Orlando's father --

23         MR. ALVAREZ:  (Audio interruption.) Sorry.

24 Sorry.

25         THE WITNESS:  -- he said, you could stay here,



1   so that they know that there's a presence here and they

2   don't keep throwing out the trash.  But I didn't stay

3   in the offices.  I stayed at 7880, which was pretty

4   big.  That's where Carlos de la Flor is now.

5   BY MR. ALVAREZ:

6       Q.  Okay.  So you stated that if you left the

7   property, the business would run off the rails; is that

8   fair to say?

9       A.  Yes.  They don't know -- I don't know what --

10   what's going to come of it when I leave.

11       Q.  So you don't want the business to fail?

12       A.  It makes me sad because of his father.  How

13   the father himself constructed that building, how he

14   was able to get that man, how he -- how he went to

15   China, how he became rich, how he got to Venezuela with

16   $20, everything.  And so for it to crumble, that cost

17   him so much work, that person who did value my

18   presence.

19       Q.  So your tie to this property is for the love

20   of Orlando's father?

21       A.  I don't have anywhere to go.  I don't have

22   anywhere to go.

23       Q.  Okay.

24       A.  And it's not just me, it's me and my dogs.

25       Q.  Okay.  So --



1        A.  I appreciate Orlando the father, but it's not

2    only that I did it for love and family.  I worked.

3    And -- and he said to me, I inherited you along with

4    this building --

5        Q.  So --

6        A.  -- which means I'm an object.

7        Q.  Okay.  So let me -- let me get this straight.

8    You first stated that you couldn't leave the property

9    because the business would fail.  Hold on.  And now,

10   you're saying that you can't leave the property because

11   you don't have anywhere to go and you have dogs.  So --

12   so which is it?

13       A.  They're both related.  They all -- they both

14   go together.  It does make me sad for the property

15   because I've spent my life there, taking care of all of

16   it.  At the same time, I can't go be on the street with

17   my dogs.

18       Q.  Okay.

19       A.  He has to be fair.  All I ask is for him to be

20   fair.

21       Q.  Okay.

22       A.  To recognize, tell the truth.  I've done a lot

23   of things for him.  And I'll leave, and I will be in

24   peace.  I will be in peace.

25       Q.  Okay.  Is there anything preventing you from



1  working as a security guard or as a mechanic elsewhere?

2      A.  No.

3      Q.  Okay.

4      A.  I'm -- I'm getting better with my eyesight.  I

5  can't drive yet.  I would like to.  Everything is

6  stacked up against me.  I don't have a place, I can't

7  see.

8      Q.  So would it be fair to say that your damages

9  right now is that if you were required to leave the

10  property, you would have to pay rent to live somewhere

11  else?

12      A.  No.  Right now it is difficult because I can't

13  really see.  Paint a wall, to paint a car.  I can't do

14  mechanic work.  I don't know.

15      Q.  Okay.

16      A.  How do I recognize a tool?  I can know what's

17  wrong with the car, but I can't repair it.

18      Q.  Have you ever gone to an ophthalmologist?

19      A.  They said it was a problem that with a special

20  diet that I have.  It's some kind of stroke.

21      Q.  Okay.  And who told you that?

22      A.  A doctor did.  I just don't like to go to the

23  doctors a lot.

24      Q.  Can you tell me which doctor diagnosed you

25  with that?



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                                    69

1      A.  I have to look in my papers when I went.  I

2   had an accident and I became handicapped, and then I

3   left the hospital.

4      Q.  Okay.  What -- what year did that accident

5   happen?

6      A.  When I first came to this country.

7      Q.  Okay.  And I know that you don't remember the

8   ophthalmologist that you saw, but do you remember which

9   hospital you went to?

10     A.  Baptist Hospital.

11     Q.  Okay.  And what year did you go to the

12  ophthalmologist?

13     A.  End of last year, this year.

14     Q.  Okay.

15     A.  And this year.

16     Q.  And did those doctors ever tell you that you

17  couldn't work because of the injury?

18     A.  No.

19     Q.  Okay.

20     A.  They didn't say anything like that.

21         THE INTERPRETER:  Counsel, just one second.

22  In the --

23         MR. ALVAREZ:  We --

24         THE INTERPRETER:  Can we go off --

25         MR. ALVAREZ:  We can go off the record for a



1  minute, yeah.

2        THE REPORTER:  We are going off the -- oh,

3  excuse me.  We are going off record.  The time is now

4  1:10 p.m., Eastern Standard Time.

5        (A recess was taken.)

6        THE REPORTER:  We are on the record.  The time

7  is now 1:53 p.m., Eastern Standard Time.

8  BY MR. ALVAREZ:

9     Q.  All right, Dennis.  So before we get into the

10  Complaint, I'm going to ask you, you know, a couple of

11  questions just to clear things up.  How did the

12  defendants force you to work?

13     A.  Well, if I wouldn't do the things, then he

14  would kick me out of the place.  He knew the conditions

15  I was in.

16     Q.  Okay.  And what do you mean by the conditions

17  you were in?

18     A.  Well, he knows that the little money I had, I

19  utilized it for the patents that I had, and that I

20  don't have money for, like, a down payment for a house

21  or an apartment, or do any sort of business.  He knew

22  that.  And he was like, yeah, yeah, go ahead, stay,

23  handle the business, but you have to work here doing

24  all of this.

25     Q.  So you're -- are you saying that your damages,



1  if you were evicted, would be that you would have to

2  find another place to live?

3       A.  And re-incorporate myself into society.

4       Q.  Okay.

5       A.  I feel isolated from the world.

6       Q.  Okay.  Before -- before Orlando's father found

7  you on the property, what -- what type of work were you

8  doing?

9       A.  I did cars, same, on my own.  And so then I

10  saw in television that, like, the kids were dying

11  because of it, and so I decided to start working on

12  that system.  I saw that people were stealing license

13  plates, and so I focused on getting that patent as

14  well.  I was a working man.

15       Q.  Okay.  So would it be fair to say that you

16  were doing independent jobs, like you're doing now,

17  even before you met Orlando's father?

18       A.  I did cars and whatever would show up.

19       Q.  So that's the same thing you're doing now,

20  though, right?

21       A.  Well, if -- if Orlando Fernandez would pay me

22  a certain amount per week, then I would not have to go

23  do a door, I would not go have to do a car or anything

24  like that.

25       Q.  But that wasn't what your original agreement



 1  was, right?  Because before you testified that he would

 2  let you live there rent-free, and you were allowed to

 3  do jobs for various other people.

 4       A.  I did say that.  And I did do side jobs, but I

 5  didn't always have side jobs.  It's not the same thing

 6  to have money coming in every week or every month.  He

 7  would always be telling me he didn't have money.

 8       Q.  But -- but, what prevented you from getting a

 9  job that paid consistently, like Burger King or

10  McDonald's?

11       A.  I don't understand that question.

12       Q.  Okay.  So I could rephrase that.  So you

13  testified that you had training and security.

14       A.  Yes.

15       Q.  Okay.  So what was stopping you from applying

16  for work at a security company?

17       A.  What would stop me?  Being in a company.

18  If -- if I go somewhere else, then I'm giving up the

19  occupation that they gave me.

20       Q.  But you testified previously that they

21  permitted you to do other jobs.

22       A.  Yes, I know.

23       Q.  Okay.

24       A.  I know.  It was only to support myself --

25       Q.  Okay.



1          A.  -- so that I could survive.

2          Q.  But just to be clear, you've made the decision

3     not to apply to different jobs?

4          A.  I don't know if you understand what I'm

5     saying.  I cannot go to apply for other jobs outside

6     because I cannot leave the property.

7          Q.  Okay.

8          A.  There's messages there that say, you have to

9     be there because this thing is going to arrive there.

10    I have to be there because there's packages --

11             THE INTERPRETER:  I'm sorry.

12             THE WITNESS:  -- there's packages, there's

13    mail, there's checks coming in.

14    BY MR. ALVAREZ:

15         Q.  How often were those messages coming in?

16         A.  All the time.

17         Q.  So you have, in your possession, messages

18    reflecting a consistent date where they're telling you,

19    you have to be on the property?

20         A.  Yes, I do have them.  My attorney has them.

21    I've given it to him.  E-mails too.

22         Q.  Okay.  And how long would it take you,

23    roughly, to receive a package that they told you, you

24    needed to be there for?

25             THE INTERPRETER:  How long would it take you



1   to do what?

2          MR. ALVAREZ:  Yeah.  Let me rephrase that.

3   BY MR. ALVAREZ:

4      Q.  So if they told you that a package was

5   arriving, how long would you need to stay on the

6   property, generally, to receive that package?

7      A.  So I'll give you an example.  One day, they

8   were delivering skylights.  And they sent him a message

9   saying, we're here, the person is not here.

10     Q.  Okay.

11     A.  Where are you, you have to be there.

12     Q.  Yeah.

13     A.  I can't -- I can't have them go back again.

14  So I couldn't have a job outside.

15         MR. ALVAREZ:  Okay.  All right.  I'm going to

16  introduce, as Exhibit 3, I believe --

17         THE REPORTER:  Yep.

18         MR. ALVAREZ:  It might -- may be 2.  It's 3?

19         THE REPORTER:  Yeah.

20         MR. ALVAREZ:  As Exhibit 3 Plaintiff's Second

21  Amended Complaint.

22         (Defendant's Exhibit 3 was marked for

23  identification.)

24  BY MR. ALVAREZ:

25     Q.  And I'm going to go through it with you.



1          MR. ALVAREZ:  Brooks, you may, you know,

2    assist him.

3          Or -- well, I suppose you can as well.

4    BY MR. ALVAREZ:

5       Q.  So I would like to -- to --

6          THE INTERPRETER:  All right.  So if we -- if

7    you're going to read off of it, I'd like --

8          MR. LAROU:  Okay.

9          THE INTERPRETER:  I don't know if we have --

10   oh, you have a copy, too?

11         MR. LAROU:  Right here.

12         THE INTERPRETER:  Okay.  Good.

13         MR. LAROU:  Yeah.

14   BY MR. ALVAREZ:

15      Q.  All right.  So I want us to look at Page 2.

16   All right.  In Paragraph 9, it says, "Defendants

17   regularly employed two or more employees for the

18   relevant time that handled goods or materials that

19   travel through interstate commerce or use

20   instrumentalities of interstate commerce, thus making

21   Defendant's business an enterprise covered by the Fair

22   Labor Standards Act." Now, earlier in your deposition,

23   I asked you if Viormar had any other employees, and you

24   said no; is that right?

25      A.  No, they never did.



```
 1          Q.  Okay.  Now --
 2          A.  Unless you want to call Cristina an employee,
 3     or his wife, Ita [phonetic], or his son -- or his son.
 4     And maybe there -- it's, like, something they -- they
 5     portray on the Internet and not physically.
 6          Q.  Okay.  What --
 7          A.  Or the other daughter, who's also on the
 8     Internet.
 9          Q.  Okay.  What about the -- the goods or
10     materials that travel through interstate commerce
11     that's here?  Did -- what was it that Viormar was
12     working on that traveled outside the state of Florida?
13          A.  I don't know about that.  That's their
14     mystery.  I don't know about that.  My thing was within
15     there.
16          Q.  But you do recognize that this is an
17     allegation in your Complaint, right?
18          A.  I'm saying it.  That's what it says here?
19          Q.  Yeah, in Paragraph --
20          MR. ALVAREZ:  If you want, read Paragraph 9 to
21     him again and --
22          THE WITNESS:  Well, I don't know about that.
23     I don't know if merchandise comes in and out.
24     BY MR. ALVAREZ:
25          Q.  Okay.
```



1      A.  I don't know.  I don't know if they do it.

2      Q.  All right.  So let's look at Paragraph 10.

3 "Defendants have been, at all times material, an

4 enterprise engaged in interstate commerce in the course

5 of their ownership, management, and rental of real

6 property" -- and in parentheses, it says, "(warehouse

7 space), which, traditionally, cannot be performed

8 without using goods, materials, supplies, and equipment

9 that all move through interstate commerce." Do you know

10 if the maintenance of those properties require the

11 importation of materials that travel through interstate

12 commerce?

13          THE INTERPRETER:  Can you repeat that last

14 part of the question?

15          MR. ALVAREZ:  Yeah.

16 BY MR. ALVAREZ:

17      Q.  Do you know if Viormar has imported materials

18 that travel through interstate commerce to maintain

19 these properties?

20      A.  Well, they -- they would buy material for me

21 to work the walls.  I don't know if they bought it

22 locally or they bought it from another state.  I don't

23 know.  And I understood the other one now.  Now, I

24 understand.

25      Q.  Okay.



1      A.  Other tools that I utilized, the rollers,

2   paint, tools, they would bring in.  When -- when I

3   would do the oil change for their cars, the oil came

4   outside, from -- from elsewhere.

5      Q.  Okay.  But -- all right.  So which state did

6   the oil come from?

7      A.  I don't know.  They buy those things at auto

8   parts store.

9      Q.  Okay.  And when you were changing these oils,

10  how does that further Viormar's business interest?

11          THE INTERPRETER:  When you were buying these

12  oils --

13          MR. ALVAREZ:  No, because he said that he was

14  changing the oils on his cars, right?  So how does him

15  doing that further the business interests of Viormar?

16          THE WITNESS:  How does it advance?

17  BY MR. ALVAREZ:

18     Q.  Yeah.

19     A.  Because they would utilize the cars for their

20  transportation, for their daily ins and outs.

21     Q.  Okay.  But were those cars owned by Viormar,

22  or were they owned by individuals?

23     A.  Their individual persons.

24     Q.  Okay.  And with respect to your job duties --

25  actually, let me -- let me back up.  I'm going to



1  retract that and rephrase.  You -- you stated earlier

2  that they took you to a Cuban cafe and you negotiated

3  your business terms; is that right?

4       A.  Yes.

5       Q.  Okay.  And what did they tell you were going

6  to be your responsibilities at that time?

7       A.  What was going to be my responsibility?

8       Q.  Yep.

9       A.  Maintenance and care of the property.

10       Q.  Okay.

11       A.  That they were moving to Orlando and I was

12  going to be in charge of everything.

13       Q.  So --

14       A.  I would -- I would do the deposits in their

15  bank, Ocean Bank.  They even know me there.  I would

16  put postage on stamps.  I would send them things over

17  there.

18       Q.  Okay.  So speaking of that -- so -- so

19  speaking of that, you mentioned that Orlando Fernandez

20  is now living in Orlando.  How often does he visit the

21  Viormar property?

22       A.  No.

23       Q.  Okay.

24       A.  When he -- when he's coming to pay his taxes

25  in Miami, he'll send me a message, I'm going to come



1  over, I'm in Miami.

2        Q.  Okay.

3        A.  He never comes.

4        Q.  And you testified earlier that you weren't

5  provided a work schedule from Viormar; is that right?

6        A.  No.  It was, do everything always, all hours.

7        Q.  Okay.  So how would Viormar know if you did or

8  didn't do something?

9        A.  He would call me.  He would ask me via

10  message.  And then he would send me a message, I'll

11  call you later.  And then I would tell him, I -- it's

12  just that I had to tell you what was going on.  And he

13  said that he took long calling me back because he was

14  feeding his canaries or whatever birds.

15        Q.  All right.

16        A.  I had to represent him in front of the City of

17  Doral for all the complaints.  I would get the letters,

18  I would send pictures to him.  But when I would show

19  up, I would show up as the representative of Orlando

20  Fernandez.

21             So the City of Doral does not deal with you,

22  the police either, the post office.  They don't give

23  you the papers nor the correspondence if you're the

24  representative.

25        Q.  All right.  Who in the City of Doral did you



```
 1   meet with?
 2        A.  The inspectors would come often and say, well,
 3   the cables are touching the electricity, you need to
 4   trim them.  I would say to Orlando -- and then I would
 5   say, go find a tree trimming company, see if you can
 6   find it cheaper.
 7        Q.  So --
 8        A.  That's all in -- in the mail.
 9        Q.  So would you say that you almost acted as an
10   advisor to Orlando on how to keep the company compliant
11   with code enforcement regulations?
12           THE INTERPRETER:  Can you repeat that?  I'm
13   sorry.
14           MR. ALVAREZ:  Yeah.
15   BY MR. ALVAREZ:
16        Q.  Would you say that you offered advice to
17   Orlando on how to keep Viormar compliant with the rules
18   of the City of Doral?
19        A.  I would tell him.  The -- when the 40-year
20   inspection came -- I'm just setting an example.
21   There's a lot more.  I told him that the roof had
22   deteriorated, that I kept putting sealant on it, and
23   for him to buy the sealant.
24           And I would get up there and I would try to
25   improve it to see if it would pass inspection, but it
```



1   wouldn't.  I had to put in a new roof.  And I had to

2   get the estimates myself of a new roof.

3       Q.  All right.  So hold on.  Before we move on, do

4   you have messages from anyone at Viormar directing you

5   to do these things?

6       A.  Orlando Fernandez.

7       Q.  Okay.

8       A.  I would tell them to get me estimates,

9   receipts, the tree trimming receipts, receipts of the

10  roof.  And when there was an open wall -- let me give

11  you an advice.  I sleep under that, and I will tell

12  him, Orlando, that's going to fall on me.  That eight

13  ton beam is going to fall on me.  And you want to rent

14  this in this condition?

15      Q.  So --

16      A.  And he said, I have to rent it anyway.  I --

17  go cover it up, go buy cement, go buy paint, and here's

18  the money.

19      Q.  Okay.

20      A.  And I advised him not to.  And then, that's

21  when the discordance began.  Why?  Because he wants to

22  rent out a building that's going to fall on people's

23  head.

24      Q.  Okay.  And -- give me a minute to think this

25  one.



1        A.  So I'm sorry, I'm just telling the truth.

2   I've done the entire electricity for that building.

3        Q.  If --

4        A.  And he doesn't learn, which means I don't do

5   anything.

6        Q.  Has anyone at Viormar threatened you with

7   eviction if you stopped working?

8        A.  The daughter came a few days ago and told me

9   that she was going to get me out of there.  I said,

10  what?  You have to pay 5,000, she said now.  I have to

11  pay 5,000 in a 600 feet square place.  And I told her,

12  I don't think I have to pay 5,000.

13        And she was rude to me that day.  I didn't

14  want to do it.  I wanted her to understand that I have

15  worked for him.  I have been a person unlike any other

16  person he is ever going to find in his lifetime.

17        And now, he's going to -- when I'm out of

18  there, he's going to have to pay people, like the

19  landscaping company, that he now has to pay.  Never had

20  to pay for that before.  Who gave maintenance to that?

21        Q.  How long has Viormar been trying to sell the

22  property?

23        A.  I just found out.

24        MR. ALVAREZ:  All right.  So -- hold on one

25  second.  Were you able to get everything that was being



1    said there?

2         THE REPORTER:  Yeah, I -- I was.  Thank you --

3    and thank you for asking.  I just -- yeah.  But

4    everyone's doing a great -- a great job.  I appreciate

5    it.

6         MR. ALVAREZ:  Okay.  Sorry.  Can you reread

7    his response to me?  Because I was going to follow up

8    with -- on that.

9         THE REPORTER:  Sure.  Just one moment.

10   I'll -- I'll actually play the -- play it back, the

11   question and -- and answer.  Just one second.

12        THE INTERPRETER:  I hate to hear myself on

13   video -- on sound.

14        MR. ALVAREZ:  I'm not a fan of it either.

15        THE INTERPRETER:  It's weird.

16        (The previous answer was played back.)

17        MR. ALVAREZ:  All right.  All right.

18        THE REPORTER:  Oh, and the last question was:

19   How long has Viormar been trying to sell the property?

20   I don't know.

21   BY MR. ALVAREZ:

22        Q.  I'll ask that one again.  How long has Viormar

23   been trying to sell the property?

24        A.  Never.

25        Q.  So they've never told you that they're



1   planning on selling the property?

2        A.   No.

3        Q.   So I don't mean to interrupt, but didn't you

4   testify earlier that you would be happy if they did

5   sell the property?

6        A.   Not -- did I say that?  No.

7        Q.   Okay.

8        A.   I'm -- I'm not happy that they're selling the

9   property.

10       Q.   Okay.

11       A.   He has not wanted to sell the property.  I

12  have brought him people to buy the property, and he

13  said no.  And then, a man came and said, I'm going to

14  buy this property whether you want to or not.  And then

15  Orlando said, that man's crazy because how is he going

16  to buy the property if I'm not selling it to him.

17       Q.   But you're the one that found that potential

18  buyer?

19       A.   Yes.  He -- he's a truck -- tow truck driver,

20  and he came to pick up a car at Carlos' to -- it's --

21  it's to make, like, a trucking -- tow trucking company.

22  And he said no.

23       Q.   But why would you try to find a buyer if you

24  intend on remaining on the property?

25       A.   I don't want a buyer.  And hear me out.  It's



1  not that I want to stay in the property, I don't

2  have -- how to get out of the property.

3      Q.  Why don't you have the means of getting out of

4  the property?

5      A.  I don't have enough money saved up from what I

6  have been able to save throughout the years in order

7  for me to move out.

8      Q.  But if I'm understanding correctly: When you

9  first came into this agreement, you found it favorable

10 to live on the property rent-free and provide services;

11 is that right?

12     A.  I was never living there for free because I

13 have to work for him about 24 hours a day, and he

14 doesn't pay me.

15     Q.  So you are working in lieu of paying rent?

16     A.  I don't understand.

17     Q.  So instead of having to pay rent, like other

18 tenants, you pay for that in the work you provide; is

19 that what you're saying?

20     A.  That is right.  That's how he's paying me.

21 He's paying me with a roof, which the law says he can't

22 do.  Blue Lightning Campaign says that, and I'm

23 educating myself on how that works.

24     Q.  Okay.

25     A.  I'm -- this is not good, and I am getting



1  assessment from the government.

2      Q.  So when you met Orlando's father, both of you

3  came into agreement that you would pay $500 a month in

4  rent; is that right?

5      A.  I paid that to live there.  As a matter of

6  fact, my brother stayed outside.  And what he would

7  want me to do was to create, like, an office space or

8  fix the office, so that he could rent it out to my

9  brother.  But then the land came up -- he didn't want

10  me to leave.  And he was, like, the one telling me,

11  don't go to the land or lot because, what are you going

12  to go do over there?

13      You need to stay here.  And so I introduced

14  him to my brother, and then my brother buys the land

15  off of him.  And then he's like, no, you go here.

16      Q.  Was Orlando's father concerned for your

17  well-being?  Is that why he told you not to go to the

18  lot?

19      A.  His dad wasn't alive at the time.  Orlando's

20  son did that.

21      Q.  So Orlando's son told you to stay inside the

22  office instead of the lot?

23      A.  He's -- he's always saying that, no, no, no,

24  no, I need you.  Stay there, stay there.

25      Q.  Okay.  All right.  Can we look at Page 3 of



```
 1   the Complaint, Paragraph 17.  It says, "Plaintiff
 2   worked for Defendants by performing various job duties,
 3   including cleaning, repairing, renovating, collecting,
 4   and renting for its commercial property rentals." How
 5   were you renting for its commercial property rentals?
 6        A.  What do you mean by "renting"?
 7        Q.  Well, I mean, that's what it says in the --
 8        A.  I would bring people in.  I would bring them
 9   the person.  And I would introduce them and say, this
10   is a trustworthy person, you can rent it to them.  And
11   then he would do everything, all the paperwork.
12        Q.  How did you find these people?
13        A.  Because I get commented on by people, and then
14   I go to them and I see their living conditions and
15   stuff.  Orlando's never there.  Never.
16        Q.  Were you ever threatened physically that you
17   had to stay on the property?
18            THE INTERPRETER:  That -- where you had to do
19   what?
20            MR. ALVAREZ:  Had to stay and work on the
21   property.
22            THE WITNESS:  Orlando Fernandez, you mean?
23   BY MR. ALVAREZ:
24        Q.  Anyone at Viormar?
25        A.  Very subtle threat.  No, you have to -- you
```



1  don't need anything.  You have to stay here, you have

2  everything here.  I don't have everything there.  I

3  have children.  I have family.  I have a mother.  I

4  don't have any reason to be in some solitary place.

5      Q.  Okay.

6      A.  I have to be normal, like the rest of people.

7      Q.  So you could stay with those family members

8  you're referencing, can't you?

9      A.  I don't think I can.  Everybody has their own

10  lives here.  My mom lives with my sister.  One of my

11  children went to Japan.  Cousins, uncles, it's not the

12  same here.  There's only one solution here.  For that

13  man to -- I worked a lot for that -- for that man to

14  tell the truth, pay me what he owes me, and I'll leave.

15  He has a lot of properties.  He has a lot of money.

16      Q.  If it's your --

17      A.  That's on my behalf.

18      Q.  If it's your position that they're saying that

19  you have to stay on the property and can't leave, that

20  they want you on that property, why is it that they're

21  trying to evict you from that property?

22      A.  You know why?  Why did this happen?  Because

23  the minute that I got an attorney and they got the

24  petition from the attorney, they -- that's when they

25  wanted to evict me.  They went as far as to tell me



1   that if I removed the lawsuit, they would get me a lot.

2       Q.  Okay.  But earlier, you testified that you'd

3   never wanted to bring this suit.  If your original

4   agreement was that you get to stay on the property

5   without paying rent in exchange for your work, at what

6   point did you decide, no, I want -- I need to get paid

7   as well?

8       A.  When he told me he didn't care about my life

9   or where I went, and I was insignificant to him.  And I

10  said, I have worked for you many years.  And I gave my

11  life there.

12      Q.  When did he tell you that?

13      A.  On a Friday.  On February 28th, that's the

14  date of the lawsuit.  That previous Friday, he came.  I

15  told them that thing about that the building wall was

16  going to fall off and I was supposed to cover up this

17  crack.  Why was the debris from the five offices that I

18  demolished still there?

19          And that's -- and I said, I'm one person.

20  That we needed a big container for me to get everything

21  out.  He -- he said he couldn't do that, that he

22  couldn't get a big container, that I would have to do

23  it slowly in the regular trash.

24      Q.  All right.  And again, just to confirm, were

25  those verbal demands?



1       A.  Yeah, they're smart.

2       Q.  Okay.

3       A.  They're smart.

4           THE INTERPRETER:  Counsel, whenever you get a

5   good breaking point, if we could use a restroom break.

6   I don't know how much time --

7           MR. ALVAREZ:  Yeah.  I don't have much left,

8   but I also need to use the restroom, so now would be a

9   good time.

10          THE INTERPRETER:  Okay.  Good.

11          MR. ALVAREZ:  We're going to go off the

12  record.

13          THE REPORTER:  We are going off the record.

14  The time is now 2:39 p.m., Eastern Standard Time.

15          (A recess was taken.)

16          THE REPORTER:  We are back on the record.  The

17  time is now 2:45 p.m., Eastern Standard Time.

18  BY MR. ALVAREZ:

19      Q.  All right.  So back in 2010, you stated that

20  Orlando's father found you sleeping in your car due to

21  your financial situation.

22      A.  I didn't say that.

23      Q.  Okay.

24      A.  He saw me working one of Jessy's Limousines

25  cars.

1      Q.  Okay.  Could you go to Paragraph 41 of the

2   Complaint?  I think I'm already there.

3          THE INTERPRETER:  I'm here.

4   BY MR. ALVAREZ:

5      Q.  Okay.  So it says, "Plaintiff slept in his car

6   near the defendant's property located at 7884 Northwest

7   55th Street, Doral, Florida 33166 due to his financial

8   situation." So is that not the case?

9      A.  Who said that?

10     Q.  You did.  It's -- that's your allegation.

11     A.  I was sleep -- I wouldn't sleep in the

12   property.  I would sleep across.  I did not sleep in

13   their property.  I slept across the street.  I would --

14   I would live by Roberto Perez.  It was only because I

15   sold everything I had to make those patents.  And I

16   would work Jessy's cars.

17     Q.  So -- but at that time, you lived out of your

18   car; is that fair to say?

19     A.  Yes, until I would find some rent.

20     Q.  Okay.  And if you were evicted today, where

21   would you live?

22     A.  It's different now.  I don't really have a

23   good eyesight.  I'll tell you this, I'm trained to do

24   whatever.  But I can't see now.  I don't care to live

25   on the street because I know how to live on the street.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      93

1    I was abandoned after 2 years old by my own mother.

2    And I learned to survive without going and being a

3    delinquent.  So imagine, there's this person who

4    supposedly is prestigious and honorable.

5           He's degraded himself based on this huge lie

6    that he's told just because he doesn't want to pay me

7    what I deserve.  It says here.  I remember him saying,

8    don't tell anybody, don't let anybody know that I --

9    that you worked for me.  And don't let anybody know you

10   live here.

11         Q.  What's the document you're referring to?

12         A.  I'm -- I wrote it down here, so I don't forget

13   it.  It's just a lot of things.  I'm regaining my

14   memory, all that he would tell me constantly, the whole

15   life I lived there.

16         MR. ALVAREZ:  Okay.  I think that's going to

17   wrap up my questions.  I -- and I'm going to reserve

18   the right to reexamine after your cross if I have to.

19   I don't anticipate I will.  But yeah, I'm -- I'm done

20   with my --

21         MR. LAROU:  Sure.

22                 CROSS-EXAMINATION

23   BY MR. LAROU:

24         Q.  Mr. Aneiros, just a couple of follow-up

25   questions from me.  You mentioned earlier in your



 1 | deposition that during the time you were performing
 2 | work for Viormar and for Orlando Fernandez on
 3 | occasions, at least one occasion, Orlando would travel
 4 | to Curacao; is that right?
 5 |      A.  No.  I said that one would have to travel to
 6 | Curacao.  Okay.  So he sent me the whole -- he did it
 7 | from here.  And then he sent me the package, so that I
 8 | could certify it at the post office and send it.  And
 9 | that's when he tells me, don't tell anybody about what
10 | we're doing.  Because the company didn't have a
11 | property.  That's when he tells me that.
12 |      Q.  So just to make sure I'm understanding
13 | correctly, Orlando would instruct you to mail this
14 | package to Curacao?
15 |      A.  Correct.
16 |      Q.  Do you know what was in the package?
17 |      A.  No.  Well, when he would say Curacao, I knew
18 | that the company was based out of Curacao.
19 |      Q.  Understood.  So you believe that that package,
20 | which Orlando was instructing you to send to Curacao,
21 | was something related to the business of Viormar?
22 |      A.  My deductive reasoning tells me so.  Because
23 | he said not to tell anybody about it.
24 |      Q.  As part of the job duties that you were
25 | performing for Viormar or for Orlando Fernandez, were



1  you regularly sending or receiving mail for the

2  company?

3       A.  Correct.

4       Q.  How often would you send mail for Viormar or

5  for Orlando?

6       A.  Every 15 days, something like that.  The

7  letters would accumulate.  They would accumulate.  He

8  would send everything with the stickers, Denny and

9  Orlando, and then he would buy the postage and send it

10  to me.

11            And then he told me he'd have -- I'd have to

12  pay for my own electricity, that I'd have to buy my own

13  postage.  And then -- postage and envelopes.  And I

14  didn't have the funds to buy the postage and the

15  envelope, so they would delay it a little bit.

16       Q.  How often would you receive mail for Viormar

17  or for Orlando?

18       A.  Every day.

19       Q.  Every day.  And so where would you retrieve

20  that mail from?

21       A.  You know, from washing dishes or whatever.

22  Whatever I would do.

23            MR. LAROU:  And so I don't -- I don't think

24  that answer was completely responsive to my question,

25  so I just want to see if I can ask that question in a



 1  different way.  I'll slightly rephrase.

 2  BY MR. LAROU:

 3      Q.  So where would you pick up the mail from that

 4  would arrive for Viormar or for Orlando?

 5      A.  It will get delivered by the post office.

 6      Q.  Delivered to where, to a mail box?

 7      A.  The mail box at 7884 Viormar, or -- or the

 8  postman himself would say, Denny, Denny, here is the

 9  correspondence for Orlando Fernandez.

10      Q.  Okay.  And so after you would retrieve or

11  accept those letters or packages, either for Viormar or

12  for Orlando, how would you get those letters or

13  packages to Orlando?

14      A.  I would buy the stamps and the envelopes after

15  he stopped sending me stamps and envelopes.  I still

16  send him stuff.  So I would grab the letter, and then

17  put it in the new envelope and address it to his

18  address.  It's a P.O Box.  And then I will give it to

19  the postman.

20      Q.  So earlier in your deposition, you mentioned

21  quite a few job duties that you were performing either

22  for Viormar or for Orlando.  And I just want to go

23  through those.  Okay.  Other than -- other than

24  performing repairs to the building, finding new tenants

25  to rent out the space, general maintenance of the



 1   warehouse, cleaning the warehouse and the parking lot,

 2   taking out trash --

 3          THE INTERPRETER:  One second.

 4   BY MR. LAROU:

 5      Q.  -- and also evicting tenants from a warehouse,

 6   and painting the warehouse, are there any other job

 7   duties that you can think of that you performed either

 8   for Viormar or for Orlando?

 9      A.  At night -- well, guard the property.  Every

10   time that the dog barked and I go outside, there would

11   be a man out there.

12      Q.  Okay.  And did you perform all of those job

13   duties throughout the entire time that you were living

14   on Viormar's property?

15      A.  Yes.  I still live there and I still do it.

16   Yes.  And that landscaping person he hired only comes

17   once.  But my little cart with the trash and the dust

18   bin are still there.  And daily, there's a lot of

19   debris, leaves fall off, people take out -- leave

20   trash, and they also -- water bottles and things like

21   that.  I pick up all the -- all of that, still.  I

22   still send the mail I receive.

23      Q.  Okay.  I want to talk a little bit more about

24   painting the warehouse.  What part of the warehouse did

25   you paint?



1        A.  The interior completely.

2        Q.  Okay.  Did you only paint the --

3        A.  Inside and all the exterior.

4        Q.  Okay.  So you -- you painted the inside as

5   well as the outside of the entire Viormar warehouse

6   property?

7        A.  Yes, in order to rent it out.  It was still,

8   like, concrete block.  And they said, you have to

9   paint.  They bought the paint -- the paint tanks,

10  rollers, brushes, everything.

11       Q.  Okay.  And so just to make sure, so you

12  painted the portion of the warehouse that was rented by

13  Jessy's Limousines; is that correct?

14          THE INTERPRETER:  You rented?

15          MR. ALVAREZ:  Painted.

16          THE INTERPRETER:  Painted.

17          THE WITNESS:  Yes, I painted that too.

18  BY MR. LAROU:

19       Q.  And you painted the portions of the warehouse

20  that were rented by Viormar's other commercial tenants

21  as well?

22       A.  Correct.

23       Q.  How many times have you painted Viormar's

24  warehouse?

25       A.  It's 10,000 square feet.  It's a warehouse.



1  And it's divided, 5,000, 5,000.  Carlos de la Flor is

2  in one of them.  When Carlos comes to -- to rent it, I

3  brought him in with his trailer and truck.  Then they

4  said, paint walls, doors, install the water heater.

5        Vita Home Care Solutions used to be there, so

6  I had to paint all of the outside.  And then -- so I

7  had made, like, on the door of Vita, like, this huge

8  logo, and they wanted me to remove that.

9     Q.  Okay.  And so -- so have you painted Viormar's

10  warehouse more than one time?

11     A.  Three times.

12     Q.  Three times.  Do you remember about how long

13  ago it was that you were painting the warehouse?

14     A.  Last time, it was, like, three years.  I was

15  changing that thing that had the termites.  And so

16  there was new wood.  He brought the paint, and I had to

17  paint it again to pass the inspection from the City.

18     Q.  Got it.  So what type of tools or materials

19  did you use to paint the warehouse?

20     A.  Rollers, brushes.  And I had to put, like,

21  caulking to cover the holes.  A pressure washer machine

22  to remove the dust and dirt, all of that.  Orlando

23  would bring all that.

24     Q.  And I'm assuming you probably had to use paint

25  itself, right, to -- to paint the warehouse?



1      A.  Yeah, he would bring the paint.  He would,

2  like, remove a piece of the wall, and then he'll have

3  it matched and then bring that paint color.

4      Q.  And who would have a piece of the wall

5  removed?  Orlando?

6      A.  He would tell me to do it, to remove a piece.

7  He wouldn't do anything.

8      Q.  Got it.  So let's go through some of those

9  materials that you were using to paint the warehouse.

10  First, let's start with the rollers.  I believe you

11  stated just a moment ago that Orlando provided you with

12  those rollers.  Do you know where he got those rollers?

13      A.  He would get them at a paint company on -- he

14  would get them off 79th Street and 52nd, and the place

15  was called, America.  But that -- American Paint.  That

16  was for the government.  And -- but she's no longer

17  there.  She would prepare paint for the military and

18  stuff.  But I would recommend that place because that

19  was the one that was closest by.

20      Q.  Got it.  So you recommended Orlando to go to

21  American Paint, and Orlando would purchase those

22  materials himself for you to use; is that correct?

23      A.  True.  And the sealants for the roof, he'd buy

24  them there.

25      Q.  What about the caulking that you mentioned



1   just a moment ago?  Do you know where that came from?

2        A.   Same place.

3        Q.   What about the pressure washers?  Do you know

4   where Orlando got those?

5        A.   It was electric.  I don't know.  I would

6   imagine Walmart or -- I don't know where he got them.

7        Q.   Do you know if he bought those pressure

8   washers or rented them?

9        A.   No, it was their pressure washer.  We got that

10  when -- he got that when Vita Home Care Solutions was

11  made to clean the floors.  We remodeled everything and

12  to paint -- do it before painting the walls.  So that

13  stayed as part of the company.

14       Q.   As part of Viormar's company?

15       A.   Yes, Viormar.

16       Q.   Do you happen to remember the brand of the

17  pressure washer you were using?

18       A.   Husky, I think it was called.

19       Q.   So you mentioned just a second ago, there was

20  an issue at the warehouse where there were cracks in

21  the structure or in the foundation of the building, and

22  that you tried to apply sealant, but it seemed like

23  that wasn't working.  There were still leaks.  Do you

24  know if Orlando or Viormar ever got those cracks fixed?

25            THE INTERPRETER:  That it -- the -- it had the



1  cracks, but -- you started with something else.  But it
2  was not --
3          MR. LAROU:  Oh, but there was still water
4  leaking through the cracks.
5          THE WITNESS:  No, not that one.  There was
6  a -- like, an explosion, 2017, 2018.  And I
7  investigated what was going on.  And I investigated it,
8  and in the back, it was, like, the wall was going to
9  crumble.  I called him at that night.  It was, like,
10  midnight.  I said, Orlando, the back wall is going to
11  fall completely.
12          Next day, he was here.  He came.  And when --
13  and when he saw that it was falling apart, he hired a
14  big company.  And they did the whole building in the
15  back.
16  BY MR. LAROU:
17      Q.  So where -- where were those cracks that --
18  that were being fixed?  Was it in the wall of the
19  warehouse?  Was it in the roof?
20      A.  It was the back wall, sorry.  Back and lateral
21  wall.
22      Q.  Okay.
23      A.  Those walls support the roof.
24      Q.  Got it.
25      A.  But the one in the back, what's the wall that



1  he asked me to cover up or fill in the holes.

2     Q.  Okay.  So during the time that you've been

3  living and working at Viormar's warehouse, have there

4  been any contractors that have come to the property to

5  fix any kind of structural issues?

6     A.  One or another person may have come, yes.

7     Q.  Do you know how Orlando or Viormar found those

8  contractors?

9     A.  I brought the electricians.  And the

10 contractors who checked the structure, he sent them.

11 But since all of this process has began, and I think it

12 has been somewhat delayed, there have been no other

13 contractors because this process is on the way.

14    Q.  Okay.  So you said that you contacted some

15 electricians to come and perform work at Viormar's

16 warehouse.  What happened to necessitate an electrician

17 to come to Viormar's property?

18    A.  Well, he hired some electricians because we

19 had to change the meter when Carlos first came.  So

20 he -- he had to get a meter that had higher voltage,

21 like, 100 watts because of the machinery that he uses

22 to fix cars.  So they did the job.  Carlos paid for

23 that.  Water heater -- in warehouse.  So one of the

24 electricians that came disconnected the warehouse of

25 the person who says -- this famous person who says they



 1 | can't rent out their warehouse.

 2 |         MR. LAROU:  Okay.  Hold on.  Just one second.

 3 | I would like to put a new rule.  If you're already

 4 | translating, could he pause and wait for her to finish

 5 | the --

 6 |         THE INTERPRETER:  Yeah.

 7 |         MR. LAROU:  -- translation?  Because it's --

 8 |         THE INTERPRETER:  I'm getting a little

 9 | overwhelmed.

10 |         MR. LAROU:  -- it's hard -- yeah.

11 |         THE INTERPRETER:  It's okay.

12 |         MR. LAROU:  It's okay.  All right.

13 |         THE WITNESS:  So the line that brings in the

14 | electricity to that warehouse was broken.  And so it

15 | stalled the process for a long time due to that.  He

16 | had not used that warehouse in seven years.  He wanted

17 | me to tear down the walls and the offices.  And so I

18 | told him, I need you to install the electricity because

19 | I need to install machines there.

20 |         So I got him an electrician, so that he could

21 | install the electrical system once again.  He wants to

22 | do everything under the table, and not everything can

23 | be done under the table.  You have to get permits, you

24 | have to bring qualified people as FPML demands it

25 | until -- it hasn't even been six months since the new



1   meter was installed.  November, December of last year

2   was when the electricity was finally installed in that

3   building.

4   BY MR. LAROU:

5       Q.  Okay.  So did Orlando -- you -- you said that

6   you were the one responsible for bringing in those

7   electricians.  Did Orlando instruct you to go out and

8   find an electrician to perform that work?

9       A.  Yes, he always tells me.

10      Q.  Okay.  Other than the electrician who

11  performed the work you just discussed, have you

12  coordinated with any other contractors or individuals

13  to come perform work at the warehouse?

14      A.  The roofers.  I look for several and they

15  would charge a lot of money.  The first one I brought

16  was charging $77,900.  And it's called Romero Roofing.

17      Q.  Okay.  And so when the roof needed work, did

18  Orlando instruct you to go out and find the roofer to

19  come perform that job, Romero Roofing?

20      A.  No.  He said it was a lot of money.  And he

21  said to wait, that he was going to get somebody.  And

22  he brought another person.

23      Q.  Okay.  Do you remember the name of the

24  electrician, either the -- the individual or the

25  company, that came and performed that electrical work



1  at Viormar's warehouse?

2      A.  That he brought?

3      Q.  Yes.

4      A.  I don't remember.  He had done that roof when

5  his father was alive.

6      Q.  Oh, okay.  Earlier in your deposition, you

7  mentioned that there were sometimes issues with

8  compliance with the City's building codes, including

9  there being a lot of trees and an issue with the power

10  lines.  Were you responsible for trimming those trees?

11     A.  Yes, but it was dangerous because they were

12  making contact with the tree -- I'm sorry, with the

13  cable.  So the City inspector gave me 30 days, a

14  warning, to do it.

15     Q.  Got it.  So you -- you were the one that was

16  going out and trimming the trees yourself?

17     A.  No.  I told Orlando I couldn't do it because

18  there were -- of the electricity running.  He would

19  always say, make it cheap.  Like, he asked me to get a

20  company to do it.  So I looked for a company.  And then

21  I introduced it to him and then he -- he had the guys

22  do it.

23     Q.  Got it.  And do you remember the name of the

24  tree trimming company?

25     A.  I have it in an e-mail.



1        Q.  That's okay.  If you don't remember, that's

2   all right.  About how long ago was it that Orlando

3   instructed you to find the tree trimming company, if

4   you can remember?

5        A.  End of last year.

6        Q.  Okay.  So towards the end of 2023?

7        A.  Yes.  Correct.

8        Q.  Okay.  Earlier, you also mentioned that

9   Orlando would ask you to perform work on his vehicles

10  or the vehicles of his family members.

11       A.  Correct.

12       Q.  And you mentioned that you would sometimes

13  paint cars --

14       A.  Yes.

15       Q.  -- perform oil changes, tune-ups.  Where did

16  you get the tools to do those jobs?

17       A.  Orlando would buy it.

18       Q.  Do you remember what type of tools you were

19  using?

20       A.  I did an oil change -- a motor change -- I

21  changed the engine on his son's car.  And I did -- I

22  restored the paint, that kind of paint that doesn't

23  have gloss.  Well, when we started doing it -- when I

24  started doing it, I didn't have the proper tools.

25       Q.  Okay.  So the paint that you were using to



1  paint the cars, do you know where that came from?

2      A.  So we went to buy the paint.  And what a

3  coincidence, the name of the place is also called

4  America.  It's in Hialeah, East End Hialeah.  We also

5  bought the gun there, the paint, the -- the sanding

6  devices, everything there.

7      Q.  So who -- who bought all of those materials

8  you just mentioned?

9      A.  Orlando Fernandez.

10     Q.  And he gave them to you to --

11     A.  I didn't have money for that.

12     Q.  So Orlando gave you those materials to use to

13  work on his cars and the cars of his family members?

14     A.  To do his son's car and Cristina's.

15     Q.  Did you ever change the motor oil for Orlando

16  Fernandez or any of his family members?

17     A.  Sporadically, I would do that because they

18  would go on long trips.

19     Q.  Got it.  And so who would buy the oil for you

20  to use for that oil change?

21     A.  Orlando.

22          THE INTERPRETER:  I'm going to use a restroom

23  break soon, so I don't know how much more you got.

24          MR. LAROU:  Almost -- almost done.

25          THE INTERPRETER:  Almost.  Okay.



```
 1   BY MR. LAROU:
 2       Q.  So you mentioned performing work on the cars
 3   for Orlando, his son, his daughter.  Did you ever work
 4   on -- or yeah.  Did you -- did you ever work on
 5   Orlando's father's car?
 6       A.  Yes.  I would do his brakes and mechanical
 7   work on his car when I met him.  Because he used to
 8   take it to Roberto Perez.  But since it was too costly,
 9   and I said, I can help you with that, I can do that, I
10   could charge you less.
11       Q.  Do you remember about how long ago Orlando's
12   father passed away?
13       A.  He died, like, in 2017.
14       Q.  Okay.
15       A.  When I got very out of there.
16       Q.  Do you know what happened to Orlando's
17   father's cars after he passed away?
18       A.  They gave them to me to sell.
19       Q.  What cars -- first off, who gave you cars to
20   sell after Orlando's father passed away?
21       A.  It was only one car owned by the father, and
22   it was a Mercedes Benz E320.
23       Q.  Okay.  So did you find a buyer for that car?
24       A.  I found a man.  He lives in the Northwest.  I
25   do call it, but he doesn't answer that number.
```



1      Q.  Okay.  So earlier you mentioned building some

2   displays for one of Orlando's companies in the

3   warehouse.  Can you describe to me the -- the displays

4   that you were building?

5      A.  Cristina buys, like, one of those bench

6   saws -- chainsaw.  They had to have, like, a portable

7   shelf of sorts because they were doing these displays.

8   It was, like, everything related to bath -- bathroom,

9   the things that hold up a bathroom.

10     Q.  Okay.  So Cristina would give you those saws

11  to construct the displays?

12     A.  Correct.  She would buy it, the saw, the

13  drills.

14     Q.  Do you remember the brand of the wood saw that

15  you were using?

16     A.  I still have it.  I still have it.  I think

17  it's called Circa.  It's not very good, but it's

18  useful.

19     Q.  Do you remember the brand of the drills you

20  were using to build those displays?

21          THE INTERPRETER:  The what?

22          MR. LAROU:  Drills.

23          MR. ALVAREZ:  Drills.

24          THE WITNESS:  Riot, could be.  I don't know

25  how to say those names.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     111

1   BY MR. LAROU:

2       Q.  I think it -- I think it was Ryobi.  And --

3   and just to clarify, R-Y-O-B-I?

4       A.  Yes.

5       Q.  Do you know where either those -- the

6   woodcutting saw or the drills were purchased from?

7       A.  No.  They said at a Home Depot, Walmart.

8   Harbor Freight, something like that.

9       Q.  Okay.  So earlier, you mentioned that there

10  were skylights being delivered to the warehouse.  Do

11  you know what those skylights were being used for?

12      A.  When they were going to repair the roof.

13  You'd have to -- you'd have to change the ones that

14  were broken.

15      Q.  Okay.  So did you accept those packages when

16  the skylights were delivered to Viormar's warehouse?

17      A.  Yes.  Correct.  That's when he said, they

18  brought the skylights and you weren't in the warehouse,

19  where are you?

20      Q.  Do you know where the skylights came from?

21      A.  No.

22      Q.  Did you -- did you help to install the

23  skylights?

24      A.  No.  He just asked for the measurements.

25      Q.  Have you installed any other kind of fixtures,



1   either inside or outside of Viormar's warehouse?

2       A.  Water heater, faucets -- water faucets.  I've

3   lost some phones, so I haven't found that text, but

4   there was a text in him asking me to do something

5   because the water consumption was too high.

6       Q.  Do you remember about how long ago you

7   installed the water heater?

8       A.  When Carlos moved into the place.

9       Q.  Do you remember about how long ago you

10  installed the water faucets in the warehouse?

11      A.  I've changed them several times because they

12  get deteriorated quickly.

13      Q.  Do you remember the last time you installed a

14  water faucet?

15      A.  Could be five years, I don't know.

16      Q.  What happens if light bulbs go out at the

17  warehouse?  Who's responsible for replacing those?

18      A.  I do.

19      Q.  How often --

20      A.  And I'm the one who says, hey, we have to buy

21  a light bulb.

22      Q.  Who do you tell that you need to buy a light

23  bulb?

24      A.  I tell Orlando.

25      Q.  So Orlando is the one that then buys those



1   light bulbs after you tell him?

2        A.  He used to buy the light bulbs.  But ever

3   since Carlos got there, he's now saying that Carlos is

4   the one that has to do it himself.  Well, but they

5   don't do it.  They're always calling me to do it.

6        Q.  Got it.  So even though Carlos is a commercial

7   tenant of Viormar, you're still the one that's

8   responsible for changing those light bulbs in his

9   portion of the rented warehouse?

10       A.  Yes.

11            THE INTERPRETER:  Do you have much more?

12   Because I really need to go to the bathroom.

13            MR. LAROU:  Like, two more questions.

14            THE INTERPRETER:  Okay.

15            MR. ALVAREZ:  Yeah, I have to change my backup

16   as well.

17            MR. LAROU:  Okay.

18            THE INTERPRETER:  Two questions.

19            MR. LAROU:  If -- if you want to -- if you

20   guys want to take a quick, like, five-minute break or

21   something.

22            THE INTERPRETER:  Well --

23            MR. LAROU:  There might be a redirect.

24            THE INTERPRETER:  No, no, no. I'm sure there

25   is.



1          MR. ALVAREZ:  There is a redirect.

2          THE INTERPRETER:  I know.

3          MR. ALVAREZ:  So let's -- let's go to the

4  bathroom.

5          THE INTERPRETER:  Yeah.

6          MR. LAROU:  That's totally fine.

7          THE INTERPRETER:  Okay.  Thank you.

8          MR. LAROU:  Yeah, yeah.

9          THE REPORTER:  We are going off the record.

10  The time is now 3:38 p.m., Eastern Standard Time.

11          (A recess was taken.)

12          THE REPORTER:  We are back on the record.  The

13  time is now 3:45 p.m., Eastern Standard Time.

14  BY MR. LAROU:

15      Q.  Mr. Aneiros, earlier you mentioned that

16  Orlando Fernandez would instruct you to make deposits

17  of checks to an account with Ocean Bank; is that

18  correct?

19      A.  True.

20      Q.  Do you know what bank account you were

21  depositing those checks into?

22      A.  Viormar, Fersom.  Fersom.

23          MR. LAROU:  And again, I think for the record,

24  the spelling of that second company he named is

25  F-E-R-S-O-M.



 1            THE INTERPRETER:  Fersom.

 2   BY MR. LAROU:

 3       Q.  How would you receive those checks to deposit

 4   into Viormar's bank account?

 5       A.  He would send them to me in the envelopes with

 6   the stickers.

 7       Q.  Got it.  And so were you making those deposits

 8   into Viormar's bank account throughout the entire time

 9   you were working and living in Viormar's warehouse?

10       A.  Yes.

11       Q.  Do you know who wrote those checks or where

12   those checks came from?

13       A.  No.

14       Q.  That's okay.  Has Orlando Fernandez ever

15   threatened to kick you out of Viormar's warehouse,

16   other than, obviously, the pending eviction suit

17   against you?

18       A.  Well, if I wouldn't do the things, then, of

19   course, I'd have to get out.

20       Q.  What things do you mean?  You mean continuing

21   to work for the company or Orlando?

22       A.  What I did for the company.

23            MR. LAROU:  Okay.  Thank you.  No further

24   questions.

25                    REDIRECT EXAMINATION



1   BY MR. ALVAREZ:

2        Q.  Sorry, just wanted to make sure.  Okay.  So --

3   yeah.  You mentioned earlier, when you were being

4   questioned by your counsel, that you evicted a tenant.

5   Which tenant did you evict?

6        A.  Jessy Limo.  That's what it's called.

7        Q.  Did you provide them with notice?

8        A.  Jorge Sandina [sic].  That's the owner.

9   That's the owner of Jessy Limo.

10       Q.  Okay.  Did you provide them with notice of

11  their eviction?

12       A.  Yes.  Correct.

13       Q.  Do you have a copy of that notice?

14       A.  The notice was me tell them that they had to

15  leave.

16       Q.  Okay.  So just to confirm, you never gave them

17  written notice?

18       A.  No.

19       Q.  Okay.  You also mentioned that Viormar had

20  hired a landscaping person that would only come once a

21  week.  So any cleanup work that you did was to

22  supplement that visitation, right?

23       A.  No, I didn't say that.  What I said is that he

24  hired that company after this lawsuit was established.

25       Q.  Okay.  But after he hired them, they would



1    come once a week; is that right?

2         A.  No.  They come monthly, once a month.

3         Q.  Okay.

4         A.  I used to do that myself before.  And now,

5    I -- I still do it.

6         Q.  Why are you still doing it?

7         A.  Because there's dirt.  Because I live there.

8         Q.  Okay.

9         A.  And whether he knows it or not, I still have

10   appreciation for him, except he doesn't realize that.

11        Q.  Okay.  If you lived in a house and a tree on

12   your property was not complying with city regulations,

13   would it be your responsibility to fix that?

14        A.  The owner has to fix it.  Well, if it's my

15   house, since I'm the owner, I would have to fix it.

16   But if I'm rented there, it would be the owner who has

17   to do it.

18        Q.  Okay.  So let's -- let's speak about owners.

19   You mentioned that Orlando told Carlos that if he

20   needed the lights changed, he had to change them.  And

21   I know that, eventually, you changed them.  But Orlando

22   did originally say that it was Carlos' responsibility;

23   is that right?

24        A.  Yes, he did say that occasionally.  But Carlos

25   has -- has been there, not at the only time I've worked



 1  for Orlando.  It doesn't depend on changing a light

 2  bulb.

 3       Q.  Okay.  And if you owned a property, or you're

 4  residing in a property -- actually, let me rephrase

 5  that.  If you're residing at a property and you wanted

 6  to install a security camera, would that be your

 7  responsibility?

 8       A.  As I said, I put it there so that I could see.

 9       Q.  Okay.

10       A.  I put it to -- to be able to see if somebody

11  is in there.

12       Q.  Okay.  If you shared a home with a guest and

13  the guest needed to repair his car, but he didn't know

14  how, would they be required to pay for any repairs that

15  you made if you never entered into a contract with

16  them?

17            THE INTERPRETER:  I need that read back.

18            MR. ALVAREZ:  All right.  So --

19            THE REPORTER:  I -- I -- if -- if you -- I --

20  I have it if you -- if you --

21            MR. ALVAREZ:  Go -- go for it.

22            THE REPORTER:  Okay.  Okay.  Okay.  So if you

23  shared a home with a guest that needed to repair their

24  car and didn't know how, would you --

25            THE INTERPRETER:  Go ahead.



THE REPORTER: -- would you -- would you be required to pay any repairs you made without entering a contract?

I apologize if I didn't get that for sure.

MR. ALVAREZ: Okay. So yeah, that -- that's not exact.

THE REPORTER: I -- I can play it back, if you'd like.

MR. ALVAREZ: Let me just rephrase that.

THE REPORTER: Sure.

BY MR. ALVAREZ:

Q. If you shared a home with a guest and they needed repairs done to their car, and you repaired that car, would you be entitled to payment for the repairs that you made --

THE INTERPRETER: To -- to payments that -- would you be entitled to --

BY MR. ALVAREZ:

Q. Would you be entitled to the -- would you be entitled to payment for the repairs that you made if you never entered into a contract to do those repairs?

A. The -- the Bible says that the worker is deemed or has rights to his pay.

Q. Okay.

A. God says it.



1    Q.  If you were to mention to me that you were

2    trying to sell a car, and I happen to know a buyer and

3    got you into contact with them, is that enough for you

4    to be considered my employer?

5          THE INTERPRETER:  Say that again?

6          MR. LAROU:  Form.

7    BY MR. ALVAREZ:

8    Q.  That if you were to mention to me that you

9    were trying to sell a car, and I happen to know a buyer

10   and I got the two of you into contact, is that enough

11   for you to be considered my employer?

12         MR. LAROU:  Form.

13         THE WITNESS:  Well, it's not about the sale of

14   the car.  It's -- it's a whole lifetime of working.

15   Don't try to get me confused.

16   BY MR. ALVAREZ:

17   Q.  I'm not trying to get you confused.

18   A.  Well, the sale of the car had to do with them.

19   I'm trying to get rid of a car.  That's just -- or the

20   changing of a light bulb, but that -- you can't compare

21   that to working a lifetime for somebody.

22         MR. ALVAREZ:  All right.  So I -- I want to

23   ask this question, but I'm not sure if it will

24   translate correctly in Spanish.

25   BY MR. ALVAREZ:



1      Q.  So are you saying that the -- the repair of

2    the vehicle was a one-off thing?

3      A.  No.  You're telling me if I live with a

4    person -- first of all, I don't live with Orlando.

5    We're not neighbors.  We reached an agreement.  I will

6    live there and I'll do everything.  He's not my

7    neighbor.  He's not my friend.  He's my employer.

8          He said, my son's car is in this repair.  I'm

9    a mechanical engineer.  Therefore, he knew that I knew

10   how to fix that.  He said, you can fix my son's car.

11   And this is where we go back to the labor is dignified

12   or entitled to his pay.  I worked, he didn't pay me.

13     Q.  Okay.  When you repaired the vehicle, did you

14   ask for payment after the repairs?

15     A.  Of course.

16     Q.  Did -- what did you --

17     A.  So they asked me how much it is, and I could

18   kind of estimate based on their condition.  It's the

19   same thing, a fee.  Just like when you are serving

20   somebody, you charge them a fee.

21     Q.  Did you give them an invoice showing the

22   amount that you're requesting to be paid?

23     A.  No.

24     Q.  Okay.

25     A.  He was paying me by the living situation or



1  roof, which is illegal.

2      Q.  Okay.  I have two last questions.  So your

3  counsel was asking you about the various tools that you

4  claim to have been provided to you by Viormar for

5  fixing up the place.  If -- if Mr. Fernandez was living

6  in Orlando, was it up to you to go out and purchase

7  those tools?

8      A.  No.

9      Q.  So how did you get the tools?

10     A.  He would live in Orlando, but he would bring

11 me those things.

12     Q.  So how often would he go from Orlando to Doral

13 to bring you tools?

14     A.  Because he didn't -- but he didn't live in

15 Orlando the whole time.

16     Q.  Okay.  So how long has he been living in

17 Orlando?

18     A.  When his father died.

19     Q.  Okay.  What year did his father die?

20     A.  Like, 2017, '18.

21     Q.  Okay.  Didn't you say that you made these

22 repairs within the past year?

23     A.  I never said that.

24     Q.  Okay.

25     A.  Are you talking about car repairs?



1        Q.  I'm talking about any of the repairs that you

2   made.

3        A.  Sporadic.

4        Q.  Okay.

5        A.  Three repairs.  At the beginning, when I met

6   the father, changing the color of the building.  When

7   we did the Vita Home Care Solution, when I did that

8   logo type and all of that in the front.

9            And then the third one was when the

10  inspection -- they said there was termite and broken

11  windows.  And that's when I painted everything.  He

12  bought the paint.

13       Q.  All right.  Wait.  Who -- who bought the

14  paint?

15       A.  Orlando.

16       Q.  Okay.

17       A.  They're the ones who say, oh, I want this

18  paint.

19       Q.  All right.  Now, I want to talk about the --

20  the checks that were deposited into Ocean Bank.  Did

21  you receive receipts after making those deposits?

22       A.  Yes.  I would send everything through text.

23       Q.  Okay.  So --

24       A.  If they're there.

25            MR. ALVAREZ:  All right.  That's going to



1  conclude my questioning.

2          MR. LAROU:  No follow-ups from me.

3          THE INTERPRETER:  All your spellings are here,

4  if you have more questions.

5          THE REPORTER:  Thank you.  Before I take us

6  off the record, I just have to briefly go through

7  transcript orders.  And I did want to ask -- oh,

8  just -- can we -- just one moment, please.

9          Counsel Alvarez, there were three exhibits.  I

10  just sent you an e-mail.  Did you want to retain them

11  or send them?

12          MR. ALVAREZ:  Let me see.

13          THE REPORTER:  So Defense Exhibit 1 was the

14  Sunbiz.org printout with -- for Ocean Mack's.  Defense

15  Exhibit 2 was a printout for -- the same website for

16  Doc Motors.  And Defense Exhibit 3 was Plaintiff's

17  Second Amended Complaint.

18          MR. ALVAREZ:  Yeah, that sounds right.

19          THE REPORTER:  Perfect.  Did you want to

20  retain them or send them?

21          MR. ALVAREZ:  Send them is fine.

22          THE REPORTER:  Sure.  And, Counsel, did you

23  want to place an order for a copy of the transcript?

24          MR. LAROU:  We're not going to be ordering

25  right now, no.



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                              125

1        THE REPORTER:  Okay.  And Counsel Alvarez?

2        MR. ALVAREZ:  Yeah, we -- we want to order.

3   Also, can I change the -- the send to retain?

4        THE REPORTER:  Sure.  Of course.  And did you

5   need that rushed, or is standard delivery okay?

6        MR. ALVAREZ:  Standard delivery is fine.

7        THE REPORTER:  Electronic?

8        MR. ALVAREZ:  Yeah.

9        THE REPORTER:  Perfect.  Thank you so much.

10       And thank you, Madam, for providing me your

11  spellings.

12       Read or waive, Counsel?

13       MR. LAROU:  We'll waive.

14       THE REPORTER:  Okay.  That's everything on my

15  end.  Counsel, may I take us off the record?

16       MR. ALVAREZ:  You may.

17       THE REPORTER:  Okay.  We are going off the

18  record.  The time is now 4:01 p.m., Eastern Standard

19  Time.

20       (The deposition concluded at 4:01 p.m.)

21

22

23

24

25



1              CERTIFICATE OF DIGITAL REPORTER

2

3         I, Dillon Poberezhsky, a Digital Reporter and

4    Notary Public within and for the State of Florida,

5    do hereby certify:

6

7         That DENNIS ANEIROS, the witness whose

8    examination is hereinbefore set forth, was not sworn/

9    affirmed by me, and that said testimony was accurately

10   captured with annotations by me during the proceeding.

11

12        I further certify that I am not related to any

13   of the parties to this action by blood or marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16

17        IN WITNESS THEREOF, I have hereunto set my hand

18   this 16th day of October, 2024.

19

20

21

22

23

24        _____
          Dillon Poberezhsky
25        Notary Commission Florida/HH 324684
          Commission Expires: October 23, 2026



1                    CERTIFICATE OF TRANSCRIPTIONIST

2

3          I, Caroline Blauvelt, Legal Transcriptionist,

4     do hereby certify:

5              That the foregoing is a complete and true

6     transcription of the original digital audio recording

7     of the testimony and proceedings captured in the

8     above-entitled matter.  As the transcriptionist, I

9     have reviewed and transcribed the entirety of the

10    original digital audio recording of the proceeding to

11    ensure a verbatim record to the best of my ability.

12             I further certify that I am neither attorney

13    for nor a relative or employee of any of the parties

14    to the action; further, that I am not a relative or

15    employee of any attorney employed by the parties

16    hereto, nor financially or otherwise interested in the

17    outcome of this matter.

18             IN WITNESS THEREOF, I have hereunto set my

19    hand this 16th day of October, 2024.

20

21

22                    *Caroline Blauvelt*

23           _____

                   Caroline Blauvelt

24

25



# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20722-GAYLES/LOUIS

DENNIS ANEIROS

      Plaintiff,

vs.

VIORMAR TRADING CORPORATION, N.V.,
AND ORLANDO A. FERNANDEZ,

      Defendants.

_____/

### <u>AFFIDAVIT OF DEFENDANT, ORLANDO A. FERNANDEZ</u>

STATE OF FLORIDA      }
COUNT OF MIAMI-DADE }

      I, Orlando A. Fernandez, being duly sworn and competent to make this affidavit, hereby state:

      1.     My name is Orlando A. Fernandez, I am above the age of 18 and I am competent to testify as to the matters before this Court.

      2.     I am the President of VIORMAR TRADING CORPORATION, N.V., a Florida corporation.

      3.     VIORMAR TRADING CORPORATION, N.V., was originally owned by my father, Orlando M Fernandez Bello who passed away on December 22, 2017. I inherited the property following my father's passing.

      4.     VIORMAR TRADING CORPORATION, N.V., owns the property located a7880-7884 NW 55th Street Doral, FL 33166 (list all properties).

5.      My father discovered the Plaintiff, Dennis Aneiros ("Mr. Aneiros"), living out of his car on (circa) 2010.

6.      My father had compassion on Mr. Aneiros and expressed concern for his safety. If anything were to happen to Mr. Aneiros while he was on Viormar property, my father could have faced legal trouble. Therefore, my father permitted Dennis to reside in one of the vacant offices on the property.

7.      Our families intention was that Mr. Aneiros would sleep in the office until he was able to get back on his feet. Mr. Aneiros represented that he had no desire to remain on the property and intended to leave as soon as possible.

8.      Mr. Aneiros informed us that he was working on various patents that he believed would be lucrative. He would tell us that he simply needed more time to get the patents cleared and once that happened, he would willingly vacate the property. Unfortunately, none of Mr. Aneiros alleged patents came to fruition.

9.      In hindsight, we should have known that Mr. Aneiros never intended to leave the property. Mr. Aneiros had always intended to remain on the property and was simply exploiting the kindness that my father generously extended.

10.     Mr. Aneiros claims that he had entered into an arrangement with my father that he would be permitted to reside in the property rent free if he agreed to perform services for us at no charge. This is simply not true. No such arrangement has ever occurred.

11.     The property subject to this suit has been owned by my family since 1979 and since that time we have only had a single tenant named Jessy's Limounsine. For the past seven years the property has essentially remained vacant aside from Mr. Aneiros illegally squatting on the property.

12.     I can no longer economically maintain the property. On 2018 I informed Mr. Aneiros that I would have to sell the property due to my financial situation, but I could not sell the property if he continued to reside in it.

13.     Mr. Aneiros did not take this news well and filed the suit that is currently before this Court in an effort to get money that he is not owed and/or prevent the sale of the property.

14.     Throughout the course of the litigation, Mr. Aneiros has made various discovery requests that asked for our entire employment files and tax returns. We complied with the discovery request and it was shown that VIORMAR TRADING CORPORATION, N.V. does not have more than two employees, in fact we don't have any employees, and we do not make more than $500,000.00 a year. Nevertheless, Mr. Aneiros is determined to proceed with this suit.

15.     Mr. Aneiros has never been an employee of VIORMAR TRADING CORPORATION, N.V. and I never hired him in any capacity.


FURTHER AFFIANT SAYETH NAUGHT



_____
Orlando A. Fernandéz
President of VIORMAR TRADING CORPORATION, N.V.


I HEREBY CERTIFY that on this day before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally/virtually appeared, Orlando A. Fernandez, who is known to me or who presented _Florida  ID_____ as identification, and executed the foregoing instrument, after being duly sworn, and acknowledged before me that he executed this document freely and voluntarily for the purposes herein stated.

WITNESS my hand and official seal in the County and State last aforesaid this ___20___<sup>Th</sup>

day of ___ December, 2024.

NOTARY PUBLIC, STATE OF ___Florida___

(SEAL)

Alain Robert Guerre
Comm.: HH 398107
Expires: Sep. 9, 2027
Notary Public - State of Florida

# EXHIBIT "C"

December 12, 1978

| | | | |
|---|---|---|---|
| Form **1120-F** | For calendar year 2020, | **U.S. Income Tax Return of a Foreign Corporation** | OMB No. 1545-0123 |
| Department of the Treasury Internal Revenue Service | or tax year beginning | , and ending ▶ Go to www.irs.gov/Form1120F for instructions and the latest information. | **2020** |

**Name** Viormar Trading Corporation N.V.

**Employer Identification number** 59-1878157

**Type or Print**

Number, street, and room or suite no. (see instructions)
439 STILL FOREST TER

City or town, state or province, country, and ZIP or foreign postal code
Sanford, FL 32771

**Check box(es) if:**
- ☐ Initial return
- ☐ Name or address change
- ☐ Final return
- ☐ First post-merger return
- ☐ Amended return
- ☐ Schedule M-3 attached
- ☐ Protective return

**A** Country of incorporation CURACAO

**B** Foreign country under whose laws the income reported on this return is also subject to tax CURACAO

**C** Date incorporated 12/12/1978

**D** (1) Location of corporation's primary books and records (city, province or state, and country) Sanford, FL

(2) Principal location of worldwide business
439 Still Forest Ter
Sanford, FL 32771

(3) If the corporation maintains an office or place of business in the U.S., check here ▶ ☒

**E** If the corporation had an agent in the United States at any time during the tax year, enter:

(1) Type of agent INDIVIDUAL

(2) Name ORLANDO FERNANDEZ

(3) Address 439 STILL FOREST TER
SANFORD, FL 32771

**F** See the instructions and enter the corporation's principal:

(1) Business activity code number ▶ 531120

(2) Business activity ▶ LESSOR NONRES BUILD

(3) Product or service ▶ LESSOR NONRES BUILD

**G** Check method of accounting: (1) ☒ Cash (2) ☐ Accrual

(3) ☐ Other (specify) ▶

### Computation of Tax Due or Overpayment

| | | | |
|---|---|---|---|
| 1 | Tax from Section I, line 11, page 3 | **1** | 0. |
| 2 | Tax from Section II, Schedule J, line 9, page 5 | **2** | 0. |
| 3 | Tax from Section III (add lines 6 and 10 on page 6) | **3** | 0. |
| 4 | Total tax. Add lines 1 through 3 | **4** | 0. |
| 5a | 2019 overpayment credited to 2020 | **5a** | |
| b | 2020 estimated tax payments | **5b** | |
| c | Less 2020 refund applied for on Form 4466 | **5c** | ( ) |
| d | Combine lines 5a through 5c | **5d** | |
| e | Tax deposited with Form 7004 | **5e** | |
| f | Credit for tax paid on undistributed capital gains (attach Form 2439) | **5f** | |
| g | Credit for federal tax paid on fuels (attach Form 4136). See instructions | **5g** | |
| h | Reserved for future use | **5h** | |
| i | U.S. income tax paid or withheld at source (add line 12, page 3, and amounts from Forms 8288-A and 8805 (attach Forms 8288-A and 8805)) | **5i** | |
| j | Total payments. Add lines 5d through 5i | **5j** | |
| 6 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | **6** | |
| 7 | Amount owed. If line 5j is smaller than the total of lines 4 and 6, enter amount owed | **7** | 0. |
| 8a | Overpayment. If line 5j is larger than the total of lines 4 and 6, enter amount overpaid | **8a** | |
| b | Amount of overpayment on line 8a resulting from tax deducted and withheld under Chapters 3 and 4 (from Schedule W, line 7, page 8) | **8b** | |
| 9 | Enter portion of line 8a you want Credited to 2021 estimated tax ▶     Refunded ▶ | **9** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ Signature of officer    Date    Title ▶ President

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer Use Only**

Print/Type preparer's name

Preparer's signature    Date 07/24/24    Check ☐ if self-employed    PTIN P01496734

Firm's name ▶ MAGNO & ASSOCIATES, PL

Firm's EIN ▶ 20-2323418

Firm's address ▶ 1200 BRICKELL AVE STE 1220
MIAMI, FL 331313255

Phone no. (305) 379-4400

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120-F** (2020)

Form 1120-F (2020)    **Viormar Trading Corporation N.V.**     59-1878157   Page **2**

## Additional Information *(continued from page 1)*

| | Yes | No |
|---|---|---|
| **H** Did the corporation's method of accounting change from the preceding tax year? ................ *If "Yes," attach a statement with an explanation.* | | X |
| **I** Did the corporation's method of determining income change from the preceding tax year? ................ *If "Yes," attach a statement with an explanation.* | | X |
| **J** Did the corporation file a U.S. income tax return for the preceding tax year? ................ | X | |
| **K (1)** At any time during the tax year, was the corporation engaged in a trade or business in the United States? ........ | X | |
| **(2)** If "Yes," is taxpayer's trade or business within the United States solely the result of a section 897 (FIRPTA) sale or disposition? ................ | | X |
| **L** Did the corporation have a permanent establishment in the United States for purposes of any applicable tax treaty between the United States and a foreign country? ................ *If "Yes," enter the name of the foreign country:* | | X |
| **M** Did the corporation have any transactions with related parties? .... *If "Yes," Form 5472 may have to be filed (see instructions).* Enter number of Forms 5472 attached ► | | X |
| **N** Is the corporation a controlled foreign corporation? (See section 957(a) for definition.) ................ | X | |
| **O** Is the corporation a personal service corporation? (See instructions for definition.) ................ | | X |
| **P** Enter tax-exempt interest received or accrued during the tax year ► $ | | |
| **Q** At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a U.S. corporation? (See section 267(c) for rules of attribution.) ................ *If "Yes," attach a statement showing (1) name and EIN of such U.S. corporation; (2) percentage owned; and (3) taxable income or (loss) before NOL and special deductions of such U.S. corporation for the tax year ending with or within your tax year.* | | X |
| **R** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ................ ► ☐ | | |
| **S** Enter the available NOL carryover from prior tax years. (Do not reduce it by any deduction on line 30a, page 4.) ► $    139,600. | | |
| **T** Is the corporation a subsidiary in a parent-subsidiary controlled group? ................ *If "Yes," enter the parent corporation's:* **(1)** EIN ► **(2)** Name ► | | X |
| **U (1)** Is the corporation a dealer under section 475? ................ | | X |
| **(2)** Did the corporation mark to market any securities or commodities other than in a dealer capacity? ........ | | X |

| | Yes | No |
|---|---|---|
| **V** At the end of the tax year, did any individual, partnership, corporation, estate, or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (See section 267(c) for rules of attribution.) ................ *If "Yes," attach a statement showing the name and identifying number. (Do not include any information already entered in item T.) Enter percentage owned* ► | | X |
| **W (1)** Is the corporation taking a position on this return that a U.S. tax treaty overrules or modifies an Internal Revenue law of the United States, thereby causing a reduction of tax? ........ *If "Yes," the corporation is generally required to complete and attach Form 8833. See Form 8833 for exceptions.* **Note:** Failure to disclose a treaty-based return position may result in a $10,000 penalty (see section 6712). | | X |
| **(2)** Is the corporation claiming treaty benefits pursuant to, or otherwise filing its return pursuant to, a Competent Authority determination or an Advance Pricing Agreement? ........ *If "Yes," attach a copy of the Competent Authority determination letter or Advance Pricing Agreement to your return.* | | X |
| **X** During the tax year, did the corporation own any entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? ........ *If "Yes," attach a statement listing the name, country under whose laws the entity was organized, and EIN (if any) of each such entity.* | | X |
| **Y (1)** Did a partnership allocate to the corporation a distributive share of income from a directly owned partnership interest, any of which is ECI or treated as ECI by the partnership or the partner? ................ *If "Yes," attach Schedule P. See instructions.* | | X |
| **(2)** During the tax year, did the corporation own, directly or indirectly, at least a 10% interest, in any foreign partnership? *If "Yes," see instructions for required attachment.* | | X |
| **Z (1)** Has the corporation engaged in any transactions the results of which are subject to the arm's-length standard under section 482 and its regulations? ................ | | X |
| **(2)** Has the corporation recognized any interbranch amounts? *If "Yes," attach statement (see instructions).* | | X |
| **AA** Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? ........ *If "Yes," complete and attach Schedule UTP.* | | X |
| **BB** During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? ........ | | X |
| **CC** Is the corporation (including the home office or any branch) a qualified derivatives dealer (QDD)? ................ **(1)** If "Yes," attach Schedule Q (Form 1120-F) (see instructions) **(2)** If "Yes," enter the QI-EIN ► | | X |
| **DD** Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years (see sections 59A (e)(2) and (3))? ................ *If "Yes," complete and attach Form 8991.* | | X |
| **EE** During the tax year, did the corporation pay or accrue any interest or royalty for which a deduction is not allowed under section 267A (see instructions)? ................ *If "Yes," enter the total amount of the disallowed deductions ........* ► $ | | X |

Form **1120-F** (2020)

2020 05085 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)    **Viormar Trading Corporation N.V.**    59-1878157    Page **3**

## Additional Information *(continued from page 2)*

| | | Yes | No |
|---|---|---|---|
| FF | Did the corporation have an election under section 163(j) for any real property trade or business or a farming business in effect during the tax year (see instructions)? | | X |
| GG | Does the corporation satisfy **one or more** of the following (see instructions)? | | X |
| | **(1)** The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| | **(2)** The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $26 million and the corporation has business interest expense. | | |
| | **(3)** The corporation is a tax shelter and the corporation has business interest expense. | | |
| | If "Yes," to any, complete and attach Form 8990. | | |

| | | Yes | No |
|---|---|---|---|
| HH | During the tax year, did the corporation dispose of an interest in a partnership that directly or indirectly engaged in a trade or business within the United States? | | X |
| II | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? | | X |
| | If "Yes," enter amount from Form 8996, line 15 ............. ▶ $ | | |

## SECTION I - Income From U.S. Sources Not Effectively Connected With the Conduct of a Trade or Business in the United States- Do not report items properly withheld and reported on Form 1042-S. See instructions.

Report all gross transportation income subject to 4% tax on line 9. Report other column (a) income items only if not properly withheld and reported on Form 1042-S. The rate of tax on these gross income items is 30% or such lower rate specified by tax treaty. No deductions are allowed against these types of income. Enter treaty rates where applicable. **If the corporation is claiming a lower treaty rate, also complete item W on page 2.** If multiple treaty rates apply to a type of income (for example, subsidiary and portfolio dividends or dividends received by disregarded entities), attach a statement showing the amounts, tax rates, and withholding for each.

Name of treaty country, if any ▶

| | (a) Class of income | (b) Gross amount | (c) Rate of tax (%) | (d) Amount of tax liability | (e) Amount of U.S. income tax paid or withheld at the source |
|---|---|---|---|---|---|
| 1 | Interest ................................. | | | | |
| 2a | Dividends (excluding payments received by QDDs in their equity derivatives dealer capacity) ........................ | | | | |
| 2b | Dividend equivalents (excluding payments received by QDDs in their equity derivatives dealer capacity) ........................ | | | | |
| 3 | Rents .................................... | | | | |
| 4 | Royalties ................................ | | | | |
| 5 | Annuities ............................... | | | | |
| 6 | Gains from disposal of timber, coal, or domestic iron ore with a retained economic interest (attach supporting statement) ........ | | | | |
| 7 | Gains from sale or exchange of patents, copyrights, etc. ............................ | | | | |
| 8 | Fiduciary distributions (attach supporting statement) ............................. | | | | |
| 9 | Gross transportation income (see instructions) ........ | | 4 | | |
| 10 | Other items of income ........................ | | | | |
| 11 | Total. Enter here and on line 1, page 1 ................................. ▶ | | | | |
| 12 | Total. Enter here and include on line 5i, page 1 ................................. | | | ▶ | |

13 Is the corporation fiscally transparent under the laws of the foreign jurisdiction with respect to any item of income listed above?      ☐ Yes   ☒ No
   If "Yes," attach a statement that provides the information requested above with respect to each such item of income.

Form **1120-F** (2020)

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)   **Viormar Trading Corporation N.V.**   59-1878157   Page **4**

## SECTION II - Income Effectively Connected With the Conduct of a Trade or Business in the United States
(see instructions)

**Important:** *Fill in all applicable lines and schedules. If you need more space, see* Assembling the Return *in the instructions.*

| | | | | |
|---|---|---|---|---|
| **1 a** Gross receipts or sales | **b** Less returns and allowances | | **c** Bal ▶ **1c** | |
| **2** Cost of goods sold (attach Form 1125-A) | | | **2** | |
| **3** Gross profit (subtract line 2 from line 1c) | | | **3** | |
| **4** Dividends (Schedule C, line 13) | | | **4** | |
| **5** Interest | | | **5** | |
| **6** Gross rents | | | **6** | 37,338. |
| **7** Gross royalties | | | **7** | |
| **8** Capital gain net income (attach Schedule D (Form 1120)) | | | **8** | |
| **9** Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | **9** | |
| **10** Other income (see instructions - attach statement) ▶ | | | **10** | 37,338. |
| **11** Total income. Add lines 3 through 10 ▶ | | | **11** | |
| **12** Compensation of officers (attach Form 1125-E) | | | **12** | |
| **13** Salaries and wages (less employment credits) | | | **13** | |
| **14** Repairs and maintenance | | | **14** | |
| **15** Bad debts (for bad debts over $500,000, attach a list of debtors and amounts) | | | **15** | |
| **16** Rents     See Statement 1 | | | **16** | 32,745. |
| **17** Taxes and licenses | | | **17** | |
| **18** Interest expense from Schedule I, line 25 | | | **18** | |
| **19** Charitable contributions | | | **19** | |
| **20** Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | | **20** | |
| **21** Depletion | | | **21** | |
| **22** Advertising | | | **22** | |
| **23** Pension, profit-sharing, etc., plans | | | **23** | |
| **24** Employee benefit programs | | | **24** | |
| **25** Reserved for future use | | | **25** | |
| **26** Deductions allocated and apportioned to ECI from Schedule H, line 20 (see instructions) | | | **26** | |
| **27** Other deductions (attach statement)     See Statement 2 ▶ | | | **27** | 2,255. |
| **28** Total deductions. Add lines 12 through 27 ▶ | | | **28** | 35,000. |
| **29** Taxable income before NOL deduction and special deductions (subtract line 28 from line 11) | | | **29** | 2,338. |
| **30** Less: **a** Net operating loss deduction (see instructions)  Stmt 3 | **30a** | 2,338. | | |
| **b** Special deductions (Schedule C, line 14) | **30b** | | | |
| **c** Add lines 30a and 30b | | | **30c** | 2,338. |
| **31** Taxable income or (loss). Subtract line 30c from line 29 | | | **31** | 0. |

Form **1120-F** (2020)

4

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)   **Viormar Trading Corporation N.V.**                    59-1878157        Page **5**

**SECTION II - Income Effectively Connected With the Conduct of a Trade or Business in the United States** *(continued)*

### Schedule C   Dividends and Special Deductions  (see instructions)

| | (a) Dividends | (b) % | (c) Special deductions: (a) X (b) |
|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 | |
| 3 Dividends on certain debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 Dividends from less-than-20%-owned foreign corporations | | 50 | |
| 7 Dividends from 20%-or-more-owned foreign corporations | | 65 | |
| 8 **Subtotal.** Add lines 1 through 7 | | see instructions | |
| 9 Dividends from foreign corporations not included on line 3, 6, or 7 | | | |
| 10 IC-DISC and former DISC dividends not included on line 1, 2, or 3 (section 246(d)) | | | |
| 11 Other dividends | | | |
| 12 Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 13 **Total dividends.** Add column (a), lines 8 through 11. Enter here and on line 4, page 4 ▶ | | | |
| 14 **Total special deductions.** Add column (c), lines 8 and 12. Enter here and on line 30b, page 4 ▶ | | | |

### Schedule J   Tax Computation  (see instructions)

| | | |
|---|---|---|
| 1 Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) ▶ ☐ | | |
| 2 Income tax | 2 | 0. |
| 3 Base erosion minimum tax amount (attach Form 8991) | 3 | |
| 4 Add lines 2 and 3 | 4 | 0. |
| 5 a Foreign tax credit (attach Form 1118) | 5a | |
| b General business credit (attach Form 3800) | 5b | |
| c Credit for prior year minimum tax (attach Form 8827) | 5c | |
| d Bond credits from Form 8912 | 5d | |
| 6 **Total credits.** Add lines 5a through 5d | 6 | |
| 7 Subtract line 6 from line 4 | 7 | 0. |
| 8 Other taxes. Check if from:  ☐ Form 4255  ☐ Form 8611  ☐ Form 8697  ☐ Form 8866  ☐ Form 8902  ☐ Other (attach statement) | 8 | |
| 9 **Total tax.** Add lines 7 and 8. Enter here and on line 2, page 1 | 9 | 0. |

Form **1120-F** (2020)

011981  12-08-20

5

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)  **Viormar Trading Corporation N.V.**    59-1878157   Page **6**

## SECTION III—Branch Profits Tax and Tax on Excess Interest

### Part I—Branch Profits Tax   (see instructions)

| | | |
|---|---|---:|
| 1 | Enter the amount from Section II, line 29 | 1 | 2,338. |
| 2 | Enter total adjustments to line 1 to get effectively connected earnings and profits. (Attach required statement showing the nature and amount of adjustments.) (See instructions.) | 2 | |
| 3 | Effectively connected earnings and profits. Combine line 1 and line 2 | 3 | 2,338. |
| 4a | Enter U.S. net equity at the end of the current tax year. (Att. required stmt.) | 4a | 18,688. |
| b | Enter U.S. net equity at the end of the prior tax year. (Att. required stmt.) | 4b | 16,350. |
| c | Increase in U.S. net equity. If line 4a is greater than or equal to line 4b, subtract line 4b from line 4a. Enter the result here and skip to line 4e | 4c | 2,338. |
| d | Decrease in U.S. net equity. If line 4b is greater than line 4a, subtract line 4a from line 4b | 4d | |
| e | Non-previously taxed accumulated effectively connected earnings and profits. Enter excess, if any, of effectively connected earnings and profits for preceding tax years beginning after 1986 over any dividend equivalent amounts for those tax years | 4e | |
| 5 | Dividend equivalent amount. Subtract line 4c from line 3. If zero or less, enter -0-. If no amount is entered on line 4c, add the lesser of line 4d or line 4e to line 3 and enter the total here | 5 | 0. |
| 6 | Branch profits tax. Multiply line 5 by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | 6 | 0. |

### Part II—Tax on Excess Interest   (see instructions for this Part and for Schedule I (Form 1120-F))

| | | |
|---|---|---:|
| 7a | Enter the interest from Section II, line 18 | 7a | |
| b | Enter the inverse of the total amount deferred, capitalized, and disallowed from Schedule I, line 24d (i.e., if line 24d is negative, enter as a positive number; if line 24d is positive, enter as a negative number) | 7b | |
| c | Combine lines 7a and 7b (amount must equal Schedule I, line 23) | 7c | |
| 8 | Branch Interest (see instructions for definition): Enter the sum of Schedule I, line 9, column (c), and Schedule I, line 22. If the interest paid by the foreign corporation's U.S. trade or business was increased because 80% or more of the foreign corporation's assets are U.S. assets, check this box ▶ ☐ | 8 | |
| 9a | Excess interest. Subtract line 8 from line 7c. If zero or less, enter -0- | 9a | |
| b | If the foreign corporation is a bank, enter the excess interest treated as interest on deposits (see instructions for rules for computing this amount). Otherwise, enter -0- | 9b | |
| c | Subtract line 9b from line 9a | 9c | |
| 10 | Tax on excess interest. Multiply line 9c by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | 10 | |

### Part III—Additional Information

| | | Yes | No |
|---|---|:---:|:---:|
| 11 | Is the corporation claiming a reduction in, or exemption from, the branch profits tax due to: | | |
| a | A complete termination of all U.S. trades or businesses? | | X |
| b | The tax-free liquidation or reorganization of a foreign corporation? | | X |
| c | The tax-free incorporation of a U.S. trade or business? | | X |

If 11a or 11b applies and the transferee is a domestic corporation, attach Form 8848. If 11c applies, attach the statement required by Temporary Regulations section 1.884-2T(d)(5).

Form **1120-F** (2020)

011991 12-08-20

6

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)    **Viormar Trading Corporation N.V.**     59-1878157    Page **7**

Note: *Check if completing on* ▶ [X] U.S. basis or    [ ] Worldwide basis

| **Schedule L** | **Balance Sheets per Books** | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | | (a) | (b) | (c) | (d) |
| | **Assets** | | | | |
| 1 | Cash | | 16,350. | | 7,103. |
| 2a | Trade notes and accounts receivable ..... | | | | |
| b | Less allowance for bad debts ................. | ( ) | | ( ) | |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6a | Interbranch current assets* | | | | |
| b | Other current non-U.S. assets* ......... | | | | |
| c | Other current U.S. assets* ................. | | 0. | | 11,585. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans ......... | | | | |
| 9a | Other loans and investments-non-U.S. assets* | | | | |
| b | Other loans and investments - U.S. assets* | | | | |
| 10a | Buildings and other depreciable assets ... | 155,950. | | 155,950. | |
| b | Less accumulated depreciation ............. | ( 155,950.) | 0. | ( 155,950.) | 0. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion ................. | ( ) | | ( ) | |
| 12 | Land (net of any amortization) ............. | | | | |
| 13a | Intangible assets (amortizable only) ........ | | | | |
| b | Less accumulated amortization .............. | ( ) | | ( ) | |
| 14 | Assets held in trust | | | | |
| 15 | Other non-current interbranch assets* ..... | | | | |
| 16a | Other non-current non-U.S. assets* ........ | | | | |
| b | Other non-current U.S. assets* ........... | | | | |
| 17 | Total assets ................................. | | 16,350. | | 18,688. |
| | **Liabilities** | | | | |
| 18 | Accounts payable | | | | |
| 19 | Mtges., notes, bonds payable in less than 1 year: | | | | |
| a | Interbranch liabilities* ........................... | | | | |
| b | Third-party liabilities* ........................ | | | | |
| 20 | Other current liabilities* ..................... | | | | |
| 21 | Loans from shareholders | | | | |
| 22 | Mtges., notes, bonds payable in 1 year or more: | | | | |
| a | Interbranch liabilities* ......................... | | | | |
| b | Third-party liabilities* ......................... | | | | |
| 23 | Liabilities held in trust ........................ | | | | |
| 24a | Other interbranch liabilities* .................. | | | | |
| b | Other third-party liabilities* .................. | | | | |
| | **Equity** | | | | |
| 25 | Capital stock:   a   Preferred stock ...... | | | | |
| | b   Common stock ......... | | | | |
| 26 | Additional paid-in capital ...................... | | 155,950. | | 155,950. |
| 27 | Retained earnings - Appropriated* .......... | | | | |
| 28 | Retained earnings-Unappropriated ......... | | -139,600. | | -137,262. |
| 29 | Adjustments to shareholders' equity* ....... | | | | |
| 30 | Less cost of treasury stock ................ | ( ) | | ( ) | |
| 31 | Total liabilities and shareholders' equity | | 16,350. | | 18,688. |

\* Attach statement - see instructions.

Form **1120-F** (2020)

7

2020.05095 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2020)   **Viormar Trading Corporation N.V.**              59-1878157   Page **8**

| Schedule W | Overpayment Resulting From Tax Deducted and Withheld Under Chapters 3 and 4 | | |
|---|---|---|---|
| 1 | Total Chapter 3 and 4 payments. Enter the amount from page 1, line 5i ............................................... | **1** | |
| 2 | Enter the tax amount from page 1, line 1 ............................. **2** | | |
| 3 | Enter the portion of the tax amount shown on page 1, line 2, pertaining to income associated with amounts deducted and withheld under sections 1445 and 1446 (see instructions for general guidelines) .................................... **3** | | |
| 4 | Total Chapter 3 and 4 tax. Combine lines 2 and 3 ............................................................... | **4** | |
| 5 | Tentative overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Subtract line 4 from line 1 ....................................................................................................... | **5** | |
| 6 | Enter the amount from page 1, line 8a ............................................................................... | **6** | |
| 7 | Overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Enter the smaller of line 5 or line 6. Enter the result here and on page 1, line 8b .................................. | **7** | |

Form **1120-F** (2020)

011993  12-08-20

Form **8810**

Department of the Treasury
Internal Revenue Service

## Corporate Passive Activity Loss and Credit Limitations

▶ Attach to your tax return (personal service and closely held corporations only).
▶ Go to www.irs.gov/Form8810 for instructions and the latest information.

OMB No. 1545-0123

**2020**

Name

**Viormar Trading Corporation N.V.**

Employer identification number

**59-1878157**

| Part I | 2020 Passive Activity Loss |
| --- | --- |

**Caution:** See the instructions and complete Worksheets 1 and 2 before completing Part I.

| | | | |
| --- | --- | --- | --- |
| 1 a | Current year income (from Worksheet 2, column (a)) | 1a | 37,338. |
| b | Current year deductions and losses (from Worksheet 2, column (b)) | 1b ( | 35,000.) |
| c | Prior year unallowed losses (from Worksheet 2, column (c)) | 1c ( | ) |
| d | Combine lines 1a, 1b, and 1c. If the result is net income or zero, see instructions | 1d | 2,338. |
| 2 | Closely held corporations enter net active income and see instructions. Personal service corporations enter -0- on this line | 2 | 0. |
| 3 | Unallowed passive activity deductions and losses. Combine lines 1d and 2. If the result is net income or zero, see the instructions for lines 1d and 3. Otherwise, go to line 4 | 3 | 0. |
| 4 | Total deductions and losses allowed. Add the income, if any, on lines 1a and 2 and enter the result (see instructions) | 4 | 35,000. |

| Part II | 2020 Passive Activity Credits |
| --- | --- |

**Caution:** See the instructions and complete Worksheet 5 before completing Part II.

| | | | |
| --- | --- | --- | --- |
| 5 a | Current year credits (from Worksheet 5, column (a)) | 5a | |
| b | Prior year unallowed credits (from Worksheet 5, column (b)) | 5b | |
| 6 | Add lines 5a and 5b | 6 | |
| 7 | Enter the tax attributable to net passive income and net active income. See instructions | 7 | |
| 8 | Unallowed passive activity credit. Subtract line 7 from line 6. If the result is zero or less, enter -0- | 8 | |
| 9 | Allowed passive activity credit. Subtract line 8 from line 6. See instructions | 9 | |

| Part III | Election To Increase Basis of Credit Property |
| --- | --- |

| | |
| --- | --- |
| 10 | If the corporation disposed of its entire interest in a passive activity or former passive activity in a fully taxable transaction, and the corporation elects to increase the basis of credit property used in that activity by the unallowed credit that reduced the property's basis, check this box. See instructions ........................ ▶ ☐ |
| 11 | Name of passive activity disposed of ▶ _____ |
| 12 | Description of the credit property for which the election is being made ▶ _____ |
| 13 | Amount of unallowed credit that reduced the property's basis ▶ $ _____ |

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **8810** (2020)

019891
11-23-20

9

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

**Form 8810 Worksheet 1 - Computation of Income, Gains, Deductions, and Losses for Worksheet 2**

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|---|---|---|

Name of Activity

A WAREHOUSE RENTAL

B

C

D

| | Activities | | | |
|---|---|---|---|---|
| | **A** | **B** | **C** | **D** |
| 1. Gross receipts | 37,338. | | | |
| 2. Schedule D Gains: | | | | |
| Long-term capital gains | | | | |
| Short-term capital gains | | | | |
| 3. Form 4797 Gains: | | | | |
| 1231 gains | | | | |
| Ordinary gains | | | | |
| 4. Other passive income | | | | |
| 5. Total income. Add lines 1 through 4 and enter the result in column (a) of Worksheet 2 | 37,338. | | | |
| 6. Current Year Deductions: | | | | |
| a. Cost of goods sold | | | | |
| b. Compensation of officers | | | | |
| c. Salaries and wages | | | | |
| d. Repairs and maintenance | | | | |
| e. Bad debts | | | | |
| f. Rents | 32,745. | | | |
| g. Taxes and licenses | | | | |
| h. Interest | | | | |
| i. Depreciation | | | | |
| j. Depletion | | | | |
| k. Advertising | | | | |
| l. Other deductions | 2,255. | | | |
| 7. Total Deductions. Add lines 6a through 6l | 35,000. | | | |
| 8. Schedule D losses | | | | |
| Long-term losses | | | | |
| Short-term losses | | | | |
| 9. Form 4797 losses | | | | |
| 1231 losses | | | | |
| Ordinary losses | | | | |
| 10. Current year deductions and losses. Add lines 7 through 9 and enter the result here and in column (b) of Worksheet 2 | 35,000. | | | |
| 11. Prior year carryovers | | | | |
| 12. Net gain/loss (line 5 less lines 10 and 11) | 2,338. | | | |

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|------|----------------------------------|------------|

### Worksheet 2 for Form 8810, Lines 1a, 1b, and 1c

| Name of Activity | Current Year | | Prior Year | Overall Gain or Loss | |
|------------------|--------------|--------------|------------|----------------------|------|
| | (a) Income (line 1a) | (b) Deductions and Losses (line 1b) | (c) Unallowed Loss (line 1c) | (d) Gain | (e) Loss |
| WAREHOUSE RENTAL | 37,338. | 35,000. | | 2,338. | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals. Enter on lines 1a, 1b, and 1c of Form 8810 | 37,338. | 35,000. | | | |

020071
04-01-20

Name: **Viormar Trading Corporation N.V.**   I.D. Number **59-1878157**

## Income (Loss) From Other Rental Activities

**1**   Show the kind and location of each rental property.

A  WAREHOUSE RENTAL
7884 NW 55TH STREET, MIAMI, FL 33166

B

C

D

| Rental Income | | Properties | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **2**  Gross rents | 2 | 37,338. | | | |
| **Rental Expenses** | | | | | |
| **3**  Advertising | 3 | | | | |
| **4**  Auto and travel | 4 | | | | |
| **5**  Cleaning and maintenance | 5 | | | | |
| **6**  Commissions | 6 | | | | |
| **7**  Insurance | 7 | 712. | | | |
| **8**  Legal and other professional fees | 8 | | | | |
| **9**  Interest | 9 | | | | |
| **10**  Repairs | 10 | | | | |
| **11**  Taxes | 11 | 32,745. | | | |
| **12**  Utilities | 12 | 1,543. | | | |
| **13**  Wages and salaries | 13 | | | | |
| **14**  Depreciation | 14 | | | | |
| **15**  Other (list) ▶ | 15 | | | | |
| **16**  Total expenses for each property. Add lines 3 through 15 | 16 | 35,000. | | | |

| | | |
|---|---|---|
| **17**  Total gross rents. Add gross rents from line 2, columns A through D | 17 | 37,338. |
| **18**  Total expenses. Add total expenses from line 16, columns A through D | 18 | 35,000. |
| **19**  Net gain (loss) from Form 4797, Part II, line 17, from disposition of property from other rental activities | 19 | |
| **20**  Net income (loss) from other rental(s) | 20 | 2,338. |

011111
04-01-20

12

Viormar Trading Corporation N.V.                                    59-1878157

| Form 1120-F | Taxes and Licenses | Statement 1 |
|---|---|---|

| Description | Amount |
|---|---|
| Taxes from Rent and Royalties | 32,745. |
| Total to Form 1120-F, Page 4, line 17 | 32,745. |

| Form 1120-F | Other Deductions | Statement 2 |
|---|---|---|

| Description | Amount |
|---|---|
| Insurance | |
| Other Rent & Royalty Expenses | 2,255. |
| Utilities | |
| Total to Form 1120-F, Page 4, line 27 | 2,255. |

| | Net Operating Loss Deduction | | | Statement 3 |
|---|---|---|---|---|

| Tax Year | Loss Sustained | Loss Previously Applied | Loss Remaining | Available This Year |
|---|---|---|---|---|
| 12/31/19 | 139,600. | | 139,600. | 139,600. |
| NOL Available This Year | | | 139,600. | 139,600. |



**Florida Corporate Income/Franchise Tax Return**

F-1120, R. 01/20    **1019**
Rule 12C-1.051
Florida Administrative Code
Effective 01/21
Page 1 of 6

FEIN  59-1878157

For calendar year 2020
or tax year beginning    JAN 1    , 2020
ending    DEC 31, 2020

813302020123100020050375359187815700000

| | |
|---|---|
| **Name** | Viormar Trading Corporation N.V. |
| **Address** | 439 STILL FOREST TER |
| **City/State/ZIP** | Sanford, FL  32771 |

☐ Check here if any changes have been made to name or address

**Computation of Florida Net Income Tax**

|   |   |   |   |
|---|---|---|---|
| 1. | Federal taxable income (see instructions) - Attach pages 1-5 of federal return | Check here if negative ___ | 0.00 |
| 2. | State income taxes deducted in computing federal taxable income (attach schedule) | Check here if negative ___ | |
| 3. | Additions to federal taxable income (from Schedule I) | Check here if negative ___ | 2,338.00 |
| 4. | Total of Lines 1, 2 and 3 | Check here if negative ___ | 2,338.00 |
| 5. | Subtractions from federal taxable income (from Schedule II) | Check here if negative ___ | 139,600.00 |
| 6. | Adjusted federal income (Line 4 minus Line 5) | Check here if negative X | -137,262.00 |
| 7. | Florida portion of adjusted federal income (see instructions) | Check here if negative X | -137,262.00 |
| 8. | Nonbusiness income allocated to Florida (from Schedule R) | Check here if negative ___ | 0.00 |
| 9. | Florida exemption | | 0.00 |
| 10. | Florida net income (Line 7 plus Line 8 minus Line 9) | | 0.00 |
| 11. | Tax due: 4.458% of Line 10 | | |
| 12. | Credits against the tax (from Schedule V) | | 0.00 |
| 13. | Total corporate income/franchise tax due (Line 11 minus Line 12) | | |
| 14. | a) Penalty: F-2220 _____  b) Other _____  c) Interest: F-2220 _____  d) Other _____  Line 14 Total ▶ _____ | | |
| 15. | Total of Lines 13 and 14 | | |
| 16. | Payment credits:  Estimated tax payments  16a $ _____  Tentative tax payment  16b $ _____ | | |
| 17. | Total amount due: Subtract Line 16 from Line 15. If positive, enter amount due here and on payment coupon. If the amount is negative (overpayment), enter on Line 18 and/or Line 19 | | |
| 18. | Credit: Enter amount of overpayment credited to next year's estimated tax here and on payment coupon | | |
| 19. | Refund: Enter amount of overpayment to be refunded here and on payment coupon | | |

044081 10-20-20

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Payment Coupon for Florida Corporate Income Tax Return**

1019
F-1120
R. 01/20

**Do Not Detach**    YEAR ENDING  12/31/20

To ensure proper credit to your account, enclose your check with tax return when mailing.

| | |
|---|---|
| **Name** | Viormar Trading Corporation N |
| **Address** | 439 STILL FOREST TER |
| **City/State/ZIP** | Sanford, FL  32771 |

If 6/30 year end, return is due 1st day of the 4th month after the close of the taxable year, otherwise return is due 1st day of the 5th month after the close of the taxable year.

| | | | |
|---|---|---|---|
| 591878157 | 233800 | 0 | 0 |
| 20200101 | 13960000 | 0 | 0 |
| 20201231 | -13726200 | 0 | 0 |
| 00000000 | 0.000000 | 0 | 0 |
| 004 | 13960000 | 0 | 0 |
| 202 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

0

8133 0 20201231 0002005037 5 3591878157 0000 0



**Viormar Trading Corporation N.V.**

1019
F-1120
R. 01/20
Page 2 of 6

FEIN _____59-1878157_____

**This return is considered incomplete unless a copy of the federal return is attached.**

If your return is not signed, or improperly signed and verified, it will be subject to a penalty. The statute of limitations will not start until your return is properly signed and verified. Your return must be completed in its entirety.

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| | | | | |
|---|---|---|---|---|
| **Sign here** | Signature of officer (must be an original signature) | Date | **Title** | **Managing Director** |
| **Paid preparers only** | Preparer's signature ▶ | Date 07/24/24 | Preparer check if self-employed | Preparer's PTIN ▶ P01496734 |
| | Firm's name (or yours if self-employed) and address ▶ | MAGNO & ASSOCIATES, PL<br>1200 BRICKELL AVE STE 1220<br>MIAMI, FL 3 | FEIN ▶ 20-2323418<br>ZIP ▶ 331313255 | |

**All Taxpayers Must Answer Questions A through M Below - See Instructions**

A. State of incorporation: _____

B. Florida Secretary of State document number: _____

C. Florida consolidated return?   YES ☐   NO ☒

D. ☐ Initial return   ☐ Final return (final federal return filed)

E. Principal Business Activity Code (as pertains to Florida)

531120

F. A Florida extension of time was timely filed?   YES ☐   NO ☒

G-1. Corporation is a member of a controlled group?   YES ☐   NO ☐   If yes, attach list.

G-2. Part of a federal consolidated return?   YES ☐   NO ☒   If yes, provide:

FEIN from federal consolidated return: _____

Name of corporation: _____

G-3. The federal common parent has sales, property, or payroll in Florida?   YES ☐   NO ☒

H. Location of corporate books: Schottegatweg Oost 10 Unit A1K

City, State, ZIP: SANFORD, FL  32771

I. Taxpayer is a member of a Florida partnership or joint venture?   YES ☐   NO ☒

J. Enter date of latest IRS audit: _____

   a) List years examined: _____

K. Contact person concerning this return: Corpag Services (Cur

   a) Contact person telephone number: +599 9 736 4500

   b) Contact person e-mail address: orlandofernandezs@yah

L. Type of federal return filed   ☐ 1120   ☐ 1120S or 1120F

**Online Information Reporting Requirement**

Visit the Department website to obtain a list of the required information, due date, penalty rate and application to enter the information. (See section 220.27, Florida Statutes)

**Where to Send Payments and Returns**

Make check payable to and mail with return to:

Florida Department of Revenue
5050 W Tennessee Street
Tallahassee FL 32399-0135

If you are requesting a refund (Line 19), send your return to:

Florida Department of Revenue
PO Box 6440
Tallahassee FL 32314-6440

**Remember:**

✔ **Make your check payable to the Florida Department of Revenue.**

✔ **Write your FEIN on your check.**

✔ **Sign your check and return.**

✔ **Attach a copy of your federal return.**

✔ **Attach a copy of your Florida Form F-7004 (extension of time) if applicable.**

044082  10-20-20



1019
F-1120
R. 01/20
Page 3 of 6

NAME **Viormar Trading Corporation N.V.**   FEIN **59-1878157**   TAXABLE YEAR ENDING **12/31/20**

## Schedule I - Additions and/or Adjustments to Federal Taxable Income

| | | |
|---|---|---|
| 1. | Interest excluded from federal taxable income (see Instructions) | 1. |
| 2. | Undistributed net long-term capital gains (see Instructions)   *Statement 2* | 2. |
| 3. | Net operating loss deduction (attach schedule) | 3.   2,338.00 |
| 4. | Net capital loss carryover (attach schedule) | 4. |
| 5. | Excess charitable contribution carryover (attach schedule) | 5. |
| 6. | Employee benefit plan contribution carryover (attach schedule) | 6. |
| 7. | Enterprise zone jobs credit (Florida Form F-1156Z) | 7. |
| 8. | Ad valorem taxes allowable as enterprise zone property tax credit (Florida Form F-1158Z) | 8. |
| 9. | Guaranty association assessment(s) credit | 9. |
| 10. | Rural and/or urban high crime area job tax credits | 10. |
| 11. | State housing tax credit | 11. |
| 12. | Florida Tax Credit Scholarship Program Credits | 12. |
| 13. | Florida Renewable energy production tax credit | 13. |
| 14. | New markets tax credit | 14. |
| 15. | Entertainment industry tax credit | 15. |
| 16. | Research and Development tax credit | 16. |
| 17. | Energy Economic Zone tax credit | 17. |
| 18. | a. 168(k) IRC special bonus depreciation | 18. |
| 19. | Other additions (attach schedule) | 19. |
| 20. | Total Lines 1 through 19. Enter total on Line 20 and on Page 1, Line 3. | 20.   2,338.00 |

## Schedule II - Subtractions from Federal Taxable Income

| | | |
|---|---|---|
| 1. | Gross foreign source income less attributable expenses | |
| | (a)  Enter s. 78, IRC income   $ _____ | |
| | (b)  plus s. 862, IRC dividends   $ _____ | |
| | (c)  plus s. 951A, IRC, income   $ _____ | 1. |
| | (d)  less direct and indirect expenses | |
| | and related amounts deducted | |
| | under s. 250, IRC   $ _____   Total ▶ | |
| 2. | Gross subpart F income less attributable expenses | |
| | (a)  Enter s. 951, IRC subpart F income   $ _____   Total ▶ | 2. |
| | (b)  less direct and indirect expenses   $ _____ | |
| | Note: Taxpayers doing business outside Florida enter zero on Lines 3 through 6, and complete Schedule IV. | |
| 3. | Florida net operating loss carryover deduction (see instructions)   *Statement 1* | 3.   139,600.00 |
| 4. | Florida net capital loss carryover deduction (see instructions) | 4. |
| 5. | Florida excess charitable contribution carryover (see instructions) | 5. |
| 6. | Florida employee benefit plan contribution carryover (see instructions) | 6. |
| 7. | Nonbusiness income (from Schedule R, Line 3) | 7. |
| 8. | Eligible net income of an international banking facility (see instructions) | 8. |
| 9. | s. 179, IRC expense (see instructions) | 9. |
| 10. | s. 168(k), IRC special bonus depreciation (see instructions) | 10. |
| 11. | Other subtractions (attach statement) | 11. |
| 12. | Total Lines 1 through 11. Enter total on Line 12 and on Page 1, Line 5. | 12.   139,600.00 |

3

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1



<div align="right">

1019
F-1120
R. 01/20
Page 4 of 6

</div>

NAME **Viormar Trading Corporation N.V.**  FEIN <u>59-1878157</u>  TAXABLE YEAR ENDING <u>12/31/20</u>

## Schedule III - Apportionment of Adjusted Federal Income

**III-A  For use by taxpayers doing business outside Florida, except those providing insurance or transportation services.**

| | (a) WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) | (c) Col. (a) ÷ Col. (b) Rounded to Six Decimal Places | (d) Weight If any factor in Column (b) is zero, see note on Pg 9 of the instructions. | (e) Weighted Factors Rounded to Six Decimal Places |
|---|---|---|---|---|---|
| 1. Property (Schedule III-B below) | | | | X 25% or | |
| 2. Payroll | | | | X 25% or | |
| 3. Sales (Schedule III-C below) | | | | X 50% or | |
| 4. Apportionment fraction (Sum of Lines 1, 2, and 3, Column (e). Enter here and on Schedule IV, Line 2. | | | | | |

**III-B  For use in computing average value of property (use original cost).**

| | WITHIN FLORIDA | | TOTAL EVERYWHERE | |
|---|---|---|---|---|
| | a. Beginning of year | b. End of year | c. Beginning of year | d. End of year |
| 1. Inventories of raw material, work in process, finished goods | | | | |
| 2. Buildings and other depreciable assets | | | | |
| 3. Land owned | | | | |
| 4. Other tangible and intangible (financial org. only) assets (attach schedule) | | | | |
| 5. Total (Lines 1 through 4) | | | | |

6. Average value of property
   a. Add Line 5, Columns (a) and (b) and divide by 2 (for within Florida) ...... 6a. _____
   b. Add Line 5, Columns (c) and (d) and divide by 2 (for total everywhere) .......................................... 6b. _____
7. Rented property (8 times net annual rent)
   a. Rented property in Florida .......................................... 7a. _____
   b. Rented property Everywhere .......................................... 7b. _____
8. Total (Lines 6 and 7). Enter on Line 1, Schedule III-A, Columns (a) and (b).
   a. Enter Lines 6 a. plus 7 a. and also enter on Schedule III-A, Line 1.
      Column (a) for total average property in Florida ........................... 8a. _____
   b. Enter Lines 6 b. plus 7 b. and also enter on Schedule III-A, Line 1.
      Column (b) for total average property Everywhere .......................................... 8b. _____

| **III-C  Sales Factor** | (a) TOTAL WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) |
|---|---|---|
| | **N/A** | |
| 1. Sales (gross receipts) | | **N/A** |
| 2. Sales delivered or shipped to Florida purchasers | | |
| 3. Other gross receipts (rents, royalties, interest, etc. when applicable) | | |
| 4. TOTAL SALES (Enter on Schedule III-A, Line 3, Columns [a] and [b]) | | |

| **III-D  Special Apportionment Fractions**  (see instructions) | (a) WITHIN FLORIDA | (b) TOTAL EVERYWHERE | (c) FLORIDA Fraction ([a] ÷ [b]) Rounded to Six Decimal Places |
|---|---|---|---|
| 1. Insurance companies (attach copy of Schedule T - Annual Report) | | | |
| 2. Transportation services | | | |

## Schedule IV - Computation of Florida Portion of Adjusted Federal Income

| | | |
|---|---|---|
| 1. Apportionable adjusted federal income from Page 1, Line 6 | 1. | |
| 2. Florida apportionment fraction (Schedule III-A, Line 4) | 2. | |
| 3. Tentative apportioned adjusted federal income (multiply Line 1 by Line 2) | 3. | |
| 4. Net operating loss carryover apportioned to Florida (attach schedule; see instructions) | 4. | |
| 5. Net capital loss carryover apportioned to Florida (attach schedule; see instructions) | 5. | |
| 6. Excess charitable contribution carryover apportioned to Florida (attach schedule; see instructions) | 6. | |
| 7. Employee benefit plan contribution carryover apportioned to Florida (attach schedule; see instructions) | 7. | |
| 8. Total carryovers apportioned to Florida (add Lines 4 through 7) | 8. | |
| 9. Adjusted federal income apportioned to Florida (Line 3 less Line 8; see instructions) | 9. | |

044092  10-20-20

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1



1019
F-1120
R. 01/20
Page 5 of 6

NAME Viormar Trading Corporation N.V.      FEIN 59-1878157   TAXABLE YEAR ENDING 12/31/20

## Schedule V - Credits Against the Corporate Income/Franchise Tax

| | | |
|---|---|---|
| 1. | Florida health maintenance organization credit (attach assessment notice) | 1. |
| 2. | Capital investment tax credit (attach certification letter) | 2. |
| 3. | Enterprise zone jobs credit (from Florida Form F-1158Z attached) | 3. |
| 4. | Community contribution tax credit (attach certification letter) | 4. |
| 5. | Enterprise zone property tax credit (from Florida Form F-1158Z attached) | 5. |
| 6. | Rural job tax credit (attach certification letter) | 6. |
| 7. | Urban high crime area job tax credit (attach certification letter) | 7. |
| 8. | Hazardous waste facility tax credit | 8. |
| 9. | Florida alternative minimum tax (AMT) credit | 9. |
| 10. | Contaminated site rehabilitation tax credit (attach tax credit certificate) | 10. |
| 11. | State housing tax credit (attach certification letter) | 11. |
| 12. | Florida Tax Credit: Scholarship Program Credits, (attach certificate) | 12. |
| 13. | Florida renewable energy production tax credit | 13. |
| 14. | New markets tax credit | 14. |
| 15. | Entertainment industry tax credit | 15. |
| 16. | Research and Development tax credit | 16. |
| 17. | Energy Economic Zone tax credit | 17. |
| 18. | Other credits (attach schedule) | 18. |
| 19. | Total credits against the tax (sum of Lines 1 through 18 not to exceed the amount on Page 1, Line 11). Enter total credits on Page 1, Line 12 | 19. |

## Schedule R - Nonbusiness Income

**Line 1.  Nonbusiness income (loss) allocated to Florida**

Type                                                          Amount

_____

_____

_____

Total allocated to Florida ................................................................................................  1. _____

(Enter here and on Page 1, Line 8)

**Line 2.  Nonbusiness income (loss) allocated elsewhere**

Type                        State/country allocated to                Amount

_____       _____

_____       _____

_____       _____

Total allocated elsewhere ...........................................................................  2. _____

**Line 3.  Total nonbusiness income**

Grand total. Total of Lines 1 and 2 ..................................................................  3. _____

(Enter here and on Schedule II, Line 7)



1019
F-1120
R. 01/20
Page 6 of 6

NAME Viormar Trading Corporation N.V.    FEIN 59-1878157   TAXABLE YEAR ENDING 12/31/20

## Estimated Tax Worksheet
### For Taxable Years Beginning On or After January 1, 2021

1. Florida income expected in taxable year ................................................... 1. $ _____
2. Florida exemption $50,000 (Members of a controlled group, see instructions on Page 14 of
   Florida Form F-1120N) ....................................................................... 2. $ _____
3. Estimated Florida net income (Line 1 less Line 2) ..................................... 3. $ _____
4. Total Estimated Florida tax (4.458% of Line 3) ............................ $ _____
   Less: Credits against the tax .................................... $ _____   4. $ _____

5. Computation of installments:
   Payment due dates and          If 6/30 year end, last day of 4th month,
   payment amounts:               otherwise last day of 5th month - Enter 0.25 of Line 4 .......... 5a. _____
                                  Last day of 6th month - Enter 0.25 of Line 4 .................... 5b. _____
                                  Last day of 9th month - Enter 0.25 of Line 4 .................... 5c. _____
                                  Last day of fiscal year - Enter 0.25 of Line 4 ................. 5d. _____

   NOTE: If your estimated tax should change during the year, you may use the amended computation
   below to determine the amended amounts to be entered on the declaration (Florida Form F-1120ES).

1. Amended estimated tax ........................................................................ 1. $ _____
2. Less:
   (a) Amount of overpayment from last year elected for credit
       to estimated tax and applied to date ........................... 2a. – $ _____
   (b) Payments made on estimated tax declaration (Florida Form F-1120ES)  2b. – $ _____
   (c) Total of Lines 2(a) and 2(b) ................................................... 2c. $ _____
3. Unpaid balance (Line 1 less Line 2(c)) ................................................. 3. $ _____
4. Amount to be paid (Line 3 divided by number of remaining installments) ............... 4. $ _____

---

### References

*The following documents were mentioned in this form and are incorporated by reference in the rules indicated below.*
*The forms are available online at  floridarevenue.com/forms.*

| | | |
|---|---|---|
| Form F-2220 | Underpayment of Estimated Tax on Florida Corporate Income/Franchise Tax | Rule 12C-1.051, F.A.C. |
| Form F-7004 | Florida Tentative Income/Franchise Tax Return and Application for Extension of Time to File Return | Rule 12C-1.051, F.A.C. |
| Form F-1156Z | Florida Enterprise Zone Jobs Credit Certificate of Eligibility for Corporate Income Tax | Rule 12C-1.051, F.A.C. |
| Form F-1158Z | Enterprise Zone Property Tax Credit | Rule 12C-1.051, F.A.C. |
| Form F-1120N | Instructions for Corporate Income/Franchise Tax Return | Rule 12C-1.051, F.A.C. |
| Form F-1120ES | Declaration/Installment of Florida Estimated Income/Franchise Tax | Rule 12C-1.051, F.A.C. |

044094 10-20-20

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

 Viormar Trading Corporation N.V.

1019
F-1120
R. 01/20

FEIN    59-1878157

DATA Page 1 of 2

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 13960000 |
| 233800 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 00000000 | 0 | 0 | 0 |
| 0 | 233800 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0.000000 |

044083  10-20-20



**Viormar Trading Corporation N.V.**

1019
F-1120
R. 01/20

FEIN    59-1878157

DATA Page 2 of 2

| 591878157 | 0 | 0 | 0 |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

Viormar Trading Corporation N.V.                                    59-1878157

| FL F-1120 | | Net Operating Loss Carryovers | | | Statement 1 |
|---|---|---|---|---|---|
| Year | Apportion Factor | Current Yr NOL/ Sec 382/ SRLY Limit | Net Operating Loss Carryover | Loss Previously Deducted | Net Loss Remaining |
| 2019 | .00000 | 0.00 | 139,600.00 | 0.00 | 139,600.00 |
| Total Net Operating Loss Carryover Available | | | | | 139,600.00 |

Viormar Trading Corporation N.V.                                    59-1878157

| FL F-1120 | Federal Carryover Deductions | Statement 2 |
|---|---|---|

| Carryovers Deducted in Federal Taxable Income | Amount |
|---|---|
| Net Operating Loss | 2,338.00 |
| Net Capital Loss | |
| Excess Charitable Contribution | |
| Excess Employee Benefit Plan Contribution | |

2020 05095 VIORMAR TRADING CORPORATI VIORMAR1

December 12, 1978

Form **1120-F**
Department of the Treasury
Internal Revenue Service

**U.S. Income Tax Return of a Foreign Corporation**
For calendar year 2021, or tax year beginning _____ , and ending _____
▶ Go to www.irs.gov/Form1120F for instructions and the latest information.

OMB No. 1545-0123
**2021**

Type or Print

Name
**Viormar Trading Corporation N.V.**

Number, street, and room or suite no. (see instructions)
**439 STILL FOREST TER**

City or town, state or province, country, and ZIP or foreign postal code
**Sanford, FL  32771**

Employer identification number
**59-1878157**

Check box(es) if:
- ☐ Initial return
- ☐ Name or address change
- ☐ Final return
- ☐ First post-merger return
- ☐ Amended return
- ☐ Schedule M-3 attached
- ☐ Protective return

**A** Country of incorporation **CURACAO**

**B** Foreign country under whose laws the income reported on this return is also subject to tax **CURACAO**

**C** Date incorporated **12/12/1978**

**D** (1) Location of corporation's primary books and records (city, province or state, and country) **Sanford, FL**

(2) Principal location of worldwide business
**439 STILL FOREST TER**
**Sanford, FL 32771**

(3) If the corporation maintains an office or place of business in the U.S., check here ▶ ☒

**E** If the corporation had an agent in the United States at any time during the tax year, enter:

(1) Type of agent **INDIVIDUAL**

(2) Name **ORLANDO A. FERNANDEZ**

(3) Address **439 STILL FOREST TER**
**SANFORD, FL 32771**

**F** See the instructions and enter the corporation's principal:

(1) Business activity code number ▶ **531120**

(2) Business activity ▶ **LESSOR OF NONRES. BUIL.**

(3) Product or service ▶ **WAREHOUSE RENTAL**

**G** Check method of accounting: (1) ☒ Cash  (2) ☐ Accrual

(3) ☐ Other (specify) ▶

**Computation of Tax Due or Overpayment**

| | | | |
|---|---|---|---|
| 1 | Tax from Section I, line 11, page 3 | 1 | 0. |
| 2 | Tax from Section II, Schedule J, line 9, page 5 | 2 | 660. |
| 3 | Tax from Section III (add lines 6 and 10 on page 6) | 3 | 0. |
| 4 | Total tax. Add lines 1 through 3 | 4 | 660. |
| 5a | 2020 overpayment credited to 2021 | 5a | |
| b | 2021 estimated tax payments | 5b | |
| c | Less 2021 refund applied for on Form 4466 | 5c ( ) | |
| d | Combine lines 5a through 5c | 5d | |
| e | Tax deposited with Form 7004 | 5e | |
| f | Credit for tax paid on undistributed capital gains (attach 2439) | 5f | |
| g | Credit for federal tax paid on fuels (attach Form 4136). See instructions | 5g | |
| h | Reserved for future use | 5h | |
| i | U.S. income tax paid or withheld at source (add line 12, page 3, and amounts from Forms 8288-A and 8805 (attach Forms 8288-A and 8805)) | 5i | |
| j | Total payments. Add lines 5d through 5i | 5j | |
| 6 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | 6 | |
| 7 | Amount owed. If line 5j is smaller than the total of lines 4 and 6, enter amount owed | 7 | 660. |
| 8a | Overpayment. If line 5j is larger than the total of lines 4 and 6, enter amount overpaid | 8a | |
| b | Amount of overpayment on line 8a resulting from tax deducted and withheld under Chapters 3 and 4 (from Schedule W, line 7, page 8) | 8b | |
| 9 | Enter portion of line 8a you want Credited to 2022 estimated tax ▶ _____ Refunded ▶ | 9 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____  Date _____  ▶**President** Title

May the IRS discuss this return with the preparer shown below (see instructions)?
☒ Yes  ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date 07/24/24 | Check ☐ if self-employed | PTIN P01496734 |
|---|---|---|---|---|

Firm's name ▶ **MAGNO & ASSOCIATES, PL**

Firm's EIN ▶ **20-2323418**

Firm's address ▶ **1200 BRICKELL AVE STE 1220**
**MIAMI, FL 331313255**

Phone no. **(305) 379-4400**

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120-F** (2021)

111921 12-08-21    LHA

1

1200724 160886 VIORMAR TRADING

Form 1120-F (2021)   **Viormar Trading Corporation N.V.**   59-1878157   Page **2**

**Additional Information** *(continued from page 1)*

| | | Yes | No |
|---|---|---|---|
| H | Did the corporation's method of accounting change from the preceding tax year? | | X |
| | If "Yes," attach a statement with an explanation. | | |
| I | Did the corporation's method of determining income change from the preceding tax year? | | X |
| | If "Yes," attach a statement with an explanation. | | |
| J | Did the corporation file a U.S. income tax return for the preceding tax year? | X | |
| K | (1) At any time during the tax year, was the corporation engaged in a trade or business in the United States? | X | |
| | (2) If "Yes," is taxpayer's trade or business within the United States solely the result of a section 897 (FIRPTA) sale or disposition? | | X |
| L | Did the corporation have a permanent establishment in the United States for purposes of any applicable tax treaty between the United States and a foreign country? | | X |
| | If "Yes," enter the name of the foreign country: | | |
| M | Did the corporation have any transactions with related parties? | | X |
| | If "Yes," Form 5472 may have to be filed (see instructions). Enter number of Forms 5472 attached ▶ | | |
| N | Is the corporation a controlled foreign corporation? (See section 957(a) for definition.) | X | |
| O | Is the corporation a personal service corporation? (See instructions for definition.) | | X |
| P | Enter tax-exempt interest received or accrued during the tax year ▶ $ | | |
| Q | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a U.S. corporation? (See section 267(c) for rules of attribution.) | | X |
| | If "Yes," attach a statement showing (1) name and EIN of such U.S. corporation; (2) percentage owned; and (3) taxable income or (loss) before NOL and special deductions of such U.S. corporation for the tax year ending with or within your tax year. | | |
| R | If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ▶ ☐ | | |
| S | Enter the available NOL carryover from prior tax years. (Do not reduce it by any deduction on line 30a, page 4.) ▶ $ **137,262.** | | |
| T | Is the corporation a subsidiary in a parent-subsidiary controlled group? | | X |
| | If "Yes," enter the parent corporation's: | | |
| | (1) EIN ▶ | | |
| | (2) Name ▶ | | |
| U | (1) Is the corporation a dealer under section 475? | | X |
| | (2) Did the corporation mark to market any securities or commodities other than in a dealer capacity? | | X |

| | | Yes | No |
|---|---|---|---|
| V | At the end of the tax year, did any individual, partnership, corporation, estate, or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (See section 267(c) for rules of attribution.) | | X |
| | If "Yes," attach a statement showing the name and identifying number. (Do not include any information already entered in item T.) Enter percentage owned ▶ | | |
| W | (1) Is the corporation taking a position on this return that a U.S. tax treaty overrules or modifies an Internal Revenue law of the United States, thereby causing a reduction of tax? | | X |
| | If "Yes," the corporation is generally required to complete and attach Form 8833. See Form 8833 for exceptions. Note: Failure to disclose a treaty-based return position may result in a $10,000 penalty (see section 6712). | | |
| | (2) Is the corporation claiming treaty benefits pursuant to, or otherwise filing its return pursuant to a Competent Authority determination or an Advance Pricing Agreement? | | X |
| | If "Yes," attach a copy of the Competent Authority determination letter or Advance Pricing Agreement to your return. | | |
| X | During the tax year, did the corporation own any entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? | | X |
| | If "Yes," attach a statement listing the name, country under whose laws the entity was organized, and EIN (if any) of each such entity. | | |
| Y | (1) Did a partnership allocate to the corporation a distributive share of income from a directly owned partnership interest, any of which is ECI or treated as ECI by the partnership or the partner? | | X |
| | If "Yes," attach Schedule P. See Instructions. | | |
| | (2) During the tax year, did the corporation own, directly or indirectly, at least a 10% interest in any foreign partnership? | | X |
| | If "Yes," see instructions for required attachment. | | |
| Z | (1) Has the corporation engaged in any transactions the results of which are subject to the arm's-length standard under section 482 and its regulations? | | X |
| | (2) Has the corporation recognized any interbranch amounts? | | X |
| | If "Yes," attach statement (see instructions). | | |
| AA | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? | | X |
| | If "Yes," complete and attach Schedule UTP. | | |
| BB | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? | | X |
| CC | Is the corporation (including the home office or any branch) a qualified derivatives dealer (QDD)? | | X |
| | (1) If "Yes," attach Schedule Q (Form 1120-F) (see instructions) | | |
| | (2) If "Yes," enter the QI-EIN ▶ | | |
| DD | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years (see sections 59A (e)(2) and (3))? | | X |
| | If "Yes," complete and attach Form 8991. | | |
| EE | During the tax year, did the corporation pay or accrue any interest or royalty for which a deduction is not allowed under section 267A (see instructions)? | | X |
| | If "Yes," enter the total amount of the disallowed deductions ......... ▶ $ | | |

Form **1120-F** (2021)

111931 12-06-21

2

Form 1120-F (2021) **Viormar Trading Corporation N.V.**                    59-1878157    Page **3**

## Additional Information (continued from page 2)

| FF | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year (see instructions)? | Yes | No |
|---|---|---|---|
| | | | X |
| GG | Does the corporation satisfy one or more of the following (see instructions)? | | X |
| | (1) The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| | (2) The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $26 million and the corporation has business interest expense. | | |
| | (3) The corporation is a tax shelter and the corporation has business interest expense. If "Yes," to any, complete and attach Form 8990. | | |

| HH | During the tax year, did the corporation dispose of an interest in a partnership that directly or indirectly engaged in a trade or business within the United States? | Yes | No |
|---|---|---|---|
| | | | X |
| II | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? | | X |
| | If "Yes," enter amount from Form 8996, line 15 ▶ $ _____ | | |

## SECTION I - Income From U.S. Sources Not Effectively Connected With the Conduct of a Trade or Business in the United States - Do not report items properly withheld and reported on Form 1042-S. See instructions.

Report all gross transportation income subject to 4% tax on line 9. Report other column (a) income items only if not properly withheld and reported on Form 1042-S. The rate of tax on these gross income items is 30% or such lower rate specified by tax treaty. No deductions are allowed against these types of income. Enter treaty rates where applicable. **If the corporation is claiming a lower treaty rate, also complete item W on page 2.** If multiple treaty rates apply to a type of income (for example, subsidiary and portfolio dividends or dividends received by disregarded entities), attach a statement showing the amounts, tax rates, and withholding for each.

Name of treaty country, if any ▶

| | (a) Class of income | (b) Gross amount | (c) Rate of tax (%) | (d) Amount of tax liability | (e) Amount of U.S. income tax paid or withheld at the source |
|---|---|---|---|---|---|
| 1 | Interest | | | | |
| 2a | Dividends (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| 2b | Dividend equivalents (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| 3 | Rents | | | | |
| 4 | Royalties | | | | |
| 5 | Annuities | | | | |
| 6 | Gains from disposal of timber, coal, or domestic iron ore with a retained economic interest (attach supporting statement) | | | | |
| 7 | Gains from sale or exchange of patents, copyrights, etc. | | | | |
| 8 | Fiduciary distributions (attach supporting statement) | | | | |
| 9 | Gross transportation income (see instructions) | | 4 | | |
| 10 | Other items of income | | | | |
| 11 | Total. Enter here and on line 1, page 1 ▶ | | | | |
| 12 | Total. Enter here and include on line 5i, page 1 | | | ▶ | |

13  Is the corporation fiscally transparent under the laws of the foreign jurisdiction with respect to any item of income listed above?
If "Yes," attach a statement that provides the information requested above with respect to each such item of income.        ☐ Yes   ☒ No

Form **1120-F** (2021)

111951 12-06-21

1200724 160886 VIORMAR TRADING

Form 1120-F (2021)   **Viormar Trading Corporation N.V.**                    59-1878157   Page **4**

## SECTION II - Income Effectively Connected With the Conduct of a Trade or Business in the United States
(see instructions)

**Important:** *Fill in all applicable lines and schedules. If you need more space, see* Assembling the Return *in the instructions.*

| | | | | |
|---|---|---|---|---:|
| **Income** | **1 a** Gross receipts or sales | **b** Less returns and allowances | **c** Bal ▶ | **1c** |
| | **2** Cost of goods sold (attach Form 1125-A) | | **2** | |
| | **3** Gross profit (subtract line 2 from line 1c) | | **3** | |
| | **4** Dividends (Schedule C, line 13) | | **4** | |
| | **5** Interest | | **5** | |
| | **6** Gross rents | | **6** | 41,912. |
| | **7** Gross royalties | | **7** | |
| | **8** Capital gain net income (attach Schedule D (Form 1120)) | | **8** | |
| | **9** Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | **9** | |
| | **10** Other income (see instructions - attach statement) | | **10** | |
| | **11** Total income. Add lines 3 through 10 ▶ | | **11** | 41,912. |

| | | | |
|---|---|---|---:|
| **Deductions (See instructions for limitations on deductions.)** | **12** Compensation of officers (attach Form 1125-E) | **12** | |
| | **13** Salaries and wages (less employment credits) | **13** | |
| | **14** Repairs and maintenance | **14** | 1,346. |
| | **15** Bad debts (for bad debts over $500,000, attach a list of debtors and amounts) | **15** | |
| | **16** Rents | **16** | |
| | **17** Taxes and licenses               See Statement 1 | **17** | 21,511. |
| | **18** Interest expense from Schedule I, line 25 | **18** | |
| | **19** Charitable contributions | **19** | |
| | **20** Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **20** | |
| | **21** Depletion | **21** | |
| | **22** Advertising | **22** | |
| | **23** Pension, profit-sharing, etc., plans | **23** | |
| | **24** Employee benefit programs | **24** | |
| | **25** Reserved for future use | **25** | |
| | **26** Deductions allocated and apportioned to ECI from Schedule H, line 20 (see instructions) | **26** | |
| | **27** Other deductions (attach statement)          See Statement 2 | **27** | 3,345. |
| | **28** Total deductions. Add lines 12 through 27 ▶ | **28** | 26,202. |
| | **29** Taxable income before NOL deduction and special deductions (subtract line 28 from line 11) ▶ | **29** | 15,710. |

| | | | | |
|---|---|---|---:|---:|
| **30** Less: **a** Net operating loss deduction (see instructions)  Stmt 3 | **30a** | 12,568. | | |
| **b** Special deductions (Schedule C, line 14) | **30b** | | | |
| **c** Add lines 30a and 30b | | | **30c** | 12,568. |
| **31** Taxable income or (loss). Subtract line 30c from line 29 | | | **31** | 3,142. |

Form **1120-F** (2021)

111971 12-06-21

4

1200724 160886 VIORMAR TRADING          2021.06020 VIORMAR TRADING CORPORATI VIORMAR6

Form 1120-F (2021)   **Viormar Trading Corporation N.V.**                    59-1878157   Page **5**

## SECTION II – Income Effectively Connected With the Conduct of a Trade or Business in the United States
*(continued)*

| Schedule C | Dividends and Special Deductions *(see instructions)* |

| | (a) Dividends | (b) % | (c) Special deductions: (a) X (b) |
|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 | |
| 3 Dividends on certain debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 Dividends from less-than-20%-owned foreign corporations | | 50 | |
| 7 Dividends from 20%-or-more-owned foreign corporations | | 65 | |
| 8 **Subtotal.** Add lines 1 through 7 | | see instructions | |
| 9 Dividends from foreign corporations not included on line 3, 6, or 7 | | | |
| 10 IC-DISC and former DISC dividends not included on line 1, 2, or 3 (section 246(d)) | | | |
| 11 Other dividends | | | |
| 12 Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 13 **Total dividends.** Add column (a), lines 8 through 11. Enter here and on line 4, page 4 | | | |
| 14 **Total special deductions.** Add column (c), lines 8 and 12. Enter here and on line 30b, page 4 ▶ | | | |

| Schedule J | Tax Computation *(see instructions)* |

| | | |
|---|---|---|
| 1 Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) ▶ ☐ | | |
| 2 Income tax | 2 | 660. |
| 3 Base erosion minimum tax amount (attach Form 8991) | 3 | |
| 4 Add lines 2 and 3 | 4 | 660. |
| 5 a Foreign tax credit (attach Form 1118) | 5a | |
| b General business credit (attach Form 3800) | 5b | |
| c Credit for prior year minimum tax (attach Form 8827) | 5c | |
| d Bond credits from Form 8912 | 5d | |
| 6 **Total credits.** Add lines 5a through 5d | 6 | |
| 7 Subtract line 6 from line 4 | 7 | 660. |
| 8 Other taxes. Check if from: ☐ Form 4255  ☐ Form 8611  ☐ Form 8697  ☐ Form 8866  ☐ Form 8902  ☐ Other (attach statement) | 8 | |
| 9 **Total tax.** Add lines 7 and 8. Enter here and on line 2, page 1 | 9 | 660. |

Form **1120-F** (2021)

111881 12-08-21

1200724 160886 VIORMAR TRADING
2021.06020 VIORMAR TRADING CORPORATI VIORMAR

Form 1120-F (2021)   **Viormar Trading Corporation N.V.**   59-1878157   Page **6**

## SECTION III–Branch Profits Tax and Tax on Excess Interest

### Part I–Branch Profits Tax   (see instructions)

| | | | |
|---|---|---|---:|
| 1 | Enter the amount from Section II, line 29 | 1 | 15,710. |
| 2 | Enter total adjustments to line 1 to get effectively connected earnings and profits. (Attach required statement showing the nature and amount of adjustments.) (See instructions.) | 2 | |
| 3 | Effectively connected earnings and profits. Combine line 1 and line 2 | 3 | 15,710. |
| 4a | Enter U.S. net equity at the end of the current tax year. (Att. required stmt.) | 4a | 34,398. |
| b | Enter U.S. net equity at the end of the prior tax year. (Att. required stmt.) | 4b | 18,688. |
| c | Increase in U.S. net equity. If line 4a is greater than or equal to line 4b, subtract line 4b from line 4a. Enter the result here and skip to line 4e | 4c | 15,710. |
| d | Decrease in U.S. net equity. If line 4b is greater than line 4a, subtract line 4a from line 4b | 4d | |
| e | Non-previously taxed accumulated effectively connected earnings and profits. Enter excess, if any, of effectively connected earnings and profits for preceding tax years beginning after 1986 over any dividend equivalent amounts for those tax years | 4e | |
| 5 | Dividend equivalent amount. Subtract line 4c from line 3. If zero or less, enter -0-. If no amount is entered on line 4c, add the lesser of line 4d or line 4e to line 3 and enter the total here | 5 | 0. |
| 6 | Branch profits tax. Multiply line 5 by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete item W on page 2 | 6 | 0. |

### Part II–Tax on Excess Interest   (see instructions for this Part and for Schedule I (Form 1120-F))

| | | | |
|---|---|---|---|
| 7a | Enter the interest from Section II, line 18 | 7a | |
| b | Enter the inverse of the total amount deferred, capitalized, and disallowed from Schedule I, line 24g (i.e., if line 24g is negative, enter as a positive number; if line 24g is positive, enter as a negative number) | 7b | |
| c | Combine lines 7a and 7b (amount must equal Schedule I, line 23) | 7c | |
| 8 | Branch Interest (see instructions for definition): Enter the sum of Schedule I, line 9, column (c), and Schedule I, line 22. If the interest paid by the foreign corporation's U.S. trade or business was increased because 80% or more of the foreign corporation's assets are U.S. assets, check this box ▶ ☐ | 8 | |
| 9a | Excess interest. Subtract line 8 from line 7c. If zero or less, enter -0- | 9a | |
| b | If the foreign corporation is a bank, enter the excess interest treated as interest on deposits (see instructions for rules for computing this amount). Otherwise, enter -0- | 9b | |
| c | Subtract line 9b from line 9a | 9c | |
| 10 | Tax on excess interest. Multiply line 9c by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete item W on page 2 | 10 | |

### Part III–Additional Information

| | | Yes | No |
|---|---|---|---|
| 11 | Is the corporation claiming a reduction in, or exemption from, the branch profits tax due to: | | |
| a | A complete termination of all U.S. trades or businesses? | | X |
| b | The tax-free liquidation or reorganization of a foreign corporation? | | X |
| c | The tax-free incorporation of a U.S. trade or business? | | X |

If 11a or 11b applies and the transferee is a domestic corporation, attach Form 8848. If 11c applies, attach the statement required by Temporary Regulations section 1.884-2T(d)(5).

Form **1120-F** (2021)

111991 12-08-21

Form 1120-F (2021)     **Viormar Trading Corporation N.V.**     59-1878157    Page **7**

Note: *Check if completing on* ▶ [X] U.S. basis or [ ] Worldwide basis

| Schedule L | Balance Sheets per Books |
|---|---|

| | | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| **Assets** | | (a) | (b) | (c) | (d) |
| 1 | Cash | | 7,103. | | 7,295. |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | ( | ) | ( | ) |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6a | Interbranch current assets* | | | | |
| b | Other current non-U.S. assets* | | | | |
| c | Other current U.S. assets* | | | | |
| 7 | Loans to shareholders | | 11,585. | | 27,103. |
| 8 | Mortgage and real estate loans | | | | |
| 9a | Other loans and investments-non-U.S. assets* | | | | |
| b | Other loans and investments - U.S. assets* | | | | |
| 10a | Buildings and other depreciable assets | 155,950. | | 155,950. | |
| b | Less accumulated depreciation | ( 155,950.) | 0. | ( 155,950.) | 0. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( | ) | ( | ) |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | ( | ) | ( | ) |
| 14 | Assets held in trust | | | | |
| 15 | Other non-current interbranch assets* | | | | |
| 16a | Other non-current non-U.S. assets* | | | | |
| b | Other non-current U.S. assets* | | | | |
| 17 | Total assets | | 18,688. | | 34,398. |
| **Liabilities** | | | | | |
| 18 | Accounts payable | | | | |
| 19 | Mtges., notes, bonds payable in less than 1 year: | | | | |
| a | Interbranch liabilities* | | | | |
| b | Third-party liabilities* | | | | |
| 20 | Other current liabilities* | | | | |
| 21 | Loans from shareholders | | | | |
| 22 | Mtges., notes, bonds payable in 1 year or more: | | | | |
| a | Interbranch liabilities* | | | | |
| b | Third-party liabilities* | | | | |
| 23 | Liabilities held in trust | | | | |
| 24a | Other interbranch liabilities* | | | | |
| b | Other third-party liabilities* | | | | |
| **Equity** | | | | | |
| 25 | Capital stock: a Preferred stock | | | | |
| | b Common stock | | | | |
| 26 | Additional paid-in capital | | 155,950. | | 155,950. |
| 27 | Retained earnings - Appropriated* | | | | |
| 28 | Retained earnings-Unappropriated | | -137,262. | | -121,552. |
| 29 | Adjustments to shareholders' equity* | | | | |
| 30 | Less cost of treasury stock | | ( ) | | ( ) |
| 31 | Total liabilities and shareholders' equity | | 18,688. | | 34,398. |

* Attach statement - see instructions.

Form **1120-F** (2021)

111992 12-06-21

Form 1120-F (2021) **Viormar Trading Corporation N.V.**        59-1878157        Page **8**

| **Schedule W** | Overpayment Resulting From Tax Deducted and Withheld Under Chapters 3 and 4 | | |
|---|---|---|---|
| 1 | Total Chapter 3 and 4 payments. Enter the amount from page 1, line 5i .................................. | **1** | |
| 2 | Enter the tax amount from page 1, line 1 ................................... | **2** | | |
| 3 | Enter the portion of the tax amount shown on page 1, line 2, pertaining to income associated with amounts deducted and withheld under sections 1445 and 1446 (see instructions for general guidelines) ................... | **3** | | |
| 4 | Total Chapter 3 and 4 tax. Combine lines 2 and 3 ....................................... | **4** | |
| 5 | Tentative overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Subtract line 4 from line 1 .............................................. | **5** | |
| 6 | Enter the amount from page 1, line 8a .......................................... | **6** | |
| 7 | **Overpayment resulting from tax deducted and withheld under Chapters 3 and 4.** Enter the smaller of line 5 or line 6. Enter the result here and on page 1, line 8b ................. | **7** | |

Form **1120-F** (2021)

111993 12-06-21

8

| SCHEDULES M-1 and M-2<br>(Form 1120-F)<br><br>Department of the Treasury<br>Internal Revenue Service | **Reconciliation of Income (Loss) and Analysis of<br>Unappropriated Retained Earnings per Books**<br>▶ Go to www.irs.gov/Form1120F for the latest information.<br>▶ Attach to Form 1120-F. | OMB No. 1545-0123<br><br>**2021** |

| Name of corporation | Employer identification number |
|---|---|
| Viormar Trading Corporation N.V. | 59-1878157 |

### Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return

**Note:** The corporation may be required to file Schedule M-3 (see instructions).

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 15,710. | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books | | a | Tax-exempt interest ... $ _____ | |
| 3 | Excess of capital losses over capital gains | | b | Other (itemize): _____ | |
| 4 | Income subject to tax not recorded on books this year (itemize): _____ | | | | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| a | Depreciation ... $ _____ | | a | Depreciation ... $ _____ | |
| b | Charitable contributions ... $ _____ | | b | Charitable contributions ... $ _____ | |
| c | Travel and entertainment ... $ _____ | | c | Other (itemize): _____ | |
| d | Other (itemize): _____ | | 9 | Add lines 7 and 8 | |
| 6 | Add lines 1 through 5 | 15,710. | 10 | Income - line 6 less line 9 | 15,710. |

### Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | -137,262. | 5 | Distributions: a Cash | |
| 2 | Net income (loss) per books | 15,710. | | b Stock | |
| 3 | Other increases (itemize): | | | c Property | |
| | | | 6 | Other decreases (itemize): | |
| | | | 7 | Add lines 5 and 6 | |
| 4 | Add lines 1, 2, and 3 | -121,552. | 8 | Balance at end of year (line 4 less line 7) | -121,552. |

1200724 160886 VIORMAR TRADING        2021.06020 VIORMAR TRADING CORPORATI VIORMARS

Form **8810**

Department of the Treasury
Internal Revenue Service

## Corporate Passive Activity Loss and Credit Limitations

▶ Attach to your tax return (personal service and closely held corporations only).
▶ Go to www.irs.gov/Form8810 for instructions and the latest information.

OMB No. 1545-0123

**2021**

Name

Viormar Trading Corporation N.V.

Employer identification number

59-1878157

| Part I | **2021 Passive Activity Loss** |
| --- | --- |

**Caution:** See the instructions and complete Worksheets 1 and 2 before completing Part I.

| | | | |
| --- | --- | --- | --- |
| 1 a | Current year income (from Worksheet 2, column (a)) | 1a | 41,912. |
| b | Current year deductions and losses (from Worksheet 2, column (b)) | 1b | ( 26,202. ) |
| c | Prior year unallowed losses (from Worksheet 2, column (c)) | 1c | ( ) |
| d | Combine lines 1a, 1b, and 1c. If the result is net income or zero, see instructions | 1d | 15,710. |
| 2 | Closely held corporations enter net active income and see instructions. Personal service corporations enter -0- on this line | 2 | 0. |
| 3 | **Unallowed passive activity deductions and losses.** Combine lines 1d and 2. If the result is net income or zero, see the instructions for lines 1d and 3. Otherwise, go to line 4 | 3 | 0. |
| 4 | **Total deductions and losses allowed.** Add the income, if any, on lines 1a and 2 and enter the result (see instructions) | 4 | 26,202. |

| Part II | **2021 Passive Activity Credits** |
| --- | --- |

**Caution:** See the instructions and complete Worksheet 5 before completing Part II.

| | | | |
| --- | --- | --- | --- |
| 5 a | Current year credits (from Worksheet 5, column (a)) | 5a | |
| b | Prior year unallowed credits (from Worksheet 5, column (b)) | 5b | |
| 6 | Add lines 5a and 5b | 6 | |
| 7 | Enter the tax attributable to net passive income and net active income. See instructions | 7 | |
| 8 | **Unallowed passive activity credit.** Subtract line 7 from line 6. If the result is zero or less, enter -0- | 8 | |
| 9 | **Allowed passive activity credit.** Subtract line 8 from line 6. See instructions | 9 | |

| Part III | **Election To Increase Basis of Credit Property** |
| --- | --- |

10   If the corporation disposed of its entire interest in a passive activity or former passive activity in a fully taxable transaction, and the corporation elects to increase the basis of credit property used in that activity by the unallowed credit that reduced the property's basis, check this box. See instructions ▶ ☐

11   Name of passive activity disposed of ▶ _____

12   Description of the credit property for which the election is being made ▶ _____

13   Amount of unallowed credit that reduced the property's basis ▶ $ _____

LHA   For Paperwork Reduction Act Notice, see separate instructions.

Form **8810** (2021)

119891
08-20-21

10

81200724 160886 VIORMAR TRADING          2021.06020 VIORMAR TRADING CORPORATI VIORMAR6

**Form 8810 Worksheet 1 - Computation of Income, Gains, Deductions, and Losses for Worksheet 2**

| Name | | |
|------|--|--|
| | Viormar Trading Corporation N.V. | 59-1878157 |

Name of Activity

A WAREHOUSE RENTAL
B
C
D

| | | Activities | | | |
|--|--|:--:|:--:|:--:|:--:|
| | | **A** | **B** | **C** | **D** |
| 1. | Gross receipts | 41,912. | | | |
| 2. | Schedule D Gains: | | | | |
| | Long-term capital gains | | | | |
| | Short-term capital gains | | | | |
| 3. | Form 4797 Gains: | | | | |
| | 1231 gains | | | | |
| | Ordinary gains | | | | |
| 4. | Other passive income | | | | |
| 5. | Total income. Add lines 1 through 4 and enter the result in column (a) of Worksheet 2 | 41,912. | | | |
| 6. | Current Year Deductions: | | | | |
| a. | Cost of goods sold | | | | |
| b. | Compensation of officers | | | | |
| c. | Salaries and wages | | | | |
| d. | Repairs and maintenance | 1,346. | | | |
| e. | Bad debts | | | | |
| f. | Rents | | | | |
| g. | Taxes and licenses | 21,511. | | | |
| h. | Interest | | | | |
| i. | Depreciation | | | | |
| j. | Depletion | | | | |
| k. | Advertising | | | | |
| l. | Other deductions | 3,345. | | | |
| 7. | Total Deductions. Add lines 6a through 6l | 26,202. | | | |
| 8. | Schedule D losses | | | | |
| | Long-term losses | | | | |
| | Short-term losses | | | | |
| 9. | Form 4797 losses | | | | |
| | 1231 losses | | | | |
| | Ordinary losses | | | | |
| 10. | Current year deductions and losses. Add lines 7 through 9 and enter the result here and in column (b) of Worksheet 2 | 26,202. | | | |
| 11. | Prior year carryovers | | | | |
| 12. | Net gain/loss (line 5 less lines 10 and 11) | 15,710. | | | |

120051
04-01-21

1200724  160886  VIORMAR  TRADING
2021.06020  VIORMAR  TRADING  CORPORATI  VIORMAR

| Name | Viormar Trading Corporation N.V. | | | | 59-1878157 |

**Worksheet 2 for Form 8810, Lines 1a, 1b, and 1c**

| Name of Activity | Current Year | | Prior Year | Overall Gain or Loss | |
| | (a) Income (line 1a) | (b) Deductions and Losses (line 1b) | (c) Unallowed Loss (line 1c) | (d) Gain | (e) Loss |
|---|---|---|---|---|---|
| WAREHOUSE RENTAL | 41,912. | 26,202. | | 15,710. | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals. Enter on lines 1a, 1b, and 1c of Form 8810 | 41,912. | 26,202. | | | |

:1200724 160886 VIORMAR TRADING          2021.06020 VIORMAR TRADING CORPORATI VIORMAR6

Name: **Viormar Trading Corporation N.V.**   I.D. Number **59-1878157**

## Income (Loss) From Other Rental Activities

**1**   Show the kind and location of each rental property.

**A**   WAREHOUSE RENTAL
7884 NW 55TH STREET, MIAMI, FL 33166

**B**

**C**

**D**

| Rental Income | | Properties | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **2** Gross rents | 2 | 41,912. | | | |
| **Rental Expenses** | | | | | |
| **3** Advertising | 3 | | | | |
| **4** Auto and travel | 4 | | | | |
| **5** Cleaning and maintenance | 5 | | | | |
| **6** Commissions | 6 | | | | |
| **7** Insurance | 7 | 708. | | | |
| **8** Legal and other professional fees | 8 | | | | |
| **9** Interest | 9 | | | | . |
| **10** Repairs | 10 | 1,346. | | | |
| **11** Taxes | 11 | 21,511. | | | |
| **12** Utilities | 12 | 2,637. | | | |
| **13** Wages and salaries | 13 | | | | |
| **14** Depreciation | 14 | | | | |
| **15** Other (list) ▶ | 15 | | | | |
| **16** Total expenses for each property. Add lines 3 through 15 | 16 | 26,202. | | | |

| | | |
|---|---|---|
| **17** Total gross rents. Add gross rents from line 2, columns A through D | 17 | 41,912. |
| **18** Total expenses. Add total expenses from line 16, columns A through D | 18 | 26,202. |
| **19** Net gain (loss) from Form 4797, Part II, line 17, from disposition of property from other rental activities | 19 | |
| **20** Net income (loss) from other rental(s) | 20 | 15,710. |

111111
04-01-21

13

P1200724  160886  VIORMAR  TRADING            2021  06030  VIORMAR  TRADING  CORPORATE  VIOPMAR

Viormar Trading Corporation N.V.

59-1878157

| Form 1120-F | Taxes and Licenses | Statement 1 |
|---|---|---|

| Description | Amount |
|---|---|
| Taxes from Rent and Royalties | 21,511. |
| Total to Form 1120-F, Page 4, line 17 | 21,511. |

| Form 1120-F | Other Deductions | Statement 2 |
|---|---|---|

| Description | Amount |
|---|---|
| Other Rent & Royalty Expenses | 3,345. |
| Total to Form 1120-F, Page 4, line 27 | 3,345. |

| | Net Operating Loss Deduction | | Statement 3 |
|---|---|---|---|

| Tax Year | Loss Sustained | Loss Previously Applied | Loss Remaining | Available This Year |
|---|---|---|---|---|
| 12/31/19 | 139,600. | 2,338. | 137,262. | 137,262. |
| 12/31/20 | | | 0. | 0. |
| NOL Available This Year | | | 137,262. | 137,262. |

1200724 160886 VIORMAR TRADING



### Florida Corporate Income/Franchise Tax Return

F-1120, R. 01/22   **1019**
Rule 12C-1.051
Florida Administrative Code
Effective 01/22
Page 1 of 6

FEIN **59-1878157**

For calendar year 2021
or tax year beginning **JAN 1** , 2021
ending **DEC 31, 2021**

82330202112310002005037135918781570000

| | |
|---|---|
| Name | **Viormar Trading Corporation N.V.** |
| Address | **439 STILL FOREST TER** |
| City/State/ZIP | **Sanford, FL   32771** |

☐ Check here if any changes have been made to name or address

**Computation of Florida Net Income Tax**

| | | |
|---|---|---|
| 1. | Federal taxable income (see instructions) - Attach pages 1-5 of federal return   Check here if negative ___ | 3,142.00 |
| 2. | State income taxes deducted in computing federal taxable income (attach schedule)   Check here if negative ___ | |
| 3. | Additions to federal taxable income (from Schedule I)   Check here if negative ___ | 15,710.00 |
| 4. | Total of Lines 1, 2 and 3   Check here if negative ___ | 18,852.00 |
| 5. | Subtractions from federal taxable income (from Schedule II)   Check here if negative ___ | 15,081.60 |
| 6. | Adjusted federal income (Line 4 minus Line 5)   Check here if negative ___ | 3,770.40 |
| 7. | Florida portion of adjusted federal income (see instructions)   Check here if negative ___ | 3,770.00 |
| 8. | Nonbusiness income allocated to Florida (from Schedule R)   Check here if negative ___ | |
| 9. | Florida exemption | 3,770.00 |
| 10. | Florida net income (Line 7 plus Line 8 minus Line 9) | 0.00 |
| 11. | Tax due: 3.535% of Line 10 | 0.00 |
| 12. | Credits against the tax (from Schedule V) | |
| 13. | Total corporate income/franchise tax due (Line 11 minus Line 12) | 0.00 |
| 14. | a) Penalty: F-2220 _____   b) Other _____ | |
| | c) Interest: F-2220 _____   d) Other _____   Line 14 Total ▶ | |
| 15. | Total of Lines 13 and 14 | |
| 16. | Payment credits: Estimated tax payments   16a $ _____ | |
| | Tentative tax payment   16b $ _____ | |
| 17. | Total amount due: Subtract Line 16 from Line 15. If positive, enter amount due here and on payment coupon. If the amount is negative (overpayment), enter on Line 18 and/or Line 19 | |
| 18. | Credit: Enter amount of overpayment credited to next year's estimated tax here and on payment coupon | |
| 19. | Refund: Enter amount of overpayment to be refunded here and on payment coupon | |

144081 10-21-21

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Payment Coupon for Florida Corporate Income Tax Return

1019
F-1120
R. 01/22

**Do Not Detach**   YEAR ENDING **12/31/21**
To ensure proper credit to your account, enclose your check with tax return when mailing.

| | |
|---|---|
| Name | **Viormar Trading Corporation N** |
| Address | **439 STILL FOREST TER** |
| City/State/ZIP | **Sanford, FL   32771** |

If 6/30 year end, return is due 1st day of the 4th month after the close of the taxable year, otherwise return is due 1st day of the 5th month after the close of the taxable year.

| | | | |
|---|---|---|---|
| 591878157 | 1571000 | 0 | 0 |
| 20210101 | 1508160 | 0 | 0 |
| 20211231 | 377040 | 0 | 0 |
| 00000000 | 0.000000 | 0 | 0 |
| 004 | 1508160 | 0 | 0 |
| 202 | 0 | 0 | 0 |
| 314200 | 0 | 0 | 0 |
| 0 | 377000 | 0 | 0 |

0

8233 0 20211231 0002005037 1 3591878157 0000 0



**Viormar Trading Corporation N.V.**

1019
F-1120
R. 01/22
Page 2 of 6

FEIN _____59-1878157_____

| This return is considered incomplete unless a copy of the federal return is attached. |
|---|
| If your return is not signed, or improperly signed and verified, it will be subject to a penalty. The statute of limitations will not start until your return is properly signed and verified. Your return must be completed in its entirety. |

**Sign here** ▶

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer (must be an original signature)      Date      **Title** ▶ **President**

**Paid preparers only**

Preparer's signature ▶      Date **07/24/24**

Preparer check if self-employed ☐

Preparer's PTIN ▶ **P01496734**

Firm's name (or yours if self-employed) and address ▶ **MAGNO & ASSOCIATES, PL**
**1200 BRICKELL AVE STE 1220**
**MIAMI, FL 3**

FEIN ▶ **20-2323418**

ZIP ▶ **331313255**

**All Taxpayers Must Answer Questions A through M Below - See Instructions**

A. State of incorporation: _____

B. Florida Secretary of State document number: _____

C. Florida consolidated return?   YES ☐   NO ☒

D. ☐ Initial return   ☐ Final return (final federal return filed)

E. Principal Business Activity Code (as pertains to Florida)

**531120**

F. A Florida extension of time was timely filed?   YES ☐   NO ☒

G-1. Corporation is a member of a controlled group?   YES ☐   NO ☐   If yes, attach list.

G-2. Part of a federal consolidated return?   YES ☐   NO ☒   If yes, provide:

FEIN from federal consolidated return: _____

Name of corporation: _____

G-3. The federal common parent has sales, property, or payroll in Florida?   YES ☐   NO ☒

H. Location of corporate books: **439 STILL FOREST TER**

City, State, ZIP: **SANFORD, FL 32771**

I. Taxpayer is a member of a Florida partnership or joint venture?   YES ☐   NO ☒

J. Enter date of latest IRS audit: _____

   a) List years examined: _____

K. Contact person concerning this return: **ORLANDO A. FERNANDEZ**

   a) Contact person telephone number: **(305) 301-7035**

   b) Contact person e-mail address: **orlandofernandezs@yah**

L. Type of federal return filed ☐ 1120   ☐ 1120S or ☒ **1120F**

**Where to Send Payments and Returns**

Make check payable to and mail with return to:

Florida Department of Revenue
5050 W Tennessee Street
Tallahassee FL 32399-0135

If you are requesting a refund (Line 19), send your return to:

Florida Department of Revenue
PO Box 6440
Tallahassee FL 32314-6440

| **Remember:** |
|---|
| ↳ **Make your check payable to the Florida Department of Revenue.** |
| ↳ **Write your FEIN on your check.** |
| ↳ **Sign your check and return.** |
| ↳ **Attach a copy of your federal return.** |
| ↳ **Attach a copy of your Florida Form F-7004 (extension of time) if applicable.** |

144082  10-21-21



1019
F-1120
R. 01/22
Page 3 of 6

NAME __Viormar Trading Corporation N.V.__   FEIN __59-1878157__   TAXABLE YEAR ENDING __12/31/21__

## Schedule I - Additions and/or Adjustments to Federal Taxable Income

| | | |
|---|---|---|
| 1. Interest excluded from federal taxable income (see instructions) | 1. | |
| 2. Undistributed net long-term capital gains (see instructions) | 2. | |
| 3. Net operating loss deduction (attach schedule) | 3. | 15,710.00 |
| 4. Net capital loss carryover (attach schedule)           Statement 2 | 4. | |
| 5. Excess charitable contribution carryover (attach schedule) | 5. | |
| 6. Employee benefit plan contribution carryover (attach schedule) | 6. | |
| 7. Enterprise zone jobs credit (Florida Form F-1158Z) | 7. | |
| 8. Ad valorem taxes allowable as enterprise zone property tax credit (Florida Form F-1158Z) | 8. | |
| 9. Guaranty association assessment(s) credit | 9. | |
| 10. Rural and/or urban high crime area job tax credits | 10. | |
| 11. State housing tax credit | 11. | |
| 12. Florida Tax Credit Scholarship Program Credits (AKA credit for contributions for nonprofit scholarship-funding organizations) | 12. | |
| 13. Florida Renewable energy production tax credit | 13. | |
| 14. New markets tax credit | 14. | |
| 15. Entertainment industry tax credit | 15. | |
| 16. Research and Development tax credit | 16. | |
| 17. Energy Economic Zone tax credit | 17. | |
| 18. s. 168(k) IRC special bonus depreciation | 18. | |
| 19. Qualified Improvement Property Decoupling. | 19. | |
| 20. Business Meal Expenses at a Restaurant. | 20. | |
| 21. Film, Television, and Live theatrical production expenses. | 21. | |
| 22. Other additions (attach schedule) | 22. | |
| 23. Total Lines 1 through 22. Enter total on Line 23 and on Page 1, Line 3. | 23. | 15,710.00 |

## Schedule II - Subtractions from Federal Taxable Income

| | | |
|---|---|---|
| 1. Gross foreign source income less attributable expenses | | |
|    (a) Enter s. 78, IRC income $ _____ | | |
|    (b) plus s. 862, IRC dividends $ _____ | | |
|    (c) plus s. 951A, IRC, income $ _____ | | |
|    (d) less direct and indirect expenses | 1. | |
|      and related amounts deducted | | |
|      under s. 250, IRC $ _____                Total ▶ | | |
| 2. Gross subpart F income less attributable expenses | | |
|    (a) Enter s. 951, IRC subpart F income $ _____ | | |
|    (b) less direct and indirect expenses $ _____        Total ▶ | 2. | |
| Note: Taxpayers doing business outside Florida enter zero on Lines 3 through 6, and complete Schedule IV. | | |
| 3. Florida net operating loss carryover deduction (see instructions)         Statement 1 | 3. | 15,081.60 |
| 4. Florida net capital loss carryover deduction (see instructions) | 4. | |
| 5. Florida excess charitable contribution carryover (see instructions) | 5. | |
| 6. Florida employee benefit plan contribution carryover (see instructions) | 6. | |
| 7. Nonbusiness income (from Schedule R, Line 3) | 7. | |
| 8. Eligible net income of an international banking facility (see instructions) | 8. | |
| 9. s. 179, IRC expense (see instructions) | 9. | |
| 10. s. 168(k), IRC special bonus depreciation (see instructions) | 10. | |
| 11. Depreciation of qualified improvement property | 11. | |
| 12. Film, Television, and Live Theatrical Expenses. | 12. | |
| 13. Other subtractions (attach statement) | 13. | |
| 14. Total Lines 1 through 13. Enter total on Line 14 and on Page 1, Line 5. | 14. | 15,081.60 |

144091 10-21-21

3



1019
F-1120
R. 01/22
Page 4 of 6

NAME __Viormar Trading Corporation N.V.__   FEIN _59-1878157_   TAXABLE YEAR ENDING _12/31/21_

## Schedule III - Apportionment of Adjusted Federal Income

III-A  For use by taxpayers doing business outside Florida, except those providing insurance or transportation services.

| | (a) WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) | (c) Col. (a) ÷ Col. (b) Rounded to Six Decimal Places | (d) Weight If any factor in Column (b) is zero, see note on Pg 9 of the instructions. | (e) Weighted Factors Rounded to Six Decimal Places |
|---|---|---|---|---|---|
| 1. Property (Schedule III-B below) | | | | X 25% or | |
| 2. Payroll | | | | X 25% or | |
| 3. Sales (Schedule III-C below) | | | | X 50% or | |
| 4. Apportionment fraction (Sum of Lines 1, 2, and 3, Column [e]). Enter here and on Schedule IV, Line 2. | | | | | |

| III-B  For use in computing average value of property (use original cost). | WITHIN FLORIDA | | TOTAL EVERYWHERE | |
|---|---|---|---|---|
| | a. Beginning of year | b. End of year | c. Beginning of year | d. End of year |
| 1. Inventories of raw material, work in process, finished goods | | | | |
| 2. Buildings and other depreciable assets | | | | |
| 3. Land owned | | | | |
| 4. Other tangible and intangible (financial org. only) assets (attach schedule) | | | | |
| 5. Total (Lines 1 through 4) | | | | |

6. Average value of property
   a. Add Line 5, Columns (a) and (b) and divide by 2 (for within Florida) ...... 6a. _____
   b. Add Line 5, Columns (c) and (d) and divide by 2 (for total everywhere) ........................... 6b. _____
7. Rented property (8 times net annual rent)
   a. Rented property in Florida ........................................ 7a. _____
   b. Rented property Everywhere ........................................................ 7b. _____
8. Total (Lines 6 and 7). Enter on Line 1, Schedule III-A, Columns (a) and (b).
   a. Enter Lines 6 a. plus 7 a. and also enter on Schedule III-A, Line 1.
     Column (a) for total average property in Florida ....................... 8a. _____
   b. Enter Lines 6 b. plus 7 b. and also enter on Schedule III-A, Line 1.
     Column (b) for total average property Everywhere ........................... 8b. _____

| III-C  Sales Factor | (a) TOTAL WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) |
|---|---|---|
| 1. Sales (gross receipts) | N/A | |
| 2. Sales delivered or shipped to Florida purchasers | | N/A |
| 3. Other gross receipts (rents, royalties, interest, etc. when applicable) | | |
| 4. TOTAL SALES (Enter on Schedule III-A, Line 3, Columns [a] and [b]) | | |

| III-D  Special Apportionment Fractions (see instructions) | (a) WITHIN FLORIDA | (b) TOTAL EVERYWHERE | (c) FLORIDA Fraction ([a] ÷ [b]) Rounded to Six Decimal Places |
|---|---|---|---|
| 1. Insurance companies (attach copy of Schedule T - Annual Report) | | | |
| 2. Transportation services | | | |

## Schedule IV - Computation of Florida Portion of Adjusted Federal Income

| | | |
|---|---|---|
| 1. Apportionable adjusted federal income from Page 1, Line 6 | 1. | |
| 2. Florida apportionment fraction (Schedule III-A, Line 4) | 2. | |
| 3. Tentative apportioned adjusted federal income (multiply Line 1 by Line 2) | 3. | |
| 4. Net operating loss carryover apportioned to Florida (attach schedule; see instructions) | 4. | |
| 5. Net capital loss carryover apportioned to Florida (attach schedule; see instructions) | 5. | |
| 6. Excess charitable contribution carryover apportioned to Florida (attach schedule; see instructions) | 6. | |
| 7. Employee benefit plan contribution carryover apportioned to Florida (attach schedule; see instructions) | 7. | |
| 8. Total carryovers apportioned to Florida (add Lines 4 through 7) | 8. | |
| 9. Adjusted federal income apportioned to Florida (Line 3 less Line 8; see instructions) | 9. | |

144092 10-21-21

21200724 160886 VIORMAR TRADING          2021 06020 VIORMAR TRADING CORPORATI VIORMAR



1019
F-1120
R. 01/22
Page 5 of 6

NAME Viormar Trading Corporation N.V.    FEIN 59-1878157   TAXABLE YEAR ENDING 12/31/21

## Schedule V - Credits Against the Corporate Income/Franchise Tax

| | | |
|---|---|---|
| 1. | Florida health maintenance organization credit (attach assessment notice) | 1. |
| 2. | Capital investment tax credit (attach certification letter) | 2. |
| 3. | Enterprise zone jobs credit (from Florida Form F-1156Z attached) | 3. |
| 4. | Community contribution tax credit (attach certification letter) | 4. |
| 5. | Enterprise zone property tax credit (from Florida Form F-1156Z attached) | 5. |
| 6. | Rural job tax credit (attach certification letter) | 6. |
| 7. | Urban high crime area job tax credit (attach certification letter) | 7. |
| 8. | Hazardous waste facility tax credit | 8. |
| 9. | Florida alternative minimum tax (AMT) credit | 9. |
| 10. | Contaminated site rehabilitation tax credit (AKA voluntary cleanup tax credit) (attach tax credit certificate) | 10. |
| 11. | State housing tax credit (attach certification letter) | 11. |
| 12. | Florida Tax Credit Scholarship Program Credits, (AKA credit for contributions to nonprofit scholarship-funding organizations) (attach certificate) | 12. |
| 13. | Florida renewable energy production tax credit | 13. |
| 14. | New markets tax credit | 14. |
| 15. | Entertainment industry tax credit | 15. |
| 16. | Research and Development tax credit | 16. |
| 17. | Energy Economic Zone tax credit | 17. |
| 18. | Other credits (attach schedule) | 18. |
| 19. | Total credits against the tax (sum of Lines 1 through 18 not to exceed the amount on Page 1, Line 11). Enter total credits on Page 1, Line 12 | 19. |

## Schedule R - Nonbusiness Income

**Line 1.  Nonbusiness income (loss) allocated to Florida**

<u>Type</u>                                                                                     <u>Amount</u>

_____

_____

_____

Total allocated to Florida ............................................................................... 1. _____

(Enter here and on Page 1, Line 8)

**Line 2.  Nonbusiness income (loss) allocated elsewhere**

<u>Type</u>                                <u>State/country allocated to</u>                          <u>Amount</u>

_____     _____

_____     _____

_____     _____

Total allocated elsewhere ............................................................................. 2. _____

**Line 3.  Total nonbusiness income**

Grand total. Total of Lines 1 and 2 .................................................................. 3. _____

(Enter here and on Schedule II, Line 7)

144093 01-12-22

5

21390724  160886  VIORMAR  TRADING        2021.06020 VIORMAR TRADING CORPORATI VIORMAR6



<div align="right">

1019
F-1120
R. 01/22
Page 6 of 6

</div>

NAME **Viormar Trading Corporation N.V.** FEIN **59-1878157** TAXABLE YEAR ENDING **12/31/21**

## Estimated Tax Worksheet
### For Taxable Years Beginning On or After January 1, 2022

| | | | | |
|---|---|---|---|---|
| 1. | Florida income expected in taxable year ............................................................................................ | | 1. $ | 3,770.00 |
| 2. | Florida exemption $50,000 (Members of a controlled group, see instructions on Page 14 of Florida Form F-1120N) | | 2. $ | 3,770.00 |
| 3. | Estimated Florida net income (Line 1 less Line 2) ........................................................................... | | 3. $ | |
| 4. | Total Estimated Florida tax (5.5% of Line 3) .................................... $ | | 4. $ | |
| | Less: Credits against the tax ................................................ $ | | | |

5. Computation of installments:
Payment due dates and
payment amounts:

| | | | |
|---|---|---|---|
| If 6/30 year end, last day of 4th month, otherwise last day of 5th month - Enter 0.25 of Line 4 | ...................... | 5a. | |
| Last day of 6th month - Enter 0.25 of Line 4 | ................................... | 5b. | |
| Last day of 9th month - Enter 0.25 of Line 4 | ................................... | 5c. | |
| Last day of fiscal year - Enter 0.25 of Line 4 | ................................... | 5d. | |

NOTE: If your estimated tax should change during the year, you may use the amended computation
below to determine the amended amounts to be entered on the declaration (Florida Form F-1120ES).

| | | | | |
|---|---|---|---|---|
| 1. | Amended estimated tax ........................................................................................................... | | 1. $ | |
| 2. | Less: | | | |
| | (a) Amount of overpayment from last year elected for credit to estimated tax and applied to date ................................ 2a. – $ | | | |
| | (b) Payments made on estimated tax declaration (Florida Form F-1120ES)  2b. – $ | | | |
| | (c) Total of Lines 2(a) and 2(b) ............................................................. | | 2c. $ | |
| 3. | Unpaid balance (Line 1 less Line 2(c)) ......................................................................................... | | 3. $ | |
| 4. | Amount to be paid (Line 3 divided by number of remaining installments) ................................... | | 4. $ | |

---

### References

*The following documents were mentioned in this form and are incorporated by reference in the rules indicated below.*
*The forms are available online at  floridarevenue.com/forms.*

| | | |
|---|---|---|
| Form F-2220 | Underpayment of Estimated Tax on Florida Corporate Income/Franchise Tax | Rule 12C-1.051, F.A.C. |
| Form F-7004 | Florida Tentative Income/Franchise Tax Return and Application for Extension of Time to File Return | Rule 12C-1.051, F.A.C. |
| Form F-1156Z | Florida Enterprise Zone Jobs Credit Certificate of Eligibility for Corporate Income Tax | Rule 12C-1.051, F.A.C. |
| Form F-1158Z | Enterprise Zone Property Tax Credit | Rule 12C-1.051, F.A.C. |
| Form F-1120N | Instructions for Corporate Income/Franchise Tax Return | Rule 12C-1.051, F.A.C. |
| Form F-1120ES | Declaration/Installment of Florida Estimated Income/Franchise Tax | Rule 12C-1.051, F.A.C. |

144094  10-21-21

1200724 160886 VIORMAR TRADING        2021.06020 VIORMAR TRADING CORPORATI VIORMAR5

 Viormar Trading Corporation N.V.

1019
F-1120
R. 01/22

FEIN __59-1878157__

DATA Page 1 of 2

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 1508160 |
| 1885200 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 00000000 | 0 | 0 | 0 |
| 0 | 1571000 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0.000000 |

 Viormar Trading Corporation N.V.

1019
F-1120
R. 01/22

FEIN    59-1878157

DATA Page 2 of 2

| 591878157 | 0 | 0 | 0 |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

144084  10-21-21

Viormar Trading Corporation N.V.                                    59-1878157

| FL F-1120 | | Net Operating Loss Carryovers | | | Statement 1 |
|---|---|---|---|---|---|
| Year | Apportion Factor | Current Yr NOL/ Sec 382/ SRLY Limit | Net Operating Loss Carryover | Loss Previously Deducted | Net Loss Remaining |
| 2019 | .00000 | 0.00 | 139,600.00* | 2,338.00 | 137,262.00 |
| 2020 | .00000 | 0.00 | 0.00* | 0.00 | 0.00 |
| Total Net Operating Loss Carryover Available | | | | | 137,262.00 |

* Subject to 80% Taxable Income Limit of        15,081.60

21200724 160886 VIORMAR TRADING        2021 06020 VIORMAR TRADING CORPORATI VIORMAR6

Viormar Trading Corporation N.V.                                    59-1878157

| FL F-1120 | Federal Carryover Deductions | Statement 2 |
|-----------|------------------------------|-------------|

| Carryovers Deducted in Federal Taxable Income | Amount |
|-----------------------------------------------|--------|
| Net Operating Loss | 15,710.00 |
| Net Capital Loss | |
| Excess Charitable Contribution | |
| Excess Employee Benefit Plan Contribution | |

December 12, 1978

| Form **1120-F** | For calendar year 2022, or tax year beginning | **U.S. Income Tax Return of a Foreign Corporation** | | OMB No. 1545-0123 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | , and ending Go to www.irs.gov/Form1120F for instructions and the latest information. | | **2022** |

| | **Name** Viormar Trading Corporation N.V. | **Employer identification number** 59-1878157 |
|---|---|---|
| **Type or Print** | Number, street, and room or suite no. (see instructions)  439 STILL FOREST TER | **Check box(es) if:** ☐ Initial return |
| | City or town, state or province, country, and ZIP or foreign postal code  Sanford, FL  32771 | ☐ Name or address change ☐ Final return<br>☐ First post-merger return ☐ Amended return<br>☐ Schedule M-3 attached ☐ Protective return |

**A** Country of incorporation  CURACAO

**B** Foreign country under whose laws the income reported on this return is also subject to tax  CURACAO

**C** Date incorporated  12/12/1978

**D** (1) Location of corporation's primary books and records (city, province or state, and country)  Sanford, FL

(2) Principal location of worldwide business  439 STILL FOREST TER  Sanford, FL  32771

(3) If the corporation maintains an office or place of business in the U.S., check here  ☒

**E** If the corporation had an agent in the United States at any time during the tax year, enter:

(1) Type of agent  INDIVIDUAL

(2) Name  ORLANDO A. FERNANDEZ

(3) Address  439 STILL FOREST TER  SANFORD, FL 32771

**F** See the instructions and enter the corporation's principal:

(1) Business activity code number  531120

(2) Business activity  LESSOR NONRES BUILD

(3) Product or service  LESSOR NON RES BUILD

**G** Check method of accounting:  (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify)

**Computation of Tax Due or Overpayment**

| | | | | |
|---|---|---|---|---|
| 1 | Tax from Section I, line 11, page 3 | **1** | 0. | |
| 2 | Tax from Section II, Schedule J, line 9, page 5 | **2** | 1,195. | |
| 3 | Tax from Section III (add lines 6 and 10 on page 6) | **3** | 0. | |
| 4 | Total tax. Add lines 1 through 3 | | **4** | 1,195. |
| 5a | 2021 overpayment credited to 2022 | **5a** | | |
| b | 2022 estimated tax payments | **5b** | | |
| c | Less 2022 refund applied for on Form 4466 | **5c** | ( ) | |
| d | Combine lines 5a through 5c | **5d** | | |
| e | Tax deposited with Form 7004 | **5e** | | |
| f | Credit for tax paid on undistributed capital gains (attach Form 2439) | **5f** | | |
| g | Credit for federal tax paid on fuels (attach Form 4136). See instructions | **5g** | | |
| h | Reserved for future use | **5h** | | |
| i | U.S. income tax paid or withheld at source (add line 12, page 3, and amounts from Forms 8288-A and 8805 (attach Forms 8288-A and 8805)) | **5i** | | |
| j | Total payments. Add lines 5d through 5i | | **5j** | |
| 6 | Estimated tax penalty (see instructions). Check if Form 2220 is attached  ☒ | | **6** | 51. |
| 7 | Amount owed. If line 5j is smaller than the total of lines 4 and 6, enter amount owed | | **7** | 1,246. |
| 8a | Overpayment. If line 5j is larger than the total of lines 4 and 6, enter amount overpaid | | **8a** | |
| b | Amount of overpayment on line 8a resulting from tax deducted and withheld under Chapters 3 and 4 (from Schedule W, line 7, page 8) | | **8b** | |
| 9 | Enter portion of line 8a you want Credited to 2023 estimated tax | Refunded | **9** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____   Title  **President**

May the IRS discuss this return with the preparer shown below (see instructions)?  ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date 07/29/24 | Check ☐ if self-employed | PTIN P01496734 |
|---|---|---|---|---|
| Firm's name  MAGNO & ASSOCIATES, PL | | | Firm's EIN  20-2323418 | |
| Firm's address  1200 BRICKELL AVE STE 1220  MIAMI, FL 331313255 | | | Phone no.  (305) 379-4400 | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120-F** (2022)

211921 01-23-23   LHA

1

15120729 160886 VIORMAR TRADING    2022.06000 VIORMAR TRADING CORPORATI VIORMAR5

Form 1120-F (2022)   **Viormar Trading Corporation N.V.**                    59-1878157        Page **2**

## Additional Information *(continued from page 1)*

| | | Yes | No |
|---|---|---|---|
| **H** | Did the corporation's method of accounting change from the preceding tax year? | | X |
| | If "Yes," attach a statement with an explanation. | | |
| **I** | Did the corporation's method of determining income change from the preceding tax year? | | X |
| | If "Yes," attach a statement with an explanation. | | |
| **J** | Did the corporation file a U.S. income tax return for the preceding tax year? | | X |
| **K (1)** | At any time during the tax year, was the corporation engaged in a trade or business in the United States? | X | |
| **(2)** | If "Yes," is taxpayer's trade or business within the United States solely the result of a section 897 (FIRPTA) sale or disposition? | | X |
| **L** | Did the corporation have a permanent establishment in the United States for purposes of any applicable tax treaty between the United States and a foreign country? | | X |
| | If "Yes," enter the name of the foreign country: | | |
| **M** | Did the corporation have any transactions with related parties? | | X |
| | If "Yes," Form 5472 may have to be filed (see instructions). Enter number of Forms 5472 attached _____ | | |
| **N** | Is the corporation a controlled foreign corporation? (See section 957(a) for definition.) | X | |
| **O** | Is the corporation a personal service corporation? (See instructions for definition.) | | X |
| **P** | Enter tax-exempt interest received or accrued during the tax year    $ _____ | | |
| **Q** | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a U.S. corporation? (See section 267(c) for rules of attribution.) | | X |
| | If "Yes," attach a statement showing (1) name and EIN of such U.S. corporation; (2) percentage owned; and (3) taxable income or (loss) before NOL and special deductions of such U.S. corporation for the tax year ending with or within your tax year. | | |
| **R** | If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ☐ | | |
| **S** | Enter the available NOL carryover from prior tax years. (Do not reduce it by any deduction on line 30a, page 4.)    $    124,694. | | |
| **T** | Is the corporation a subsidiary in a parent-subsidiary controlled group? | | X |
| | If "Yes," enter the parent corporation's: | | |
| | **(1)** EIN _____ | | |
| | **(2)** Name _____ | | |
| **U (1)** | Is the corporation a dealer under section 475? | | X |
| **(2)** | Did the corporation mark to market any securities or commodities other than in a dealer capacity? | | X |

| | | Yes | No |
|---|---|---|---|
| **V** | At the end of the tax year, did any individual, partnership, corporation, estate, or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (See section 267(c) for rules of attribution.) | | X |
| | If "Yes," attach a statement showing the name and identifying number. (Do not include any information already entered in item T.) Enter percentage owned _____ | | |
| **W (1)** | Is the corporation taking a position on this return that a U.S. tax treaty overrules or modifies an Internal Revenue law of the United States, thereby causing a reduction of tax? | | X |
| | If "Yes," the corporation is generally required to complete and attach Form 8833. See Form 8833 for exceptions. Note: Failure to disclose a treaty-based return position may result in a $10,000 penalty (see section 6712). | | |
| **(2)** | Is the corporation claiming treaty benefits pursuant to, or otherwise filing its return pursuant to, a Competent Authority determination or an Advance Pricing Agreement? | | X |
| | If "Yes," attach a copy of the Competent Authority determination letter or Advance Pricing Agreement to your return. | | |
| **X** | During the tax year, did the corporation own any entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? | | X |
| | If "Yes," attach a statement listing the name, country under whose laws the entity was organized, and EIN (if any) of each such entity. | | |
| **Y (1)** | Did a partnership allocate to the corporation a distributive share of income from a directly owned partnership interest, any of which is ECI or treated as ECI by the partnership or the partner? | | X |
| | If "Yes," attach Schedule P. See instructions. | | |
| **(2)** | During the tax year, did the corporation own, directly or indirectly, at least a 10% interest, in any foreign partnership? | | X |
| | If "Yes," see instructions for required attachment. | | |
| **Z (1)** | Has the corporation engaged in any transactions the results of which are subject to the arm's-length standard under section 482 and its regulations? | | X |
| **(2)** | Has the corporation recognized any interbranch amounts? | | X |
| | If "Yes," attach statement (see instructions). | | |
| **AA** | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? | | X |
| | If "Yes," complete and attach Schedule UTP. | | |
| **BB** | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? | | X |
| **CC** | Is the corporation (including the home office or any branch) a qualified derivatives dealer (QDD)? | | X |
| | **(1)** If "Yes," attach Schedule Q (Form 1120-F) (see instructions) | | |
| | **(2)** If "Yes," enter the QI-EIN _____ | | |
| **DD** | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years (see sections 59A (e)(2) and (3))? | | X |
| | If "Yes," complete and attach Form 8991. | | |
| **EE** | During the tax year, did the corporation pay or accrue any interest or royalty for which a deduction is not allowed under section 267A (see instructions)? | | X |
| | If "Yes," enter the total amount of the disallowed deductions ......... $ _____ | | |

Form **1120-F** (2022)

211931 01-23-23

2

Form 1120-F (2022)  **Viormar Trading Corporation N.V.**        59-1878157        Page **3**

### Additional Information (continued from page 2)

| | | Yes | No |
|---|---|---|---|
| FF | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year (see instructions)? | | X |
| GG | Does the corporation satisfy **one or more** of the following (see instructions)? | | X |

(1) The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense.

(2) The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $27 million and the corporation has business interest expense.

(3) The corporation is a tax shelter and the corporation has business interest expense.

If "Yes," to any, complete and attach Form 8990.

| | | Yes | No |
|---|---|---|---|
| HH | During the tax year, did the corporation dispose of an interest in a partnership that directly or indirectly engaged in a trade or business within the United States? | | X |
| II | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? | | X |
| | If "Yes," enter amount from Form 8996, line 15  $ | | |

## SECTION I - Income From U.S. Sources Not Effectively Connected With the Conduct of a Trade or Business in the United States - Do not report items properly withheld and reported on Form 1042-S. See instructions.

Report all gross transportation income subject to 4% tax on line 9. Report other column (a) income items only if not properly withheld and reported on Form 1042-S. The rate of tax on these **gross income** items is 30% or such lower rate specified by tax treaty. No deductions are allowed against these types of income. Enter treaty rates where applicable. **If the corporation is claiming a lower treaty rate, also complete item W on page 2.** If multiple treaty rates apply to a type of income (for example, subsidiary and portfolio dividends or dividends received by disregarded entities), attach a statement showing the amounts, tax rates, and withholding for each.

Name of treaty country, if any _____

| | (a) Class of income | (b) Gross amount | (c) Rate of tax (%) | (d) Amount of tax liability | (e) Amount of U.S. income tax paid or withheld at the source |
|---|---|---|---|---|---|
| 1 | Interest | | | | |
| 2a | Dividends (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| 2b | Dividend equivalents (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| 3 | Rents | | | | |
| 4 | Royalties | | | | |
| 5 | Annuities | | | | |
| 6 | Gains from disposal of timber, coal, or domestic iron ore with a retained economic interest (attach supporting statement) | | | | |
| 7 | Gains from sale or exchange of patents, copyrights, etc. | | | | |
| 8 | Fiduciary distributions (attach supporting statement) | | | | |
| 9 | Gross transportation income (see instructions) | | 4 | | |
| 10 | Other items of income | | | | |
| 11 | Total. Enter here and on line 1, page 1 | | | | |
| 12 | Total. Enter here and include on line 5i, page 1 | | | | |

13 Is the corporation fiscally transparent under the laws of the foreign jurisdiction with respect to any item of income listed above?     ☐ Yes  ☒ No
   If "Yes," attach a statement that provides the information requested above with respect to each such item of income.

Form **1120-F** (2022)

211961 01-23-23

3

Form 1120-F (2022)   **Viormar Trading Corporation N.V.**            59-1878157      Page **4**

## SECTION II –  Income Effectively Connected With the Conduct of a Trade or Business in the United States
(see instructions)

**Important:** *Fill in all applicable lines and schedules. If you need more space, see* Assembling the Return *in the instructions.*

| | | | | | |
|---|---|---|---:|---|---:|
| **1 a** Gross receipts or sales | | **b** Less returns and allowances | | **c** Bal | |
| | | | | **1c** | |
| **2** | Cost of goods sold (attach Form 1125-A) | | | **2** | |
| **3** | Gross profit (subtract line 2 from line 1c) | | | **3** | |
| **4** | Dividends (Schedule C, line 13) | | | **4** | |
| **5** | Interest | | | **5** | |
| **6** | Gross rents | | | **6** | 43,540. |
| **7** | Gross royalties | | | **7** | |
| **8** | Capital gain net income (attach Schedule D (Form 1120)) | | | **8** | |
| **9** | Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | **9** | |
| **10** | Other income (see instructions - attach statement) | | | **10** | |
| **11** | **Total income.** Add lines 3 through 10 | | | **11** | 43,540. |
| **12** | Compensation of officers (attach Form 1125-E) | | | **12** | |
| **13** | Salaries and wages (less employment credits) | | | **13** | |
| **14** | Repairs and maintenance | | | **14** | 7,640. |
| **15** | Bad debts (for debts over $500,000, attach a list of debtors and amounts) | | | **15** | |
| **16** | Rents | | | **16** | |
| **17** | Taxes and licenses | See Statement 1 | | **17** | 2,511. |
| **18** | Interest expense from Schedule I, line 25 | | | **18** | |
| **19** | Charitable contributions | | | **19** | |
| **20** | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | | **20** | |
| **21** | Depletion | | | **21** | |
| **22** | Advertising | | | **22** | |
| **23** | Pension, profit-sharing, etc., plans | | | **23** | |
| **24** | Employee benefit programs | | | **24** | |
| **25** | Reserved for future use | | | **25** | |
| **26** | Deductions allocated and apportioned to ECI from Schedule H, line 20 (see instructions) | | | **26** | |
| **27** | Other deductions (attach statement) | See Statement 2 | | **27** | 4,935. |
| **28** | **Total deductions.** Add lines 12 through 27 | | | **28** | 15,086. |
| **29** | Taxable income before NOL deduction and special deductions (subtract line 28 from line 11) | | | **29** | 28,454. |
| **30** Less:  **a** | Net operating loss deduction (see instructions) | Stmt 3 | **30a** | 22,763. | |
| **b** | Special deductions (Schedule C, line 14) | | **30b** | | |
| **c** | Add lines 30a and 30b | | | **30c** | 22,763. |
| **31** | Taxable income or (loss). Subtract line 30c from line 29 | | | **31** | 5,691. |

Form **1120-F** (2022)

211971 01-23-23

2022.06000 VIORMAR TRADING CORPORATI  VIORMAR5

Form 1120-F (2022)     **Viormar Trading Corporation N.V.**          59-1878157       Page **5**

## SECTION II – Income Effectively Connected With the Conduct of a Trade or Business in the United States (continued)

### Schedule C   Dividends and Special Deductions  (see instructions)

| | (a) Dividends | (b) % | (c) Special deductions: (a) X (b) |
|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 | |
| 3 Dividends on certain debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 Dividends from less-than-20%-owned foreign corporations | | 50 | |
| 7 Dividends from 20%-or-more-owned foreign corporations | | 65 | |
| 8 Subtotal. Add lines 1 through 7 | | see instructions | |
| 9 Dividends from foreign corporations not included on line 3, 6, or 7 | | | |
| 10 IC-DISC and former DISC dividends not included on line 1, 2, or 3 (section 246(d)) | | | |
| 11 Other dividends | | | |
| 12 Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 13 Total dividends. Add column (a), lines 8 through 11. Enter here and on line 4, page 4 | | | |
| 14 Total special deductions. Add column (c), lines 8 and 12. Enter here and on line 30b, page 4 | | | |

### Schedule J   Tax Computation  (see instructions)

| | |
|---|---|
| 1 Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) ☐ | |
| 2 Income tax | **2** 1,195. |
| 3 Base erosion minimum tax amount (attach Form 8991) | **3** |
| 4 Add lines 2 and 3 | **4** 1,195. |
| 5 a Foreign tax credit (attach Form 1118) ..... **5a** | |
| b General business credit (attach Form 3800) ..... **5b** | |
| c Credit for prior year minimum tax (attach Form 8827) ..... **5c** | |
| d Bond credits from Form 8912 ..... **5d** | |
| 6 Total credits. Add lines 5a through 5d | **6** |
| 7 Subtract line 6 from line 4 | **7** 1,195. |
| 8 Other taxes. Check if from:  ☐ Form 4255  ☐ Form 8611  ☐ Form 8697  ☐ Form 8866  ☐ Form 8902  ☐ Other (attach statement) | **8** |
| 9 Total tax. Add lines 7 and 8. Enter here and on line 2, page 1 | **9** 1,195. |

Form **1120-F** (2022)

211981  01-23-23

2022.06000 VIORMAR TRADING CORPORATI VIORMAR5

Form 1120-F (2022)   **Viormar Trading Corporation N.V.**                    59-1878157      Page **6**

## SECTION III—Branch Profits Tax and Tax on Excess Interest

### Part I—Branch Profits Tax   (see instructions)

| | | |
|---|---|---:|
| 1 | Enter the amount from Section II, line 29 | **1** 28,454. |
| 2 | Enter total adjustments to line 1 to get effectively connected earnings and profits. (Attach required statement showing the nature and amount of adjustments.) (See instructions.) | **2** |
| 3 | Effectively connected earnings and profits. Combine line 1 and line 2 | **3** 28,454. |
| 4a | Enter U.S. net equity at the end of the current tax year. (Att. required stmt.) | **4a** 62,852. |
| b | Enter U.S. net equity at the end of the prior tax year. (Att. required stmt.) | **4b** 34,398. |
| c | Increase in U.S. net equity. If line 4a is greater than or equal to line 4b, subtract line 4b from line 4a. Enter the result here and skip to line 4e | **4c** 28,454. |
| d | Decrease in U.S. net equity. If line 4b is greater than line 4a, subtract line 4a from line 4b | **4d** |
| e | Non-previously taxed accumulated effectively connected earnings and profits. Enter excess, if any, of effectively connected earnings and profits for preceding tax years beginning after 1986 over any dividend equivalent amounts for those tax years | **4e** |
| 5 | Dividend equivalent amount. Subtract line 4c from line 3. If zero or less, enter -0-. If no amount is entered on line 4c, add the lesser of line 4d or line 4e to line 3 and enter the total here | **5** 0. |
| 6 | Branch profits tax. Multiply line 5 by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | **6** 0. |

### Part II—Tax on Excess Interest   (see instructions for this Part and for Schedule I (Form 1120-F))

| | | |
|---|---|---|
| 7a | Enter the interest from Section II, line 18 | **7a** |
| b | Enter the inverse of the total amount deferred, capitalized, and disallowed from Schedule I, line 24g (i.e., if line 24g is negative, enter as a positive number; if line 24g is positive, enter as a negative number) | **7b** |
| c | Combine lines 7a and 7b (amount must equal Schedule I, line 23) | **7c** |
| 8 | Branch Interest (see instructions for definition): Enter the sum of Schedule I, line 9, column (c), and Schedule I, line 22. If the interest paid by the foreign corporation's U.S. trade or business was increased because 80% or more of the foreign corporation's assets are U.S. assets, check this box | **8** |
| 9a | Excess interest. Subtract line 8 from line 7c. If zero or less, enter -0- | **9a** |
| b | If the foreign corporation is a bank, enter the excess interest treated as interest on deposits (see instructions for rules for computing this amount). Otherwise, enter -0- | **9b** |
| c | Subtract line 9b from line 9a | **9c** |
| 10 | Tax on excess interest. Multiply line 9c by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | **10** |

### Part III—Additional Information

| | | Yes | No |
|---|---|---|---|
| 11 | Is the corporation claiming a reduction in, or exemption from, the branch profits tax due to: | | |
| a | A complete termination of all U.S. trades or businesses? | | X |
| b | The tax-free liquidation or reorganization of a foreign corporation? | | X |
| c | The tax-free incorporation of a U.S. trade or business? | | X |

If 11a or 11b applies and the transferee is a domestic corporation, attach Form 8848. If 11c applies, attach the statement required by Temporary Regulations section 1.884-2T(d)(5).

Form **1120-F** (2022)

211991 01-23-23

2022 06000 VIORMAR TRADING CORPORATI VIORMAR5

Form 1120-F (2022)   **Viormar Trading Corporation N.V.**   59-1878157   Page **7**

Note: *Check if completing on* [X] U.S. basis or [ ] Worldwide basis

| **Schedule L** | **Balance Sheets per Books** | | | | | |
|---|---|---|---|---|---|---|
| | | Beginning of tax year | | | End of tax year | |
| | **Assets** | (a) | (b) | (c) | (d) | |
| 1 | Cash | | 7,295. | | 22,808. | |
| 2a | Trade notes and accounts receivable | | | | | |
| b | Less allowance for bad debts | ( ) | | ( ) | | |
| 3 | Inventories | | | | | |
| 4 | U.S. government obligations | | | | | |
| 5 | Tax-exempt securities | | | | | |
| 6a | Interbranch current assets* | | | | | |
| b | Other current non-U.S. assets* | | | | | |
| c | Other current U.S. assets* | | 27,103. | | 40,044. | |
| 7 | Loans to shareholders | | | | | |
| 8 | Mortgage and real estate loans | | | | | |
| 9a | Other loans and investments-non-U.S. assets* | | | | | |
| b | Other loans and investments - U.S. assets* | 155,950. | | 155,950. | | |
| 10a | Buildings and other depreciable assets | 155,950. | | 155,950. | | |
| b | Less accumulated depreciation | ( 155,950.) | 0. | ( 155,950.) | 0. | |
| 11a | Depletable assets | | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | | |
| 12 | Land (net of any amortization) | | | | | |
| 13a | Intangible assets (amortizable only) | | | | | |
| b | Less accumulated amortization | ( ) | | ( ) | | |
| 14 | Assets held in trust | | | | | |
| 15 | Other non-current interbranch assets* | | | | | |
| 16a | Other non-current non-U.S. assets* | | | | | |
| b | Other non-current U.S. assets* | | | | | |
| 17 | Total assets | | 34,398. | | 62,852. | |
| | **Liabilities** | | | | | |
| 18 | Accounts payable | | | | | |
| 19 | Mtges., notes, bonds payable in less than 1 year: | | | | | |
| a | Interbranch liabilities* | | | | | |
| b | Third-party liabilities* | | | | | |
| 20 | Other current liabilities* | | | | | |
| 21 | Loans from shareholders | | | | | |
| 22 | Mtges., notes, bonds payable in 1 year or more: | | | | | |
| a | Interbranch liabilities* | | | | | |
| b | Third-party liabilities* | | | | | |
| 23 | Liabilities held in trust | | | | | |
| 24a | Other interbranch liabilities* | | | | | |
| b | Other third-party liabilities* | | | | | |
| | **Equity** | | | | | |
| 25 | Capital stock: a Preferred stock | | | | | |
| | b Common stock | | 155,950. | | 155,950. | |
| 26 | Additional paid-in capital | | | | | |
| 27 | Retained earnings - Appropriated* | | | | | |
| 28 | Retained earnings - Unappropriated | | -121,552. | | -93,098. | |
| 29 | Adjustments to shareholders' equity* | | | | | |
| 30 | Less cost of treasury stock | ( ) | | ( ) | | |
| 31 | Total liabilities and shareholders' equity | | 34,398. | | 62,852. | |

\* Attach statement - see instructions.

Form **1120-F** (2022)

211992 01-23-23

7

2022 06000 VIORMAR TRADING CORPORATI VIORMAR5

Form 1120-F (2022)   **Viormar Trading Corporation N.V.**   59-1878157   Page **8**

| Schedule W | Overpayment Resulting From Tax Deducted and Withheld Under Chapters 3 and 4 | | |
|---|---|---|---|
| 1 | Total Chapter 3 and 4 payments. Enter the amount from page 1, line 5i .............................................. | 1 | |
| 2 | Enter the tax amount from page 1, line 1 ..................................................... | 2 | |
| 3 | Enter the portion of the tax amount shown on page 1, line 2, pertaining to income associated with amounts deducted and withheld under sections 1445 and 1446 (see instructions for general guidelines) ........................... | 3 | |
| 4 | Total Chapter 3 and 4 tax. Combine lines 2 and 3 ................................................. | 4 | |
| 5 | Tentative overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Subtract line 4 from line 1 ............................................................. | 5 | |
| 6 | Enter the amount from page 1, line 8a ...................................................... | 6 | |
| 7 | Overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Enter the smaller of line 5 or line 6. Enter the result here and on page 1, line 8b .......................... | 7 | |

Form **1120-F** (2022)

2022.06000 VIORMAR TRADING CORPORATI VIORMAR5

**SCHEDULES M-1 and M-2**
**(Form 1120-F)**
Department of the Treasury
Internal Revenue Service

**Reconciliation of Income (Loss) and Analysis of Unappropriated Retained Earnings per Books**

Go to *www.irs.gov/Form1120F* for the latest information.
Attach to Form 1120-F.

OMB No. 1545-0123

**2022**

Name of corporation

Viormar Trading Corporation N.V.

Employer identification number

59-1878157

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income per Return

Note: The corporation may be required to file Schedule M-3 (see instructions).

| | | |
|---|---|---|
| 1 Net income (loss) per books | 28,454. | 7 Income recorded on books this year not included on this return (itemize): |
| 2 Federal income tax per books | | a Tax-exempt interest ... $ |
| 3 Excess of capital losses over capital gains | | b Other (itemize): |
| 4 Income subject to tax not recorded on books this year (itemize): | | |
| | | 8 Deductions on this return not charged against book income this year (itemize): |
| 5 Expenses recorded on books this year not deducted on this return (itemize): | | a Depreciation ........ $ |
| a Depreciation ...... $ | | b Charitable contributions ........... $ |
| b Charitable contributions ...... $ | | c Other (itemize): |
| c Travel and entertainment ...... $ | | |
| d Other (itemize): | | 9 Add lines 7 and 8 |
| 6 Add lines 1 through 5 | 28,454. | 10 Income - line 6 less line 9 ..................... 28,454. |

## Schedule M-2   Analysis of Unappropriated Retained Earnings per Books

| | | |
|---|---|---|
| 1 Balance at beginning of year | -121,552. | 5 Distributions: a Cash |
| 2 Net income (loss) per books | 28,454. | b Stock |
| 3 Other increases (itemize): | | c Property |
| | | 6 Other decreases (itemize): |
| | | 7 Add lines 5 and 6 |
| 4 Add lines 1, 2, and 3 | -93,098. | 8 Balance at end of year (line 4 less line 7) ......... -93,098. |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120-F.

Schedules M-1 and M-2 (Form 1120-F) 2022

213991
01-16-23   LHA

| Form **2220** | **Underpayment of Estimated Tax by Corporations** | OMB No. 1545-0123 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | Attach to the corporation's tax return. Go to www.irs.gov/Form2220 for instructions and the latest information. | **2022** |

| Name | Employer identification number |
|---|---|
| Viormar Trading Corporation N.V. | 59-1878157 |

**Note:** Generally, the corporation is not required to file Form 2220 (see Part II below for exceptions) because the IRS will figure any penalty owed and bill the corporation. However, the corporation may still use Form 2220 to figure the penalty. If so, enter the amount from page 2, line 38, on the estimated tax penalty line of the corporation's income tax return, but **do not attach Form 2220.**

### Part I  Required Annual Payment

| | | | |
|---|---|---|---|
| 1 | Total tax (see instructions) | 1 | 1,195. |
| 2 a | Personal holding company tax (Schedule PH (Form 1120), line 26) included on line 1 ............... 2a | | |
| b | Look-back interest included on line 1 under section 460(b)(2) for completed long-term contracts or section 167(g) for depreciation under the income forecast method .......................... 2b | | |
| c | Credit for federal tax paid on fuels (see instructions) ........................... 2c | | |
| d | Total. Add lines 2a through 2c | 2d | |
| 3 | Subtract line 2d from line 1. If the result is less than $500, do not complete or file this form. The corporation does not owe the penalty | 3 | 1,195. |
| 4 | Enter the tax shown on the corporation's 2021 income tax return. See instructions. **Caution:** If the tax is zero or the tax year was for less than 12 months, skip this line and enter the amount from line 3 on line 5 ............... | 4 | 2,314. |
| 5 | Required annual payment. Enter the smaller of line 3 or line 4. If the corporation is required to skip line 4, enter the amount from line 3 | 5 | 1,195. |

### Part II  Reasons for Filing – Check the boxes below that apply. If any boxes are checked, the corporation **must** file Form 2220 even if it does not owe a penalty. See instructions.

| | | |
|---|---|---|
| 6 | ☐ | The corporation is using the adjusted seasonal installment method. |
| 7 | ☐ | The corporation is using the annualized income installment method. |
| 8 | ☐ | The corporation is a "large corporation" figuring its first required installment based on the prior year's tax. |

### Part III  Figuring the Underpayment

| | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|
| 9 | Installment due dates. Enter in columns (a) through (d) the 15th day of the 4th (Form 990-PF filers: Use 5th month), 6th, 9th, and 12th months of the corporation's tax year | 04/18/2022 | 06/15/2022 | 09/15/2022 | 12/15/2022 |
| 10 | Required installments. If the box on line 6 and/or line 7 above is checked, enter the amounts from Sch A, line 38. If the box on line 8 (but not 6 or 7) is checked, see instructions for the amounts to enter. If none of these boxes are checked, enter 25% (0.25) of line 5 above in each column ............ | 299. | 299. | 298. | 299. |
| 11 | Estimated tax paid or credited for each period. For column (a) only, enter the amount from line 11 on line 15. See instructions | | | | |
| | Complete lines 12 through 18 of one column before going to the next column. | | | | |
| 12 | Enter amount, if any, from line 18 of the preceding column | | | | |
| 13 | Add lines 11 and 12 ................................................ | | 299. | 598. | 896. |
| 14 | Add amounts on lines 16 and 17 of the preceding column | | | | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- ............ | | | | |
| 16 | If the amount on line 15 is zero, subtract line 13 from line 14. Otherwise, enter -0- ............................................ | | 299. | 598. | |
| 17 | Underpayment. If line 15 is less than or equal to line 10, subtract line 15 from line 10. Then go to line 12 of the next column. Otherwise, go to line 18 ............................. | 299. | 299. | 298. | 299. |
| 18 | Overpayment. If line 10 is less than line 15, subtract line 10 from line 15. Then go to line 12 of the next column ......... | | | | |

Go to Part IV on page 2 to figure the penalty. Do not go to Part IV if there are no entries on line 17 - no penalty is owed.

LHA    For Paperwork Reduction Act Notice, see separate instructions.

Form 2220 (2022)

212801 01-24-23

10

2022.06000 VIORMAR TRADING CORPORATI VIORMAR5

59-1878157

**Viormar Trading Corporation N.V.**

Page **2**

Form 2220 (2022)

| Part IV | Figuring the Penalty |
| --- | --- |

|  |  |  | (a) | (b) | (c) | (d) |
| --- | --- | --- | --- | --- | --- | --- |
| 19 | Enter the date of payment or the 15th day of the 4th month after the close of the tax year, whichever is earlier. **(C corporations with tax years ending June 30 and S corporations: Use 3rd month instead of 4th month. Form 990-PF and Form 990-T filers: Use 5th month instead of 4th month.)** See instructions .................. | **19** | Statement 4 |  |  |  |
| 20 | Number of days from due date of installment on line 9 to the date shown on line 19 ................ | **20** |  |  |  |  |
| 21 | Number of days on line 20 after 4/15/2022 and before 7/1/2022 ...... | **21** |  |  |  |  |
| 22 | Underpayment on line 17 x Number of days on line 21 x 4% (0.04) / 365 | **22** | $ | $ | $ | $ |
| 23 | Number of days on line 20 after 6/30/2022 and before 10/1/2022 | **23** |  |  |  |  |
| 24 | Underpayment on line 17 x Number of days on line 23 x 5% (0.05) / 365 | **24** | $ | $ | $ | $ |
| 25 | Number of days on line 20 after 9/30/2022 and before 1/1/2023 ...... | **25** |  |  |  |  |
| 26 | Underpayment on line 17 x Number of days on line 25 x 6% (0.06) / 365 | **26** | $ | $ | $ | $ |
| 27 | Number of days on line 20 after 12/31/2022 and before 4/1/2023 | **27** |  |  |  |  |
| 28 | Underpayment on line 17 x Number of days on line 27 x 7% (0.07) / 365 | **28** | $ | $ | $ | $ |
| 29 | Number of days on line 20 after 3/31/2023 and before 7/1/2023 | **29** |  |  |  |  |
| 30 | Underpayment on line 17 x Number of days on line 29 x *% / 365 | **30** | $ | $ | $ | $ |
| 31 | Number of days on line 20 after 6/30/2023 and before 10/1/2023 | **31** |  |  |  |  |
| 32 | Underpayment on line 17 x Number of days on line 31 x *% / 365 | **32** | $ | $ | $ | $ |
| 33 | Number of days on line 20 after 9/30/2023 and before 1/1/2024 ...... | **33** |  |  |  |  |
| 34 | Underpayment on line 17 x Number of days on line 33 x *% / 365 | **34** | $ | $ | $ | $ |
| 35 | Number of days on line 20 after 12/31/2023 and before 3/16/2024 | **35** |  |  |  |  |
| 36 | Underpayment on line 17 x Number of days on line 35 x *% / 366 | **36** | $ | $ | $ | $ |
| 37 | Add lines 22, 24, 26, 28, 30, 32, 34, and 36 .................. | **37** | $          17. | $          15. | $          12. | $           7. |
| 38 | **Penalty.** Add columns (a) through (d) of line 37. Enter the total here and on Form 1120, line 34; or the comparable line for other income tax returns ...... | | | | **38** $          51. |

\* Use the penalty interest rate for each calendar quarter, which the IRS will determine during the first month in the preceding quarter. These rates are published quarterly in an IRS News Release and in a revenue ruling in the Internal Revenue Bulletin. To obtain this information on the Internet, access the IRS website at **www.irs.gov**. You can also call 1-800-829-4933 to get interest rate information.

Form 2220 (2022)

11

2023 06000 VIORMAR TRADING CORPORATI VIORMAR5

Form **8810**

Department of the Treasury
Internal Revenue Service

## Corporate Passive Activity Loss and Credit Limitations

Attach to your tax return (personal service and closely held corporations only).
Go to www.irs.gov/Form8810 for instructions and the latest information.

OMB No. 1545-0123

**2022**

Name

Viormar Trading Corporation N.V.

Employer identification number

59-1878157

| Part I | 2022 Passive Activity Loss |
|---|---|

Caution: See the instructions and complete Worksheets 1 and 2 before completing Part I.

| | | | | |
|---|---|---|---|---|
| 1 a | Current year income (from Worksheet 2, column (a)) | 1a | 43,540. | |
| b | Current year deductions and losses (from Worksheet 2, column (b)) | 1b ( | 15,086. ) | |
| c | Prior year unallowed losses (from Worksheet 2, column (c)) | 1c ( | ) | |
| d | Combine lines 1a, 1b, and 1c. If the result is net income or zero, see instructions | | 1d | 28,454. |
| 2 | Closely held corporations enter net active income and see instructions. Personal service corporations enter -0- on this line | | 2 | 0. |
| 3 | Unallowed passive activity deductions and losses. Combine lines 1d and 2. If the result is net income or zero, see the instructions for lines 1d and 3. Otherwise, go to line 4 | | 3 | 0. |
| 4 | Total deductions and losses allowed. Add the income, if any, on lines 1a and 2 and enter the result (see instructions) | | 4 | 15,086. |

| Part II | 2022 Passive Activity Credits |
|---|---|

Caution: See the instructions and complete Worksheet 5 before completing Part II.

| | | | | |
|---|---|---|---|---|
| 5 a | Current year credits (from Worksheet 5, column (a)) | 5a | | |
| b | Prior year unallowed credits (from Worksheet 5, column (b)) | 5b | | |
| 6 | Add lines 5a and 5b | | 6 | |
| 7 | Enter the tax attributable to net passive income and net active income. See instructions | | 7 | |
| 8 | Unallowed passive activity credit. Subtract line 7 from line 6. If the result is zero or less, enter -0- | | 8 | |
| 9 | Allowed passive activity credit. Subtract line 8 from line 6. See instructions | | 9 | |

| Part III | Election To Increase Basis of Credit Property |
|---|---|

| | |
|---|---|
| 10 | If the corporation disposed of its entire interest in a passive activity or former passive activity in a fully taxable transaction, and the corporation elects to increase the basis of credit property used in that activity by the unallowed credit that reduced the property's basis, check this box. See instructions ☐ |
| 11 | Name of passive activity disposed of: |
| 12 | Description of the credit property for which the election is being made: |
| 13 | Amount of unallowed credit that reduced the property's basis ... $ |

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **8810** (2022)

219891
11-18-22

12

2022.06000 VIORMAR TRADING CORPORATI VIORMAR5

**Form 8810 Worksheet 1 - Computation of Income, Gains, Deductions, and Losses for Worksheet 2**

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|---|---|---|

Name of Activity

**A** WAREHOUSE RENTAL

**B**

**C**

**D**

| | | Activities | | |
|---|---|---|---|---|
| | **A** | **B** | **C** | **D** |
| 1. Gross receipts .......... | 43,540. | | | |
| 2. Schedule D Gains: | | | | |
| Long-term capital gains .......... | | | | |
| Short-term capital gains .......... | | | | |
| 3. Form 4797 Gains: | | | | |
| 1231 gains .......... | | | | |
| Ordinary gains .......... | | | | |
| 4. Other passive income .......... | | | | |
| 5. Total income. Add lines 1 through 4 and enter the result in column (a) of Worksheet 2 .......... | 43,540. | | | |
| 6. Current Year Deductions: | | | | |
| a. Cost of goods sold .......... | | | | |
| b. Compensation of officers .......... | | | | |
| c. Salaries and wages .......... | 7,640. | | | |
| d. Repairs and maintenance .......... | | | | |
| e. Bad debts .......... | | | | |
| f. Rents .......... | 2,511. | | | |
| g. Taxes and licenses .......... | | | | |
| h. Interest .......... | | | | |
| i. Depreciation .......... | | | | |
| j. Depletion .......... | | | | |
| k. Advertising .......... | | | | |
| l. Other deductions .......... | 4,935. | | | |
| 7. Total Deductions. Add lines 6a through 6l .......... | 15,086. | | | |
| 8. Schedule D losses | | | | |
| Long-term losses .......... | | | | |
| Short-term losses .......... | | | | |
| 9. Form 4797 losses | | | | |
| 1231 losses .......... | | | | |
| Ordinary losses .......... | | | | |
| 10. Current year deductions and losses. Add lines 7 through 9 and enter the result here and in column (b) of Worksheet 2 ... | 15,086. | | | |
| 11. Prior year carryovers .......... | | | | |
| 12. Net gain/loss (line 5 less lines 10 and 11) | 28,454. | | | |

| Name | Viormar Trading Corporation N.V. | | | 59-1878157 | |
|---|---|---|---|---|---|

## Worksheet 2 for Form 8810, Lines 1a, 1b, and 1c

| Name of Activity | Current Year | | Prior Year | Overall Gain or Loss | |
|---|---|---|---|---|---|
| | (a) Income (line 1a) | (b) Deductions and Losses (line 1b) | (c) Unallowed Loss (line 1c) | (d) Gain | (e) Loss |
| WAREHOUSE RENTAL | 43,540. | 15,086. | | 28,454. | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals. Enter on lines 1a, 1b, and 1c of Form 8810 | 43,540. | 15,086. | | | |

220071
04-01-22

14

Name: **Viormar Trading Corporation N.V.**     I.D. Number **59-1878157**

## Income (Loss) From Other Rental Activities

1    Show the kind and location of each rental property.

A    WAREHOUSE RENTAL
     7884 NW 55TH STREET, MIAMI, FL 33166

B

C

D

| Rental Income | | Properties | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| 2  Gross rents | 2 | 43,540. | | | |
| **Rental Expenses** | | | | | |
| 3  Advertising | 3 | | | | |
| 4  Auto and travel | 4 | | | | |
| 5  Cleaning and maintenance | 5 | | | | |
| 6  Commissions | 6 | | | | |
| 7  Insurance | 7 | 2,090. | | | |
| 8  Legal and other professional fees | 8 | | | | |
| 9  Interest | 9 | | | | |
| 10  Repairs | 10 | 7,640. | | | |
| 11  Taxes | 11 | 2,511. | | | |
| 12  Utilities | 12 | 2,845. | | | |
| 13  Wages and salaries | 13 | | | | |
| 14  Depreciation | 14 | | | | |
| 15  Other (list)  ▷ | 15 | | | | |
| 16  Total expenses for each property. Add lines 3 through 15 | 16 | 15,086. | | | |

| | | | |
|---|---|---|---|
| 17  Total gross rents. Add gross rents from line 2, columns A through D | | 17 | 43,540. |
| 18  Total expenses. Add total expenses from line 16, columns A through D | | 18 | 15,086. |
| 19  Net gain (loss) from Form 4797, Part II, line 17, from disposition of property from other rental activities | | 19 | |
| 20  Net income (loss) from other rental(s) | | 20 | 28,454. |

Viormar Trading Corporation N.V.                                    59-1878157

| Form 1120-F | Taxes and Licenses | Statement 1 |
|---|---|---|

| Description | Amount |
|---|---|
| Taxes from Rent and Royalties | 2,511. |
| Total to Form 1120-F, Page 4, line 17 | 2,511. |

| Form 1120-F | Other Deductions | Statement 2 |
|---|---|---|

| Description | Amount |
|---|---|
| Other Rent & Royalty Expenses | 4,935. |
| Total to Form 1120-F, Page 4, line 27 | 4,935. |

| | Net Operating Loss Deduction | | | Statement 3 |
|---|---|---|---|---|

| Tax Year | Loss Sustained | Loss Previously Applied | Loss Remaining | Available This Year |
|---|---|---|---|---|
| 12/31/19 | 139,600. | 14,906. | 124,694. | 124,694. |
| 12/31/20 | | | 0. | 0. |
| 12/31/21 | | | 0. | 0. |
| NOL Available This Year | | | 124,694. | 124,694. |

Viormar Trading Corporation N.V.

59-1878157

| Form 2220 | Computation of Underpayment Penalty | Statement 4 |
|---|---|---|

| Q T R | EVENT AMOUNT TYPE | * | REMAINING UNDERPAYMENT | PERIOD OF UNDERPAYMENT | | DAYS | INT RATE | AMOUNT OF PENALTY |
|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | |
| | Q | | 299. | 04/15/2022 | 06/30/2022 | 76 | 4% | 2. |
| | R | | 299. | 06/30/2022 | 09/30/2022 | 92 | 5% | 4. |
| | R | | 299. | 09/30/2022 | 12/31/2022 | 92 | 6% | 5. |
| | R | | 299. | 12/31/2022 | 04/15/2023 | 105 | 7% | 6. |
| B | | | | | | | | |
| | Q | | 299. | 06/15/2022 | 06/30/2022 | 15 | 4% | 0. |
| | R | | 299. | 06/30/2022 | 09/30/2022 | 92 | 5% | 4. |
| | R | | 299. | 09/30/2022 | 12/31/2022 | 92 | 6% | 5. |
| | R | | 299. | 12/31/2022 | 04/15/2023 | 105 | 7% | 6. |
| C | | | | | | | | |
| | Q | | 298. | 09/15/2022 | 09/30/2022 | 15 | 5% | 1. |
| | R | | 298. | 09/30/2022 | 12/31/2022 | 92 | 6% | 5. |
| | R | | 298. | 12/31/2022 | 04/15/2023 | 105 | 7% | 6. |
| D | | | | | | | | |
| | Q | | 299. | 12/15/2022 | 12/31/2022 | 16 | 6% | 1. |
| | R | | 299. | 12/31/2022 | 04/15/2023 | 105 | 7% | 6. |

Total to Form 2220, Line 38                                          51.

Event Type: Q = Amount underpaid at start of quarter
            P = Payment
            W = Withholding
            R = Interest rate change
            L = Switch to or from a leap year

**Florida Corporate Income/Franchise Tax Return**

F-1120, R. 01/23   **1019**
Rule 12C-1.051
Florida Administrative Code
Effective 01/23
Page 1 of 6

FEIN **59-1878157**

For calendar year 2022 or tax year beginning **JAN 1** , 2022 ending **DEC 31, 2022**

8333020221231000200503773591878157 00000

| | |
|---|---|
| Name | **Viormar Trading Corporation N.V.** |
| Address | **439 STILL FOREST TER** |
| City/State/ZIP | **Sanford, FL  32771** |

☐ Check here if any changes have been made to name or address

**Computation of Florida Net Income Tax**

| | | | |
|---|---|---|---|
| 1. | Federal taxable income (see instructions) - Attach pages 1-5 of federal return | Check here if negative ___ | 5,691.00 |
| 2. | State income taxes deducted in computing federal taxable income (attach schedule) | Check here if negative ___ | 22,763.00 |
| 3. | Additions to federal taxable income (from Schedule I) | Check here if negative ___ | 28,454.00 |
| 4. | Total of Lines 1, 2 and 3 | Check here if negative ___ | 22,763.20 |
| 5. | Subtractions from federal taxable income (from Schedule II) | Check here if negative ___ | 5,690.80 |
| 6. | Adjusted federal income (Line 4 minus Line 5) | Check here if negative ___ | 5,691.00 |
| 7. | Florida portion of adjusted federal income (see instructions) | Check here if negative ___ | |
| 8. | Nonbusiness income allocated to Florida (from Schedule R) | Check here if negative ___ | 5,691.00 |
| 9. | Florida exemption | | 0.00 |
| 10. | Florida net income (Line 7 plus Line 8 minus Line 9) | | 0.00 |
| 11. | Tax due: 5.5% of Line 10 | | |
| 12. | Credits against the tax (from Schedule V) | | 0.00 |
| 13. | Total corporate income/franchise tax due (Line 11 minus Line 12) | | |

14. a) Penalty: F-2220 _____ b) Other _____
    c) Interest: F-2220 _____ d) Other _____ Line 14 Total ▶ _____
15. Total of Lines 13 and 14 ..........
16. Payment credits: Estimated tax payments 16a $ [_____]
    Tentative tax payment 16b $ [_____]
17. Total amount due: Subtract Line 16 from Line 15. If positive, enter amount due here and on payment coupon.
    If the amount is negative (overpayment), enter on Line 18 and/or Line 19
18. Credit: Enter amount of overpayment credited to next year's estimated tax here and on payment coupon ..........
19. Refund: Enter amount of overpayment to be refunded here and on payment coupon ..........

244081 10-04-22

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Payment Coupon for Florida Corporate Income Tax Return**

**1019**
F-1120
R. 01/23

**Do Not Detach**    YEAR ENDING **12/31/22**

To ensure proper credit to your account, enclose your check with tax return when mailing.

| | |
|---|---|
| Name | **Viormar Trading Corporation N** |
| Address | **439 STILL FOREST TER** |
| City/State/ZIP | **Sanford, FL  32771** |

If 6/30 year end, return is due 1st day of the 4th month after the close of the taxable year, otherwise return is due 1st day of the 5th month after the close of the taxable year.

| | | | |
|---|---|---|---|
| 591878157 | 2276300 | 0 | 0 |
| 20220101 | 2276320 | 0 | 0 |
| 20221231 | 569080 | 0 | 0 |
| 00000000 | 0.000000 | 0 | 0 |
| 004 | 2276320 | 0 | 0 |
| 202 | 0 | 0 | 0 |
| 569100 | 0 | 0 | 0 |
| 0 | 569100 | 0 | 0 |

0

8333 0 20221231 0002005037 7 3591878157 0000 0



**1019**

F-1120
R. 01/23
Page 2 of 6

Viormar Trading Corporation N.V.

FEIN _____ 59-1878157 _____

---

This return is considered incomplete unless a copy of the federal return is attached.

If your return is not signed, or improperly signed and verified, it will be subject to a penalty. The statute of limitations will not start until your return is properly signed and verified. Your return must be completed in its entirety.

| Sign here ▶ | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| | Signature of officer (must be an original signature)          Date | Title ▶ **Managing Director** | |
| Paid preparers only | Preparer's signature ▶              Date **07/29/24** | Preparer check if self-employed ☐ | Preparer's PTIN ▶ **P01496734** |
| | Firm's name (or yours if self-employed) and address | **MAGNO & ASSOCIATES, PL**<br>**1200 BRICKELL AVE STE 1220**<br>**MIAMI, FL 3** | FEIN ▶ **20-2323418**<br>ZIP ▶ **331313255** |

---

**All Taxpayers Must Answer Questions A through L Below - See Instructions**

A. State of incorporation: **FLORIDA**

B. Florida Secretary of State document number: _____

C. Florida consolidated return?   YES ☐   NO ☒

D. ☐ Initial return   ☐ Final return (final federal return filed)

E. Principal Business Activity Code (as pertains to Florida)

**531120**

F. A Florida extension of time was timely filed?   YES ☐   NO ☒

G-1. Corporation is a member of a controlled group?  YES ☐  NO ☐  If yes, attach list.

G-2. Part of a federal consolidated return?  YES ☐  NO ☒  If yes, provide:

FEIN from federal consolidated return: _____

Name of corporation: _____

G-3. The federal common parent has sales, property, or payroll in Florida?  YES ☐  NO ☒

H. Location of corporate books: **Schottegatweg Oost 10 Unit A1K**

City, State, ZIP:  **SANFORD, FL 32771**

I. Taxpayer is a member of a Florida partnership or joint venture?  YES ☐  NO ☒

J. Enter date of latest IRS audit: _____

   a) List years examined: _____

K. Contact person concerning this return: **Corpag Services (Cur**

   a) Contact person telephone number: **+599 9 736 4500**

   b) Contact person e-mail address: **orlandofernandezs@yah**

L. Type of federal return filed ☐ 1120  ☐ 1120S or **1120F**

---

## Online Information Reporting Requirement

Visit the Department website to obtain a list of the required information, due date, penalty rate and application to enter the information. (See section 220.27, Florida Statutes)

## Where to Send Payments and Returns

Make check payable to and mail with return to:

Florida Department of Revenue
5050 W Tennessee Street
Tallahassee FL 32399-0135

If you are requesting a **refund** (Line 19), send your return to:

Florida Department of Revenue
PO Box 6440
Tallahassee FL 32314-6440

---

## Remember:

- ✔ **Make your check payable to the Florida Department of Revenue.**
- ✔ **Write your FEIN on your check.**
- ✔ **Sign your check and return.**
- ✔ **Attach a copy of your federal return.**
- ✔ **Attach a copy of your Florida Form F-7004 (extension of time) if applicable.**

---

244082  10-04-22



1019
F-1120
R. 01/23
Page 3 of 6

NAME **Viormar Trading Corporation N.V.**   FEIN **59-1878157**   TAXABLE YEAR ENDING **12/31/22**

## Schedule I – Additions and/or Adjustments to Federal Taxable Income

| | | |
|---|---|---|
| 1. | Interest excluded from federal taxable income (see instructions) | 1. |
| 2. | Undistributed net long-term capital gains (see instructions) | 2. |
| 3. | Net operating loss deduction (attach schedule) | 3. **22,763.00** |
| 4. | Net capital loss carryover (attach schedule)                          Statement 2 | 4. |
| 5. | Excess charitable contribution carryover (attach schedule) | 5. |
| 6. | Employee benefit plan contribution carryover (attach schedule) | 6. |
| 7. | Enterprise zone jobs credit (Florida Form F-1156Z) | 7. |
| 8. | Ad valorem taxes allowable as an enterprise zone property tax credit (Florida Form F-1158Z) | 8. |
| 9. | Guaranty association assessment(s) credit | 9. |
| 10. | Rural and/or urban high-crime area job tax credits | 10. |
| 11. | State housing tax credit | 11. |
| 12. | Florida tax credit scholarship program credit (credit for contributions to nonprofit scholarship-funding organizations) | 12. |
| 13. | New worlds reading initiative credit | 13. |
| 14. | Strong families tax credit (credit for contributions to eligible charitable organizations) | 14. |
| 15. | New markets tax credit | 15. |
| 16. | Entertainment industry tax credit | 16. |
| 17. | Research and development tax credit | 17. |
| 18. | Energy economic zone tax credit | 18. |
| 19. | s. 168(k), IRC, special bonus depreciation | 19. |
| 20. | Depreciation of qualified improvement property (see instructions) | 20. |
| 21. | Expenses for business meals provided by a restaurant (see instructions) | 21. |
| 22. | Film, television, and live theatrical production expenses (see instructions) | 22. |
| 23. | Internship tax credit | 23. |
| 24. | Other additions (attach schedule) | 24. |
| 25. | Total Lines 1 through 24. Enter total on this line and on Page 1, Line 3. | 25. **22,763.00** |

## Schedule II – Subtractions from Federal Taxable Income

| | | |
|---|---|---|
| 1. | Gross foreign source income less attributable expenses | |
| | (a)  Enter s. 78, IRC, income              $ _____ | |
| | (b)  plus s. 862, IRC, dividends          $ _____ | 1. |
| | (c)  plus s. 951A, IRC, income           $ _____ | |
| | (d)  less direct and indirect expenses | |
| | and related amounts deducted | |
| | under s. 250, IRC          $ _____                              Total ▶ | |
| 2. | Gross subpart F income less attributable expenses | |
| | (a)  Enter s. 951, IRC, subpart F income  $ _____          Total ▶ | 2. |
| | (b)  less direct and indirect expenses     $ _____ | |
| | Note: Taxpayers doing business outside Florida enter zero on Lines 3 through 6, and complete Schedule IV. | |
| 3. | Florida net operating loss carryover deduction (see instructions)        Statement 1 | 3. **22,763.20** |
| 4. | Florida net capital loss carryover deduction (see instructions) | 4. |
| 5. | Florida excess charitable contribution carryover (see instructions) | 5. |
| 6. | Florida employee benefit plan contribution carryover (see instructions) | 6. |
| 7. | Nonbusiness income (from Schedule R, Line 3) | 7. |
| 8. | Eligible net income of an international banking facility (see instructions) | 8. |
| 9. | s. 168(k), IRC, special bonus depreciation (see instructions) | 9. |
| 10. | Depreciation of qualified improvement property (see instructions) | 10. |
| 11. | Film, television, and live theatrical production expenses (see instructions) | 11. |
| 12. | Other subtractions (attach schedule) | 12. **22,763.20** |
| 13. | Total Lines 1 through 12. Enter total on this line and on Page 1, Line 5. | 13. |

3

2022 06000 VIORMAR TRADING CORPORATI VIORMAR5



1019
F-1120
R. 01/23
Page 4 of 6

NAME  Viormar Trading Corporation N.V.    FEIN 59-1878157    TAXABLE YEAR ENDING 12/31/22

## Schedule III - Apportionment of Adjusted Federal Income

**III-A  For use by taxpayers doing business outside Florida, except those providing insurance or transportation services.**

| | (a) WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) | (c) Col. (a) ÷ Col. (b) Rounded to Six Decimal Places | (d) Weight If any factor in Column (b) is zero, see note on Pg 9 of the instructions. | (e) Weighted Factors Rounded to Six Decimal Places |
|---|---|---|---|---|---|
| 1. Property (Schedule III-B below) | | | | X 25% or | |
| 2. Payroll | | | | X 25% or | |
| 3. Sales (Schedule III-C below) | | | | X 50% or | |
| 4. Apportionment fraction (Sum of Lines 1, 2, and 3, Column (e)). Enter here and on Schedule IV, Line 2. | | | | | |

**III-B  For use in computing average value of property (use original cost).**

| | WITHIN FLORIDA | | TOTAL EVERYWHERE | |
|---|---|---|---|---|
| | a. Beginning of year | b. End of year | c. Beginning of year | d. End of year |
| 1. Inventories of raw material, work in process, finished goods | | | | |
| 2. Buildings and other depreciable assets | | | | |
| 3. Land owned | | | | |
| 4. Other tangible and intangible (financial org. only) assets (attach schedule) | | | | |
| 5. Total (Lines 1 through 4) | | | | |

6. Average value of property
     a. Add Line 5, Columns (a) and (b) and divide by 2 (for within Florida) ...... 6a. _____
     b. Add Line 5, Columns (c) and (d) and divide by 2 (for total everywhere) ..................... 6b. _____

7. Rented property (8 times net annual rent)
     a. Rented property in Florida ..................... 7a. _____
     b. Rented property Everywhere ..................... 7b. _____

8. Total (Lines 6 and 7). Enter on Line 1, Schedule III-A, Columns (a) and (b).
     a. Enter Lines 6 a. plus 7 a. and also enter on Schedule III-A, Line 1.
         Column (a) for total average property in Florida ..................... 8a. _____
     b. Enter Lines 6 b. plus 7 b. and also enter on Schedule III-A, Line 1.
         Column (b) for total average property Everywhere ..................... 8b. _____

| III-C  Sales Factor | | (a) TOTAL WITHIN FLORIDA (Numerator) N/A | (b) TOTAL EVERYWHERE (Denominator) |
|---|---|---|---|
| 1. Sales (gross receipts) | | | N/A |
| 2. Sales delivered or shipped to Florida purchasers | | | |
| 3. Other gross receipts (rents, royalties, interest, etc. when applicable) | | | |
| 4. TOTAL SALES (Enter on Schedule III-A, Line 3, Columns (a) and (b) | | | |

| III-D  Special Apportionment Fractions  (see instructions) | (a) WITHIN FLORIDA | (b) TOTAL EVERYWHERE | (c) FLORIDA Fraction (a) ÷ (b) Rounded to Six Decimal Places |
|---|---|---|---|
| 1. Insurance companies (attach copy of Schedule T - Annual Report) | | | |
| 2. Transportation services | | | |

## Schedule IV - Computation of Florida Portion of Adjusted Federal Income

| | | |
|---|---|---|
| 1. Apportionable adjusted federal income from Page 1, Line 6 | 1. | |
| 2. Florida apportionment fraction (Schedule III-A, Line 4) | 2. | |
| 3. Tentative apportioned adjusted federal income (multiply Line 1 by Line 2) | 3. | |
| 4. Net operating loss carryover apportioned to Florida (attach schedule; see instructions) | 4. | |
| 5. Net capital loss carryover apportioned to Florida (attach schedule; see instructions) | 5. | |
| 6. Excess charitable contribution carryover apportioned to Florida (attach schedule; see instructions) | 6. | |
| 7. Employee benefit plan contribution carryover apportioned to Florida (attach schedule; see instructions) | 7. | |
| 8. Total carryovers apportioned to Florida (add Lines 4 through 7) | 8. | |
| 9. Adjusted federal income apportioned to Florida (Line 3 less Line 8; see instructions) | 9. | |

244092  10-04-22



1019
F-1120
R. 01/23
Page 5 of 6

NAME Viormar Trading Corporation N.V.     FEIN 59-1878157     TAXABLE YEAR ENDING 12/31/22

## Schedule V - Credits Against the Corporate Income/Franchise Tax

| | | |
|---|---|---|
| 1. | Florida health maintenance organization consumer assistance assessment credit (attach assessment notice) | 1. |
| 2. | Capital investment tax credit (attach certification letter) | 2. |
| 3. | Enterprise zone jobs credit (from Florida Form F-1156Z attached) | 3. |
| 4. | Community contribution tax credit (attach certification letter) | 4. |
| 5. | Enterprise zone property tax credit (from Florida Form F-1158Z attached) | 5. |
| 6. | Rural job tax credit (attach certification letter) | 6. |
| 7. | Urban high-crime area job tax credit (attach certification letter) | 7. |
| 8. | Hazardous waste facility tax credit | 8. |
| 9. | Florida alternative minimum tax (AMT) credit | 9. |
| 10. | Contaminated site rehabilitation tax credit (voluntary cleanup tax credit) (attach tax credit certificate) | 10. |
| 11. | State housing tax credit (attach certification letter) | 11. |
| 12. | Florida tax credit scholarship program credit (credit for contributions to nonprofit scholarship-funding organizations) (attach certificate) | 12. |
| 13. | New worlds reading initiative credit (attach certificate) | 13. |
| 14. | Strong families tax credit (credit for contributions to eligible charitable organizations) (attach certificate) | 14. |
| 15. | New markets tax credit | 15. |
| 16. | Entertainment industry tax credit | 16. |
| 17. | Research and development tax credit | 17. |
| 18. | Energy economic zone tax credit | 18. |
| 19. | Internship tax credit | 19. |
| 20. | Other credits (attach schedule) | 20. |
| 21. | Total credits against the tax (sum of Lines 1 through 20 not to exceed the amount on Page 1, Line 11). Enter total credits on Page 1, Line 12 | 21. |

## Schedule R - Nonbusiness Income

**Line 1.  Nonbusiness income (loss) allocated to Florida**

Type                                                                                        Amount

Total allocated to Florida ............................................................................................  1.
(Enter here and on Page 1, Line 8)

**Line 2.  Nonbusiness income (loss) allocated elsewhere**

Type                                  State/country allocated to                       Amount

Total allocated elsewhere ............................................................................................  2.

**Line 3.  Total nonbusiness income**

Grand total. Total of Lines 1 and 2 ............................................................................  3.
(Enter here and on Schedule II, Line 7)

244093  10-04-22

5

2022 06000 VIORMAR TRADING CORPORATI VIORMAR5



1019
F-1120
R. 01/23
Page 6 of 6

NAME **Viormar Trading Corporation N.V.**   FEIN **59-1878157**   TAXABLE YEAR ENDING **12/31/22**

## Estimated Tax Worksheet
### For Taxable Years Beginning On or After January 1, 2023

| | | |
|---|---|---|
| 1. Florida income expected in taxable year | 1. $ | 5,691.00 |
| 2. Florida exemption $50,000 (Members of a controlled group, see instructions on Page 14 of Florida Form F-1120N) | 2. $ | 5,691.00 |
| 3. Estimated Florida net income (Line 1 less Line 2) | 3. $ | |
| 4. Total Estimated Florida tax (5.5% of Line 3) ............ $ _____ | | |
| Less: Credits against the tax ........ $ _____ | 4. $ | |

5. Computation of installments:
   Payment due dates and
   payment amounts:

| | | |
|---|---|---|
| If 6/30 year end, last day of 4th month, otherwise last day of 5th month - Enter 0.25 of Line 4 | 5a. | _____ |
| Last day of 6th month - Enter 0.25 of Line 4 | 5b. | _____ |
| Last day of 9th month - Enter 0.25 of Line 4 | 5c. | _____ |
| Last day of fiscal year - Enter 0.25 of Line 4 | 5d. | _____ |

NOTE: If your estimated tax should change during the year, you may use the amended computation below to determine the amended amounts to be entered on the declaration (Florida Form F-1120ES).

| | | |
|---|---|---|
| 1. Amended estimated tax | 1. $ | _____ |
| 2. Less: | | |
| (a) Amount of overpayment from last year elected for credit to estimated tax and applied to date ........ 2a. – $ _____ | | |
| (b) Payments made on estimated tax declaration (Florida Form F-1120ES) 2b. – $ _____ | | |
| (c) Total of Lines 2(a) and 2(b) | 2c. $ | _____ |
| 3. Unpaid balance (Line 1 less Line 2(c)) | 3. $ | _____ |
| 4. Amount to be paid (Line 3 divided by number of remaining installments) | 4. $ | _____ |

### References

*The following documents were mentioned in this form and are incorporated by reference in the rules indicated below. The forms are available online at  floridarevenue.com/forms.*

| | | |
|---|---|---|
| Form F-2220 | Underpayment of Estimated Tax on Florida Corporate Income/Franchise Tax | Rule 12C-1.051, F.A.C. |
| Form F-7004 | Florida Tentative Income/Franchise Tax Return and Application for Extension of Time to File Return | Rule 12C-1.051, F.A.C. |
| Form F-1156Z | Florida Enterprise Zone Jobs Credit Certificate of Eligibility for Corporate Income Tax | Rule 12C-1.051, F.A.C. |
| Form F-1158Z | Enterprise Zone Property Tax Credit | Rule 12C-1.051, F.A.C. |
| Form F-1120N | Instructions for Corporate Income/Franchise Tax Return | Rule 12C-1.051, F.A.C. |
| Form F-1120ES | Declaration/Installment of Florida Estimated Income/Franchise Tax | Rule 12C-1.051, F.A.C. |

244094  08-24-23

2022  06000  VIORMAR TRADING CORPORATI VIORMAR5



Viormar Trading Corporation N.V.

1019
F-1120
R. 01/23

FEIN  59-1878157

DATA Page 1 of 2

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 2276320 |
| 2845400 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 2276300 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 00000000 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0.000000 |



Viormar Trading Corporation N.V.

1019
F-1120
R. 01/23

FEIN   59-1878157

DATA Page 2 of 2

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

244084  10-04-22

Viormar Trading Corporation N.V.

59-1878157

| FL F-1120 | | Net Operating Loss Carryovers | | | Statement 1 |
|---|---|---|---|---|---|
| Year | Apportion Factor | Current Yr NOL/ Sec 382/ SRLY Limit | Net Operating Loss Carryover | Loss Previously Deducted | Net Loss Remaining |
| 2019 | .00000 | 0.00 | 139,600.00* | 17,420.00 | 122,180.00 |
| 2020 | .00000 | 0.00 | 0.00* | 0.00 | 0.00 |
| 2021 | .00000 | 0.00 | 0.00* | 0.00 | 0.00 |

Total Net Operating Loss Carryover Available      122,180.00

* Subject to 80% Taxable Income Limit of     22,763.20

Viormar Trading Corporation N.V.                                    59-1878157

| FL F-1120 | Federal Carryover Deductions | Statement 2 |
|---|---|---|

| Carryovers Deducted in Federal Taxable Income | Amount |
|---|---|
| Net Operating Loss | 22,763.00 |
| Net Capital Loss | |
| Excess Charitable Contribution | |
| Excess Employee Benefit Plan Contribution | |

December 12, 1978

Form **1120-F**

Department of the Treasury
Internal Revenue Service

For calendar year 2023, or tax year beginning _____ , and ending _____

**U.S. Income Tax Return of a Foreign Corporation**

Go to www.irs.gov/Form1120F for instructions and the latest information.

OMB No. 1545-0123

**2023**

Type or Print

**Name**
Viormar Trading Corporation N.V.

**Employer identification number**
59-1878157

**Number, street, and room or suite no. (see instructions)**
439 STILL FOREST TER

**City or town, state or province, country, and ZIP or foreign postal code**
Sanford, FL  32778

Check box(es) if:
- [ ] Initial return
- [ ] Name or address change
- [ ] Final return
- [ ] First post-merger return
- [ ] Amended return
- [ ] Schedule M-3 attached
- [ ] Protective return

**A** Country of incorporation **CURACAO**

**B** Foreign country whose laws the income reported on this return is also subject to tax **CURACAO**

**C** Date incorporated **12/12/1978**

**D** (1) Location of corporation's primary books and records (city, province or state, and country) **Sanford, FL**

(2) Principal location of worldwide business
**439 STILL FOREST TER**
**Sanford, FL 32771**

(3) If the corporation maintains an office or place of business in the U.S., check here ...... [X]

**E** If the corporation had an agent in the United States at any time during the tax year, enter:
(1) Type of agent **INDIVIDUAL**
(2) Name **ORLANDO A. FERNANDEZ**
(3) Address **439 STILL FOREST TER**
**SANFORD, FL 32771**

**F** See the instructions and enter the corporation's principal:
(1) Business activity code number **531120**
(2) Business activity **Lessor Non Res Build**
(3) Product or service **Lessor Non Res Build**

**G** Check method of accounting: (1) [X] Cash  (2) [ ] Accrual
(3) [ ] Other (specify)

**Computation of Tax Due or Overpayment**

| | | | |
|---|---|---|---|
| 1 | Tax from Section I, line 11, page 4 | 1 | 0. |
| 2 | Tax from Section II, Schedule J, line 9, page 6 | 2 | 0. |
| 3 | Tax from Section III (add lines 6 and 10 on page 7) | 3 | 0. |
| 4 | Total tax. Add lines 1 through 3 | 4 | 0. |
| 5a | Preceding year's overpayment credited to the current year | 5a | |
| b | Current year's estimated tax payments | 5b | |
| c | Current year's refund applied for on Form 4466 | 5c ( | ) |
| d | Combine lines 5a through 5c | 5d | |
| e | Tax deposited with Form 7004 | 5e | |
| f | Credit for tax paid on undistributed capital gains (attach Form 2439) | 5f | |
| g | Credit for federal tax paid on fuels (attach Form 4136). See instructions | 5g | |
| h | Reserved for future use | 5h | |
| i | U.S. income tax paid or withheld at source (add amount from Section I, line 12 (on page 4) and amounts from Forms 8288-A and 8805 (attach Forms 8288-A and 8805)) | 5i | |
| j | Elective payment election amount from Form 3800 | 5j | |
| z | Total payments. Add lines 5d through 5j | 5z | |
| 6 | Estimated tax penalty (see instructions). Check if Form 2220 is attached | 6 | |
| 7 | Amount owed. If line 5z is smaller than the total of lines 4 and 6, enter amount owed | 7 | 0. |
| 8a | Overpayment. If line 5z is larger than the total of lines 4 and 6, enter amount overpaid | 8a | |
| b | Amount of overpayment on line 8a resulting from tax deducted and withheld under Chapters 3 and 4 (from Schedule W, line 7, page 9) | 8b | |
| 9 | Enter portion of line 8a you want Credited to 2024 estimated tax _____ Refunded | 9 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____  Date _____  Title **President**

May the IRS discuss this return with the preparer shown below (see instructions)? [X] Yes [ ] No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date 07/29/24 | Check [ ] if self-employed | PTIN P01496734 |
|---|---|---|---|---|

Firm's name **MAGNO & ASSOCIATES, PL**  Firm's EIN **20-2323418**

Firm's address **1200 BRICKELL AVE STE 1220**
**MIAMI, FL 331313255**  Phone no. **(305) 379-4400**

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120-F** (2023)

311921 01-06-24  LHA

1

5240729 160886 VIORMAR TRADING          2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**                59-1878157        Page **2**

## Additional Information *(continued from page 1)*

|  | | Yes | No |
|---|---|---|---|
| H | Did the corporation's method of accounting change from the preceding tax year? ........................................ | | X |
|  | If "Yes," attach a statement with an explanation. | | |
| I | Did the corporation's method of determining income change from the preceding tax year? ........................ | | X |
|  | If "Yes," attach a statement with an explanation. | | |
| J | Did the corporation file a U.S. income tax return for the preceding tax year? ............................................ | X | |
| K | (1) At any time during the tax year, was the corporation engaged in a trade or business in the United States? .......... | X | |
|  | (2) If "Yes," is taxpayer's trade or business within the United States solely the result of a section 897 (FIRPTA) sale or disposition? ................ | | X |
| L | Did the corporation have a permanent establishment in the United States for purposes of any applicable tax treaty between the United States and a foreign country? ............................................................................. | | X |
|  | If "Yes," enter the name of the foreign country: | | |
|  | _____ | | |
| M | Did the corporation have any transactions with related parties? ............................................................. | | X |
|  | If "Yes," Form 5472 may have to be filed (see instructions). | | |
|  | Enter number of Forms 5472 attached _____ | | |
| N | Is the corporation a controlled foreign corporation? (See section 957(a) for definition.) ................................. | X | |
| O | Is the corporation a personal service corporation? (See instructions for definition.) ..................................... | | X |
| P | Enter tax-exempt interest received or accrued during the tax year (see instructions) .................. $ _____ | | |
| Q | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a U.S. corporation? (See section 267(c) for rules of attribution.) | | X |
|  | If "Yes," attach a statement showing (1) name and EIN of such U.S. corporation; (2) percentage owned; and (3) taxable income or (loss) before NOL and special deductions of such U.S. corporation for the tax year ending with or within your tax year. | | |
| R | If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here (see instructions) ....☐ | | |
| S | Enter the available NOL carryover from prior tax years. (Do not reduce it by any deduction on Section II, line 30a, page 5.) $ ___101,931. | | |
|  | Is the corporation a subsidiary in a parent-subsidiary controlled group? ................................................... | | X |
| T | If "Yes," enter the parent corporation's: | | |
|  | (1) EIN _____ | | |
|  | (2) Name _____ | | |
|  | _____ | | |
| U | (1) Is the corporation a dealer under section 475? ............................................................................. | | X |
|  | (2) Did the corporation mark to market any securities or commodities other than in a dealer capacity? .................. | | X |
| V | At the end of the tax year, did any individual, partnership, corporation, estate, or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (See section 267(c) for rules of attribution.) | | X |
|  | If "Yes," attach a statement showing the name and identifying number. (Do not include any information already entered in item T.) Enter percentage owned _____ | | |
| W | (1) Is the corporation taking a position on this return that a U.S. tax treaty overrules or modifies an Internal Revenue law of the United States, thereby causing a reduction of tax? ................................................................ | | X |
|  | If "Yes," the corporation is generally required to complete and attach Form 8833. See Form 8833 for exceptions. | | |
|  | **Note:** Failure to disclose a treaty-based return position may result in a $10,000 penalty (see section 6712). | | |
|  | (2) Is the corporation claiming treaty benefits pursuant to, or otherwise filing its return pursuant to, a Competent Authority determination or an Advance Pricing Agreement? ............................................................... | | X |
|  | If "Yes," attach a copy of the Competent Authority determination letter or Advance Pricing Agreement to your return. | | |
| X | During the tax year, did the corporation own any entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? ......................................................................... | | X |
|  | If "Yes," attach a statement listing the name, country under whose laws the entity was organized, and EIN (if any) of each such entity. | | |
| Y | (1) Did a partnership allocate to the corporation a distributive share of income from a directly owned partnership interest, any of which is ECI or treated as ECI by the partnership or the partner? ........................................ | | X |
|  | If "Yes," attach Schedule P. See instructions. | | |
|  | (2) During the tax year, did the corporation dispose of an interest in a partnership that directly or indirectly engaged in a trade or business in the United States? ................................................................................... | | X |
|  | If "Yes," attach Schedule P (Form 1120-F). See instructions. | | |
|  | (3) During the tax year, did the corporation own, directly or indirectly, at least a 10% interest, in any foreign partnership? ....... | | X |
| Z | (1) Has the corporation engaged in any transactions the results of which are subject to the arm's-length standard under section 482 and its regulations? ........................................................................................... | | X |
|  | (2) Has the corporation recognized any interbranch amounts? ............................................................... | | X |
|  | If "Yes," attach statement (see instructions). | | |

311931 01-08-24                                                                 Form **1120-F** (2023)

Form 1120-F (2023)  **Viormar Trading Corporation N.V.**  59-1878157  Page **3**

## Additional Information *(continued from page 2)*

| | | Yes | No |
|---|---|:---:|:---:|
| AA | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? | | X |
| | If "Yes," complete and attach Schedule UTP. | | |
| BB | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? | | X |
| CC | Is the corporation (including the home office or any branch) a qualified derivatives dealer (QDD)? | | X |
| | (1) If "Yes," attach Schedule Q (Form 1120-F) (see instructions). | | |
| | (2) If "Yes," enter the QI-EIN | | |
| DD | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years (see sections 59A(e)(2) and (3))? | | X |
| | If "Yes," complete and attach Form 8991. | | |
| EE | During the tax year, did the corporation pay or accrue any interest or royalty for which a deduction is not allowed under section 267A (see instructions)? | | X |
| | If "Yes," enter the total amount of the disallowed deductions _____ $_____ | | |
| FF | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year (see instructions)? | | X |
| GG | Does the corporation satisfy one or more of the following (see instructions)? | | X |
| | (1) The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| | (2) The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $29 million and the corporation has business interest expense. | | |
| | (3) The corporation is a tax shelter and the corporation has business interest expense. | | |
| | If "Yes," to any, complete and attach Form 8990. | | |
| HH | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? | | X |
| | If "Yes," enter amount from Form 8996, line 15 _____ $_____ | | |
| II | Is the corporation a member of a controlled group? | | X |
| | If "Yes," attach Schedule O (Form 1120). See instructions. | | |
| JJ | Corporate Alternative Minimum Tax: | | |
| | (1) Was the corporation an applicable corporation under section 59(k)(1) in any prior tax year? | | X |
| | If "Yes," go to question JJ(2). | | |
| | If "No," skip to question JJ(3). | | |
| | (2) Is the corporation an applicable corporation under section 59(k)(1) in the current tax year because the corporation was an applicable corporation in the prior tax year? | | |
| | If "Yes," complete and attach Form 4626. | | |
| | If "No," continue to question JJ(3). | | |
| | (3) Does the corporation meet the requirements of the safe harbor method as provided under section 59(k)(3)(A) for the current tax year (see instructions)? | X | |
| | If "Yes," the corporation is not required to file Form 4626. | | |
| | If "No," complete and attach Form 4626. | | |

311961 01-08-24

Form **1120-F** (2023)

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**   59-1878157   Page **4**

**SECTION I - Income From U.S. Sources Not Effectively Connected With the Conduct of a Trade or Business in the United States -** Do not report items properly withheld and reported on Form 1042-S. See instructions.

Report all gross transportation income subject to 4% tax on line 9. Report other column (a) income items only if not properly withheld and reported on Form 1042-S. The rate of tax on these gross income items is 30% or such lower rate specified by tax treaty. No deductions are allowed against these types of income. Enter treaty rates where applicable. **If the corporation is claiming a lower treaty rate, also complete item W on page 2.** If multiple treaty rates apply to a type of income (for example, subsidiary and portfolio dividends or dividends received by disregarded entities), attach a statement showing the amounts, tax rates, and withholding for each. For any amounts reported in this Section I, you must attach Form(s) 1042-S to substantiate any withholding claimed on line 5i, page 1, related to these amounts.

Name of treaty country, if any

| | (a) Class of income | (b) Gross amount | (c) Rate of tax (%) | (d) Amount of tax liability | (e) Amount of U.S. income tax paid or withheld at the source |
|---|---|---|---|---|---|
| 1 | Interest | | | | |
| 2a | Dividends (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| b | Dividend equivalents (excluding payments received by QDDs in their equity derivatives dealer capacity) | | | | |
| 3 | Rents | | | | |
| 4 | Royalties | | | | |
| 5 | Annuities | | | | |
| 6 | Gains from disposal of timber, coal, or domestic iron ore with a retained economic interest (attach supporting statement) | | | | |
| 7 | Gains from sale or exchange of patents, copyrights, etc. | | | | |
| 8 | Fiduciary distributions (attach supporting statement) | | | | |
| 9 | Gross transportation income (see instructions) | | 4 | | |
| 10 | Other items of income | | | | |
| | | | | | |
| | | | | | |
| 11 | Total. Enter here and on line 1, page 1 | | | | |
| 12 | Total. Enter here and include on line 5i, page 1 | | | | |

13 Is the corporation fiscally transparent under the laws of the foreign jurisdiction with respect to any item of income listed above?   ☐ Yes   ☒ No
   If "Yes," attach a statement that provides the information requested above with respect to each such item of income.

Form **1120-F** (2023)

311971 01-08-24

4

15240729 160886 VIORMAR TRADING       2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2023)  **Viormar Trading Corporation N.V.**  59-1878157  Page **5**

## SECTION II - Income Effectively Connected With the Conduct of a Trade or Business in the United States
(see instructions)

**Important:** *Fill in all applicable lines and schedules. If you need more space, see* Assembling the Return *in the instructions.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Income** | 1 a | Gross receipts or sales | b Less returns and allowances | c Bal | 1c | | |
| | 2 | Cost of goods sold (attach Form 1125-A) | | | 2 | | |
| | 3 | Gross profit (subtract line 2 from line 1c) | | | 3 | | |
| | 4 | Dividends (Schedule C, line 13) | | | 4 | | |
| | 5 | Interest | | | 5 | | |
| | 6 | Gross rents | | | 6 | 50,600. |
| | 7 | Gross royalties | | | 7 | | |
| | 8 | Capital gain net income (attach Schedule D (Form 1120)) | | | 8 | | |
| | 9 | Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | 9 | | |
| | 10 | Other income (see instructions - attach statement) | | | 10 | | |
| | 11 | **Total income.** Add lines 3 through 10 | | | 11 | 50,600. |
| **Deductions (See instructions for limitations on deductions.)** | 12 | Compensation of officers (attach Form 1125-E) | | | 12 | | |
| | 13 | Salaries and wages (less employment credits) | | | 13 | | |
| | 14 | Repairs and maintenance | | * | 14 | 14,169. |
| | 15 | Bad debts (for bad debts over $500,000, attach a list of debtors and amounts) | | | 15 | | |
| | 16 | Rents | | | 16 | | |
| | 17 | Taxes and licenses      See Statement 1 | | * | 17 | 26,014. |
| | 18 | Interest expense from Schedule I, line 25 | | | 18 | | |
| | 19 | Charitable contributions | | | 19 | | |
| | 20 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | | 20 | | |
| | 21 | Depletion | | | 21 | | |
| | 22 | Advertising | | | 22 | | |
| | 23 | Pension, profit-sharing, etc., plans | | | 23 | | |
| | 24 | Employee benefit programs | | | 24 | | |
| | 25 | Reserved for future use | | | 25 | | |
| | 26 | Deductions allocated and apportioned to ECI from Schedule H, line 20 (see instructions) | | | 26 | | |
| | 27 | Other deductions (attach statement)      See Statement 2 | | * | 27 | 10,417. |
| | 28 | **Total deductions.** Add lines 12 through 27  * See Passive Reconciliation | | | 28 | 50,600. |
| | 29 | Taxable income before NOL deduction and special deductions (subtract line 28 from line 11) | | | 29 | 0. |
| | 30 | Less: a  Net operating loss deduction (see instructions)     Stmt 3 | 30a | | | |
| | | b  Special deductions (Schedule C, line 14) | 30b | | | |
| | | c  Add lines 30a and 30b | | | 30c | |
| | 31 | Taxable income or (loss). Subtract line 30c from line 29 | | | 31 | 0. |

Form **1120-F** (2023)

311981 01-08-24

5240729 160886 VIORMAR TRADING          2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**                    59-1878157    Page **6**

## Schedule C   Dividends and Special Deductions   (see instructions)

| | (a) Dividends | (b) % | (c) Special deductions: (a) X (b) |
|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 see instructions | |
| 3 Dividends on certain debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 Dividends from less-than-20%-owned foreign corporations | | 50 | |
| 7 Dividends from 20%-or-more-owned foreign corporations | | 65 see instructions | |
| 8 Subtotal. Add lines 1 through 7 | | | |
| 9 Dividends from foreign corporations not included on line 3, 6, or 7 | | | |
| 10 IC-DISC and former DISC dividends not included on line 1, 2, or 3 (section 246(d)) | | | |
| 11 Other dividends | | | |
| 12 Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 13 Total dividends. Add column (a), lines 8 through 11. Enter here and on line 4, page 5 | | | |
| 14 Total special deductions. Add column (c), lines 8 and 12. Enter here and on line 30c, page 5 | | | |

## Schedule J   Tax Computation   (see instructions)

| | | | |
|---|---|---|---|
| 1 Income tax | | 1 | 0. |
| 2 Base erosion minimum tax amount (attach Form 8991) | | 2 | |
| 3 Corporate alternative minimum tax from Form 4626, Part II, line 13 (attach Form 4626) | | 3 | |
| 4 Add lines 1, 2, and 3 | | 4 | 0. |
| 5 a Foreign tax credit (attach Form 1118) | 5a | | |
| b General business credit (see instructions -attach Form 3800) | 5b | | |
| c Credit for prior year minimum tax (attach Form 8827) | 5c | | |
| d Bond credits from Form 8912 | 5d | | |
| 6 Total credits. Add lines 5a through 5d | | 6 | |
| 7 Subtract line 6 from line 4 | | 7 | 0. |
| 8 Other taxes. | | | |
| a Recapture of investment credit (attach Form 4255) | 8a | | |
| b Recapture of low-income housing credit (attach Form 8611) | 8b | | |
| c Interest due under the look-back method-completed long term contracts (attach Form 8697) | 8c | | |
| d Interest due under the look-back method-income forecast method (attach Form 8866) | 8d | | |
| e Alternative tax on qualifying shipping activities (attach Form 8902) | 8e | | |
| f Other (attach statement) | 8f | | |
| z Total other taxes (add lines 8a through 8f) | | 8z | |
| 9 Total tax. Add lines 7 and 8z. Enter here and on line 2, page 1 | | 9 | 0. |

Form **1120-F** (2023)

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**   59-1878157   Page **7**

## SECTION III—Branch Profits Tax and Tax on Excess Interest

### Part I—Branch Profits Tax   (see instructions)

| | | | |
|---|---|---|---|
| 1 | Enter the amount from Section II, line 29 | 1 | |
| 2 | Enter total adjustments to line 1 to get effectively connected earnings and profits. (Attach required statement showing the nature and amount of adjustments.) (See instructions.) | 2 | |
| 3 | Effectively connected earnings and profits. Combine line 1 and line 2 | 3 | |
| 4a | Enter U.S. net equity at the end of the current tax year. (Att. required stmt.) | 4a | 76,305. |
| b | Enter U.S. net equity at the end of the prior tax year. (Att. required stmt.) | 4b | 62,852. |
| c | Increase in U.S. net equity. If line 4a is greater than or equal to line 4b, subtract line 4b from line 4a. Enter the result here and skip to line 4e | 4c | 13,453. |
| d | Decrease in U.S. net equity. If line 4b is greater than line 4a, subtract line 4a from line 4b | 4d | |
| e | Non-previously taxed accumulated effectively connected earnings and profits. Enter excess, if any, of effectively connected earnings and profits for preceding tax years beginning after 1986 over any dividend equivalent amounts for those tax years | 4e | |
| 5 | Dividend equivalent amount. Subtract line 4c from line 3. If zero or less, enter -0-. If no amount is entered on line 4c, add the lesser of line 4d or line 4e to line 3 and enter the total here | 5 | 0. |
| 6 | Branch profits tax. Multiply line 5 by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | 6 | 0. |

### Part II—Tax on Excess Interest   (see instructions for this Part and for Schedule I (Form 1120-F))

| | | | |
|---|---|---|---|
| 7a | Enter the interest from Section II, line 18 | 7a | |
| b | Enter the inverse of the total amount deferred, capitalized, and disallowed from Schedule I, line 24g ( that is, if line 24g is negative, enter as a positive number; if line 24g is positive, enter as a negative number) | 7b | |
| c | Combine lines 7a and 7b (amount must equal Schedule I, line 23) | 7c | |
| 8 | Branch Interest (see instructions for definition): Enter the sum of Schedule I, line 9, column (c), and Schedule I, line 22. If the interest paid by the foreign corporation's U.S. trade or business was increased because 80% or more of the foreign corporation's assets are U.S. assets, check this box ▶ ☐ | 8 | |
| 9a | Excess interest. Subtract line 8 from line 7c. If zero or less, enter -0- | 9a | |
| b | If the foreign corporation is a bank, enter the excess interest treated as interest on deposits (see instructions for rules for computing this amount). Otherwise, enter -0- | 9b | |
| c | Subtract line 9b from line 9a | 9c | |
| 10 | Tax on excess interest. Multiply line 9c by 30% (0.30) (or lower treaty rate if the corporation is a qualified resident or otherwise qualifies for treaty benefits). (See instructions.) Enter here and include on line 3, page 1. Also complete Item W on page 2 | 10 | |

### Part III—Additional Information

| | | Yes | No |
|---|---|---|---|
| 11 | Is the corporation claiming a reduction in, or exemption from, the branch profits tax due to: | | |
| a | A complete termination of all U.S. trades or businesses? | | X |
| b | The tax-free liquidation or reorganization of a foreign corporation? | | X |
| c | The tax-free incorporation of a U.S. trade or business? | | X |
| | If 11a or 11b applies and the transferee is a domestic corporation, attach Form 8848. If 11c applies, attach the statement required by Temporary Regulations section 1.884-2T(d)(5). | | |

Form **1120-F** (2023)

15340730 160886 VIORMAR TRADING          2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**                    59-1878157      Page **8**

Note: *Check if completing on*  [ X ] **U.S. basis or**   [ ] **Worldwide basis**

| Schedule L | Balance Sheets per Books | | | |
|---|---|---|---|---|

| | | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | **Assets** | (a) | (b) | (c) | (d) |
| 1 | Cash | | 22,808. | | 22,849. |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | ( ) | | ( ) | |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6a | Interbranch current assets* | | | | |
| b | Other current non-U.S. assets* | | | | |
| c | Other current U.S. assets* | | 40,044. | | 53,456. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9a | Other loans and investments-non-U.S. assets* | | | | |
| b | Other loans and investments - U.S. assets* | | | | |
| 10a | Buildings and other depreciable assets | 155,950. | | 155,950. | |
| b | Less accumulated depreciation | ( 155,950. ) | 0. | ( 155,950. ) | 0. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | ( ) | | ( ) |
| 14 | Assets held in trust | | | | |
| 15 | Other non current interbranch assets* | | | | |
| 16a | Other non current non-U.S. assets* | | | | |
| b | Other non-current U.S. assets | | | | |
| 17 | Total assets | | 62,852. | | 76,305. |
| | **Liabilities** | | | | |
| 18 | Accounts payable | | | | |
| 19 | Mtges, notes, bonds payable in less 1 year | | | | |
| a | Interbranch liabilities | | | | |
| b | Third-party liabilities*  **Stmt 4** | | 0. | | 14,448. |
| 20 | Other current liabilities* | | | | |
| 21 | Loans from shareholders | | | | |
| 22 | Mtges, notes, bonds payable in 1 year or more | | | | |
| a | Interbranch liabilities* | | | | |
| b | Third-party liabilities* | | | | |
| 23 | Liabilities held in trust | | | | |
| 24a | Other interbranch liabilities* | | | | |
| b | Other third-party liabilities* | | | | |
| | **Equity** | | | | |
| 25 | Capital stock:  a  Preferred stock | | | | |
| | b  Common stock | | | | |
| 26 | Additional paid-in capital | | 155,950. | | 155,950. |
| 27 | Retained earnings - Appropriated* | | | | |
| 28 | Retained earnings - Unappropriated | | -93,098. | | -94,093. |
| 29 | Adjustments to shareholders' equity* | | | | |
| 30 | Less cost of treasury stock | | ( ) | | ( ) |
| 31 | Total liabilities and shareholders' equity | | 62,852. | | 76,305. |

* Attach statement - see instructions.

Form **1120-F** (2023)

311993 01-08-24

8

2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Form 1120-F (2023)   **Viormar Trading Corporation N.V.**   59-1878157   Page **9**

| Schedule W | Overpayment Resulting From Tax Deducted and Withheld Under Chapters 3 and 4 | | |
|---|---|---|---|
| 1 | Total Chapter 3 and 4 payments. Enter the amount from page 1, line 5i ............................ | | 1 | |
| 2 | Enter the tax amount from page 1, line 1 | 2 | | |
| 3 | Enter the portion of the tax amount shown on page 1, line 2, pertaining to income associated with amounts deducted and withheld under sections 1445 and 1446 (see instructions for general guidelines) ........................... | 3 | | |
| 4 | Total Chapter 3 and 4 tax. Combine lines 2 and 3 ....................................... | | 4 | |
| 5 | Tentative overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Subtract line 4 from line 1 | | 5 | |
| 6 | Enter the amount from page 1, line 8a ............................................ | | 6 | |
| 7 | Overpayment resulting from tax deducted and withheld under Chapters 3 and 4. Enter the smaller of line 5 or line 6. Enter the result here and on page 1, line 8b ............ | | 7 | |

Form **1120-F** (2023)

311694 01-08-24

9

15240720 160886 VIORMAR TRADING        2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

| SCHEDULES M-1 and M-2 (Form 1120-F)<br><br>Department of the Treasury<br>Internal Revenue Service | **Reconciliation of Income (Loss) and Analysis of<br>Unappropriated Retained Earnings per Books**<br>Attach to Form 1120-F.<br>Go to *www.irs.gov/Form1120F* for the latest information. | OMB No. 1545-0123<br><br>**2023** |

**Name of corporation**

Viormar Trading Corporation N.V.

**Employer identification number**

59-1878157

### Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return
**Note:** The corporation may be required to file Schedule M-3 (see instructions).

| 1 | Net income (loss) per books | | -995. | 7 | Income recorded on books this year not included on this return (itemize): | | |
|---|---|---|---|---|---|---|---|
| 2 | Federal income tax per books | | | a | Tax-exempt interest ... $ | | |
| 3 | Excess of capital losses over capital gains | | | b | Other (itemize): | | |
| 4 | Income subject to tax not recorded on books this year (itemize): | | | | | | |
| | | | | 8 | Deductions on this return not charged against book income this year (itemize): | | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | | a | Depreciation ......... $ | | |
| a | Depreciation ...... $ | | | b | Charitable contributions ............ $ | | |
| b | Charitable contributions ...... $ | | | c | Other (itemize): | | |
| c | Travel and entertainment ...... $ | | | | | | |
| d | Other (itemize): Stmt 5    995. | | 995. | 9 | Add lines 7 and 8 ................................... | | |
| 6 | Add lines 1 through 5 | | 0. | 10 | Income - line 6 less line 9 ...................... | | 0. |

### Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books

| 1 | Balance at beginning of year | -93,098. | 5 | Distributions: a Cash | | |
|---|---|---|---|---|---|---|
| 2 | Net income (loss) per books | -995. | | b Stock | | |
| 3 | Other increases (itemize): | | | c Property | | |
| | | | 6 | Other decreases (itemize): | | |
| | | | 7 | Add lines 5 and 6 | | |
| 4 | Add lines 1, 2, and 3 | -94,093. | 8 | Balance at end of year (line 4 less line 7) | | -94,093. |

For Paperwork Reduction Act Notice, see the instructions for Form 1120-F.<br>LHA   313991 12-28-22                                    Schedules M-1 and M-2 (Form 1120-F) 2023

10

Form **8810**

Department of the Treasury
Internal Revenue Service

**Corporate Passive Activity Loss and Credit Limitations**

Attach to your tax return (personal service and closely held corporations only).
Go to www.irs.gov/Form8810 for instructions and the latest information.

OMB No. 1545-0123

**2023**

| Name | Employer identification number |
|---|---|
| Viormar Trading Corporation N.V. | 59-1878157 |

| Part I | **2023 Passive Activity Loss** |
|---|---|

Caution: See the instructions and complete Worksheets 1 and 2 before completing Part I.

| | | | | |
|---|---|---|---|---|
| 1 a | Current year income (from Worksheet 2, column (a)) | **1a** | 50,600. | |
| b | Current year deductions and losses (from Worksheet 2, column (b)) | **1b** | ( 51,595.) | |
| c | Prior year unallowed losses (from Worksheet 2, column (c)) | **1c** | ( ) | |
| d | Combine lines 1a, 1b, and 1c. If the result is net income or zero, see instructions | | **1d** | -995. |
| 2 | Closely held corporations enter net active income and see instructions. Personal service corporations enter -0- on this line    See Statement 6 | | **2** | 0. |
| 3 | Unallowed passive activity deductions and losses.  Combine lines 1d and 2. If the result is net income or zero, see the instructions for lines 1d and 3. Otherwise, go to line 4 | | **3** | -995. |
| 4 | Total deductions and losses allowed.  Add the income, if any, on lines 1a and 2 and enter the result (see instructions) | | **4** | 50,600. |

| Part II | **2023 Passive Activity Credits** |
|---|---|

Caution: See the instructions and complete Worksheet 5 before completing Part II.

| | | | | |
|---|---|---|---|---|
| 5 a | Current year credits (from Worksheet 5, column (a)) | **5a** | | |
| b | Prior year unallowed credits (from Worksheet 5, column (b)) | **5b** | | |
| 6 | Add lines 5a and 5b | | **6** | |
| 7 | Enter the tax attributable to net passive income and net active income. See instructions | | **7** | |
| 8 | Unallowed passive activity credit. Subtract line 7 from line 6. If the result is zero or less, enter -0- | | **8** | |
| 9 | Allowed passive activity credit. Subtract line 8 from line 6. See instructions | | **9** | |

| Part III | **Election To Increase Basis of Credit Property** |
|---|---|

| | | |
|---|---|---|
| 10 | If the corporation disposed of its entire interest in a passive activity or former passive activity in a fully taxable transaction, and the corporation elects to increase the basis of credit property used in that activity by the unallowed credit that reduced the property's basis, check this box. See instructions | ☐ |
| 11 | Name of passive activity disposed of: | |
| 12 | Description of the credit property for which the election is being made: | |
| 13 | Amount of unallowed credit that reduced the property's basis | $ |

For Paperwork Reduction Act Notice, see separate instructions.

Form **8810** (2023)

LHA    319891
11-30-23

11

15340738 160886 VIORMAR TRADING        2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

**Form 8810 Worksheet 1 - Computation of Income, Gains, Deductions, and Losses for Worksheet 2**

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|---|---|---|

Name of Activity

**A** WAREHOUSE RENTAL
**B**
**C**
**D**

| | | Activities | | |
|---|---|---|---|---|
| | A | B | C | D |
| 1. Gross receipts | 50,600. | | | |
| 2. Schedule D Gains: | | | | |
| Long-term capital gains | | | | |
| Short-term capital gains | | | | |
| 3. Form 4797 Gains: | | | | |
| 1231 gains | | | | |
| Ordinary gains | | | | |
| 4. Other passive income | | | | |
| 5. Total Income. Add lines 1 through 4 and enter the result in column (a) of Worksheet 2 | 50,600. | | | |
| 6. Current Year Deductions: | | | | |
| a. Cost of goods sold | | | | |
| b. Compensation of officers | | | | |
| c. Salaries and wages | | | | |
| d. Repairs and maintenance | 14,448. | | | |
| e. Bad debts | | | | |
| f. Rents | | | | |
| g. Taxes and licenses | 26,525. | | | |
| h. Interest | | | | |
| i. Depreciation | | | | |
| j. Depletion | | | | |
| k. Advertising | | | | |
| l. Other deductions | 10,622. | | | |
| 7. Total Deductions. Add lines 6a through 6l | 51,595. | | | |
| 8. Schedule D losses | | | | |
| Long-term losses | | | | |
| Short-term losses | | | | |
| 9. Form 4797 losses | | | | |
| 1231 losses | | | | |
| Ordinary losses | | | | |
| 10. Current year deductions and losses. Add lines 7 through 9 and enter the result here and in column (b) of Worksheet 2 | 51,595. | | | |
| 11. Prior year carryovers | | | | |
| 12. Net gain/loss (line 5 less lines 10 and 11) | -995. | | | |

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|---|---|---|

**Worksheet 2 for Form 8810, Lines 1a, 1b, and 1c**

| Name of Activity | Current Year | | Prior Year | Overall Gain or Loss | |
|---|---|---|---|---|---|
| | (a) Income (line 1a) | (b) Deductions and Losses (line 1b) | (c) Unallowed Loss (line 1c) | (d) Gain | (e) Loss |
| WAREHOUSE RENTAL | 50,600. | 51,595. | | | 995. |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals. Enter on lines 1a, 1b, and 1c of Form 8810 | 50,600. | 51,595. | | | |

| Name | Viormar Trading Corporation N.V. | | | 59-1878157 |

**Worksheet 3 - Allocation of Unallowed Deductions and Losses**

| Name of Activity | (a) Loss from Worksheet 2 col. (e) | (b) Ratio | (c) Unallowed Deductions and Losses |
|---|---|---|---|
| WAREHOUSE RENTAL | 995. | 1 | 995. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Totals | 995. | 1.00000 | 995. |

310761
04-01-23

14

| Name | Viormar Trading Corporation N.V. | 59-1878157 |
|---|---|---|

## Worksheet 4 - Allowed Deductions and Losses

**Name of Activity:** WAREHOUSE RENTAL

| | (a) Deductions and Losses | (b) Ratio | (c) Unallowed Deductions and Losses | (d) Allowed Deductions and Losses |
|---|---|---|---|---|
| 1. Form 1120 deductions: | | | | |
| a. Cost of goods sold | | | | |
| b. Compensation of officers | | | | |
| c. Salaries and wages | | | | |
| d. Repairs and maintenance | 14,448. | .280027 | 279. | 14,169. |
| e. Bad debts | | | | |
| f. Rents | | | | |
| g. Taxes and licenses | 26,525. | .514100 | 511. | 26,014. |
| h. Interest | | | | |
| i. Depreciation | | | | |
| j. Depletion | | | | |
| k. Advertising | | | | |
| l. Other deductions | 10,622. | .205873 | 205. | 10,417. |
| Total Form 1120 deductions | 51,595. | 1 | 995. | 50,600. |
| 2. Schedule D losses: | | | | |
| Long-term losses | | | | |
| Short-term losses | | | | |
| 3. Form 4797 losses: | | | | |
| 1231 losses | | | | |
| Ordinary losses | | | | |
| 4. Total deductions and losses | 51,595. | | 995. | 50,600. |

**Name of Activity:** Summary of Passive Activities

| | (a) Deductions and Losses | (b) Ratio | (c) Unallowed Deductions and Losses | (d) Allowed Deductions and Losses |
|---|---|---|---|---|
| 1. Form 1120 deductions: | | | | |
| a. Cost of goods sold | | | | |
| b. Compensation of officers | | | | |
| c. Salaries and wages | | | | |
| d. Repairs and maintenance | 14,448. | | 279. | 14,169. |
| e. Bad debts | | | | |
| f. Rents | | | | |
| g. Taxes and licenses | 26,525. | | 511. | 26,014. |
| h. Interest | | | | |
| i. Depreciation | | | | |
| j. Depletion | | | | |
| k. Advertising | | | | |
| l. Other deductions | 10,622. | | 205. | 10,417. |
| Total Form 1120 deductions | 51,595. | | 995. | 50,600. |
| 2. Schedule D losses: | | | | |
| Long-term losses | | | | |
| Short-term losses | | | | |
| 3. Form 4797 losses: | | | | |
| 1231 losses | | | | |
| Ordinary losses | | | . | |
| 4. Total deductions and losses | 51,595. | | 995. | 50,600. |

2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Viormar Trading Corporation N.V.                          59-1878157

## RECONCILIATION OF TAXABLE INCOME AND
## PASSIVE LOSS ADJUSTMENTS

| DESCRIPTION | ORIGINAL AMOUNTS | DISALLOWED PASSIVE LOSS | OTHER INCOME LIMITATION ADJUSTMENTS CAUSED BY DISALLOWED PASSIVE LOSSES | TAXABLE INCOME AFTER ADJUSTMENTS |
|---|---|---|---|---|
| 1 GROSS RECEIPTS | | | | |
| 2 COST OF GOODS SOLD | | | | |
| 3 GROSS PROFIT, LINE 1 LESS LINE 2 | | | | |
| 4 DIVIDENDS | | | | |
| 5 INTEREST | | | | |
| 6 GROSS RENTS | 50,600. | | | 50,600. |
| 7 GROSS ROYALTIES | | | | |
| 8 CAPITAL GAIN | | | | |
| 9 ORDINARY GAIN (LOSS) | | | | |
| 10 OTHER INCOME | | | | |
| 11 TOTAL INCOME | 50,600. | | | 50,600. |
| 12 OFFICERS' COMPENSATION | | | | |
| 13 SALARIES & WAGES | | | | |
| 14 REPAIRS AND MAINTENANCE | 14,448. | 279. | | 14,169. |
| 15 BAD DEBTS | | | | |
| 16 RENTS | | | | |
| 17 TAXES & LICENSES | 26,525. | 511. | | 26,014. |
| 18 INTEREST | | | | |
| 19 CONTRIBUTIONS | | | | |
| 20 & 21 DEPRECIATION | | | | |
| 22 DEPLETION | | | | |
| 23 ADVERTISING | | | | |
| 24 PENSION, PROFIT-SHARING | | | | |
| 25 EMPLOYEE BENEFIT PROGRAM | | | | |
| 26 OTHER DEDUCTIONS | 10,622. | 205. | | 10,417. |
| 27 TOTAL DEDUCTIONS | 51,595. | 995. | | 50,600. |
| 28 TAXABLE INCOME BEFORE NOL & SPECIAL DEDUCTION | -995. | 995. | | |

5240729 160886 VIORMAR TRADING          2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

Name: **Viormar Trading Corporation N.V.**     I.D. Number **59-1878157**

## Income (Loss) From Other Rental Activities

**1**   Show the kind and location of each rental property.

**A**   WAREHOUSE RENTAL
7884 NW 55TH STREET, MIAMI, FL 33166

**B**

**C**

**D**

| Rental Income | | Properties | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| **2** Gross rents | **2** | 50,600. | | | |
| **Rental Expenses** | | | | | |
| **3** Advertising | **3** | | | | |
| **4** Auto and travel | **4** | | | | |
| **5** Cleaning and maintenance | **5** | | | | |
| **6** Commissions | **6** | | | | |
| **7** Insurance | **7** | 316. | | | |
| **8** Legal and other professional fees | **8** | | | | |
| **9** Interest | **9** | | | | |
| **10** Repairs | **10** | 14,448. | | | |
| **11** Taxes | **11** | 26,525. | | | |
| **12** Utilities | **12** | 10,306. | | | |
| **13** Wages and salaries | **13** | | | | |
| **14** Depreciation | **14** | | | | |
| **15** Other (list) ▶ | **15** | | | | |
| **16** Total expenses for each property. Add lines 3 through 15 | **16** | 51,595. | | | |

| | | | |
|---|---|---|---|
| **17** Total gross rents. Add gross rents from line 2, columns A through D | **17** | | 50,600. |
| **18** Total expenses. Add total expenses from line 16, columns A through D | **18** | | 51,595. |
| **19** Net gain (loss) from Form 4797, Part II, line 17, from disposition of property from other rental activities | **19** | | |
| **20** Net income (loss) from other rental(s) | **20** | | -995. |

311111
04-01-23

**17**

Viormar Trading Corporation N.V.                                      59-1878157

| Form 1120-F | Taxes and Licenses | Statement 1 |

| Description | Amount |
|---|---|
| Allowed Passive Taxes | 26,014. |
| Total to Form 1120-F, Page 4, line 17 | 26,014. |

| Form 1120-F | Other Deductions | Statement 2 |

| Description | Amount |
|---|---|
| Allowed Passive Activity Losses | 10,417. |
| Total to Form 1120-F, Page 4, line 27 | 10,417. |

| | Net Operating Loss Deduction | | | Statement 3 |

| Tax Year | Loss Sustained | Loss Previously Applied | Loss Remaining | Available This Year |
|---|---|---|---|---|
| 12/31/19 | 139,600. | 37,669. | 101,931. | 101,931. |
| 12/31/20 | | | 0. | 0. |
| 12/31/21 | | | 0. | 0. |
| 12/31/22 | | | 0. | 0. |
| NOL Available This Year | | | 101,931. | 101,931. |

| Form 1120-F | Mortgages, Notes, Bonds Payable in Less Than 1 Year: Third-Party Liabilities | Statement 4 |

| Description | Beginning of Tax Year | End of Tax Year |
|---|---|---|
| Loan for Fersom roof repair | 0. | 14,448. |
| Total to Form 1120-F, Schedule L, line 19b | 0. | 14,448. |

Viormar Trading Corporation N.V.                                    59-1878157

| Schedule M-1 | Other Expenses Recorded on Books not Deducted in this Return | Statement 5 |
|---|---|---|

| Description | Amount |
|---|---|
| Passive Activity Loss Adjustment | 995. |
| Total to Schedule M-1, Line 5 | 995. |

Viormar Trading Corporation N.V.

59-1878157

| Form 8810 | Net Active Income | | Statement 6 |
|---|---|---|---|
| | Before Passive Limitations | Passive and Portfolio | Net Active Income |
| Gross receipts . . . . . . . . | | | |
| Less: COGS (without depr) . . | | | |
| Gross rents and royalties . . | 50,600 | 50,600 | |
| Ordinary gain (loss) . . . . . | | | |
| 1231 gain (loss) . . . . . . . | | | |
| Other Income . . . . . . . . | | | |
| Other adjustments . . . . . . | | | |
| Total income . . . . . . . . . | 50,600 | 50,600 | |
| Compensation of officers . . . | | | |
| Salaries & wages less credits. | | | |
| Repairs and maintenance . . . | 14,448 | 14,448 | |
| Bad debts . . . . . . . . . . | | | |
| Rents . . . . . . . . . . . | | | |
| Taxes and Licenses . . . . . . | 26,525 | 26,525 | |
| Interest . . . . . . . . . . . | | | |
| Depreciation without Sec. 179 (includes all depr. types) | | | |
| Depletion . . . . . . . . . . | | | |
| Advertising . . . . . . . . . | | | |
| Pension, profit sharing plans. | | | |
| Employee benefit programs . . | | | |
| Other deductions (less depr.) | 10,622 | 10,622 | |
| Other adjustments . . . . . | | | |
| Total deductions . . . . . . | 51,595 | 51,595 | |

1) Income before contributions and section 179 deductions . .
2) Total non-passive/non-portfolio sec. 179
3) Preliminary sec. 179 deduction (Lesser of line 1 or 2) . .

4) Income after preliminary section 179 deduction . . . . . .
5) Less total net operating loss carryover available. . . . .          101,931

6) Income for preliminary charitable contribution limit . . .
7) 10% of line 6 - preliminary limit . . . .
8) Total contributions available . . . . . .
9) Preliminary contributions (lesser of line 7 or line 8) . .

10) Net Active Income before final section 179
    and DPAD (line 1 less line 9) . . . . . . . . . . . . .
11) Final section 179 deduction (Lesser of line 10 or line 2)

12) Net Active Income before final charitable contributions
    and DPAD (line 1 less lines 5 and 11) . . . . . . . . .          -101,931
13) Final contributions (lesser of line 8 or 10% of line 12)

14) Net Active Income before DPAD . . . . . . . . . . . . . .          -101,931
15) DPAD after limitations . . . . . . . . . . . . . . . . .

16) Net Active Income . . . . . . . . . . . . . . . . . . . .          -101,931

Viormar Trading Corporation N.V.

59-1878157

2023 04010 VIORMAR TRADING CORPORATI VIORMAR1



**Florida Corporate Income/Franchise Tax Return**

**1019**
F-1120, R. 01/24
Rule 12C-1.051
Florida Administrative Code
Effective 01/24
Page 1 of 6

FEIN  59-1878157
For calendar year 2023   JAN 1   , 2023 ending   DEC 31, 2023

843302023123100020050373359187815700000

| | |
|---|---|
| **Name** | Viormar Trading Corporation N.V. |
| **Address** | 439 STILL FOREST TER |
| **City/State/ZIP** | Sanford, FL   32778 |

☐ Check here if any changes have been made to name or address

**Computation of Florida Net Income Tax**

1. Federal taxable income (see instructions) - Attach pages 1-5 of federal return   Check here if negative  ___ .......   **0.00**
2. State income taxes deducted in computing federal taxable income
   (attach schedule) ..............................................   Check here if negative  ___ .......
3. Additions to federal taxable income (from Schedule I) .................   Check here if negative  ___ .......
4. Total of Lines 1, 2 and 3 ...............................................   Check here if negative  ___ .......   **0.00**
5. Subtractions from federal taxable income (from Schedule II) .............   Check here if negative  ___ .......
6. Adjusted federal income (Line 4 minus Line 5) .........................   Check here if negative  ___ .......
7. Florida portion of adjusted federal income (see instructions) ...........   Check here if negative  ___ .......   **0.00**
8. Nonbusiness income allocated to Florida (from Schedule R) ............   Check here if negative  ___ .......
9. Florida exemption .........................................................................   **0.00**
10. Florida net income (Line 7 plus Line 8 minus Line 9) .........................................   **0.00**
11. Tax due: 5.5% of Line 10 ...............................................................................   **0.00**
12. Credits against the tax (from Schedule V) ...........................................................
13. Total corporate income/franchise tax due (Line 11 minus Line 12) ..........................   **0.00**
14. a) Penalty: F-2220 _____   b) Other _____
    c) Interest: F-2220 _____   d) Other _____   Line 14 Total ▶  ...............
15. Total of Lines 13 and 14 ................................................................................
16. Payment credits: Estimated tax payments  16a  $ _____
    Tentative tax payment   16b  $ _____
17. Total amount due: Subtract Line 16 from Line 15. If positive, enter amount due here and on payment coupon.
    If the amount is negative (overpayment), enter on Line 18 and/or Line 19 ..........................
18. Credit: Enter amount of overpayment credited to next year's estimated tax here and on payment coupon ..............
19. Refund: Enter amount of overpayment to be refunded here and on payment coupon ..........................................

344081 11-28-23

---

## Payment Coupon for Florida Corporate Income Tax Return

**1019**
F-1120
R. 01/24

**Do Not Detach**   YEAR ENDING  12/31/23

To ensure proper credit to your account, enclose your check with tax return when mailing.

| | |
|---|---|
| **Name** | Viormar Trading Corporation N |
| **Address** | 439 STILL FOREST TER |
| **City/State/ZIP** | Sanford, FL   32778 |

If 6/30 year end, return is due 1st day of the 4th month after the close of the taxable year, otherwise return is due 1st day of the 5th month after the close of the taxable year.

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 0 |
| 20230101 | 0 | 0 | 0 |
| 20231231 | 0 | 0 | 0 |
| 00000000 | 0.000000 | 0 | 0 |
| 004 | 0 | 0 | 0 |
| 202 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

0

8433 0 20231231 0002005037 3 3591878157 0000 0



**Viormar Trading Corporation N.V.**

1019
F-1120
R. 01/24
Page 2 of 6

FEIN    59-1878157

---

**This return is considered incomplete unless a copy of the federal return is attached.**

If your return is not signed, or improperly signed and verified, it will be subject to a penalty. The statute of limitations will not start until your return is properly signed and verified. Your return must be completed in its entirety.

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Sign here ▶ | Signature of officer (must be an original signature)    Date | Title ▶ Managing Director |
|---|---|---|

| Paid preparers only | Preparer's signature ▶ | Date 07/29/24 | Preparer check if self-employed | Preparer's PTIN ▶ P01496734 |
|---|---|---|---|---|

| | Firm's name (or yours if self-employed) and address | MAGNO & ASSOCIATES, PL<br>1200 BRICKELL AVE STE 1220<br>MIAMI, FL 3 | FEIN ▶ 20-2323418 |
|---|---|---|---|
| | | | ZIP ▶ 331313255 |

---

**All Taxpayers Must Answer Questions A through L Below - See Instructions**

A. State of incorporation: _____

B. Florida Secretary of State document number: _____

C. Florida consolidated return?   YES ☐   NO ☒

D. ☐ Initial return   ☐ Final return (final federal return filed)

E. Principal Business Activity Code (as pertains to Florida)

   531120

F. A Florida extension of time was timely filed?   YES ☐   NO ☒

G-1. Corporation is a member of a controlled group?   YES ☐   NO ☐   If yes, attach list.

G-2. Part of a federal consolidated return?   YES ☐   NO ☒   If yes, provide:

   FEIN from federal consolidated return: _____

   Name of corporation: _____

G-3. The federal common parent has sales, property, or payroll in Florida?   YES ☐   NO ☒

H. Location of corporate books: Schottegatweg Oost 10 Unit A1K

   City, State, ZIP: SANFORD, FL 32771

I. Taxpayer is a member of a Florida partnership or joint venture?   YES ☐   NO ☒

J. Enter date of latest IRS audit: _____

   a) List years examined: _____

K. Contact person concerning this return: Corpag Services (Cur

   a) Contact person telephone number: +599 9 736 4500

   b) Contact person e-mail address: orlandofernandezs@yah

L. Type of federal return filed   ☐ 1120   ☐ 1120S or   1120F

---

## Remember:

↳ **Make your check payable to the Florida Department of Revenue.**

↳ **Write your FEIN on your check.**

↳ **Sign your check and return.**

↳ **Attach a copy of your federal return.**

↳ **Attach a copy of your Florida Form F-7004 (extension of time) if applicable.**

**If Filing Paper Return**
**Where to Send Payments and Returns**

Make check payable to and mail with return to:

   Florida Department of Revenue
   5050 W Tennessee Street
   Tallahassee FL 32399-0135

If you are requesting a refund (Line 19), send your return to:

   Florida Department of Revenue
   PO Box 6440
   Tallahassee FL 32314-6440



1019
F-1120
R. 01/24
Page 3 of 6

NAME __Viormar Trading Corporation N.V.__   FEIN __59-1878157__   TAXABLE YEAR ENDING __12/31/23__

## Schedule I - Additions and/or Adjustments to Federal Taxable Income

| | | |
|---|---|---|
| 1. | Interest excluded from federal taxable income (see instructions) | 1. |
| 2. | Undistributed net long-term capital gains (see instructions) | 2. |
| 3. | Net operating loss deduction (attach schedule) | 3. |
| 4. | Net capital loss carryover (attach schedule) | 4. |
| 5. | Excess charitable contribution carryover (attach schedule) | 5. |
| 6. | Employee benefit plan contribution carryover (attach schedule) | 6. |
| 7. | Enterprise zone jobs credit (Florida Form F-1156Z) | 7. |
| 8. | Ad valorem taxes allowable as an enterprise zone property tax credit (Florida Form F-1158Z) | 8. |
| 9. | Guaranty association assessment(s) credit | 9. |
| 10. | Rural and/or urban high-crime area job tax credits | 10. |
| 11. | State housing tax credit | 11. |
| 12. | Florida tax credit scholarship program credit (credit for contributions to nonprofit scholarship-funding organizations) | 12. |
| 13. | New worlds reading initiative credit | 13. |
| 14. | Strong families tax credit (credit for contributions to eligible charitable organizations) | 14. |
| 15. | Live local program credit | 15. |
| 16. | New markets tax credit | 16. |
| 17. | Entertainment industry tax credit | 17. |
| 18. | Research and development tax credit | 18. |
| 19. | Experiential learning tax credit program | 19. |
| 20. | Credit for qualified railroad reconstruction or replacement expenditures | 20. |
| 21. | Credit for manufacturing of human breast milk derived human milk fortifiers | 21. |
| 22. | s. 168(k), IRC, special bonus depreciation | 22. |
| 23. | Depreciation of qualified improvement property (see instructions) | 23. |
| 24. | Expenses for business meals provided by a restaurant (see instructions) | 24. |
| 25. | Film, television, and live theatrical production expenses (see instructions) | 25. |
| 26. | Other additions (attach schedule) | 26. |
| 27. | Total Lines 1 through 26. Enter total on this line and on Page 1, Line 3. | 27. |

## Schedule II - Subtractions from Federal Taxable Income

| | | |
|---|---|---|
| 1. | Gross foreign source income less attributable expenses | |
| | (a) Enter s. 78, IRC, income         $ | |
| | (b) plus s. 862, IRC, dividends      $ | |
| | (c) plus s. 951A, IRC, income        $ | 1. |
| | (d) less direct and indirect expenses and related amounts deducted under s. 250, IRC         $          Total ▶ | |
| 2. | Gross subpart F income less attributable expenses | |
| | (a) Enter s. 951, IRC, subpart F income   $ | |
| | (b) less direct and indirect expenses    $          Total ▶ | 2. |

Note: Taxpayers doing business outside Florida enter zero on Lines 3 through 6, and complete Schedule IV.

| | | |
|---|---|---|
| 3. | Florida net operating loss carryover deduction (see instructions)      **Statement 1** | 3. |
| 4. | Florida net capital loss carryover deduction (see instructions) | 4. |
| 5. | Florida excess charitable contribution carryover (see instructions) | 5. |
| 6. | Florida employee benefit plan contribution carryover (see instructions) | 6. |
| 7. | Nonbusiness income (from Schedule R, Line 3) | 7. |
| 8. | Eligible net income of an international banking facility (see instructions) | 8. |
| 9. | s. 168(k), IRC, special bonus depreciation (see instructions) | 9. |
| 10. | Depreciation of qualified improvement property (see instructions) | 10. |
| 11. | Film, television, and live theatrical production expenses (see instructions) | 11. |
| 12. | Other subtractions (attach schedule) | 12. |
| 13. | Total Lines 1 through 12. Enter total on this line and on Page 1, Line 5. | 13. |

344091 10-31-23

3

15240720 160896 VIORMAR TRADING          2023 04010 VIORMAR TRADING CORPORATT VIORMAR1



1019
F-1120
R. 01/24
Page 4 of 6

NAME **Viormar Trading Corporation N.V.**   FEIN **59-1878157**   TAXABLE YEAR ENDING **12/31/23**

## Schedule III - Apportionment of Adjusted Federal Income

**III-A  For use by taxpayers doing business outside Florida, except those providing insurance or transportation services.**

| | (a) WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) | (c) Col. (a) ÷ Col. (b) Rounded to Six Decimal Places | (d) Weight If any factor in Column (b) is zero, see note on Pg 9 of the instructions. | (e) Weighted Factors Rounded to Six Decimal Places |
|---|---|---|---|---|---|
| 1. Property (Schedule III-B below) | | | | X 25% or | |
| 2. Payroll | | | | X 25% or | |
| 3. Sales (Schedule III-C below) | | | | X 50% or | |
| 4. Apportionment fraction (Sum of Lines 1, 2, and 3, Column (e). Enter here and on Schedule IV, Line 2. | | | | | |

**III-B  For use in computing average value of property (use original cost).**

| | WITHIN FLORIDA | | TOTAL EVERYWHERE | |
|---|---|---|---|---|
| | a. Beginning of year | b. End of year | c. Beginning of year | d. End of year |
| 1. Inventories of raw material, work in process, finished goods | | | | |
| 2. Buildings and other depreciable assets | | | | |
| 3. Land owned | | | | |
| 4. Other tangible and intangible (financial org. only) assets (attach schedule) | | | | |
| 5. Total (Lines 1 through 4) | | | | |

6. Average value of property
  a. Add Line 5, Columns (a) and (b) and divide by 2 (for within Florida) ...... 6a. _____
  b. Add Line 5, Columns (c) and (d) and divide by 2 (for total everywhere) ................ 6b. _____
7. Rented property (8 times net annual rent)
  a. Rented property in Florida ............... 7a. _____
  b. Rented property Everywhere .............................................. 7b. _____
8. Total (Lines 6 and 7). Enter on Line 1, Schedule III-A, Columns (a) and (b).
  a. Enter Lines 6 a. plus 7 a. and also enter on Schedule III-A, Line 1.
    Column (a) for total average property in Florida ............... 8a. _____
  b. Enter Lines 6 b. plus 7 b. and also enter on Schedule III-A, Line 1.
    Column (b) for total average property Everywhere ................ 8b. _____

| **III-C  Sales Factor** | | (a) TOTAL WITHIN FLORIDA (Numerator) | (b) TOTAL EVERYWHERE (Denominator) |
|---|---|---|---|
| | | **N/A** | **N/A** |
| 1. Sales (gross receipts) | | | |
| 2. Sales delivered or shipped to Florida purchasers | | | |
| 3. Other gross receipts (rents, royalties, interest, etc. when applicable) | | | |
| 4. TOTAL SALES (Enter on Schedule III-A, Line 3, Columns (a) and (b)) | | | |

| **III-D  Special Apportionment Fractions**  (see instructions) | (a) WITHIN FLORIDA | (b) TOTAL EVERYWHERE | (c) FLORIDA Fraction ([a] ÷ [b]) Rounded to Six Decimal Places |
|---|---|---|---|
| 1. Insurance companies (attach copy of Schedule T – Annual Report) | | | |
| 2. Transportation services | | | |

## Schedule IV - Computation of Florida Portion of Adjusted Federal Income

| | |
|---|---|
| 1. Apportionable adjusted federal income from Page 1, Line 6 | 1. |
| 2. Florida apportionment fraction (Schedule III-A, Line 4) | 2. |
| 3. Tentative apportioned adjusted federal income (multiply Line 1 by Line 2) | 3. |
| 4. Net operating loss carryover apportioned to Florida (attach schedule; see instructions) | 4. |
| 5. Net capital loss carryover apportioned to Florida (attach schedule; see instructions) | 5. |
| 6. Excess charitable contribution carryover apportioned to Florida (attach schedule; see instructions) | 6. |
| 7. Employee benefit plan contribution carryover apportioned to Florida (attach schedule; see instructions) | 7. |
| 8. Total carryovers apportioned to Florida (add Lines 4 through 7) | 8. |
| 9. Adjusted federal income apportioned to Florida (Line 3 less Line 8; see instructions) | 9. |

344092 10-31-23

4

2023 04010 VIORMAR TRADING CORPORATI VIORMAR1



1019
F-1120
R. 01/24
Page 5 of 6

NAME Viormar Trading Corporation N.V. _____ FEIN 59-1878157_ TAXABLE YEAR ENDING 12/31/23

## Schedule V - Credits Against the Corporate Income/Franchise Tax

| | | |
|---|---|---|
| 1. | Florida health maintenance organization consumer assistance assessment credit (attach assessment notice) | 1. |
| 2. | Capital investment tax credit (attach certification letter) | 2. |
| 3. | Enterprise zone jobs credit (from Florida Form F-1156Z attached) | 3. |
| 4. | Community contribution tax credit (attach certification letter) | 4. |
| 5. | Enterprise zone property tax credit (from Florida Form F-1158Z attached) | 5. |
| 6. | Rural job tax credit (attach certification letter) | 6. |
| 7. | Urban high-crime area job tax credit (attach certification letter) | 7. |
| 8. | Hazardous waste facility tax credit | 8. |
| 9. | Florida alternative minimum tax (AMT) credit | 9. |
| 10. | Contaminated site rehabilitation tax credit (voluntary cleanup tax credit) (attach tax credit certificate) | 10. |
| 11. | State housing tax credit (attach certification letter) | 11. |
| 12. | Florida tax credit scholarship program credit (credit for contributions to nonprofit scholarship-funding organizations) (attach certificate) | 12. |
| 13. | New worlds reading initiative credit (attach certificate) | 13. |
| 14. | Strong families tax credit (credit for contributions to eligible charitable organizations) (attach certificate) | 14. |
| 15. | Live local program credit (attach certificate) | 15. |
| 16. | New markets tax credit | 16. |
| 17. | Entertainment industry tax credit | 17. |
| 18. | Research and development tax credit | 18. |
| 19. | Experiential learning tax credit | 19. |
| 20. | Credit for qualified railroad reconstruction or replacement expenditures | 20. |
| 21. | Credit for manufacturing of human breast milk derived human milk fortifiers | 21. |
| 22. | Other credits (attach schedule) | 22. |
| 23. | Total credits against the tax (sum of Lines 1 through 22 not to exceed the amount on Page 1, Line 11). Enter total credits on Page 1, Line 12 | 23. |

## Schedule R - Nonbusiness Income

**Line 1.  Nonbusiness income (loss) allocated to Florida**

Type                                                                                          Amount

Total allocated to Florida ............................................................. 1. _____
(Enter here and on Page 1, Line 8)

**Line 2.  Nonbusiness income (loss) allocated elsewhere**

Type                                        State/country allocated to                        Amount

Total allocated elsewhere ............................................................. 2. _____

**Line 3.  Total nonbusiness income**
Grand total. Total of Lines 1 and 2 ............................................. 3. _____
(Enter here and on Schedule II, Line 7)

344093  10-31-23

5



**1019**
F-1120
R. 01/24
Page 6 of 6

NAME **Viormar Trading Corporation N.V.**    FEIN **59-1878157**    TAXABLE YEAR ENDING **12/31/23**

### Estimated Tax Worksheet
### For Taxable Years Beginning On or After January 1, 2024

| | | | |
|---|---|---|---|
| 1. | Florida income expected in taxable year ............................................................ | 1. | $ _____ |
| 2. | Florida exemption $50,000 (Members of a controlled group, see instructions on Page 14 of Florida Form F-1120N) ........................................................... | 2. | $ _____ |
| 3. | Estimated Florida net income (Line 1 less Line 2) ............................................. | 3. | $ _____ |
| 4. | Total Estimated Florida tax (5.5% of Line 3) ............... $ _____ | | |
| | Less: Credits against the tax .................................... $ _____ | 4. | $ _____ |

5. Computation of installments:

| Payment due dates and payment amounts: | If 6/30 year end, last day of 4th month, otherwise last day of 5th month - Enter 0.25 of Line 4 ....................... 5a. | _____ |
|---|---|---|
| | Last day of 6th month - Enter 0.25 of Line 4 ................................. 5b. | _____ |
| | Last day of 9th month - Enter 0.25 of Line 4 ................................. 5c. | _____ |
| | Last day of fiscal year - Enter 0.25 of Line 4 ................................ 5d. | _____ |

NOTE: If your estimated tax should change during the year, you may use the amended computation below to determine the amended amounts to be entered on the declaration (Florida Form F-1120ES).

| | | | |
|---|---|---|---|
| 1. | Amended estimated tax ............................................................................... | 1. | $ _____ |
| 2. | Less: | | |
| | (a) Amount of overpayment from last year elected for credit to estimated tax and applied to date ............... 2a. – $ _____ | | |
| | (b) Payments made on estimated tax declaration (Florida Form F-1120ES)  2b. – $ _____ | | |
| | (c) Total of Lines 2(a) and 2(b) ...................................................... | 2c. | $ _____ |
| 3. | Unpaid balance (Line 1 less Line 2(c)) ........................................................ | 3. | $ _____ |
| 4. | Amount to be paid (Line 3 divided by number of remaining installments) ................ | 4. | $ _____ |

---

### References

*The following documents were mentioned in this form and are incorporated by reference in the rules indicated below.*
*The forms are available online at  floridarevenue.com/forms.*

| Form F-2220 | Underpayment of Estimated Tax on Florida Corporate Income/Franchise Tax | Rule 12C-1.051, F.A.C. |
|---|---|---|
| Form F-7004 | Florida Tentative Income/Franchise Tax Return and Application for Extension of Time to File Return | Rule 12C-1.051, F.A.C. |
| Form F-1120A | Florida Corporate Short Form Income Tax Return | Rule 12C-1.051, F.A.C. |
| Form F-1156Z | Florida Enterprise Zone Jobs Credit Certificate of Eligibility for Corporate Income Tax | Rule 12C-1.051, F.A.C. |
| Form F-1158Z | Enterprise Zone Property Tax Credit | Rule 12C-1.051, F.A.C. |
| Form F-1120N | Instructions for Corporate Income/Franchise Tax Return | Rule 12C-1.051, F.A.C. |
| Form F-1120ES | Declaration/Installment of Florida Estimated Income/Franchise Tax | Rule 12C-1.051, F.A.C. |

344094  10-31-23

15240720 160886 VIORMAR TRADING    2023.04010 VIORMAR TRADING CORPORATI VIORMAR1



Viormar Trading Corporation N.V.

1019
F-1120
R. 01/24

| FEIN | 59-1878157 | | |
|---|---|---|---|
| | | DATA Page 1 of 2 | |
| 591878157 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 00000000 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0.000000 |

344083 10-31-23

 Viormar Trading Corporation N.V.

1019
F-1120
R. 01/24

FEIN ___59-1878157_____

DATA Page 2 of 2

| | | | |
|---|---|---|---|
| 591878157 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0.000000 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |

Viormar Trading Corporation N.V.                                         59-1878157

| FL F-1120 | | Net Operating Loss Carryovers | | | Statement 1 |
|---|---|---|---|---|---|
| Year | Apportion Factor | Current Yr NOL/ Sec 382/ SRLY Limit | Net Operating Loss Carryover | Loss Previously Deducted | Net Loss Remaining |
| 2019 | .00000 | 0.00 | 139,600.00 | 40,183.00 | 99,417.00 |
| 2020 | .00000 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2021 | .00000 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2022 | .00000 | 0.00 | 0.00 | 0.00 | 0.00 |

Total Net Operating Loss Carryover Available                            99,417.00

Statement(s) 1

15240729 160886 VIORMAR TRADING          2023.04010 VIORMAR TRADING CORPORATI VIORMAR1

# EXHIBIT "D"



# CORINA

March 1, 2017

Re:    Sunrise Paradise Plaza –Assistant Property Manager

Dear Tenant:

This letter is to inform you that Mr. Dennis Aneiros has been contracted by our office to serve as assistant property manager. As such, Mr. Aneiros is authorized to collect the rent payments for Sunrise Paradise Plaza, among other responsibilities.

If you have any questions, please feel free to call me at 786.271.1883.

Sincerely,

Christina Fernandez
Property Manager