UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20772-GAYLES/LOUIS

DENNIS ANEIROS

     Plaintiff,

vs.

VIORMAR TRADING CORPORATION, N.V.,
AND ORLANDO A. FERNANDEZ,

     Defendants.

_____/

## DEFENDANTS' REPLY TO PLAINTIFF'S
## RESPONSE AND COUNTER MOTION FOR SUMMARY JUDGMENT

Defendants VIORMAR TRADING CORPORATION, N.V. ("VIORMAR") and ORLANDO A. FERNANDEZ ("Mr. Fernandez")(collectively, "Defendants") by and through its undersigned counsel, hereby files its response to Plaintiff's ("Plaintiff' or "Mr. Aneiros") Counter Motion for Summary Judgment and as grounds states:

**BRIEF IN OPPOSITION**

On December 20, 2024, Defendants submitted their Motion for Summary Judgment. See [ECF No. 33]. On January 3, 2024 Plaintiff submitted its Response and Counter Motion for Summary Judgment. See [ECF No. 34]. Plaintiff's Amended Complaint [ECF No. 13] raises three counts: FLSA Minimum Wage Violation(s)(Count I), Florida Minimum Wage Action Violations (Count II), Violation of the Trafficking Victims Protection Act (Count III).

Although Plaintiff's counter motion directs the Court to various exhibits to support their position, Plaintiff's motion fails to meet its burden because the exhibits alone are insufficient to demonstrate that no genuine dispute of material fact exists. Furthermore, Plaintiff's motion leaves the letters and text messages untranslated and paraphrases the deposition testimony to such an extent that the motion cannot be harmonized with the evidence it cites. For these reasons, the Court should not grant summary judgment in Plaintiff's favor because they have failed to establish that there is no genuine dispute of material fact with respect to Plaintiff's status as an employee.

**ARGUMENT**

**<u>INDEPENDENT CONTRACTOR v. EMPLOYEE</u>**

**I.      Plaintiff has failed to sufficiently establish his status as an employee**

Plaintiff's counter motion argues that Mr. Aneiros cannot be found qualified as an independent contractor due to the "expansiveness" of the FLSA's definition of "employer". However, the title of a laborer is not determined by the definitions section of the statute alone. The 11th Circuit has continually used the economic reality test found in *Nieman v. Nat'l claims Adjusters, Inc.*, 775 Fed. Appx. 622, 624 (11th Cir. 2019), which provides six factors to consider when determining whether a laborer is an employee or independent contractor, otherwise known as the *Scantland* factors. The six factors are as follows:

1) The nature and degree of the alleged employers control as to the manner in which the work is to be performed;

2) The alleged employee's opportunity for profit or loss depending upon his managerial skill

3) The alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) Whether the service rendered requires a special skill

5) The degree of permanency and duration of the working relationship

6) The extent to which the service rendered is an integral part of the alleged employer's business.

*Id*.

Plaintiff's counter motion, like Defendants motion for summary judgment, cites each of the six factors. However, Plaintiff's counter motion fails to flesh out the six factors in a manner that would permit the Court to construe the accompanying evidence in Plaintiff's favor.

### a. Plaintiff's citation to evidence is insufficient to establish Defendants degree of control.

Addressing the first Scantland factor, Plaintiff's counter motion argues "Defendant Fernandez has served as an officer/director of Viormar since 2012 (ECF No. 34 at ¶27), and regularly instructed Mr. Aneiros to perform maintenance and renovation work at the Viormar Warehouse according to Defendant Fernandez's specifications. (Id. at ¶¶43-45.)". Plaintiff is directing the court to its Statement of Material Facts where Plaintiff references a letter dated December 12, 2016 that designates Mr. Aneiros with the charge and care of maintaining the subject property. However, Plaintiff's motion fails to accompany this citation with any analysis as to how this letter establishes Plaintiff's status as an employee.

This letter alone does not qualify Mr. Aneiros as an employee for the same reason it doesn't qualify Mr. Aneiros as an independent contractor. "This inquiry is not governed by the "label" put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether "the work done, in its essence, follows the usual path of an employee." *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1311 (11th Cir. 2013)(quoting *Rutherford Food,* 331 U.S. at 729, 67 S.Ct. at 1476.). Unfortunately, Plaintiff does not provide the translation of the letter to the Court. The letter can be translated as follows:

3

> *Dear sirs,*
>
> *Through this note we inform you that Mr. Dennis Aneiro has been appointed in charge of the care, order and maintenance of the property NW 7870-7882 and 7884.*
>
> *I appreciate any help you can provide so that Mr. Aneiro can fulfill his assigned responsibilities.*
>
> *Without any other matter to refer to, I remain yours*
>
> *Sincerely,*
>
> *Orlando Fernandez*

Certainly, a property manager could be an employee hired by a company. But it can also be an independent contractor that performs these services. The exclusivity of the working relationship is relevant. If a worker is engaged exclusively with one employer, it suggests economic dependence and thus an employment relationship. *See Amponsah v. DirecTV, LLC*, 278 F.Supp.3d 1352 (2017). Conversely, if the worker performs similar work for multiple employers, it indicates a lack of economic dependence and supports independent contractor status. *See Hanson v. Trop, Inc.*, 167 F.Supp.3d 1324 (2016).

Defendants motion for summary judgment provides an extensive analysis and supporting evidence that shows that the parties did not have an exclusive working relationship.

**Q: Can you tell me, what are some of the side jobs you would do while you were at Viormar?**

A: Dishwashing, fixing of a door. I have a – I have a friend who's like – it – it would break down, something in his house, and I'd go fix it. So Ricky, the guy from across the street, he had a factory that made fishing rods. But he was older, so he would call me in to help him.

**Q: Can – can you tell me Ricky's full name?**

A: His name is Riano.

See **Exhibit "A"** Mr. Aneiros Deposition Transcript, 29:14-23.

The record evidence clearly shows that Mr. Aneiros was performing property maintenance for others while allegedly working at Viormar. Nevertheless, even if Plaintiff was working exclusively for Viormar in that capacity (which he wasn't) the letter is excluded from consideration by the simple fact that it is more than 8 years old.

The statute of limitations for an FLSA claim is two years after the cause of action accrued, but can be raised to three years if it is a willful violation.

> The Fair Labor Standards Act (FLSA) requires that a civil enforcement action be commenced within two years after the cause of action accrued, except that a cause of action arising out of a "willful" violation may be commenced within three years. In the Secretary of Labor's enforcement action based on respondent's alleged failure to pay overtime compensation required by the FLSA, the District Court rejected respondent's claim that the 2–year statute of limitations applied, finding the 3–year exception applicable under the standard of *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139,
> *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 128, 108 S. Ct. 1677, 1678, 100 L. Ed. 2d 115 (1988).

Even if the Court found that Defendants engaged in a willful violation, the letter would have to be dated sometime after April 9, 2021 to be actionable. As such, if Plaintiff is seeking to establish a degree of control, it cannot rely on letters that were sent 8 years ago.

Plaintiff's next attempt at establishing control is the contention that Mr. Fernandez "regularly instructed" Plaintiff to perform maintenance and renovation work, but this assertion also isn't accompanied by any sort of analysis. Plaintiff again directs the Court's attention to untranslated evidence. Plaintiff's evidence is a series of text messages regarding the purchase of lights. Plaintiff's motion states:

> **Defendant Fernandez' control over Mr. Aneiros maintenance/renovation duties is further exhibited through text messages exchanged between the two, wherein Fernandez directs Mr. Aneiros to install lights at the Viormar Warehouse that Fernandez purchased, and instructs him how to perform that work.**

See [ECF No. 34] Plaintiff's Response to Defendant's Motion for Summary Judgment and Counter Motion for Summary Judgment, Page 7, Control Over Work Performed, Paragraph 1.

The text messages do not reflect this. In an effort of complete transparency, Defendants have retained a third party to translate the messages that Plaintiff is using to support his counter motion. Unfortunately, it is unlikely that Defendants will be able to receive the full translation by the deadline so the following translations have been done using google translate to keep the translations neutral. Once Defendant receives the translations from the third party, it will upload them for the Court's review if needed. The text messages regarding the alleged instruction on how to install the lights are translated as follows:

**Mr. Fernandez:** Call me!!

**Mr. Fernandez:** They tried to deliver the skylights yesterday and you weren't there. They want to deliver today but I need to know if you'll be there to receive them. Call me soon.

**Plaintiff:** Yes, if you want, I can do it. But it doesn't have a solar panel, it only has a light sensor. It turns on when it's dark… and in the morning it turns off.

**Orlando:** It seems that they sent the wrong lights. When I can I will check what I bought. Try to (messages cuts off)

**Plaintiff:** Don't worry, I just sent it to you so you'd know. I'm installing them.

**Mr. Fernandez:** But the idea was not to have to make an electrical connection. Could you try with an unplugged lamp, just put it in the sun and see at night if it works?

As the Court can see, Plaintiff was never instructed to install the lights nor was he instructed on how to perform the installation. Mr. Fernandez did ask Plaintiff if he will be on the property to receive the delivery, but if anything that shows the lack of control Mr. Fernandez had over Plaintiff.

6

Mr. Fernandez doesn't even know when Plaintiff is on the property. What the messages do show is a conversation between two individuals who are completely confused as to whether or not the lights are electric or solar powered. If a landlord purchases lights and they are delivered to a tenant's unit, the landlord isn't the tenant's employer by asking the tenant to confirm if the lights are solar powered or electric. Plaintiff's motion fails to provide the Court with an analysis that shows that this was done in an employment capacity. Another apparent example of "control" Plaintiff raises is the posting of the Local Business Tax Receipt. Paragraph 51 of Plaintiff's Statement of Material Facts states,

> **In September 2023, Defendant Fernandez wrote a letter to Mr. Aneiros thanking and acknowledging him for forwarding Viormar's mail for several months, and asking Mr. Aneiros to post Viormar's Local Business Tax Receipt in a visible place inside of the Viormar Warehouse. (Ex. 10, Orlando Fernandez Dep., 74:13-76:26; Ex. 15, September 29, 2023 Letter from Orlando Fernandez to Aneiros.)**

The reality is the letter makes no mention of Plaintiff forwarding Viormar's mail for several months, the actual letter states:

> *Dear Denis,*
>
> *Thank you very much for sending me the correspondence.*
>
> *This card that I include in this envelope must remain in the Viormar office, in a visible place but inside the building.*
>
> *Thanks again,*
>
> *Orlando*

Again, Plaintiff's counter Motion directs the Court's attention to the exhibit and leaves the Court to connect the dots. Granted, Plaintiff's motion does also cite the deposition transcript of Mr. Fernandez, but these are choice cuts. The deposition citations fail to show that Mr. Aneiros has been forwarding Viormar's mail as a job requirement. In fact, the deposition transcript shows Mr. Fernandez saying that the forwarding of mail was not a responsibility of Plaintiff, but a favor:

**Q: Okay. So, if I'm understanding correctly, Mr. Aneiros received the mail for Viormar and then he would, he forwarded it to you in the mail. Is that correct?**
A: Yes, for a time.

**Q: And how long was Mr. Aneiros responsible for doing that?**
A: He was not responsible. He did that as a favor.
See Plaintiff's Exhibit 10, Orlando Fernandez Dep., 75:20-76:1-3

To be fully transparent with the court, Mr. Fernandez does say Mr. Aneiros had forwarded Viormar's mail to him for several months. *See* Plaintiff's Exhibit 10, Orlando Fernandez Dep., 76:4-11. However, there is no record evidence that this was done in an employment capacity. The reality is that Mr. Fernandez had no idea when Plaintiff was on the property and paragraph 14 of Plaintiff's Statement of Material facts concedes that Plaintiff never had a fixed work schedule. Moreover, the posting of the business tax receipt alone is not enough for a finding that Plaintiff is an employee. The sixth scantland factor considers whether the work performed is integral to the purpose of the business. While the posting of the business tax receipt  may be in VIORMAR'S best interest, this isolated act is not sufficient to establish Mr. Aneiros as an employee unless Plaintiff has shown that this was a job requirement and he has failed to do so.

Plaintiff provides no analysis as to how the posting of the tax receipt establishes control. If the Court looks at Plaintiff's counter motion, Plaintiff discusses the letter and then immediately

transitions to text messages that purportedly show Mr. Fernandez asking Plaintiff to remain on the property to receive a package. Plaintiff's counter motion makes a habit of citing evidence and asking the Court to connect the dots.

With respect to the assertion that Plaintiff was instructed to remain on the property, the translated messages paint an entirely different picture. The proper translation is as follows:

**Mr. Fernandez: "They want to deliver today but I need to know if you will be there to receive it. Call me soon."**

See Plaintiff's Exhibit 14, Page 33 of 66.

At this point it should be apparent to the Court that Plaintiff deliberately chose not to translate the text messages to English for the sole purpose of meeting the first factor under the economic realities test. It is extremely difficult to establish the degree of control necessary to establish a laborer as an employee when there are text messages from the alleged employer indicating that he has no clue whether or not the alleged employee is even at the property. Moreover, the text message do not show that Mr. Fernandez instructed Plaintiff to remain at the property to receive the package. Rather, Mr. Fernandez is making a simple inquiry as to whether Plaintiff will be on the property on the day of delivery. Again, in an effort of full transparency, there are messages relating to the package where Mr. Fernandez states "Call me!". However, even though that message may be a little more assertive, it still isn't enough for a finding that Plaintiff was an employee.

Plaintiff's next attempt to establish control is the assertion that Mr. Fernandez instructed Plaintiff to find commercial tenants to rent space in the Viormar Warehouse and to evict current tenants for failing to pay rent. Plaintiff also states that he was instructed to coordinate with contractors to perform work at the Viormar Warehouse. *See* [ECF No. 34] Plaintiff's Response

and Counter-Motion for Summary Judgment, Control Over Work Performed, Page 8, Paragraph 1. Again, Plaintiff provides no analysis and simply directs the Court's attention to its Statement of Material Facts which cites to Mr. Aneiro's Deposition Transcript, Plaintiff's Exhibit 1, 25:1-10, 43:22-44:11, 96:20-97:15, 116:2-12, and Page 46 of the Parties text messages, Plaintiff's Exhibit 14.

The text messages Plaintiff is directing the Court to is a single message from Plaintiff to Mr. Fernandez. The text message is translated as follows:

> I wanted to talk to you about a guy from a machine shop. He wants to rent you the whole warehouse. I told him it was 4000. More 4000.
>
> He thought it was a good idea. First I told him 5000 for each one. But he said yes to 4000. What do you think? About that. They are good people.

This message was sent by Mr. Aneiros, not Mr. Fernandez. The only thing this message shows is that Mr. Aneiros had a conversation with someone who may be interested in acquiring commercial property. Now, Plaintiff's motion clearly states that Mr. Fernandez instructed Plaintiff to find commercial tenants. If that is true, Plaintiff should be directing the Court's attention to messages that Mr. Fernandez has sent to Mr. Aneiros, not the other way around. The deposition citations Plaintiff references also do not provide a concrete example of Mr. Fernandez instructing Plaintiff to find commercial tenants.

**Q: Okay. Do you have any document that could support your assertion that Orlando asked you to find tenants?**

**The Interpreter:** That Orlando did what?

**Mr. Alvarez:** Asked him to find tenants.

**The Witness:** No. That's verbal

**Q: Okay. Are there any –**
**A:** That is what his father, who died, told me from the beginning.

**(25:1-10)**

**Q: Okay. So – all right. Let's stay with Jessy, and then I'll go to Carlos in a second. What is Jessy currently paying for rent?**
**A:** Jessy is no longer there. I got Jessy out of there.

**Q: Okay. How did you get Jessy out of there?**
**A:** With the letter that Orlando made and said that I was the manager of the building and required Jessy to move out.

**Q: And just to confirm: Jessy's Limousine was on Viormar property? There were a tenant of Viormar property?**
**A:** Yes.

**(43:22-44:11)**

**Q: So earlier in your deposition, you mentioned quite a few job duties that you were performing either for Viormar or for Orlando. And I just want to go through those. Okay. Other than – other than performing repairs to the building, finding new tenants to rent out the space, general maintenance of the warehouse, cleaning the warehouse and the parking lot, taking out trash –**

**THE INTERPRETER:** One second.

**Q: – and also evicting tenants from a warehouse and painting the warehouse, are there any other job duties that you can think of that you performed either for Viormar or for Orlando?**
**A:** At night – well, guard the property. Every time that the dog barked and I go outside, there would be a man out there.

**Q: Okay. And did you perform all of those job duties throughout the entire time that you were living on Viormar's property?**
**A:** yes. I still live there and I still do it.

**(96:20-97:15)**

**Q: Sorry, just wanted to make sure. Okay. So – yeah. You mentioned earlier, when you were being questioned by your counsel, that you evicted a tenant. Which tenant did you evict?**

**A:** Jessy Limo. That's what it's called.

**Q: Did you provide them with notice?**
A: Jorge Sandina [sic]. That's the owner. That's the owner of Jessy Limo.

**Q: Okay. Did you provide them with notice of their eviction?**
A: Yes. Correct.

**Q: Do you have a copy of that notice?**
A: The notice was me tell them that they had to leave.

**Q: Okay. So just to confirm, you never gave them written notice?**
A: No.
**(116:2-118)**

The above cited transcript is the entirety of what Plaintiff cites in support of their assertion that Mr. Fernandez instructed Plaintiff to find commercial tenants. When asked if Plaintiff was in possession of any document that reflects this requests, Plaintiff responds that it was done verbally. When asked if Plaintiff has a copy of the eviction notice, he also claims that it was done verbally. One would think the citation to the messages would provide some sort of evidence that Plaintiff was asked to do these things, but the message only shows Plaintiff telling Mr. Fernandez that he knows someone who may be interested in the property. This is not a sufficient showing of control.

**II. Plaintiff cannot establish that his opportunity of profit or loss was beyond his control**

The second *Scantland* factor is "the alleged employee's opportunity for profit or loss depending upon [her] managerial skill." *Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1325 (S.D. Fla. 2017)(quoting Scantland, 721 F.3d at 1312). The focus in applying this factor "should remain on the worker's contribution to managerial decision-making and investment relative to the company's." *Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1325 (S.D. Fla. 2017)(quoting McFeeley, 825 F.3d at 244 (emphasis in original)).

Plaintiff's counter motion does not focus on Mr. Aneiro's contribution to managerial decision-making and investment relative to Viormar's. Instead, Plaintiff focuses on the argument that "where a defendant-employer's risk of profit and loss far exceeds that of the plaintiff-employee, the defendant-employer is found to exercise significant control over the plaintiff's opportunity for profit, weighing 'strongly in favor of finding an employer-employee relationship." *Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1326 (S.D. Fla. 2017). If the case law is stating that the focus should remain on the workers contribution to managerial decision making and the workers investment, its peculiar that Plaintiff doesn't address it in his analysis.

In *Shaw*, the case involved exotic dancers who brought a putative class action suit against the club. The Defendant-employer in Shaw argued that the dancer's opportunity of loss was within their control because it depended on how often they came in to work, what they would wear, and the type of entertainment they would offer. The Court stated that the clubs have a greater degree of control over the dancers ability to gain profit because they are responsible for drawing in customers through marketing and service fees. *Id*. In short, the second factor is a different approach regarding the degree of control. Here, the degree of control is whether or not the dancers had the ability to profit from their own actions, or if they had to rely on the club to make profit.

Plaintiff's deposition testimony conclusively shows that his ability to earn was not hindered/dependent upon Defendants.

**Q: Okay. Were you an independent contractor for Jessy Limos?**
A: I would just come in as a friend, do the work, and he'd pay me.

**Q: Okay. Is that a similar relationship that you have with defendants?**
A: Yes. So since I met his father, it became like family.

See **Exhibit "A"** 11:18-25, Mr. Aneiro's Deposition Transcript.

**Q: So look – just for my own clarification purposes: Orlando allowed you to work any odd jobs that you needed to get paid otherwise?**

A: Yes.

See **Exhibit "A"** 28:24-25; 29:1; Mr. Aneiro's Deposition Transcript.

If Mr. Aneiros had a working relationship with Defendants (which he did not) this was not an exclusive working relationship. Mr. Aneiros has routinely made his living as an independent contractor and he continued to work as an independent contractor for others while squatting on VIOMAR's property.

### III. Plaintiff has shown insufficient evidence of Defendants Investment in Equipment or Materials

The third *Scantland* factor involves the purchase of equipment and materials that are necessary to complete the job. Independent contractors typically bring their own tools for the job and hire subcontractors or employees to assist them in completing the job. Plaintiff's counter motion again directs the Court to its Statement of Material Facts, particularly paragraphs 12, 45, 46, and 49. Paragraph 12 alleges that Mr. Fernandez purchased various tools and postage to assist Mr. Aneiros in his alleged maintenance and mailing duties. These assertions are supported by Plaintiff's citation to Mr. Aneiro's deposition transcript and Plaintiff's Exhibit 3 which contains pictures of the tools that were allegedly purchased by Mr. Fernandez.

Again, Plaintiff provides no supporting analysis stating how this evidence establishes Plaintiff's title as an employee. Exhibit 3 simply contains pictures of various tools. There are no attachments of receipts and Plaintiff does not cite any text messages showing Mr. Fernandez saying that he has purchased any tools for Plaintiff. In fact, in Plaintiff's depositions the purchase of tools seem to be tied to a company that is not a party to this suit–Vita Home Care Solutions.

**The WITNESS:** So during that time, Orlando Fernandez created this company called Vita Home Care Solutions. And then I started working with them, assembling and having

everything to do with that company. They bought saws, and tools, and equipment for me to work, working on the display, getting ready for the exhibition.

**Mr. Alvarez:** Okay. But hold on. That's for Vita Home Care Solutions, is what he's talking about now?

**THE WITNESS:** Yes.

**Mr. Alvarez:** Okay. So I don't – I don't mean to interrupt, but I want to focus on – on what – Viormar and what he's done for Viormar.

See **Exhibit "A"** 9:20-25; 10:1-8, Mr. Aneiro's Deposition Transcript.

The evidence does not support that Mr. Fernandez bought Plaintiff tools to perform work on behalf of VIORMAR. With respect to the postage, it has already been shown that Mr. Aneiros has stated that he was required to pay for the postage. Therefore, the third *Scantland* factor has not been met by Plaintiff.

### IV. Mr. Aneiro's alleged work did consist of specialized skills

The fourth *Scantland* factor looks to whether the services performed require a specialized skill. Plaintiff argues that "manual labor" is not a specialized skill, but this is a fairly reductionist view of the work Plaintiff claims to have performed. Mr. Aneiros has claimed to have done extensive demolition work and even performed work to bring the subject property into the 40 year recertification compliance. See Exhibit "A", 26:15-25; 27:1; 42:18-25; 43:1, Mr. Aneiros' Deposition Transcript. This is work that is typically performed by independent contractors, not employees and performing a 40 year recertification project typically requires a license that evidences a specialized skill. Plaintiff's argument that he doesn't have the licenses required by law to do this work does not mean that the work itself is not a specialized skill.

### V. Permanency/Duration

Plaintiff's counter motion does not have a fleshed out analysis of the permanency/duration requirement under the *Scantland* factors. Plaintiff cites *Artola*, 2015 U.S. Dist. LEXIS 130183, at *27, which states that the longer and more permanent working relationship weighs toward a finding that a laborer is an employee. However, it also states that a non-exclusive work relationship indicates that a laborer is an independent contractor. In the instant case, Plaintiff has been squatting on the property since 2010. It is indisputable that he can meet the duration prong, however, there is extensive testimony from Plaintiff that the working relationship was not exclusive.

### VI. Services Integral to the Employer's Business

Defendants concede that the final factor in the *Scantland* test is a genuine dispute of fact. The work Plaintiff claims to have done would be integral and related to Defendants business operation. However, as Defendant's motion states, the economic realities test does not require a showing that all six factors have been met for a finding that a laborer is an independent contractor. *Nieman v. Nat'l Claims Adjusters, Inc.*, 775 F. App'x 622, 623 (11th Cir. 2019). In *Nieman* the Court simply evaluated if more factors leaned toward independent contractor as opposed to employee. If this was the only factor needed for a finding that a laborer is an employee, then every high rise property manager that independently contracts an architect would be found liable as an employer under the FLSA. In the instant case, the vast majority of the factors lean toward a finding that Plaintiff is an independent contractor, at best. The reality is that Plaintiff is a squatter who would occasionally forward a couple of letters.

### <u>MR. FERNANDEZ CANNOT BE PLAINTIFF'S EMPLOYER</u>

### I.    Plaintiff's motion abandons the Eleventh Circuits Four Prong Test

The subsequent argument in Plaintiff's Motion is that Mr. Fernandez is an employer as defined by the FLSA. Plaintiff's counter motion hinges on Mr. Fernandez position at VIOMAR.

However, the FLSA uses another economic reality test to determine who can be qualified as an employer. In fact, Plaintiff cites this test in their own motion, stating

> In the Eleventh Circuit, a separate four-factor economic reality test is used to determine liability by evaluating whether the individual: (i) had the power to hire and fire employees; (ii) supervised and controlled employee work schedules or conditions of employment; (iii) determined the rate and method of payment; and (iv) maintained employment records. Whether an individual falls within the classification of "employer" under the FLSA turns not on "technical or isolated factors but rather on the circumstances of the whole activity." *Alvarez Perez*, 515 F. 3d at 1160.

Mr. Fernandez certainly had the power to hire and fire employees, but there is no evidence indicating that Mr. Fernandez hired Plaintiff. Plaintiff has produced no application, W-2, wire transfer, check, or any other evidence that is typically found in an employee/employer relationship. Mr. Fernandez certainly did not supervise or control Plaintiff's work schedule or conditions of employment. As shown previously, Mr. Fernandez didn't even know when Plaintiff was on the property. *See* Plaintiff's Exhibit __ Pages 33 of 66. Plaintiff's own deposition testimony states that he did not have a work schedule. See Exhibit "A" 25:23-25, Mr. Aneiros' Deposition Transcript. There is no evidence that Mr. Fernandez had ever determined the rate or method of payment for any employee including Mr. Aneiros. In fact Mr. Fernandez affidavit says he hasn't had any employees for more than a decade. See **Exhibit "B"** Mr. Fernandez's Affidavit. Plaintiff has provided no evidence of any employee records that were in Defendant's possession because those records do not exist.

The sole argument in Plaintiff's counter motion is that Mr. Fernandez has attested to the State of Florida that he is the corporate officer financially responsible for Viormar's affairs from

2012 through the present and that Mr. Fernandez has "controlled the company's purse strings" as the sole owner of Viormar. If that was the standard, every business owner would be found liable under the FLSA.

## PLAINTIFF CANNOT ESTABLISH
## INDIVIDUAL COVERAGE UNDER THE FLSA

**I.    Plaintiff's evidence is insufficient to find that he engaged in interstate commerce**

Employees are covered under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., in one of two instances: individual coverage or enterprise coverage. Individual coverage lies where the employee is engaged in commerce or the production of goods for commerce. 29 U.S.C.S. § 207(a)(1). Individual coverage exists if the employee "regularly us[es] the instrumentalities of interstate commerce in his work such as the use of telephone, telegraph, mail, or travel. *Thorne v. All Restoration Servs., Inc*., 448 F. 3d 1264, 1266 (11th Cir. 2006). Plaintiff's motion argues that Defendants have represented to the U.S. Department of Treasury that 75% of VIOMAR's shares are held by Curacao-based entities, therefore, the deposits Mr. Aneiros made into VIORMAR'S bank accounts constitute engagement in interstate commerce.

In support of this assertion, Plaintiff references the text messages that Mr. Aneiros sent to Mr. Fernandez which show Ocean Bank Deposit receipts. Plaintiff also states that he was responsible for receiving mail every single day. The "receiving" of mail is not the same as the "regular use" of the instrumentalities of commerce. Mail is being delivered to the property and Plaintiff is squatting on the property. This does not qualify as engagement in interstate commerce. With respect to the bank deposits, there is no analysis as to how this constitutes engagement in interstate commerce. Plaintiff does not seem to be claiming that these "Curacao-based" entities are being paid through these accounts. Nor does Plaintiff assert that the funds which are being

deposited into these accounts are being derived from the engagement in interstate commerce. Plaintiff also states that he regularly sent or received mail to and from Curacao. However, Plaintiff fails to show how this was regular or recurrent. There are no dates or receipts that show how often this was occurring. There's no evidence to show that this occurred at all aside from Plaintiff saying that it did. Plaintiff himself stated that he did not work on anything that traveled through interstate commerce.

> **Q: Okay. And is there anything that you worked on, on behalf of Viormar, whether goods or materials, that traveled through interstate commerce?**
>
> **Mr. Alvarez:** I can rephrase if it's –
>
> **The interpreter:** Yeah.
>
> **Mr. Alvarez:** – hard to translate.
>
> **The interpreter:** Yeah.
>
> **Q: Okay. Let me see. Is there anything in your job duties that required to work on things that traveled out of the state of Florida?**
>
> **Mr. Larou:** Form.
>
> **The Witness:** No.

See **Exhibit "A"** Mr. Aneiros' Deposition Transcript, 12:9-21.

Even if the Court did find that Viormar engaged in interstate commerce, this alone would not warrant a finding that Plaintiff is entitled to summary judgment. Plaintiff must first establish that he was an employee, not an independent contractor, who was engaged in interstate commerce.

<u>**THERE IS NO EVIDENCE THAT PLAINTIFF WAS COERCED INTO FORCED LABOR**</u>

    I.    **Plaintiff cannot establish physical or psychological coercion.**

Plaintiff's counter motion cites *U.S. v. Paulin*, 329 Fed. Appx. 232, 233 (11th Cir. 2009), stating that the TVPA "makes it a crime to obtain labor or services through physical or psychological coercion." Plaintiff's counter motion then states that "After finding Mr. Aneiros living in homeless near the Viormar Warehouse, Defendants capitalized off of his vulnerability by coercing Mr. Aneiros to sleep inside of the warehouse in exchange for free labor." Again, there has been no evidence produced by the Defendant that shows this coercion aside from his own testimony. Interestingly enough, Plaintiff's own testimony also indicates that he willingly entered this alleged arrangement to live on the property rent free in exchange for his "services". See **Exhibit "A"** Plaintiff's Depo. Transcript 55:22-56:1-6

> **Q: But it was – you stated earlier that you came into an agreement with Viormar that you would be allowed to live on the property for free in exchange for whatever labor you provided. Was that your testimony?**
> A: Yes.
>
> **Q: Okay.**
> A: And that they would pay for everything. And then they came back a month later and said, no, you pay your own electricity.

Plaintiff further expands on the alleged arrangement stating that Defendants took him out to lunch to discuss his alleged employment.

> **THE WITNESS:** Since I already lived there – well, we had a meeting about it before moving. They took me out to a lunch or they asked to me to meet. So it was like, lets talk business, they said. And initially, I would paid them $500 for the office space. And they said, don't pay us, we're going to pay everything, just handle all the maintenance, all the things that have to be done.
> See **Exhibit "A"** 13:18-24
>
> **Q: Okay. So during the year of 2020– '12, you were paying $500 for that office space. Would you say that you were a tenant at that time?**
>
> **Mr. Larou:** Form.
>
> THE WITNESS: I was a tenant, but I worked for them.

The record also reflects that Plaintiff did not exclusively perform work for Defendants. If anything, the record indicates that Plaintiff is a commercial tenant who worked as an independent contractor for various individuals/entities. The TVPA requires a showing that Defendants obtained Plaintiff's labor by means of serious harms or threats.

> Former church ministers' claims against church and corporate entity under Trafficking Victims Protection Act failed because record contained little evidence that church obtained their labor by means of serious harm, threats, or other improper methods since, inter alia, they joined and voluntarily worked for church, they had innumerable opportunities to leave, and potential consequence of being declared "suppressive persons" and thus potentially losing contact with family, friends, or each other was not "serious harm" and warning of such consequence was not "threat."

> *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 2012 U.S. App. LEXIS 15224 (9th Cir. 2012).

The record does not indicate that any threats or serious harm was committed by Defendants. If anything, the record shows that Plaintiff willingly entered this arrangement. Moreover, the record does not show that Plaintiff was not free to leave, if anything the text messages show that Mr. Fernandez didn't even know when Plaintiff was there. If the above cited case found that the TVPA claim failed due to a lack of evidence that the labor was obtained through threats or serious harm, this Court should find that the TVPA claims fails due to Plaintiff's agreement to the alleged arrangements terms. Additionally, Plaintiff's deposition, as demonstrated in Defendant's Motion for Summary Judgment, shows that Plaintiff's reason for not leaving is supposedly because the business would fail. When asked why he would care if the business of his alleged enslaver's would fail, he then says that he can't leave because he also has dogs. Plaintiff was never coerced into working for Defendants no was he forced to remain on the property. In fact, Defendants have been asking him to leave the property so that they can sell it.

## CONCLUSION

Plaintiff's response/counter motion for summary judgment makes many conclusory claims that are devoid of any sort of analysis. While Plaintiff does direct the Court to it's evidence, it leaves it to the Court to connect the dots. Moreover, it is abundantly clear that Plaintiff has been conspicuously liberal with his interpretation of the text messages and paraphrasing of the deposition transcripts. As such, Plaintiff's response fails as a matter of law because it fails to establish a genuine dispute of material fact with respect to Plaintiff's status as an independent contractor. Additionally, Plaintiff's counter motion for summary judgment should be denied because he has failed to establish that there is no genuine dispute of material fact with respect to Plaintiff's status as an employee. For these reasons, Defendants respectfully request that this Court grant summary judgment in Defendants favor as to all counts under Plaintiff's Amended Complaint and deny Plaintiff's response and counter motion for summary judgment.

Respectfully submitted,

By: */s/Robert Twombly*
Robert Twombly, Esquire
FBN: 60127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the undesigned counsel, on this 12th day of January, 2025, served the foregoing upon counsel for the Plaintiff by email to: bvirues@lawgmp.com, Garcia-Menocal, P.L, 350 Sevilla Ave, Coral Gables, FL 33134 and rdiego@lawgmp.com, The Law Office of Ramon J. Diego, P.A., 5001 SW 74th Court, Miami, FL 33155.

Respectfully submitted,

**WHITE & TWOMBLY, P.A.**
*Counsel for Defendants*
9999 NE 2nd Avenue, Suite 306
Miami Shores, Florida 33138
Telephone: (786) 502-2038
robert@whitetwombly.com
david@whitetwombly.com
paralegalryt@whitetwombly.com

By: */s/Robert Twombly*
Robert Twombly, Esquire
FBN: 0060127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

# EXHIBIT "A"

### In the Matter Of:

## ANEIROS vs VIORMAR TRADING

1:24-CV-20772-GAYLES/LOUIS

---

# DENNIS ANEIROS

*October 07, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3    DENNIS ANEIROS,

4              Plaintiff,

5         vs.                CASE NO. 1:24-CV-20772-GAYLES/LOUIS

6    VIORMAR TRADING CORPORATION, N.V.,
     AND ORLANDO A. FERNANDEZ,
7
               Defendants.
8

9

10                       DEPOSITION OF

11                       DENNIS ANEIROS

12                  Monday, October 7, 2024

13                       10:00 a.m.

14

15              Offices of White & Twombly
           9999 Northeast 2nd Avenue, Suite 306
16                  Miami, Florida 33138

17

18

19

20

21

22

23                    Dillon Poberezhsky
                      Digital Reporter
24                 Commission No. HH 324684

25



```
 1                    APPEARANCES OF COUNSEL

 2    On behalf of DENNIS ANEIROS, Plaintiff:

 3         PATRICK B. LAROU, ESQ.
           FAIRLAW FIRM
 4         135 San Lorenzo Avenue
           Suite 770
 5         Miami, Florida 33146
           305-686-2460
 6         larou@fairlawattorney.com
           APPEARED IN PERSON
 7

 8    On behalf of VIORMAR TRADING CORPORATION
      AND ORLANDO A FERNANDEZ, Defendants:
 9
           DAVID ALVAREZ, ESQ.
10         WHITE & TWOMBLY, P.A.
           9999 Northeast 2nd Avenue
11         Suite 306
           Miami, Florida 33138
12         786-502-2038
           david@whitetwombly.com
13         APPEARED IN PERSON

14

15    Also present:

16         Yenisbel Rodriguez, Spanish Interpreter

17

18

19

20

21

22

23

24

25
```



```
1                    INDEX TO EXAMINATION

2  EXAMINATION OF DENNIS ANEIROS              PAGE

3  Direct Examination by MR. ALVAREZ             5

4  Cross-Examination by MR. LAROU               93

5  Redirect Examination by MR. ALVAREZ         115

6  CERTIFICATE OF REPORTER                     126

7  CERTIFICATE OF TRANSCRIPTIONIST             127

8

9

10                    INDEX TO EXHIBITS

11      DEFENDANT EXHIBITS FOR IDENTIFICATION:

12  NUMBER          DESCRIPTION                PAGE

13  Exhibit 1    Sunbiz Listing for Ocean Mack's    35

14  Exhibit 2    Sunbiz Listing for Doc Motors       38

15  Exhibit 3    Plaintiff's Second Amended         74
                 Complaint
16

17
    (Original exhibits retained by counsel for Defendant.)
18

19

20

21

22

23

24

25
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                       4

1          THE REPORTER:  We are now on the record; the

2    date is October 7th, 2024; the time is 10:00 a.m.,

3    Eastern Standard Time; to take the deposition of Dennis

4    Aneiros in the case of Dennis Aneiros v. Viormar

5    Trading Corporation, N.V., and Orlando A.  Fernandez.

6          My name is Dillon Poberezhsky, notary public

7    and digital reporter for Esquire Deposition Solutions

8    in the state of Florida.  I'll be capturing the

9    verbatim record of today's proceeding using electronic

10   audio equipment, a computer, and specialized recording

11   software, which is not a form of stenography.  I'll

12   begin by swearing in the interpreter, Yenisbel

13   Rodriguez, who has produced her Florida driver's

14   license as identification.

15               YENISBEL RODRIGUEZ,

16   being called as an interpreter, was first sworn to

17   translate English to Spanish and Spanish to English the

18   testimony of the following witness:

19          THE REPORTER:  Thank you, Madam.

20          The witness, Dennis Aneiros, is located in

21   Miami, Florida and does not have a valid State-issued

22   ID, preventing me from administering the oath to them.

23   In lieu of my administering the oath to this witness, I

24   would ask all parties to stipulate that the witness has

25   identified themselves as David Aneiros, and the



 1   witness' testimony will be treated as if given under

 2   oath.

 3          Counsel, can you please state your appearance,

 4   and then verbalize your agreement to this stipulation.

 5          MR. LAROU:  Yes.  Good morning.  This is

 6   Patrick Brooks Larou on behalf of the plaintiff.  My

 7   only correction is I -- I believe the plaintiff's name

 8   is Dennis Aneiros.

 9          THE REPORTER:  Oh, I --

10          THE INTERPRETER:  That is --

11          THE REPORTER:  I'm so sorry.  The witness has

12   identified themselves as Dennis Aneiros, and the

13   witness' testimony will be treated as if given under

14   oath.

15          Counsel, can you verbalize you're in agreement

16   for this stipulation?

17          MR. LAROU:  Counsel for plaintiff agrees.

18          THE REPORTER:  Thank you --

19          MR. ALVAREZ:  Same for defendant.

20          THE REPORTER:  Thanks.  Thank you.  Counsel,

21   you may begin.

22                    DIRECT EXAMINATION

23   BY MR. ALVAREZ:

24      Q.  Good morning, Dennis.  Thank you for coming in

25   today.



1        A.   Good morning.  Good morning.

2        Q.   Dennis, have you ever had your deposition

3   taken before?

4        A.   No.

5        Q.   Okay.  So before we get into the --

6        A.   When I went to the attorney's office?  No.

7             MR. ALVAREZ:  Well, no, I think it's -- he's

8   referencing the deposition of -- of my client.

9             THE WITNESS:  No.  This is the first time this

10  happens to me.

11  BY MR. ALVAREZ:

12       Q.   Okay.  So I'm going to go through a few ground

13  rules to explain how depositions essentially work.  And

14  after we get through that, we could start asking about

15  questions about the case.  All right.  So the way a

16  deposition works is, I'm going to ask you a series of

17  questions to get a better idea of your position on the

18  case.  It's not an interrogation.  There's no need to

19  feel anxious about what's happening.

20       A.   No.

21       Q.   If you ever feel that you need a break or you

22  need to use the bathroom, please let me know and I'd be

23  happy to let you do so.

24       A.   Okay.  Yes.  Thank you.

25       Q.   The only thing that I ask is that if there's a



1  question pending at that time, you answer that

2  question, and then we'll go take the break.

3      A.  Okay.

4      Q.  Now, is there any reason why you wouldn't be

5  able to testify truthfully today?

6      A.  No.

7      Q.  Okay.

8      A.  I always tell the truth.

9      Q.  Okay.  Are you under any prescription

10  medication that would prevent you from testifying

11  truthfully?

12      A.  No.

13      Q.  Are you on any illicit substances that would

14  keep you from testifying truthfully?

15      A.  No.  No, I don't do that.  I don't do any of

16  that.

17      Q.  All right.  Do you have any medical -- medical

18  conditions that would prevent you from testifying

19  truthfully?

20      A.  No.

21      Q.  Okay.  Perfect.  All right.  So Dennis, in

22  Paragraph 8 of your Complaint, you allege that the

23  defendants are your direct employers, joint employers,

24  and co-employers for the purposes of the -- for the

25  purposes of the FLSA.



1            THE INTERPRETER:  For the purpose of?

2            MR. ALVAREZ:  The FLSA, Fair Labor Standards

3   Act.

4            THE INTERPRETER:  Employer, co-employer, or --

5            MR. ALVAREZ:  Joint -- joint employer.

6   BY MR. ALVAREZ:

7       Q.  Can you tell me how that relationship came

8   about?

9            MR. LAROU:  Objection to form.

10           MR. ALVAREZ:  I'm sorry.  Before we move

11  forward, what was the basis for the form objection?

12           MR. LAROU:  For the form; I think if someone

13  calls for a legal conclusion for my client by -- by

14  asking him for the grounds on which, you know, an

15  employment relationship under the FLSA would be formed.

16           MR. ALVAREZ:  Okay.  All right.  I'll move

17  forward.

18           THE WITNESS:  It's many years I would have to

19  explain to you.

20           MR. ALVAREZ:  Okay.

21           THE WITNESS:  Many years.

22  BY MR. ALVAREZ:

23      Q.  Okay.  So what year do you claim to have

24  started working for Viormar?

25      A.  2010, '11.



DENNIS ANEIROS                                              October 07, 2024
ANEIROS vs VIORMAR TRADING                                                 9

1      Q.   Okay.   And what type of work were you doing at

2    Viormar?

3      A.   I met a father, who then died.   And then he

4    gave me the opportunity to start repairing that whole

5    building, which was abandoned.   I started by painting

6    the building, making divisions to the vessels.

7          Then I brought in Jessy Limo.   I rented a

8    property out to him.   And then I brought in another

9    tenant and it was called 911.   And it was some sort of

10   tire place.   I continued to do the maintenance outside,

11   dealing with everything.   And then the years went by.

12   And then in 2016, I had to remove Jessy Limo.

13         Orlando Fernandez made the contracts for 911.

14   A lot of people knew me, so I would bring him the

15   people and he would make the contracts.   They didn't

16   pay for two months.   They were evicted, taken to court.

17         Then that part of the building remained empty.

18   We were also trying to deal with Jessy because he

19   wasn't complying with the payments due to a rent

20   increase.   So during that time, Orlando Fernandez

21   created this company called Vita Home Care Solutions.

22         And then I started working with them,

23   assembling and having everything to do with that

24   company.   They bought saws, and tools, and equipment

25   for me to work, working on the display, getting ready



```
 1   for the exhibition.

 2           MR. ALVAREZ:  Okay.  But hold on.  That's for

 3   Vita Home Care Solutions, is what he's talking about

 4   now?

 5           THE WITNESS:  Yes.

 6           MR. ALVAREZ:  Okay.  So I don't -- I don't

 7   mean to interrupt, but I want to focus on -- on what --

 8   Viormar and what he's done for Viormar.

 9           THE INTERPRETER:  Okay.

10   BY MR. ALVAREZ:

11       Q.  So -- and -- and let's -- let's walk it back a

12   little bit.  Before you began working for Viormar, what

13   job did you have prior to that?

14       A.  I was self-employed, and I was working on some

15   patents.  As a matter of fact, I have two patents.

16   That's how I met Orlando Father.

17       Q.  Okay.  So how -- you met Orlando's father

18   through those two patents?  Does --

19           THE INTERPRETER:  Orlando, the father.  It's

20   Orlando, Sr.

21           MR. ALVAREZ:  Right.

22           THE INTERPRETER:  Okay.  What's your question?

23   BY MR. ALVAREZ:

24       Q.  Or so -- or so my question is: Tell me how you

25   met Orlando's father, if you could expand on that.
```



DENNIS ANEIROS                                       October 07, 2024
ANEIROS vs VIORMAR TRADING                                         11

 1       A.  I worked at Jessy Limo.  That was next to the
 2  building.  Sometimes I would repair a car.  And since
 3  that building, Viormar was abandoned.  Sometimes we
 4  would park a car underneath a tree.  And so that's how,
 5  on one occasion, the father arrived and I met him.
 6       Q.  Okay.  So was Jessy Limo a tenant on the
 7  Viormar property?
 8       A.  After I met the father.
 9       Q.  Okay.
10       A.  So Viormar is here, Jessy Limo is here.  And
11  so they sold the building where Jessy Limo was, and I
12  brought him over to Viormar.
13       Q.  Okay.  And when you were working at Jessy
14  Limo, what -- what years did that span?
15       A.  2005 to 2010, '11.
16       Q.  And was -- were you a W2 employee?
17       A.  No.
18       Q.  Okay.  Were you an independent contractor for
19  Jessy Limos?
20       A.  I would just come in as a friend, do the work,
21  and he'd pay me.
22       Q.  Okay.  Is that a similar relationship that you
23  have with the defendants?
24       A.  Yes.  So since I met his father, it became
25  like family.



 1      Q.  Okay.  And can you remind me what year you

 2   roughly began working at Viormar?

 3      A.  2011, 2012, something like that.

 4      Q.  Okay.  And did Viormar have any other

 5   employees from 2010 to 2024?

 6      A.  No.

 7      Q.  Okay.

 8      A.  I'd get everything for them.

 9      Q.  Okay.  And is there anything that you worked

10   on, on behalf of Viormar, whether goods or materials,

11   that traveled through interstate commerce?

12          MR. ALVAREZ:  I can rephrase it if it's --

13          THE INTERPRETER:  Yeah.

14          MR. ALVAREZ:  -- hard to translate.

15          THE INTERPRETER:  Yeah.

16   BY MR. ALVAREZ:

17      Q.  Okay.  Let me see.  Is there anything in your

18   job duties that required you to work on things that

19   traveled out of the state of Florida?

20          MR. LAROU:  Form.

21          THE WITNESS:  No.

22   BY MR. ALVAREZ:

23      Q.  Okay.

24      A.  Just want to move them to Orlando.

25      Q.  Okay.  Explain that.  How did you move them to



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                                 13

1   Orlando?

2        A.   Orlando rented a truck and we went back and

3   forth.  It was like he was moving his house when his

4   father dies.  I do restoration of the home, including

5   broken floors, broken tiles on the roof, the fence.  So

6   when it was ready, they sold it.  I removed the

7   furniture.  And I moved them up there to Orlando.

8        Q.   Okay.  Did you perform that as one of your job

9   duties?

10       A.   Well, they didn't employ anybody else, just

11  me.  Remember Orlando is an elderly person.

12       Q.   But did you do it as a favor because he is an

13  elderly person, or did they order you to do that?

14       A.   They would tell me to do it, the job.

15       Q.   Were they asking you to do it as a favor?

16       A.   I don't think so.

17       Q.   Okay.  Did they --

18       A.   Since I already lived there -- well, we had a

19  meeting about it before moving.  They took me out to a

20  lunch or they asked me to meet.  So it was like, let's

21  talk business, they said.  And initially, I would paid

22  them $500 for the office space.  And they said, don't

23  pay us, we're going to pay everything, just handle all

24  the maintenance, all the things that have to be done.

25            And then that's where everything came in, in



 1  terms of the move and the repair of the cars.  And they

 2  would pay me through -- through lodging.  And so, you

 3  know, Orlando said, you've lived for free in this

 4  country.  And I said, no, I've lived through the work

 5  that I do for you.

 6      Q.  Okay.  So when you were paying for -- you

 7  know, when you were paying $500 for the office space,

 8  can you tell me the -- the time frame of when those

 9  payments were being made?

10      A.  Those were the first times that they told me

11  to come and stay.  Okay.  So in terms of the Viormar

12  property, I did all the removal of everything there,

13  including the safety -- the safes.  I also did

14  shredding of all the documentation that they had there.

15  I did everything.  I emptied it out or vacated it.  I

16  vanished everything.  I shredded all the paper.

17      Q.  Okay.  So the documents that you were -- were

18  shredding, what were they in relation to?

19      A.  I don't know.  I think it was the history of

20  the company.  He said those papers were very

21  confidential, Orlando said, and that it was very costly

22  to have them shredded.  I am -- I am an inventor.  I

23  invent things.  So I just said, well, I'll make a

24  machine with an engine that shreds.  So I shredded,

25  like, 80, 100 boxes.



1      Q.   Okay.   So -- and I don't want to get into the

2   information that's related to your patents, but can you

3   describe some of the things that you've invented?

4      A.   So I created a system for this -- you know how

5   the cars overheat and the children die in them?   So

6   this system will save the children's lives.

7      Q.   That's beautiful.

8      A.   And the other is a system in which you can't

9   steal license plates of cars.

10     Q.   Okay.   Do you have any investors in those

11  inventions?

12     A.   No.

13     Q.   Okay.

14     A.   I've spoken to Orlando about it.   A company

15  that he didn't want to mention.   So there was a lot of

16  money spent in the company, but then the father died,

17  and then they decided to move to Orlando.

18          So that's why they wanted to me to shred

19  everything regarding that company.   They would spend a

20  lot of money.   And I was like, I need so much of that,

21  even if it's just to create 50, 100 systems.   It's --

22  it's, like, criminal.

23     Q.   Okay.   Have -- have you ever sold any of your

24  inventions?

25     A.   I want to or finance it, or when they give you



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      16

 1  a license for the person who's making it -- I don't

 2  know what you call that.  I've tried to do all those

 3  things, but I never have been able to.

 4       Q.  Okay.

 5       A.  I've written to the President, I've written to

 6  Congress, I've met with a lot of people.  But I don't

 7  know why, but the children are not going to be able to

 8  be saved.  I don't have money.

 9       Q.  Okay.  So during the year of 2020 -- '12, you

10  were paying $500 for that office space.  Would you say

11  that you were a tenant at that time?

12            MR. LAROU:  Form.

13            THE WITNESS:  I was a tenant, but I worked for

14  them.

15  BY MR. ALVAREZ:

16       Q.  Okay.

17       A.  I would do the maintenance and everything.

18       Q.  Can you tell me what type of business Viormar

19  was engaged in, in 2020 -- '12?

20            MR. LAROU:  Form.

21            THE WITNESS:  It created those companies,

22  Viormar, Vita Home Care Solution.  They would do

23  mortgage, so they would receive checks from houses and

24  stuff.  Well, they had a foreign company and it was

25  kind of, like, lost, and I was able to get it back for



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                        17

1  them.

2  BY MR. ALVAREZ:

3      Q.  Hold on.  I want to get into that.  So how

4  were you able to get it back from them?

5      A.  So when the father dies, Orlando Fernandez'

6  son, he didn't have control of all those things.  I

7  would get the correspondence because it would -- it

8  would arrive to where I was.  And the correspondence or

9  letter said that the title to the company had been

10 lost.  I immediately sent them the paperwork.  Well,

11 don't tell anybody that this is happening because the

12 building doesn't have papers.

13         I would have to go to Curacao because that's

14 where the company is.  And I think you have to be there

15 six months in order to do the paperwork and gain the

16 papers back.  Years went by, and I did not relay this

17 concern to anybody.  He had already sent the papers,

18 the due diligence papers.  In another occasion, the

19 company was put up at auction due to lack of tax

20 payment.

21     Q.  And which company are we talking about right

22 now?

23     A.  Viormar.

24     Q.  Okay.

25     A.  And I said -- and -- and then -- the paper --



1  the papers for auction said that the company would go

2  to the greatest bidder.

3      Q.  Okay.

4      A.  He does all the paperwork, and then he sends a

5  letter, thank you for my work, my attorney has it, he

6  thanks me for my good job, and to put that sticker

7  behind the door, like, saying the taxes were paid.

8      Q.  Okay.  So since we've kind of ventured into

9  various roles that you performed on behalf of Viormar,

10  how would you label your job title?

11      A.  Well, I would guard the property at night,

12  too.  It's in the records.  It's in the police records

13  when I was chasing the bandits.  They were very

14  grateful for that.  I don't know why he's saying I

15  didn't work for him.

16      Q.  Well --

17      A.  I don't know why he would say that.

18      Q.  So were --

19      A.  There's so much evidence to that.

20      Q.  So were you requested to provide security

21  services for Viormar?

22      A.  It wasn't requested of me, but he said, at

23  night -- well, I was living there.  And then he would

24  put me in charge of the whole property and building.

25  They were (audio interruption) at another building at



```
 1  another time in Sunrise.
 2       Q.  Okay.
 3       A.  It was a big shopping center.  There were
 4  problems there.  And Cristina, his daughter, she -- she
 5  was having difficulties, like, getting the rent money.
 6       Q.  Well, hold on.  Is the property in Sunrise, is
 7  that owned by Viormar?
 8       A.  No.
 9       Q.  Okay.  So -- so let -- let's focus on --
10       A.  You're asking me to qualify my job
11  description --
12       Q.  Yes.
13       A.  -- and I'm telling you that all of my work has
14  been for them.  And everything arose or arised [sic]
15  from Viormar or came from there.  Because Corrina
16  [phonetic] resided at Viormar.  The -- First Son
17  Mortgage, that resided at Viormar.
18          MR. LAROU:  And pardon my interruption.  Just
19  for the record, I believe the spelling on the mortgage
20  company he was referring to is Fersom -- Fersom,
21  F-E-R-S-O-M.
22          MR. ALVAREZ:  I believe he's correct.
23          THE WITNESS:  Well, Viormar had a lot of
24  companies there and they all resided there.  All the
25  deposits were made via Fersom, Corrina, Viormar.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      20

```
 1   BY MR. ALVAREZ:
 2       Q.  Okay.  And I don't mean to interrupt.  I -- I
 3   do appreciate your explanation.  But the reason why I
 4   want to limit it to Viormar is because right now,
 5   Fersom and Corrine [sic], and all those other names,
 6   they're not named in this suit.
 7       A.  But I would do all the work for them --
 8       Q.  I understand.
 9       A.  -- through those companies.
10       Q.  I understand your position.
11       A.  Aside from maintenance --
12       Q.  But --
13       A.  -- and restoration of the whole building.  You
14   understand?
15       Q.  I do understand.  But --
16       A.  And they would have me, you know, collect rent
17   from people and do other things.  That's work.
18       Q.  Okay.  Who did you collect rent from?
19       A.  Okay.  So the black people from Sunrise.  So
20   Cristina had difficulties getting the rent money.  So
21   they wrote a letter saying that from that moment on, I
22   was going to be the assistant manager and they
23   introduced me as such.  And so I started getting
24   involved with getting the rent because she was a woman
25   and she was having difficulty doing that.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      21

1        Q.  Okay.

2        A.  And then there's copies of that paper.  But it

3   all stemmed or started from Viormar.

4        Q.  Okay.  But that property in Sunrise that

5   you're collecting rents for, who is the landlord of

6   that property?

7        A.  In -- in Sunrise?

8            THE INTERPRETER:  In Sunrise.

9            THE WITNESS:  Corrina is a real estate

10  company.  I don't know what relation Corrina had with

11  Viormar with that property.  I would -- I would do

12  maintenance, I would --

13           THE INTERPRETER:  Sorry.

14           THE REPORTER:  I'm sorry to interrupt.  Would

15  you -- I just wanted to advise, if we could please let

16  the interpreter fully finish translating before

17  answering the question, just so I can make sure I get a

18  clear transcript.  I apologize.

19           MR. ALVAREZ:  No, no, I probably should

20  have --

21           THE WITNESS:  It's just that I get excited and

22  stuff.  It's just that there's a lot of things.  Sorry.

23  BY MR. ALVAREZ:

24       Q.  No, it's fine.  But that property where

25  Corrina is residing at -- let me rephrase.  To -- as to



 1  the best of your knowledge, you're not aware of who the
 2  landlord is at the Corrina property?
 3      A.  Yes.  Cristina Fernandez.
 4      Q.  Okay.  So you're -- would you say that you
 5  were collecting rents for Cristina Fernandez?
 6      A.  Yes.
 7      Q.  Okay.
 8      A.  Well, she couldn't do it.  So her father
 9  motivated me to do it, so that I could help out his
10  daughter.  But that's work.
11      Q.  But that was for the benefit of the daughter's
12  company, right?
13      A.  I know that, but it would come from Viormar.
14      Q.  Earlier, you mentioned that you had gotten
15  some tenants for Viormar.  Can you identify who those
16  tenants were?
17      A.  Joelle Sardina -- Jorge Sardina [phonetic] --
18          THE INTERPRETER:  I'm going to put the
19  spellings right here.
20          THE WITNESS:  I only -- 911, I only know the
21  name of the company.  I didn't have much dealings with
22  them.  There's Carlos de la Flor [phonetic], and that's
23  a tenant that I brought in.  The only thing that
24  Orlando did was the paperwork.  It's a mechanic shop,
25  and he has a brother whose name is Miguel de la Flor.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      23

 1  There -- there's no one else there right now.  There's
 2  only two vessels.
 3  BY MR. ALVAREZ:
 4      Q.  Okay.  What year did you bring those two
 5  vessels in?
 6      A.  What did I bring Carlos de la Flor?  Carlos de
 7  la Flor has been at the property for seven years.
 8      Q.  Okay.  And why did you bring them in?
 9      A.  A lot of people know me.  So, you know, I
10  would bring him people to rent out the property.  And
11  sometimes issues wouldn't go through because of the
12  money or whatever.  But Carlos de la Flor was a person
13  that they were getting out of another unit or vessel.
14      Q.  Okay.  Hold on.
15      A.  And he didn't have a place to go, so I told
16  him --
17          MR. ALVAREZ:  So hold on.  And -- and I should
18  have done this instruction in the beginning, and I
19  failed to do that, and I apologize.  But, you know,
20  he's saying a lot.  And I know you can only translate
21  as much as you can --
22          THE INTERPRETER:  Sure.
23          MR. ALVAREZ:  -- remember.  If we could get
24  him to, you know, pieces.  Because he mentioned
25  earlier -- and I speak Spanish, and that's why I'm



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                                  24

 1  picking up on it -- that he knows a lot of people --
 2          THE INTERPRETER:  Uh-huh.
 3          MR. ALVAREZ:  -- right?  So if you could
 4  instruct him to, you know, give you a minute to --
 5          THE INTERPRETER:  Sure.
 6          MR. ALVAREZ:  -- translate back to me.
 7          THE INTERPRETER:  Thank you.
 8          THE WITNESS:  Okay.  Sorry.
 9  BY MR. ALVAREZ:
10      Q.  No, it's fine.  I understand.  You know,
11  it's -- it's your first deposition and they're
12  stressful.
13      A.  I wish I did -- I wish I did speak English and
14  tell you the whole story.
15      Q.  So let's go back.  So you said that you were
16  able to get these tenants because you know a lot of
17  people; is -- is that right?
18      A.  That is correct.
19      Q.  Okay.  Did you go out and get these tenants
20  before Orlando spoke to you about this?
21      A.  No.
22      Q.  Okay.  So if Orlando had never spoken to you
23  about it, you would have never gone looking for
24  tenants?
25      A.  No, because he's the owner of the property.



1    Q.  Okay.  Do you have any document that could

2    support your assertion that Orlando asked you to find

3    tenants?

4         THE INTERPRETER:  That Orlando did what?

5         MR. ALVAREZ:  Asked him to go find tenants.

6         THE WITNESS:  No.  That's verbal.

7    BY MR. ALVAREZ:

8    Q.  Okay.  Are there any --

9    A.  That is what his father, who died, told me

10   from the beginning.

11   Q.  All right.  So tell me, to the best of your

12   recollection, exactly what Orlando's father told you.

13   A.  He wanted to fix the building because there

14   was a lot of disorder inside, and that he wanted to

15   rent out the two vessels.  That's why I enclosed the

16   door that connected both buildings.

17   Q.  Okay.  Did he mention that he wanted that done

18   in passing, or did he ask you directly to do that?

19   A.  He asked me to do that.

20   Q.  Okay.  How many hours would you say that you

21   work a week for Viormar on average?

22   A.  It would be a night.  Imagine how many hours.

23   Q.  Were you ever provided a schedule from

24   Viormar?

25   A.  No.



1      Q.  Okay.  Did you ever have a written employment

2  contract?

3      A.  No.  Just a paper authorizing me to be his

4  representative.

5      Q.  Okay.  So let's talk about the remodeling that

6  you claim to have done on Orlando's father's behalf.

7  Did he supervise those renovations in any way?

8      A.  Yes.  He bought all the material.  It was a

9  computer factory.  So I started the renovation process,

10  the taking out the trash from it.

11     Q.  Did he -- all right.  Did you have the ability

12  to complete that job in the way that you wanted to do

13  it?

14     A.  No.  Whatever they said.

15     Q.  Okay.  And what exactly did they order you to

16  do?

17     A.  Paint, repair walls, debris removal, the paint

18  of the structure.  There was termites, and so the

19  restructuring of the wood.  There was a lot of wood in

20  that building.  And I've done that throughout the

21  years, many years.

22     Q.  Okay.  Do you have any professional licenses?

23     A.  Me?  A professional license?

24     Q.  Yeah.  Like, do you have any contractor's

25  license that allow you to do construction work?



1        A.   No.  I'm a genius.

2        Q.   Understood.

3        A.   That's why they used me.

4        Q.   Got it.

5        A.   To restore cars, to do all kinds of things.

6   And telling me that I inherited the building or I was

7   inherited with the building.

8        Q.   When did they tell you that?

9        A.   Orlando Fernandez did.  When his father died.

10       Q.   What did he mean by "inherited"?

11       A.   He was now that -- that I am his property.

12       Q.   Were you ever interviewed by Orlando's father

13   before you began working for him?

14       A.   When he saw me working on Jessy's car under --

15   under the tree, he approaches me and we start talking.

16   I show him my projects.

17       Q.   Hold on.  The -- that's a good amount.  What

18   type of projects were you showing him?

19       A.   My patents.

20       Q.   Okay.

21       A.   He admired it.  And then he said, come in my

22   office.  And then we started to talk about things like,

23   how did he get to Venezuela, how he got to have

24   everything he had.  We started to build a friendship.

25   So then, since he saw that I was a reliable person, he



1  said, come, do the repair work, take out the trash.

2  All the keys to the building.  Gave the keys to the

3  building, and I've had them ever since.

4      Q.  So --

5      A.  He wanted repairs and restorations.  He wanted

6  to rent out the building.

7      Q.  Okay.  So hold on.  The trash and -- and

8  garbage stuff that you were doing, was that just for

9  the unit you were residing in?

10     A.  The one that I occupied to live?  I had to

11 throw out a bunch of stuff from there, too, but that

12 came after.  We're talking about the building, 8,500

13 square feet.

14     Q.  Okay.  When you were discussing working with

15 Orlando, did you ever negotiate payment?

16     A.  Yes.

17     Q.  Okay.  What did those negotiations look like?

18     A.  I said that I needed money because I had to

19 pay for electricity.  I need to eat.  And he said that

20 I was free to go and work outside, and that I could go

21 repair a car or do whatever it was that I needed to

22 survive, that I only had the lodging or the roof to

23 live under.

24     Q.  So look -- just for my own clarification

25 purposes: Orlando allowed you to work any odd jobs that



 1  you needed to get paid otherwise?

 2       A.  Yes.

 3       Q.  Okay.

 4       A.  I would go -- I -- I would do it, but then I

 5  would get home and -- and I was tired at night.  Well,

 6  I had a lot of work.  By the time I got back from doing

 7  whatever job I was doing, like washing dishes or

 8  whatever, I was exhausted.

 9       Q.  But you didn't -- but did you have a set time

10  schedule while working at Viormar?

11       A.  No.

12       Q.  Okay.

13       A.  He would write to me at whatever hour.

14       Q.  Can you tell me, what are some of the side

15  jobs you would do while you were at Viormar?

16       A.  Dishwashing, fixing of a door.  I have a -- I

17  have a friend who's, like -- it -- it would break down,

18  something in his house, and I'd go fix it.  So Ricky,

19  the guy from across the street, he had a factory that

20  made fishing rods.  But he was older, so he would call

21  me in to help him.

22       Q.  Can -- can you tell me Ricky's full name?

23       A.  His name is Riano [phonetic].

24       Q.  Okay.  Do you --

25       A.  I don't remember his last name.  It's in the



 1 | Internet.

 2 |     Q.  Do you -- do you have Ricky's phone number?

 3 |     A.  It's here.  He would see me all the time

 4 | working.  He's, like, I've never seen a person work so

 5 | hard day and night.

 6 |     Q.  Can you -- can you read us Ricky's phone

 7 | number?

 8 |     A.  I had turned it off.  I'm turning it back on.

 9 |         MR. ALVAREZ:  Okay.  I think we could take a

10 | five-minute break, if that's okay with you, Brooks.

11 |         THE REPORTER:  Counsel, may I call us off the

12 | record?

13 |         MR. ALVAREZ:  Yeah.

14 |         THE REPORTER:  We are going off the record.

15 | The time is now 11:07 a.m., Eastern Standard Time.

16 |         (A recess was taken.)

17 |         THE REPORTER:  We are going back on the

18 | record.  The time is now 11:32 a.m., Eastern Standard

19 | Time.

20 | BY MR. ALVAREZ:

21 |     Q.  All right.  I'd like to talk about Ricky for a

22 | moment, and the jobs that you did for him.  How much

23 | would Ricky pay you to do those jobs?

24 |     A.  I would just help him, like, unload a

25 | merchandise.



1      Q.  Is -- do you make a habit of -- of helping

2    people with odd jobs?

3      A.  I help them because you have to help.  You

4    have to keep up a store.  You have to buy merchandise.

5    You have to do everything everybody else does.  You

6    have to get an incentive to do it.

7      Q.  Okay.  But --

8      A.  So Orlando Fernandez's son told me, for

9    example, when I got the food stamps, that nobody could

10   know that I worked for him nor that I lived there.

11     Q.  Okay.  Do you have that communication in

12   writing?

13     A.  No.  It's very subtle.  That's something very

14   subtle.

15     Q.  Okay.  And earlier, you were mentioning that

16   Orlando's father permitted you to do odd jobs on the

17   side.  Can you give me an example of some of the

18   clients that you did odd jobs for?

19     A.  Cars.

20     Q.  Cars?

21     A.  Cars, walls, doors, repair doors at homes,

22   electricity, plumbing.

23     Q.  Okay.

24     A.  Everything that needs to be done.

25     Q.  Okay.  Can you tell me some of the people --



1  can you identify -- hold on.  Let -- let me retract and

2  rephrase that.  Whose cars did you work on?

3      A.  Acquaintances or their own cars.  I did a lot

4  of their own cars.  Tune-ups, change the oil, paint,

5  repairs to their cars as well.

6      Q.  Okay.  How much would you charge, say, for an

7  oil change?

8      A.  For him or the other people?

9      Q.  The other people.

10      A.  I would tell people to buy their own oil.  And

11  I would charge, like, $20 to change it, something like

12  that.

13      Q.  Okay.  And what about the -- the tune-ups?

14  How much would you charge for the tune-ups?

15      A.  I would do everything regarding the tune-up.

16  The air filters, spark plugs.

17          THE INTERPRETER:  Thank you.

18  BY MR. ALVAREZ:

19      Q.  And how much would you charge for paint jobs?

20      A.  I would -- I would do it on the cheap because

21  there was a lot of body shops.  100, 150, the person

22  buys their own materials.  But that's not money.  You

23  turn the corner, you go to the store, and you spend it.

24  Electricity, telephone.

25      Q.  Is that a mystery to figure it out?



```
 1            MR. ALVAREZ:  Can we go off the record for a
 2    little --
 3            THE REPORTER:  We are going off the record.
 4    The time is now 11:37 a.m., Eastern Standard Time.
 5            (A recess was taken.)
 6            THE REPORTER:  All right.  We are back on the
 7    record.  The time is now 11:41 a.m., Eastern Standard
 8    Time.
 9    BY MR. ALVAREZ:
10       Q.  So, Dennis, you were mentioning that you
11    charge rather reasonable prices for the mechanic work
12    you do.  Did you find that that allowed you to get a
13    larger clientele?
14            THE INTERPRETER:  Did you say mechanic or
15    painting?
16            MR. ALVAREZ:  Mechanic.
17            THE WITNESS:  It wasn't always.  It was
18    sporadic.  I didn't have a lot of clientele.  When you
19    have clientele, that's when you have a business.  I
20    don't have a -- that type of business.  I did -- I did
21    it to survive.
22            My real job was Viormar and taking care of the
23    property.  But he would say he couldn't pay me.  I had
24    to survive.
25    BY MR. ALVAREZ:
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      34

1      Q.  Okay.  So did Viormar ever pay you for your

2   time working there?

3      A.  No.  Only with the roof over my head.

4      Q.  And is that why you weren't able to afford to

5   move out?

6      A.  I haven't because of that.  I've even told

7   Orlando, Orlando, you do real estate, get me a lot or

8   land.  He did find me one years ago.  And so my brother

9   lived outside, and so I seized rights to the property

10  to my brother.

11         Orlando would say, what do you need that lot

12  for, you're fine here.  He never wanted me to leave.

13  And I would say to him, I do need a place to go, I'm

14  going to have to leave one day from here.  And last

15  time we spoke, I explained that to him again.  And

16  that's why I ended up doing this.

17      Q.  Okay.

18      A.  He said that wasn't his problem.  He said,

19  that's your problem.  And I said, Orlando, I've given

20  my life here, I've worked here.

21      Q.  Okay.

22      A.  I -- he didn't care.

23      Q.  All right.

24      A.  He said no.

25      Q.  All right.  So you mentioned earlier that your



 1  true job is at Viormar.  Do you own any other
 2  businesses?
 3       A.  No.
 4       Q.  Okay.
 5       A.  I have a company with Renee.  And it's --
 6  it -- it has a website, and it's an order for me once I
 7  get my patent to do the car thing, then I could use
 8  that.
 9       Q.  Okay.  What's the name of that company?
10       A.  Ocean Mark.  I -- it's something like that.
11  Renee is the one that knows the name.
12       Q.  All right.  So I'm going to introduce my first
13  exhibit.  It's going to be marked as Exhibit 1.  And I
14  pulled this from Sunbiz.
15           (Defendant's Exhibit 1 was marked for
16  identification.)
17  BY MR. ALVAREZ:
18       Q.  Can you please let me know if that's the
19  company you're referring to?
20       A.  I can't really see things.  I didn't bring --
21           MR. ALVAREZ:  Well, maybe -- Mr. Larou, would
22  you be able to assist him?
23           MR. LAROU:  Of course.
24           Yeah.  And, Mr. Aneiros, the spelling on this
25  exhibit, which appears to be a printout from Sun --

 1  Sunbiz.org --

 2          THE INTERPRETER:  Are you doing this for the

 3  client off the record or on the record?

 4          MR. LAROU:  On the record.

 5          THE INTERPRETER:  Uh-huh.

 6          MR. LAROU:  So Exhibit 1, it -- it appears to

 7  be a printout from Sunbiz.org.  And the name of the

 8  business entity listed for this profile is Ocean

 9  Mack's.  And the spelling of that is M-A-C-K apostrophe

10  S.

11          THE WITNESS:  That's where Renee did it.  So

12  we could do -- if we could do some kind of business as

13  it involves the patents for the seat or the license

14  plates, that's where we would put in the percentages

15  and amounts and stuff.

16  BY MR. ALVAREZ:

17      Q.  Okay.  Can you state Renee's full name for the

18  record?  Okay.

19      A.  Renee Sevreco [phonetic].  Okay.

20          MR. ALVAREZ:  And, I'm sorry; I'm going to

21  have to ask for your assistance again, Mr. Larou.

22  BY MR. ALVAREZ:

23      Q.  Who is the director listed under Ocean Mack's,

24  according to Sunbiz?

25          MR. LAROU:  Who?



```
 1              MR. ALVAREZ:  The director.

 2              THE WITNESS:  I think Renee named me that.

 3              MR. ALVAREZ:  Okay.  I can take the exhibit

 4     back.

 5              MR. LAROU:  Sure.

 6     BY MR. ALVAREZ:

 7         Q.  So does Ocean Mack's only exist for the

 8     purposes of your patent?

 9         A.  Yes.

10         Q.  Does Ocean Mack's currently have any revenue?

11         A.  No.

12         Q.  Okay.

13         A.  It -- it doesn't show us that.

14         Q.  Okay.  And for which patent is this for?

15         A.  The child seat.

16         Q.  Got it.  How did you meet Renee?

17         A.  Renee was a client of Carlos de la Flor.

18         Q.  Okay.

19         A.  Or still is a client.

20         Q.  Okay.  Is -- is Renee an investor in Ocean

21     Mack's?

22         A.  No.  No, he doesn't have anything.

23         Q.  Are there any shareholders in Ocean Mack's?

24         A.  No.

25         Q.  What is -- sorry, go ahead.
```



1        A.   We're -- we're looking for some.

2        Q.   What is Doc Motors, Inc.?

3        A.   I don't know.  I don't know what that is.

4             MR. ALVAREZ:  Okay.  So I'm going to introduce

5    Exhibit Number 2.

6             (Defendant's Exhibit 2 was marked for

7    identification.)

8             MR. ALVAREZ:  Mr. Larou, I'm going to need

9    your help with this one as well.  If you could describe

10   the document to your client.

11            MR. LAROU:  Sure.  And so Exhibit 2 appears to

12   be another printout from Sunbiz.org.  The business

13   entity listed on this profile is Doc Motors, Inc.  And

14   the spelling of Doc is D-O-C.

15   BY MR. ALVAREZ:

16       Q.   Do you have any affiliation with that company?

17       A.   I don't know what that company is.

18            MR. ALVAREZ:  Can you read the second page for

19   your client, Mr. Larou?

20            MR. LAROU:  Of course.  And --

21            THE WITNESS:  What does the company say?  I

22   don't know.

23            MR. LAROU:  So listed as the vice president on

24   this printout from Sunbiz.org, Dennis Aneiros is listed

25   as the vice president of the company.



```
 1           THE WITNESS:  I don't know what that is.
 2   BY MR. ALVAREZ:
 3      Q.  Considering that you claim to have entered the
 4   property since 2010, why did you wait nearly 14 years
 5   to file a suit for unpaid wages?
 6           THE INTERPRETER:  Why did you wait how many
 7   years?
 8           MR. ALVAREZ:  14.
 9           THE WITNESS:  I was expecting that question.
10   I -- I appreciate them -- I appreciated them so much
11   that I gave my life to them there.  But he showed up --
12   on a Friday, he showed up and he was very rude or --
13   and he was very unpleasant.  And as it states in the
14   other lawsuit, he called me a homeless.  He -- he
15   really treated me poorly.
16           He said he didn't care about my life.  And he
17   said, you've been living in this country for free for
18   many years.  And that's -- and that's when I said, I'm
19   going to find out how to go about this because I've
20   been working for this man, and there's a lot of
21   witnesses to this.
22   BY MR. ALVAREZ:
23      Q.  Can you name some of the witnesses?
24      A.  Yes.  Roberto Perez.
25      Q.  Okay.  Can you tell me Roberto Perez's title
```



DENNIS ANEIROS                                        October 07, 2024
ANEIROS vs VIORMAR TRADING                                         40

1  and what he essentially knows?

2      A.  He's -- he's an owner from the building across

3  the street.

4      Q.  Okay.  And what is it that he knows?

5      A.  He had a mechanic shop as well.  Everything,

6  that I even restored their home and they even pay me --

7  they didn't even pay me a penny.  Everything.  He was

8  his dad's mechanic.

9      Q.  Now, Paragraph 43 of your Complaint, you state

10  that the plaintiffs offered for you to reside in the

11  office if you performed work for them back in 2010, and

12  you accepted that offer.

13          THE INTERPRETER:  If you did what?

14  BY MR. ALVAREZ:

15      Q.  If you worked for them.  Yes.  Okay.  And you

16  stated previously in your testimony today that you

17  collected rents on behalf of the defendants.  Do you

18  know how much the defendants typically charged for

19  renting out the property at Viormar?

20      A.  The big warehouses, the current ones?

21          MR. ALVAREZ:  Oh, the one that he's residing

22  in.

23          THE WITNESS:  That was his dad's office.

24  BY MR. ALVAREZ:

25      Q.  Okay.  But did the father ever rent out other



 1  properties on that lot to different tenants?

 2       A.  No.  Not at the office space.  It's small.

 3       Q.  Okay.  But I'm not referring to -- I'm not

 4  limiting it to just the office space.  I'm talking

 5  about the entire lot that Viormar owns.  Do you know if

 6  they've rented any piece of that lot to another tenant?

 7       A.  It is rented out to Jessy Limo and 911 Tire.

 8  They were rented there.

 9       Q.  Okay.  And do you know how much rent is

10  charged to that company?

11       A.  3,800 to Carlos de la Flor.

12       Q.  Okay.

13       A.  Presently.

14       Q.  How big is -- is the property that he's

15  renting out?

16       A.  600 square feet.

17            MR. ALVAREZ:  Okay.  He's talking about his

18  office?

19            THE INTERPRETER:  Sorry, first person would

20  help.

21  BY MR. ALVAREZ:

22       Q.  So -- all right.  So I'm asking how -- roughly

23  the size of Jessy's Limousine company.

24       A.  4,400.

25       Q.  Okay.  And what's, roughly, the size of the



1   office that you're residing in?

2        A.  600 square feet.

3        Q.  Okay.  And are you using any other property at

4   Viormar?

5        A.  Well, he told me to tear down all the office

6   space that Jessy -- Jessy Limousine had.

7        Q.  Okay.

8        A.  And that's undergoing a process.

9        Q.  Okay.  Is that the only piece of property that

10  you are using?

11       A.  I am using it because he assigned me to undo

12  all of it, all of the offices.

13       Q.  Okay.  Does he have that assignment in

14  writing?

15       A.  No.

16       Q.  Okay.

17       A.  He's very smart.

18       Q.  How -- how big is that second property that

19  he's now in the process of remodeling?

20       A.  4,400 feet.

21       Q.  Okay.

22       A.  But aside from that, there's a problem.  That

23  property needs structural repair.

24       Q.  Okay.

25       A.  And that man had me remove the cracks that



1  were on the walls to pass the 40 year inspection.

2      Q.  Okay.

3      A.  I said no, that that was a -- that was

4  dangerous, to rent out to a person, and then have the

5  building fall upon them or on them.

6      Q.  Okay.  Has -- since you've been on the Viormar

7  property, have you ever seen it rented out for

8  residential purposes?

9      A.  No, never.

10      Q.  Okay.  Now, I want to talk about Jessy Limos

11  again.  You're saying that the monthly rent was $3,800.

12  So would you agree that, a year, that would bring a

13  rental proceeds of $45,600?

14      A.  When I say 3,800, that was the initial

15  contract.  But it -- that was Carlos de la Flor.

16      Q.  Okay.

17      A.  And there was another problem because I said

18  if the contract was only for the first three years, why

19  does Carlos de la Flor not have the original price,

20  which would be for 5,000 square feet?  And so that's

21  where the problems begin.  Jessy is another price.

22      Q.  Okay.  So -- all right.  Let's stay with

23  Jessy, and then I'll go to Carlos in a second.  What is

24  Jessy currently paying for rent?

25      A.  Jessy is no longer there.  I got Jessy out of



 1  there.

 2       Q.  Okay.  How did you get Jessy out of there?

 3       A.  With the letter that Orlando made and said

 4  that I was the manager of the building and required

 5  Jessy to move out.

 6       Q.  And just to confirm: Jessy's Limousine was on

 7  Viormar property?  There were a tenant of Viormar

 8  property?

 9       A.  Yes.

10       Q.  Okay.  So before Jessy was evicted by you, how

11  much was Jessy Limousine paying in rent monthly?

12       A.  At the beginning, because the -- it was the

13  starting of the building, they made a contract in which

14  he would pay $1,800.

15       Q.  And that's monthly?

16       A.  Yes.  And then, as time went on, Orlando

17  needed more money.  And then, he puts it in writing,

18  and that he's going to revert it to the original price

19  of the location.

20       Q.  Okay.

21       A.  Jessy did not want to do that.  And that's

22  when he did that in writing, so that he could be

23  evicted.

24       Q.  Okay.  And so for my clarification purposes,

25  based on your answer, Orlando wanted to begin charging



1    Jessy the true market value of the property in rent?

2         A.  Yes.

3         Q.  Okay.  And what was the true market value of

4    the property?

5         A.  So at the current rate for a 4,400 square

6    feet, that runs about $10 per square feet.  And they

7    should be paying around $5,000.

8         Q.  And that's monthly?

9         A.  Yes.

10        Q.  Okay.  So would you agree that if they're

11   paying -- if they were to be paying $5,000 monthly,

12   that would be $60,000 a year?

13        A.  Something like that.

14        Q.  Okay.  And you're currently not paying any

15   rent for where you're residing; is that right?

16        A.  No.

17        Q.  Okay.

18        A.  That would be -- that -- mine's 600.

19        Q.  Were you ever told that if you stopped working

20   at Viormar that you would be evicted?

21        A.  Certainly.

22            MR. ALVAREZ:  All right.  If you could tell

23   him that he can't be on his phone during a depo.

24            THE WITNESS:  I'm going to turn it off.

25   BY MR. ALVAREZ:



1        Q.  Okay.

2        A.  Didn't you need Riano's number?

3        Q.  Oh, I did.  I did.

4        A.  Do you want the number?

5        Q.  Well, I would like the number.  So if you

6   could just --

7        A.  It's (305) 362-7556.

8        Q.  And whose phone number is this, again, just

9   for the record?

10        A.  Riano Ricardo.

11        Q.  And what was your relation to Riano Ricardo?

12        A.  He was my neighbor, so I would help him out,

13   do certain jobs.  I don't know if you want Roberto

14   Perez's.

15        Q.  Yeah.  If I could get Roberto Perez's number,

16   too, that would be great.

17        A.  (305) 282-4539.

18        Q.  And what's your relation to Roberto Perez?

19        A.  He was the owner from the property across the

20   street.  He had a mechanic shop.  And he knew that

21   Orlando Fernandez would not pay me for my job.  And

22   then, he would ask me to go work for him or with him on

23   his cars.  That man did pay me.  Just to help him at

24   his shop with the cars, he would pay me weekly 250,

25   350.



1    Q.  Okay.

2    A.  Something like that.

3    Q.  And if I'm recalling correctly, you stated

4  earlier that Orlando encouraged you to do other jobs to

5  supplement your pay; is that right?

6         THE INTERPRETER:  To supplement?

7         MR. ALVAREZ:  His pay.

8         THE WITNESS:  Yes.  He knew I did that.

9  BY MR. ALVAREZ:

10    Q.  Okay.  So why is it that you claim that you

11  can't afford to move out of the property?

12    A.  Because in order to move out, I have to make a

13  decent amount of money, which I can't do all the time.

14  They ask for security, they ask for one deposit, one

15  rent's worth, and then one rent month.

16    Q.  So if you were evicted from the property, what

17  would your damages be?

18    A.  I was -- I was doing a job in a building, and

19  there was a piece of wood in the structure, and there

20  was an inspection coming up.  And I'm -- the structure

21  had termites.  I -- I sent a letter to Orlando saying

22  we had to do that.

23         And then he said, cover all that up, cover,

24  cover, cover.  And so all of that debris or termite

25  fell onto my eye.  And so I've been having this problem



 1   for three years now.  And all he did was get me some

 2   glasses through Amazon.

 3        Q.  Okay.  Those are --

 4        A.  How am I going to go out into the street and

 5   I'm blind?

 6        Q.  Okay.  But, so those are more so damages

 7   related to work that you claim to have performed.  What

 8   I'm asking is: What are the damages that you would

 9   suffer if you were removed from the property?

10        A.  Imagine a person with nothing out on the

11   street after I've spent my whole life there.

12        Q.  But you just said, not so long ago, that you

13   perform jobs in various capacities for various other

14   people.  So why wouldn't you be able to continue doing

15   that elsewhere?

16        A.  Because I've lost my eyesight.  I've asked for

17   help.  The government gives me food stamps.  Something

18   fell in my eye and it affected my head, it affected my

19   eyesight, because of the terrible living conditions in

20   which I live, mold, cockroaches, spiders.

21        Q.  So if it's so terrible to live there because

22   of the mold, cockroaches, and spiders, why wouldn't you

23   want to move out?

24        A.  I don't have -- I don't have where to live.  I

25   don't have a place to go.  Where am I going to go?



1      Q.   Okay.

2      A.   Pay me my money, and I'll leave.

3      Q.   Okay.

4      A.   I worked very hard for them.  It's not a lie.

5  It is true.  He's the liar here.  So he even said that

6  I was a homeless person and I was invading that

7  property without permission.  He made me even a notary

8  public, so that I would notarize all his dirty

9  paperwork.

10      Q.   Are you currently a notary public that's

11  licensed?

12      A.   I'm not right now because I don't have -- I

13  don't have a way to pay.  They paid for that, the 2,500

14  that they asked for.

15      Q.   Why did they make you pay notary public?

16      A.   They -- they wanted me to be a notary, so they

17  wouldn't have to go do that out on the street.

18      Q.   Okay.  Can you identify the people, dates, and

19  times in which you acted in the capacity as a notary?

20      A.   It was only the paperworks that they would

21  say -- or tell me.  When they had the company, Vita

22  Solutions, they would notarize things that were in

23  regards to the company.

24      Q.   Are you currently collecting disability from

25  the State?



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      50

1          A.  No.  She wanted -- he wanted me to.

2          Q.  Okay.  Have you ever filed a workers'

3     compensation claim due to your eye injury?

4          A.  I did not want to do that.  I didn't want to

5     do that.  I just think it's unfair.

6          Q.  Okay.

7          A.  I've even been his bodyguard.  I'm just

8     saying, no, that I don't exist.

9          Q.  Can -- can you expand on that?  How -- how --

10    what do you mean that you were his bodyguard?

11         A.  Well, to go charge rent to the black people,

12    watching his back on the warehouse when people had to

13    be removed from there.  It's in the police record.

14         Q.  Have you ever been charged with a crime of

15    dishonesty at any point?

16         A.  No.

17         Q.  Okay.

18         A.  God doesn't want you to tell lies.  My roots

19    are of honesty.  I never thought this person would do

20    this to me.  He would say, I want you to go up there

21    with me, I have a farm, I want to do a house in the

22    back for you, so we could grow things over there.  He

23    wanted me to continue that way.  I appreciate you as a

24    son.  No such thing.  When he sold the house and had me

25    throw out the trash, you know what I found in the



1   trash?  His photos of his mother and father.

2          And I said no, that I would keep that, that I

3   was not going to throw out the painting of the man who

4   helped me out.  So what are we talking about?  We're

5   talking about a person who took advantage of his own

6   father his whole life.  You can never throw out a

7   picture of your parents.

8       Q.  So how -- how is it that Orlando took

9   advantage of his father?

10      A.  Well, his dad would give him everything, so he

11  got off with that his whole life.  Had him go study in

12  Canada.  He became a doctor, sports medicine.  And he

13  never actually practiced it.  How -- how else would I

14  know all of this history [inaudible 01:46:20]?

15      Q.  So it's your position that Orlando took

16  advantage of his father because he was able to go get

17  his doctorate degree in Canada?

18      A.  That's not the only thing.  It's his

19  lifestyle.  His whole lifestyle.

20      Q.  What is your --

21      A.  How is he going to throw out his dad's

22  photograph?

23      Q.  Is that the only issue of his lifestyle that

24  bothers you?

25      A.  No.  His life doesn't bother me.  I



1  | appreciated him.  I would take care of him.

2  |     Q.  Okay.  What's your highest level of education,

3  | Dennis?

4  |     A.  I never went to school.

5  |     Q.  Okay.

6  |     A.  I did go to school, but that has nothing to do

7  | with this.  Bad people.

8  |          MR. ALVAREZ:  Is it all right if we take a

9  | five-minute break to go off the record?

10 |          THE REPORTER:  We are going off the record.

11 | The time is now 12:23 p.m., Eastern Standard Time.

12 |          (A recess was taken.)

13 |          THE REPORTER:  We're back on the record.  The

14 | time is now 12:31 p.m., Eastern Standard Time.

15 | BY MR. ALVAREZ:

16 |     Q.  Dennis, so I wanted to speak a bit about that

17 | period of time where you were paying $300 a month in

18 | rent.  Why did you stop paying that?

19 |     A.  It wasn't 300.  It was 500.

20 |     Q.  500.  Okay.  So why did you stop paying $500 a

21 | month in rent?

22 |     A.  Well, they -- they sat me down at Villa de

23 | Sabores to talk business.  It's a restaurant or a

24 | cafeteria.  They said, we're leaving to Orlando, can

25 | you -- that I had to stay in charge of the property.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    53

1      Q.  Okay.  So during that period when you were
2  paying $500 a month in rent, what jobs were you
3  performing out at the Viormar property?
4      A.  It's a lot of trees, so the care and
5  maintenance of it, parking spaces, if a pipe breaks.
6  There was a man who was stealing water from the
7  property in the back of the property.  I caught him.
8  And -- and I told Orlando, then Orlando was afraid to
9  take him to court.  That was my job, to take care of
10  it, fix a pipe, the bathrooms.
11          When I brought Carlos in, fix a lot of the
12  office space.  And when the guy from the limousine,
13  Barry [phonetic], then a lot of things that were broken
14  inside, repair everything.  It was -- that was my job.
15      Q.  Okay.  Are you aware that commercial tenants
16  are required to maintain their own properties?
17      A.  That is correct.
18      Q.  Okay.  So what's the difference?
19      A.  Yeah, but he wouldn't say that to them.  He
20  wouldn't tell them that, they had to do it themselves.
21  So the tenants would call me all the -- oh, fix that
22  light, oh, the fake ceiling.
23      Q.  Why would the tenants call you to do that?
24      A.  They knew I was in charge.
25      Q.  How did they know that you were in charge?



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      54

1        A.   That I was in charge?  They knew because
2   Orlando had said it.
3        Q.   Okay.  How long has Orlando been -- how long
4   has Mr. Fernandez been in the city of Orlando?
5        A.   When his father died.  I think it's been
6   eight, nine years.
7        Q.   Okay.  And you testified earlier that Orlando
8   knew that you were doing jobs on the side; is that
9   right?  And -- and he didn't prevent you --
10       A.   Yes, he knew.  He would send me messages, even
11   at 1:00, and then send the correspondence to him.  He
12   would prepare, like, a package, stickers with the
13   stamps to prepare packages to go to this P.O Box that
14   he had.  He said, I would pick up the packages and get
15   the mail.
16            He would start asking me about the cars.  This
17   car, that car.  I would say, this is Carlos, that other
18   one says Carlos.  I would say, this car, I'm -- I'm
19   holding it for a friend, he's traveling, and he's
20   giving me a little money because I have it there.
21       Q.   Who's --
22       A.   Because I have to pay for the electricity.
23       Q.   Who's giving you a little money?
24       A.   The person that I told to leave the car there.
25       Q.   Okay.



1      A.  He said, no, take everything out, take them

2   all out.  But -- and I found mold.  That's how I paid

3   my electricity on my own thing.

4      Q.  Okay.  So --

5      A.  Because he doesn't pay me.  And then he would

6   say, no, remove everything, get everything out.  And he

7   knew it, that I would -- that that's what I would make

8   money doing.

9      Q.  So if you're paying for the electricity and

10  you're maintaining the property, what's the difference

11  between you and every other commercial tenant?

12         THE INTERPRETER:  Can you repeat that?

13         MR. ALVAREZ:  Yes.

14  BY MR. ALVAREZ:

15     Q.  So if you're paying for the electricity and

16  maintaining the property, what is -- what is the

17  difference between you and every other commercial

18  tenant?

19     A.  Because the tenant pays him rent and they work

20  their business.  I don't have a business.  I work for

21  Orlando Fernandez.

22     Q.  But it was -- you stated earlier that you came

23  into an agreement with Viormar that you would be

24  allowed to live on the property for free in exchange

25  for whatever labor you provided.  Was that your



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      56

 1  testimony?

 2      A.  Yes.

 3      Q.  Okay.

 4      A.  And that they would pay for everything.  And

 5  then they came back a month later and said, no, you pay

 6  your own electricity.

 7      Q.  Okay.  Is that a damage that you've suffered?

 8      A.  What?

 9      Q.  Having to pay for the light?

10      A.  No.  I have to have electricity.

11      Q.  Okay.

12      A.  I don't have A/C. And I don't really have

13  water to bathe with.  And -- and I withstood it

14  because -- because of the need I had.

15      Q.  Okay.  So let's talk about the need you had

16  for a minute.  You stated previously that you were

17  allowed to work outside of your role in Viormar, right?

18      A.  Yes.

19      Q.  Have you tried finding gainful employment

20  outside of doing odd jobs?

21      A.  I have tried.

22      Q.  Where have you applied to?

23      A.  I looked for employment in several places,

24  body shops, including this man, Roberto -- Roberto

25  Perez.  I've done work for him in cars, I've been a



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                           57

```
 1   dishwasher.
 2        Q.  Okay.  Hold on.  Because I want to be able to
 3   get all this information.  What is the name of
 4   Roberto's company?
 5        A.  He got out and he rented that place.  And I
 6   said, give them my number because I know how this
 7   works.  I do know the history.
 8        Q.  So Roberto used to own a property at the
 9   Viormar location?
10        A.  No.  He's a neighbor across the street.  He
11   owns a building across the street, Roberto.  And he --
12   and at some point, he wanted to buy Viormar.
13        Q.  Okay.  So then I'll make my question broader.
14   Have you ever looked for work outside of a 20-mile
15   radius of Viormar?
16        A.  Well, I can't leave Viormar because I have to
17   take care of everything there.  I can't leave there.  I
18   have to be on top of it, like they say.  When an
19   inspector comes, when everything.
20        Q.  Who's -- what would happen if you weren't on
21   top of it?
22        A.  Everything.  Their life would just go down or
23   get derailed.
24        Q.  But why do you care about if their life or
25   business goes down?
```



1        A.  Because that's the occupation that they gave

2   me.

3        Q.  Okay.  But you seem to have -- do you believe

4   that Viormar has enslaved you?

5        A.  I think so.

6        Q.  Okay.  So then why do you care if their

7   business gets derailed?

8        A.  Because I -- I thought they were trustworthy

9   people or people with principles, so I guarded and

10  protected them.  But see that they didn't care about my

11  life.

12       Q.  Okay.  Did you know that Viormar is trying to

13  sell the property?

14       A.  Me?  I know that they're trying to sell the

15  property, of course.  I have brought people who want to

16  buy it.

17       Q.  So you would find it beneficial for the

18  property to be sold then?

19       A.  Of course.  And that way, they could pay me my

20  money and I could leave.

21       Q.  Okay.

22       A.  It's $6 million that that property is worth.

23       Q.  Okay.

24       A.  And he's going to spend it, just like he spent

25  all of his father's money.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     59

1        Q.  But are you aware that that property cannot be

2    sold while you're residing in it?

3        A.  So give me a deposit and I'll leave.

4        Q.  So --

5        A.  Or an advance.  I'll leave.

6        Q.  So you wouldn't say that's extortion?

7        A.  And they exploited me my whole life.

8        Q.  Okay.  So you testified earlier that the

9    living conditions are unfavorable; is that fair to say?

10       A.  No.

11       Q.  And you claim to have worked long hours as

12   well?

13       A.  Yes.

14       Q.  Which portion of the job requires you to work

15   these long hours?

16       A.  Which?  I have to be there the whole time.

17       Q.  Okay.  But you don't have -- do you have a

18   schedule that says from 9:00 a.m. to 1:00 p.m., you

19   have to do this specific job, and then from 2:00 p.m.

20   to 10:00, you have to do this other one?

21           THE INTERPRETER:  What -- what time?  5:00?

22           MR. ALVAREZ:  10:00.

23           MR. LAROU:  Objection.  Asked and answered.

24           THE WITNESS:  How is it possible that you

25   don't understand?  Well, now with the pandemic,



DENNIS ANEIROS                                        October 07, 2024
ANEIROS vs VIORMAR TRADING                                          60

1   everybody threw their dogs out into the street.  I

2   picked up some dogs.  They accompany me.  They protect

3   me.  And they protect their property.

4          Those dogs bark because outside, there's a lot

5   of people, there's a lot of cars because then, they'll

6   steal their parts.  And there's police reports.  So

7   while the cars are being disassembled, people will come

8   and steal the parts.

9   BY MR. ALVAREZ:

10      Q.  Okay.  The cars that are being disassembled,

11  are those cars that Viormar is working on?

12      A.  They are from Carlos, a tenant from Viormar.

13      Q.  Okay.  So wouldn't you agree that the security

14  responsibility lies on Carlos and not Viormar?

15      A.  Could be.

16      Q.  Okay.

17      A.  But that's my job.  I also put the cameras to

18  see.  That's what Orlando would tell me.

19      Q.  Okay.

20      A.  Because if they steal things from Carlos, then

21  Carlos is not going to want to live there or -- or be

22  there, and then he's going to go find somewhere else to

23  be.  Just a few days ago, let's say last week, I felt,

24  I heard an explosion, dogs barking.  I go outside, lots

25  of smoke.  Turns out my neighbor's building exploded



 1  and fire started.

 2          I can't wait for the firemen to come, so I

 3  went and I grabbed the extinguisher and jumped over.

 4  And I saved all of those other -- all those buildings

 5  and cars from not catching fire.  I did it because I

 6  wanted to.  No, I did it --

 7          THE INTERPRETER:  Sorry.

 8          MR. ALVAREZ:  Oh, no, you're good.

 9          THE WITNESS:  I did it because I have a

10  conscience and I have appreciation.

11  BY MR. ALVAREZ:

12      Q.  Okay.

13      A.  And because I have to take care of it.

14      Q.  When did this happen?

15      A.  A few days ago.  Last week.

16      Q.  Did --

17      A.  And if I wouldn't have been there at that

18  place, everything would have burned down.  It was 11:00

19  at night.  There was no one there.  It -- I'm not doing

20  anything bad by that.  I'm doing my job.

21      Q.  That sounds like a pretty large fire if it

22  could have burned everything down.  Did the fire

23  department show up?

24      A.  Yes, and the police, too.

25      Q.  Okay.



1        A.  And then they said, you did a good job.  So I

2   was doing a good job.  As one of those letters say,

3   like the people from the building thanking me for my

4   good job.

5        Q.  So --

6        A.  I did a good job.  I need him to compensate

7   me.

8        Q.  Okay.

9        A.  That's it.

10        Q.  So can you remember what day of last week that

11   fire happened?

12        A.  I think it was a Monday or a Tuesday of last

13   week, something like that.

14        Q.  Do you know if there was any news article

15   reporting that a local man stopped fire?

16        A.  No.

17        Q.  Okay.

18        A.  It was none of that.  But I can get the

19   report.  I called.

20        Q.  Okay.  Would you agree --

21        A.  I do it because -- to show that, like, it's my

22   job.

23        Q.  All right.  So we've established that -- well,

24   you've established that part of your job duties were

25   security; would that be fair to say?

1      A.  Correct.

2      Q.  Now, would you agree that if most companies

3  hire security personnel, part of their job duties is in

4  fighting fires?

5      A.  Yes.

6      Q.  Okay.

7      A.  But I can't let it burn down.  Nobody says in

8  the Constitution or any law says, you have to let it be

9  and let the fire happen.

10      Q.  Okay.

11      A.  Or I see somebody getting killed, that I'm not

12  going to intervene to stop them from getting killed.

13      Q.  Fair enough.  Let's talk about the dogs for a

14  minute.  How good are they at providing security?

15      A.  My dogs are good.  They -- I trained them

16  myself.  I trained their dog, too.  I have the videos.

17  They destroyed the big house.

18      Q.  And he also mentioned that you installed

19  security cameras on the property.  Is that encompassing

20  the whole property?

21      A.  No.

22      Q.  Where are the security cameras?

23      A.  There's only one, but it doesn't -- to see,

24  but it doesn't record.  I -- it's just for me to look.

25      Q.  So those security cameras don't really benefit



1    Viormar, they benefit where you're residing?

2         A.  It sees everything, the front.

3         Q.  Okay.  So if --

4         A.  And it has the audio.

5         Q.  So if there are security dogs on the property

6    and security cameras, why is your position as a

7    security guard required?

8         A.  I installed those cameras for self-protection.

9         Q.  Okay.  I thought a moment ago, you said you

10   installed the cameras as a part of your job duties?

11        A.  No.  I bought them.

12        Q.  Okay.

13        A.  And I brought the dogs myself, too.  And he

14   agreed to it.  And there was a moment that they were

15   going to break in, and then he said, don't go out there

16   without the dog.

17             When there's an incident, I call the police,

18   and they don't come, and then I call them again.  And

19   then I -- I say to them, if you don't come soon, I'm

20   going to let the dogs out.  They're like, no, we're --

21   we're almost there.  So they're not aggressive or

22   clandestine, those dogs.  If you have a weapon or

23   you're aggressive, they'll turn aggressive.

24        Q.  Okay.  So can you give me a rough

25   approximation of how many years you're providing



 1  security services for Viormar for?

 2      A.  Since I started.

 3      Q.  So that's about --

 4      A.  Since I started.  2010.

 5      Q.  Okay.

 6      A.  When I started, the piles of trash were all

 7  over the parking lot, everywhere.  And I eliminated all

 8  of that.

 9      Q.  So would you say that you're good at providing

10  security?

11      A.  Yes.

12      Q.  Okay.

13      A.  When I was a boy in Cuba, like, 16 or 17, I

14  was trained to guard.

15      Q.  Okay.  Well, if you have training in security

16  from your time in Cuba, and you've been providing

17  training services for 14 years at Viormar, why haven't

18  you ever tried applying to be a security guard at

19  another company?

20      A.  I would like to, but I can't leave there.  As

21  we're speaking about the pile of trash, that's when

22  Orlando's father --

23          MR. ALVAREZ:  (Audio interruption.) Sorry.

24  Sorry.

25          THE WITNESS:  -- he said, you could stay here,



 1  so that they know that there's a presence here and they

 2  don't keep throwing out the trash.  But I didn't stay

 3  in the offices.  I stayed at 7880, which was pretty

 4  big.  That's where Carlos de la Flor is now.

 5  BY MR. ALVAREZ:

 6      Q.  Okay.  So you stated that if you left the

 7  property, the business would run off the rails; is that

 8  fair to say?

 9      A.  Yes.  They don't know -- I don't know what --

10  what's going to come of it when I leave.

11      Q.  So you don't want the business to fail?

12      A.  It makes me sad because of his father.  How

13  the father himself constructed that building, how he

14  was able to get that man, how he -- how he went to

15  China, how he became rich, how he got to Venezuela with

16  $20, everything.  And so for it to crumble, that cost

17  him so much work, that person who did value my

18  presence.

19      Q.  So your tie to this property is for the love

20  of Orlando's father?

21      A.  I don't have anywhere to go.  I don't have

22  anywhere to go.

23      Q.  Okay.

24      A.  And it's not just me, it's me and my dogs.

25      Q.  Okay.  So --



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      67

1        A.  I appreciate Orlando the father, but it's not

2    only that I did it for love and family.  I worked.

3    And -- and he said to me, I inherited you along with

4    this building --

5        Q.  So --

6        A.  -- which means I'm an object.

7        Q.  Okay.  So let me -- let me get this straight.

8    You first stated that you couldn't leave the property

9    because the business would fail.  Hold on.  And now,

10   you're saying that you can't leave the property because

11   you don't have anywhere to go and you have dogs.  So --

12   so which is it?

13       A.  They're both related.  They all -- they both

14   go together.  It does make me sad for the property

15   because I've spent my life there, taking care of all of

16   it.  At the same time, I can't go be on the street with

17   my dogs.

18       Q.  Okay.

19       A.  He has to be fair.  All I ask is for him to be

20   fair.

21       Q.  Okay.

22       A.  To recognize, tell the truth.  I've done a lot

23   of things for him.  And I'll leave, and I will be in

24   peace.  I will be in peace.

25       Q.  Okay.  Is there anything preventing you from



1  working as a security guard or as a mechanic elsewhere?

2      A.  No.

3      Q.  Okay.

4      A.  I'm -- I'm getting better with my eyesight.  I

5  can't drive yet.  I would like to.  Everything is

6  stacked up against me.  I don't have a place, I can't

7  see.

8      Q.  So would it be fair to say that your damages

9  right now is that if you were required to leave the

10  property, you would have to pay rent to live somewhere

11  else?

12     A.  No.  Right now it is difficult because I can't

13  really see.  Paint a wall, to paint a car.  I can't do

14  mechanic work.  I don't know.

15     Q.  Okay.

16     A.  How do I recognize a tool?  I can know what's

17  wrong with the car, but I can't repair it.

18     Q.  Have you ever gone to an ophthalmologist?

19     A.  They said it was a problem that with a special

20  diet that I have.  It's some kind of stroke.

21     Q.  Okay.  And who told you that?

22     A.  A doctor did.  I just don't like to go to the

23  doctors a lot.

24     Q.  Can you tell me which doctor diagnosed you

25  with that?



```
1        A.   I have to look in my papers when I went.  I

2   had an accident and I became handicapped, and then I

3   left the hospital.

4        Q.   Okay.  What -- what year did that accident

5   happen?

6        A.   When I first came to this country.

7        Q.   Okay.  And I know that you don't remember the

8   ophthalmologist that you saw, but do you remember which

9   hospital you went to?

10        A.   Baptist Hospital.

11        Q.   Okay.  And what year did you go to the

12   ophthalmologist?

13        A.   End of last year, this year.

14        Q.   Okay.

15        A.   And this year.

16        Q.   And did those doctors ever tell you that you

17   couldn't work because of the injury?

18        A.   No.

19        Q.   Okay.

20        A.   They didn't say anything like that.

21             THE INTERPRETER:  Counsel, just one second.

22   In the --

23             MR. ALVAREZ:  We --

24             THE INTERPRETER:  Can we go off --

25             MR. ALVAREZ:  We can go off the record for a
```



1    minute, yeah.

2              THE REPORTER:  We are going off the -- oh,

3    excuse me.  We are going off record.  The time is now

4    1:10 p.m., Eastern Standard Time.

5              (A recess was taken.)

6              THE REPORTER:  We are on the record.  The time

7    is now 1:53 p.m., Eastern Standard Time.

8    BY MR. ALVAREZ:

9        Q.  All right, Dennis.  So before we get into the

10   Complaint, I'm going to ask you, you know, a couple of

11   questions just to clear things up.  How did the

12   defendants force you to work?

13       A.  Well, if I wouldn't do the things, then he

14   would kick me out of the place.  He knew the conditions

15   I was in.

16       Q.  Okay.  And what do you mean by the conditions

17   you were in?

18       A.  Well, he knows that the little money I had, I

19   utilized it for the patents that I had, and that I

20   don't have money for, like, a down payment for a house

21   or an apartment, or do any sort of business.  He knew

22   that.  And he was like, yeah, yeah, go ahead, stay,

23   handle the business, but you have to work here doing

24   all of this.

25       Q.  So you're -- are you saying that your damages,



1   if you were evicted, would be that you would have to

2   find another place to live?

3        A.   And re-incorporate myself into society.

4        Q.   Okay.

5        A.   I feel isolated from the world.

6        Q.   Okay.  Before -- before Orlando's father found

7   you on the property, what -- what type of work were you

8   doing?

9        A.   I did cars, same, on my own.  And so then I

10  saw in television that, like, the kids were dying

11  because of it, and so I decided to start working on

12  that system.  I saw that people were stealing license

13  plates, and so I focused on getting that patent as

14  well.  I was a working man.

15       Q.   Okay.  So would it be fair to say that you

16  were doing independent jobs, like you're doing now,

17  even before you met Orlando's father?

18       A.   I did cars and whatever would show up.

19       Q.   So that's the same thing you're doing now,

20  though, right?

21       A.   Well, if -- if Orlando Fernandez would pay me

22  a certain amount per week, then I would not have to go

23  do a door, I would not go have to do a car or anything

24  like that.

25       Q.   But that wasn't what your original agreement



 1   was, right?  Because before you testified that he would

 2   let you live there rent-free, and you were allowed to

 3   do jobs for various other people.

 4        A.  I did say that.  And I did do side jobs, but I

 5   didn't always have side jobs.  It's not the same thing

 6   to have money coming in every week or every month.  He

 7   would always be telling me he didn't have money.

 8        Q.  But -- but, what prevented you from getting a

 9   job that paid consistently, like Burger King or

10   McDonald's?

11        A.  I don't understand that question.

12        Q.  Okay.  So I could rephrase that.  So you

13   testified that you had training and security.

14        A.  Yes.

15        Q.  Okay.  So what was stopping you from applying

16   for work at a security company?

17        A.  What would stop me?  Being in a company.

18   If -- if I go somewhere else, then I'm giving up the

19   occupation that they gave me.

20        Q.  But you testified previously that they

21   permitted you to do other jobs.

22        A.  Yes, I know.

23        Q.  Okay.

24        A.  I know.  It was only to support myself --

25        Q.  Okay.



DENNIS ANEIROS                                  October 07, 2024
ANEIROS vs VIORMAR TRADING                                    73

```
 1        A.  -- so that I could survive.
 2        Q.  But just to be clear, you've made the decision
 3   not to apply to different jobs?
 4        A.  I don't know if you understand what I'm
 5   saying.  I cannot go to apply for other jobs outside
 6   because I cannot leave the property.
 7        Q.  Okay.
 8        A.  There's messages there that say, you have to
 9   be there because this thing is going to arrive there.
10   I have to be there because there's packages --
11            THE INTERPRETER:  I'm sorry.
12            THE WITNESS:  -- there's packages, there's
13   mail, there's checks coming in.
14   BY MR. ALVAREZ:
15        Q.  How often were those messages coming in?
16        A.  All the time.
17        Q.  So you have, in your possession, messages
18   reflecting a consistent date where they're telling you,
19   you have to be on the property?
20        A.  Yes, I do have them.  My attorney has them.
21   I've given it to him.  E-mails too.
22        Q.  Okay.  And how long would it take you,
23   roughly, to receive a package that they told you, you
24   needed to be there for?
25            THE INTERPRETER:  How long would it take you
```



 1 | to do what?

 2 |         MR. ALVAREZ:  Yeah.  Let me rephrase that.

 3 | BY MR. ALVAREZ:

 4 |     Q.  So if they told you that a package was

 5 | arriving, how long would you need to stay on the

 6 | property, generally, to receive that package?

 7 |     A.  So I'll give you an example.  One day, they

 8 | were delivering skylights.  And they sent him a message

 9 | saying, we're here, the person is not here.

10 |     Q.  Okay.

11 |     A.  Where are you, you have to be there.

12 |     Q.  Yeah.

13 |     A.  I can't -- I can't have them go back again.

14 | So I couldn't have a job outside.

15 |         MR. ALVAREZ:  Okay.  All right.  I'm going to

16 | introduce, as Exhibit 3, I believe --

17 |         THE REPORTER:  Yep.

18 |         MR. ALVAREZ:  It might -- may be 2.  It's 3?

19 |         THE REPORTER:  Yeah.

20 |         MR. ALVAREZ:  As Exhibit 3 Plaintiff's Second

21 | Amended Complaint.

22 |         (Defendant's Exhibit 3 was marked for

23 | identification.)

24 | BY MR. ALVAREZ:

25 |     Q.  And I'm going to go through it with you.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      75

```
 1            MR. ALVAREZ:  Brooks, you may, you know,

 2    assist him.

 3            Or -- well, I suppose you can as well.

 4    BY MR. ALVAREZ:

 5       Q.  So I would like to -- to --

 6            THE INTERPRETER:  All right.  So if we -- if

 7    you're going to read off of it, I'd like --

 8            MR. LAROU:  Okay.

 9            THE INTERPRETER:  I don't know if we have --

10    oh, you have a copy, too?

11            MR. LAROU:  Right here.

12            THE INTERPRETER:  Okay.  Good.

13            MR. LAROU:  Yeah.

14    BY MR. ALVAREZ:

15       Q.  All right.  So I want us to look at Page 2.

16    All right.  In Paragraph 9, it says, "Defendants

17    regularly employed two or more employees for the

18    relevant time that handled goods or materials that

19    travel through interstate commerce or use

20    instrumentalities of interstate commerce, thus making

21    Defendant's business an enterprise covered by the Fair

22    Labor Standards Act." Now, earlier in your deposition,

23    I asked you if Viormar had any other employees, and you

24    said no; is that right?

25       A.  No, they never did.
```



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                            76

1    Q.   Okay.  Now --

2    A.   Unless you want to call Cristina an employee,

3  or his wife, Ita [phonetic], or his son -- or his son.

4  And maybe there -- it's, like, something they -- they

5  portray on the Internet and not physically.

6    Q.   Okay.  What --

7    A.   Or the other daughter, who's also on the

8  Internet.

9    Q.   Okay.  What about the -- the goods or

10 materials that travel through interstate commerce

11 that's here?  Did -- what was it that Viormar was

12 working on that traveled outside the state of Florida?

13   A.   I don't know about that.  That's their

14 mystery.  I don't know about that.  My thing was within

15 there.

16   Q.   But you do recognize that this is an

17 allegation in your Complaint, right?

18   A.   I'm saying it.  That's what it says here?

19   Q.   Yeah, in Paragraph --

20      MR. ALVAREZ:  If you want, read Paragraph 9 to

21 him again and --

22      THE WITNESS:  Well, I don't know about that.

23 I don't know if merchandise comes in and out.

24 BY MR. ALVAREZ:

25   Q.   Okay.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    77

1          A.  I don't know.  I don't know if they do it.

2          Q.  All right.  So let's look at Paragraph 10.

3    "Defendants have been, at all times material, an

4    enterprise engaged in interstate commerce in the course

5    of their ownership, management, and rental of real

6    property" -- and in parentheses, it says, "(warehouse

7    space), which, traditionally, cannot be performed

8    without using goods, materials, supplies, and equipment

9    that all move through interstate commerce." Do you know

10   if the maintenance of those properties require the

11   importation of materials that travel through interstate

12   commerce?

13          THE INTERPRETER:  Can you repeat that last

14   part of the question?

15          MR. ALVAREZ:  Yeah.

16   BY MR. ALVAREZ:

17          Q.  Do you know if Viormar has imported materials

18   that travel through interstate commerce to maintain

19   these properties?

20          A.  Well, they -- they would buy material for me

21   to work the walls.  I don't know if they bought it

22   locally or they bought it from another state.  I don't

23   know.  And I understood the other one now.  Now, I

24   understand.

25          Q.  Okay.

DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     78

1      A.  Other tools that I utilized, the rollers,

2  paint, tools, they would bring in.  When -- when I

3  would do the oil change for their cars, the oil came

4  outside, from -- from elsewhere.

5      Q.  Okay.  But -- all right.  So which state did

6  the oil come from?

7      A.  I don't know.  They buy those things at auto

8  parts store.

9      Q.  Okay.  And when you were changing these oils,

10 how does that further Viormar's business interest?

11         THE INTERPRETER:  When you were buying these

12 oils --

13         MR. ALVAREZ:  No, because he said that he was

14 changing the oils on his cars, right?  So how does him

15 doing that further the business interests of Viormar?

16         THE WITNESS:  How does it advance?

17 BY MR. ALVAREZ:

18     Q.  Yeah.

19     A.  Because they would utilize the cars for their

20 transportation, for their daily ins and outs.

21     Q.  Okay.  But were those cars owned by Viormar,

22 or were they owned by individuals?

23     A.  Their individual persons.

24     Q.  Okay.  And with respect to your job duties --

25 actually, let me -- let me back up.  I'm going to



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      79

1   retract that and rephrase.  You -- you stated earlier

2   that they took you to a Cuban cafe and you negotiated

3   your business terms; is that right?

4       A.  Yes.

5       Q.  Okay.  And what did they tell you were going

6   to be your responsibilities at that time?

7       A.  What was going to be my responsibility?

8       Q.  Yep.

9       A.  Maintenance and care of the property.

10      Q.  Okay.

11      A.  That they were moving to Orlando and I was

12  going to be in charge of everything.

13      Q.  So --

14      A.  I would -- I would do the deposits in their

15  bank, Ocean Bank.  They even know me there.  I would

16  put postage on stamps.  I would send them things over

17  there.

18      Q.  Okay.  So speaking of that -- so -- so

19  speaking of that, you mentioned that Orlando Fernandez

20  is now living in Orlando.  How often does he visit the

21  Viormar property?

22      A.  No.

23      Q.  Okay.

24      A.  When he -- when he's coming to pay his taxes

25  in Miami, he'll send me a message, I'm going to come



 1   over, I'm in Miami.

 2        Q.  Okay.

 3        A.  He never comes.

 4        Q.  And you testified earlier that you weren't

 5   provided a work schedule from Viormar; is that right?

 6        A.  No.  It was, do everything always, all hours.

 7        Q.  Okay.  So how would Viormar know if you did or

 8   didn't do something?

 9        A.  He would call me.  He would ask me via

10   message.  And then he would send me a message, I'll

11   call you later.  And then I would tell him, I -- it's

12   just that I had to tell you what was going on.  And he

13   said that he took long calling me back because he was

14   feeding his canaries or whatever birds.

15        Q.  All right.

16        A.  I had to represent him in front of the City of

17   Doral for all the complaints.  I would get the letters,

18   I would send pictures to him.  But when I would show

19   up, I would show up as the representative of Orlando

20   Fernandez.

21             So the City of Doral does not deal with you,

22   the police either, the post office.  They don't give

23   you the papers nor the correspondence if you're the

24   representative.

25        Q.  All right.  Who in the City of Doral did you



 1  meet with?

 2      A.  The inspectors would come often and say, well,

 3  the cables are touching the electricity, you need to

 4  trim them.  I would say to Orlando -- and then I would

 5  say, go find a tree trimming company, see if you can

 6  find it cheaper.

 7      Q.  So --

 8      A.  That's all in -- in the mail.

 9      Q.  So would you say that you almost acted as an

10  advisor to Orlando on how to keep the company compliant

11  with code enforcement regulations?

12          THE INTERPRETER:  Can you repeat that?  I'm

13  sorry.

14          MR. ALVAREZ:  Yeah.

15  BY MR. ALVAREZ:

16      Q.  Would you say that you offered advice to

17  Orlando on how to keep Viormar compliant with the rules

18  of the City of Doral?

19      A.  I would tell him.  The -- when the 40-year

20  inspection came -- I'm just setting an example.

21  There's a lot more.  I told him that the roof had

22  deteriorated, that I kept putting sealant on it, and

23  for him to buy the sealant.

24          And I would get up there and I would try to

25  improve it to see if it would pass inspection, but it



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                                  82

1  wouldn't.  I had to put in a new roof.  And I had to

2  get the estimates myself of a new roof.

3       Q.  All right.  So hold on.  Before we move on, do

4  you have messages from anyone at Viormar directing you

5  to do these things?

6       A.  Orlando Fernandez.

7       Q.  Okay.

8       A.  I would tell them to get me estimates,

9  receipts, the tree trimming receipts, receipts of the

10 roof.  And when there was an open wall -- let me give

11 you an advice.  I sleep under that, and I will tell

12 him, Orlando, that's going to fall on me.  That eight

13 ton beam is going to fall on me.  And you want to rent

14 this in this condition?

15      Q.  So --

16      A.  And he said, I have to rent it anyway.  I --

17 go cover it up, go buy cement, go buy paint, and here's

18 the money.

19      Q.  Okay.

20      A.  And I advised him not to.  And then, that's

21 when the discordance began.  Why?  Because he wants to

22 rent out a building that's going to fall on people's

23 head.

24      Q.  Okay.  And -- give me a minute to think this

25 one.



1      A.  So I'm sorry, I'm just telling the truth.

2   I've done the entire electricity for that building.

3      Q.  If --

4      A.  And he doesn't learn, which means I don't do

5   anything.

6      Q.  Has anyone at Viormar threatened you with

7   eviction if you stopped working?

8      A.  The daughter came a few days ago and told me

9   that she was going to get me out of there.  I said,

10  what?  You have to pay 5,000, she said now.  I have to

11  pay 5,000 in a 600 feet square place.  And I told her,

12  I don't think I have to pay 5,000.

13       And she was rude to me that day.  I didn't

14  want to do it.  I wanted her to understand that I have

15  worked for him.  I have been a person unlike any other

16  person he is ever going to find in his lifetime.

17       And now, he's going to -- when I'm out of

18  there, he's going to have to pay people, like the

19  landscaping company, that he now has to pay.  Never had

20  to pay for that before.  Who gave maintenance to that?

21      Q.  How long has Viormar been trying to sell the

22  property?

23      A.  I just found out.

24      MR. ALVAREZ:  All right.  So -- hold on one

25  second.  Were you able to get everything that was being



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      84

 1  said there?
 2         THE REPORTER:  Yeah, I -- I was.  Thank you --
 3  and thank you for asking.  I just -- yeah.  But
 4  everyone's doing a great -- a great job.  I appreciate
 5  it.
 6         MR. ALVAREZ:  Okay.  Sorry.  Can you reread
 7  his response to me?  Because I was going to follow up
 8  with -- on that.
 9         THE REPORTER:  Sure.  Just one moment.
10  I'll -- I'll actually play the -- play it back, the
11  question and -- and answer.  Just one second.
12         THE INTERPRETER:  I hate to hear myself on
13  video -- on sound.
14         MR. ALVAREZ:  I'm not a fan of it either.
15         THE INTERPRETER:  It's weird.
16         (The previous answer was played back.)
17         MR. ALVAREZ:  All right.  All right.
18         THE REPORTER:  Oh, and the last question was:
19  How long has Viormar been trying to sell the property?
20  I don't know.
21  BY MR. ALVAREZ:
22      Q.  I'll ask that one again.  How long has Viormar
23  been trying to sell the property?
24      A.  Never.
25      Q.  So they've never told you that they're



1  planning on selling the property?

2      A.  No.

3      Q.  So I don't mean to interrupt, but didn't you

4  testify earlier that you would be happy if they did

5  sell the property?

6      A.  Not -- did I say that?  No.

7      Q.  Okay.

8      A.  I'm -- I'm not happy that they're selling the

9  property.

10     Q.  Okay.

11     A.  He has not wanted to sell the property.  I

12 have brought him people to buy the property, and he

13 said no.  And then, a man came and said, I'm going to

14 buy this property whether you want to or not.  And then

15 Orlando said, that man's crazy because how is he going

16 to buy the property if I'm not selling it to him.

17     Q.  But you're the one that found that potential

18 buyer?

19     A.  Yes.  He -- he's a truck -- tow truck driver,

20 and he came to pick up a car at Carlos' to -- it's --

21 it's to make, like, a trucking -- tow trucking company.

22 And he said no.

23     Q.  But why would you try to find a buyer if you

24 intend on remaining on the property?

25     A.  I don't want a buyer.  And hear me out.  It's



 1  not that I want to stay in the property, I don't

 2  have -- how to get out of the property.

 3      Q.  Why don't you have the means of getting out of

 4  the property?

 5      A.  I don't have enough money saved up from what I

 6  have been able to save throughout the years in order

 7  for me to move out.

 8      Q.  But if I'm understanding correctly: When you

 9  first came into this agreement, you found it favorable

10  to live on the property rent-free and provide services;

11  is that right?

12      A.  I was never living there for free because I

13  have to work for him about 24 hours a day, and he

14  doesn't pay me.

15      Q.  So you are working in lieu of paying rent?

16      A.  I don't understand.

17      Q.  So instead of having to pay rent, like other

18  tenants, you pay for that in the work you provide; is

19  that what you're saying?

20      A.  That is right.  That's how he's paying me.

21  He's paying me with a roof, which the law says he can't

22  do.  Blue Lightning Campaign says that, and I'm

23  educating myself on how that works.

24      Q.  Okay.

25      A.  I'm -- this is not good, and I am getting



1  assessment from the government.

2      Q.  So when you met Orlando's father, both of you

3  came into agreement that you would pay $500 a month in

4  rent; is that right?

5      A.  I paid that to live there.  As a matter of

6  fact, my brother stayed outside.  And what he would

7  want me to do was to create, like, an office space or

8  fix the office, so that he could rent it out to my

9  brother.  But then the land came up -- he didn't want

10  me to leave.  And he was, like, the one telling me,

11  don't go to the land or lot because, what are you going

12  to go do over there?

13      You need to stay here.  And so I introduced

14  him to my brother, and then my brother buys the land

15  off of him.  And then he's like, no, you go here.

16      Q.  Was Orlando's father concerned for your

17  well-being?  Is that why he told you not to go to the

18  lot?

19      A.  His dad wasn't alive at the time.  Orlando's

20  son did that.

21      Q.  So Orlando's son told you to stay inside the

22  office instead of the lot?

23      A.  He's -- he's always saying that, no, no, no,

24  no, I need you.  Stay there, stay there.

25      Q.  Okay.  All right.  Can we look at Page 3 of



 1  the Complaint, Paragraph 17.  It says, "Plaintiff
 2  worked for Defendants by performing various job duties,
 3  including cleaning, repairing, renovating, collecting,
 4  and renting for its commercial property rentals." How
 5  were you renting for its commercial property rentals?
 6        A.  What do you mean by "renting"?
 7        Q.  Well, I mean, that's what it says in the --
 8        A.  I would bring people in.  I would bring them
 9  the person.  And I would introduce them and say, this
10  is a trustworthy person, you can rent it to them.  And
11  then he would do everything, all the paperwork.
12        Q.  How did you find these people?
13        A.  Because I get commented on by people, and then
14  I go to them and I see their living conditions and
15  stuff.  Orlando's never there.  Never.
16        Q.  Were you ever threatened physically that you
17  had to stay on the property?
18            THE INTERPRETER:  That -- where you had to do
19  what?
20            MR. ALVAREZ:  Had to stay and work on the
21  property.
22            THE WITNESS:  Orlando Fernandez, you mean?
23  BY MR. ALVAREZ:
24        Q.  Anyone at Viormar?
25        A.  Very subtle threat.  No, you have to -- you



 1  don't need anything.  You have to stay here, you have

 2  everything here.  I don't have everything there.  I

 3  have children.  I have family.  I have a mother.  I

 4  don't have any reason to be in some solitary place.

 5      Q.  Okay.

 6      A.  I have to be normal, like the rest of people.

 7      Q.  So you could stay with those family members

 8  you're referencing, can't you?

 9      A.  I don't think I can.  Everybody has their own

10  lives here.  My mom lives with my sister.  One of my

11  children went to Japan.  Cousins, uncles, it's not the

12  same here.  There's only one solution here.  For that

13  man to -- I worked a lot for that -- for that man to

14  tell the truth, pay me what he owes me, and I'll leave.

15  He has a lot of properties.  He has a lot of money.

16      Q.  If it's your --

17      A.  That's on my behalf.

18      Q.  If it's your position that they're saying that

19  you have to stay on the property and can't leave, that

20  they want you on that property, why is it that they're

21  trying to evict you from that property?

22      A.  You know why?  Why did this happen?  Because

23  the minute that I got an attorney and they got the

24  petition from the attorney, they -- that's when they

25  wanted to evict me.  They went as far as to tell me



1  that if I removed the lawsuit, they would get me a lot.

2      Q.  Okay.  But earlier, you testified that you'd

3  never wanted to bring this suit.  If your original

4  agreement was that you get to stay on the property

5  without paying rent in exchange for your work, at what

6  point did you decide, no, I want -- I need to get paid

7  as well?

8      A.  When he told me he didn't care about my life

9  or where I went, and I was insignificant to him.  And I

10  said, I have worked for you many years.  And I gave my

11  life there.

12      Q.  When did he tell you that?

13      A.  On a Friday.  On February 28th, that's the

14  date of the lawsuit.  That previous Friday, he came.  I

15  told them that thing about that the building wall was

16  going to fall off and I was supposed to cover up this

17  crack.  Why was the debris from the five offices that I

18  demolished still there?

19          And that's -- and I said, I'm one person.

20  That we needed a big container for me to get everything

21  out.  He -- he said he couldn't do that, that he

22  couldn't get a big container, that I would have to do

23  it slowly in the regular trash.

24      Q.  All right.  And again, just to confirm, were

25  those verbal demands?



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                           91

1       A.  Yeah, they're smart.

2       Q.  Okay.

3       A.  They're smart.

4           THE INTERPRETER:  Counsel, whenever you get a

5   good breaking point, if we could use a restroom break.

6   I don't know how much time --

7           MR. ALVAREZ:  Yeah.  I don't have much left,

8   but I also need to use the restroom, so now would be a

9   good time.

10          THE INTERPRETER:  Okay.  Good.

11          MR. ALVAREZ:  We're going to go off the

12  record.

13          THE REPORTER:  We are going off the record.

14  The time is now 2:39 p.m., Eastern Standard Time.

15          (A recess was taken.)

16          THE REPORTER:  We are back on the record.  The

17  time is now 2:45 p.m., Eastern Standard Time.

18  BY MR. ALVAREZ:

19      Q.  All right.  So back in 2010, you stated that

20  Orlando's father found you sleeping in your car due to

21  your financial situation.

22      A.  I didn't say that.

23      Q.  Okay.

24      A.  He saw me working one of Jessy's Limousines

25  cars.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      92

 1        Q.  Okay.  Could you go to Paragraph 41 of the
 2   Complaint?  I think I'm already there.
 3            THE INTERPRETER:  I'm here.
 4   BY MR. ALVAREZ:
 5        Q.  Okay.  So it says, "Plaintiff slept in his car
 6   near the defendant's property located at 7884 Northwest
 7   55th Street, Doral, Florida 33166 due to his financial
 8   situation." So is that not the case?
 9        A.  Who said that?
10        Q.  You did.  It's -- that's your allegation.
11        A.  I was sleep -- I wouldn't sleep in the
12   property.  I would sleep across.  I did not sleep in
13   their property.  I slept across the street.  I would --
14   I would live by Roberto Perez.  It was only because I
15   sold everything I had to make those patents.  And I
16   would work Jessy's cars.
17        Q.  So -- but at that time, you lived out of your
18   car; is that fair to say?
19        A.  Yes, until I would find some rent.
20        Q.  Okay.  And if you were evicted today, where
21   would you live?
22        A.  It's different now.  I don't really have a
23   good eyesight.  I'll tell you this, I'm trained to do
24   whatever.  But I can't see now.  I don't care to live
25   on the street because I know how to live on the street.



1   I was abandoned after 2 years old by my own mother.

2   And I learned to survive without going and being a

3   delinquent.  So imagine, there's this person who

4   supposedly is prestigious and honorable.

5            He's degraded himself based on this huge lie

6   that he's told just because he doesn't want to pay me

7   what I deserve.  It says here.  I remember him saying,

8   don't tell anybody, don't let anybody know that I --

9   that you worked for me.  And don't let anybody know you

10  live here.

11       Q.  What's the document you're referring to?

12       A.  I'm -- I wrote it down here, so I don't forget

13  it.  It's just a lot of things.  I'm regaining my

14  memory, all that he would tell me constantly, the whole

15  life I lived there.

16            MR. ALVAREZ:  Okay.  I think that's going to

17  wrap up my questions.  I -- and I'm going to reserve

18  the right to reexamine after your cross if I have to.

19  I don't anticipate I will.  But yeah, I'm -- I'm done

20  with my --

21            MR. LAROU:  Sure.

22                  CROSS-EXAMINATION

23  BY MR. LAROU:

24       Q.  Mr. Aneiros, just a couple of follow-up

25  questions from me.  You mentioned earlier in your



1  deposition that during the time you were performing

2  work for Viormar and for Orlando Fernandez on

3  occasions, at least one occasion, Orlando would travel

4  to Curacao; is that right?

5       A.   No.  I said that one would have to travel to

6  Curacao.  Okay.  So he sent me the whole -- he did it

7  from here.  And then he sent me the package, so that I

8  could certify it at the post office and send it.  And

9  that's when he tells me, don't tell anybody about what

10  we're doing.  Because the company didn't have a

11  property.  That's when he tells me that.

12       Q.   So just to make sure I'm understanding

13  correctly, Orlando would instruct you to mail this

14  package to Curacao?

15       A.   Correct.

16       Q.   Do you know what was in the package?

17       A.   No.  Well, when he would say Curacao, I knew

18  that the company was based out of Curacao.

19       Q.   Understood.  So you believe that that package,

20  which Orlando was instructing you to send to Curacao,

21  was something related to the business of Viormar?

22       A.   My deductive reasoning tells me so.  Because

23  he said not to tell anybody about it.

24       Q.   As part of the job duties that you were

25  performing for Viormar or for Orlando Fernandez, were



 1  you regularly sending or receiving mail for the

 2  company?

 3       A.  Correct.

 4       Q.  How often would you send mail for Viormar or

 5  for Orlando?

 6       A.  Every 15 days, something like that.  The

 7  letters would accumulate.  They would accumulate.  He

 8  would send everything with the stickers, Denny and

 9  Orlando, and then he would buy the postage and send it

10  to me.

11           And then he told me he'd have -- I'd have to

12  pay for my own electricity, that I'd have to buy my own

13  postage.  And then -- postage and envelopes.  And I

14  didn't have the funds to buy the postage and the

15  envelope, so they would delay it a little bit.

16       Q.  How often would you receive mail for Viormar

17  or for Orlando?

18       A.  Every day.

19       Q.  Every day.  And so where would you retrieve

20  that mail from?

21       A.  You know, from washing dishes or whatever.

22  Whatever I would do.

23           MR. LAROU:  And so I don't -- I don't think

24  that answer was completely responsive to my question,

25  so I just want to see if I can ask that question in a



 1  different way.  I'll slightly rephrase.

 2  BY MR. LAROU:

 3      Q.  So where would you pick up the mail from that

 4  would arrive for Viormar or for Orlando?

 5      A.  It will get delivered by the post office.

 6      Q.  Delivered to where, to a mail box?

 7      A.  The mail box at 7884 Viormar, or -- or the

 8  postman himself would say, Denny, Denny, here is the

 9  correspondence for Orlando Fernandez.

10      Q.  Okay.  And so after you would retrieve or

11  accept those letters or packages, either for Viormar or

12  for Orlando, how would you get those letters or

13  packages to Orlando?

14      A.  I would buy the stamps and the envelopes after

15  he stopped sending me stamps and envelopes.  I still

16  send him stuff.  So I would grab the letter, and then

17  put it in the new envelope and address it to his

18  address.  It's a P.O Box.  And then I will give it to

19  the postman.

20      Q.  So earlier in your deposition, you mentioned

21  quite a few job duties that you were performing either

22  for Viormar or for Orlando.  And I just want to go

23  through those.  Okay.  Other than -- other than

24  performing repairs to the building, finding new tenants

25  to rent out the space, general maintenance of the



 1 | warehouse, cleaning the warehouse and the parking lot,

 2 | taking out trash --

 3 |        THE INTERPRETER:  One second.

 4 | BY MR. LAROU:

 5 |     Q.  -- and also evicting tenants from a warehouse,

 6 | and painting the warehouse, are there any other job

 7 | duties that you can think of that you performed either

 8 | for Viormar or for Orlando?

 9 |     A.  At night -- well, guard the property.  Every

10 | time that the dog barked and I go outside, there would

11 | be a man out there.

12 |     Q.  Okay.  And did you perform all of those job

13 | duties throughout the entire time that you were living

14 | on Viormar's property?

15 |     A.  Yes.  I still live there and I still do it.

16 | Yes.  And that landscaping person he hired only comes

17 | once.  But my little cart with the trash and the dust

18 | bin are still there.  And daily, there's a lot of

19 | debris, leaves fall off, people take out -- leave

20 | trash, and they also -- water bottles and things like

21 | that.  I pick up all the -- all of that, still.  I

22 | still send the mail I receive.

23 |     Q.  Okay.  I want to talk a little bit more about

24 | painting the warehouse.  What part of the warehouse did

25 | you paint?



1          A.  The interior completely.

2          Q.  Okay.  Did you only paint the --

3          A.  Inside and all the exterior.

4          Q.  Okay.  So you -- you painted the inside as

5    well as the outside of the entire Viormar warehouse

6    property?

7          A.  Yes, in order to rent it out.  It was still,

8    like, concrete block.  And they said, you have to

9    paint.  They bought the paint -- the paint tanks,

10   rollers, brushes, everything.

11         Q.  Okay.  And so just to make sure, so you

12   painted the portion of the warehouse that was rented by

13   Jessy's Limousines; is that correct?

14              THE INTERPRETER:  You rented?

15              MR. ALVAREZ:  Painted.

16              THE INTERPRETER:  Painted.

17              THE WITNESS:  Yes, I painted that too.

18   BY MR. LAROU:

19         Q.  And you painted the portions of the warehouse

20   that were rented by Viormar's other commercial tenants

21   as well?

22         A.  Correct.

23         Q.  How many times have you painted Viormar's

24   warehouse?

25         A.  It's 10,000 square feet.  It's a warehouse.



1   And it's divided, 5,000, 5,000.  Carlos de la Flor is

2   in one of them.  When Carlos comes to -- to rent it, I

3   brought him in with his trailer and truck.  Then they

4   said, paint walls, doors, install the water heater.

5            Vita Home Care Solutions used to be there, so

6   I had to paint all of the outside.  And then -- so I

7   had made, like, on the door of Vita, like, this huge

8   logo, and they wanted me to remove that.

9        Q.  Okay.  And so -- so have you painted Viormar's

10  warehouse more than one time?

11       A.  Three times.

12       Q.  Three times.  Do you remember about how long

13  ago it was that you were painting the warehouse?

14       A.  Last time, it was, like, three years.  I was

15  changing that thing that had the termites.  And so

16  there was new wood.  He brought the paint, and I had to

17  paint it again to pass the inspection from the City.

18       Q.  Got it.  So what type of tools or materials

19  did you use to paint the warehouse?

20       A.  Rollers, brushes.  And I had to put, like,

21  caulking to cover the holes.  A pressure washer machine

22  to remove the dust and dirt, all of that.  Orlando

23  would bring all that.

24       Q.  And I'm assuming you probably had to use paint

25  itself, right, to -- to paint the warehouse?



1        A.  Yeah, he would bring the paint.  He would,

2    like, remove a piece of the wall, and then he'll have

3    it matched and then bring that paint color.

4        Q.  And who would have a piece of the wall

5    removed?  Orlando?

6        A.  He would tell me to do it, to remove a piece.

7    He wouldn't do anything.

8        Q.  Got it.  So let's go through some of those

9    materials that you were using to paint the warehouse.

10   First, let's start with the rollers.  I believe you

11   stated just a moment ago that Orlando provided you with

12   those rollers.  Do you know where he got those rollers?

13       A.  He would get them at a paint company on -- he

14   would get them off 79th Street and 52nd, and the place

15   was called, America.  But that -- American Paint.  That

16   was for the government.  And -- but she's no longer

17   there.  She would prepare paint for the military and

18   stuff.  But I would recommend that place because that

19   was the one that was closest by.

20       Q.  Got it.  So you recommended Orlando to go to

21   American Paint, and Orlando would purchase those

22   materials himself for you to use; is that correct?

23       A.  True.  And the sealants for the roof, he'd buy

24   them there.

25       Q.  What about the caulking that you mentioned



1  just a moment ago?  Do you know where that came from?

2      A.  Same place.

3      Q.  What about the pressure washers?  Do you know

4  where Orlando got those?

5      A.  It was electric.  I don't know.  I would

6  imagine Walmart or -- I don't know where he got them.

7      Q.  Do you know if he bought those pressure

8  washers or rented them?

9      A.  No, it was their pressure washer.  We got that

10 when -- he got that when Vita Home Care Solutions was

11 made to clean the floors.  We remodeled everything and

12 to paint -- do it before painting the walls.  So that

13 stayed as part of the company.

14     Q.  As part of Viormar's company?

15     A.  Yes, Viormar.

16     Q.  Do you happen to remember the brand of the

17 pressure washer you were using?

18     A.  Husky, I think it was called.

19     Q.  So you mentioned just a second ago, there was

20 an issue at the warehouse where there were cracks in

21 the structure or in the foundation of the building, and

22 that you tried to apply sealant, but it seemed like

23 that wasn't working.  There were still leaks.  Do you

24 know if Orlando or Viormar ever got those cracks fixed?

25          THE INTERPRETER:  That it -- the -- it had the



1  cracks, but -- you started with something else.  But it

2  was not --

3          MR. LAROU:  Oh, but there was still water

4  leaking through the cracks.

5          THE WITNESS:  No, not that one.  There was

6  a -- like, an explosion, 2017, 2018.  And I

7  investigated what was going on.  And I investigated it,

8  and in the back, it was, like, the wall was going to

9  crumble.  I called him at that night.  It was, like,

10  midnight.  I said, Orlando, the back wall is going to

11  fall completely.

12          Next day, he was here.  He came.  And when --

13  and when he saw that it was falling apart, he hired a

14  big company.  And they did the whole building in the

15  back.

16  BY MR. LAROU:

17      Q.  So where -- where were those cracks that --

18  that were being fixed?  Was it in the wall of the

19  warehouse?  Was it in the roof?

20      A.  It was the back wall, sorry.  Back and lateral

21  wall.

22      Q.  Okay.

23      A.  Those walls support the roof.

24      Q.  Got it.

25      A.  But the one in the back, what's the wall that



1  he asked me to cover up or fill in the holes.

2      Q.  Okay.  So during the time that you've been

3  living and working at Viormar's warehouse, have there

4  been any contractors that have come to the property to

5  fix any kind of structural issues?

6      A.  One or another person may have come, yes.

7      Q.  Do you know how Orlando or Viormar found those

8  contractors?

9      A.  I brought the electricians.  And the

10 contractors who checked the structure, he sent them.

11 But since all of this process has began, and I think it

12 has been somewhat delayed, there have been no other

13 contractors because this process is on the way.

14     Q.  Okay.  So you said that you contacted some

15 electricians to come and perform work at Viormar's

16 warehouse.  What happened to necessitate an electrician

17 to come to Viormar's property?

18     A.  Well, he hired some electricians because we

19 had to change the meter when Carlos first came.  So

20 he -- he had to get a meter that had higher voltage,

21 like, 100 watts because of the machinery that he uses

22 to fix cars.  So they did the job.  Carlos paid for

23 that.  Water heater -- in warehouse.  So one of the

24 electricians that came disconnected the warehouse of

25 the person who says -- this famous person who says they



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    104

```
 1   can't rent out their warehouse.
 2          MR. LAROU:  Okay.  Hold on.  Just one second.
 3   I would like to put a new rule.  If you're already
 4   translating, could he pause and wait for her to finish
 5   the --
 6          THE INTERPRETER:  Yeah.
 7          MR. LAROU:  -- translation?  Because it's --
 8          THE INTERPRETER:  I'm getting a little
 9   overwhelmed.
10          MR. LAROU:  -- it's hard -- yeah.
11          THE INTERPRETER:  It's okay.
12          MR. LAROU:  It's okay.  All right.
13          THE WITNESS:  So the line that brings in the
14   electricity to that warehouse was broken.  And so it
15   stalled the process for a long time due to that.  He
16   had not used that warehouse in seven years.  He wanted
17   me to tear down the walls and the offices.  And so I
18   told him, I need you to install the electricity because
19   I need to install machines there.
20          So I got him an electrician, so that he could
21   install the electrical system once again.  He wants to
22   do everything under the table, and not everything can
23   be done under the table.  You have to get permits, you
24   have to bring qualified people as FPML demands it
25   until -- it hasn't even been six months since the new
```



```
1   meter was installed.  November, December of last year

2   was when the electricity was finally installed in that

3   building.

4   BY MR. LAROU:

5        Q.  Okay.  So did Orlando -- you -- you said that

6   you were the one responsible for bringing in those

7   electricians.  Did Orlando instruct you to go out and

8   find an electrician to perform that work?

9        A.  Yes, he always tells me.

10       Q.  Okay.  Other than the electrician who

11  performed the work you just discussed, have you

12  coordinated with any other contractors or individuals

13  to come perform work at the warehouse?

14       A.  The roofers.  I look for several and they

15  would charge a lot of money.  The first one I brought

16  was charging $77,900.  And it's called Romero Roofing.

17       Q.  Okay.  And so when the roof needed work, did

18  Orlando instruct you to go out and find the roofer to

19  come perform that job, Romero Roofing?

20       A.  No.  He said it was a lot of money.  And he

21  said to wait, that he was going to get somebody.  And

22  he brought another person.

23       Q.  Okay.  Do you remember the name of the

24  electrician, either the -- the individual or the

25  company, that came and performed that electrical work
```



 1   at Viormar's warehouse?

 2        A.   That he brought?

 3        Q.   Yes.

 4        A.   I don't remember.  He had done that roof when

 5   his father was alive.

 6        Q.   Oh, okay.  Earlier in your deposition, you

 7   mentioned that there were sometimes issues with

 8   compliance with the City's building codes, including

 9   there being a lot of trees and an issue with the power

10   lines.  Were you responsible for trimming those trees?

11        A.   Yes, but it was dangerous because they were

12   making contact with the tree -- I'm sorry, with the

13   cable.  So the City inspector gave me 30 days, a

14   warning, to do it.

15        Q.   Got it.  So you -- you were the one that was

16   going out and trimming the trees yourself?

17        A.   No.  I told Orlando I couldn't do it because

18   there were -- of the electricity running.  He would

19   always say, make it cheap.  Like, he asked me to get a

20   company to do it.  So I looked for a company.  And then

21   I introduced it to him and then he -- he had the guys

22   do it.

23        Q.   Got it.  And do you remember the name of the

24   tree trimming company?

25        A.   I have it in an e-mail.



 1      Q.  That's okay.  If you don't remember, that's

 2   all right.  About how long ago was it that Orlando

 3   instructed you to find the tree trimming company, if

 4   you can remember?

 5      A.  End of last year.

 6      Q.  Okay.  So towards the end of 2023?

 7      A.  Yes.  Correct.

 8      Q.  Okay.  Earlier, you also mentioned that

 9   Orlando would ask you to perform work on his vehicles

10   or the vehicles of his family members.

11      A.  Correct.

12      Q.  And you mentioned that you would sometimes

13   paint cars --

14      A.  Yes.

15      Q.  -- perform oil changes, tune-ups.  Where did

16   you get the tools to do those jobs?

17      A.  Orlando would buy it.

18      Q.  Do you remember what type of tools you were

19   using?

20      A.  I did an oil change -- a motor change -- I

21   changed the engine on his son's car.  And I did -- I

22   restored the paint, that kind of paint that doesn't

23   have gloss.  Well, when we started doing it -- when I

24   started doing it, I didn't have the proper tools.

25      Q.  Okay.  So the paint that you were using to



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                         108

```
 1   paint the cars, do you know where that came from?
 2        A.  So we went to buy the paint.  And what a
 3   coincidence, the name of the place is also called
 4   America.  It's in Hialeah, East End Hialeah.  We also
 5   bought the gun there, the paint, the -- the sanding
 6   devices, everything there.
 7        Q.  So who -- who bought all of those materials
 8   you just mentioned?
 9        A.  Orlando Fernandez.
10        Q.  And he gave them to you to --
11        A.  I didn't have money for that.
12        Q.  So Orlando gave you those materials to use to
13   work on his cars and the cars of his family members?
14        A.  To do his son's car and Cristina's.
15        Q.  Did you ever change the motor oil for Orlando
16   Fernandez or any of his family members?
17        A.  Sporadically, I would do that because they
18   would go on long trips.
19        Q.  Got it.  And so who would buy the oil for you
20   to use for that oil change?
21        A.  Orlando.
22             THE INTERPRETER:  I'm going to use a restroom
23   break soon, so I don't know how much more you got.
24             MR. LAROU:  Almost -- almost done.
25             THE INTERPRETER:  Almost.  Okay.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     109

1  BY MR. LAROU:
2      Q.  So you mentioned performing work on the cars
3  for Orlando, his son, his daughter.  Did you ever work
4  on -- or yeah.  Did you -- did you ever work on
5  Orlando's father's car?
6      A.  Yes.  I would do his brakes and mechanical
7  work on his car when I met him.  Because he used to
8  take it to Roberto Perez.  But since it was too costly,
9  and I said, I can help you with that, I can do that, I
10  could charge you less.
11     Q.  Do you remember about how long ago Orlando's
12  father passed away?
13     A.  He died, like, in 2017.
14     Q.  Okay.
15     A.  When I got very out of there.
16     Q.  Do you know what happened to Orlando's
17  father's cars after he passed away?
18     A.  They gave them to me to sell.
19     Q.  What cars -- first off, who gave you cars to
20  sell after Orlando's father passed away?
21     A.  It was only one car owned by the father, and
22  it was a Mercedes Benz E320.
23     Q.  Okay.  So did you find a buyer for that car?
24     A.  I found a man.  He lives in the Northwest.  I
25  do call it, but he doesn't answer that number.



1    Q.  Okay.  So earlier you mentioned building some

2    displays for one of Orlando's companies in the

3    warehouse.  Can you describe to me the -- the displays

4    that you were building?

5    A.  Cristina buys, like, one of those bench

6    saws -- chainsaw.  They had to have, like, a portable

7    shelf of sorts because they were doing these displays.

8    It was, like, everything related to bath -- bathroom,

9    the things that hold up a bathroom.

10   Q.  Okay.  So Cristina would give you those saws

11   to construct the displays?

12   A.  Correct.  She would buy it, the saw, the

13   drills.

14   Q.  Do you remember the brand of the wood saw that

15   you were using?

16   A.  I still have it.  I still have it.  I think

17   it's called Circa.  It's not very good, but it's

18   useful.

19   Q.  Do you remember the brand of the drills you

20   were using to build those displays?

21         THE INTERPRETER:  The what?

22         MR. LAROU:  Drills.

23         MR. ALVAREZ:  Drills.

24         THE WITNESS:  Riot, could be.  I don't know

25   how to say those names.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    111

1  | BY MR. LAROU:
2  |     Q.  I think it -- I think it was Ryobi.  And --
3  | and just to clarify, R-Y-O-B-I?
4  |     A.  Yes.
5  |     Q.  Do you know where either those -- the
6  | woodcutting saw or the drills were purchased from?
7  |     A.  No.  They said at a Home Depot, Walmart.
8  | Harbor Freight, something like that.
9  |     Q.  Okay.  So earlier, you mentioned that there
10 | were skylights being delivered to the warehouse.  Do
11 | you know what those skylights were being used for?
12 |     A.  When they were going to repair the roof.
13 | You'd have to -- you'd have to change the ones that
14 | were broken.
15 |     Q.  Okay.  So did you accept those packages when
16 | the skylights were delivered to Viormar's warehouse?
17 |     A.  Yes.  Correct.  That's when he said, they
18 | brought the skylights and you weren't in the warehouse,
19 | where are you?
20 |     Q.  Do you know where the skylights came from?
21 |     A.  No.
22 |     Q.  Did you -- did you help to install the
23 | skylights?
24 |     A.  No.  He just asked for the measurements.
25 |     Q.  Have you installed any other kind of fixtures,



1  either inside or outside of Viormar's warehouse?

2       A.  Water heater, faucets -- water faucets.  I've

3  lost some phones, so I haven't found that text, but

4  there was a text in him asking me to do something

5  because the water consumption was too high.

6       Q.  Do you remember about how long ago you

7  installed the water heater?

8       A.  When Carlos moved into the place.

9       Q.  Do you remember about how long ago you

10  installed the water faucets in the warehouse?

11       A.  I've changed them several times because they

12  get deteriorated quickly.

13       Q.  Do you remember the last time you installed a

14  water faucet?

15       A.  Could be five years, I don't know.

16       Q.  What happens if light bulbs go out at the

17  warehouse?  Who's responsible for replacing those?

18       A.  I do.

19       Q.  How often --

20       A.  And I'm the one who says, hey, we have to buy

21  a light bulb.

22       Q.  Who do you tell that you need to buy a light

23  bulb?

24       A.  I tell Orlando.

25       Q.  So Orlando is the one that then buys those



 1   light bulbs after you tell him?

 2        A.  He used to buy the light bulbs.  But ever

 3   since Carlos got there, he's now saying that Carlos is

 4   the one that has to do it himself.  Well, but they

 5   don't do it.  They're always calling me to do it.

 6        Q.  Got it.  So even though Carlos is a commercial

 7   tenant of Viormar, you're still the one that's

 8   responsible for changing those light bulbs in his

 9   portion of the rented warehouse?

10        A.  Yes.

11             THE INTERPRETER:  Do you have much more?

12   Because I really need to go to the bathroom.

13             MR. LAROU:  Like, two more questions.

14             THE INTERPRETER:  Okay.

15             MR. ALVAREZ:  Yeah, I have to change my backup

16   as well.

17             MR. LAROU:  Okay.

18             THE INTERPRETER:  Two questions.

19             MR. LAROU:  If -- if you want to -- if you

20   guys want to take a quick, like, five-minute break or

21   something.

22             THE INTERPRETER:  Well --

23             MR. LAROU:  There might be a redirect.

24             THE INTERPRETER:  No, no, no. I'm sure there

25   is.



1           MR. ALVAREZ:  There is a redirect.

2           THE INTERPRETER:  I know.

3           MR. ALVAREZ:  So let's -- let's go to the

4  bathroom.

5           THE INTERPRETER:  Yeah.

6           MR. LAROU:  That's totally fine.

7           THE INTERPRETER:  Okay.  Thank you.

8           MR. LAROU:  Yeah, yeah.

9           THE REPORTER:  We are going off the record.

10  The time is now 3:38 p.m., Eastern Standard Time.

11           (A recess was taken.)

12           THE REPORTER:  We are back on the record.  The

13  time is now 3:45 p.m., Eastern Standard Time.

14  BY MR. LAROU:

15     Q.  Mr. Aneiros, earlier you mentioned that

16  Orlando Fernandez would instruct you to make deposits

17  of checks to an account with Ocean Bank; is that

18  correct?

19     A.  True.

20     Q.  Do you know what bank account you were

21  depositing those checks into?

22     A.  Viormar, Fersom.  Fersom.

23           MR. LAROU:  And again, I think for the record,

24  the spelling of that second company he named is

25  F-E-R-S-O-M.



```
 1              THE INTERPRETER:  Fersom.
 2  BY MR. LAROU:
 3       Q.  How would you receive those checks to deposit
 4  into Viormar's bank account?
 5       A.  He would send them to me in the envelopes with
 6  the stickers.
 7       Q.  Got it.  And so were you making those deposits
 8  into Viormar's bank account throughout the entire time
 9  you were working and living in Viormar's warehouse?
10       A.  Yes.
11       Q.  Do you know who wrote those checks or where
12  those checks came from?
13       A.  No.
14       Q.  That's okay.  Has Orlando Fernandez ever
15  threatened to kick you out of Viormar's warehouse,
16  other than, obviously, the pending eviction suit
17  against you?
18       A.  Well, if I wouldn't do the things, then, of
19  course, I'd have to get out.
20       Q.  What things do you mean?  You mean continuing
21  to work for the company or Orlando?
22       A.  What I did for the company.
23              MR. LAROU:  Okay.  Thank you.  No further
24  questions.
25                    REDIRECT EXAMINATION
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    116

```
 1   BY MR. ALVAREZ:
 2        Q.  Sorry, just wanted to make sure.  Okay.  So --
 3   yeah.  You mentioned earlier, when you were being
 4   questioned by your counsel, that you evicted a tenant.
 5   Which tenant did you evict?
 6        A.  Jessy Limo.  That's what it's called.
 7        Q.  Did you provide them with notice?
 8        A.  Jorge Sandina [sic].  That's the owner.
 9   That's the owner of Jessy Limo.
10        Q.  Okay.  Did you provide them with notice of
11   their eviction?
12        A.  Yes.  Correct.
13        Q.  Do you have a copy of that notice?
14        A.  The notice was me tell them that they had to
15   leave.
16        Q.  Okay.  So just to confirm, you never gave them
17   written notice?
18        A.  No.
19        Q.  Okay.  You also mentioned that Viormar had
20   hired a landscaping person that would only come once a
21   week.  So any cleanup work that you did was to
22   supplement that visitation, right?
23        A.  No, I didn't say that.  What I said is that he
24   hired that company after this lawsuit was established.
25        Q.  Okay.  But after he hired them, they would
```



1  come once a week; is that right?

2       A.  No.  They come monthly, once a month.

3       Q.  Okay.

4       A.  I used to do that myself before.  And now,

5  I -- I still do it.

6       Q.  Why are you still doing it?

7       A.  Because there's dirt.  Because I live there.

8       Q.  Okay.

9       A.  And whether he knows it or not, I still have

10  appreciation for him, except he doesn't realize that.

11       Q.  Okay.  If you lived in a house and a tree on

12  your property was not complying with city regulations,

13  would it be your responsibility to fix that?

14       A.  The owner has to fix it.  Well, if it's my

15  house, since I'm the owner, I would have to fix it.

16  But if I'm rented there, it would be the owner who has

17  to do it.

18       Q.  Okay.  So let's -- let's speak about owners.

19  You mentioned that Orlando told Carlos that if he

20  needed the lights changed, he had to change them.  And

21  I know that, eventually, you changed them.  But Orlando

22  did originally say that it was Carlos' responsibility;

23  is that right?

24       A.  Yes, he did say that occasionally.  But Carlos

25  has -- has been there, not at the only time I've worked



 1  for Orlando.  It doesn't depend on changing a light

 2  bulb.

 3      Q.  Okay.  And if you owned a property, or you're

 4  residing in a property -- actually, let me rephrase

 5  that.  If you're residing at a property and you wanted

 6  to install a security camera, would that be your

 7  responsibility?

 8      A.  As I said, I put it there so that I could see.

 9      Q.  Okay.

10      A.  I put it to -- to be able to see if somebody

11  is in there.

12      Q.  Okay.  If you shared a home with a guest and

13  the guest needed to repair his car, but he didn't know

14  how, would they be required to pay for any repairs that

15  you made if you never entered into a contract with

16  them?

17          THE INTERPRETER:  I need that read back.

18          MR. ALVAREZ:  All right.  So --

19          THE REPORTER:  I -- I -- if -- if you -- I --

20  I have it if you -- if you --

21          MR. ALVAREZ:  Go -- go for it.

22          THE REPORTER:  Okay.  Okay.  Okay.  So if you

23  shared a home with a guest that needed to repair their

24  car and didn't know how, would you --

25          THE INTERPRETER:  Go ahead.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    119

```
 1              THE REPORTER:  -- would you -- would you be
 2    required to pay any repairs you made without entering a
 3    contract?
 4              I apologize if I didn't get that for sure.
 5              MR. ALVAREZ:  Okay.  So yeah, that -- that's
 6    not exact.
 7              THE REPORTER:  I -- I can play it back, if
 8    you'd like.
 9              MR. ALVAREZ:  Let me just rephrase that.
10              THE REPORTER:  Sure.
11    BY MR. ALVAREZ:
12       Q.  If you shared a home with a guest and they
13    needed repairs done to their car, and you repaired that
14    car, would you be entitled to payment for the repairs
15    that you made --
16              THE INTERPRETER:  To -- to payments that --
17    would you be entitled to --
18    BY MR. ALVAREZ:
19       Q.  Would you be entitled to the -- would you be
20    entitled to payment for the repairs that you made if
21    you never entered into a contract to do those repairs?
22       A.  The -- the Bible says that the worker is
23    deemed or has rights to his pay.
24       Q.  Okay.
25       A.  God says it.
```



1    Q.  If you were to mention to me that you were

2    trying to sell a car, and I happen to know a buyer and

3    got you into contact with them, is that enough for you

4    to be considered my employer?

5             THE INTERPRETER:  Say that again?

6             MR. LAROU:  Form.

7    BY MR. ALVAREZ:

8        Q.  That if you were to mention to me that you

9    were trying to sell a car, and I happen to know a buyer

10   and I got the two of you into contact, is that enough

11   for you to be considered my employer?

12            MR. LAROU:  Form.

13            THE WITNESS:  Well, it's not about the sale of

14   the car.  It's -- it's a whole lifetime of working.

15   Don't try to get me confused.

16   BY MR. ALVAREZ:

17       Q.  I'm not trying to get you confused.

18       A.  Well, the sale of the car had to do with them.

19   I'm trying to get rid of a car.  That's just -- or the

20   changing of a light bulb, but that -- you can't compare

21   that to working a lifetime for somebody.

22            MR. ALVAREZ:  All right.  So I -- I want to

23   ask this question, but I'm not sure if it will

24   translate correctly in Spanish.

25   BY MR. ALVAREZ:



1      Q.  So are you saying that the -- the repair of
2   the vehicle was a one-off thing?
3      A.  No.  You're telling me if I live with a
4   person -- first of all, I don't live with Orlando.
5   We're not neighbors.  We reached an agreement.  I will
6   live there and I'll do everything.  He's not my
7   neighbor.  He's not my friend.  He's my employer.
8          He said, my son's car is in this repair.  I'm
9   a mechanical engineer.  Therefore, he knew that I knew
10   how to fix that.  He said, you can fix my son's car.
11   And this is where we go back to the labor is dignified
12   or entitled to his pay.  I worked, he didn't pay me.
13      Q.  Okay.  When you repaired the vehicle, did you
14   ask for payment after the repairs?
15      A.  Of course.
16      Q.  Did -- what did you --
17      A.  So they asked me how much it is, and I could
18   kind of estimate based on their condition.  It's the
19   same thing, a fee.  Just like when you are serving
20   somebody, you charge them a fee.
21      Q.  Did you give them an invoice showing the
22   amount that you're requesting to be paid?
23      A.  No.
24      Q.  Okay.
25      A.  He was paying me by the living situation or



DENNIS ANEIROS                                   October 07, 2024
ANEIROS vs VIORMAR TRADING                                   122

1   roof, which is illegal.

2       Q.  Okay.  I have two last questions.  So your

3   counsel was asking you about the various tools that you

4   claim to have been provided to you by Viormar for

5   fixing up the place.  If -- if Mr. Fernandez was living

6   in Orlando, was it up to you to go out and purchase

7   those tools?

8       A.  No.

9       Q.  So how did you get the tools?

10      A.  He would live in Orlando, but he would bring

11  me those things.

12      Q.  So how often would he go from Orlando to Doral

13  to bring you tools?

14      A.  Because he didn't -- but he didn't live in

15  Orlando the whole time.

16      Q.  Okay.  So how long has he been living in

17  Orlando?

18      A.  When his father died.

19      Q.  Okay.  What year did his father die?

20      A.  Like, 2017, '18.

21      Q.  Okay.  Didn't you say that you made these

22  repairs within the past year?

23      A.  I never said that.

24      Q.  Okay.

25      A.  Are you talking about car repairs?



1      Q.   I'm talking about any of the repairs that you

2   made.

3      A.   Sporadic.

4      Q.   Okay.

5      A.   Three repairs.  At the beginning, when I met

6   the father, changing the color of the building.  When

7   we did the Vita Home Care Solution, when I did that

8   logo type and all of that in the front.

9           And then the third one was when the

10  inspection -- they said there was termite and broken

11  windows.  And that's when I painted everything.  He

12  bought the paint.

13     Q.   All right.  Wait.  Who -- who bought the

14  paint?

15     A.   Orlando.

16     Q.   Okay.

17     A.   They're the ones who say, oh, I want this

18  paint.

19     Q.   All right.  Now, I want to talk about the --

20  the checks that were deposited into Ocean Bank.  Did

21  you receive receipts after making those deposits?

22     A.   Yes.  I would send everything through text.

23     Q.   Okay.  So --

24     A.   If they're there.

25          MR. ALVAREZ:  All right.  That's going to



 1 | conclude my questioning.

 2 |         MR. LAROU:  No follow-ups from me.

 3 |         THE INTERPRETER:  All your spellings are here,

 4 | if you have more questions.

 5 |         THE REPORTER:  Thank you.  Before I take us

 6 | off the record, I just have to briefly go through

 7 | transcript orders.  And I did want to ask -- oh,

 8 | just -- can we -- just one moment, please.

 9 |         Counsel Alvarez, there were three exhibits.  I

10 | just sent you an e-mail.  Did you want to retain them

11 | or send them?

12 |         MR. ALVAREZ:  Let me see.

13 |         THE REPORTER:  So Defense Exhibit 1 was the

14 | Sunbiz.org printout with -- for Ocean Mack's.  Defense

15 | Exhibit 2 was a printout for -- the same website for

16 | Doc Motors.  And Defense Exhibit 3 was Plaintiff's

17 | Second Amended Complaint.

18 |         MR. ALVAREZ:  Yeah, that sounds right.

19 |         THE REPORTER:  Perfect.  Did you want to

20 | retain them or send them?

21 |         MR. ALVAREZ:  Send them is fine.

22 |         THE REPORTER:  Sure.  And, Counsel, did you

23 | want to place an order for a copy of the transcript?

24 |         MR. LAROU:  We're not going to be ordering

25 | right now, no.



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                      125

1          THE REPORTER:  Okay.  And Counsel Alvarez?

2          MR. ALVAREZ:  Yeah, we -- we want to order.

3    Also, can I change the -- the send to retain?

4          THE REPORTER:  Sure.  Of course.  And did you

5    need that rushed, or is standard delivery okay?

6          MR. ALVAREZ:  Standard delivery is fine.

7          THE REPORTER:  Electronic?

8          MR. ALVAREZ:  Yeah.

9          THE REPORTER:  Perfect.  Thank you so much.

10         And thank you, Madam, for providing me your

11   spellings.

12         Read or waive, Counsel?

13         MR. LAROU:  We'll waive.

14         THE REPORTER:  Okay.  That's everything on my

15   end.  Counsel, may I take us off the record?

16         MR. ALVAREZ:  You may.

17         THE REPORTER:  Okay.  We are going off the

18   record.  The time is now 4:01 p.m., Eastern Standard

19   Time.

20         (The deposition concluded at 4:01 p.m.)

21

22

23

24

25



```
 1                CERTIFICATE OF DIGITAL REPORTER

 2

 3          I, Dillon Poberezhsky, a Digital Reporter and

 4    Notary Public within and for the State of Florida,

 5    do hereby certify:

 6

 7          That DENNIS ANEIROS, the witness whose

 8    examination is hereinbefore set forth, was not sworn/

 9    affirmed by me, and that said testimony was accurately

10    captured with annotations by me during the proceeding.

11

12          I further certify that I am not related to any

13    of the parties to this action by blood or marriage and

14    that I am in no way interested in the outcome of this

15    matter.

16

17          IN WITNESS THEREOF, I have hereunto set my hand

18    this 16th day of October, 2024.

19

20

21

22

23

24          _____
            Dillon Poberezhsky
            Notary Commission Florida/HH 324684
25          Commission Expires: October 23, 2026
```



1                CERTIFICATE OF TRANSCRIPTIONIST

2

3              I, Caroline Blauvelt, Legal Transcriptionist,

4       do hereby certify:

5              That the foregoing is a complete and true

6       transcription of the original digital audio recording

7       of the testimony and proceedings captured in the

8       above-entitled matter.  As the transcriptionist, I

9       have reviewed and transcribed the entirety of the

10      original digital audio recording of the proceeding to

11      ensure a verbatim record to the best of my ability.

12             I further certify that I am neither attorney

13      for nor a relative or employee of any of the parties

14      to the action; further, that I am not a relative or

15      employee of any attorney employed by the parties

16      hereto, nor financially or otherwise interested in the

17      outcome of this matter.

18             IN WITNESS THEREOF, I have hereunto set my

19      hand this 16th day of October, 2024.

20

21

22                    *Caroline Blauvelt*

23             _____
                      Caroline Blauvelt
24

25



DENNIS ANEIROS
ANEIROS vs VIORMAR TRADING

October 07, 2024
Index: $1,800..5,000

---

**$**

**$1,800**
44:14

**$10**
45:6

**$20**
32:11
66:16

**$3,800**
43:11

**$300**
52:17

**$45,600**
43:13

**$5,000**
45:7,11

**$500**
13:22
14:7
16:10
52:20
53:2 87:3

**$6**
58:22

**$60,000**
45:12

**$77,900**
105:16

---

**0**

**01:46:20**
51:14

---

**1**

**1**
35:13,15

36:6
124:13

**10**
77:2

**10,000**
98:25

**100**
14:25
15:21
32:21
103:21

**10:00**
4:2
59:20,22

**11**
8:25
11:15

**11:00**
61:18

**11:07**
30:15

**11:32**
30:18

**11:37**
33:4

**11:41**
33:7

**12**
16:9,19

**12:23**
52:11

**12:31**
52:14

**14**
39:4,8
65:17

**15**
95:6

**150**
32:21

**16**
65:13

**17**
65:13
88:1

**18**
122:20

**1:00**
54:11
59:18

**1:10**
70:4

**1:53**
70:7

---

**2**

**2**
38:5,6,11
74:18
75:15
93:1
124:15

**2,500**
49:13

**20-mile**
57:14

**2005**
11:15

**2010**
8:25
11:15
12:5 39:4
40:11
65:4
91:19

**2011**
12:3

**2012**
12:3

**2016**
9:12

**2017**
102:6
109:13
122:20

**2018**
102:6

**2020**
16:9,19

**2023**
107:6

**2024**
4:2 12:5

**24**
86:13

**250**
46:24

**28th**
90:13

**2:00**
59:19

**2:39**
91:14

**2:45**
91:17

---

**3**

**3**
74:16,18,
20,22
87:25
124:16

**3,800**
41:11
43:14

**30**
106:13

**300**
52:19

**305 282-
4539**
46:17

**305 362-
7556**
46:7

**33166**
92:7

**350**
46:25

**3:38**
114:10

**3:45**
114:13

---

**4**

**4,400**
41:24
42:20
45:5

**40**
43:1

**40-year**
81:19

**41**
92:1

**43**
40:9

**4:01**
125:18,20

---

**5**

**5,000**
43:20
83:10,11,
12 99:1

---



**50**
15:21

**500**
52:19,20

**52nd**
100:14

**55th**
92:7

**5:00**
59:21

---

**6**

**600**
41:16
42:2
45:18
83:11

---

**7**

**7880**
66:3

**7884**
92:6 96:7

**79th**
100:14

**7th**
4:2

---

**8**

**8**
7:22

**8,500**
28:12

**80**
14:25

---

**9**

**9**
75:16
76:20

**911**
9:9,13
22:20
41:7

**9:00**
59:18

---

**A**

**a.m.**
4:2
30:15,18
33:4,7
59:18

**A/c**
56:12

**abandoned**
9:5 11:3
93:1

**ability**
26:11

**accept**
96:11
111:15

**accepted**
40:12

**accident**
69:2,4

**accompany**
60:2

**account**
114:17,20
115:4,8

**accumulate**

95:7

**Acquaintances**
32:3

**Act**
8:3 75:22

**acted**
49:19
81:9

**address**
96:17,18

**administering**
4:22,23

**admired**
27:21

**advance**
59:5
78:16

**advantage**
51:5,9,16

**advice**
81:16
82:11

**advise**
21:15

**advised**
82:20

**advisor**
81:10

**affected**
48:18

**affiliation**
38:16

**afford**
34:4
47:11

**afraid**
53:8

**aggressive**
64:21,23

**agree**
43:12
45:10
60:13
62:20
63:2

**agreed**
64:14

**agreement**
5:4,15
55:23
71:25
86:9 87:3
90:4
121:5

**agrees**
5:17

**ahead**
37:25
70:22
118:25

**air**
32:16

**alive**
87:19
106:5

**allegation**
76:17
92:10

**allege**
7:22

**allowed**
28:25
33:12
55:24
56:17
72:2

**Alvarez**
5:19,23
6:7,11

8:2,5,6,
10,16,20,
22 10:2,
6,10,21,
23 12:12,
14,16,22
16:15
17:2
19:22
20:1
21:19,23
23:3,17,
23 24:3,
6,9 25:5,
7 30:9,
13,20
32:18
33:1,9,
16,25
35:17,21
36:16,20,
22 37:1,
3,6 38:4,
8,15,18
39:2,8,22
40:14,21,
24 41:17,
21 45:22,
25 47:7,9
52:8,15
55:13,14
59:22
60:9
61:8,11
65:23
66:5
69:23,25
70:8
73:14
74:2,3,
15,18,20,
24 75:1,
4,14
76:20,24
77:15,16
78:13,17
81:14,15



83:24
84:6,14,
17,21
88:20,23
91:7,11,
18 92:4
93:16
98:15
110:23
113:15
114:1,3
116:1
118:18,21
119:5,9,
11,18
120:7,16,
22,25
123:25
124:9,12,
18,21
125:1,2,
6,8,16

**Amazon**
48:2

**Amended**
74:21
124:17

**America**
100:15
108:4

**American**
100:15,21

**amount**
27:17
47:13
71:22
121:22

**amounts**
36:15

**Aneiros**
4:4,20,25
5:8,12
35:24
38:24

93:24
114:15

**answering**
21:17

**anticipate**
93:19

**anxious**
6:19

**apartment**
70:21

**apologize**
21:18
23:19
119:4

**apostrophe**
36:9

**appearance**
5:3

**appears**
35:25
36:6
38:11

**applied**
56:22

**apply**
73:3,5
101:22

**applying**
65:18
72:15

**appreciated**
39:10
52:1

**appreciation**
61:10
117:10

**approaches**
27:15

**approximation**
64:25

**arised**
19:14

**arose**
19:14

**arrive**
17:8 73:9
96:4

**arrived**
11:5

**arriving**
74:5

**article**
62:14

**assembling**
9:23

**assertion**
25:2

**assessment**
87:1

**assigned**
42:11

**assignment**
42:13

**assist**
35:22
75:2

**assistance**
36:21

**assistant**
20:22

**assuming**
99:24

**attorney**
18:5
73:20
89:23,24

**attorney's**
6:6

**auction**
17:19
18:1

**audio**
4:10
18:25
64:4
65:23

**authorizing**
26:3

**auto**
78:7

**average**
25:21

**aware**
22:1
53:15
59:1

_____

        B
_____

**back**
10:11
13:2
16:25
17:4,16
24:6,15
29:6
30:8,17
33:6 37:4
40:11
50:12,22
52:13
53:7 56:5
74:13
78:25
80:13
84:10,16
91:16,19
102:8,10,
15,20,25

114:12
118:17
119:7
121:11

**backup**
113:15

**bad**
52:7
61:20

**bandits**
18:13

**bank**
79:15
114:17,20
115:4,8
123:20

**Baptist**
69:10

**bark**
60:4

**barked**
97:10

**barking**
60:24

**Barry**
53:13

**based**
44:25
93:5
94:18
121:18

**basis**
8:11

**bath**
110:8

**bathe**
56:13

**bathroom**
6:22
110:8,9



113:12
114:4

**bathrooms**
53:10

**beam**
82:13

**beautiful**
15:7

**began**
10:12
12:2
27:13
82:21
103:11

**begin**
4:12 5:21
43:21
44:25

**beginning**
23:18
25:10
44:12
123:5

**behalf**
5:6 12:10
18:9 26:6
40:17
89:17

**bench**
110:5

**beneficial**
58:17

**benefit**
22:11
63:25
64:1

**Benz**
109:22

**Bible**
119:22

**bidder**

18:2

**big**
19:3
40:20
41:14
42:18
63:17
66:4
90:20,22
102:14

**bin**
97:18

**birds**
80:14

**bit**
10:12
52:16
95:15
97:23

**black**
20:19
50:11

**blind**
48:5

**block**
98:8

**Blue**
86:22

**body**
32:21
56:24

**bodyguard**
50:7,10

**bother**
51:25

**bothers**
51:24

**bottles**
97:20

**bought**

9:24 26:8
64:11
77:21,22
98:9
101:7
108:5,7
123:12,13

**box**
54:13
96:6,7,18

**boxes**
14:25

**boy**
65:13

**brakes**
109:6

**brand**
101:16
110:14,19

**break**
6:21 7:2
29:17
30:10
52:9
64:15
91:5
108:23
113:20

**breaking**
91:5

**breaks**
53:5

**briefly**
124:6

**bring**
9:14
23:4,6,8,
10 35:20
43:12
78:2 88:8
90:3
99:23

100:1,3
104:24
122:10,13

**bringing**
105:6

**brings**
104:13

**broader**
57:13

**broken**
13:5
53:13
104:14
111:14
123:10

**Brooks**
5:6 30:10
75:1

**brother**
22:25
34:8,10
87:6,9,14

**brought**
9:7,8
11:12
22:23
53:11
58:15
64:13
85:12
99:3,16
103:9
105:15,22
106:2
111:18

**brushes**
98:10
99:20

**build**
27:24
110:20

**building**

9:5,6,17
11:2,3,11
17:12
18:24,25
20:13
25:13
26:20
27:6,7
28:2,3,6,
12 40:2
43:5
44:4,13
47:18
57:11
60:25
62:3
66:13
67:4
82:22
83:2
90:15
96:24
101:21
102:14
105:3
106:8
110:1,4
123:6

**buildings**
25:16
61:4

**bulb**
112:21,23
118:2
120:20

**bulbs**
112:16
113:1,2,8

**bunch**
28:11

**Burger**
72:9

**burn**
63:7



**burned**
61:18,22

**business**
13:21
16:18
33:19,20
36:8,12
38:12
52:23
55:20
57:25
58:7
66:7,11
67:9
70:21,23
75:21
78:10,15
79:3
94:21

**businesses**
35:2

**buy**
31:4
32:10
57:12
58:16
77:20
78:7
81:23
82:17
85:12,14,
16 95:9,
12,14
96:14
100:23
107:17
108:2,19
110:12
112:20,22
113:2

**buyer**
85:18,23,
25 109:23
120:2,9

**buying**
78:11

**buys**
32:22
87:14
110:5
112:25

———————

**C**

———————

**cable**
106:13

**cables**
81:3

**cafe**
79:2

**cafeteria**
52:24

**call**
16:2
29:20
30:11
53:21,23
64:17,18
76:2
80:9,11
109:25

**called**
4:16 9:9,
21 39:14
62:19
100:15
101:18
102:9
105:16
108:3
110:17
116:6

**calling**
80:13
113:5

**calls**

8:13

**camera**
118:6

**cameras**
60:17
63:19,22,
25 64:6,
8,10

**Campaign**
86:22

**Canada**
51:12,17

**canaries**
80:14

**capacities**
48:13

**capacity**
49:19

**capturing**
4:8

**car**
11:2,4
27:14
28:21
35:7
54:17,18,
24 68:13,
17 71:23
85:20
91:20
92:5,18
107:21
108:14
109:5,7,
21,23
118:13,24
119:13,14
120:2,9,
14,18,19
121:8,10
122:25

**care**

9:21 10:3
16:22
33:22
34:22
39:16
52:1
53:4,9
57:17,24
58:6,10
61:13
67:15
79:9 90:8
92:24
99:5
101:10
123:7

**Carlos**
22:22
23:6,12
37:17
41:11
43:15,19,
23 53:11
54:17,18
60:12,14,
20,21
66:4
99:1,2
103:19,22
112:8
113:3,6
117:19,24

**Carlos'**
85:20
117:22

**cars**
14:1
15:5,9
27:5
31:19,20,
21 32:2,
3,4,5
46:23,24
54:16
56:25

60:5,7,
10,11
61:5
71:9,18
78:3,14,
19,21
91:25
92:16
103:22
107:13
108:1,13
109:2,17,
19

**cart**
97:17

**case**
4:4 6:15,
18 92:8

**catching**
61:5

**caught**
53:7

**caulking**
99:21
100:25

**ceiling**
53:22

**cement**
82:17

**center**
19:3

**certify**
94:8

**chainsaw**
110:6

**change**
32:4,7,11
78:3
103:19
107:20
108:15,20
111:13



113:15
117:20
125:3

**changed**
107:21
112:11
117:20,21

**changing**
78:9,14
99:15
113:8
118:1
120:20
123:6

**charge**
18:24
32:6,11,
14,19
33:11
50:11
52:25
53:24,25
54:1
79:12
105:15
109:10
121:20

**charged**
40:18
41:10
50:14

**charging**
44:25
105:16

**chasing**
18:13

**cheap**
32:20
106:19

**cheaper**
81:6

**checked**
103:10

**checks**
16:23
73:13
114:17,21
115:3,11,
12 123:20

**child**
37:15

**children**
15:5 16:7
89:3,11

**children's**
15:6

**China**
66:15

**Circa**
110:17

**city**
54:4
80:16,21,
25 81:18
99:17
106:13
117:12

**City's**
106:8

**claim**
8:23 26:6
39:3
47:10
48:7 50:3
59:11
122:4

**clandestine**
64:22

**clarificati
on**
28:24
44:24

**clarify**
111:3

**clean**
101:11

**cleaning**
88:3 97:1

**cleanup**
116:21

**clear**
21:18
70:11
73:2

**client**
6:8 8:13
36:3
37:17,19
38:10,19

**clientele**
33:13,18,
19

**clients**
31:18

**closest**
100:19

**co-employer**
8:4

**co-
employers**
7:24

**cockroaches**
48:20,22

**code**
81:11

**codes**
106:8

**coincidence**
108:3

**collect**
20:16,18

**collected**
40:17

**collecting**
21:5 22:5
49:24
88:3

**color**
100:3
123:6

**commented**
88:13

**commerce**
12:11
75:19,20
76:10
77:4,9,
12,18

**commercial**
53:15
55:11,17
88:4,5
98:20
113:6

**communicati
on**
31:11

**companies**
16:21
19:24
20:9 63:2
110:2

**company**
9:21,24
14:20
15:14,16,
19 16:24
17:9,14,
19,21
18:1
19:20
21:10
22:12,21
35:5,9,19
38:16,17,
21,25
41:10,23

49:21,23
57:4
65:19
72:16,17
81:5,10
83:19
85:21
94:10,18
95:2
100:13
101:13,14
102:14
105:25
106:20,24
107:3
114:24
115:21,22
116:24

**compare**
120:20

**compensate**
62:6

**compensatio
n**
50:3

**Complaint**
7:22 40:9
70:10
74:21
76:17
88:1 92:2
124:17

**complaints**
80:17

**complete**
26:12

**completely**
95:24
98:1
102:11

**compliance**
106:8



compliant
  81:10,17

complying
  9:19
  117:12

computer
  4:10 26:9

concern
  17:17

concerned
  87:16

conclude
  124:1

concluded
  125:20

conclusion
  8:13

concrete
  98:8

condition
  82:14
  121:18

conditions
  7:18
  48:19
  59:9
  70:14,16
  88:14

confidentia
l
  14:21

confirm
  44:6
  90:24
  116:16

confused
  120:15,17

Congress
  16:6

connected

25:16

conscience
  61:10

considered
  120:4,11

consistent
  73:18

consistentl
y
  72:9

constantly
  93:14

Constitutio
n
  63:8

construct
  110:11

constructed
  66:13

constructio
n
  26:25

consumption
  112:5

contact
  106:12
  120:3,10

contacted
  103:14

container
  90:20,22

continue
  48:14
  50:23

continued
  9:10

continuing
  115:20

contract

26:2
  43:15,18
  44:13
  118:15
  119:3,21

contractor
  11:18

contractor'
s
  26:24

contractors
  103:4,8,
  10,13
  105:12

contracts
  9:13,15

control
  17:6

coordinated
  105:12

copies
  21:2

copy
  75:10
  116:13
  124:23

corner
  32:23

Corporation
  4:5

correct
  19:22
  24:18
  53:17
  63:1
  94:15
  95:3
  98:13,22
  100:22
  107:7,11
  110:12
  111:17

114:18
  116:12

correction
  5:7

correctly
  47:3 86:8
  94:13
  120:24

corresponde
nce
  17:7,8
  54:11
  80:23
  96:9

Corrina
  19:15,25
  21:9,10,
  25 22:2

Corrine
  20:5

cost
  66:16

costly
  14:21
  109:8

counsel
  5:3,15,
  17,20
  30:11
  69:21
  91:4
  116:4
  122:3
  124:9,22
  125:1,12,
  15

country
  14:4
  39:17
  69:6

couple
  70:10

93:24

court
  9:16 53:9

Cousins
  89:11

cover
  47:23,24
  82:17
  90:16
  99:21
  103:1

covered
  75:21

crack
  90:17

cracks
  42:25
  101:20,24
  102:1,4,
  17

crazy
  85:15

create
  15:21
  87:7

created
  9:21 15:4
  16:21

crime
  50:14

criminal
  15:22

Cristina
  19:4
  20:20
  22:3,5
  76:2
  110:5,10

Cristina's
  108:14



cross
    93:18

CROSS-
EXAMINATION
    93:22

crumble
    66:16
    102:9

Cuba
    65:13,16

Cuban
    79:2

Curacao
    17:13
    94:4,6,
    14,17,18,
    20

current
    40:20
    45:5

――――――――

        D

――――――――

D-O-C
    38:14

dad
    51:10
    87:19

dad's
    40:8,23
    51:21

daily
    78:20
    97:18

damage
    56:7

damages
    47:17
    48:6,8
    68:8
    70:25

dangerous
    43:4
    106:11

date
    4:2 73:18
    90:14

dates
    49:18

daughter
    19:4
    22:10
    76:7 83:8
    109:3

daughter's
    22:11

David
    4:25

day
    30:5
    34:14
    62:10
    74:7
    83:13
    86:13
    95:18,19
    102:12

days
    60:23
    61:15
    83:8 95:6
    106:13

de
    22:22,25
    23:6,12
    37:17
    41:11
    43:15,19
    52:22
    66:4 99:1

deal
    9:18
    80:21

dealing
    9:11

dealings
    22:21

debris
    26:17
    47:24
    90:17
    97:19

December
    105:1

decent
    47:13

decide
    90:6

decided
    15:17
    71:11

decision
    73:2

deductive
    94:22

deemed
    119:23

defendant
    5:19

defendant's
    35:15
    38:6
    74:22
    75:21
    92:6

defendants
    7:23
    11:23
    40:17,18
    70:12
    75:16
    77:3 88:2

Defense
    124:13,

14,16

degraded
    93:5

degree
    51:17

delay
    95:15

delayed
    103:12

delinquent
    93:3

delivered
    96:5,6
    111:10,16

delivering
    74:8

delivery
    125:5,6

demands
    90:25
    104:24

demolished
    90:18

Dennis
    4:3,4,20
    5:8,12,24
    6:2 7:21
    33:10
    38:24
    52:3,16
    70:9

Denny
    95:8 96:8

department
    61:23

depend
    118:1

depo
    45:23

deposit
    47:14
    59:3
    115:3

deposited
    123:20

depositing
    114:21

deposition
    4:3,7
    6:2,8,16
    24:11
    75:22
    94:1
    96:20
    106:6
    125:20

depositions
    6:13

deposits
    19:25
    79:14
    114:16
    115:7
    123:21

Depot
    111:7

derailed
    57:23
    58:7

describe
    15:3 38:9
    110:3

description
    19:11

deserve
    93:7

destroyed
    63:17

deteriorate
d



81:22
112:12

**devices**
108:6

**diagnosed**
68:24

**die**
15:5
122:19

**died**
9:3 15:16
25:9 27:9
54:5
109:13
122:18

**dies**
13:4 17:5

**diet**
68:20

**difference**
53:18
55:10,17

**difficult**
68:12

**difficulties**
19:5
20:20

**difficulty**
20:25

**digital**
4:7

**dignified**
121:11

**diligence**
17:18

**Dillon**
4:6

**direct**
5:22 7:23

**directing**
82:4

**directly**
25:18

**director**
36:23
37:1

**dirt**
99:22
117:7

**dirty**
49:8

**disability**
49:24

**disassembled**
60:7,10

**disconnected**
103:24

**discordance**
82:21

**discussed**
105:11

**discussing**
28:14

**dishes**
29:7
95:21

**dishonesty**
50:15

**dishwasher**
57:1

**Dishwashing**
29:16

**disorder**
25:14

**display**
9:25

**displays**
110:2,3,
7,11,20

**divided**
99:1

**divisions**
9:6

**Doc**
38:2,13,
14 124:16

**doctor**
51:12
68:22,24

**doctorate**
51:17

**doctors**
68:23
69:16

**document**
25:1
38:10
93:11

**documentation**
14:14

**documents**
14:17

**dog**
63:16
64:16
97:10

**dogs**
60:1,2,4,
24 63:13,
15 64:5,
13,20,22
66:24
67:11,17

**door**
18:7
25:16

29:16
71:23
99:7

**doors**
31:21
99:4

**Doral**
80:17,21,
25 81:18
92:7
122:12

**drills**
110:13,
19,22,23
111:6

**drive**
68:5

**driver**
85:19

**driver's**
4:13

**due**
9:19
17:18,19
50:3
91:20
92:7
104:15

**dust**
97:17
99:22

**duties**
12:18
13:9
62:24
63:3
64:10
78:24
88:2
94:24
96:21
97:7,13

**dying**
71:10

_____

E

_____

**e-mail**
106:25
124:10

**E-MAILS**
73:21

**E320**
109:22

**earlier**
22:14
23:25
31:15
34:25
47:4 54:7
55:22
59:8
75:22
79:1 80:4
85:4 90:2
93:25
96:20
106:6
107:8
110:1
111:9
114:15
116:3

**East**
108:4

**Eastern**
4:3
30:15,18
33:4,7
52:11,14
70:4,7
91:14,17
114:10,13
125:18

**eat**



28:19
educating
  86:23
education
  52:2
elderly
  13:11,13
electric
  101:5
electrical
  104:21
  105:25
electrician
  103:16
  104:20
  105:8,10,
  24
electricians
  103:9,15,
  18,24
  105:7
electricity
  28:19
  31:22
  32:24
  54:22
  55:3,9,15
  56:6,10
  81:3 83:2
  95:12
  104:14,18
  105:2
  106:18
electronic
  4:9 125:7
eliminated
  65:7
employ
  13:10
employed

75:17
employee
  11:16
  76:2
employees
  12:5
  75:17,23
employer
  8:4,5
  120:4,11
  121:7
employers
  7:23
employment
  8:15 26:1
  56:19,23
emptied
  14:15
empty
  9:17
enclosed
  25:15
encompassin
  g
  63:19
encouraged
  47:4
end
  69:13
  107:5,6
  108:4
  125:15
ended
  34:16
enforcement
  81:11
engaged
  16:19
  77:4
engine

14:24
  107:21
engineer
  121:9
English
  4:17
  24:13
enslaved
  58:4
entered
  39:3
  118:15
  119:21
entering
  119:2
enterprise
  75:21
  77:4
entire
  41:5 83:2
  97:13
  98:5
  115:8
entitled
  119:14,
  17,19,20
  121:12
entity
  36:8
  38:13
envelope
  95:15
  96:17
envelopes
  95:13
  96:14,15
  115:5
equipment
  4:10 9:24
  77:8
Esquire

4:7
essentially
  6:13 40:1
established
  62:23,24
  116:24
estate
  21:9 34:7
estimate
  121:18
estimates
  82:2,8
eventually
  117:21
everyone's
  84:4
evict
  89:21,25
  116:5
evicted
  9:16
  44:10,23
  45:20
  47:16
  71:1
  92:20
  116:4
evicting
  97:5
eviction
  83:7
  115:16
  116:11
evidence
  18:19
exact
  119:6
EXAMINATION
  5:22
  115:25

exchange
  55:24
  90:5
excited
  21:21
excuse
  70:3
exhausted
  29:8
exhibit
  35:13,15,
  25 36:6
  37:3
  38:5,6,11
  74:16,20,
  22
  124:13,
  15,16
exhibition
  10:1
exhibits
  124:9
exist
  37:7 50:8
expand
  10:25
  50:9
expecting
  39:9
explain
  6:13 8:19
  12:25
explained
  34:15
explanation
  20:3
exploded
  60:25
exploited
  59:7



**explosion**
  60:24
  102:6

**exterior**
  98:3

**extinguisher**
  61:3

**extortion**
  59:6

**eye**
  47:25
  48:18
  50:3

**eyesight**
  48:16,19
  68:4
  92:23

———————

——— **F** ———

**F-E-R-S-O-M**
  19:21
  114:25

**fact**
  10:15
  87:6

**factory**
  26:9
  29:19

**fail**
  66:11
  67:9

**failed**
  23:19

**fair**
  8:2 59:9
  62:25
  63:13
  66:8
  67:19,20

  68:8
  71:15
  75:21
  92:18

**fake**
  53:22

**fall**
  43:5
  82:12,13,
  22 90:16
  97:19
  102:11

**falling**
  102:13

**family**
  11:25
  67:2
  89:3,7
  107:10
  108:13,16

**famous**
  103:25

**fan**
  84:14

**farm**
  50:21

**father**
  9:3
  10:16,17,
  19,25
  11:5,8,24
  13:4
  15:16
  17:5 22:8
  25:9,12
  27:9,12
  31:16
  40:25
  51:1,6,9,
  16 54:5
  65:22
  66:12,13,
  20 67:1

  71:6,17
  87:2,16
  91:20
  106:5
  109:12,
  20,21
  122:18,19
  123:6

**father's**
  26:6
  58:25
  109:5,17

**faucet**
  112:14

**faucets**
  112:2,10

**favor**
  13:12,15

**favorable**
  86:9

**February**
  90:13

**fee**
  121:19,20

**feeding**
  80:14

**feel**
  6:19,21
  71:5

**feet**
  28:13
  41:16
  42:2,20
  43:20
  45:6
  83:11
  98:25

**fell**
  47:25
  48:18

**felt**

  60:23

**fence**
  13:5

**Fernandez**
  4:5 9:13,
  20 22:3,5
  27:9
  46:21
  54:4
  55:21
  71:21
  79:19
  80:20
  82:6
  88:22
  94:2,25
  96:9
  108:9,16
  114:16
  115:14
  122:5

**Fernandez'**
  17:5

**Fernandez's**
  31:8

**Fersom**
  19:20,25
  20:5
  114:22
  115:1

**fighting**
  63:4

**figure**
  32:25

**file**
  39:5

**filed**
  50:2

**fill**
  103:1

**filters**
  32:16

**finally**
  105:2

**finance**
  15:25

**financial**
  91:21
  92:7

**find**
  25:2,5
  33:12
  34:8
  39:19
  58:17
  60:22
  71:2
  81:5,6
  83:16
  85:23
  88:12
  92:19
  105:8,18
  107:3
  109:23

**finding**
  56:19
  96:24

**fine**
  21:24
  24:10
  34:12
  114:6
  124:21
  125:6

**finish**
  21:16
  104:4

**fire**
  61:1,5,
  21,22
  62:11,15
  63:9

**firemen**
  61:2



fires
  63:4

fishing
  29:20

five-minute
  30:10
  52:9
  113:20

fix
  25:13
  29:18
  53:10,11,
  21 87:8
  103:5,22
  117:13,
  14,15
  121:10

fixed
  101:24
  102:18

fixing
  29:16
  122:5

fixtures
  111:25

floors
  13:5
  101:11

Flor
  22:22,25
  23:6,7,12
  37:17
  41:11
  43:15,19
  66:4 99:1

Florida
  4:8,13,21
  12:19
  76:12
  92:7

FLSA
  7:25 8:2,

15

focus
  10:7 19:9

focused
  71:13

follow
  84:7

follow-up
  93:24

follow-ups
  124:2

food
  31:9
  48:17

force
  70:12

foreign
  16:24

forget
  93:12

form
  4:11 8:9,
  11,12
  12:20
  16:12,20
  120:6,12

formed
  8:15

forward
  8:11,17

found
  50:25
  55:2 71:6
  83:23
  85:17
  86:9
  91:20
  103:7
  109:24
  112:3

foundation
  101:21

FPML
  104:24

frame
  14:8

free
  14:3
  28:20
  39:17
  55:24
  86:12

Freight
  111:8

Friday
  39:12
  90:13,14

friend
  11:20
  29:17
  54:19
  121:7

friendship
  27:24

front
  64:2
  80:16
  123:8

full
  29:22
  36:17

fully
  21:16

funds
  95:14

furniture
  13:7

—————

————— G

gain

17:15

gainful
  56:19

garbage
  28:8

gave
  9:4 28:2
  39:11
  58:1
  72:19
  83:20
  90:10
  106:13
  108:10,12
  109:18,19
  116:16

general
  96:25

generally
  74:6

genius
  27:1

get all
  57:3

give
  15:25
  24:4
  31:17
  51:10
  57:6 59:3
  64:24
  74:7
  80:22
  82:10,24
  96:18
  110:10
  121:21

giving
  54:20,23
  72:18

glasses
  48:2

gloss
  107:23

God
  50:18
  119:25

good
  5:5,24
  6:1 18:6
  27:17
  61:8
  62:1,2,4,
  6 63:14,
  15 65:9
  75:12
  86:25
  91:5,9,10
  92:23
  110:17

goods
  12:10
  75:18
  76:9 77:8

government
  48:17
  87:1
  100:16

grab
  96:16

grabbed
  61:3

grateful
  18:14

great
  46:16
  84:4

greatest
  18:2

ground
  6:12

grounds
  8:14



grow
 50:22

guard
 18:11
 64:7
 65:14,18
 68:1 97:9

guarded
 58:9

guest
 118:12,
 13,23
 119:12

gun
 108:5

guy
 29:19
 53:12

guys
 106:21
 113:20

——————
    H
——————

habit
 31:1

handicapped
 69:2

handle
 13:23
 70:23

handled
 75:18

happen
 57:20
 61:14
 63:9 69:5
 89:22
 101:16
 120:2,9

happened
 62:11
 103:16
 109:16

happening
 6:19
 17:11

happy
 6:23
 85:4,8

Harbor
 111:8

hard
 12:14
 30:5 49:4
 104:10

hate
 84:12

he'll
 79:25
 100:2

head
 34:3
 48:18
 82:23

hear
 84:12
 85:25

heard
 60:24

heater
 99:4
 103:23
 112:2,7

helped
 51:4

helping
 31:1

hey
 112:20

Hialeah
 108:4

high
 112:5

higher
 103:20

highest
 52:2

hire
 63:3

hired
 97:16
 102:13
 103:18
 116:20,
 24,25

history
 14:19
 51:14
 57:7

hold
 10:2 17:3
 19:6
 23:14,17
 27:17
 28:7 32:1
 57:2 67:9
 82:3
 83:24
 104:2
 110:9

holding
 54:19

holes
 99:21
 103:1

home
 9:21 10:3
 13:4
 16:22
 29:5 40:6
 99:5

101:10
 111:7
 118:12,23
 119:12
 123:7

homeless
 39:14
 49:6

homes
 31:21

honesty
 50:19

honorable
 93:4

hospital
 69:3,9,10

hour
 29:13

hours
 25:20,22
 59:11,15
 80:6
 86:13

house
 13:3
 29:18
 50:21,24
 63:17
 70:20
 117:11,15

houses
 16:23

huge
 93:5 99:7

Husky
 101:18

——————
    I
——————

ID
 4:22

idea
 6:17

identificat
ion
 4:14
 35:16
 38:7
 74:23

identified
 4:25 5:12

identify
 22:15
 32:1
 49:18

illegal
 122:1

illicit
 7:13

imagine
 25:22
 48:10
 93:3
 101:6

immediately
 17:10

importation
 77:11

imported
 77:17

improve
 81:25

inaudible
 51:14

incentive
 31:6

incident
 64:17

including
 13:4
 14:13



56:24
88:3
106:8

**increase**
9:20

**independent**
11:18
71:16

**individual**
78:23
105:24

**individuals**
78:22
105:12

**information**
15:2 57:3

**inherited**
27:6,7,10
67:3

**initial**
43:14

**initially**
13:21

**injury**
50:3
69:17

**ins**
78:20

**inside**
25:14
53:14
87:21
98:3,4
112:1

**insignifica
nt**
90:9

**inspection**
43:1
47:20
81:20,25

99:17
123:10

**inspector**
57:19
106:13

**inspectors**
81:2

**install**
99:4
104:18,
19,21
111:22
118:6

**installed**
63:18
64:8,10
105:1,2
111:25
112:7,10,
13

**instruct**
24:4
94:13
105:7,18
114:16

**instructed**
107:3

**instructing**
94:20

**instruction**
23:18

**instrumenta
lities**
75:20

**intend**
85:24

**interest**
78:10

**interests**
78:15

**interior**

98:1

**Internet**
30:1
76:5,8

**interpreter**
4:12,16
5:10 8:1,
4 10:9,
19,22
12:13,15
21:8,13,
16 22:18
23:22
24:2,5,7
25:4
32:17
33:14
36:2,5
39:6
40:13
41:19
47:6
55:12
59:21
61:7
69:21,24
73:11,25
75:6,9,12
77:13
78:11
81:12
84:12,15
88:18
91:4,10
92:3 97:3
98:14,16
101:25
104:6,8,
11
108:22,25
110:21
113:11,
14,18,22,
24 114:2,
5,7 115:1
118:17,25

119:16
120:5
124:3

**interrogati
on**
6:18

**interrupt**
10:7 20:2
21:14
85:3

**interruptio
n**
18:25
19:18
65:23

**interstate**
12:11
75:19,20
76:10
77:4,9,
11,18

**intervene**
63:12

**interviewed**
27:12

**introduce**
35:12
38:4
74:16
88:9

**introduced**
20:23
87:13
106:21

**invading**
49:6

**invent**
14:23

**invented**
15:3

**inventions**

15:11,24

**inventor**
14:22

**investigate
d**
102:7

**investor**
37:20

**investors**
15:10

**invoice**
121:21

**involved**
20:24

**involves**
36:13

**isolated**
71:5

**issue**
51:23
101:20
106:9

**issues**
23:11
103:5
106:7

**Ita**
76:3

_____

**J**

_____

**Japan**
89:11

**Jessy**
9:7,12,18
11:1,6,
10,11,13,
19 41:7
42:6
43:10,21,



23,24,25
44:2,5,
10,11,21
45:1
116:6,9

**Jessy's**
27:14
41:23
44:6
91:24
92:16
98:13

**job**
10:13
12:18
13:8,14
18:6,10
19:10
26:12
29:7
33:22
35:1
46:21
47:18
53:9,14
59:14,19
60:17
61:20
62:1,2,4,
6,22,24
63:3
64:10
72:9
74:14
78:24
84:4 88:2
94:24
96:21
97:6,12
103:22
105:19

**jobs**
28:25
29:15
30:22,23

31:2,16,
18 32:19
46:13
47:4
48:13
53:2 54:8
56:20
71:16
72:3,4,5,
21 73:3,5
107:16

**Joelle**
22:17

**joint**
7:23 8:5

**Jorge**
22:17
116:8

**jumped**
61:3

——————
**K**
——————

**keys**
28:2

**kick**
70:14
115:15

**kids**
71:10

**killed**
63:11,12

**kind**
16:25
18:8
36:12
68:20
103:5
107:22
111:25
121:18

**kinds**
27:5

**King**
72:9

**knew**
9:14
46:20
47:8
53:24
54:1,8,10
55:7
70:14,21
94:17
121:9

**knowledge**
22:1

——————
**L**
——————

**la**
22:22,25
23:6,7,12
37:17
41:11
43:15,19
66:4 99:1

**label**
18:10

**labor**
8:2 55:25
75:22
121:11

**lack**
17:19

**land**
34:8
87:9,11,
14

**landlord**
21:5 22:2

**landscaping**
83:19

97:16
116:20

**large**
61:21

**larger**
33:13

**Larou**
5:5,6,17
8:9,12
12:20
16:12,20
19:18
35:21,23
36:4,6,
21,25
37:5
38:8,11,
19,20,23
59:23
75:8,11,
13 93:21,
23 95:23
96:2 97:4
98:18
102:3,16
104:2,7,
10,12
105:4
108:24
109:1
110:22
111:1
113:13,
17,19,23
114:6,8,
14,23
115:2,23
120:6,12
124:2,24
125:13

**lateral**
102:20

**law**
63:8

86:21

**lawsuit**
39:14
90:1,14
116:24

**leaking**
102:4

**leaks**
101:23

**learn**
83:4

**learned**
93:2

**leave**
34:12,14
49:2
54:24
57:16,17
58:20
59:3,5
65:20
66:10
67:8,10,
23 68:9
73:6
87:10
89:14,19
97:19
116:15

**leaves**
97:19

**leaving**
52:24

**left**
66:6 69:3
91:7

**legal**
8:13

**letter**
17:9 18:5
20:21
44:3



47:21
96:16

**letters**
62:2
80:17
95:7
96:11,12

**level**
52:2

**liar**
49:5

**license**
4:14 15:9
16:1
26:23,25
36:13
71:12

**licensed**
49:11

**licenses**
26:22

**lie**
49:4 93:5

**lies**
50:18
60:14

**lieu**
4:23
86:15

**life**
34:20
39:11,16
48:11
51:6,11,
25 57:22,
24 58:11
59:7
67:15
90:8,11
93:15

**lifestyle**
51:19,23

**lifetime**
83:16
120:14,21

**light**
53:22
56:9
112:16,
21,22
113:1,2,8
118:1
120:20

**Lightning**
86:22

**lights**
117:20

**limit**
20:4

**limiting**
41:4

**Limo**
9:7,12
11:1,6,
10,11,14
41:7
116:6,9

**Limos**
11:19
43:10

**limousine**
41:23
42:6
44:6,11
53:12

**Limousines**
91:24
98:13

**lines**
106:10

**listed**
36:8,23
38:13,23,
24

**live**
28:10,23
48:20,21,
24 55:24
60:21
68:10
71:2 72:2
86:10
87:5
92:14,21,
24,25
93:10
97:15
117:7
121:3,4,6
122:10,14

**lived**
13:18
14:3,4
31:10
34:9
92:17
93:15
117:11

**lives**
15:6
89:10
109:24

**living**
18:23
39:17
48:19
59:9
79:20
86:12
88:14
97:13
103:3
115:9
121:25
122:5,16

**local**
62:15

**locally**

77:22

**located**
4:20 92:6

**location**
44:19
57:9

**lodging**
14:2
28:22

**logo**
99:8
123:8

**long**
48:12
54:3
59:11,15
73:22,25
74:5
80:13
83:21
84:19,22
99:12
104:15
107:2
108:18
109:11
112:6,9
122:16

**longer**
43:25
100:16

**looked**
56:23
57:14
106:20

**lost**
16:25
17:10
48:16
112:3

**lot**
9:14
15:15,20

16:6
19:23
21:22
23:9,20
24:1,16
25:14
26:19
29:6
32:3,21
33:18
34:7,11
39:20
41:1,5,6
53:4,11,
13 60:4,5
65:7
67:22
68:23
81:21
87:11,18,
22 89:13,
15 90:1
93:13
97:1,18
105:15,20
106:9

**lots**
60:24

**love**
66:19
67:2

**lunch**
13:20

———————

**M**

———————

**M-A-C-K**
36:9

**machine**
14:24
99:21

**machinery**
103:21



machines
    104:19

Mack's
    36:9,23
    37:7,10,
    21,23
    124:14

Madam
    4:19
    125:10

made
    9:13 14:9
    19:25
    29:20
    44:3,13
    49:7 73:2
    99:7
    101:11
    118:15
    119:2,15,
    20 122:21
    123:2

mail
    54:15
    73:13
    81:8
    94:13
    95:1,4,
    16,20
    96:3,6,7
    97:22

maintain
    53:16
    77:18

maintaining
    55:10,16

maintenance
    9:10
    13:24
    16:17
    20:11
    21:12
    53:5
    77:10

79:9
83:20
96:25

make
    9:15
    14:23
    21:17
    31:1
    47:12
    49:15
    55:7
    57:13
    67:14
    85:21
    92:15
    94:12
    98:11
    106:19
    114:16
    116:2

makes
    66:12

making
    9:6 16:1
    75:20
    106:12
    115:7
    123:21

man
    39:20
    42:25
    46:23
    51:3 53:6
    56:24
    62:15
    66:14
    71:14
    85:13
    89:13
    97:11
    109:24

man's
    85:15

management

77:5

manager
    20:22
    44:4

Mark
    35:10

marked
    35:13,15
    38:6
    74:22

market
    45:1,3

matched
    100:3

material
    26:8
    77:3,20

materials
    12:10
    32:22
    75:18
    76:10
    77:8,11,
    17 99:18
    100:9,22
    108:7,12

matter
    10:15
    87:5

Mcdonald's
    72:10

means
    67:6 83:4
    86:3

measurement
s
    111:24

mechanic
    22:24
    33:11,14,
    16 40:5,8

46:20
68:1,14

mechanical
    109:6
    121:9

medical
    7:17

medication
    7:10

medicine
    51:12

meet
    13:20
    37:16
    81:1

meeting
    13:19

members
    89:7
    107:10
    108:13,16

memory
    93:14

mention
    15:15
    25:17
    120:1,8

mentioned
    22:14
    23:24
    34:25
    63:18
    79:19
    93:25
    96:20
    100:25
    101:19
    106:7
    107:8,12
    108:8
    109:2
    110:1

111:9
114:15
116:3,19
117:19

mentioning
    31:15
    33:10

Mercedes
    109:22

merchandise
    30:25
    31:4
    76:23

message
    74:8
    79:25
    80:10

messages
    54:10
    73:8,15,
    17 82:4

met
    9:3
    10:16,17,
    25 11:5,
    8,24 16:6
    71:17
    87:2
    109:7
    123:5

meter
    103:19,20
    105:1

Miami
    4:21
    79:25
    80:1

midnight
    102:10

Miguel
    22:25



military
  100:17

million
  58:22

mine's
  45:18

minute
  24:4
  56:16
  63:14
  70:1
  82:24
  89:23

mold
  48:20,22
  55:2

mom
  89:10

moment
  20:21
  30:22
  64:9,14
  84:9
  100:11
  101:1
  124:8

Monday
  62:12

money
  15:16,20
  16:8 19:5
  20:20
  23:12
  28:18
  32:22
  44:17
  47:13
  49:2
  54:20,23
  55:8
  58:20,25
  70:18,20
  72:6,7

  82:18
  86:5
  89:15
  105:15,20
  108:11

month
  47:15
  52:17,21
  53:2 56:5
  72:6 87:3
  117:2

monthly
  43:11
  44:11,15
  45:8,11
  117:2

months
  9:16
  17:15
  104:25

morning
  5:5,24
  6:1

mortgage
  16:23
  19:17,19

mother
  51:1 89:3
  93:1

motivated
  22:9

motor
  107:20
  108:15

Motors
  38:2,13
  124:16

move
  8:10,16
  12:24,25
  14:1
  15:17

  34:5 44:5
  47:11,12
  48:23
  77:9 82:3
  86:7

moved
  13:7
  112:8

moving
  13:3,19
  79:11

mystery
  32:25
  76:14

———————

N

———————

N.V.
  4:5

named
  20:6 37:2
  114:24

names
  20:5
  110:25

necessitate
  103:16

needed
  28:18,21
  29:1
  44:17
  73:24
  90:20
  105:17
  117:20
  118:13,23
  119:13

negotiate
  28:15

negotiated
  79:2

negotiation
s
  28:17

neighbor
  46:12
  57:10
  121:7

neighbor's
  60:25

neighbors
  121:5

news
  62:14

night
  18:11,23
  25:22
  29:5 30:5
  61:19
  97:9
  102:9

normal
  89:6

Northwest
  92:6
  109:24

notarize
  49:8,22

notary
  4:6 49:7,
  10,15,16,
  19

notice
  116:7,10,
  13,14,17

November
  105:1

number
  30:2,7
  38:5
  46:2,4,5,
  8,15 57:6

  109:25

———————

O

———————

oath
  4:22,23
  5:2,14

object
  67:6

objection
  8:9,11
  59:23

occasion
  11:5
  17:18
  94:3

occasionall
y
  117:24

occasions
  94:3

occupation
  58:1
  72:19

occupied
  28:10

Ocean
  35:10
  36:8,23
  37:7,10,
  20,23
  79:15
  114:17
  123:20
  124:14

October
  4:2

odd
  28:25
  31:2,16,
  18 56:20



**offer**
40:12

**offered**
40:10
81:16

**office**
6:6 13:22
14:7
16:10
27:22
40:11,23
41:2,4,18
42:1,5
53:12
80:22
87:7,8,22
94:8 96:5

**offices**
42:12
66:3
90:17
104:17

**oil**
32:4,7,10
78:3,6
107:15,20
108:15,
19,20

**oils**
78:9,12,
14

**older**
29:20

**one-off**
121:2

**open**
82:10

**ophthalmolo
gist**
68:18
69:8,12

**opportunity**

9:4

**order**
13:13
17:15
26:15
35:6
47:12
86:6 98:7
124:23
125:2

**ordering**
124:24

**orders**
124:7

**original**
43:19
44:18
71:25
90:3

**originally**
117:22

**Orlando**
4:5 9:13,
20 10:16,
19,20
12:24
13:1,2,7,
11 14:3,
21 15:14,
17 17:5
22:24
24:20,22
25:2,4
27:9
28:15,25
31:8
34:7,11,
19 44:3,
16,25
46:21
47:4,21
51:8,15
52:24
53:8

54:2,3,4,
7 55:21
60:18
67:1
71:21
79:11,19,
20 80:19
81:4,10,
17 82:6,
12 85:15
88:22
94:2,3,
13,20,25
95:5,9,17
96:4,9,
12,13,22
97:8
99:22
100:5,11,
20,21
101:4,24
102:10
103:7
105:5,7,
18 106:17
107:2,9,
17 108:9,
12,15,21
109:3
112:24,25
114:16
115:14,21
117:19,21
118:1
121:4
122:6,10,
12,15,17
123:15

**Orlando's**
10:17,25
25:12
26:6
27:12
31:16
65:22
66:20

71:6,17
87:2,16,
19,21
88:15
91:20
109:5,11,
16,20
110:2

**outs**
78:20

**overheat**
15:5

**overwhelmed**
104:9

**owes**
89:14

**owned**
19:7
78:21,22
109:21
118:3

**owner**
24:25
40:2
46:19
116:8,9
117:14,
15,16

**owners**
117:18

**ownership**
77:5

**owns**
41:5
57:11

———————

**P**

———————

**p.m.**
52:11,14
59:18,19
70:4,7

91:14,17
114:10,13
125:18,20

**P.o**
54:13
96:18

**package**
54:12
73:23
74:4,6
94:7,14,
16,19

**packages**
54:13,14
73:10,12
96:11,13
111:15

**paid**
13:21
18:7 29:1
49:13
55:2 72:9
87:5 90:6
103:22
121:22

**paint**
26:17
32:4,19
68:13
78:2
82:17
97:25
98:2,9
99:4,6,
16,17,19,
24,25
100:1,3,
9,13,15,
17,21
101:12
107:13,
22,25
108:1,2,5
123:12,



14,18

**painted**
98:4,12,
15,16,17,
19,23
99:9
123:11

**painting**
9:5 33:15
51:3
97:6,24
99:13
101:12

**pandemic**
59:25

**paper**
14:16
17:25
21:2 26:3

**papers**
14:20
17:12,16,
17,18
18:1 69:1
80:23

**paperwork**
17:10,15
18:4
22:24
49:9
88:11

**paperworks**
49:20

**Paragraph**
7:22 40:9
75:16
76:19,20
77:2 88:1
92:1

**pardon**
19:18

**parentheses**

77:6

**parents**
51:7

**park**
11:4

**parking**
53:5 65:7
97:1

**part**
9:17
62:24
63:3
64:10
77:14
94:24
97:24
101:13,14

**parties**
4:24

**parts**
60:6,8
78:8

**pass**
43:1
81:25
99:17

**passed**
109:12,
17,20

**passing**
25:18

**past**
122:22

**patent**
35:7
37:8,14
71:13

**patents**
10:15,18
15:2
27:19

36:13
70:19
92:15

**Patrick**
5:6

**pause**
104:4

**pay**
9:16
11:21
13:23
14:2
28:19
30:23
33:23
34:1
40:6,7
44:14
46:21,23,
24 47:5,7
49:2,13,
15 54:22
55:5
56:4,5,9
58:19
68:10
71:21
79:24
83:10,11,
12,18,19,
20 86:14,
17,18
87:3
89:14
93:6
95:12
118:14
119:2,23
121:12

**paying**
14:6,7
16:10
43:24
44:11
45:7,11,

14 52:17,
18,20
53:2
55:9,15
86:15,20,
21 90:5
121:25

**payment**
17:20
28:15
70:20
119:14,20
121:14

**payments**
9:19 14:9
119:16

**pays**
55:19

**peace**
67:24

**pending**
7:1
115:16

**penny**
40:7

**people**
9:14,15
16:6
20:17,19
23:9,10
24:1,17
31:2,25
32:8,9,10
48:14
49:18
50:11,12
52:7
58:9,15
60:5,7
62:3
71:12
72:3
83:18
85:12

88:8,12,
13 89:6
97:19
104:24

**people's**
82:22

**percentages**
36:14

**Perez**
39:24
46:18
56:25
92:14
109:8

**Perez's**
39:25
46:14,15

**Perfect**
7:21
124:19
125:9

**perform**
13:8
48:13
97:12
103:15
105:8,13,
19 107:9,
15

**performed**
18:9
40:11
48:7 77:7
97:7
105:11,25

**performing**
53:3 88:2
94:1,25
96:21,24
109:2

**period**
52:17
53:1



permission
49:7

permits
104:23

permitted
31:16
72:21

person
13:11,13
16:1
23:12
27:25
30:4
32:21
41:19
43:4
48:10
49:6
50:19
51:5
54:24
66:17
74:9
83:15,16
88:9,10
90:19
93:3
97:16
103:6,25
105:22
116:20
121:4

personnel
63:3

persons
78:23

petition
89:24

phone
30:2,6
45:23
46:8

phones

112:3

phonetic
19:16
22:17,22
29:23
36:19
53:13
76:3

photograph
51:22

photos
51:1

physically
76:5
88:16

pick
54:14
85:20
96:3
97:21

picked
60:2

picking
24:1

picture
51:7

pictures
80:18

piece
41:6 42:9
47:19
100:2,4,6

pieces
23:24

pile
65:21

piles
65:6

pipe
53:5,10

place
9:10
23:15
34:13
48:25
57:5
61:18
68:6
70:14
71:2
83:11
89:4
100:14,18
101:2
108:3
112:8
122:5
124:23

places
56:23

plaintiff
5:6,17
88:1 92:5

plaintiff's
5:7 74:20
124:16

plaintiffs
40:10

planning
85:1

plates
15:9
36:14
71:13

play
84:10
119:7

played
84:16

plugs
32:16

plumbing

31:22

Poberezhsky
4:6

point
50:15
57:12
90:6 91:5

police
18:12
50:13
60:6
61:24
64:17
80:22

poorly
39:15

portable
110:6

portion
59:14
98:12
113:9

portions
98:19

portray
76:5

position
6:17
20:10
51:15
64:6
89:18

possession
73:17

post
80:22
94:8 96:5

postage
79:16
95:9,13,
14

postman
96:8,19

potential
85:17

power
106:9

practiced
51:13

prepare
54:12,13
100:17

prescriptio
n
7:9

presence
66:1,18

Presently
41:13

president
16:5
38:23,25

pressure
99:21
101:3,7,
9,17

prestigious
93:4

pretty
61:21
66:3

prevent
7:10,18
54:9

prevented
72:8

preventing
4:22
67:25

previous
84:16



90:14

**previously**
40:16
56:16
72:20

**price**
43:19,21
44:18

**prices**
33:11

**principles**
58:9

**printout**
35:25
36:7
38:12,24
124:14,15

**prior**
10:13

**problem**
34:18,19
42:22
43:17
47:25
68:19

**problems**
19:4
43:21

**proceeding**
4:9

**proceeds**
43:13

**process**
26:9
42:8,19
103:11,13
104:15

**produced**
4:13

**professiona
l**

26:22,23

**profile**
36:8
38:13

**projects**
27:16,18

**proper**
107:24

**properties**
41:1
53:16
77:10,19
89:15

**property**
9:8 11:7
14:12
18:11,24
19:6
21:4,6,
11,24
22:2
23:7,10
24:25
27:11
33:23
34:9 39:4
40:19
41:14
42:3,9,
18,23
43:7
44:7,8
45:1,4
46:19
47:11,16
48:9 49:7
52:25
53:3,7
55:10,16,
24 57:8
58:13,15,
18,22
59:1 60:3
63:19,20

64:5
66:7,19
67:8,10,
14 68:10
71:7
73:6,19
74:6 77:6
79:9,21
83:22
84:19,23
85:1,5,9,
11,12,14,
16,24
86:1,2,4,
10 88:4,
5,17,21
89:19,20,
21 90:4
92:6,12,
13 94:11
97:9,14
98:6
103:4,17
117:12
118:3,4,5

**protect**
60:2,3

**protected**
58:10

**provide**
18:20
86:10,18
116:7,10

**provided**
25:23
55:25
80:5
100:11
122:4

**providing**
63:14
64:25
65:9,16
125:10

**public**
4:6 49:8,
10,15

**pulled**
35:14

**purchase**
100:21
122:6

**purchased**
111:6

**purpose**
8:1

**purposes**
7:24,25
28:25
37:8 43:8
44:24

**put**
17:19
18:6,24
22:18
36:14
60:17
79:16
82:1
96:17
99:20
104:3
118:8,10

**puts**
44:17

**putting**
81:22

————————

**Q**

————————

**qualified**
104:24

**qualify**
19:10

**question**

7:1,2
10:22,24
21:17
39:9
57:13
72:11
77:14
84:11,18
95:24,25
120:23

**questioned**
116:4

**questioning**
124:1

**questions**
6:15,17
70:11
93:17,25
113:13,18
115:24
122:2
124:4

**quick**
113:20

**quickly**
112:12

————————

**R**

————————

**R-Y-O-B-I**
111:3

**radius**
57:15

**rails**
66:7

**rate**
45:5

**re-
incorporate**
71:3

**reached**



121:5

**read**
30:6
38:18
75:7
76:20
118:17
125:12

**ready**
9:25 13:6

**real**
21:9
33:22
34:7 77:5

**realize**
117:10

**reason**
7:4 20:3
89:4

**reasonable**
33:11

**reasoning**
94:22

**recalling**
47:3

**receipts**
82:9
123:21

**receive**
16:23
73:23
74:6
95:16
97:22
115:3
123:21

**receiving**
95:1

**recess**
30:16
33:5

52:12
70:5
91:15
114:11

**recognize**
67:22
68:16
76:16

**recollectio
n**
25:12

**recommend**
100:18

**recommended**
100:20

**record**
4:1,9
19:19
30:12,14,
18 33:1,
3,7 36:3,
4,18 46:9
50:13
52:9,10,
13 63:24
69:25
70:3,6
91:12,13,
16 114:9,
12,23
124:6
125:15,18

**recording**
4:10

**records**
18:12

**redirect**
113:23
114:1
115:25

**reexamine**
93:18

**referencing**
6:8 89:8

**referring**
19:20
35:19
41:3
93:11

**reflecting**
73:18

**regaining**
93:13

**regular**
90:23

**regularly**
75:17
95:1

**regulations**
81:11
117:12

**related**
15:2 48:7
67:13
94:21
110:8

**relation**
14:18
21:10
46:11,18

**relationshi
p**
8:7,15
11:22

**relay**
17:16

**relevant**
75:18

**reliable**
27:25

**remained**
9:17

**remaining**
85:24

**remember**
13:11
23:23
29:25
62:10
69:7,8
93:7
99:12
101:16
105:23
106:4,23
107:1,4,
18 109:11
110:14,19
112:6,9,
13

**remind**
12:1

**remodeled**
101:11

**remodeling**
26:5
42:19

**removal**
14:12
26:17

**remove**
9:12
42:25
55:6
99:8,22
100:2,6

**removed**
13:6 48:9
50:13
90:1
100:5

**Renee**
35:5,11
36:11,19
37:2,16,

17,20

**Renee's**
36:17

**renovating**
88:3

**renovation**
26:9

**renovations**
26:7

**rent**
9:19 19:5
20:16,18,
20,24
23:10
25:15
28:6
40:25
41:9
43:4,11,
24 44:11
45:1,15
47:15
50:11
52:18,21
53:2
55:19
68:10
82:13,16,
22 86:15,
17 87:4,8
88:10
90:5
92:19
96:25
98:7 99:2
104:1

**rent's**
47:15

**rent-free**
72:2
86:10

**rental**
43:13



77:5

**rentals**
88:4,5

**rented**
9:7 13:2
41:6,7,8
43:7 57:5
98:12,14,
20 101:8
113:9
117:16

**renting**
40:19
41:15
88:4,5,6

**rents**
21:5 22:5
40:17

**repair**
11:2 14:1
26:17
28:1,21
31:21
42:23
53:14
68:17
111:12
118:13,23
121:1,8

**repaired**
119:13
121:13

**repairing**
9:4 88:3

**repairs**
28:5 32:5
96:24
118:14
119:2,13,
14,20,21
121:14
122:22,25
123:1,5

**repeat**
55:12
77:13
81:12

**rephrase**
12:12
21:25
32:2
72:12
74:2 79:1
96:1
118:4
119:9

**replacing**
112:17

**report**
62:19

**reporter**
4:1,7,19
5:9,11,
18,20
21:14
30:11,14,
17 33:3,6
52:10,13
70:2,6
74:17,19
84:2,9,18
91:13,16
114:9,12
118:19,22
119:1,7,
10 124:5,
13,19,22
125:1,4,
7,9,14,17

**reporting**
62:15

**reports**
60:6

**represent**
80:16

**representat**
**ive**
26:4
80:19,24

**requested**
18:20,22

**requesting**
121:22

**require**
77:10

**required**
12:18
44:4
53:16
64:7 68:9
118:14
119:2

**requires**
59:14

**reread**
84:6

**reserve**
93:17

**reside**
40:10

**resided**
19:16,17,
24

**residential**
43:8

**residing**
21:25
28:9
40:21
42:1
45:15
59:2 64:1
118:4,5

**respect**
78:24

**response**

84:7

**responsibil**
**ities**
79:6

**responsibil**
**ity**
60:14
79:7
117:13,22
118:7

**responsible**
105:6
106:10
112:17
113:8

**responsive**
95:24

**rest**
89:6

**restaurant**
52:23

**restoration**
13:4
20:13

**restoration**
**s**
28:5

**restore**
27:5

**restored**
40:6
107:22

**restroom**
91:5,8
108:22

**restructuri**
**ng**
26:19

**retain**
124:10,20
125:3

**retract**
32:1 79:1

**retrieve**
95:19
96:10

**revenue**
37:10

**revert**
44:18

**Riano**
29:23
46:10,11

**Riano's**
46:2

**Ricardo**
46:10,11

**rich**
66:15

**Ricky**
29:18
30:21,23

**Ricky's**
29:22
30:2,6

**rid**
120:19

**rights**
34:9
119:23

**Riot**
110:24

**Roberto**
39:24,25
46:13,15,
18 56:24
57:8,11
92:14
109:8

**Roberto's**
57:4



Rodriguez
 4:13,15

rods
 29:20

role
 56:17

roles
 18:9

rollers
 78:1
 98:10
 99:20
 100:10,12

Romero
 105:16,19

roof
 13:5
 28:22
 34:3
 81:21
 82:1,2,10
 86:21
 100:23
 102:19,23
 105:17
 106:4
 111:12
 122:1

roofer
 105:18

roofers
 105:14

Roofing
 105:16,19

roots
 50:18

rough
 64:24

roughly
 12:2
 41:22,25

73:23

rude
 39:12
 83:13

rule
 104:3

rules
 6:13
 81:17

run
 66:7

running
 106:18

runs
 45:6

rushed
 125:5

Ryobi
 111:2

————————

——— S ———

————————

Sabores
 52:23

sad
 66:12
 67:14

safes
 14:13

safety
 14:13

sale
 120:13,18

Sandina
 116:8

sanding
 108:5

Sardina
 22:17

sat
 52:22

save
 15:6 86:6

saved
 16:8 61:4
 86:5

saws
 9:24
 110:6,10

schedule
 25:23
 29:10
 59:18
 80:5

school
 52:4,6

sealant
 81:22,23
 101:22

sealants
 100:23

seat
 36:13
 37:15

security
 18:20
 47:14
 60:13
 62:25
 63:3,14,
 19,22,25
 64:5,6,7
 65:1,10,
 15,18
 68:1
 72:13,16
 118:6

sees
 64:2

seized
 34:9

self-
employed
 10:14

self-
protection
 64:8

sell
 58:13,14
 83:21
 84:19,23
 85:5,11
 109:18,20
 120:2,9

selling
 85:1,8,16

send
 54:10,11
 79:16,25
 80:10,18
 94:8,20
 95:4,8,9
 96:16
 97:22
 115:5
 123:22
 124:11,
 20,21
 125:3

sending
 95:1
 96:15

sends
 18:4

series
 6:16

services
 18:21
 65:1,17
 86:10

serving
 121:19

set

29:9

setting
 81:20

Sevreco
 36:19

shared
 118:12,23
 119:12

shareholder
s
 37:23

shelf
 110:7

shop
 22:24
 40:5
 46:20,24

shopping
 19:3

shops
 32:21
 56:24

show
 27:16
 37:13
 61:23
 62:21
 71:18
 80:18,19

showed
 39:11,12

showing
 27:18
 121:21

shred
 15:18

shredded
 14:16,22,
 24

shredding



14:14,18

**shreds**
14:24

**sic**
19:14
20:5
116:8

**side**
29:14
31:17
54:8
72:4,5

**similar**
11:22

**sister**
89:10

**situation**
91:21
92:8
121:25

**size**
41:23,25

**skylights**
74:8
111:10,
11,16,18,
20,23

**sleep**
82:11
92:11,12

**sleeping**
91:20

**slept**
92:5,13

**slightly**
96:1

**slowly**
90:23

**small**
41:2

**smart**
42:17
91:1,3

**smoke**
60:25

**society**
71:3

**software**
4:11

**sold**
11:11
13:6
15:23
50:24
58:18
59:2
92:15

**solitary**
89:4

**solution**
16:22
89:12
123:7

**Solutions**
4:7 9:21
10:3
49:22
99:5
101:10

**son**
17:6
19:16
31:8
50:24
76:3
87:20,21
109:3

**son's**
107:21
108:14
121:8,10

**sort**

9:9 70:21

**sorts**
110:7

**sound**
84:13

**sounds**
61:21
124:18

**space**
13:22
14:7
16:10
41:2,4
42:6
53:12
77:7 87:7
96:25

**spaces**
53:5

**span**
11:14

**Spanish**
4:17
23:25
120:24

**spark**
32:16

**speak**
23:25
24:13
52:16
117:18

**speaking**
65:21
79:18,19

**special**
68:19

**specialized**
4:10

**specific**
59:19

**spelling**
19:19
35:24
36:9
38:14
114:24

**spellings**
22:19
124:3
125:11

**spend**
15:19
32:23
58:24

**spent**
15:16
48:11
58:24
67:15

**spiders**
48:20,22

**spoke**
24:20
34:15

**spoken**
15:14
24:22

**sporadic**
33:18
123:3

**Sporadicall
y**
108:17

**sports**
51:12

**square**
28:13
41:16
42:2
43:20
45:5,6
83:11

98:25

**Sr**
10:20

**stacked**
68:6

**stalled**
104:15

**stamps**
31:9
48:17
54:13
79:16
96:14,15

**standard**
4:3
30:15,18
33:4,7
52:11,14
70:4,7
91:14,17
114:10,13
125:5,6,
18

**Standards**
8:2 75:22

**start**
6:14 9:4
27:15
54:16
71:11
100:10

**started**
8:24 9:5,
22 20:23
21:3 26:9
27:22,24
61:1
65:2,4,6
102:1
107:23,24

**starting**
44:13



state
4:8 5:3
12:19
36:17
40:9
49:25
76:12
77:22
78:5

State-
issued
4:21

stated
40:16
47:3
55:22
56:16
66:6 67:8
79:1
91:19
100:11

states
39:13

stay
14:11
43:22
52:25
65:25
66:2
70:22
74:5 86:1
87:13,21,
24 88:17,
20 89:1,
7,19 90:4

stayed
66:3 87:6
101:13

steal
15:9
60:6,8,20

stealing
53:6
71:12

stemmed
21:3

stenography
4:11

sticker
18:6

stickers
54:12
95:8
115:6

stipulate
4:24

stipulation
5:4,16

stop
52:18,20
63:12
72:17

stopped
45:19
62:15
83:7
96:15

stopping
72:15

store
31:4
32:23
78:8

story
24:14

straight
67:7

street
29:19
40:3
46:20
48:4,11
49:17
57:10,11
60:1

67:16
92:7,13,
25 100:14

stressful
24:12

stroke
68:20

structural
42:23
103:5

structure
26:18
47:19,20
101:21
103:10

study
51:11

stuff
16:24
21:22
28:8,11
36:15
88:15
96:16
100:18

substances
7:13

subtle
31:13,14
88:25

suffer
48:9

suffered
56:7

suit
20:6 39:5
90:3
115:16

Sun
35:25

Sunbiz

35:14
36:24

Sunbiz.org
36:1
38:24
124:14

Sunbiz.org.
36:7
38:12

Sunrise
19:1,6
20:19
21:4,7,8

supervise
26:7

supplement
47:5,6
116:22

supplies
77:8

support
25:2
72:24
102:23

suppose
75:3

supposed
90:16

supposedly
93:4

survive
28:22
33:21,24
73:1 93:2

swearing
4:12

sworn
4:16

system
15:4,6,8

71:12
104:21

systems
15:21

_____

T
_____

table
104:22,23

taking
26:10
33:22
67:15
97:2

talk
13:21
26:5
27:22
30:21
43:10
52:23
56:15
63:13
97:23
123:19

talking
10:3
17:21
27:15
28:12
41:4,17
51:4,5
122:25
123:1

tanks
98:9

tax
17:19

taxes
18:7
79:24

tear



42:5
104:17

**telephone**
32:24

**television**
71:10

**telling**
19:13
27:6 72:7
73:18
83:1
87:10
121:3

**tells**
94:9,11,
22 105:9

**tenant**
9:9 11:6
16:11,13
22:23
41:6 44:7
55:11,18,
19 60:12
113:7
116:4,5

**tenants**
22:15,16
24:16,19,
24 25:3,5
41:1
53:15,21,
23 86:18
96:24
97:5
98:20

**termite**
47:24
123:10

**termites**
26:18
47:21
99:15

**terms**
14:1,11
79:3

**terrible**
48:19,21

**testified**
54:7 59:8
72:1,13,
20 80:4
90:2

**testify**
7:5 85:4

**testifying**
7:10,14,
18

**testimony**
4:18 5:1,
13 40:16
56:1

**text**
112:3,4
123:22

**thanking**
62:3

**thing**
6:25
22:23
35:7
50:24
51:18
55:3
71:19
72:5 73:9
76:14
90:15
99:15
121:2,19

**things**
12:18
13:24
14:23
15:3 16:3
17:6

20:17
21:22
27:5,22
35:20
49:22
50:22
53:13
60:20
67:23
70:11,13
78:7
79:16
82:5
93:13
97:20
110:9
115:18,20
122:11

**thought**
50:19
58:8 64:9

**threat**
88:25

**threatened**
83:6
88:16
115:15

**threw**
60:1

**throw**
28:11
50:25
51:3,6,21

**throwing**
66:2

**tie**
66:19

**tiles**
13:5

**time**
4:2,3 6:9
7:1 9:20
14:8

16:11
19:1
29:6,9
30:3,15,
18,19
33:4,7,8
34:2,15
44:16
47:13
52:11,14,
17 59:16,
21 65:16
67:16
70:3,4,6,
7 73:16
75:18
79:6
87:19
91:6,9,
14,17
92:17
94:1
97:10,13
99:10,14
103:2
104:15
112:13
114:10,13
115:8
117:25
122:15
125:18,19

**times**
14:10
49:19
77:3
98:23
99:11,12
112:11

**tire**
9:10 41:7

**tired**
29:5

**title**
17:9

18:10
39:25

**today**
5:25 7:5
40:16
92:20

**today's**
4:9

**told**
14:10
23:15
25:9,12
31:8 34:6
42:5
45:19
53:8
54:24
68:21
73:23
74:4
81:21
83:8,11
84:25
87:17,21
90:8,15
93:6
95:11
104:18
106:17
117:19

**ton**
82:13

**tool**
68:16

**tools**
9:24
78:1,2
99:18
107:16,
18,24
122:3,7,
9,13

**top**
57:18,21



**totally**
  114:6

**touching**
  81:3

**tow**
  85:19,21

**Trading**
  4:5

**traditionally**
  77:7

**trailer**
  99:3

**trained**
  63:15,16
  65:14
  92:23

**training**
  65:15,17
  72:13

**transcript**
  21:18
  124:7,23

**translate**
  4:17
  12:14
  23:20
  24:6
  120:24

**translating**
  21:16
  104:4

**translation**
  104:7

**transportation**
  78:20

**trash**
  26:10
  28:1,7
  50:25

  51:1
  65:6,21
  66:2
  90:23
  97:2,17,
  20

**travel**
  75:19
  76:10
  77:11,18
  94:3,5

**traveled**
  12:11,19
  76:12

**traveling**
  54:19

**treated**
  5:1,13
  39:15

**tree**
  11:4
  27:15
  81:5 82:9
  106:12,24
  107:3
  117:11

**trees**
  53:4
  106:9,10,
  16

**trim**
  81:4

**trimming**
  81:5 82:9
  106:10,
  16,24
  107:3

**trips**
  108:18

**truck**
  13:2
  85:19

  99:3

**trucking**
  85:21

**true**
  35:1
  45:1,3
  49:5
  100:23
  114:19

**trustworthy**
  58:8
  88:10

**truth**
  7:8 67:22
  83:1
  89:14

**truthfully**
  7:5,11,
  14,19

**Tuesday**
  62:12

**tune-up**
  32:15

**tune-ups**
  32:4,13,
  14 107:15

**turn**
  32:23
  45:24
  64:23

**turned**
  30:8

**turning**
  30:8

**Turns**
  60:25

**type**
  9:1 16:18
  27:18
  33:20
  71:7

  99:18
  107:18
  123:8

**typically**
  40:18

————————

**U**

**Uh-huh**
  24:2 36:5

**uncles**
  89:11

**undergoing**
  42:8

**underneath**
  11:4

**understand**
  20:8,10,
  14,15
  24:10
  59:25
  72:11
  73:4
  77:24
  83:14
  86:16

**understanding**
  86:8
  94:12

**understood**
  27:2
  77:23
  94:19

**undo**
  42:11

**unfair**
  50:5

**unfavorable**
  59:9

**unit**
  23:13
  28:9

**unlike**
  83:15

**unload**
  30:24

**unpaid**
  39:5

**unpleasant**
  39:13

**utilize**
  78:19

**utilized**
  70:19
  78:1

————————

**V**

**vacated**
  14:15

**valid**
  4:21

**vanished**
  14:16

**vehicle**
  121:2,13

**vehicles**
  107:9,10

**Venezuela**
  27:23
  66:15

**ventured**
  18:8

**verbal**
  25:6
  90:25

**verbalize**
  5:4,15



**verbatim**
    4:9

**vessel**
    23:13

**vessels**
    9:6 23:2,
    5 25:15

**vice**
    38:23,25

**video**
    84:13

**videos**
    63:16

**Villa**
    52:22

**Viormar**
    4:4 8:24
    9:2 10:8,
    12 11:3,
    7,10,12
    12:2,4,10
    14:11
    16:18,22
    17:23
    18:9,21
    19:7,15,
    16,17,23,
    25 20:4
    21:3,11
    22:13,15
    25:21,24
    29:10,15
    33:22
    34:1 35:1
    40:19
    41:5 42:4
    43:6 44:7
    45:20
    53:3
    55:23
    56:17
    57:9,12,
    15,16
    58:4,12

    60:11,12,
    14 64:1
    65:1,17
    75:23
    76:11
    77:17
    78:15,21
    79:21
    80:5,7
    81:17
    82:4
    83:6,21
    84:19,22
    88:24
    94:2,21,
    25 95:4,
    16 96:4,
    7,11,22
    97:8 98:5
    101:15,24
    103:7
    113:7
    114:22
    116:19
    122:4

**Viormar's**
    78:10
    97:14
    98:20,23
    99:9
    101:14
    103:3,15,
    17 106:1
    111:16
    112:1
    115:4,8,
    9,15

**visit**
    79:20

**visitation**
    116:22

**Vita**
    9:21 10:3
    16:22
    49:21

    99:5,7
    101:10
    123:7

**voltage**
    103:20

————————

W

————————

**W2**
    11:16

**wages**
    39:5

**wait**
    39:4,6
    61:2
    104:4
    105:21
    123:13

**waive**
    125:12,13

**walk**
    10:11

**wall**
    68:13
    82:10
    90:15
    100:2,4
    102:8,10,
    18,20,21,
    25

**walls**
    26:17
    31:21
    43:1
    77:21
    99:4
    101:12
    102:23
    104:17

**Walmart**
    101:6
    111:7

**wanted**
    15:18
    21:15
    25:13,14,
    17 26:12
    28:5
    34:12
    44:25
    49:16
    50:1,23
    52:16
    57:12
    61:6
    83:14
    85:11
    89:25
    90:3 99:8
    104:16
    116:2
    118:5

**warehouse**
    50:12
    77:6
    97:1,5,6,
    24 98:5,
    12,19,24,
    25 99:10,
    13,19,25
    100:9
    101:20
    102:19
    103:3,16,
    23,24
    104:1,14,
    16 105:13
    106:1
    110:3
    111:10,
    16,18
    112:1,10,
    17 113:9
    115:9,15

**warehouses**
    40:20

**warning**

    106:14

**washer**
    99:21
    101:9,17

**washers**
    101:3,8

**washing**
    29:7
    95:21

**watching**
    50:12

**water**
    53:6
    56:13
    97:20
    99:4
    102:3
    103:23
    112:2,5,
    7,10,14

**watts**
    103:21

**weapon**
    64:22

**website**
    35:6
    124:15

**week**
    25:21
    60:23
    61:15
    62:10,13
    71:22
    72:6
    116:21
    117:1

**weekly**
    46:24

**weird**
    84:15

**well-being**



87:17

**wife**
76:3

**windows**
123:11

**withstood**
56:13

**witness'**
5:1,13

**witnesses**
39:21,23

**woman**
20:24

**wood**
26:19
47:19
99:16
110:14

**woodcutting**
111:6

**work**
6:13 9:1,
25 11:20
12:18
14:4
18:5,15
19:13
20:7,17
22:10
25:21
26:25
28:1,20,
25 29:6
30:4 32:2
33:11
40:11
46:22
48:7
55:19,20
56:17,25
57:14
59:14
66:17

68:14
69:17
70:12,23
71:7
72:16
77:21
80:5
86:13,18
88:20
90:5
92:16
94:2
103:15
105:8,11,
13,17,25
107:9
108:13
109:2,3,
4,7
115:21
116:21

**worked**
11:1 12:9
16:13
31:10
34:20
40:15
49:4
59:11
67:2
83:15
88:2
89:13
90:10
93:9
117:25
121:12

**worker**
119:22

**workers'**
50:2

**working**
8:24
9:22,25
10:12,14

11:13
12:2
27:13,14
28:14
29:10
30:4 34:2
39:20
45:19
60:11
68:1
71:11,14
76:12
83:7
86:15
91:24
101:23
103:3
115:9
120:14,21

**works**
6:16 57:7
86:23

**world**
71:5

**worth**
47:15
58:22

**wrap**
93:17

**write**
29:13

**writing**
31:12
42:14
44:17,22

**written**
16:5 26:1
116:17

**wrong**
68:17

**wrote**
20:21
93:12

115:11

_____

**Y**

_____

**year**
8:23 12:1
16:9 23:4
43:1,12
45:12
69:4,11,
13,15
105:1
107:5
122:19,22

**years**
8:18,21
9:11
11:14
17:16
23:7
26:21
34:8
39:4,7,18
43:18
48:1 54:6
64:25
65:17
86:6
90:10
93:1
99:14
104:16
112:15

**Yenisbel**
4:12,15

