UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20722-GAYLES/LOUIS

DENNIS ANEIROS

      Plaintiff,

vs.

VIORMAR TRADING CORPORATION, N.V.,
AND ORLANDO A. FERNANDEZ,

      Defendants.

_____/

**<u>DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT</u>**

      Defendants, VIORMAR TRADING CORPORATION, N.V., ("VIORMAR TRADING") and ORLANDO A. FERNANDEZ (collectively "Defendants"), by and through its undersigned counsel, hereby files its Motion for Summary Judgment against Plaintiff, Dennis Aneiros ("Mr. Aneiros" or "Plaintiff"), and as grounds states:

      On December 20, 2024, Defendants submitted it's motion for summary judgment with it's undisputed facts. See [ECF No. 33]. On January 13, 2025, the Court struck Defendants' motion for summary judgment because of Defendants failure to comply with Local Rule 56.1(b)(1). Pursuant to the Court's Order, Defendants must submit its Amended Motion for Summary Judgment and a separate Statement of Material facts within five (5) days of the January 13, 2025 Order. This Amended Motion for Summary Judgment corrects the errors of Defendants' previous Motion and brings it in compliance with Local 56.1(b)(1) and the Order of this Court. See [ECF No. 39]. As such, the only difference between Defendant's original motion for summary judgment

and this Amended Motion for Summary Judgment is as follows: (i) Defendants have removed the "undisputed material facts" section and filed a separate Statement of Material Facts, (ii) Defendants have changed the exhibits from alphabetical to numerical, and (iii) the summary judgment standard now reflects the federal standard (the florida standard in the previous summary judgment adopts the federal standard as well, but for clarity Defendants have replaced the language to only reflect the federal standard.)

## SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23). *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)

(The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)). Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for [*8]  trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

In the present case, the Plaintiff has made incendiary claims of violations of the Fair Labor Standards Act of 1938 (Count I), Florida Minimum Wage Action Violations (Count II), and slave trafficking in violation of the Trafficking Victims Protection Act (Coun III); three claims that are rarely brought in the same action. Following the deposition of Plaintiff and the discovery responses of Defendants, the record clearly establishes that the claims raised in Plaintiff's complaint cannot

be supported by the evidence. As such, pursuant to *Cleotex Corp. v. Cartrett*, Defendants are entitled to summary judgment as a matter of law.

## SUMMARY OF ARGUMENT

With respect to the first two Counts in Plaintiff's Second Amended Complaint, FLSA Minimum Wage Violation and Florida Minimum Wage Action Violations, Defendants are entitled to summary judgment in their favor for two reasons: (i) Plaintiff cannot establish that he is an employee as defined by the FLSA, and (ii) Defendants are not liable under individual or enterprise coverage. When determining whether a laborer is an employee or independent contractor, the court uses the economic reality test. The economic reality test has six factors, and Plaintiff can only establish two. As the evidence will show, Plaintiff was not economically dependent upon the Defendants, he was not provided a work schedule, he had to use his own materials to complete aspects of his alleged job duties, and he had no prospect of profit or loss depending on his managerial skills.

However, even if this Court were to find that the Plaintiff was an employee according to the FLSA, Plaintiff still has to establish that the defendants are liable under individual coverage or enterprise coverage. The evidence shows that Defendants are not liable under individual coverage because they do not have employees who are working on goods or materials that travel through interstate commerce and they are not liable under enterprise coverage because they are not an entity that engages in interstate commerce, has two or more employees, or makes more than $500,000.00 annually.

With respect to the third Count in Plaintiff's Second Amended Complaint, Violation of the Trafficking Victims Protection Act, the evidence shows that Plaintiff was not lured into forced

labor. Nor was the Plaintiff restricted from leaving the property. In fact, the evidence shows the opposite. Plaintiff was free to work with whomever he desired, Plaintiff often stated that he had a familial relationship with Defendants and was grateful for them. Additionally, the evidence shows that the Defendants did not abuse the legal process by threatening eviction. In reality, Plaintiff was fully aware that Defendants intended to sell the property. Plaintiff even knew how much the property was worth and stated that he would leave if the Plaintiff's agreed to pay him some of the sale proceeds. For these reasons, Defendants are entitled to summary judgment on all counts.

## ARGUMENT

### I.   Defendants Cannot Be Held Liable Under the Fair Labor Standards Act Because Mr. Aneiros is Not an Employee ("FLSA").

#### a.   The purpose and intent of the FLSA.

The purposes of the FLSA are undeniably noble and just. It was designed to prevent the unseemly conditions that employees often found themselves in during the Great Depression. Congress, recognizing the unequal bargaining power between workers and employers, enacted the FLSA to prevent contracts that would endanger the flow of goods traversing through interstate commerce and ensure that the basic rights of workers were protected.

**The Fair Labor Standards Act (FLSA) was enacted in 1938 for the prime purpose of aiding the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage. Congress enacted the FLSA in recognition of the fact that, due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum**

hours were provided, and the policy considerations underlying those standards forbid waiver of those basic standards.

*Walthour v. Chipio Windshield Repair*, LLC, 745 F.3d 1326, 1327 (11th Cir. 2014).

### b. The scope of liability under the FLSA.

Nevertheless, the scope of the FLSA is a limited. In order to bring a claim under the FLSA, the laborer must establish that he is an employee rather than an independent contractor. *See Nieman v. Nat'l Claims Adjusters, Inc.*, 775 F. App'x 622, 623 (11th Cir. 2019). There are several factors to consider when determining whether a laborer is an independent contractor, but the most integral consideration is the degree of control an employer has over the laborer, "[T]he court found that there was sufficient evidence for the jury to find an employer-employee relationship, as defined under the Fair Labor Standards Act, based on the testimony about employer's control over employee's work schedule, tasks, tools, and review of timesheets." *Cornelius v. Rollins Ranches, Ltd. Liab. Co*., No. 22-12862, 2024 U.S. App. LEXIS 6268, at *1 (11th Cir. Mar. 15, 2024). Seeing that this action was brought by Mr. Aneiro's, examining his testimony about Defendants' control is a natural starting point.

### c. How an independent contractor can be distinguished from an employee.

To determine if an individual is an employee, courts look at the "economic reality" of all the circumstances surrounding the activity. This has been referred to as the "economic reality" test. The touchstone of the economic reality test is the alleged employee's economic dependence on the employer. The final and determinative question must be whether the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit. *Freeman v. Key Largo Volunteer Fire & Rescue Dep't., Inc*., 494 F. App'x 940, 941 (11th Cir. 2012).

### d.  The six factors of the economic reality test

The 11th Circuit identifies several factors that guide the economic reality inquiry in determining if an individual is a contractor, namely: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. While those factors are important, the overarching focus of the inquiry is economic dependence, or in other words, whether the individual is in business for himself or is dependent upon finding employment in the business of others. *Nieman v. Nat'l Claims Adjusters, Inc*., 775 F. App'x 622, 623 (11th Cir. 2019).

## II.   Mr. Aneiros Is An Independent Contractor Under The Economic Reality Test.

### a.  Test #1 - Degree of Control

The Nieman Court found that the Plaintiff in its case was indeed an independent contractor rather than an employer, and the analysis supporting this ruling should be used by this Court. Now, for the ease of the Court's review and comparison, Defendant will intertwine the facts of the present case with the bolded, block quote below just so the Court can quickly identify the similarities between the two cases. Before delving into the findings, it is important to note that the economics realities test only requires a simple majority for a finding on whether or not a laborer is an independent contractor.

**Construing the allegations in the complaint in the light most favorable to Nieman, the district court did not err in dismissing Nieman's complaint on the ground that Nieman was an independent contractor, rather than an employee. Using the six factors to guide the economic reality inquiry, the first, third, fourth, and fifth factors favor independent contractor status while the second and sixth factors do not weigh in favor of either. The first factor—control—weighs in favor of independent contractor status because Nieman controlled when he started work for National and for how long, how many assignments he took from National, and when he received those assignments. In other words, he controlled his schedule. He admitted in his complaint that after he began receiving assignments from Brown, he set up his own appointments and inspections. He also controlled the geographic location within which he took assignments. Although he alleged that National controlled the software that he used, the methods by which he completed his reports, and in some ways, how he performed the job, he ultimately controlled how and when he completed the assignments and whether he would take on more or less of them, showing that he was essentially "in business for himself."** *See Scantland*, **721 F.3d at 1312.**

With respect to the first consideration under the economics realities test, control, much like Nieman, Mr. Aneiros also did not have a set schedule. Or, at the very least, he controlled his own schedule as indicated by his deposition testimony.

**Q: Okay. How many hours would you say that you work a week for Viormar on average?**

A: It would be a night. Imagine how many hours.

**Q: Were you ever provided a schedule from Viormar?**

A: No.

See Ex. 1 Mr. Aneiros Deposition Transcript 25:20-25

**Q: As part of the job duties that you were performing for Viormar or for Orlando Fernandez, were you regularly sending or receiving mail for the company?**

A: Correct.

**Q: How often would you send mail for Viormar or for Orlando?**

A: Every 15 days, something like that. The letters would accumulate. They would accumulate. He would send everything with the stickers, Denny and Orlando, and then he would buy the postage and send it to me. And then he told me he'd' have – I'd have to pay for my own electricity, that I'd have to buy my own postage. And then – postage and envelopes. And I didn't have the funds to buy the postage and the envelope, so they would delay it a little bit.

See Ex. 1 Depo. Transcript of Mr. Aneiros, **94:24-25; 95:1-15.**

Another instance showing Defendants lack of control over Mr. Aneiros is his ability to work for others and himself whenever he desired. This shows that Mr. Aneiros had no economic dependency on Defendant VIORMAR.

**Q: Okay. When you were discussing working with Orlando, did you ever negotiate payment?**

A: Yes.

**Q: Okay. What did those negotiations look like?**

A: I said that I needed money because I had to pay for electricity. I need to eat. And he said that I was free to go and work outside, and that I could go repair a car or do whatever it was that I needed to survive, that I only had the logding or the roof to live under.

**Q: So look -- just for my own clarification purposes: Orlando allowed you to work any odd jobs that you needed to get paid otherwise?**

A: Yes.

**Q: Okay.**

A: I would go -- I -- I would do it, but then I would get home and -- and I was tired at night. Well, I had a lot of work. By the time I got back from doing whatever job I was doing, like washing dishes or whatever, I was exhausted.

**Q: But you didn't -- but did you have a set time schedule while working at Viormar?**

A: No.

See Ex. 1, Mr. Aneiros Deposition Transcript, **28:14-25; 29:1-11**

It is abundantly clear that the first factor, control, under the economic reality test favors that Mr. Aneiros is an independent contractor rather than an employee because he had no economic dependency upon Defendants and he had no set schedule. In fact, his degree of independence far exceeded that of the Plaintiff in Neiman because Defendants didn't even provide him with the postage to send mail. Therefore, the first test of control shows that Mr. Aneiros is an independent contractor.

### b. Test #2 - Profit or loss depending upon managerial skill.

The second factor of profit or loss depending upon managerial skill also seems to indicate that Mr. Aneiros is an independent contractor. Much like the case before the Neiman Court, Defendant's Amended Complaint is rather light on allegations of managerial skill.

> **As to the second factor—the employee's opportunity for profit or loss depending on his managerial skill—and the sixth factor—the extent to which the service rendered is an integral part of the alleged employer's business—Neiman did not state many facts in his complaint that would support his claim for employee status.**

Plaintiff's Amended Complaint alleges that Mr. Aneiros performed various job duties, such as: cleaning, repairing, renovating, collecting, and renting for its commercial property rentals. See Paragraph 17 of Plaintiff's Amended Complaint. As such, there is simply not enough information to determine whether Mr. Aneiros had an opportunity for profit or loss based on his managerial skills. However, in Mr. Aneiros deposition, he does make the claim that he has a letter establishing him as property manager. The March 1, 2017 letter which labels Mr. Aneiro's as "assistant property manager" is attached hereto as Ex. 4. It should be noted that this letter is on behalf of a company named Corina, which is not a party to this suit. Furthermore, if the Plaintiff wishes to argue that he was an assistant property manager, which his testimony seems to suggest, he would

be exempt under the FLSA. "The administrative and executive exemptions provide that the FLSA's requirements shall not apply with respect to any employee employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C.S. § 213(a)(1)." *Gonzalez v. Batmasian*, 734 F. App'x 677, 678 (11th Cir. 2018). Therefore, Mr. Aneiros cannot satisfy the second prong of the economic reality test.

### c.   Test #3 - Employee's investment in equipment and materials for the work.

The third test is whether the laborer had invested in the equipment and materials that were necessary for the work. As this Court knows, contractors (generally construction related contractors) use their own tools to complete the job. Here, we have already seen that one of Mr. Aneiro's claimed duties (mailing) required him to use his own postage. The Neiman Court notes that most if not all of the work performed by the Plaintiff, was done with his own materials.

> **The third factor—alleged employee's investment in equipment and materials for the work—weighs in favor of independent contractor status. Nieman had his own home office, a laptop, and iPad for field work and was equipped with a vehicle, ladder, measuring tools, digital voice and photographic equipment, and "other similar tools of the trade." It appears that the only "tool" that National provided was the Xactimate software, and even then, it is not clear whether Nieman had this software before he began work for National, or whether National paid for and provided it to him.**

However, mailing isn't the only job duty that Mr. Aneiros has claimed to perform. Mr. Aneiros also claims to have done extensive construction work, even making renovations to comply with Florida's 40 year recertification requirements.

> **Q: Okay. And what exactly did they order you to do?**
> A: Paint, repair walls, debris removal, the paint of the structure. There was termites, and so the restructuring of the wood. There was a lot of wood in that building. And I've done that throughout the years, many years.

**Q: Okay. Do you have any professional licenses?**
A: Me? A professional license?

**Q: Yeah. Like, do you have any contractor's license that allows you to do construction work?**
A: No. I'm a genius.

See Ex. 1 Mr. Aneiro's Deposition Transcript, 26:15-25; 27:1

**Q: How -- how big is that second property that he's now in the process of remodeling?**
A: 4,400 feet.

**Q: Okay.**
A: But aside from that, theres a problem. That property needs structural repair.

**Q: Okay.**
A: And that man made me remove the cracks that were on the walls to pass the 40 year inspection.

See Ex. 1, Mr. Aneiros' Deposition Transcript, 42:18-25; 43:1

Now, Mr. Aneiros claims that he was provided the tools to perform this work, but there hasn't been any documentation produced in discovery to suggest that this has occurred. But even if it did in the state of Florida, a construction contractor must either have a license issued by the relevant state department, or, conduct the work under the license of another contractor. In fact, it is a felony to perform work without the proper certification and any work that is performed without the required license cannot be compensated. *See* Fla. Stat. § 489.117.

Therefore, even if Mr. Aneiros did perform this work and even if Defendant VIORMAR provided him with the tools to perform this work (which they did not), Mr. Aneiros cannot seek recovery based upon this construction work by circumventing the statute via an FLSA claim. It should be noted that test number 6 asks whether the work performed was integral to the employer's business and Defendants are not in the business of construction. Therefore, Mr. Aneiros has not

met the third test of being provided the tools necessary to complete his work. For this reason, test three also establishes Mr. Aneiros as an independent contractor.

### d. Test #4 - Special Skill

Similar to the preceding test, the question of whether or not a job requires a special skill helps the finder of fact to determine whether or not an individual is acting in the capacity of an independent contractor. Most construction companies that are hired to do 40-year recertification work on buildings are independent contractors. Construction firms that are hired to ensure commercial facilities are ADA Compliant, or firms that handle the plumbing or electric linings of buildings are also typically independent contractors. They are individuals who are hired to perform a specialized job. Here, as shown above, all of the construction work or "demolition" work as alleged in Paragraph 40 of the Plaintiff's Amended Complaint, require licensure.

Therefore, at least with respect to construction work Plaintiff alleges to have performed, he is an independent contractor. This also highlights the conspicuously convenient nature of Plaintiff's pleading. Plaintiff alleges that he provided cleaning, repairing, renovating, collecting, and renting services for Defendants. In his deposition, he also claims to have provided security and bodyguard services. There is absolute no semblance of continuity with respect to Plaintiff's job role. If Defendants show that he is an independent contractor for jobs "A" through "C", Plaintiff will simply argue that he was an employee for "D" through "E". Under the law, that is a completely viable position. However, Plaintiff has produced zero evidence to support the contention that he was an employee for any of the claimed work he alleges to have performed.

### e. Test #5 - Degree of permanency and duration

The 5th test is arguably Plaintiff's strongest position. However, it's strength is still mired by the facts of the case. Mr. Aneiros claims to have worked at Viormar since 2010 or 2011. The reality is that Mr. Aneiros has simply been squatting on the property since 2010 or 2011.

**The fifth factor—the degree of permanency and duration of the working relationship—weighs in favor of independent contractor status because Nieman alleged that National engaged him to handle claims arising from Hurricane Irma and acknowledged that he was hired for a "special project."**

Mr. Aneiros himself does not refute that he has been residing on the property. The only dispute is whether Mr. Aneiros has been employed since 2010 or 2011. Now, it is important to note that the fifth factor questions not only the duration, but the degree of permanency. Mr. Aneiros testimony clearly shows that he has performed various jobs for himself and others during this time period.

> **Q: Can you tell me, what are some of the side jobs you would do while you were at Viormar?**
>
> A: Dishwashing, fixing of a door. I have a – I have a friend who's like – it – it would break down, something in his house, and I'd go fix it. So Ricky, the guy from across the street, he had a factory that made fishing rods. But he was older, so he would call me in to help him.
>
> **Q: Can – can you tell me Ricky's full name?**
>
> A: His name is Riano.
>
> See Ex. 1, Mr. Aneiros Deposition Transcript, 29:14-23.

The record shows that Mr. Aneiros has conducted himself as an independent contractor. Nevertheless, as shown by the Neiman Court, even if the degree of permanency requirement is in Mr. Aneiros favor, he must have a majority of such requirements to be found as an employee.

    **f.  Test #6 - Was the work an integral part of the business**

The Neiman Court combines the 6th test with an all encompassing economic overview. The Court noted that Neiman did not state many facts in his complaint that showed the work he performed was an integral part of the Defendant's business. Mr. Aneiro's Complaint suffers the same fatal flaw.

> **Further, looking to the overall economic reality of the parties' working relationship, it is also significant that Nieman completed work for another company after he responded to National's initial advertisement and looked for and interviewed for other jobs while he was still engaged with National, which shows that he was not economically dependent on National. As to the second factor—the employee's opportunity for profit or loss depending on his managerial skill—and the sixth factor—the extent to which the service rendered is an integral part of the alleged employer's business—Neiman did not state many facts in his complaint that would support his claim for employee status. Therefore, when all the factors are viewed in the light most favorable to Nieman, four of the six factors weigh strongly in favor of independent contractor status. Thus, Nieman was an independent contractor, not an employee, under the FLSA, and to the extent that he argues that National committed tax fraud for falsely representing to the IRS that he was an independent contractor, that argument fails for the same reason. Accordingly, the district court correctly dismissed his federal claims.**

**Nieman v. Nat'l Claims Adjusters, Inc., 775 F. App'x 622, 624-25 (11th Cir. 2019)**

The Complaint completely fails to state the business in which the Defendants are engaged in. As such, there is almost no way to determine whether or not cleaning, repairing, renovating, collecting, is an integral part of the Defendants business. With that being said, Defendant hasn't been an active business for over a decade now and has only leased part of its property to a single tenant. Defendant concedes that the job duties listed above can certainly be interpreted as integral to it's business. However, the documents produced in discovery and the testimony provided in Plaintiff's deposition do not show that those job duties were done in an employment capacity rather than in the capacity as an independent contractor.

Now, the Court may be tempted to identify that as a genuine dispute of material fact. However, Defendant wishes to remind the Court that the economic reality test is simply a tool used to determine whether a laborer is closer to an employee or an independent contractor. If the factors are evenly split (3-3), then a genuine dispute of material fact exists. Thus far, Mr. Aneiros has only met two out of the six factors to establish employment. Neiman also only met two out of the six factors and the Court found that he was an independent contractor. Therefore, the Court should do the same here.

### g. Brief Summary of Mr. Aneiros' Status as an Independent Contractor

It is abundantly clear that Defendants did not maintain sufficient control over Mr. Aneiros for the Court to find that they were his employer. Mr. Aneiros did not have a set schedule and by his own admission he worked for others while allegedly being employed by Defendant VIORMAR. Mr. Aneiros claims to have provided construction work that requires special licenses that he does not have. Mr. Aneiros claims to have collected rent on behalf of Defendants, but the only evidence he has substantiating this claim is a letter that is for a company that is not a party to this suit. Therefore, Mr. Aneiros cannot establish the economic dependency which is typically shown by employees. For these reasons, this Court should find that Mr. Aneiros is an independent contractor.

### III.   Mr. Aneiros Cannot Establish Individual or Enterprise Coverage Under the FLSA

Although it is sufficient for Defendants to win on summary judgment by showing that Mr. Aneiros is an independent contractor rather than an employee, Mr. Aneiros must also show that Defendants are liable under the theories of individual coverage or enterprise coverage. In other

words, even if the Court finds that Mr. Aneiros is an employee, if individual or enterprise coverage does not apply, Defendants are entitled to summary judgment in their favor as a matter of law.

Employees are covered under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., in one of two instances: individual coverage or enterprise coverage. Individual coverage lies where the employee is engaged in commerce or the production of goods for commerce. 29 U.S.C.S. § 207(a)(1). Enterprise coverage lies where the employee works for an enterprise engaged in commerce or in the production of goods for commerce. § 207(a)(1). *Josendis v. Wall to Wall Residence Repairs, Inc.*, 606 F. Supp. 2d 1376, 1378 (S.D. Fla. 2009).

In the context of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., an "enterprise engaged in commerce or in the production of goods for commerce" is defined, in part, as an enterprise that: (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $ 500,000 (exclusive of excise taxes at the retail level that are separately stated); or (B) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution. 29 U.S.C.S. § 203(s)(1). *Id.*

Mr. Aneiros has testified that he has not worked on any goods or materials that have traveled through interstate commerce. Therefore, individual coverage is not applicable here.

**Q: Okay. And is there anything that you worked on, on behalf of Viormar, whether goods or materials, that traveled through interstate commerce?**

Mr. Alvarez: I can rephrase if it's –

The interpreter: Yeah.

Mr. Alvarez: – hard to translate.

The interpreter: Yeah.

**Q: Okay. Let me see. Is there anything in your job duties that required to work on things that traveled out of the state of Florida?**

Mr. Larou: Form.

The Witness: No.

See Ex. 1, Mr. Aneiros' Deposition Transcript, 12:9-21.

With respect to enterprise coverage, Defendants also are not a company that engages in goods or materials that travel through interstate commerce, nor do they have employees that work on goods or materials that travel through interstate commerce, and they do not have an annual gross volume of sales that exceed $500,000.00. (See Ex. 3, Defendants Tax Returns and Ex. 2, Affidavit of Orlando A. Fernandez). Moreover, enterprise coverage also requires the employment of two or more employees that are engaged in interstate commerce and Mr. Aneiros has testified in his deposition that the Defendants did not have two or more employees during the relevant period.

**Q: Okay. And did Viormar have any other employees from 2010 to 2024?**

A: No.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 12:4-6).

It is Defendants' understanding that Plaintiff is arguing that the leasing of property and the sending or receiving of mail is engagement in interstate commerce. However, the FLSA only considers "the actual movement of persons or things in interstate commerce."

Under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., to be engaged in interstate commerce, an employee must be directly participating in the actual movement of persons or things in interstate commerce. This includes employees of the transportation or communications industries or any employee who regularly uses "interstate telephone, telegraph, mails, or travel.

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 606 F. Supp. 2d 1376, 1378 (S.D. Fla. 2009)

Now, Mr. Aneiros claims to have sent and received mail on behalf of Viormar. However, there is no evidence that any of this mail was sent to different states. Mr. Aneiros does claim that he sent mail to Curacao, a dutch Carribean island. However, this does not constitute interstate commerce as it is typically understood. "Interstate Commerce defined: The term "interstate commerce" means commerce between one state and another state. This includes all means of transportation and communication between one state and another state." *United States v. Klopf*, 423 F.3d 1228, 1238 n.6 (11th Cir. 2005). Therefore, Defendants cannot be found liable under the FLSA because Mr. Aneiros cannot be found as an employee and Defendant VIORMAR cannot be found as an employer.

## IV. Defendants Cannot Be Found Liable for Violating the Florida Minimum Wage Act Because Defendants Are not Plaintiff's Employer.

The analysis in this section is the same analysis detailed in the FLSA section of this Motion. This is because Fla. Const. Art. X § 24 adopts the definitions of employer, employee, and wage from the federal Fair Labor Standards Act. *See* Fla. Const. Art. X § 24(b). Paragraph 27 of Plaintiff's Amended Complaint alleges that "Florida law provides a cause of action against each "employer" who violates the FMWA by failing to pay the minimum wages required by Florida law." If we look at the Florida Constitution itself it states, "It is intended that case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall

guide the construction of this amendment and any implementing statutes or regulations." Fla. Const. Art. X, § 24(f).

As such, the economics realities test and all the supporting case law cited in the FLSA portion of this Motion applies. It has already been conclusively established that Defendants cannot be held to be employers under the FLSA and Mr. Aneiros cannot be an employee as defined by the Act. For these reasons, Defendants' are entitled to summary judgment as to Count II of Plaintiff's Amended Complaint.

### V. Defendants Did Not Violate the Trafficking Victims Protection Act

#### a.   The applicability of the TVPA

The third and final Count in Plaintiff's Amended Complaint is the most egregious and incendiary, the Violation of the Trafficking Victims Protection Act (the "TVPA"). The TVPA is typically used, and was intended to be used, to protect victims of sex trafficking, an allegation that is not present here. "The Trafficking Victims Protection Act permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture." 18 U.S.C.S. § 1595(a). However, Defendants acknowledge that the wording of the Act is broad and has been used in cases involving forced labor. The Act states:

> **(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—**
>
> **(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;**
>
> **(2) by means of serious harm or threats of serious harm to that person or another person;**

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c) In this section:

(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

(d) Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

18 USCS § 1589

The key allegation of violation of the TVPA is found in Paragraph 42 of Plaintiff's Amended Complaint, "In essence, Defendants subjected Plaintiff to involuntary servitude by threatening to remove him from the property where he resided if he did not continue to perform

free labor for them, despite Defendants' knowledge of Plaintiff's financial hardship." See Paragraph 42 of Plaintiff's Amended Complaint. It appears that Plaintiff's allegation is traveling under subsection (c)(1) of the TVPA, the "abuse or threatened abuse of legal process".

### b.  Defendants have not abused the legal process

Aside from there being no evidence that Defendants threatened Mr. Aneiros' with eviction if he refused to perform free labor, the alleged misuse of legal process is not enough to find a violation of the TVPA. "Alleged misuse of the legal process is not enough to allege a violation of 18 USCS § 1589(3); to adequately allege a violation of this statute, the government must allege that a defendant misused the legal process to coerce another into providing labor." *United States v. Peterson*, 627 F. Supp. 2d 1359, 2008 U.S. Dist. LEXIS 78780 (M.D. Ga. 2008). Nevertheless, Mr. Aneiros concession that he is aware that Defendants are trying to sell the property presents a key question that this Court must consider. If the Plaintiff is acknowledging that Defendants have been trying to sell the property, do the facts not seem to indicate that Mr. Aneiros' is taking advantage of this development? After all, Mr. Aneiros did not file his claim until 14 years after he allegedly began working for Defendants, which is around the time that he learned of the Defendants desire to sell the property.

**Q: Okay. Did you know that Viormar is trying to sell the property?**

A: Me? I know that they're trying to sell the property, of course. I have brought people who want to buy it.

**Q: So you would find it beneficial for the property to be sold then?**

A: Of course. And that way, they could pay me my money and I could leave.

**Q: Okay.**

A: It's $6 million that that property is worth.

**Q: Okay.**

A: And he's going to spend it, just like he spent all of his father's money.

**Q: But you are aware that the property cannot be sold while you're residing in it?**

A: So give me a deposit and I'll leave.

**Q: So –**

A: Or an advance. I'll leave.

**Q: So you wouldn't say that's extortion?**

A: And they exploited me my whole life.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 58:12-25; 59:1-7)

The Plaintiff has failed to produce a single shred of evidence that Defendants have threatened him with eviction in order to obtain free labor. If Defendants did threaten Mr. Aneiros with eviction (which they didn't) it is awfully convenient that he waits until the Defendants are attempting to sell the property to file his claim.

The reason why Defendants are trying to get Mr. Aneiros removed from the property is so that they can sell it. This is not a misuse of the legal process, it is why the process was created. However, it is a misuse of the legal process to file a frivolous claim for unpaid wages in an effort to extort an employer. Mr. Aneiro's seems to know the exact value of the property and now that he knows the Defendants intend to sell it, he decides to file a claim for unpaid wages 14 years late.

### c. Mr. Aneiros was free to leave at any time.

Another key component of the TVPA is the inability to escape and Plaintiffs allege this in Paragraph 34 of their Amended Complaint, "Once Defendants lured Plaintiff into working for

them in exchange for living in an office, he could not escape; he had no other meaningful choice but to continue performing free labor for Defendants' benefit since 2010 out of fear that he would lose his home if he ceased working for them." See Paragraph 34 of Plaintiff's Amended Complaint [ECF No. 13].

The allegations raised in the Complaint do not coincide with the testimony of Plaintiff at his deposition. Plaintiff was free to work any where he wanted and did in fact do so.

**Q: Can you tell me, what are some of the side jobs you would do while you were at Viormar?**

A: Dishwashing, fixing of a door. I have a – I have a friend who's like – it – it would break down, something in his house, and I'd go fix it. So Ricky, the guy from across the street, he had a factory that made fishing rods. But he was older, so he would call me in to help him.

**Q: Can – can you tell me Ricky's full name?**

A: His name is Riano.

(See Ex. 1, Mr. Aneiros Deposition Transcript, 29:14-23).

### d.  Mr. Aneiros was not lured into working for Defendants.

Additionally, there is no evidence that Plaintiff was "lured" into working for Defendants. The fact of the matter is that Defendants found Mr. Aneiros living out of his car and this is supported by Mr. Aneiros' own testimony.

**Q: Or so – or so my question is: Tell me how you met Orlando's father, if you could expand on that.**

A: I worked at Jessy Limo. That was next to the building. Sometimes I would repair a car. And since that building, Viormar was abandoned. Sometimes we would park a car underneath a tree. And so that's how, on one occasion, the father arrived and I met him.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 10:24-25; 11:1-5).

This is also corroborated by Orlando Fernandez's testimony as seen in his affidavit. (See Ex. 2, Orlando Fernandez's Affidavit). Orlando Fernandez's father as an act of charity allowed Mr. Aneiro's to sleep in one of the properties units so he wouldn't have to sleep in a car underneath a tree. In fact, Mr. Fernandez testifies that he had immense gratitude for this act of charity. Mr. Aneiros recalls an incident where he found a painting of Orlando's father in the trash and he states:

**Mr. Aneiros:** And I said no, that I would keep that, that I was not going to throw out the painting of the man who helped me out.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 51:2-4).

Mr. Aneiros was never lured into working for the Defendants. Mr. Aneiros was never an employee of the Defendants. The only predatory action before the Court today, is Mr. Aneiros' bold attempt at extortion.

### e. Mr. Aneiros' testimony does not reflect his alleged enslavement.

Aside from the fact that Mr. Aneiros was free to work for others and often did work for others, he appears to have conflicting reasons on why he could not vacate the property. None of his testimony suggests that he was forced to stay. He often states that he cannot leave because he has animals, or because the business would fail without him.

**Q: So your tie to this property is for the love of Orlando's father?**

A: I don't have anywhere to go. I don't have anywhere to go.

**Q: Okay.**

A: And it's not just me, it's me and my dogs.

**Q: Okay. So –**

A: I appreciate Orlando the father, but it's not only that I did it for love and family. I worked. And – and he said to me, I inherited you along with this building –

**Q: So –**

A: – Which means i'm an object.

**Q: Okay. So let me – let me get this straight. You first stated that you couldn't leave the property because the business would fail. Hold on. And now, you're saying that you can't leave the property because you don't have anywhere to go and you have dogs. So – so which is it?**

A: They're both related.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 66:19-25; 67:1-13).

It should also be noted that Mr. Aneiros  stated that when he met Orlando's father, he considered him to be family. There is nothing in Mr. Aneiro's testimony that suggest that he was being held by Defendants against his own will.

**Q: Okay. Is that a similar relationship that you have with the defendants?**

A: Yes. So since I met his father, it became like family.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 11:22-25).

Even if the Court chooses not to consider Mr. Aneiros' conflicting testimony, the only consideration needed to dispel the claims of slave trafficking is determining whether or not Mr. Aneiros was free to leave. The below cited case shows how important that distinction is with respect to the TVPA:

**Former church ministers' claims against church and corporate entity under Trafficking Victims Protection Act failed because record contained little evidence that church obtained their labor by means of serious harm, threats, or other improper methods since, inter alia, they joined and voluntarily worked for church, they had innumerable opportunities to leave, and potential consequence of being declared**

"suppressive persons" and thus potentially losing contact with family, friends, or each other was not "serious harm" and warning of such consequence was not "threat."

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 2012 U.S. App. LEXIS 15224 (9th Cir. 2012).

In the present case, there is no evidence that Mr. Aneiros began working due to a threat of serious harm or through improper threats. Rather, Mr. Aneiros testimony seems to indicate that he had a familial type of relationship with Defendants. It was not until the Defendants asked Mr. Aneiros to vacate the property in order to sell it, that Mr. Aneiros alleged that he would be evicted if he refused to work for free.

The second phrase to focus on in the *Headley* case is "innumerable opportunities to leave". As the Court has seen, Mr. Aneiros was free to work for anyone he pleased. Mr. Aneiros had the opportunity to seek gainful employment and did in fact work for others. If Mr. Aneiros does not have the means to acquire property through his own labor, that isn't a harm that was imposed by the Defendants. Mr. Aneiros could have worked various jobs and saved that money until he had enough to make a downpayment on a property, especially since he wasn't paying any rent for residing at Viormar.

**Q: Okay. And what was the true market value of the property?**

A: So at the current rate for a 4,400 square feet, that runs about $10 per square feet. And they should be paying around $5,000.

**Q: And that's monthly?**

A: Yes.

**Q: Okay. So would you agree that if they're paying – if they were to be paying $5,000 monthly, that would be $60,000 a year?**

A: Something like that.

Q: Okay. And you're currently not paying any rent for where you're residing: is that right?

A: No.

(See Ex. 1, Mr. Aneiros' Deposition Transcript, 45:3-16)

Finally, it should be noted that Defendant Orlando Fernandez has been living in the city of Orlando for almost a decade now. (See Ex. 1, Mr. Aneiros Deposition Transcript, 54:3-6). It would be a rather difficult task to ensure that the person you are enslaving remains on the property, especially if one doesn't have any other employees or staff to ensure the slaves compliance. It is readily apparent that Mr. Aneiros had various opportunities to leave Viormar, he simply chose not to.

**VI. The Statute of Limitations Has Run On Count I and Count II of Plaintiff's Second Amended Complaint.**

An immediate issue on the face of Plaintiff's allegations is the time-frame in which these allegations are made. Plaintiff claims to have begun working for the Defendants on or about 2010. Defendant's Motion concerns the Plaintiff's Second Amended Complaint, but it will be useful to note that Plaintiff's initial Complaint was filed on February 28, 2024. In the original Complaint, Plaintiff brought a claim for the TVPA and violation of the minimum wage provisions of the FLSA. Plaintiff's Second Amended Complaint added a count for violation of the Florida minimum wage requirements of Fla. Const. Art. X, Section 24(a).

As noted previously, the Florida Constitution wholly adopts the interpretations and case law surrounding claims made under the FLSA. Pursuant to the Portal-To-Portal Pay Act, a claim for violation of the FLSA must be brought within two (2) years but if a willful violation is found, the claim must be brought within three (3) years. However, it is important to note that the Portal-

to-Portal Pay Act is only concerning unpaid overtime wages under the FLSA. For the recovery of regular unpaid wages, which is being alleged here, Fla. Stat. Section 95.11(5)(d) governs and states that an action for unpaid wages must be brought within two (2) years. Therefore, Mr. Aneiros was required to file suit by 2012 or the latest 2013.

## CONCLUSION

The first two counts of Plaintiff's Amended Complaint, Violation of the FLSA and the Florida Minimum Wage Act, fail as a matter of law because Plaintiff has failed to show that Defendant VIORMAR TRADING is an employer as defined by the Act or that Plaintiff is an employee as defined by the Act. Similarly, the final count, Violation of the Trafficking Victims Protection Act, also fails as a matter of law because Plaintiff's testimony clearly establishes that he did not begin working for Defendants under the threat of force and he was not restrained from leaving. It is readily apparent that Plaintiff's action is nothing more than an act of retaliation due to Defendants' intent to sell the property. For these reasons, Defendants are entitled to summary judgment in their favor as to all counts.

Respectfully submitted,

By: */s/Robert Twombly*
Robert Twombly, Esquire
FBN: 60127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the undesigned counsel, on this 13th day of January, 2025, served the foregoing upon counsel for the Plaintiff by email to:

bvirues@lawgmp.com, Garcia-Menocal, P.L, 350 Sevilla Ave, Coral Gables, FL 33134

and rdiego@lawgmp.com, The Law Office of Ramon J. Diego, P.A., 5001 SW 74th Court,

Miami, FL 33155.

                                        Respectfully submitted,

                                        **WHITE & TWOMBLY, P.A.**
                                        *Counsel for Defendants*
                                        9999 NE 2nd Avenue, Suite 306
                                        Miami Shores, Florida 33138
                                        Telephone: (786) 502-2038
                                        robert@whitetwombly.com
                                        david@whitetwombly.com
                                        paralegalryt@whitetwombly.com

                                        By: */s/Robert Twombly*
                                        Robert Twombly, Esquire
                                        FBN: 0060127

                                        By: */s/David Alvarez*
                                        David Alvarez, Esquire
                                        FBN: 1054426