UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20772-GAYLES/LOUIS

DENNIS ANEIROS

     Plaintiff,

vs.

VIORMAR TRADING CORPORATION, N.V.,
AND ORLANDO A. FERNANDEZ,

     Defendants.

_____/

### DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE AND DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION IN LIMINE AND/OR TO EXCLUDE

Defendants, VIORMAR TRADING CORPORATION, N.V., and ORLANDO A. FERNANDEZ (collectively "Defendants"), by and through its undersigned counsel, hereby files its reply to Plaintiff's Response in Opposition to Defendant's Motion in Limine and Defendant's Response to Plaintiff's Motion in Limine and/or to Exclude from evidence, and as grounds states:

### LEGAL STANDARD

The purpose of Motions in Limine are to aid the trial court in determining whether the evidence or testimony proffered by a party is admissible at trial. *See United States v. Laurent*, 603 F. Supp. 3d 1247 (S.D. Fla. 2022). The Court has the authority to exclude evidence in limine only when the evidence is clearly inadmissible on all potential grounds, however, if the evidence is not clearly inadmissible, then the evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy, and prejudice to be resolved in context. *Id*. Neither the Federal Rules of

Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion in limine; the practice of ruling on such motions has developed pursuant to the district court's inherent authority to manage the course of trials. *See  In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 512 F. Supp. 3d 803 (S.D. Ohio 2021). Courts are generally reluctant to grant broad exclusions of evidence before trial on motion in limine because a court is almost always better situated during the actual trial to assess the value and utility of evidence. *Id.*

Evidence is relevant if it tends to make any fact more or less probable than it would be without that evidence and the fact is of consequence in determining the action. FRE 401. However, even relevant can be excluded if it is shown that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FRE 403.

## PLAINTIFF'S REPLY TO DEFENDANT'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE

### ARGUMENT

**a.  Order of Ejectment**

Upon further consideration, Defendants agree with Plaintiff that the State Court action of Ejectment is properly addressed at trial. Plaintiff's Response states that the Order which followed Defendant's Motion for Judgment on the Pleadings in the State Court action "does not pose prejudice to the extent that it should be excluded from evidence at trial.". Defendant's are no longer of the position that the ejectment order would constitute unfair prejudice and Defendants'

intend on introducing said order as evidence at trial. Therefore, Defendants will submit an

Amended Order to remove the exclusion of the Order of Ejectment.

> **b. Evidence Predating the Statutory Period for the FLSA and FMWA Cannot be Supplemented by the TVPA**

Plaintiff misunderstands Defendant's argument. It is not Defendant's position that any

evidence predating the FLSA's actionable period should be excluded. Defendant's cannot and have

not argued that evidence predating the actionable period cannot be used to establish the alleged

employment relationship between the parties. Rather, Defendant's request is for the Court to

provide a limiting instruction with request to the determination of damages.

Plaintiff's attempt to bootstrap the TVPA to the FLSA in order to recover damages that

predate the actionable period of the FLSA is impermissible. Under the Fair Labor Standards Act

(FLSA), the statute of limitations for filing a claim is generally two years, but it extends to three

years in cases of willful violations. Nowhere in this rule does it state that the actionable period to

recover damages may be extended by a separate statute. *See Maravilla v. Rosas Bros. Constr.,*

*Inc.*, 401 F. Supp. 3d 886 (N.D. Cal. 2019)(citing Fair Labor Standards Act of 1938, § 1 et seq.,

29 U.S.C.A. § 201 et seq.). Plaintiff also raises the argument that their is also a claim under the

Florida Minimum Wage Act ("FMWA"). The statute of limitation period for a claim under the

FMWA is governed by Florida Statutes § 95.11 which provides a four-year statute of limitations

for non-willful violations and a five-year statute of limitations for willful violations. As such, the

determination of damages still must be limited to at most 5 years.

> **c. Evidence and Testimony Relating to the TVPA Must Be Excluded Because The Statute of Limitations Has Run.**

With respect to the TVPA, Plaintiff's response states that the statutory period is ten years.

This is true. Paragraph 18 of Plaintiff's Second Amended Complaint states, "Plaintiff has worked

for the Defendants since approximately 2010," See [ECF No. 29]. Plaintiff's action was initiated on February 28, 2024, four years after the statutory period had expired. On April 17, 2024, Defendant's filed a Motion to Dismiss which argued that the Court lacked subject matter jurisdiction due to expiration of the statutory period for the TVPA. See [ECF No. 16]. On September 6, 2024, this Court entered an Order granting in part Defendant's Joint Motion to Dismiss. See ECF [No. 28]. In this Order the Court states that "It is not clear from the face of the Amended Complaint that Plaintiff will be unable to prove that the statute of limitation should be tolled. Accordingly, at this stage of the litigation, Defendant's statute of limitation argument fails."

The statute of limitations for a claim under the TVPA can be equitably tolled, but the tolling is limited to extraordinary circumstances outside of the claimants control. In *Cruz v. Mypa*, the court held that the limitations period was equitably tolled until the plaintiff escaped from her employers' house, as she was isolated, had her passport confiscated, and was threatened with imprisonment and deportation. See *Cruz v. Maypa,* 773 F.3d 138 (4th Cir. 2014). Similarly, in *Jane W. v. Thomas*, the court found that the existence of a justifiable fear of violent reprisal by Defendants can toll the limitations period. *Jane W. v. Thomas*, 354 F. Supp. 3d 630 (E.D. Pa. 2018).

Plaintiff may wish to argue that the threat of eviction should toll the limitation period, but there has been no evidence presented to this Court that Plaintiff was ever threatened with eviction. At this stage, both parties have filing their motions for summary judgment. The record is completely devoid of any evidence that Plaintiff was ever threatened with eviction. Plaintiff has failed to produce a notice of eviction, a text message from Defendant's stating that they were going to evict him, or an email saying same.

Naturally, the Court may find that the ejectment order suffices as evidence, but it doesn't. The reality is that the Defendant's have been trying to sell the property for a long time and cannot do so while Plaintiff resides in it. In fact, the Defendant's deposition transcript, which was provided to this Court, shows that Plaintiff was aware of this fact.

**Q: Okay. Did you know that Viormar is trying to sell the property?**

A: Me? I know that they're trying to sell the property, of course. I have brought people who want to buy it.

**Q: So you would find it beneficial for the property to be sold then?**

A: Of course. And that way, they could pay me my money and I could leave.

See **Exhibit "A"** Mr. Aneiro's Depo. Transcript 58:12-19.

There is not a single shred of evidence that eviction was threatened. What the evidence does show is that this is Plaintiff's attempt at a shakedown. The Plaintiff does not even deny that he is extorting Defendants.

**Q: But are you aware that the property cannot be sold while you're residing in it?**

A: So give me a deposit and i'll leave.

**Q: So –**

A: Or an advance. I'll leave.

**Q: So you wouldn't say that's extortion?**

A: And they exploited me my whole life.

See **Exhibit "A"** Mr. Aneiro's Depo. Transcript 59:1-7.

The fact of the matter is that Defendants have been trying to sell this property for quite some time and Plaintiff was aware of this and filed this suit in response. This Court stated that it is not clear from the face of the Complaint whether the statute of limitations period can be tolled.

The evidence clearly shows that eviction was never at play here. This suit is nothing short of a shakedown and there is no reason why the limitation period should be tolled.

Since the statute of limitations cannot be tolled, any evidence or testimony regarding the TVPA must be excluded whether that evidence is to support the TVPA on its own, or to supplement Plaintiff's FLSA and FMWA claims.

### d.  "Work-Place" Injuries Are Not Admissible At Trial

Plaintiff argues that testimony of work-place injuries are relevant because they tend to establish that Plaintiff was coerced into forced labor under the TVPA. Plaintiff goes on to state that "work related injuries can support Plaintiff's claims of exploitation under the TVPA." but provided no supporting citation. Seeing that the actionable period for claims under the TVPA have long expired and cannot be tolled due to the evidence (or lack thereof) that has been presented to this Court, any testimony or evidence for these purposes should be excluded.

### e.  Any Conversations Between Plaintiff and Defendant Fernandez's Father Are Inadmissible Hearsay With No Applicable Exception.

Plaintiff makes two primary arguments for the inclusion of conversations between Plaintiff and Defendant Fernandez's father: (i) Defendant Fernandez's father was at one point a representative or agent of Viormar; and (ii) the conversations can be included due to the effect on the listener exception.

With respect to the exception of party opponent statement, the courts have dealt with similar issues where company officers have passed away prior to trial. The Courts generally allow the statements to be introduced into evidence as long as the statement was made during the existence of the employment relationship and within the scope of the declarant's duties. "For the hearsay exception for a statement by an opposing party's agent or employee to apply, there must be (1) an agency or employment relationship between the declarant and the party against whom

the statement is being used, (2) the statement made concerns a matter within the scope of the agency or employment, and (3) the statement was made during the existence of the agency relationship. Fed. R. Evid. 801(d)(2)(D)." *McCain v. City of Cleveland*, 286 F. Supp. 3d 800 (N.D. Miss. 2017).

In the present case, the conversations Plaintiff seeks to introduce predate any alleged employment relationship. Plaintiff's Response explicitly states "statements/agreements made by Mr. Bello with Plaintiff in relation to his living/working arrangements at the Viormar Warehouse fall squarely into Rule 801(d)(2)'s category of statements that are not hearsay" The case cited in the previous paragraph directly contradicts this contention.

With respect to the exception of effect on the listener, the statement still cannot be introduced for the truth of the matter asserted. *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 379 (6th Cir.2009). In the present case, the truth of the matter asserted is Plaintiff's claim that he allegedly entered into a communication with Defendant Fernandez's father which created an alleged employment relationship. Plaintiff attempts to liken Defendant's Motion in Limine to Binderman case. However, this is easily distinguished using Plaintiff's own quote:

> In the present case, any instructions given by Mr. Gordon to Mr. Binderman regarding the disposition of assets would not be offered to prove the truth of the *contents* of Mr. Gordon's instructions, but instead that the instructions were actually given, a fact relevant to the Bindermans' defense. It is well-settled that under these circumstances, the statements do not constitute hearsay and are thus not excludable under the hearsay rules. *See United States v. Shepherd*, 739 F.2d 510, 514(10th Cir. 1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth. The orders or instructions were offered to show that they occurred rather than to prove the truth of something asserted.") (citations omitted).

> *See Gordon v. Binderman*, 2006 U.S. Dist. LEXIS 76024 (S.D. Fla. Oct. 19, 2006).

What the Binderman Court is essentially saying is that the testimony is not seeking to establish what the assets contained, but the instruction to dispose of those assets was given.

Confusingly, Plaintiff seems to be arguing that the introduction of the communications between Defendant Fernandez's deceased father and Plaintiff are not being used to establish an employment relationship, but that Defendant Fernandez's father "agreed to allow Plaintiff to live and work inside of the Viormar Warehouse". Reviewing the Counts and allegations raised in Plaintiff's Second Amended Complaint, necessitates a finding that this is for the truth of the matter asserted. Paragraph 43 of Plaintiff's Second Amended Complaint states:

> Defendant, Viormar Trading Corporation, N.V., with and through the father of Defendant, Orlando Fernandez, offered for Plaintiff to reside inside of an office (that lacked a shower or kitchen and was otherwise not suitable for a residential tenancy) if he performed work for them back in 2010, and Plaintiff accepted the offer.

In *Binderman*, the Court states that "orders or instructions were offered to show that they occurred rather than to prove the truth of something asserted". The above allegation does not fall under an order or an instruction, it falls under an alleged job offer. Every single Count of Plaintiff's Complaint requires the establishment of an employment relationship. As such, this Court cannot possibly find that this is not being introduced for the truth of the matter asserted.

### f.   The Jury Cannot Consider the Evidence of Defendant's Other Businesses

Plaintiff argues that the evidence of Defendant's other business is relevant to establishing the scope of Defendant's operations and the context of Plaintiff's employment. If that's the case, which it is not, Plaintiff should have joined the other businesses as Defendants, but they did not. The argument that this can be used to establish that Plaintiff worked for Defendant Fernandez as an individual employer under the FLSA and FMWA is nonsensical because all of the entities listed in Plaintiff's Response are separate and distinct entities regardless of where they are based. There are two Defendants in this suit, and those Defendants have one retainer agreement with White & Twombly, P.A. It is Defendant's position that Plaintiff has never worked for any of those

companies and even if Defendant had, the jury cannot award damages for work performed for a company that is not a named Defendant to this suit.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION IN LIMINE

### ARGUMENT

I. **Evidence, Argument, Inference, and References at Trial Regarding Plaintiff's Classification as an Employee or Independent Contractor in Prior, Contemporaneous, and/or Subsequent Outside Work Cannot Be Excluded.**

The first argument of Plaintiff's Motion in Limine seeks to exclude any and all testimony or evidence regarding Plaintiff's classification as an employee or independent contractor for any other third party whether it was prior to his alleged employment with Defendants, during, or afterwards on the grounds that it is irrelevant according to Fed. R. Evid. 401 and 402.

Plaintiff further argues that Plaintiff's work with third parties before, during, or after, has no bearing on whether he was employed by Defendants, and that the *Silk* test focus on the degree of control is not to be compared to the degree of control another employer had over that worker. Defendants agree that Plaintiff's employment before or after his alleged employment with Viormar is of no consequence. However, if Plaintiff was working for others during his alleged employment with Defendants, that goes directly to his classification as an employee or independent contractor.

Defendants do not intend to introduce testimony or evidence regarding the degree of control a third party had over Plaintiff. Rather, Defendants intend on introducing evidence of their lack of control over the Defendant while he was allegedly employed by them. The primary factor for consideration of whether a worker is an employee or independent contractor is whether that worker performed work for another. *See Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015). Moreover, the law is clear that the FLSA does not apply to independent contractors. *See*

*Hobbs v. Petroplex Pipe and Construction, Incorporated*, 946 F.3d 824 (2020). In fact, this is one of the Defendant's affirmative defenses.

Introduction of evidence that Plaintiff worked as an independent contractor or employee with third parties/entities would not result in "a trial within a trial". Plaintiff cites *Sierra v. Rhino Containers LLC*, 2023 U.S. Dist. LEXIS 40844, 2023 WL 2456044, at *3 (S.D. Fla. Mar. 10, 2023) in support and argues that this Court found that the admission of evidence that Plaintiff was "later employed" by one or multiple companies as an independent contractor or an employee is of no import to the nature of the parties relationship. The key term in that quote is "later employed". Defendants are not seeking to introduce evidence that Plaintiff was later employed by one or multiple companies, only that Plaintiff was employed or contracted during his alleged employment with Defendants in order to show that Plaintiff was not economically dependent upon Defendants.

Pursuant to FRE 401, Evidence is relevant if it tends to make any fact more or less probable than it would be without that evidence and the fact is of consequence in determining the action. In the instant case, Mr. Aneiro's classification during his alleged employment with Defendants would make it more probable that he was an independent contractor and thus not entitled to the relief provided for under the FLSA and Florida Minimum Wage Act.

## II.   No Evidence, Argument, Inference, or Reference at Trial Regarding Whether Plaintiff Thought he was an Employee or Independent Contractor.

Defendants do not intend to discuss whether Plaintiff thought he was an employee or independent contractor. Therefore, Defendants have no objections to this being excluded from trial.

## III.   Evidence, Argument, Inference, or Reference at Trial Regarding Whether Plaintiff Filed/Paid Income Taxes.

Evidence of whether Plaintiff filed/paid income taxes is relevant because it tends to prove that Plaintiff was an independent contractor. If Plaintiff was an independent contractor, he would file a 10-99, but if Plaintiff was an employee, he would file a W-2. Plaintiff argues that evidence of Plaintiff's failure to pay or file income taxes will cause unfair prejudice because it may cause the jury to believe that Plaintiff has skirted his tax filing obligations. Defendants do not intend to introduce testimony or evidence that Plaintiff failed to file or pay his income taxes. However, Plaintiff's do intend on asking whether he received a W-2 or 10-99 from Defendants as this does tend to show Plaintiff's employment classification and is therefore relevant.

**IV.    Evidence, Argument, or Inferences at Trial Regarding the Timing of When Plaintiff Filed this Lawsuit are Directly Relevant to the Statute of Limitations Issue that Defendants Raised in their Second Joint Motion to Dismiss.**

Plaintiff argues that Defendants intend to introduce this evidence to "improperly attempt to portray him as an extortionist based on their contention that they are currently trying to sell the property in which Mr. Aneiros worked/lives." The fact of the matter is that Plaintiff himself admitted to this.

**Q: Okay. Did you know that Viormar is trying to sell the property?**

A: Me? I know that they're trying to sell the property, of course. I have brought people who want to buy it.

**Q: So you would find it beneficial for the property to be sold then?**

A: Of course. And that way, they could pay me my money and I could leave.

See Mr. Aneiro's Depo. Transcript 58:12-19.

There is not a single shred of evidence that eviction was threatened. What the evidence does show is that this is Plaintiff's attempt at a shakedown. The Plaintiff does not even deny that he is extorting Defendants.

**Q: But are you aware that the property cannot be sold while you're residing in it?**

A: So give me a deposit and i'll leave.

**Q: So –**

A: Or an advance. I'll leave.

**Q: So you wouldn't say that's extortion?**

A: And they exploited me my whole life.

See **Exhibit "A"** Mr. Aneiro's Depo. Transcript 59:1-7.

Notably, Plaintiff's counsel never raised an objection to this questioning. The credibility of a witness is always at issue. Factors pertinent to court's assessment of credibility of witness include: (1) interest of witness in result of hearing; (2) witness' relation to any party in interest; (3) witness' demeanor upon witness stand; (4) witness' manner of testifying; (5) witness' tendency to speak truthfully or falsely, including probability or improbability of testimony given his or her situation to see and observe; (6) witness' apparent capacity and willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether witness' testimony is supported or contradicted by other evidence in case. *See United States v. Earles*, 983 F. Supp. 1236 (N.D. Iowa 1997), aff'd sub nom. *United States v. Papajohn*, 212 F.3d 1112 (8th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Defendants respectfully requests this Court to approve Defendants' Motion in Limine, save the requests to exclude evidence of the ejectment order, exclude any evidence in support of Plaintiff's TVPA claim, include testimony regarding Plaintiff employment or contract work for other companies, entities, third parties during his alleged employment with Defendants, include testimony/evidence regarding whether Plaintiff received a

10-99 or W-2, and include testimony/evidence of the timing of the lawsuit as it goes to the witnesses credibility.

Respectfully submitted this 17th day of February 2025.

Respectfully submitted,

By: */s/Robert Twombly*
Robert Twombly, Esquire
FBN: 60127

By: */s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the undesigned counsel, on February 17, 2025, served the foregoing upon counsel for the Plaintiff by email to: bvirues@lawgmp.com, Garcia-Menocal, P.L, 350 Sevilla Ave, Coral Gables, FL 33134 and rdiego@lawgmp.com, The Law Office of Ramon J. Diego, P.A., 5001 SW 74th Court, Miami, FL 33155.

Respectfully submitted,

**WHITE & TWOMBLY, P.A.**
*Counsel for Defendants*
9999 NE 2nd Avenue, Suite 306
Miami Shores, Florida 33138
Telephone: (786) 502-2038
robert@whitetwombly.com
david@whitetwombly.com
paralegalryt@whitetwombly.com

By: */s/Robert Twombly*
Robert Twombly, Esquire
FBN: 0060127

By: */s/David Alvarez*
David Alvarez, Esquire

FBN: 1054426

# EXHIBIT "A"

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3    DENNIS ANEIROS,

4                 Plaintiff,

5            vs.              CASE NO. 1:24-CV-20772-GAYLES/LOUIS

6    VIORMAR TRADING CORPORATION, N.V.,
     AND ORLANDO A. FERNANDEZ,
7
                  Defendants.
8

9

10                        DEPOSITION OF

11                       DENNIS ANEIROS

12                   Monday, October 7, 2024

13                        10:00 a.m.

14

15                 Offices of White & Twombly
              9999 Northeast 2nd Avenue, Suite 306
16                    Miami, Florida 33138

17

18

19

20

21

22

23                    Dillon Poberezhsky
                       Digital Reporter
24               Commission No. HH 324684

25



```
 1                    APPEARANCES OF COUNSEL

 2     On behalf of DENNIS ANEIROS, Plaintiff:

 3          PATRICK B. LAROU, ESQ.
            FAIRLAW FIRM
 4          135 San Lorenzo Avenue
            Suite 770
 5          Miami, Florida 33146
            305-686-2460
 6          larou@fairlawattorney.com
            APPEARED IN PERSON
 7

 8     On behalf of VIORMAR TRADING CORPORATION
       AND ORLANDO A FERNANDEZ, Defendants:
 9
            DAVID ALVAREZ, ESQ.
10          WHITE & TWOMBLY, P.A.
            9999 Northeast 2nd Avenue
11          Suite 306
            Miami, Florida 33138
12          786-502-2038
            david@whitetwombly.com
13          APPEARED IN PERSON

14

15     Also present:

16          Yenisbel Rodriguez, Spanish Interpreter

17

18

19

20

21

22

23

24

25
```



1                    INDEX TO EXAMINATION

2    EXAMINATION OF DENNIS ANEIROS                    PAGE

3    Direct Examination by MR. ALVAREZ                   5

4    Cross-Examination by MR. LAROU                     93

5    Redirect Examination by MR. ALVAREZ              115

6    CERTIFICATE OF REPORTER                          126

7    CERTIFICATE OF TRANSCRIPTIONIST                  127

8

9

10                    INDEX TO EXHIBITS

11        DEFENDANT EXHIBITS FOR IDENTIFICATION:

12   NUMBER           DESCRIPTION                      PAGE

13   Exhibit 1        Sunbiz Listing for Ocean Mack's    35

14   Exhibit 2        Sunbiz Listing for Doc Motors       38

15   Exhibit 3        Plaintiff's Second Amended          74
                      Complaint
16

17
     (Original exhibits retained by counsel for Defendant.)
18

19

20

21

22

23

24

25



1           THE REPORTER:  We are now on the record; the

2   date is October 7th, 2024; the time is 10:00 a.m.,

3   Eastern Standard Time; to take the deposition of Dennis

4   Aneiros in the case of Dennis Aneiros v. Viormar

5   Trading Corporation, N.V., and Orlando A.  Fernandez.

6           My name is Dillon Poberezhsky, notary public

7   and digital reporter for Esquire Deposition Solutions

8   in the state of Florida.  I'll be capturing the

9   verbatim record of today's proceeding using electronic

10  audio equipment, a computer, and specialized recording

11  software, which is not a form of stenography.  I'll

12  begin by swearing in the interpreter, Yenisbel

13  Rodriguez, who has produced her Florida driver's

14  license as identification.

15                  YENISBEL RODRIGUEZ,

16  being called as an interpreter, was first sworn to

17  translate English to Spanish and Spanish to English the

18  testimony of the following witness:

19          THE REPORTER:  Thank you, Madam.

20          The witness, Dennis Aneiros, is located in

21  Miami, Florida and does not have a valid State-issued

22  ID, preventing me from administering the oath to them.

23  In lieu of my administering the oath to this witness, I

24  would ask all parties to stipulate that the witness has

25  identified themselves as David Aneiros, and the



 1  witness' testimony will be treated as if given under

 2  oath.

 3          Counsel, can you please state your appearance,

 4  and then verbalize your agreement to this stipulation.

 5          MR. LAROU:  Yes.  Good morning.  This is

 6  Patrick Brooks Larou on behalf of the plaintiff.  My

 7  only correction is I -- I believe the plaintiff's name

 8  is Dennis Aneiros.

 9          THE REPORTER:  Oh, I --

10          THE INTERPRETER:  That is --

11          THE REPORTER:  I'm so sorry.  The witness has

12  identified themselves as Dennis Aneiros, and the

13  witness' testimony will be treated as if given under

14  oath.

15          Counsel, can you verbalize you're in agreement

16  for this stipulation?

17          MR. LAROU:  Counsel for plaintiff agrees.

18          THE REPORTER:  Thank you --

19          MR. ALVAREZ:  Same for defendant.

20          THE REPORTER:  Thanks.  Thank you.  Counsel,

21  you may begin.

22                  DIRECT EXAMINATION

23  BY MR. ALVAREZ:

24      Q.  Good morning, Dennis.  Thank you for coming in

25  today.



1       A.  Good morning.  Good morning.

2       Q.  Dennis, have you ever had your deposition

3   taken before?

4       A.  No.

5       Q.  Okay.  So before we get into the --

6       A.  When I went to the attorney's office?  No.

7           MR. ALVAREZ:  Well, no, I think it's -- he's

8   referencing the deposition of -- of my client.

9           THE WITNESS:  No.  This is the first time this

10  happens to me.

11  BY MR. ALVAREZ:

12      Q.  Okay.  So I'm going to go through a few ground

13  rules to explain how depositions essentially work.  And

14  after we get through that, we could start asking about

15  questions about the case.  All right.  So the way a

16  deposition works is, I'm going to ask you a series of

17  questions to get a better idea of your position on the

18  case.  It's not an interrogation.  There's no need to

19  feel anxious about what's happening.

20      A.  No.

21      Q.  If you ever feel that you need a break or you

22  need to use the bathroom, please let me know and I'd be

23  happy to let you do so.

24      A.  Okay.  Yes.  Thank you.

25      Q.  The only thing that I ask is that if there's a



1  question pending at that time, you answer that

2  question, and then we'll go take the break.

3       A.  Okay.

4       Q.  Now, is there any reason why you wouldn't be

5  able to testify truthfully today?

6       A.  No.

7       Q.  Okay.

8       A.  I always tell the truth.

9       Q.  Okay.  Are you under any prescription

10  medication that would prevent you from testifying

11  truthfully?

12       A.  No.

13       Q.  Are you on any illicit substances that would

14  keep you from testifying truthfully?

15       A.  No.  No, I don't do that.  I don't do any of

16  that.

17       Q.  All right.  Do you have any medical -- medical

18  conditions that would prevent you from testifying

19  truthfully?

20       A.  No.

21       Q.  Okay.  Perfect.  All right.  So Dennis, in

22  Paragraph 8 of your Complaint, you allege that the

23  defendants are your direct employers, joint employers,

24  and co-employers for the purposes of the -- for the

25  purposes of the FLSA.



1           THE INTERPRETER:  For the purpose of?

2           MR. ALVAREZ:  The FLSA, Fair Labor Standards

3    Act.

4           THE INTERPRETER:  Employer, co-employer, or --

5           MR. ALVAREZ:  Joint -- joint employer.

6    BY MR. ALVAREZ:

7       Q.  Can you tell me how that relationship came

8    about?

9           MR. LAROU:  Objection to form.

10          MR. ALVAREZ:  I'm sorry.  Before we move

11   forward, what was the basis for the form objection?

12          MR. LAROU:  For the form; I think if someone

13   calls for a legal conclusion for my client by -- by

14   asking him for the grounds on which, you know, an

15   employment relationship under the FLSA would be formed.

16          MR. ALVAREZ:  Okay.  All right.  I'll move

17   forward.

18          THE WITNESS:  It's many years I would have to

19   explain to you.

20          MR. ALVAREZ:  Okay.

21          THE WITNESS:  Many years.

22   BY MR. ALVAREZ:

23      Q.  Okay.  So what year do you claim to have

24   started working for Viormar?

25      A.  2010, '11.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                       9

1      Q.  Okay.  And what type of work were you doing at

2   Viormar?

3      A.  I met a father, who then died.  And then he

4   gave me the opportunity to start repairing that whole

5   building, which was abandoned.  I started by painting

6   the building, making divisions to the vessels.

7           Then I brought in Jessy Limo.  I rented a

8   property out to him.  And then I brought in another

9   tenant and it was called 911.  And it was some sort of

10  tire place.  I continued to do the maintenance outside,

11  dealing with everything.  And then the years went by.

12  And then in 2016, I had to remove Jessy Limo.

13          Orlando Fernandez made the contracts for 911.

14  A lot of people knew me, so I would bring him the

15  people and he would make the contracts.  They didn't

16  pay for two months.  They were evicted, taken to court.

17          Then that part of the building remained empty.

18  We were also trying to deal with Jessy because he

19  wasn't complying with the payments due to a rent

20  increase.  So during that time, Orlando Fernandez

21  created this company called Vita Home Care Solutions.

22          And then I started working with them,

23  assembling and having everything to do with that

24  company.  They bought saws, and tools, and equipment

25  for me to work, working on the display, getting ready



 1   for the exhibition.

 2           MR. ALVAREZ:  Okay.  But hold on.  That's for

 3   Vita Home Care Solutions, is what he's talking about

 4   now?

 5           THE WITNESS:  Yes.

 6           MR. ALVAREZ:  Okay.  So I don't -- I don't

 7   mean to interrupt, but I want to focus on -- on what --

 8   Viormar and what he's done for Viormar.

 9           THE INTERPRETER:  Okay.

10   BY MR. ALVAREZ:

11       Q.  So -- and -- and let's -- let's walk it back a

12   little bit.  Before you began working for Viormar, what

13   job did you have prior to that?

14       A.  I was self-employed, and I was working on some

15   patents.  As a matter of fact, I have two patents.

16   That's how I met Orlando Father.

17       Q.  Okay.  So how -- you met Orlando's father

18   through those two patents?  Does --

19           THE INTERPRETER:  Orlando, the father.  It's

20   Orlando, Sr.

21           MR. ALVAREZ:  Right.

22           THE INTERPRETER:  Okay.  What's your question?

23   BY MR. ALVAREZ:

24       Q.  Or so -- or so my question is: Tell me how you

25   met Orlando's father, if you could expand on that.



1       A.  I worked at Jessy Limo.  That was next to the

2   building.  Sometimes I would repair a car.  And since

3   that building, Viormar was abandoned.  Sometimes we

4   would park a car underneath a tree.  And so that's how,

5   on one occasion, the father arrived and I met him.

6       Q.  Okay.  So was Jessy Limo a tenant on the

7   Viormar property?

8       A.  After I met the father.

9       Q.  Okay.

10      A.  So Viormar is here, Jessy Limo is here.  And

11  so they sold the building where Jessy Limo was, and I

12  brought him over to Viormar.

13      Q.  Okay.  And when you were working at Jessy

14  Limo, what -- what years did that span?

15      A.  2005 to 2010, '11.

16      Q.  And was -- were you a W2 employee?

17      A.  No.

18      Q.  Okay.  Were you an independent contractor for

19  Jessy Limos?

20      A.  I would just come in as a friend, do the work,

21  and he'd pay me.

22      Q.  Okay.  Is that a similar relationship that you

23  have with the defendants?

24      A.  Yes.  So since I met his father, it became

25  like family.



DENNIS ANEIROS                              October 07, 2024
ANEIROS vs VIORMAR TRADING                              12

 1       Q.  Okay.  And can you remind me what year you

 2   roughly began working at Viormar?

 3       A.  2011, 2012, something like that.

 4       Q.  Okay.  And did Viormar have any other

 5   employees from 2010 to 2024?

 6       A.  No.

 7       Q.  Okay.

 8       A.  I'd get everything for them.

 9       Q.  Okay.  And is there anything that you worked

10   on, on behalf of Viormar, whether goods or materials,

11   that traveled through interstate commerce?

12           MR. ALVAREZ:  I can rephrase it if it's --

13           THE INTERPRETER:  Yeah.

14           MR. ALVAREZ:  -- hard to translate.

15           THE INTERPRETER:  Yeah.

16   BY MR. ALVAREZ:

17       Q.  Okay.  Let me see.  Is there anything in your

18   job duties that required you to work on things that

19   traveled out of the state of Florida?

20           MR. LAROU:  Form.

21           THE WITNESS:  No.

22   BY MR. ALVAREZ:

23       Q.  Okay.

24       A.  Just want to move them to Orlando.

25       Q.  Okay.  Explain that.  How did you move them to



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                              13

```
1   Orlando?
2        A.  Orlando rented a truck and we went back and
3   forth.  It was like he was moving his house when his
4   father dies.  I do restoration of the home, including
5   broken floors, broken tiles on the roof, the fence.  So
6   when it was ready, they sold it.  I removed the
7   furniture.  And I moved them up there to Orlando.
8        Q.  Okay.  Did you perform that as one of your job
9   duties?
10       A.  Well, they didn't employ anybody else, just
11  me.  Remember Orlando is an elderly person.
12       Q.  But did you do it as a favor because he is an
13  elderly person, or did they order you to do that?
14       A.  They would tell me to do it, the job.
15       Q.  Were they asking you to do it as a favor?
16       A.  I don't think so.
17       Q.  Okay.  Did they --
18       A.  Since I already lived there -- well, we had a
19  meeting about it before moving.  They took me out to a
20  lunch or they asked me to meet.  So it was like, let's
21  talk business, they said.  And initially, I would paid
22  them $500 for the office space.  And they said, don't
23  pay us, we're going to pay everything, just handle all
24  the maintenance, all the things that have to be done.
25          And then that's where everything came in, in
```



 1  terms of the move and the repair of the cars.  And they

 2  would pay me through -- through lodging.  And so, you

 3  know, Orlando said, you've lived for free in this

 4  country.  And I said, no, I've lived through the work

 5  that I do for you.

 6      Q.  Okay.  So when you were paying for -- you

 7  know, when you were paying $500 for the office space,

 8  can you tell me the -- the time frame of when those

 9  payments were being made?

10      A.  Those were the first times that they told me

11  to come and stay.  Okay.  So in terms of the Viormar

12  property, I did all the removal of everything there,

13  including the safety -- the safes.  I also did

14  shredding of all the documentation that they had there.

15  I did everything.  I emptied it out or vacated it.  I

16  vanished everything.  I shredded all the paper.

17      Q.  Okay.  So the documents that you were -- were

18  shredding, what were they in relation to?

19      A.  I don't know.  I think it was the history of

20  the company.  He said those papers were very

21  confidential, Orlando said, and that it was very costly

22  to have them shredded.  I am -- I am an inventor.  I

23  invent things.  So I just said, well, I'll make a

24  machine with an engine that shreds.  So I shredded,

25  like, 80, 100 boxes.



1    Q.  Okay.  So -- and I don't want to get into the

2    information that's related to your patents, but can you

3    describe some of the things that you've invented?

4    A.  So I created a system for this -- you know how

5    the cars overheat and the children die in them?  So

6    this system will save the children's lives.

7    Q.  That's beautiful.

8    A.  And the other is a system in which you can't

9    steal license plates of cars.

10   Q.  Okay.  Do you have any investors in those

11   inventions?

12   A.  No.

13   Q.  Okay.

14   A.  I've spoken to Orlando about it.  A company

15   that he didn't want to mention.  So there was a lot of

16   money spent in the company, but then the father died,

17   and then they decided to move to Orlando.

18          So that's why they wanted to me to shred

19   everything regarding that company.  They would spend a

20   lot of money.  And I was like, I need so much of that,

21   even if it's just to create 50, 100 systems.  It's --

22   it's, like, criminal.

23   Q.  Okay.  Have -- have you ever sold any of your

24   inventions?

25   A.  I want to or finance it, or when they give you



1  a license for the person who's making it -- I don't

2  know what you call that.  I've tried to do all those

3  things, but I never have been able to.

4      Q.  Okay.

5      A.  I've written to the President, I've written to

6  Congress, I've met with a lot of people.  But I don't

7  know why, but the children are not going to be able to

8  be saved.  I don't have money.

9      Q.  Okay.  So during the year of 2020 -- '12, you

10 were paying $500 for that office space.  Would you say

11 that you were a tenant at that time?

12         MR. LAROU:  Form.

13         THE WITNESS:  I was a tenant, but I worked for

14 them.

15 BY MR. ALVAREZ:

16     Q.  Okay.

17     A.  I would do the maintenance and everything.

18     Q.  Can you tell me what type of business Viormar

19 was engaged in, in 2020 -- '12?

20         MR. LAROU:  Form.

21         THE WITNESS:  It created those companies,

22 Viormar, Vita Home Care Solution.  They would do

23 mortgage, so they would receive checks from houses and

24 stuff.  Well, they had a foreign company and it was

25 kind of, like, lost, and I was able to get it back for



1  them.

2  BY MR. ALVAREZ:

3       Q.  Hold on.  I want to get into that.  So how

4  were you able to get it back from them?

5       A.  So when the father dies, Orlando Fernandez'

6  son, he didn't have control of all those things.  I

7  would get the correspondence because it would -- it

8  would arrive to where I was.  And the correspondence or

9  letter said that the title to the company had been

10 lost.  I immediately sent them the paperwork.  Well,

11 don't tell anybody that this is happening because the

12 building doesn't have papers.

13      I would have to go to Curacao because that's

14 where the company is.  And I think you have to be there

15 six months in order to do the paperwork and gain the

16 papers back.  Years went by, and I did not relay this

17 concern to anybody.  He had already sent the papers,

18 the due diligence papers.  In another occasion, the

19 company was put up at auction due to lack of tax

20 payment.

21      Q.  And which company are we talking about right

22 now?

23      A.  Viormar.

24      Q.  Okay.

25      A.  And I said -- and -- and then -- the paper --



1  the papers for auction said that the company would go

2  to the greatest bidder.

3       Q.  Okay.

4       A.  He does all the paperwork, and then he sends a

5  letter, thank you for my work, my attorney has it, he

6  thanks me for my good job, and to put that sticker

7  behind the door, like, saying the taxes were paid.

8       Q.  Okay.  So since we've kind of ventured into

9  various roles that you performed on behalf of Viormar,

10 how would you label your job title?

11      A.  Well, I would guard the property at night,

12 too.  It's in the records.  It's in the police records

13 when I was chasing the bandits.  They were very

14 grateful for that.  I don't know why he's saying I

15 didn't work for him.

16      Q.  Well --

17      A.  I don't know why he would say that.

18      Q.  So were --

19      A.  There's so much evidence to that.

20      Q.  So were you requested to provide security

21 services for Viormar?

22      A.  It wasn't requested of me, but he said, at

23 night -- well, I was living there.  And then he would

24 put me in charge of the whole property and building.

25 They were (audio interruption) at another building at



```
 1    another time in Sunrise.

 2         Q.  Okay.

 3         A.  It was a big shopping center.  There were

 4    problems there.  And Cristina, his daughter, she -- she

 5    was having difficulties, like, getting the rent money.

 6         Q.  Well, hold on.  Is the property in Sunrise, is

 7    that owned by Viormar?

 8         A.  No.

 9         Q.  Okay.  So -- so let -- let's focus on --

10         A.  You're asking me to qualify my job

11    description --

12         Q.  Yes.

13         A.  -- and I'm telling you that all of my work has

14    been for them.  And everything arose or arised [sic]

15    from Viormar or came from there.  Because Corrina

16    [phonetic] resided at Viormar.  The -- First Son

17    Mortgage, that resided at Viormar.

18              MR. LAROU:  And pardon my interruption.  Just

19    for the record, I believe the spelling on the mortgage

20    company he was referring to is Fersom -- Fersom,

21    F-E-R-S-O-M.

22              MR. ALVAREZ:  I believe he's correct.

23              THE WITNESS:  Well, Viormar had a lot of

24    companies there and they all resided there.  All the

25    deposits were made via Fersom, Corrina, Viormar.
```



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                        20

```
 1   BY MR. ALVAREZ:
 2       Q.  Okay.  And I don't mean to interrupt.  I -- I
 3   do appreciate your explanation.  But the reason why I
 4   want to limit it to Viormar is because right now,
 5   Fersom and Corrine [sic], and all those other names,
 6   they're not named in this suit.
 7       A.  But I would do all the work for them --
 8       Q.  I understand.
 9       A.  -- through those companies.
10       Q.  I understand your position.
11       A.  Aside from maintenance --
12       Q.  But --
13       A.  -- and restoration of the whole building.  You
14   understand?
15       Q.  I do understand.  But --
16       A.  And they would have me, you know, collect rent
17   from people and do other things.  That's work.
18       Q.  Okay.  Who did you collect rent from?
19       A.  Okay.  So the black people from Sunrise.  So
20   Cristina had difficulties getting the rent money.  So
21   they wrote a letter saying that from that moment on, I
22   was going to be the assistant manager and they
23   introduced me as such.  And so I started getting
24   involved with getting the rent because she was a woman
25   and she was having difficulty doing that.
```



1        Q.  Okay.

2        A.  And then there's copies of that paper.  But it

3   all stemmed or started from Viormar.

4        Q.  Okay.  But that property in Sunrise that

5   you're collecting rents for, who is the landlord of

6   that property?

7        A.  In -- in Sunrise?

8            THE INTERPRETER:  In Sunrise.

9            THE WITNESS:  Corrina is a real estate

10  company.  I don't know what relation Corrina had with

11  Viormar with that property.  I would -- I would do

12  maintenance, I would --

13           THE INTERPRETER:  Sorry.

14           THE REPORTER:  I'm sorry to interrupt.  Would

15  you -- I just wanted to advise, if we could please let

16  the interpreter fully finish translating before

17  answering the question, just so I can make sure I get a

18  clear transcript.  I apologize.

19           MR. ALVAREZ:  No, no, I probably should

20  have --

21           THE WITNESS:  It's just that I get excited and

22  stuff.  It's just that there's a lot of things.  Sorry.

23  BY MR. ALVAREZ:

24       Q.  No, it's fine.  But that property where

25  Corrina is residing at -- let me rephrase.  To -- as to



 1  the best of your knowledge, you're not aware of who the

 2  landlord is at the Corrina property?

 3      A.  Yes.  Cristina Fernandez.

 4      Q.  Okay.  So you're -- would you say that you

 5  were collecting rents for Cristina Fernandez?

 6      A.  Yes.

 7      Q.  Okay.

 8      A.  Well, she couldn't do it.  So her father

 9  motivated me to do it, so that I could help out his

10  daughter.  But that's work.

11      Q.  But that was for the benefit of the daughter's

12  company, right?

13      A.  I know that, but it would come from Viormar.

14      Q.  Earlier, you mentioned that you had gotten

15  some tenants for Viormar.  Can you identify who those

16  tenants were?

17      A.  Joelle Sardina -- Jorge Sardina [phonetic] --

18          THE INTERPRETER:  I'm going to put the

19  spellings right here.

20          THE WITNESS:  I only -- 911, I only know the

21  name of the company.  I didn't have much dealings with

22  them.  There's Carlos de la Flor [phonetic], and that's

23  a tenant that I brought in.  The only thing that

24  Orlando did was the paperwork.  It's a mechanic shop,

25  and he has a brother whose name is Miguel de la Flor.



1  There -- there's no one else there right now.  There's

2  only two vessels.

3  BY MR. ALVAREZ:

4      Q.  Okay.  What year did you bring those two

5  vessels in?

6      A.  What did I bring Carlos de la Flor?  Carlos de

7  la Flor has been at the property for seven years.

8      Q.  Okay.  And why did you bring them in?

9      A.  A lot of people know me.  So, you know, I

10  would bring him people to rent out the property.  And

11  sometimes issues wouldn't go through because of the

12  money or whatever.  But Carlos de la Flor was a person

13  that they were getting out of another unit or vessel.

14      Q.  Okay.  Hold on.

15      A.  And he didn't have a place to go, so I told

16  him --

17          MR. ALVAREZ:  So hold on.  And -- and I should

18  have done this instruction in the beginning, and I

19  failed to do that, and I apologize.  But, you know,

20  he's saying a lot.  And I know you can only translate

21  as much as you can --

22          THE INTERPRETER:  Sure.

23          MR. ALVAREZ:  -- remember.  If we could get

24  him to, you know, pieces.  Because he mentioned

25  earlier -- and I speak Spanish, and that's why I'm



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      24

 1 | picking up on it -- that he knows a lot of people --
 2 |          THE INTERPRETER:  Uh-huh.
 3 |          MR. ALVAREZ:  -- right?  So if you could
 4 | instruct him to, you know, give you a minute to --
 5 |          THE INTERPRETER:  Sure.
 6 |          MR. ALVAREZ:  -- translate back to me.
 7 |          THE INTERPRETER:  Thank you.
 8 |          THE WITNESS:  Okay.  Sorry.
 9 | BY MR. ALVAREZ:
10 |     Q.  No, it's fine.  I understand.  You know,
11 | it's -- it's your first deposition and they're
12 | stressful.
13 |     A.  I wish I did -- I wish I did speak English and
14 | tell you the whole story.
15 |     Q.  So let's go back.  So you said that you were
16 | able to get these tenants because you know a lot of
17 | people; is -- is that right?
18 |     A.  That is correct.
19 |     Q.  Okay.  Did you go out and get these tenants
20 | before Orlando spoke to you about this?
21 |     A.  No.
22 |     Q.  Okay.  So if Orlando had never spoken to you
23 | about it, you would have never gone looking for
24 | tenants?
25 |     A.  No, because he's the owner of the property.



1    Q.  Okay.  Do you have any document that could

2  support your assertion that Orlando asked you to find

3  tenants?

4           THE INTERPRETER:  That Orlando did what?

5           MR. ALVAREZ:  Asked him to go find tenants.

6           THE WITNESS:  No.  That's verbal.

7  BY MR. ALVAREZ:

8    Q.  Okay.  Are there any --

9    A.  That is what his father, who died, told me

10  from the beginning.

11    Q.  All right.  So tell me, to the best of your

12  recollection, exactly what Orlando's father told you.

13    A.  He wanted to fix the building because there

14  was a lot of disorder inside, and that he wanted to

15  rent out the two vessels.  That's why I enclosed the

16  door that connected both buildings.

17    Q.  Okay.  Did he mention that he wanted that done

18  in passing, or did he ask you directly to do that?

19    A.  He asked me to do that.

20    Q.  Okay.  How many hours would you say that you

21  work a week for Viormar on average?

22    A.  It would be a night.  Imagine how many hours.

23    Q.  Were you ever provided a schedule from

24  Viormar?

25    A.  No.



1        Q.   Okay.  Did you ever have a written employment

2   contract?

3        A.   No.  Just a paper authorizing me to be his

4   representative.

5        Q.   Okay.  So let's talk about the remodeling that

6   you claim to have done on Orlando's father's behalf.

7   Did he supervise those renovations in any way?

8        A.   Yes.  He bought all the material.  It was a

9   computer factory.  So I started the renovation process,

10  the taking out the trash from it.

11       Q.   Did he -- all right.  Did you have the ability

12  to complete that job in the way that you wanted to do

13  it?

14       A.   No.  Whatever they said.

15       Q.   Okay.  And what exactly did they order you to

16  do?

17       A.   Paint, repair walls, debris removal, the paint

18  of the structure.  There was termites, and so the

19  restructuring of the wood.  There was a lot of wood in

20  that building.  And I've done that throughout the

21  years, many years.

22       Q.   Okay.  Do you have any professional licenses?

23       A.   Me?  A professional license?

24       Q.   Yeah.  Like, do you have any contractor's

25  license that allow you to do construction work?



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                            27

```
1         A.  No.  I'm a genius.

2         Q.  Understood.

3         A.  That's why they used me.

4         Q.  Got it.

5         A.  To restore cars, to do all kinds of things.

6    And telling me that I inherited the building or I was

7    inherited with the building.

8         Q.  When did they tell you that?

9         A.  Orlando Fernandez did.  When his father died.

10        Q.  What did he mean by "inherited"?

11        A.  He was now that -- that I am his property.

12        Q.  Were you ever interviewed by Orlando's father

13   before you began working for him?

14        A.  When he saw me working on Jessy's car under --

15   under the tree, he approaches me and we start talking.

16   I show him my projects.

17        Q.  Hold on.  The -- that's a good amount.  What

18   type of projects were you showing him?

19        A.  My patents.

20        Q.  Okay.

21        A.  He admired it.  And then he said, come in my

22   office.  And then we started to talk about things like,

23   how did he get to Venezuela, how he got to have

24   everything he had.  We started to build a friendship.

25   So then, since he saw that I was a reliable person, he
```



1  said, come, do the repair work, take out the trash.

2  All the keys to the building.  Gave the keys to the

3  building, and I've had them ever since.

4       Q.  So --

5       A.  He wanted repairs and restorations.  He wanted

6  to rent out the building.

7       Q.  Okay.  So hold on.  The trash and -- and

8  garbage stuff that you were doing, was that just for

9  the unit you were residing in?

10      A.  The one that I occupied to live?  I had to

11  throw out a bunch of stuff from there, too, but that

12  came after.  We're talking about the building, 8,500

13  square feet.

14      Q.  Okay.  When you were discussing working with

15  Orlando, did you ever negotiate payment?

16      A.  Yes.

17      Q.  Okay.  What did those negotiations look like?

18      A.  I said that I needed money because I had to

19  pay for electricity.  I need to eat.  And he said that

20  I was free to go and work outside, and that I could go

21  repair a car or do whatever it was that I needed to

22  survive, that I only had the lodging or the roof to

23  live under.

24      Q.  So look -- just for my own clarification

25  purposes: Orlando allowed you to work any odd jobs that



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      29

1   you needed to get paid otherwise?

2        A.   Yes.

3        Q.   Okay.

4        A.   I would go -- I -- I would do it, but then I

5   would get home and -- and I was tired at night.  Well,

6   I had a lot of work.  By the time I got back from doing

7   whatever job I was doing, like washing dishes or

8   whatever, I was exhausted.

9        Q.   But you didn't -- but did you have a set time

10  schedule while working at Viormar?

11       A.   No.

12       Q.   Okay.

13       A.   He would write to me at whatever hour.

14       Q.   Can you tell me, what are some of the side

15  jobs you would do while you were at Viormar?

16       A.   Dishwashing, fixing of a door.  I have a -- I

17  have a friend who's, like -- it -- it would break down,

18  something in his house, and I'd go fix it.  So Ricky,

19  the guy from across the street, he had a factory that

20  made fishing rods.  But he was older, so he would call

21  me in to help him.

22       Q.   Can -- can you tell me Ricky's full name?

23       A.   His name is Riano [phonetic].

24       Q.   Okay.  Do you --

25       A.   I don't remember his last name.  It's in the



 1 | Internet.

 2 |     Q.  Do you -- do you have Ricky's phone number?

 3 |     A.  It's here.  He would see me all the time

 4 | working.  He's, like, I've never seen a person work so

 5 | hard day and night.

 6 |     Q.  Can you -- can you read us Ricky's phone

 7 | number?

 8 |     A.  I had turned it off.  I'm turning it back on.

 9 |         MR. ALVAREZ:  Okay.  I think we could take a

10 | five-minute break, if that's okay with you, Brooks.

11 |         THE REPORTER:  Counsel, may I call us off the

12 | record?

13 |         MR. ALVAREZ:  Yeah.

14 |         THE REPORTER:  We are going off the record.

15 | The time is now 11:07 a.m., Eastern Standard Time.

16 |         (A recess was taken.)

17 |         THE REPORTER:  We are going back on the

18 | record.  The time is now 11:32 a.m., Eastern Standard

19 | Time.

20 | BY MR. ALVAREZ:

21 |     Q.  All right.  I'd like to talk about Ricky for a

22 | moment, and the jobs that you did for him.  How much

23 | would Ricky pay you to do those jobs?

24 |     A.  I would just help him, like, unload a

25 | merchandise.



1     Q.  Is -- do you make a habit of -- of helping

2   people with odd jobs?

3     A.  I help them because you have to help.  You

4   have to keep up a store.  You have to buy merchandise.

5   You have to do everything everybody else does.  You

6   have to get an incentive to do it.

7     Q.  Okay.  But --

8     A.  So Orlando Fernandez's son told me, for

9   example, when I got the food stamps, that nobody could

10  know that I worked for him nor that I lived there.

11    Q.  Okay.  Do you have that communication in

12  writing?

13    A.  No.  It's very subtle.  That's something very

14  subtle.

15    Q.  Okay.  And earlier, you were mentioning that

16  Orlando's father permitted you to do odd jobs on the

17  side.  Can you give me an example of some of the

18  clients that you did odd jobs for?

19    A.  Cars.

20    Q.  Cars?

21    A.  Cars, walls, doors, repair doors at homes,

22  electricity, plumbing.

23    Q.  Okay.

24    A.  Everything that needs to be done.

25    Q.  Okay.  Can you tell me some of the people --



 1  can you identify -- hold on.  Let -- let me retract and

 2  rephrase that.  Whose cars did you work on?

 3       A.  Acquaintances or their own cars.  I did a lot

 4  of their own cars.  Tune-ups, change the oil, paint,

 5  repairs to their cars as well.

 6       Q.  Okay.  How much would you charge, say, for an

 7  oil change?

 8       A.  For him or the other people?

 9       Q.  The other people.

10       A.  I would tell people to buy their own oil.  And

11  I would charge, like, $20 to change it, something like

12  that.

13       Q.  Okay.  And what about the -- the tune-ups?

14  How much would you charge for the tune-ups?

15       A.  I would do everything regarding the tune-up.

16  The air filters, spark plugs.

17            THE INTERPRETER:  Thank you.

18  BY MR. ALVAREZ:

19       Q.  And how much would you charge for paint jobs?

20       A.  I would -- I would do it on the cheap because

21  there was a lot of body shops.  100, 150, the person

22  buys their own materials.  But that's not money.  You

23  turn the corner, you go to the store, and you spend it.

24  Electricity, telephone.

25       Q.  Is that a mystery to figure it out?



DENNIS ANEIROS                                October 07, 2024
ANEIROS vs VIORMAR TRADING                                33

```
 1              MR. ALVAREZ:  Can we go off the record for a
 2    little --
 3              THE REPORTER:  We are going off the record.
 4    The time is now 11:37 a.m., Eastern Standard Time.
 5              (A recess was taken.)
 6              THE REPORTER:  All right.  We are back on the
 7    record.  The time is now 11:41 a.m., Eastern Standard
 8    Time.
 9    BY MR. ALVAREZ:
10         Q.  So, Dennis, you were mentioning that you
11    charge rather reasonable prices for the mechanic work
12    you do.  Did you find that that allowed you to get a
13    larger clientele?
14              THE INTERPRETER:  Did you say mechanic or
15    painting?
16              MR. ALVAREZ:  Mechanic.
17              THE WITNESS:  It wasn't always.  It was
18    sporadic.  I didn't have a lot of clientele.  When you
19    have clientele, that's when you have a business.  I
20    don't have a -- that type of business.  I did -- I did
21    it to survive.
22              My real job was Viormar and taking care of the
23    property.  But he would say he couldn't pay me.  I had
24    to survive.
25    BY MR. ALVAREZ:
```



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                            34

 1       Q.  Okay.  So did Viormar ever pay you for your
 2   time working there?
 3       A.  No.  Only with the roof over my head.
 4       Q.  And is that why you weren't able to afford to
 5   move out?
 6       A.  I haven't because of that.  I've even told
 7   Orlando, Orlando, you do real estate, get me a lot or
 8   land.  He did find me one years ago.  And so my brother
 9   lived outside, and so I seized rights to the property
10   to my brother.
11           Orlando would say, what do you need that lot
12   for, you're fine here.  He never wanted me to leave.
13   And I would say to him, I do need a place to go, I'm
14   going to have to leave one day from here.  And last
15   time we spoke, I explained that to him again.  And
16   that's why I ended up doing this.
17       Q.  Okay.
18       A.  He said that wasn't his problem.  He said,
19   that's your problem.  And I said, Orlando, I've given
20   my life here, I've worked here.
21       Q.  Okay.
22       A.  I -- he didn't care.
23       Q.  All right.
24       A.  He said no.
25       Q.  All right.  So you mentioned earlier that your



 1  true job is at Viormar.  Do you own any other

 2  businesses?

 3      A.  No.

 4      Q.  Okay.

 5      A.  I have a company with Renee.  And it's --

 6  it -- it has a website, and it's an order for me once I

 7  get my patent to do the car thing, then I could use

 8  that.

 9      Q.  Okay.  What's the name of that company?

10      A.  Ocean Mark.  I -- it's something like that.

11  Renee is the one that knows the name.

12      Q.  All right.  So I'm going to introduce my first

13  exhibit.  It's going to be marked as Exhibit 1.  And I

14  pulled this from Sunbiz.

15          (Defendant's Exhibit 1 was marked for

16  identification.)

17  BY MR. ALVAREZ:

18      Q.  Can you please let me know if that's the

19  company you're referring to?

20      A.  I can't really see things.  I didn't bring --

21          MR. ALVAREZ:  Well, maybe -- Mr. Larou, would

22  you be able to assist him?

23          MR. LAROU:  Of course.

24          Yeah.  And, Mr. Aneiros, the spelling on this

25  exhibit, which appears to be a printout from Sun --



```
 1   Sunbiz.org --
 2            THE INTERPRETER:  Are you doing this for the
 3   client off the record or on the record?
 4            MR. LAROU:  On the record.
 5            THE INTERPRETER:  Uh-huh.
 6            MR. LAROU:  So Exhibit 1, it -- it appears to
 7   be a printout from Sunbiz.org.  And the name of the
 8   business entity listed for this profile is Ocean
 9   Mack's.  And the spelling of that is M-A-C-K apostrophe
10   S.
11            THE WITNESS:  That's where Renee did it.  So
12   we could do -- if we could do some kind of business as
13   it involves the patents for the seat or the license
14   plates, that's where we would put in the percentages
15   and amounts and stuff.
16   BY MR. ALVAREZ:
17       Q.  Okay.  Can you state Renee's full name for the
18   record?  Okay.
19       A.  Renee Sevreco [phonetic].  Okay.
20            MR. ALVAREZ:  And, I'm sorry; I'm going to
21   have to ask for your assistance again, Mr. Larou.
22   BY MR. ALVAREZ:
23       Q.  Who is the director listed under Ocean Mack's,
24   according to Sunbiz?
25            MR. LAROU:  Who?
```



1          MR. ALVAREZ:  The director.

2          THE WITNESS:  I think Renee named me that.

3          MR. ALVAREZ:  Okay.  I can take the exhibit

4   back.

5          MR. LAROU:  Sure.

6   BY MR. ALVAREZ:

7      Q.  So does Ocean Mack's only exist for the

8   purposes of your patent?

9      A.  Yes.

10     Q.  Does Ocean Mack's currently have any revenue?

11     A.  No.

12     Q.  Okay.

13     A.  It -- it doesn't show us that.

14     Q.  Okay.  And for which patent is this for?

15     A.  The child seat.

16     Q.  Got it.  How did you meet Renee?

17     A.  Renee was a client of Carlos de la Flor.

18     Q.  Okay.

19     A.  Or still is a client.

20     Q.  Okay.  Is -- is Renee an investor in Ocean

21   Mack's?

22     A.  No.  No, he doesn't have anything.

23     Q.  Are there any shareholders in Ocean Mack's?

24     A.  No.

25     Q.  What is -- sorry, go ahead.



1        A.   We're -- we're looking for some.

2        Q.   What is Doc Motors, Inc.?

3        A.   I don't know.  I don't know what that is.

4             MR. ALVAREZ:  Okay.  So I'm going to introduce

5    Exhibit Number 2.

6             (Defendant's Exhibit 2 was marked for

7    identification.)

8             MR. ALVAREZ:  Mr. Larou, I'm going to need

9    your help with this one as well.  If you could describe

10   the document to your client.

11            MR. LAROU:  Sure.  And so Exhibit 2 appears to

12   be another printout from Sunbiz.org.  The business

13   entity listed on this profile is Doc Motors, Inc.  And

14   the spelling of Doc is D-O-C.

15   BY MR. ALVAREZ:

16       Q.   Do you have any affiliation with that company?

17       A.   I don't know what that company is.

18            MR. ALVAREZ:  Can you read the second page for

19   your client, Mr. Larou?

20            MR. LAROU:  Of course.  And --

21            THE WITNESS:  What does the company say?  I

22   don't know.

23            MR. LAROU:  So listed as the vice president on

24   this printout from Sunbiz.org, Dennis Aneiros is listed

25   as the vice president of the company.



1          THE WITNESS:  I don't know what that is.

2   BY MR. ALVAREZ:

3      Q.  Considering that you claim to have entered the

4   property since 2010, why did you wait nearly 14 years

5   to file a suit for unpaid wages?

6          THE INTERPRETER:  Why did you wait how many

7   years?

8          MR. ALVAREZ:  14.

9          THE WITNESS:  I was expecting that question.

10  I -- I appreciate them -- I appreciated them so much

11  that I gave my life to them there.  But he showed up --

12  on a Friday, he showed up and he was very rude or --

13  and he was very unpleasant.  And as it states in the

14  other lawsuit, he called me a homeless.  He -- he

15  really treated me poorly.

16          He said he didn't care about my life.  And he

17  said, you've been living in this country for free for

18  many years.  And that's -- and that's when I said, I'm

19  going to find out how to go about this because I've

20  been working for this man, and there's a lot of

21  witnesses to this.

22  BY MR. ALVAREZ:

23     Q.  Can you name some of the witnesses?

24     A.  Yes.  Roberto Perez.

25     Q.  Okay.  Can you tell me Roberto Perez's title



 1  and what he essentially knows?

 2       A.  He's -- he's an owner from the building across

 3  the street.

 4       Q.  Okay.  And what is it that he knows?

 5       A.  He had a mechanic shop as well.  Everything,

 6  that I even restored their home and they even pay me --

 7  they didn't even pay me a penny.  Everything.  He was

 8  his dad's mechanic.

 9       Q.  Now, Paragraph 43 of your Complaint, you state

10  that the plaintiffs offered for you to reside in the

11  office if you performed work for them back in 2010, and

12  you accepted that offer.

13           THE INTERPRETER:  If you did what?

14  BY MR. ALVAREZ:

15       Q.  If you worked for them.  Yes.  Okay.  And you

16  stated previously in your testimony today that you

17  collected rents on behalf of the defendants.  Do you

18  know how much the defendants typically charged for

19  renting out the property at Viormar?

20       A.  The big warehouses, the current ones?

21           MR. ALVAREZ:  Oh, the one that he's residing

22  in.

23           THE WITNESS:  That was his dad's office.

24  BY MR. ALVAREZ:

25       Q.  Okay.  But did the father ever rent out other



1  properties on that lot to different tenants?

2        A.  No.  Not at the office space.  It's small.

3        Q.  Okay.  But I'm not referring to -- I'm not

4  limiting it to just the office space.  I'm talking

5  about the entire lot that Viormar owns.  Do you know if

6  they've rented any piece of that lot to another tenant?

7        A.  It is rented out to Jessy Limo and 911 Tire.

8  They were rented there.

9        Q.  Okay.  And do you know how much rent is

10 charged to that company?

11       A.  3,800 to Carlos de la Flor.

12       Q.  Okay.

13       A.  Presently.

14       Q.  How big is -- is the property that he's

15 renting out?

16       A.  600 square feet.

17            MR. ALVAREZ:  Okay.  He's talking about his

18 office?

19            THE INTERPRETER:  Sorry, first person would

20 help.

21 BY MR. ALVAREZ:

22       Q.  So -- all right.  So I'm asking how -- roughly

23 the size of Jessy's Limousine company.

24       A.  4,400.

25       Q.  Okay.  And what's, roughly, the size of the



1    office that you're residing in?

2         A.   600 square feet.

3         Q.   Okay.  And are you using any other property at

4    Viormar?

5         A.   Well, he told me to tear down all the office

6    space that Jessy -- Jessy Limousine had.

7         Q.   Okay.

8         A.   And that's undergoing a process.

9         Q.   Okay.  Is that the only piece of property that

10   you are using?

11        A.   I am using it because he assigned me to undo

12   all of it, all of the offices.

13        Q.   Okay.  Does he have that assignment in

14   writing?

15        A.   No.

16        Q.   Okay.

17        A.   He's very smart.

18        Q.   How -- how big is that second property that

19   he's now in the process of remodeling?

20        A.   4,400 feet.

21        Q.   Okay.

22        A.   But aside from that, there's a problem.  That

23   property needs structural repair.

24        Q.   Okay.

25        A.   And that man had me remove the cracks that



1  were on the walls to pass the 40 year inspection.

2       Q.  Okay.

3       A.  I said no, that that was a -- that was

4  dangerous, to rent out to a person, and then have the

5  building fall upon them or on them.

6       Q.  Okay.  Has -- since you've been on the Viormar

7  property, have you ever seen it rented out for

8  residential purposes?

9       A.  No, never.

10      Q.  Okay.  Now, I want to talk about Jessy Limos

11  again.  You're saying that the monthly rent was $3,800.

12  So would you agree that, a year, that would bring a

13  rental proceeds of $45,600?

14      A.  When I say 3,800, that was the initial

15  contract.  But it -- that was Carlos de la Flor.

16      Q.  Okay.

17      A.  And there was another problem because I said

18  if the contract was only for the first three years, why

19  does Carlos de la Flor not have the original price,

20  which would be for 5,000 square feet?  And so that's

21  where the problems begin.  Jessy is another price.

22      Q.  Okay.  So -- all right.  Let's stay with

23  Jessy, and then I'll go to Carlos in a second.  What is

24  Jessy currently paying for rent?

25      A.  Jessy is no longer there.  I got Jessy out of



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      44

 1   there.

 2        Q.  Okay.  How did you get Jessy out of there?

 3        A.  With the letter that Orlando made and said

 4   that I was the manager of the building and required

 5   Jessy to move out.

 6        Q.  And just to confirm: Jessy's Limousine was on

 7   Viormar property?  There were a tenant of Viormar

 8   property?

 9        A.  Yes.

10        Q.  Okay.  So before Jessy was evicted by you, how

11   much was Jessy Limousine paying in rent monthly?

12        A.  At the beginning, because the -- it was the

13   starting of the building, they made a contract in which

14   he would pay $1,800.

15        Q.  And that's monthly?

16        A.  Yes.  And then, as time went on, Orlando

17   needed more money.  And then, he puts it in writing,

18   and that he's going to revert it to the original price

19   of the location.

20        Q.  Okay.

21        A.  Jessy did not want to do that.  And that's

22   when he did that in writing, so that he could be

23   evicted.

24        Q.  Okay.  And so for my clarification purposes,

25   based on your answer, Orlando wanted to begin charging



1    Jessy the true market value of the property in rent?

2         A.  Yes.

3         Q.  Okay.  And what was the true market value of

4    the property?

5         A.  So at the current rate for a 4,400 square

6    feet, that runs about $10 per square feet.  And they

7    should be paying around $5,000.

8         Q.  And that's monthly?

9         A.  Yes.

10        Q.  Okay.  So would you agree that if they're

11   paying -- if they were to be paying $5,000 monthly,

12   that would be $60,000 a year?

13        A.  Something like that.

14        Q.  Okay.  And you're currently not paying any

15   rent for where you're residing; is that right?

16        A.  No.

17        Q.  Okay.

18        A.  That would be -- that -- mine's 600.

19        Q.  Were you ever told that if you stopped working

20   at Viormar that you would be evicted?

21        A.  Certainly.

22             MR. ALVAREZ:  All right.  If you could tell

23   him that he can't be on his phone during a depo.

24             THE WITNESS:  I'm going to turn it off.

25   BY MR. ALVAREZ:



1        Q.  Okay.

2        A.  Didn't you need Riano's number?

3        Q.  Oh, I did.  I did.

4        A.  Do you want the number?

5        Q.  Well, I would like the number.  So if you

6    could just --

7        A.  It's (305) 362-7556.

8        Q.  And whose phone number is this, again, just

9    for the record?

10       A.  Riano Ricardo.

11       Q.  And what was your relation to Riano Ricardo?

12       A.  He was my neighbor, so I would help him out,

13   do certain jobs.  I don't know if you want Roberto

14   Perez's.

15       Q.  Yeah.  If I could get Roberto Perez's number,

16   too, that would be great.

17       A.  (305) 282-4539.

18       Q.  And what's your relation to Roberto Perez?

19       A.  He was the owner from the property across the

20   street.  He had a mechanic shop.  And he knew that

21   Orlando Fernandez would not pay me for my job.  And

22   then, he would ask me to go work for him or with him on

23   his cars.  That man did pay me.  Just to help him at

24   his shop with the cars, he would pay me weekly 250,

25   350.



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                       47

 1        Q.  Okay.

 2        A.  Something like that.

 3        Q.  And if I'm recalling correctly, you stated

 4   earlier that Orlando encouraged you to do other jobs to

 5   supplement your pay; is that right?

 6             THE INTERPRETER:  To supplement?

 7             MR. ALVAREZ:  His pay.

 8             THE WITNESS:  Yes.  He knew I did that.

 9   BY MR. ALVAREZ:

10        Q.  Okay.  So why is it that you claim that you

11   can't afford to move out of the property?

12        A.  Because in order to move out, I have to make a

13   decent amount of money, which I can't do all the time.

14   They ask for security, they ask for one deposit, one

15   rent's worth, and then one rent month.

16        Q.  So if you were evicted from the property, what

17   would your damages be?

18        A.  I was -- I was doing a job in a building, and

19   there was a piece of wood in the structure, and there

20   was an inspection coming up.  And I'm -- the structure

21   had termites.  I -- I sent a letter to Orlando saying

22   we had to do that.

23             And then he said, cover all that up, cover,

24   cover, cover.  And so all of that debris or termite

25   fell onto my eye.  And so I've been having this problem



 1   for three years now.  And all he did was get me some

 2   glasses through Amazon.

 3        Q.  Okay.  Those are --

 4        A.  How am I going to go out into the street and

 5   I'm blind?

 6        Q.  Okay.  But, so those are more so damages

 7   related to work that you claim to have performed.  What

 8   I'm asking is: What are the damages that you would

 9   suffer if you were removed from the property?

10        A.  Imagine a person with nothing out on the

11   street after I've spent my whole life there.

12        Q.  But you just said, not so long ago, that you

13   perform jobs in various capacities for various other

14   people.  So why wouldn't you be able to continue doing

15   that elsewhere?

16        A.  Because I've lost my eyesight.  I've asked for

17   help.  The government gives me food stamps.  Something

18   fell in my eye and it affected my head, it affected my

19   eyesight, because of the terrible living conditions in

20   which I live, mold, cockroaches, spiders.

21        Q.  So if it's so terrible to live there because

22   of the mold, cockroaches, and spiders, why wouldn't you

23   want to move out?

24        A.  I don't have -- I don't have where to live.  I

25   don't have a place to go.  Where am I going to go?



1       Q.  Okay.

2       A.  Pay me my money, and I'll leave.

3       Q.  Okay.

4       A.  I worked very hard for them.  It's not a lie.

5   It is true.  He's the liar here.  So he even said that

6   I was a homeless person and I was invading that

7   property without permission.  He made me even a notary

8   public, so that I would notarize all his dirty

9   paperwork.

10      Q.  Are you currently a notary public that's

11  licensed?

12      A.  I'm not right now because I don't have -- I

13  don't have a way to pay.  They paid for that, the 2,500

14  that they asked for.

15      Q.  Why did they make you pay notary public?

16      A.  They -- they wanted me to be a notary, so they

17  wouldn't have to go do that out on the street.

18      Q.  Okay.  Can you identify the people, dates, and

19  times in which you acted in the capacity as a notary?

20      A.  It was only the paperworks that they would

21  say -- or tell me.  When they had the company, Vita

22  Solutions, they would notarize things that were in

23  regards to the company.

24      Q.  Are you currently collecting disability from

25  the State?



1       A.  No.  She wanted -- he wanted me to.

2       Q.  Okay.  Have you ever filed a workers'

3   compensation claim due to your eye injury?

4       A.  I did not want to do that.  I didn't want to

5   do that.  I just think it's unfair.

6       Q.  Okay.

7       A.  I've even been his bodyguard.  I'm just

8   saying, no, that I don't exist.

9       Q.  Can -- can you expand on that?  How -- how --

10  what do you mean that you were his bodyguard?

11      A.  Well, to go charge rent to the black people,

12  watching his back on the warehouse when people had to

13  be removed from there.  It's in the police record.

14      Q.  Have you ever been charged with a crime of

15  dishonesty at any point?

16      A.  No.

17      Q.  Okay.

18      A.  God doesn't want you to tell lies.  My roots

19  are of honesty.  I never thought this person would do

20  this to me.  He would say, I want you to go up there

21  with me, I have a farm, I want to do a house in the

22  back for you, so we could grow things over there.  He

23  wanted me to continue that way.  I appreciate you as a

24  son.  No such thing.  When he sold the house and had me

25  throw out the trash, you know what I found in the



1  trash?  His photos of his mother and father.

2         And I said no, that I would keep that, that I

3  was not going to throw out the painting of the man who

4  helped me out.  So what are we talking about?  We're

5  talking about a person who took advantage of his own

6  father his whole life.  You can never throw out a

7  picture of your parents.

8      Q.  So how -- how is it that Orlando took

9  advantage of his father?

10     A.  Well, his dad would give him everything, so he

11 got off with that his whole life.  Had him go study in

12 Canada.  He became a doctor, sports medicine.  And he

13 never actually practiced it.  How -- how else would I

14 know all of this history [inaudible 01:46:20]?

15     Q.  So it's your position that Orlando took

16 advantage of his father because he was able to go get

17 his doctorate degree in Canada?

18     A.  That's not the only thing.  It's his

19 lifestyle.  His whole lifestyle.

20     Q.  What is your --

21     A.  How is he going to throw out his dad's

22 photograph?

23     Q.  Is that the only issue of his lifestyle that

24 bothers you?

25     A.  No.  His life doesn't bother me.  I



1  appreciated him.  I would take care of him.

2      Q.  Okay.  What's your highest level of education,

3  Dennis?

4      A.  I never went to school.

5      Q.  Okay.

6      A.  I did go to school, but that has nothing to do

7  with this.  Bad people.

8          MR. ALVAREZ:  Is it all right if we take a

9  five-minute break to go off the record?

10         THE REPORTER:  We are going off the record.

11  The time is now 12:23 p.m., Eastern Standard Time.

12         (A recess was taken.)

13         THE REPORTER:  We're back on the record.  The

14  time is now 12:31 p.m., Eastern Standard Time.

15  BY MR. ALVAREZ:

16     Q.  Dennis, so I wanted to speak a bit about that

17  period of time where you were paying $300 a month in

18  rent.  Why did you stop paying that?

19     A.  It wasn't 300.  It was 500.

20     Q.  500.  Okay.  So why did you stop paying $500 a

21  month in rent?

22     A.  Well, they -- they sat me down at Villa de

23  Sabores to talk business.  It's a restaurant or a

24  cafeteria.  They said, we're leaving to Orlando, can

25  you -- that I had to stay in charge of the property.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      53

1    Q.  Okay.  So during that period when you were

2  paying $500 a month in rent, what jobs were you

3  performing out at the Viormar property?

4    A.  It's a lot of trees, so the care and

5  maintenance of it, parking spaces, if a pipe breaks.

6  There was a man who was stealing water from the

7  property in the back of the property.  I caught him.

8  And -- and I told Orlando, then Orlando was afraid to

9  take him to court.  That was my job, to take care of

10  it, fix a pipe, the bathrooms.

11        When I brought Carlos in, fix a lot of the

12  office space.  And when the guy from the limousine,

13  Barry [phonetic], then a lot of things that were broken

14  inside, repair everything.  It was -- that was my job.

15    Q.  Okay.  Are you aware that commercial tenants

16  are required to maintain their own properties?

17    A.  That is correct.

18    Q.  Okay.  So what's the difference?

19    A.  Yeah, but he wouldn't say that to them.  He

20  wouldn't tell them that, they had to do it themselves.

21  So the tenants would call me all the -- oh, fix that

22  light, oh, the fake ceiling.

23    Q.  Why would the tenants call you to do that?

24    A.  They knew I was in charge.

25    Q.  How did they know that you were in charge?



DENNIS ANEIROS                                     October 07, 2024
ANEIROS vs VIORMAR TRADING                                       54

1        A.  That I was in charge?  They knew because
2   Orlando had said it.
3        Q.  Okay.  How long has Orlando been -- how long
4   has Mr. Fernandez been in the city of Orlando?
5        A.  When his father died.  I think it's been
6   eight, nine years.
7        Q.  Okay.  And you testified earlier that Orlando
8   knew that you were doing jobs on the side; is that
9   right?  And -- and he didn't prevent you --
10       A.  Yes, he knew.  He would send me messages, even
11  at 1:00, and then send the correspondence to him.  He
12  would prepare, like, a package, stickers with the
13  stamps to prepare packages to go to this P.O Box that
14  he had.  He said, I would pick up the packages and get
15  the mail.
16           He would start asking me about the cars.  This
17  car, that car.  I would say, this is Carlos, that other
18  one says Carlos.  I would say, this car, I'm -- I'm
19  holding it for a friend, he's traveling, and he's
20  giving me a little money because I have it there.
21       Q.  Who's --
22       A.  Because I have to pay for the electricity.
23       Q.  Who's giving you a little money?
24       A.  The person that I told to leave the car there.
25       Q.  Okay.



1        A.  He said, no, take everything out, take them
2   all out.  But -- and I found mold.  That's how I paid
3   my electricity on my own thing.
4        Q.  Okay.  So --
5        A.  Because he doesn't pay me.  And then he would
6   say, no, remove everything, get everything out.  And he
7   knew it, that I would -- that that's what I would make
8   money doing.
9        Q.  So if you're paying for the electricity and
10  you're maintaining the property, what's the difference
11  between you and every other commercial tenant?
12            THE INTERPRETER:  Can you repeat that?
13            MR. ALVAREZ:  Yes.
14  BY MR. ALVAREZ:
15       Q.  So if you're paying for the electricity and
16  maintaining the property, what is -- what is the
17  difference between you and every other commercial
18  tenant?
19       A.  Because the tenant pays him rent and they work
20  their business.  I don't have a business.  I work for
21  Orlando Fernandez.
22       Q.  But it was -- you stated earlier that you came
23  into an agreement with Viormar that you would be
24  allowed to live on the property for free in exchange
25  for whatever labor you provided.  Was that your



1    testimony?

2         A.   Yes.

3         Q.   Okay.

4         A.   And that they would pay for everything.  And

5    then they came back a month later and said, no, you pay

6    your own electricity.

7         Q.   Okay.  Is that a damage that you've suffered?

8         A.   What?

9         Q.   Having to pay for the light?

10        A.   No.  I have to have electricity.

11        Q.   Okay.

12        A.   I don't have A/C. And I don't really have

13   water to bathe with.  And -- and I withstood it

14   because -- because of the need I had.

15        Q.   Okay.  So let's talk about the need you had

16   for a minute.  You stated previously that you were

17   allowed to work outside of your role in Viormar, right?

18        A.   Yes.

19        Q.   Have you tried finding gainful employment

20   outside of doing odd jobs?

21        A.   I have tried.

22        Q.   Where have you applied to?

23        A.   I looked for employment in several places,

24   body shops, including this man, Roberto -- Roberto

25   Perez.  I've done work for him in cars, I've been a



 1  dishwasher.

 2      Q.  Okay.  Hold on.  Because I want to be able to

 3  get all this information.  What is the name of

 4  Roberto's company?

 5      A.  He got out and he rented that place.  And I

 6  said, give them my number because I know how this

 7  works.  I do know the history.

 8      Q.  So Roberto used to own a property at the

 9  Viormar location?

10      A.  No.  He's a neighbor across the street.  He

11  owns a building across the street, Roberto.  And he --

12  and at some point, he wanted to buy Viormar.

13      Q.  Okay.  So then I'll make my question broader.

14  Have you ever looked for work outside of a 20-mile

15  radius of Viormar?

16      A.  Well, I can't leave Viormar because I have to

17  take care of everything there.  I can't leave there.  I

18  have to be on top of it, like they say.  When an

19  inspector comes, when everything.

20      Q.  Who's -- what would happen if you weren't on

21  top of it?

22      A.  Everything.  Their life would just go down or

23  get derailed.

24      Q.  But why do you care about if their life or

25  business goes down?



1      A.  Because that's the occupation that they gave

2  me.

3      Q.  Okay.  But you seem to have -- do you believe

4  that Viormar has enslaved you?

5      A.  I think so.

6      Q.  Okay.  So then why do you care if their

7  business gets derailed?

8      A.  Because I -- I thought they were trustworthy

9  people or people with principles, so I guarded and

10 protected them.  But see that they didn't care about my

11 life.

12     Q.  Okay.  Did you know that Viormar is trying to

13 sell the property?

14     A.  Me?  I know that they're trying to sell the

15 property, of course.  I have brought people who want to

16 buy it.

17     Q.  So you would find it beneficial for the

18 property to be sold then?

19     A.  Of course.  And that way, they could pay me my

20 money and I could leave.

21     Q.  Okay.

22     A.  It's $6 million that that property is worth.

23     Q.  Okay.

24     A.  And he's going to spend it, just like he spent

25 all of his father's money.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      59

1       Q.  But are you aware that that property cannot be
2   sold while you're residing in it?
3       A.  So give me a deposit and I'll leave.
4       Q.  So --
5       A.  Or an advance.  I'll leave.
6       Q.  So you wouldn't say that's extortion?
7       A.  And they exploited me my whole life.
8       Q.  Okay.  So you testified earlier that the
9   living conditions are unfavorable; is that fair to say?
10      A.  No.
11      Q.  And you claim to have worked long hours as
12  well?
13      A.  Yes.
14      Q.  Which portion of the job requires you to work
15  these long hours?
16      A.  Which?  I have to be there the whole time.
17      Q.  Okay.  But you don't have -- do you have a
18  schedule that says from 9:00 a.m. to 1:00 p.m., you
19  have to do this specific job, and then from 2:00 p.m.
20  to 10:00, you have to do this other one?
21          THE INTERPRETER:  What -- what time?  5:00?
22          MR. ALVAREZ:  10:00.
23          MR. LAROU:  Objection.  Asked and answered.
24          THE WITNESS:  How is it possible that you
25  don't understand?  Well, now with the pandemic,



1    everybody threw their dogs out into the street.  I

2    picked up some dogs.  They accompany me.  They protect

3    me.  And they protect their property.

4          Those dogs bark because outside, there's a lot

5    of people, there's a lot of cars because then, they'll

6    steal their parts.  And there's police reports.  So

7    while the cars are being disassembled, people will come

8    and steal the parts.

9    BY MR. ALVAREZ:

10   Q.  Okay.  The cars that are being disassembled,

11   are those cars that Viormar is working on?

12   A.  They are from Carlos, a tenant from Viormar.

13   Q.  Okay.  So wouldn't you agree that the security

14   responsibility lies on Carlos and not Viormar?

15   A.  Could be.

16   Q.  Okay.

17   A.  But that's my job.  I also put the cameras to

18   see.  That's what Orlando would tell me.

19   Q.  Okay.

20   A.  Because if they steal things from Carlos, then

21   Carlos is not going to want to live there or -- or be

22   there, and then he's going to go find somewhere else to

23   be.  Just a few days ago, let's say last week, I felt,

24   I heard an explosion, dogs barking.  I go outside, lots

25   of smoke.  Turns out my neighbor's building exploded



 1  and fire started.

 2          I can't wait for the firemen to come, so I

 3  went and I grabbed the extinguisher and jumped over.

 4  And I saved all of those other -- all those buildings

 5  and cars from not catching fire.  I did it because I

 6  wanted to.  No, I did it --

 7          THE INTERPRETER:  Sorry.

 8          MR. ALVAREZ:  Oh, no, you're good.

 9          THE WITNESS:  I did it because I have a

10  conscience and I have appreciation.

11  BY MR. ALVAREZ:

12      Q.  Okay.

13      A.  And because I have to take care of it.

14      Q.  When did this happen?

15      A.  A few days ago.  Last week.

16      Q.  Did --

17      A.  And if I wouldn't have been there at that

18  place, everything would have burned down.  It was 11:00

19  at night.  There was no one there.  It -- I'm not doing

20  anything bad by that.  I'm doing my job.

21      Q.  That sounds like a pretty large fire if it

22  could have burned everything down.  Did the fire

23  department show up?

24      A.  Yes, and the police, too.

25      Q.  Okay.



1     A.  And then they said, you did a good job.  So I

2   was doing a good job.  As one of those letters say,

3   like the people from the building thanking me for my

4   good job.

5     Q.  So --

6     A.  I did a good job.  I need him to compensate

7   me.

8     Q.  Okay.

9     A.  That's it.

10    Q.  So can you remember what day of last week that

11  fire happened?

12    A.  I think it was a Monday or a Tuesday of last

13  week, something like that.

14    Q.  Do you know if there was any news article

15  reporting that a local man stopped fire?

16    A.  No.

17    Q.  Okay.

18    A.  It was none of that.  But I can get the

19  report.  I called.

20    Q.  Okay.  Would you agree --

21    A.  I do it because -- to show that, like, it's my

22  job.

23    Q.  All right.  So we've established that -- well,

24  you've established that part of your job duties were

25  security; would that be fair to say?



DENNIS ANEIROS                                        October 07, 2024
ANEIROS vs VIORMAR TRADING                                          63

1      A.  Correct.

2      Q.  Now, would you agree that if most companies

3  hire security personnel, part of their job duties is in

4  fighting fires?

5      A.  Yes.

6      Q.  Okay.

7      A.  But I can't let it burn down.  Nobody says in

8  the Constitution or any law says, you have to let it be

9  and let the fire happen.

10     Q.  Okay.

11     A.  Or I see somebody getting killed, that I'm not

12 going to intervene to stop them from getting killed.

13     Q.  Fair enough.  Let's talk about the dogs for a

14 minute.  How good are they at providing security?

15     A.  My dogs are good.  They -- I trained them

16 myself.  I trained their dog, too.  I have the videos.

17 They destroyed the big house.

18     Q.  And he also mentioned that you installed

19 security cameras on the property.  Is that encompassing

20 the whole property?

21     A.  No.

22     Q.  Where are the security cameras?

23     A.  There's only one, but it doesn't -- to see,

24 but it doesn't record.  I -- it's just for me to look.

25     Q.  So those security cameras don't really benefit



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      64

 1  Viormar, they benefit where you're residing?

 2      A.  It sees everything, the front.

 3      Q.  Okay.  So if --

 4      A.  And it has the audio.

 5      Q.  So if there are security dogs on the property

 6  and security cameras, why is your position as a

 7  security guard required?

 8      A.  I installed those cameras for self-protection.

 9      Q.  Okay.  I thought a moment ago, you said you

10  installed the cameras as a part of your job duties?

11      A.  No.  I bought them.

12      Q.  Okay.

13      A.  And I brought the dogs myself, too.  And he

14  agreed to it.  And there was a moment that they were

15  going to break in, and then he said, don't go out there

16  without the dog.

17          When there's an incident, I call the police,

18  and they don't come, and then I call them again.  And

19  then I -- I say to them, if you don't come soon, I'm

20  going to let the dogs out.  They're like, no, we're --

21  we're almost there.  So they're not aggressive or

22  clandestine, those dogs.  If you have a weapon or

23  you're aggressive, they'll turn aggressive.

24      Q.  Okay.  So can you give me a rough

25  approximation of how many years you're providing



1  security services for Viormar for?

2      A.  Since I started.

3      Q.  So that's about --

4      A.  Since I started.  2010.

5      Q.  Okay.

6      A.  When I started, the piles of trash were all

7  over the parking lot, everywhere.  And I eliminated all

8  of that.

9      Q.  So would you say that you're good at providing

10 security?

11     A.  Yes.

12     Q.  Okay.

13     A.  When I was a boy in Cuba, like, 16 or 17, I

14 was trained to guard.

15     Q.  Okay.  Well, if you have training in security

16 from your time in Cuba, and you've been providing

17 training services for 14 years at Viormar, why haven't

18 you ever tried applying to be a security guard at

19 another company?

20     A.  I would like to, but I can't leave there.  As

21 we're speaking about the pile of trash, that's when

22 Orlando's father --

23          MR. ALVAREZ:  (Audio interruption.) Sorry.

24 Sorry.

25          THE WITNESS:  -- he said, you could stay here,



 1  so that they know that there's a presence here and they

 2  don't keep throwing out the trash.  But I didn't stay

 3  in the offices.  I stayed at 7880, which was pretty

 4  big.  That's where Carlos de la Flor is now.

 5  BY MR. ALVAREZ:

 6      Q.  Okay.  So you stated that if you left the

 7  property, the business would run off the rails; is that

 8  fair to say?

 9      A.  Yes.  They don't know -- I don't know what --

10  what's going to come of it when I leave.

11      Q.  So you don't want the business to fail?

12      A.  It makes me sad because of his father.  How

13  the father himself constructed that building, how he

14  was able to get that man, how he -- how he went to

15  China, how he became rich, how he got to Venezuela with

16  $20, everything.  And so for it to crumble, that cost

17  him so much work, that person who did value my

18  presence.

19      Q.  So your tie to this property is for the love

20  of Orlando's father?

21      A.  I don't have anywhere to go.  I don't have

22  anywhere to go.

23      Q.  Okay.

24      A.  And it's not just me, it's me and my dogs.

25      Q.  Okay.  So --



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      67

1        A.  I appreciate Orlando the father, but it's not

2    only that I did it for love and family.  I worked.

3    And -- and he said to me, I inherited you along with

4    this building --

5        Q.  So --

6        A.  -- which means I'm an object.

7        Q.  Okay.  So let me -- let me get this straight.

8    You first stated that you couldn't leave the property

9    because the business would fail.  Hold on.  And now,

10   you're saying that you can't leave the property because

11   you don't have anywhere to go and you have dogs.  So --

12   so which is it?

13       A.  They're both related.  They all -- they both

14   go together.  It does make me sad for the property

15   because I've spent my life there, taking care of all of

16   it.  At the same time, I can't go be on the street with

17   my dogs.

18       Q.  Okay.

19       A.  He has to be fair.  All I ask is for him to be

20   fair.

21       Q.  Okay.

22       A.  To recognize, tell the truth.  I've done a lot

23   of things for him.  And I'll leave, and I will be in

24   peace.  I will be in peace.

25       Q.  Okay.  Is there anything preventing you from



1  working as a security guard or as a mechanic elsewhere?

2      A.  No.

3      Q.  Okay.

4      A.  I'm -- I'm getting better with my eyesight.  I

5  can't drive yet.  I would like to.  Everything is

6  stacked up against me.  I don't have a place, I can't

7  see.

8      Q.  So would it be fair to say that your damages

9  right now is that if you were required to leave the

10  property, you would have to pay rent to live somewhere

11  else?

12      A.  No.  Right now it is difficult because I can't

13  really see.  Paint a wall, to paint a car.  I can't do

14  mechanic work.  I don't know.

15      Q.  Okay.

16      A.  How do I recognize a tool?  I can know what's

17  wrong with the car, but I can't repair it.

18      Q.  Have you ever gone to an ophthalmologist?

19      A.  They said it was a problem that with a special

20  diet that I have.  It's some kind of stroke.

21      Q.  Okay.  And who told you that?

22      A.  A doctor did.  I just don't like to go to the

23  doctors a lot.

24      Q.  Can you tell me which doctor diagnosed you

25  with that?



DENNIS ANEIROS                              October 07, 2024
ANEIROS vs VIORMAR TRADING                              69

1        A.   I have to look in my papers when I went.   I
2   had an accident and I became handicapped, and then I
3   left the hospital.
4        Q.   Okay.   What -- what year did that accident
5   happen?
6        A.   When I first came to this country.
7        Q.   Okay.   And I know that you don't remember the
8   ophthalmologist that you saw, but do you remember which
9   hospital you went to?
10       A.   Baptist Hospital.
11       Q.   Okay.   And what year did you go to the
12   ophthalmologist?
13       A.   End of last year, this year.
14       Q.   Okay.
15       A.   And this year.
16       Q.   And did those doctors ever tell you that you
17   couldn't work because of the injury?
18       A.   No.
19       Q.   Okay.
20       A.   They didn't say anything like that.
21            THE INTERPRETER:   Counsel, just one second.
22   In the --
23            MR. ALVAREZ:   We --
24            THE INTERPRETER:   Can we go off --
25            MR. ALVAREZ:   We can go off the record for a



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                           70

 1  minute, yeah.

 2          THE REPORTER:  We are going off the -- oh,

 3  excuse me.  We are going off record.  The time is now

 4  1:10 p.m., Eastern Standard Time.

 5          (A recess was taken.)

 6          THE REPORTER:  We are on the record.  The time

 7  is now 1:53 p.m., Eastern Standard Time.

 8  BY MR. ALVAREZ:

 9      Q.  All right, Dennis.  So before we get into the

10  Complaint, I'm going to ask you, you know, a couple of

11  questions just to clear things up.  How did the

12  defendants force you to work?

13      A.  Well, if I wouldn't do the things, then he

14  would kick me out of the place.  He knew the conditions

15  I was in.

16      Q.  Okay.  And what do you mean by the conditions

17  you were in?

18      A.  Well, he knows that the little money I had, I

19  utilized it for the patents that I had, and that I

20  don't have money for, like, a down payment for a house

21  or an apartment, or do any sort of business.  He knew

22  that.  And he was like, yeah, yeah, go ahead, stay,

23  handle the business, but you have to work here doing

24  all of this.

25      Q.  So you're -- are you saying that your damages,



1  if you were evicted, would be that you would have to

2  find another place to live?

3      A.  And re-incorporate myself into society.

4      Q.  Okay.

5      A.  I feel isolated from the world.

6      Q.  Okay.  Before -- before Orlando's father found

7  you on the property, what -- what type of work were you

8  doing?

9      A.  I did cars, same, on my own.  And so then I

10  saw in television that, like, the kids were dying

11  because of it, and so I decided to start working on

12  that system.  I saw that people were stealing license

13  plates, and so I focused on getting that patent as

14  well.  I was a working man.

15      Q.  Okay.  So would it be fair to say that you

16  were doing independent jobs, like you're doing now,

17  even before you met Orlando's father?

18      A.  I did cars and whatever would show up.

19      Q.  So that's the same thing you're doing now,

20  though, right?

21      A.  Well, if -- if Orlando Fernandez would pay me

22  a certain amount per week, then I would not have to go

23  do a door, I would not go have to do a car or anything

24  like that.

25      Q.  But that wasn't what your original agreement



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      72

 1  was, right?  Because before you testified that he would

 2  let you live there rent-free, and you were allowed to

 3  do jobs for various other people.

 4       A.  I did say that.  And I did do side jobs, but I

 5  didn't always have side jobs.  It's not the same thing

 6  to have money coming in every week or every month.  He

 7  would always be telling me he didn't have money.

 8       Q.  But -- but, what prevented you from getting a

 9  job that paid consistently, like Burger King or

10  McDonald's?

11       A.  I don't understand that question.

12       Q.  Okay.  So I could rephrase that.  So you

13  testified that you had training and security.

14       A.  Yes.

15       Q.  Okay.  So what was stopping you from applying

16  for work at a security company?

17       A.  What would stop me?  Being in a company.

18  If -- if I go somewhere else, then I'm giving up the

19  occupation that they gave me.

20       Q.  But you testified previously that they

21  permitted you to do other jobs.

22       A.  Yes, I know.

23       Q.  Okay.

24       A.  I know.  It was only to support myself --

25       Q.  Okay.



1        A.  -- so that I could survive.

2        Q.  But just to be clear, you've made the decision

3   not to apply to different jobs?

4        A.  I don't know if you understand what I'm

5   saying.  I cannot go to apply for other jobs outside

6   because I cannot leave the property.

7        Q.  Okay.

8        A.  There's messages there that say, you have to

9   be there because this thing is going to arrive there.

10  I have to be there because there's packages --

11          THE INTERPRETER:  I'm sorry.

12          THE WITNESS:  -- there's packages, there's

13  mail, there's checks coming in.

14  BY MR. ALVAREZ:

15       Q.  How often were those messages coming in?

16       A.  All the time.

17       Q.  So you have, in your possession, messages

18  reflecting a consistent date where they're telling you,

19  you have to be on the property?

20       A.  Yes, I do have them.  My attorney has them.

21  I've given it to him.  E-mails too.

22       Q.  Okay.  And how long would it take you,

23  roughly, to receive a package that they told you, you

24  needed to be there for?

25          THE INTERPRETER:  How long would it take you



 1  | to do what?
 2  |        MR. ALVAREZ:  Yeah.  Let me rephrase that.
 3  | BY MR. ALVAREZ:
 4  |     Q.  So if they told you that a package was
 5  | arriving, how long would you need to stay on the
 6  | property, generally, to receive that package?
 7  |     A.  So I'll give you an example.  One day, they
 8  | were delivering skylights.  And they sent him a message
 9  | saying, we're here, the person is not here.
10  |     Q.  Okay.
11  |     A.  Where are you, you have to be there.
12  |     Q.  Yeah.
13  |     A.  I can't -- I can't have them go back again.
14  | So I couldn't have a job outside.
15  |        MR. ALVAREZ:  Okay.  All right.  I'm going to
16  | introduce, as Exhibit 3, I believe --
17  |        THE REPORTER:  Yep.
18  |        MR. ALVAREZ:  It might -- may be 2.  It's 3?
19  |        THE REPORTER:  Yeah.
20  |        MR. ALVAREZ:  As Exhibit 3 Plaintiff's Second
21  | Amended Complaint.
22  |        (Defendant's Exhibit 3 was marked for
23  | identification.)
24  | BY MR. ALVAREZ:
25  |     Q.  And I'm going to go through it with you.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      75

```
 1            MR. ALVAREZ:  Brooks, you may, you know,
 2   assist him.
 3            Or -- well, I suppose you can as well.
 4   BY MR. ALVAREZ:
 5       Q.  So I would like to -- to --
 6            THE INTERPRETER:  All right.  So if we -- if
 7   you're going to read off of it, I'd like --
 8            MR. LAROU:  Okay.
 9            THE INTERPRETER:  I don't know if we have --
10   oh, you have a copy, too?
11            MR. LAROU:  Right here.
12            THE INTERPRETER:  Okay.  Good.
13            MR. LAROU:  Yeah.
14   BY MR. ALVAREZ:
15       Q.  All right.  So I want us to look at Page 2.
16   All right.  In Paragraph 9, it says, "Defendants
17   regularly employed two or more employees for the
18   relevant time that handled goods or materials that
19   travel through interstate commerce or use
20   instrumentalities of interstate commerce, thus making
21   Defendant's business an enterprise covered by the Fair
22   Labor Standards Act." Now, earlier in your deposition,
23   I asked you if Viormar had any other employees, and you
24   said no; is that right?
25       A.  No, they never did.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     76

1       Q.  Okay.  Now --

2       A.  Unless you want to call Cristina an employee,

3  or his wife, Ita [phonetic], or his son -- or his son.

4  And maybe there -- it's, like, something they -- they

5  portray on the Internet and not physically.

6       Q.  Okay.  What --

7       A.  Or the other daughter, who's also on the

8  Internet.

9       Q.  Okay.  What about the -- the goods or

10  materials that travel through interstate commerce

11  that's here?  Did -- what was it that Viormar was

12  working on that traveled outside the state of Florida?

13      A.  I don't know about that.  That's their

14  mystery.  I don't know about that.  My thing was within

15  there.

16      Q.  But you do recognize that this is an

17  allegation in your Complaint, right?

18      A.  I'm saying it.  That's what it says here?

19      Q.  Yeah, in Paragraph --

20          MR. ALVAREZ:  If you want, read Paragraph 9 to

21  him again and --

22          THE WITNESS:  Well, I don't know about that.

23  I don't know if merchandise comes in and out.

24  BY MR. ALVAREZ:

25      Q.  Okay.



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                        77

1        A.  I don't know.  I don't know if they do it.

2        Q.  All right.  So let's look at Paragraph 10.

3   "Defendants have been, at all times material, an

4   enterprise engaged in interstate commerce in the course

5   of their ownership, management, and rental of real

6   property" -- and in parentheses, it says, "(warehouse

7   space), which, traditionally, cannot be performed

8   without using goods, materials, supplies, and equipment

9   that all move through interstate commerce." Do you know

10  if the maintenance of those properties require the

11  importation of materials that travel through interstate

12  commerce?

13        THE INTERPRETER:  Can you repeat that last

14  part of the question?

15        MR. ALVAREZ:  Yeah.

16  BY MR. ALVAREZ:

17        Q.  Do you know if Viormar has imported materials

18  that travel through interstate commerce to maintain

19  these properties?

20        A.  Well, they -- they would buy material for me

21  to work the walls.  I don't know if they bought it

22  locally or they bought it from another state.  I don't

23  know.  And I understood the other one now.  Now, I

24  understand.

25        Q.  Okay.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     78

1       A.  Other tools that I utilized, the rollers,

2   paint, tools, they would bring in.  When -- when I

3   would do the oil change for their cars, the oil came

4   outside, from -- from elsewhere.

5       Q.  Okay.  But -- all right.  So which state did

6   the oil come from?

7       A.  I don't know.  They buy those things at auto

8   parts store.

9       Q.  Okay.  And when you were changing these oils,

10  how does that further Viormar's business interest?

11          THE INTERPRETER:  When you were buying these

12  oils --

13          MR. ALVAREZ:  No, because he said that he was

14  changing the oils on his cars, right?  So how does him

15  doing that further the business interests of Viormar?

16          THE WITNESS:  How does it advance?

17  BY MR. ALVAREZ:

18      Q.  Yeah.

19      A.  Because they would utilize the cars for their

20  transportation, for their daily ins and outs.

21      Q.  Okay.  But were those cars owned by Viormar,

22  or were they owned by individuals?

23      A.  Their individual persons.

24      Q.  Okay.  And with respect to your job duties --

25  actually, let me -- let me back up.  I'm going to



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      79

1   retract that and rephrase.  You -- you stated earlier

2   that they took you to a Cuban cafe and you negotiated

3   your business terms; is that right?

4       A.  Yes.

5       Q.  Okay.  And what did they tell you were going

6   to be your responsibilities at that time?

7       A.  What was going to be my responsibility?

8       Q.  Yep.

9       A.  Maintenance and care of the property.

10      Q.  Okay.

11      A.  That they were moving to Orlando and I was

12  going to be in charge of everything.

13      Q.  So --

14      A.  I would -- I would do the deposits in their

15  bank, Ocean Bank.  They even know me there.  I would

16  put postage on stamps.  I would send them things over

17  there.

18      Q.  Okay.  So speaking of that -- so -- so

19  speaking of that, you mentioned that Orlando Fernandez

20  is now living in Orlando.  How often does he visit the

21  Viormar property?

22      A.  No.

23      Q.  Okay.

24      A.  When he -- when he's coming to pay his taxes

25  in Miami, he'll send me a message, I'm going to come



1  over, I'm in Miami.

2       Q.  Okay.

3       A.  He never comes.

4       Q.  And you testified earlier that you weren't

5  provided a work schedule from Viormar; is that right?

6       A.  No.  It was, do everything always, all hours.

7       Q.  Okay.  So how would Viormar know if you did or

8  didn't do something?

9       A.  He would call me.  He would ask me via

10 message.  And then he would send me a message, I'll

11 call you later.  And then I would tell him, I -- it's

12 just that I had to tell you what was going on.  And he

13 said that he took long calling me back because he was

14 feeding his canaries or whatever birds.

15      Q.  All right.

16      A.  I had to represent him in front of the City of

17 Doral for all the complaints.  I would get the letters,

18 I would send pictures to him.  But when I would show

19 up, I would show up as the representative of Orlando

20 Fernandez.

21           So the City of Doral does not deal with you,

22 the police either, the post office.  They don't give

23 you the papers nor the correspondence if you're the

24 representative.

25      Q.  All right.  Who in the City of Doral did you



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                            81

 1   meet with?

 2        A.  The inspectors would come often and say, well,

 3   the cables are touching the electricity, you need to

 4   trim them.  I would say to Orlando -- and then I would

 5   say, go find a tree trimming company, see if you can

 6   find it cheaper.

 7        Q.  So --

 8        A.  That's all in -- in the mail.

 9        Q.  So would you say that you almost acted as an

10   advisor to Orlando on how to keep the company compliant

11   with code enforcement regulations?

12             THE INTERPRETER:  Can you repeat that?  I'm

13   sorry.

14             MR. ALVAREZ:  Yeah.

15   BY MR. ALVAREZ:

16        Q.  Would you say that you offered advice to

17   Orlando on how to keep Viormar compliant with the rules

18   of the City of Doral?

19        A.  I would tell him.  The -- when the 40-year

20   inspection came -- I'm just setting an example.

21   There's a lot more.  I told him that the roof had

22   deteriorated, that I kept putting sealant on it, and

23   for him to buy the sealant.

24             And I would get up there and I would try to

25   improve it to see if it would pass inspection, but it



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                        82

1   wouldn't.  I had to put in a new roof.  And I had to

2   get the estimates myself of a new roof.

3        Q.  All right.  So hold on.  Before we move on, do

4   you have messages from anyone at Viormar directing you

5   to do these things?

6        A.  Orlando Fernandez.

7        Q.  Okay.

8        A.  I would tell them to get me estimates,

9   receipts, the tree trimming receipts, receipts of the

10  roof.  And when there was an open wall -- let me give

11  you an advice.  I sleep under that, and I will tell

12  him, Orlando, that's going to fall on me.  That eight

13  ton beam is going to fall on me.  And you want to rent

14  this in this condition?

15       Q.  So --

16       A.  And he said, I have to rent it anyway.  I --

17  go cover it up, go buy cement, go buy paint, and here's

18  the money.

19       Q.  Okay.

20       A.  And I advised him not to.  And then, that's

21  when the discordance began.  Why?  Because he wants to

22  rent out a building that's going to fall on people's

23  head.

24       Q.  Okay.  And -- give me a minute to think this

25  one.



1        A.   So I'm sorry, I'm just telling the truth.

2   I've done the entire electricity for that building.

3        Q.   If --

4        A.   And he doesn't learn, which means I don't do

5   anything.

6        Q.   Has anyone at Viormar threatened you with

7   eviction if you stopped working?

8        A.   The daughter came a few days ago and told me

9   that she was going to get me out of there.  I said,

10  what?  You have to pay 5,000, she said now.  I have to

11  pay 5,000 in a 600 feet square place.  And I told her,

12  I don't think I have to pay 5,000.

13            And she was rude to me that day.  I didn't

14  want to do it.  I wanted her to understand that I have

15  worked for him.  I have been a person unlike any other

16  person he is ever going to find in his lifetime.

17            And now, he's going to -- when I'm out of

18  there, he's going to have to pay people, like the

19  landscaping company, that he now has to pay.  Never had

20  to pay for that before.  Who gave maintenance to that?

21       Q.   How long has Viormar been trying to sell the

22  property?

23       A.   I just found out.

24            MR. ALVAREZ:  All right.  So -- hold on one

25  second.  Were you able to get everything that was being



 1  said there?

 2          THE REPORTER:  Yeah, I -- I was.  Thank you --

 3  and thank you for asking.  I just -- yeah.  But

 4  everyone's doing a great -- a great job.  I appreciate

 5  it.

 6          MR. ALVAREZ:  Okay.  Sorry.  Can you reread

 7  his response to me?  Because I was going to follow up

 8  with -- on that.

 9          THE REPORTER:  Sure.  Just one moment.

10  I'll -- I'll actually play the -- play it back, the

11  question and -- and answer.  Just one second.

12          THE INTERPRETER:  I hate to hear myself on

13  video -- on sound.

14          MR. ALVAREZ:  I'm not a fan of it either.

15          THE INTERPRETER:  It's weird.

16          (The previous answer was played back.)

17          MR. ALVAREZ:  All right.  All right.

18          THE REPORTER:  Oh, and the last question was:

19  How long has Viormar been trying to sell the property?

20  I don't know.

21  BY MR. ALVAREZ:

22     Q.  I'll ask that one again.  How long has Viormar

23  been trying to sell the property?

24     A.  Never.

25     Q.  So they've never told you that they're



 1   planning on selling the property?

 2        A.  No.

 3        Q.  So I don't mean to interrupt, but didn't you

 4   testify earlier that you would be happy if they did

 5   sell the property?

 6        A.  Not -- did I say that?  No.

 7        Q.  Okay.

 8        A.  I'm -- I'm not happy that they're selling the

 9   property.

10        Q.  Okay.

11        A.  He has not wanted to sell the property.  I

12   have brought him people to buy the property, and he

13   said no.  And then, a man came and said, I'm going to

14   buy this property whether you want to or not.  And then

15   Orlando said, that man's crazy because how is he going

16   to buy the property if I'm not selling it to him.

17        Q.  But you're the one that found that potential

18   buyer?

19        A.  Yes.  He -- he's a truck -- tow truck driver,

20   and he came to pick up a car at Carlos' to -- it's --

21   it's to make, like, a trucking -- tow trucking company.

22   And he said no.

23        Q.  But why would you try to find a buyer if you

24   intend on remaining on the property?

25        A.  I don't want a buyer.  And hear me out.  It's



```
 1   not that I want to stay in the property, I don't
 2   have -- how to get out of the property.
 3        Q.   Why don't you have the means of getting out of
 4   the property?
 5        A.   I don't have enough money saved up from what I
 6   have been able to save throughout the years in order
 7   for me to move out.
 8        Q.   But if I'm understanding correctly: When you
 9   first came into this agreement, you found it favorable
10   to live on the property rent-free and provide services;
11   is that right?
12        A.   I was never living there for free because I
13   have to work for him about 24 hours a day, and he
14   doesn't pay me.
15        Q.   So you are working in lieu of paying rent?
16        A.   I don't understand.
17        Q.   So instead of having to pay rent, like other
18   tenants, you pay for that in the work you provide; is
19   that what you're saying?
20        A.   That is right.  That's how he's paying me.
21   He's paying me with a roof, which the law says he can't
22   do.  Blue Lightning Campaign says that, and I'm
23   educating myself on how that works.
24        Q.   Okay.
25        A.   I'm -- this is not good, and I am getting
```



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                           87

```
1   assessment from the government.
2        Q.  So when you met Orlando's father, both of you
3   came into agreement that you would pay $500 a month in
4   rent; is that right?
5        A.  I paid that to live there.  As a matter of
6   fact, my brother stayed outside.  And what he would
7   want me to do was to create, like, an office space or
8   fix the office, so that he could rent it out to my
9   brother.  But then the land came up -- he didn't want
10  me to leave.  And he was, like, the one telling me,
11  don't go to the land or lot because, what are you going
12  to go do over there?
13       You need to stay here.  And so I introduced
14  him to my brother, and then my brother buys the land
15  off of him.  And then he's like, no, you go here.
16       Q.  Was Orlando's father concerned for your
17  well-being?  Is that why he told you not to go to the
18  lot?
19       A.  His dad wasn't alive at the time.  Orlando's
20  son did that.
21       Q.  So Orlando's son told you to stay inside the
22  office instead of the lot?
23       A.  He's -- he's always saying that, no, no, no,
24  no, I need you.  Stay there, stay there.
25       Q.  Okay.  All right.  Can we look at Page 3 of
```



1  the Complaint, Paragraph 17.  It says, "Plaintiff

2  worked for Defendants by performing various job duties,

3  including cleaning, repairing, renovating, collecting,

4  and renting for its commercial property rentals." How

5  were you renting for its commercial property rentals?

6        A.  What do you mean by "renting"?

7        Q.  Well, I mean, that's what it says in the --

8        A.  I would bring people in.  I would bring them

9  the person.  And I would introduce them and say, this

10 is a trustworthy person, you can rent it to them.  And

11 then he would do everything, all the paperwork.

12       Q.  How did you find these people?

13       A.  Because I get commented on by people, and then

14 I go to them and I see their living conditions and

15 stuff.  Orlando's never there.  Never.

16       Q.  Were you ever threatened physically that you

17 had to stay on the property?

18            THE INTERPRETER:  That -- where you had to do

19 what?

20            MR. ALVAREZ:  Had to stay and work on the

21 property.

22            THE WITNESS:  Orlando Fernandez, you mean?

23 BY MR. ALVAREZ:

24       Q.  Anyone at Viormar?

25       A.  Very subtle threat.  No, you have to -- you



 1   don't need anything.  You have to stay here, you have

 2   everything here.  I don't have everything there.  I

 3   have children.  I have family.  I have a mother.  I

 4   don't have any reason to be in some solitary place.

 5        Q.  Okay.

 6        A.  I have to be normal, like the rest of people.

 7        Q.  So you could stay with those family members

 8   you're referencing, can't you?

 9        A.  I don't think I can.  Everybody has their own

10   lives here.  My mom lives with my sister.  One of my

11   children went to Japan.  Cousins, uncles, it's not the

12   same here.  There's only one solution here.  For that

13   man to -- I worked a lot for that -- for that man to

14   tell the truth, pay me what he owes me, and I'll leave.

15   He has a lot of properties.  He has a lot of money.

16        Q.  If it's your --

17        A.  That's on my behalf.

18        Q.  If it's your position that they're saying that

19   you have to stay on the property and can't leave, that

20   they want you on that property, why is it that they're

21   trying to evict you from that property?

22        A.  You know why?  Why did this happen?  Because

23   the minute that I got an attorney and they got the

24   petition from the attorney, they -- that's when they

25   wanted to evict me.  They went as far as to tell me



1  that if I removed the lawsuit, they would get me a lot.

2      Q.  Okay.  But earlier, you testified that you'd

3  never wanted to bring this suit.  If your original

4  agreement was that you get to stay on the property

5  without paying rent in exchange for your work, at what

6  point did you decide, no, I want -- I need to get paid

7  as well?

8      A.  When he told me he didn't care about my life

9  or where I went, and I was insignificant to him.  And I

10  said, I have worked for you many years.  And I gave my

11  life there.

12      Q.  When did he tell you that?

13      A.  On a Friday.  On February 28th, that's the

14  date of the lawsuit.  That previous Friday, he came.  I

15  told them that thing about that the building wall was

16  going to fall off and I was supposed to cover up this

17  crack.  Why was the debris from the five offices that I

18  demolished still there?

19          And that's -- and I said, I'm one person.

20  That we needed a big container for me to get everything

21  out.  He -- he said he couldn't do that, that he

22  couldn't get a big container, that I would have to do

23  it slowly in the regular trash.

24      Q.  All right.  And again, just to confirm, were

25  those verbal demands?



 1        A.  Yeah, they're smart.

 2        Q.  Okay.

 3        A.  They're smart.

 4            THE INTERPRETER:  Counsel, whenever you get a

 5    good breaking point, if we could use a restroom break.

 6    I don't know how much time --

 7            MR. ALVAREZ:  Yeah.  I don't have much left,

 8    but I also need to use the restroom, so now would be a

 9    good time.

10            THE INTERPRETER:  Okay.  Good.

11            MR. ALVAREZ:  We're going to go off the

12    record.

13            THE REPORTER:  We are going off the record.

14    The time is now 2:39 p.m., Eastern Standard Time.

15            (A recess was taken.)

16            THE REPORTER:  We are back on the record.  The

17    time is now 2:45 p.m., Eastern Standard Time.

18    BY MR. ALVAREZ:

19        Q.  All right.  So back in 2010, you stated that

20    Orlando's father found you sleeping in your car due to

21    your financial situation.

22        A.  I didn't say that.

23        Q.  Okay.

24        A.  He saw me working one of Jessy's Limousines

25    cars.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                      92

1       Q.  Okay.  Could you go to Paragraph 41 of the

2  Complaint?  I think I'm already there.

3          THE INTERPRETER:  I'm here.

4  BY MR. ALVAREZ:

5       Q.  Okay.  So it says, "Plaintiff slept in his car

6  near the defendant's property located at 7884 Northwest

7  55th Street, Doral, Florida 33166 due to his financial

8  situation." So is that not the case?

9       A.  Who said that?

10      Q.  You did.  It's -- that's your allegation.

11      A.  I was sleep -- I wouldn't sleep in the

12  property.  I would sleep across.  I did not sleep in

13  their property.  I slept across the street.  I would --

14  I would live by Roberto Perez.  It was only because I

15  sold everything I had to make those patents.  And I

16  would work Jessy's cars.

17      Q.  So -- but at that time, you lived out of your

18  car; is that fair to say?

19      A.  Yes, until I would find some rent.

20      Q.  Okay.  And if you were evicted today, where

21  would you live?

22      A.  It's different now.  I don't really have a

23  good eyesight.  I'll tell you this, I'm trained to do

24  whatever.  But I can't see now.  I don't care to live

25  on the street because I know how to live on the street.



DENNIS ANEIROS                                     October 07, 2024
ANEIROS vs VIORMAR TRADING                                       93

 1 | I was abandoned after 2 years old by my own mother.
 2 | And I learned to survive without going and being a
 3 | delinquent.  So imagine, there's this person who
 4 | supposedly is prestigious and honorable.
 5 |        He's degraded himself based on this huge lie
 6 | that he's told just because he doesn't want to pay me
 7 | what I deserve.  It says here.  I remember him saying,
 8 | don't tell anybody, don't let anybody know that I --
 9 | that you worked for me.  And don't let anybody know you
10 | live here.
11 |     Q.  What's the document you're referring to?
12 |     A.  I'm -- I wrote it down here, so I don't forget
13 | it.  It's just a lot of things.  I'm regaining my
14 | memory, all that he would tell me constantly, the whole
15 | life I lived there.
16 |        MR. ALVAREZ:  Okay.  I think that's going to
17 | wrap up my questions.  I -- and I'm going to reserve
18 | the right to reexamine after your cross if I have to.
19 | I don't anticipate I will.  But yeah, I'm -- I'm done
20 | with my --
21 |        MR. LAROU:  Sure.
22 |               CROSS-EXAMINATION
23 | BY MR. LAROU:
24 |     Q.  Mr. Aneiros, just a couple of follow-up
25 | questions from me.  You mentioned earlier in your



DENNIS ANEIROS
ANEIROS vs VIORMAR TRADING

October 07, 2024
94

1 | deposition that during the time you were performing

2 | work for Viormar and for Orlando Fernandez on

3 | occasions, at least one occasion, Orlando would travel

4 | to Curacao; is that right?

5 |     A.   No.  I said that one would have to travel to

6 | Curacao.  Okay.  So he sent me the whole -- he did it

7 | from here.  And then he sent me the package, so that I

8 | could certify it at the post office and send it.  And

9 | that's when he tells me, don't tell anybody about what

10 | we're doing.  Because the company didn't have a

11 | property.  That's when he tells me that.

12 |     Q.  So just to make sure I'm understanding

13 | correctly, Orlando would instruct you to mail this

14 | package to Curacao?

15 |     A.   Correct.

16 |     Q.  Do you know what was in the package?

17 |     A.   No.  Well, when he would say Curacao, I knew

18 | that the company was based out of Curacao.

19 |     Q.  Understood.  So you believe that that package,

20 | which Orlando was instructing you to send to Curacao,

21 | was something related to the business of Viormar?

22 |     A.  My deductive reasoning tells me so.  Because

23 | he said not to tell anybody about it.

24 |     Q.  As part of the job duties that you were

25 | performing for Viormar or for Orlando Fernandez, were



 1  you regularly sending or receiving mail for the

 2  company?

 3       A.  Correct.

 4       Q.  How often would you send mail for Viormar or

 5  for Orlando?

 6       A.  Every 15 days, something like that.  The

 7  letters would accumulate.  They would accumulate.  He

 8  would send everything with the stickers, Denny and

 9  Orlando, and then he would buy the postage and send it

10  to me.

11           And then he told me he'd have -- I'd have to

12  pay for my own electricity, that I'd have to buy my own

13  postage.  And then -- postage and envelopes.  And I

14  didn't have the funds to buy the postage and the

15  envelope, so they would delay it a little bit.

16       Q.  How often would you receive mail for Viormar

17  or for Orlando?

18       A.  Every day.

19       Q.  Every day.  And so where would you retrieve

20  that mail from?

21       A.  You know, from washing dishes or whatever.

22  Whatever I would do.

23           MR. LAROU:  And so I don't -- I don't think

24  that answer was completely responsive to my question,

25  so I just want to see if I can ask that question in a



DENNIS ANEIROS                                     October 07, 2024
ANEIROS vs VIORMAR TRADING                              96

1  │ different way.  I'll slightly rephrase.
2  │ BY MR. LAROU:
3  │     Q.  So where would you pick up the mail from that
4  │ would arrive for Viormar or for Orlando?
5  │     A.  It will get delivered by the post office.
6  │     Q.  Delivered to where, to a mail box?
7  │     A.  The mail box at 7884 Viormar, or -- or the
8  │ postman himself would say, Denny, Denny, here is the
9  │ correspondence for Orlando Fernandez.
10 │     Q.  Okay.  And so after you would retrieve or
11 │ accept those letters or packages, either for Viormar or
12 │ for Orlando, how would you get those letters or
13 │ packages to Orlando?
14 │     A.  I would buy the stamps and the envelopes after
15 │ he stopped sending me stamps and envelopes.  I still
16 │ send him stuff.  So I would grab the letter, and then
17 │ put it in the new envelope and address it to his
18 │ address.  It's a P.O Box.  And then I will give it to
19 │ the postman.
20 │     Q.  So earlier in your deposition, you mentioned
21 │ quite a few job duties that you were performing either
22 │ for Viormar or for Orlando.  And I just want to go
23 │ through those.  Okay.  Other than -- other than
24 │ performing repairs to the building, finding new tenants
25 │ to rent out the space, general maintenance of the



1  warehouse, cleaning the warehouse and the parking lot,

2  taking out trash --

3        THE INTERPRETER:  One second.

4  BY MR. LAROU:

5     Q.  -- and also evicting tenants from a warehouse,

6  and painting the warehouse, are there any other job

7  duties that you can think of that you performed either

8  for Viormar or for Orlando?

9     A.  At night -- well, guard the property.  Every

10  time that the dog barked and I go outside, there would

11  be a man out there.

12     Q.  Okay.  And did you perform all of those job

13  duties throughout the entire time that you were living

14  on Viormar's property?

15     A.  Yes.  I still live there and I still do it.

16  Yes.  And that landscaping person he hired only comes

17  once.  But my little cart with the trash and the dust

18  bin are still there.  And daily, there's a lot of

19  debris, leaves fall off, people take out -- leave

20  trash, and they also -- water bottles and things like

21  that.  I pick up all the -- all of that, still.  I

22  still send the mail I receive.

23     Q.  Okay.  I want to talk a little bit more about

24  painting the warehouse.  What part of the warehouse did

25  you paint?



1        A.   The interior completely.

2        Q.   Okay.  Did you only paint the --

3        A.   Inside and all the exterior.

4        Q.   Okay.  So you -- you painted the inside as

5   well as the outside of the entire Viormar warehouse

6   property?

7        A.   Yes, in order to rent it out.  It was still,

8   like, concrete block.  And they said, you have to

9   paint.  They bought the paint -- the paint tanks,

10  rollers, brushes, everything.

11       Q.   Okay.  And so just to make sure, so you

12  painted the portion of the warehouse that was rented by

13  Jessy's Limousines; is that correct?

14            THE INTERPRETER:  You rented?

15            MR. ALVAREZ:  Painted.

16            THE INTERPRETER:  Painted.

17            THE WITNESS:  Yes, I painted that too.

18  BY MR. LAROU:

19       Q.   And you painted the portions of the warehouse

20  that were rented by Viormar's other commercial tenants

21  as well?

22       A.   Correct.

23       Q.   How many times have you painted Viormar's

24  warehouse?

25       A.   It's 10,000 square feet.  It's a warehouse.



 1  And it's divided, 5,000, 5,000.  Carlos de la Flor is

 2  in one of them.  When Carlos comes to -- to rent it, I

 3  brought him in with his trailer and truck.  Then they

 4  said, paint walls, doors, install the water heater.

 5            Vita Home Care Solutions used to be there, so

 6  I had to paint all of the outside.  And then -- so I

 7  had made, like, on the door of Vita, like, this huge

 8  logo, and they wanted me to remove that.

 9       Q.   Okay.  And so -- so have you painted Viormar's

10  warehouse more than one time?

11       A.   Three times.

12       Q.   Three times.  Do you remember about how long

13  ago it was that you were painting the warehouse?

14       A.   Last time, it was, like, three years.  I was

15  changing that thing that had the termites.  And so

16  there was new wood.  He brought the paint, and I had to

17  paint it again to pass the inspection from the City.

18       Q.   Got it.  So what type of tools or materials

19  did you use to paint the warehouse?

20       A.   Rollers, brushes.  And I had to put, like,

21  caulking to cover the holes.  A pressure washer machine

22  to remove the dust and dirt, all of that.  Orlando

23  would bring all that.

24       Q.   And I'm assuming you probably had to use paint

25  itself, right, to -- to paint the warehouse?



1        A.   Yeah, he would bring the paint.  He would,

2   like, remove a piece of the wall, and then he'll have

3   it matched and then bring that paint color.

4        Q.   And who would have a piece of the wall

5   removed?  Orlando?

6        A.   He would tell me to do it, to remove a piece.

7   He wouldn't do anything.

8        Q.   Got it.  So let's go through some of those

9   materials that you were using to paint the warehouse.

10  First, let's start with the rollers.  I believe you

11  stated just a moment ago that Orlando provided you with

12  those rollers.  Do you know where he got those rollers?

13       A.   He would get them at a paint company on -- he

14  would get them off 79th Street and 52nd, and the place

15  was called, America.  But that -- American Paint.  That

16  was for the government.  And -- but she's no longer

17  there.  She would prepare paint for the military and

18  stuff.  But I would recommend that place because that

19  was the one that was closest by.

20       Q.   Got it.  So you recommended Orlando to go to

21  American Paint, and Orlando would purchase those

22  materials himself for you to use; is that correct?

23       A.   True.  And the sealants for the roof, he'd buy

24  them there.

25       Q.   What about the caulking that you mentioned



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                           101

1    just a moment ago?  Do you know where that came from?

2        A.   Same place.

3        Q.   What about the pressure washers?  Do you know

4    where Orlando got those?

5        A.   It was electric.  I don't know.  I would

6    imagine Walmart or -- I don't know where he got them.

7        Q.   Do you know if he bought those pressure

8    washers or rented them?

9        A.   No, it was their pressure washer.  We got that

10   when -- he got that when Vita Home Care Solutions was

11   made to clean the floors.  We remodeled everything and

12   to paint -- do it before painting the walls.  So that

13   stayed as part of the company.

14       Q.   As part of Viormar's company?

15       A.   Yes, Viormar.

16       Q.   Do you happen to remember the brand of the

17   pressure washer you were using?

18       A.   Husky, I think it was called.

19       Q.   So you mentioned just a second ago, there was

20   an issue at the warehouse where there were cracks in

21   the structure or in the foundation of the building, and

22   that you tried to apply sealant, but it seemed like

23   that wasn't working.  There were still leaks.  Do you

24   know if Orlando or Viormar ever got those cracks fixed?

25            THE INTERPRETER:  That it -- the -- it had the



 1  cracks, but -- you started with something else.  But it

 2  was not --

 3          MR. LAROU:  Oh, but there was still water

 4  leaking through the cracks.

 5          THE WITNESS:  No, not that one.  There was

 6  a -- like, an explosion, 2017, 2018.  And I

 7  investigated what was going on.  And I investigated it,

 8  and in the back, it was, like, the wall was going to

 9  crumble.  I called him at that night.  It was, like,

10  midnight.  I said, Orlando, the back wall is going to

11  fall completely.

12          Next day, he was here.  He came.  And when --

13  and when he saw that it was falling apart, he hired a

14  big company.  And they did the whole building in the

15  back.

16  BY MR. LAROU:

17      Q.  So where -- where were those cracks that --

18  that were being fixed?  Was it in the wall of the

19  warehouse?  Was it in the roof?

20      A.  It was the back wall, sorry.  Back and lateral

21  wall.

22      Q.  Okay.

23      A.  Those walls support the roof.

24      Q.  Got it.

25      A.  But the one in the back, what's the wall that



1  he asked me to cover up or fill in the holes.

2       Q.  Okay.  So during the time that you've been

3  living and working at Viormar's warehouse, have there

4  been any contractors that have come to the property to

5  fix any kind of structural issues?

6       A.  One or another person may have come, yes.

7       Q.  Do you know how Orlando or Viormar found those

8  contractors?

9       A.  I brought the electricians.  And the

10 contractors who checked the structure, he sent them.

11 But since all of this process has began, and I think it

12 has been somewhat delayed, there have been no other

13 contractors because this process is on the way.

14      Q.  Okay.  So you said that you contacted some

15 electricians to come and perform work at Viormar's

16 warehouse.  What happened to necessitate an electrician

17 to come to Viormar's property?

18      A.  Well, he hired some electricians because we

19 had to change the meter when Carlos first came.  So

20 he -- he had to get a meter that had higher voltage,

21 like, 100 watts because of the machinery that he uses

22 to fix cars.  So they did the job.  Carlos paid for

23 that.  Water heater -- in warehouse.  So one of the

24 electricians that came disconnected the warehouse of

25 the person who says -- this famous person who says they



```
 1   can't rent out their warehouse.

 2          MR. LAROU:  Okay.  Hold on.  Just one second.

 3   I would like to put a new rule.  If you're already

 4   translating, could he pause and wait for her to finish

 5   the --

 6          THE INTERPRETER:  Yeah.

 7          MR. LAROU:  -- translation?  Because it's --

 8          THE INTERPRETER:  I'm getting a little

 9   overwhelmed.

10          MR. LAROU:  -- it's hard -- yeah.

11          THE INTERPRETER:  It's okay.

12          MR. LAROU:  It's okay.  All right.

13          THE WITNESS:  So the line that brings in the

14   electricity to that warehouse was broken.  And so it

15   stalled the process for a long time due to that.  He

16   had not used that warehouse in seven years.  He wanted

17   me to tear down the walls and the offices.  And so I

18   told him, I need you to install the electricity because

19   I need to install machines there.

20          So I got him an electrician, so that he could

21   install the electrical system once again.  He wants to

22   do everything under the table, and not everything can

23   be done under the table.  You have to get permits, you

24   have to bring qualified people as FPML demands it

25   until -- it hasn't even been six months since the new
```



 1  meter was installed.  November, December of last year

 2  was when the electricity was finally installed in that

 3  building.

 4  BY MR. LAROU:

 5      Q.  Okay.  So did Orlando -- you -- you said that

 6  you were the one responsible for bringing in those

 7  electricians.  Did Orlando instruct you to go out and

 8  find an electrician to perform that work?

 9      A.  Yes, he always tells me.

10      Q.  Okay.  Other than the electrician who

11  performed the work you just discussed, have you

12  coordinated with any other contractors or individuals

13  to come perform work at the warehouse?

14      A.  The roofers.  I look for several and they

15  would charge a lot of money.  The first one I brought

16  was charging $77,900.  And it's called Romero Roofing.

17      Q.  Okay.  And so when the roof needed work, did

18  Orlando instruct you to go out and find the roofer to

19  come perform that job, Romero Roofing?

20      A.  No.  He said it was a lot of money.  And he

21  said to wait, that he was going to get somebody.  And

22  he brought another person.

23      Q.  Okay.  Do you remember the name of the

24  electrician, either the -- the individual or the

25  company, that came and performed that electrical work



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     106

 1   at Viormar's warehouse?

 2        A.  That he brought?

 3        Q.  Yes.

 4        A.  I don't remember.  He had done that roof when

 5   his father was alive.

 6        Q.  Oh, okay.  Earlier in your deposition, you

 7   mentioned that there were sometimes issues with

 8   compliance with the City's building codes, including

 9   there being a lot of trees and an issue with the power

10   lines.  Were you responsible for trimming those trees?

11        A.  Yes, but it was dangerous because they were

12   making contact with the tree -- I'm sorry, with the

13   cable.  So the City inspector gave me 30 days, a

14   warning, to do it.

15        Q.  Got it.  So you -- you were the one that was

16   going out and trimming the trees yourself?

17        A.  No.  I told Orlando I couldn't do it because

18   there were -- of the electricity running.  He would

19   always say, make it cheap.  Like, he asked me to get a

20   company to do it.  So I looked for a company.  And then

21   I introduced it to him and then he -- he had the guys

22   do it.

23        Q.  Got it.  And do you remember the name of the

24   tree trimming company?

25        A.  I have it in an e-mail.



 1        Q.   That's okay.  If you don't remember, that's
 2   all right.  About how long ago was it that Orlando
 3   instructed you to find the tree trimming company, if
 4   you can remember?
 5        A.   End of last year.
 6        Q.   Okay.  So towards the end of 2023?
 7        A.   Yes.  Correct.
 8        Q.   Okay.  Earlier, you also mentioned that
 9   Orlando would ask you to perform work on his vehicles
10   or the vehicles of his family members.
11        A.   Correct.
12        Q.   And you mentioned that you would sometimes
13   paint cars --
14        A.   Yes.
15        Q.   -- perform oil changes, tune-ups.  Where did
16   you get the tools to do those jobs?
17        A.   Orlando would buy it.
18        Q.   Do you remember what type of tools you were
19   using?
20        A.   I did an oil change -- a motor change -- I
21   changed the engine on his son's car.  And I did -- I
22   restored the paint, that kind of paint that doesn't
23   have gloss.  Well, when we started doing it -- when I
24   started doing it, I didn't have the proper tools.
25        Q.   Okay.  So the paint that you were using to



1   paint the cars, do you know where that came from?

2        A.  So we went to buy the paint.  And what a

3   coincidence, the name of the place is also called

4   America.  It's in Hialeah, East End Hialeah.  We also

5   bought the gun there, the paint, the -- the sanding

6   devices, everything there.

7        Q.  So who -- who bought all of those materials

8   you just mentioned?

9        A.  Orlando Fernandez.

10       Q.  And he gave them to you to --

11       A.  I didn't have money for that.

12       Q.  So Orlando gave you those materials to use to

13  work on his cars and the cars of his family members?

14       A.  To do his son's car and Cristina's.

15       Q.  Did you ever change the motor oil for Orlando

16  Fernandez or any of his family members?

17       A.  Sporadically, I would do that because they

18  would go on long trips.

19       Q.  Got it.  And so who would buy the oil for you

20  to use for that oil change?

21       A.  Orlando.

22            THE INTERPRETER:  I'm going to use a restroom

23  break soon, so I don't know how much more you got.

24            MR. LAROU:  Almost -- almost done.

25            THE INTERPRETER:  Almost.  Okay.



DENNIS ANEIROS                                      October 07, 2024
ANEIROS vs VIORMAR TRADING                                      109

```
 1   BY MR. LAROU:
 2        Q.  So you mentioned performing work on the cars
 3   for Orlando, his son, his daughter.  Did you ever work
 4   on -- or yeah.  Did you -- did you ever work on
 5   Orlando's father's car?
 6        A.  Yes.  I would do his brakes and mechanical
 7   work on his car when I met him.  Because he used to
 8   take it to Roberto Perez.  But since it was too costly,
 9   and I said, I can help you with that, I can do that, I
10   could charge you less.
11        Q.  Do you remember about how long ago Orlando's
12   father passed away?
13        A.  He died, like, in 2017.
14        Q.  Okay.
15        A.  When I got very out of there.
16        Q.  Do you know what happened to Orlando's
17   father's cars after he passed away?
18        A.  They gave them to me to sell.
19        Q.  What cars -- first off, who gave you cars to
20   sell after Orlando's father passed away?
21        A.  It was only one car owned by the father, and
22   it was a Mercedes Benz E320.
23        Q.  Okay.  So did you find a buyer for that car?
24        A.  I found a man.  He lives in the Northwest.  I
25   do call it, but he doesn't answer that number.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     110

1      Q.  Okay.  So earlier you mentioned building some

2   displays for one of Orlando's companies in the

3   warehouse.  Can you describe to me the -- the displays

4   that you were building?

5      A.  Cristina buys, like, one of those bench

6   saws -- chainsaw.  They had to have, like, a portable

7   shelf of sorts because they were doing these displays.

8   It was, like, everything related to bath -- bathroom,

9   the things that hold up a bathroom.

10     Q.  Okay.  So Cristina would give you those saws

11  to construct the displays?

12     A.  Correct.  She would buy it, the saw, the

13  drills.

14     Q.  Do you remember the brand of the wood saw that

15  you were using?

16     A.  I still have it.  I still have it.  I think

17  it's called Circa.  It's not very good, but it's

18  useful.

19     Q.  Do you remember the brand of the drills you

20  were using to build those displays?

21          THE INTERPRETER:  The what?

22          MR. LAROU:  Drills.

23          MR. ALVAREZ:  Drills.

24          THE WITNESS:  Riot, could be.  I don't know

25  how to say those names.



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                     111

```
 1   BY MR. LAROU:
 2        Q.  I think it -- I think it was Ryobi.  And --
 3   and just to clarify, R-Y-O-B-I?
 4        A.  Yes.
 5        Q.  Do you know where either those -- the
 6   woodcutting saw or the drills were purchased from?
 7        A.  No.  They said at a Home Depot, Walmart.
 8   Harbor Freight, something like that.
 9        Q.  Okay.  So earlier, you mentioned that there
10   were skylights being delivered to the warehouse.  Do
11   you know what those skylights were being used for?
12        A.  When they were going to repair the roof.
13   You'd have to -- you'd have to change the ones that
14   were broken.
15        Q.  Okay.  So did you accept those packages when
16   the skylights were delivered to Viormar's warehouse?
17        A.  Yes.  Correct.  That's when he said, they
18   brought the skylights and you weren't in the warehouse,
19   where are you?
20        Q.  Do you know where the skylights came from?
21        A.  No.
22        Q.  Did you -- did you help to install the
23   skylights?
24        A.  No.  He just asked for the measurements.
25        Q.  Have you installed any other kind of fixtures,
```



DENNIS ANEIROS                                   October 07, 2024
ANEIROS vs VIORMAR TRADING                                    112

1   either inside or outside of Viormar's warehouse?

2       A.   Water heater, faucets -- water faucets.  I've

3   lost some phones, so I haven't found that text, but

4   there was a text in him asking me to do something

5   because the water consumption was too high.

6       Q.   Do you remember about how long ago you

7   installed the water heater?

8       A.   When Carlos moved into the place.

9       Q.   Do you remember about how long ago you

10  installed the water faucets in the warehouse?

11      A.   I've changed them several times because they

12  get deteriorated quickly.

13      Q.   Do you remember the last time you installed a

14  water faucet?

15      A.   Could be five years, I don't know.

16      Q.   What happens if light bulbs go out at the

17  warehouse?  Who's responsible for replacing those?

18      A.   I do.

19      Q.   How often --

20      A.   And I'm the one who says, hey, we have to buy

21  a light bulb.

22      Q.   Who do you tell that you need to buy a light

23  bulb?

24      A.   I tell Orlando.

25      Q.   So Orlando is the one that then buys those



1  light bulbs after you tell him?

2     A.  He used to buy the light bulbs.  But ever

3  since Carlos got there, he's now saying that Carlos is

4  the one that has to do it himself.  Well, but they

5  don't do it.  They're always calling me to do it.

6     Q.  Got it.  So even though Carlos is a commercial

7  tenant of Viormar, you're still the one that's

8  responsible for changing those light bulbs in his

9  portion of the rented warehouse?

10     A.  Yes.

11          THE INTERPRETER:  Do you have much more?

12  Because I really need to go to the bathroom.

13          MR. LAROU:  Like, two more questions.

14          THE INTERPRETER:  Okay.

15          MR. ALVAREZ:  Yeah, I have to change my backup

16  as well.

17          MR. LAROU:  Okay.

18          THE INTERPRETER:  Two questions.

19          MR. LAROU:  If -- if you want to -- if you

20  guys want to take a quick, like, five-minute break or

21  something.

22          THE INTERPRETER:  Well --

23          MR. LAROU:  There might be a redirect.

24          THE INTERPRETER:  No, no, no. I'm sure there

25  is.



 1              MR. ALVAREZ:  There is a redirect.

 2              THE INTERPRETER:  I know.

 3              MR. ALVAREZ:  So let's -- let's go to the

 4    bathroom.

 5              THE INTERPRETER:  Yeah.

 6              MR. LAROU:  That's totally fine.

 7              THE INTERPRETER:  Okay.  Thank you.

 8              MR. LAROU:  Yeah, yeah.

 9              THE REPORTER:  We are going off the record.

10    The time is now 3:38 p.m., Eastern Standard Time.

11              (A recess was taken.)

12              THE REPORTER:  We are back on the record.  The

13    time is now 3:45 p.m., Eastern Standard Time.

14    BY MR. LAROU:

15       Q.  Mr. Aneiros, earlier you mentioned that

16    Orlando Fernandez would instruct you to make deposits

17    of checks to an account with Ocean Bank; is that

18    correct?

19       A.  True.

20       Q.  Do you know what bank account you were

21    depositing those checks into?

22       A.  Viormar, Fersom.  Fersom.

23              MR. LAROU:  And again, I think for the record,

24    the spelling of that second company he named is

25    F-E-R-S-O-M.



```
 1            THE INTERPRETER:  Fersom.
 2   BY MR. LAROU:
 3       Q.  How would you receive those checks to deposit
 4   into Viormar's bank account?
 5       A.  He would send them to me in the envelopes with
 6   the stickers.
 7       Q.  Got it.  And so were you making those deposits
 8   into Viormar's bank account throughout the entire time
 9   you were working and living in Viormar's warehouse?
10       A.  Yes.
11       Q.  Do you know who wrote those checks or where
12   those checks came from?
13       A.  No.
14       Q.  That's okay.  Has Orlando Fernandez ever
15   threatened to kick you out of Viormar's warehouse,
16   other than, obviously, the pending eviction suit
17   against you?
18       A.  Well, if I wouldn't do the things, then, of
19   course, I'd have to get out.
20       Q.  What things do you mean?  You mean continuing
21   to work for the company or Orlando?
22       A.  What I did for the company.
23            MR. LAROU:  Okay.  Thank you.  No further
24   questions.
25                    REDIRECT EXAMINATION
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    116

1  BY MR. ALVAREZ:

2       Q.  Sorry, just wanted to make sure.  Okay.  So --

3  yeah.  You mentioned earlier, when you were being

4  questioned by your counsel, that you evicted a tenant.

5  Which tenant did you evict?

6       A.  Jessy Limo.  That's what it's called.

7       Q.  Did you provide them with notice?

8       A.  Jorge Sandina [sic].  That's the owner.

9  That's the owner of Jessy Limo.

10      Q.  Okay.  Did you provide them with notice of

11  their eviction?

12      A.  Yes.  Correct.

13      Q.  Do you have a copy of that notice?

14      A.  The notice was me tell them that they had to

15  leave.

16      Q.  Okay.  So just to confirm, you never gave them

17  written notice?

18      A.  No.

19      Q.  Okay.  You also mentioned that Viormar had

20  hired a landscaping person that would only come once a

21  week.  So any cleanup work that you did was to

22  supplement that visitation, right?

23      A.  No, I didn't say that.  What I said is that he

24  hired that company after this lawsuit was established.

25      Q.  Okay.  But after he hired them, they would



1   come once a week; is that right?

2        A.   No.   They come monthly, once a month.

3        Q.   Okay.

4        A.   I used to do that myself before.   And now,

5   I -- I still do it.

6        Q.   Why are you still doing it?

7        A.   Because there's dirt.   Because I live there.

8        Q.   Okay.

9        A.   And whether he knows it or not, I still have

10   appreciation for him, except he doesn't realize that.

11        Q.   Okay.   If you lived in a house and a tree on

12   your property was not complying with city regulations,

13   would it be your responsibility to fix that?

14        A.   The owner has to fix it.   Well, if it's my

15   house, since I'm the owner, I would have to fix it.

16   But if I'm rented there, it would be the owner who has

17   to do it.

18        Q.   Okay.   So let's -- let's speak about owners.

19   You mentioned that Orlando told Carlos that if he

20   needed the lights changed, he had to change them.   And

21   I know that, eventually, you changed them.   But Orlando

22   did originally say that it was Carlos' responsibility;

23   is that right?

24        A.   Yes, he did say that occasionally.   But Carlos

25   has -- has been there, not at the only time I've worked



 1  for Orlando.  It doesn't depend on changing a light

 2  bulb.

 3       Q.  Okay.  And if you owned a property, or you're

 4  residing in a property -- actually, let me rephrase

 5  that.  If you're residing at a property and you wanted

 6  to install a security camera, would that be your

 7  responsibility?

 8       A.  As I said, I put it there so that I could see.

 9       Q.  Okay.

10       A.  I put it to -- to be able to see if somebody

11  is in there.

12       Q.  Okay.  If you shared a home with a guest and

13  the guest needed to repair his car, but he didn't know

14  how, would they be required to pay for any repairs that

15  you made if you never entered into a contract with

16  them?

17          THE INTERPRETER:  I need that read back.

18          MR. ALVAREZ:  All right.  So --

19          THE REPORTER:  I -- I -- if -- if you -- I --

20  I have it if you -- if you --

21          MR. ALVAREZ:  Go -- go for it.

22          THE REPORTER:  Okay.  Okay.  Okay.  So if you

23  shared a home with a guest that needed to repair their

24  car and didn't know how, would you --

25          THE INTERPRETER:  Go ahead.

```
 1            THE REPORTER:  -- would you -- would you be
 2    required to pay any repairs you made without entering a
 3    contract?
 4            I apologize if I didn't get that for sure.
 5            MR. ALVAREZ:  Okay.  So yeah, that -- that's
 6    not exact.
 7            THE REPORTER:  I -- I can play it back, if
 8    you'd like.
 9            MR. ALVAREZ:  Let me just rephrase that.
10            THE REPORTER:  Sure.
11    BY MR. ALVAREZ:
12        Q.  If you shared a home with a guest and they
13    needed repairs done to their car, and you repaired that
14    car, would you be entitled to payment for the repairs
15    that you made --
16            THE INTERPRETER:  To -- to payments that --
17    would you be entitled to --
18    BY MR. ALVAREZ:
19        Q.  Would you be entitled to the -- would you be
20    entitled to payment for the repairs that you made if
21    you never entered into a contract to do those repairs?
22        A.  The -- the Bible says that the worker is
23    deemed or has rights to his pay.
24        Q.  Okay.
25        A.  God says it.
```



DENNIS ANEIROS                                    October 07, 2024
ANEIROS vs VIORMAR TRADING                                    120

1      Q.  If you were to mention to me that you were

2   trying to sell a car, and I happen to know a buyer and

3   got you into contact with them, is that enough for you

4   to be considered my employer?

5           THE INTERPRETER:  Say that again?

6           MR. LAROU:  Form.

7   BY MR. ALVAREZ:

8      Q.  That if you were to mention to me that you

9   were trying to sell a car, and I happen to know a buyer

10  and I got the two of you into contact, is that enough

11  for you to be considered my employer?

12          MR. LAROU:  Form.

13          THE WITNESS:  Well, it's not about the sale of

14  the car.  It's -- it's a whole lifetime of working.

15  Don't try to get me confused.

16  BY MR. ALVAREZ:

17     Q.  I'm not trying to get you confused.

18     A.  Well, the sale of the car had to do with them.

19  I'm trying to get rid of a car.  That's just -- or the

20  changing of a light bulb, but that -- you can't compare

21  that to working a lifetime for somebody.

22          MR. ALVAREZ:  All right.  So I -- I want to

23  ask this question, but I'm not sure if it will

24  translate correctly in Spanish.

25  BY MR. ALVAREZ:



1      Q.  So are you saying that the -- the repair of

2  the vehicle was a one-off thing?

3      A.  No.  You're telling me if I live with a

4  person -- first of all, I don't live with Orlando.

5  We're not neighbors.  We reached an agreement.  I will

6  live there and I'll do everything.  He's not my

7  neighbor.  He's not my friend.  He's my employer.

8          He said, my son's car is in this repair.  I'm

9  a mechanical engineer.  Therefore, he knew that I knew

10  how to fix that.  He said, you can fix my son's car.

11  And this is where we go back to the labor is dignified

12  or entitled to his pay.  I worked, he didn't pay me.

13      Q.  Okay.  When you repaired the vehicle, did you

14  ask for payment after the repairs?

15      A.  Of course.

16      Q.  Did -- what did you --

17      A.  So they asked me how much it is, and I could

18  kind of estimate based on their condition.  It's the

19  same thing, a fee.  Just like when you are serving

20  somebody, you charge them a fee.

21      Q.  Did you give them an invoice showing the

22  amount that you're requesting to be paid?

23      A.  No.

24      Q.  Okay.

25      A.  He was paying me by the living situation or



DENNIS ANEIROS                              October 07, 2024
ANEIROS vs VIORMAR TRADING                           122

1  roof, which is illegal.

2      Q.  Okay.  I have two last questions.  So your

3  counsel was asking you about the various tools that you

4  claim to have been provided to you by Viormar for

5  fixing up the place.  If -- if Mr. Fernandez was living

6  in Orlando, was it up to you to go out and purchase

7  those tools?

8      A.  No.

9      Q.  So how did you get the tools?

10     A.  He would live in Orlando, but he would bring

11 me those things.

12     Q.  So how often would he go from Orlando to Doral

13 to bring you tools?

14     A.  Because he didn't -- but he didn't live in

15 Orlando the whole time.

16     Q.  Okay.  So how long has he been living in

17 Orlando?

18     A.  When his father died.

19     Q.  Okay.  What year did his father die?

20     A.  Like, 2017, '18.

21     Q.  Okay.  Didn't you say that you made these

22 repairs within the past year?

23     A.  I never said that.

24     Q.  Okay.

25     A.  Are you talking about car repairs?



DENNIS ANEIROS                          October 07, 2024
ANEIROS vs VIORMAR TRADING                           123

1        Q.  I'm talking about any of the repairs that you
2   made.
3        A.  Sporadic.
4        Q.  Okay.
5        A.  Three repairs.  At the beginning, when I met
6   the father, changing the color of the building.  When
7   we did the Vita Home Care Solution, when I did that
8   logo type and all of that in the front.
9            And then the third one was when the
10  inspection -- they said there was termite and broken
11  windows.  And that's when I painted everything.  He
12  bought the paint.
13       Q.  All right.  Wait.  Who -- who bought the
14  paint?
15       A.  Orlando.
16       Q.  Okay.
17       A.  They're the ones who say, oh, I want this
18  paint.
19       Q.  All right.  Now, I want to talk about the --
20  the checks that were deposited into Ocean Bank.  Did
21  you receive receipts after making those deposits?
22       A.  Yes.  I would send everything through text.
23       Q.  Okay.  So --
24       A.  If they're there.
25           MR. ALVAREZ:  All right.  That's going to



```
 1   conclude my questioning.
 2          MR. LAROU:  No follow-ups from me.
 3          THE INTERPRETER:  All your spellings are here,
 4   if you have more questions.
 5          THE REPORTER:  Thank you.  Before I take us
 6   off the record, I just have to briefly go through
 7   transcript orders.  And I did want to ask -- oh,
 8   just -- can we -- just one moment, please.
 9          Counsel Alvarez, there were three exhibits.  I
10   just sent you an e-mail.  Did you want to retain them
11   or send them?
12          MR. ALVAREZ:  Let me see.
13          THE REPORTER:  So Defense Exhibit 1 was the
14   Sunbiz.org printout with -- for Ocean Mack's.  Defense
15   Exhibit 2 was a printout for -- the same website for
16   Doc Motors.  And Defense Exhibit 3 was Plaintiff's
17   Second Amended Complaint.
18          MR. ALVAREZ:  Yeah, that sounds right.
19          THE REPORTER:  Perfect.  Did you want to
20   retain them or send them?
21          MR. ALVAREZ:  Send them is fine.
22          THE REPORTER:  Sure.  And, Counsel, did you
23   want to place an order for a copy of the transcript?
24          MR. LAROU:  We're not going to be ordering
25   right now, no.
```



DENNIS ANEIROS                                          October 07, 2024
ANEIROS vs VIORMAR TRADING                                          125

1          THE REPORTER:  Okay.  And Counsel Alvarez?

2          MR. ALVAREZ:  Yeah, we -- we want to order.

3     Also, can I change the -- the send to retain?

4          THE REPORTER:  Sure.  Of course.  And did you

5     need that rushed, or is standard delivery okay?

6          MR. ALVAREZ:  Standard delivery is fine.

7          THE REPORTER:  Electronic?

8          MR. ALVAREZ:  Yeah.

9          THE REPORTER:  Perfect.  Thank you so much.

10         And thank you, Madam, for providing me your

11    spellings.

12         Read or waive, Counsel?

13         MR. LAROU:  We'll waive.

14         THE REPORTER:  Okay.  That's everything on my

15    end.  Counsel, may I take us off the record?

16         MR. ALVAREZ:  You may.

17         THE REPORTER:  Okay.  We are going off the

18    record.  The time is now 4:01 p.m., Eastern Standard

19    Time.

20         (The deposition concluded at 4:01 p.m.)

21

22

23

24

25



```
 1              CERTIFICATE OF DIGITAL REPORTER

 2

 3         I, Dillon Poberezhsky, a Digital Reporter and

 4    Notary Public within and for the State of Florida,

 5    do hereby certify:

 6

 7         That DENNIS ANEIROS, the witness whose

 8    examination is hereinbefore set forth, was not sworn/

 9    affirmed by me, and that said testimony was accurately

10    captured with annotations by me during the proceeding.

11

12         I further certify that I am not related to any

13    of the parties to this action by blood or marriage and

14    that I am in no way interested in the outcome of this

15    matter.

16

17         IN WITNESS THEREOF, I have hereunto set my hand

18    this 16th day of October, 2024.

19

20

21

22

23
           _____
24         Dillon Poberezhsky
           Notary Commission Florida/HH 324684
25         Commission Expires: October 23, 2026
```



800.211.DEPO (3376)
EsquireSolutions.com

**DENNIS ANEIROS**                          October 07, 2024
**ANEIROS vs VIORMAR TRADING**                          127

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3          I, Caroline Blauvelt, Legal Transcriptionist,

 4   do hereby certify:

 5          That the foregoing is a complete and true

 6   transcription of the original digital audio recording

 7   of the testimony and proceedings captured in the

 8   above-entitled matter.  As the transcriptionist, I

 9   have reviewed and transcribed the entirety of the

10   original digital audio recording of the proceeding to

11   ensure a verbatim record to the best of my ability.

12          I further certify that I am neither attorney

13   for nor a relative or employee of any of the parties

14   to the action; further, that I am not a relative or

15   employee of any attorney employed by the parties

16   hereto, nor financially or otherwise interested in the

17   outcome of this matter.

18          IN WITNESS THEREOF, I have hereunto set my

19   hand this 16th day of October, 2024.

20

21

22              Caroline Blauvelt

23         _____
                Caroline Blauvelt
24

25
```

